FILED
IN CLERKS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS 2004 OCT 25 A 9:47

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC f/k/a ) <br> LASALLE BUSINESS CREDIT, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> GARY C. GITTO, FRANK MILLER, ) <br> CHARLES N. GITTO, JR., NANCY ) <br> GITTO PANAGIOTES, JOHN D. ) <br> TERSIGNI, KATHLEEN M. CARLAND, ) <br> WILLIAM DEAKIN, JANICE CHAISSON,) <br> HELEN KOZAK, KINGSDALE CORP. ) <br> d/b/a J&J CHEMICAL DISTRIBUTORS, ) <br> and TRADEX CORPORATION, ) <br> ) <br> Defendants, ) <br> and ) <br> ) <br> FLEET NATIONAL BANK, CLINTON ) <br> SAVINGS BANK, SOVEREIGN BANK, ) <br> COMMERCE BANK & TRUST ) <br> COMPANY, FIDELITY COOPERATIVE ) <br> BANK, BANKNORTH, N.A., ) <br> FIDELITY INVESTMENTS, INC., ) <br> LEOMINSTER CREDIT UNION, and ) <br> LEHMAN BROTHERS, INC., ) <br> ) <br> Trustee Process Defendants, ) <br> ) <br> and ) <br> ) <br> FIDELITY INVESTMENTS, INC., ) <br> DIRECT WOOD & PAPER PRODUCTS, ) <br> INC., GITTO SALES CORPORATION, ) <br> J-TAN SALES & MARKETING, INC., ) <br> HEMISPHERE DISTRIBUTION ) <br> CORPORATION, LEHMAN BROTHERS, ) <br> INC., and AWG, LLC, ) <br> ) <br> Reach-and-Apply Defendants. ) | Case No. <br><br> 04 12227 DPW |

270365.1 042314-34311

# AFFIDAVIT OF MATTHEW STILWELL

Matthew Stilwell, being duly sworn on oath, states and affirms the following facts in support of the Complaint of Plaintiff, LaSalle Business Credit LLC f/k/a LaSalle Business Credit, Inc. ("LaSalle"):

1. Affiant is a Vice President and Regional Audit Manager of LaSalle and has authority to make this affidavit on its behalf.

2. Affiant is a keeper of the books and records of LaSalle, which books and records are made and maintained in the ordinary course of business of LaSalle. Those books and records include the loans made by LaSalle to Gitto Global Corporation ("Gitto Global").

3. If sworn as a witness, Affiant could competently testify to the facts stated herein.

**LaSalle Loan**

4. Gitto Global, based in Lunenburg, Massachusetts, was organized in 1991 and is a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, styrenic and thermoplastic olefin compounds that conform to strict industry guidelines. Gitto Global's product is used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems. Gitto Global is owned by Frank Miller, Gary Gitto and Nancy Gitto Panagiotes.

5. On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan not to exceed $27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's Eligible Accounts, as defined, and 65% of the lower cost or market value of Gitto Global's Eligible Inventory, as defined, or $6,000,000, whichever was less ("LaSalle revolving loan"). Eligible Accounts was defined, inter alia, under the Loan and Security Agreement to be "genuine", to arise from the

performance of services by Gitto Global and evidenced by an invoice that was due and payable within 30 days and not less than 90 days past due. Eligible Inventory was defined, <u>inter alia</u>, as being owned by Gitto Global, located at one of its premises and held for sale. In addition, LaSalle agreed to make a term loan to Gitto Global in the original principal amount of $3,000,000 ("LaSalle term loan"). A true and correct copy of the Loan and Security Agreement is attached is attached to the Complaint filed (or to be filed) as captioned above ("Complaint") as <u>Exhibit A</u>.

6. The Loan and Security Agreement provided that Gitto Global shall deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan, accompanied by Gitto Global's sales, cash receipts and credit memo journals.

7. As part of the Loan and Security Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, which is attached to the Complaint as <u>Exhibit B</u> and a Term Note in the original principal sum of $3,000,000, which is attached to the Complaint as <u>Exhibit C</u>.

8. In consideration of the credit being extended by LaSalle to Gitto Global, Gary Gitto executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, which is attached to the Complaint as <u>Exhibit D</u>.

9. In consideration of the credit being extended by LaSalle to Gitto Global, Frank Miller executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, which is attached to the Complaint as <u>Exhibit E</u>.

10. Pursuant to the terms of the Loan and Security Agreement, Gitto Global was required to enter into a blocked account agreement with LaSalle and Gitto Global's depository bank in order to perfect LaSalle's security interest in Gitto Global's deposit accounts.

11. On or about July 25, 2002, Gitto Global, LaSalle and Fleet National Bank ("Fleet") entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account Agreement").

12. Under the terms of the Blocked Account Agreement, Gitto Global established a deposit account bearing account number 9429271277 at Fleet ("Fleet Blocked Account").

13. The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account. Also on a daily basis, Fleet was to deposit the available funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan.

14. On September 24, 2004, Gitto Global filed bankruptcy.

15. As of October 13, 2004, there is due and owing (a) under the LaSalle revolving loan, principal of $18,803,353.61, interest of $34,062.77 and interest continues to accrue at the per diem rate of $2,611.58, (b) under the LaSalle term loan, principal of $833,333.42, interest of $1,984.39 and interest continues to accrue at the per diem rate of $156.25 and (c) overdraft of $11,890,588.

**Check Kite Scheme**

16. Beginning in July of 2002 and continuing through September of 2004, Gitto Global deposited numerous checks into the Fleet Blocked Account, on a daily basis, that it purportedly received as payment of invoices for goods sold.

17. Unbeknownst to LaSalle, the vast majority of these checks were drawn from J&J Chemical's account at Clinton Savings Bank ("Clinton Bank") and bore the signature of John Tersigni, copies of some of the checks bearing his signature are attached to the Complaint as Exhibit F. These checks were prepared by Janice Chaisson at the request of Frank Miller, Helen Kozak or William Deakin. Between July of 2002 and September of 2004, over 600 J&J Chemical checks were issued. A summary of those checks is attached to the Complaint as Exhibit G.

18. Fleet, on a daily basis, without waiting until the funds from the checks were cleared, transferred the funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle ("LaSalle Account"), which LaSalle applied to pay down the LaSalle revolving loan.

19. As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global.

20. Each day, based on a daily borrowing base certificate, Frank Miller or Janice Chaisson requested an advance on the LaSalle revolving loan for Gitto Global. LaSalle advanced additional funds on the LaSalle revolving loan, relying on (a) the funds transferred from the Fleet Blocked Account and (b) the representations in the daily borrowing base certificates.

21. From the LaSalle Account, a Gitto Global employee, Rita Bartlett, at the direction of Frank Miller, Helen Kozak or William Deakin, prepared Gitto Global checks payable to J&J Chemical between July 2002 and August 2004 totaling over $34 million, which were deposited at Clinton Bank. A summary of these checks is attached to the Complaint as Exhibit H.

22. Between September 13-17, 2004, Janice Chaisson, at the direction of Helen Kozak, Frank Miller or William Deakin, deposited into the Fleet Blocked Account over $12 million in additional checks from J&J Chemical drawn on Clinton Bank made payable to Gitto Global. Fleet wired those funds to LaSalle in three separate wire transfers.

23. LaSalle advanced approximately $4 million dollars in response to Gitto Global's request for advance and in reliance on these deposits.

24. Subsequently, Fleet returned checks totaling $11,890,588 for insufficient funds that had been returned by Clinton Bank, resulting in an overdraft in the Fleet Blocked Account. A copy of the returned checks are attached to the Complaint as Exhibit I.

**False Borrowing Base Certificates**

25. In order to receive advances of funds pursuant to the Loan and Security Agreement, Frank Miller or Janice Chaisson, on behalf of Gitto Global, delivered daily borrowing base certificates to LaSalle, together with Gitto Global's sales, cash receipts, credit memo journals, and inventory valuation. Each of these daily borrowing base certificates represented and warranted above the signature line as follows:

> The undersigned hereby represents and warrants to LaSalle Business Credit, LLC that the information set forth herein is true and correct as of the date made, that any Accounts Receivable or Inventory classified as "Eligible Accounts" or "Eligible Inventory" conform in all respects to the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth in the Loan and Security Agreement (or similar agreement) entered into by and between LaSalle Business Credit, LLC and the undersigned, as amended, modified or supplemented from time to time).

26. From July 25, 2002 to January 16, 2004, daily borrowing base certificates bearing Frank Miller's name were delivered nightly by Gitto Global to LaSalle, with the detailed supporting documents. Copies of the first and last borrowing base certificates bearing Frank Miller's name are attached to the Complaint as Exhibits J and K.

270055.2 042314-34311

27. From January 17, 2004 to September 15, 2004, Janice Chaisson would e-mail the daily borrowing base certificates to LaSalle. Copies of the first and last borrowing base certificates sent via e-mail from Janice Chaisson are attached to the Complaint as <u>Exhibits L and M</u>.

### (i) The Fictitious Customers

28. The borrowing base certificates were mostly comprised of fictitious sales to Color Compounds & Consultants, Inc. ("CCC"), Hemisphere, Hitachi Cable, Inc. ("Hitachi"), J-Tan, Velco Chemicals, Inc. ("Velco"), and Zebulon Industries, Inc. ("Zebulon").

29. CCC is a corporation doing business in New Hampshire, but was not a customer of Gitto Global. Rather, it was a supplier of raw materials. None of the checks from CCC to Gitto Global were ever cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

30. Hemisphere is a fictitious customer. It is a corporation set up by Frank Miller, Kathleen Carland, Louis J. Pellegrine, Jr. ("Louis Pellegrine") and others. Hemisphere was run out of Kathleen Carland's home. None of the checks from Hemisphere to Gitto Global were ever cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

31. Zebulon is a fictitious customer purportedly located in New Jersey. The fictitious checks of Zebulon showed the same bank account as on the Velco checks. None of the checks from Zebulon to Gitto Global were ever cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

32. Velco is a fictitious customer purportedly located in New York. None of the checks from Velco to Gitto Global were ever cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

270055.2 042314-34311

33. Hitachi is a company located in New Hampshire. The majority of sales to Hitachi were supported by invoices and bills of lading which were incomplete and usually unsigned. The checks were not cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

34. J-Tan is a fictitious customer purportedly located in Massachusetts. J-Tan is owned by John Tersigni, who appears as a signatory on J&J Chemical checks and who received payments from Gitto Global purportedly for "consulting service". Further, J-Tan received funds from Gary Gitto and operates under the direction of Gary Gitto.

   (ii)  **The False Statements**

35. On or about July 25, 2002, Frank Miller provided the first borrowing base certificate to LaSalle. (Exhibit J herein)

   (iii) **Sales Misrepresentations**

36. The first Certificate represented Gitto Global's sales to be $400,054.47. Within those figures, Frank Miller included fictitious invoices evidencing sales that did not exist and fictitious checks made out to Gitto Global that were never cashed. In addition, Frank Miller included payments made to Gitto Global from J&J Chemical.

   (a) Frank Miller represented that Zebulon made payments totaling $362,750.25 for goods sold. However, Zebulon did not make those payments to Gitto Global.

   (b) Frank Miller represented that Velco purchased $133,292.65 in goods. However, Velco did not so purchase.

   (c) Frank Miller represented that Hemisphere purchased $206,940.40 in goods. However, Hemisphere did not so purchase.

37. After the first borrowing base certificate, Frank Miller and Janice Chaisson made similar misrepresentations, with respect to Gitto Global's sales, collections and invoices, the magnitude of which only increased, in each subsequent Certificate from July 26, 2002 through

September 15, 2004. LaSalle relied on the representations in the borrowing base certificates to make loan advances under the Loan and Security Agreement.

38. Gitto Global's monthly deposits of the purported sales proceeds from J&J Chemical and the funds advanced by LaSalle to Gitto Global based upon those monthly deposits and borrowing base certificates were as follows:

| Month | Deposits | Advances |
|---|---|---|
| July – 02 | $ 2,206,314 | $ 31,676,094 |
| August – 02 | $ 8,058,446 | $ 7,830,571 |
| September – 02 | $ 6,906,243 | $ 6,853,652 |
| October – 02 | $ 11,911,623 | $ 11,676,236 |
| November – 02 | $ 11,076,928 | $ 10,921,079 |
| December – 02 | $ 10,825,588 | $ 10,469,837 |
| January - 03 | $ 11,307,584 | $ 11,076,445 |
| February – 03 | $ 13,428,035 | $ 13,370,847 |
| March – 03 | $ 17,989,492 | $ 17,051,892 |
| April – 03 | $ 16,861,179 | $ 16,682,760 |
| May – 03 | $ 17,315,021 | $ 17,575,707 |
| June – 03 | $ 21,454,438 | $ 21,352,037 |
| July – 03 | $ 26,243,609 | $ 24,893,301 |
| August – 03 | $ 31,548,658 | $ 32,463,644 |
| September – 03 | $ 39,132,440 | $ 38,793,490 |
| October – 03 | $ 56,432,129 | $ 55,831,065 |
| November – 03 | $ 50,144,000 | $ 50,425,294 |
| December – 03 | $ 63,338,487 | $ 62,982,818 |
| January – 04 | $ 62,414,067 | $ 62,408,403 |
| February – 04 | $ 64,349,419 | $ 64,156,518 |
| March – 04 | $ 84,177,796 | $ 83,702,822 |
| April – 04 | $ 87,493,856 | $ 87,445,682 |
| May – 04 | $ 74,263,805 | $ 74,069,272 |
| June – 04 | $ 91,703,488 | $ 91,553,653 |
| July – 04 | $ 91,966,853 | $ 91,590,499 |
| August – 04 | $ 90,761,602 | $ 90,829,260 |
| September 15, 2004 | $ 41,190,439 | $ 37,152,378 |
| | | |
| Total | $ 1,104,501,539 | $ 1,124,835,256 |

270055.2 042314-34311

39.     Janice Chaisson kept two sets of books to keep track of the real corporate activity versus the fictitious activity. An example of the real Accounts Receivable Aging Detail is attached to the Complaint as Exhibit N. An example of the fictitious Accounts Receivable Aging Detail is attached to the Complaint as Exhibit O. A summary of the fictitious sales and collections, and the actual sales and collections are as follows:

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| July - 02 | $ 1,278,810 | $ 78,810 | $ 2,206,314 | $ 206,314 |
| August - 02 | $ 8,815,527 | $ 3,619,632 | $ 8,058,446 | $ 2,862,550 |
| September - 02 | $ 6,552,837 | $ 2,678,900 | $ 6,906,243 | $ 3,032,307 |
| October - 02 | $ 12,557,440 | $ 1,826,091 | $ 11,911,623 | $ 1,160,274 |
| November - 02 | $ 11,206,090 | $ 4,940,552 | $ 11,076,928 | $ 4,811,390 |
| December - 02 | $ 10,621,281 | $ 3,217,464 | $ 10,825,588 | $ 3,421,770 |
| January - 03 | $ 11,285,811 | $ 2,912,933 | $ 11,307,584 | $ 2,934,706 |
| February - 03 | $ 13,767,617 | $ 1,639,129 | $ 13,428,035 | $ 1,299,546 |
| March - 03 | $ 17,111,121 | $ 4,333,268 | $ 17,989,492 | $ 5,211,639 |
| April - 03 | $ 16,393,943 | $ 2,129,290 | $ 16,861,179 | $ 2,596,526 |
| May - 03 | $ 17,676,634 | $ 3,503,422 | $ 17,315,021 | $ 3,141,809 |
| June - 03 | $ 21,337,796 | $ 4,204,053 | $ 21,454,438 | $ 4,320,695 |
| July - 03 | $ 25,902,881 | $ (486,000) | $ 26,243,609 | $ (145,272) |
| August - 03 | $ 31,725,765 | $ 1,957,613 | $ 31,548,658 | $ 1,780,506 |
| September - 03 | $ 38,077,352 | $ 1,033,873 | $ 39,132,440 | $ 2,088,961 |
| October - 03 | $ 55,968,861 | $ 5,918,637 | $ 56,432,129 | $ 6,381,904 |
| November - 03 | $ 50,994,495 | $ 5,811,804 | $ 50,144,000 | $ 4,961,309 |
| December - 03 | $ 63,380,646 | $ 380,646 | $ 63,338,487 | $ 338,487 |
| January – 04 | $ 62,723,884 | $ 3,210,133 | $ 62,414,067 | $ 2,900,316 |
| February - 04 | $ 63,745,043 | $ (302,115) | $ 64,349,419 | $ 302,261 |
| March - 04 | $ 83,804,496 | $ 2,811,831 | $ 84,177,796 | $ 3,185,132 |
| April - 04 | $ 86,088,250 | $ 3,500,669 | $ 87,493,856 | $ 4,906,274 |
| May - 04 | $ 74,422,760 | $ 2,698,662 | $ 74,263,805 | $ 2,539,708 |
| June - 04 | $ 91,495,847 | $ 3,215,151 | $ 91,703,488 | $ 3,422,792 |
| July - 04 | $ 92,079,534 | $ 3,220,424 | $ 91,966,853 | $ 3,107,743 |
| August - 04 | $ 90,819,019 | $ 4,205,334 | $ 90,761,602 | $ 4,147,917 |
| September 15, 2004 | $ 41,370,938 | $ 1,437,823 | $ 41,190,439 | $ 1,257,324 |
| Total | $ 1,101,204,678 | $ 73,698,029 | $ 1,104,501,539 | $ 76,174,888 |

270055.2 042314-34311

### (iv) Inventory Misrepresentations

40. In or around the summer of 2003, Gitto Global acquired inventory from Vitrolite. Gitto Global valued this inventory at $5.25/lb. In reality, the Vitrolite inventory was worth only approximately $.30/lb. By overvaluing this inventory in the borrowing base certificates after the summer of 2003, Frank Miller and Janice Chaisson inflated the value of Gitto Global's collateral in an attempt to borrow additional funds from LaSalle. Frank Miller and Janice Chaisson carried this inflated value of the Vitrolite inventory forward, without correcting it in subsequent days and months.

41. LaSalle relied upon the inventory valuation in the borrowing base certificates to advance funds under the LaSalle revolving loan.

42. Gitto Global obtained loan advances under false pretenses and transferred those fraudulently obtained funds to the following persons or entities (at the very least for 2003-2004):

 (a) Gary Gitto: Unaccounted for disbursements of $459,358.43 and interest payments of $2,888.88 directly and disbursements totaling $1,708,684.47 through a fictitious entity known as Equitech Technologies;

 (b) Tradex: Interest payments of $230,090, prepaid rent of $217,061, consulting fees of $34,000 and unaccounted for disbursements of $134,546;

 (c) Charles Gitto: Interest payments of $10,000, consulting fees of $44,300 and unaccounted for disbursements of $320,948;

 (d) Frank Miller: Interest payments of $3,733 and unaccounted for disbursements of $683,696; and

 (e) Nancy Gitto Panagiotes: Interest payments of $37,623.

**False Audit Information**

43. Between July of 2002 and July of 2004, LaSalle conducted five field examinations and one audit. In connection with and at each audit and examination, at Gary Gitto's and Frank Miller's direction, Helen Kozak, William Deakin, and Janice Chaisson, and

- 11 -

Frank Miller misrepresented Gitto Global's sales, accounts receivable, collections and general financial condition to LaSalle.

44. On July 23-26, 2002, in connection with making the loans to Gitto Global, LaSalle, by Alyssa Whelpley, field examiner, conducted a field examination of Gitto Global's financial condition.

45. As part of the July 2002 field examination, the examiner requested telephone verifications of Gitto Global's accounts receivable balance and on July 25, 2002, William Deakin represented to the examiner that he called the top seven customers of Gitto Global, including Hitachi, Zebulon, J-Tan, Velco, and CCC; however, the examiner was not on the telephone with William Deakin. William Deakin represented to the examiner that the people with whom he spoke verified the accounts receivable balance. William Deakin did not call those top seven customers – he misrepresented his actions to the examiner to further the check-kiting and fraud schemes.

46. At the direction of Gary Gitto, Frank Miller, and William Deakin, on or about July 25, 2002, Louis Pellegrine, Gitto Global's accountant, sent to LaSalle by facsimile the following letters from Hitachi and Zebulon purportedly confirming the accounts receivable balances due to Gitto Global.

    (a) On or around July 11, 2002, Zebulon confirmed that the balance due to Gitto Global as of June 30, 2002 was $2,960,058.40. That balance was false. A copy of this confirmation is attached to the Complaint as <u>Exhibit P</u>; and

    (b) On or around July 11, 2002, Hitachi confirmed that the balance due to Gitto Global as of June 30, 2002 was $4,440,999.21. That balance was false. A copy of this confirmation is attached to the Complaint as <u>Exhibit Q</u>.

47. LaSalle relied upon the representations made during the field examination to begin its lending relationship with Gitto Global.

48.     On November 11-15, 2002, LaSalle conducted a field examination of Gitto Global.

49.     As part of the audit, LaSalle requested to "test" invoices by examining the purchase records of specific product and to "test" the cash applications by reviewing checks, bank statements and cash reconciliation for certain sales.

50.     Frank Miller, Helen Kozak and William Deakin maintained a room at Gitto Global, upstairs and away from the regular business operations, which they called the "Secret Garden."

51.     In the Secret Garden, Frank Miller, Helen Kozak and William Deakin kept blank checks purportedly from the accounts of Zebulon, Velco, Hemisphere, CCC, Hitachi and J-Tan; blank invoices; and blank bills of lading. A copy of the blank checks of Zebulon, Velco and Hemisphere are attached to the Complaint as Exhibit R. From these blank checks, blank invoices and blank bills of lading, Frank Miller, Helen Kozak, William Deakin and Janice Chaisson would create fictitious checks, invoices and bills of lading to support the fictitious sales.

52.     As part of the November 2002 field examination, Frank Miller and William Deakin, and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, John Helldorfer, that Velco, Zebulon, J-Tan, Hitachi, Hemisphere and CCC were Gitto Global's largest customers, representing over 69% of its business. To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

53.     On April 14-17, 2003, LaSalle conducted a field examination of Gitto Global.

270055.2 042314-34311

54. As part of the April 2003 field examination, Frank Miller and William Deakin and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, George Blyth, that Velco, Zebulon, J-Tan, Hemisphere, Hitachi and CCC were Gitto Global's largest customers, representing over 78% of its business. To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

55. On August 19-22, 2003, LaSalle conducted a field examination of Gitto Global.

56. As part of the August 2003 field examination, Frank Miller and William Deakin and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, Emerson Nobbee, that Hitachi, Velco, Hemisphere, Zebulon and CCC were Gitto Global's largest customers, representing over 60% of its business. To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

57. In or around January of 2004, Frank Miller purportedly sent requests for confirmation of accounts receivable to CCC, Zebulon, Hemisphere, Hitachi, and J-Tan by mail using the United States Postal Service. Louis Pellegrine received by mail using the United States Postal Service the following confirmation letters, which he delivered to LaSalle, via facsimile, in connection with its upcoming February 2004 field examination:

   (a) On or around January 27, 2004, CCC confirmed that the balance due to Gitto Global as of December 31, 2003 was $2,537,868.53. That balance was false. A copy of this confirmation is attached to the Complaint as Exhibit S.

   (b) On or around January 20, 2004, Steve Johnson, on behalf of Zebulon, confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,167,545.55. That balance was false. A copy of this confirmation is attached to the Complaint as Exhibit T.

270055.2 042314-34311

(c) On or around February 3, 2004, Kathleen Carland, on behalf of Hemisphere, confirmed that the balance due to Gitto Global as of December 31, 2003 was $2,415,032.35. That balance was false. A copy of this confirmation is attached to the Complaint as <u>Exhibit U.</u>

(d) On or around January 27, 2004, Hitachi confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,113,012.26. That balance was false. A copy of this confirmation is attached to the Complaint as <u>Exhibit V.</u>

(e) On or around January 23, 2004, John Tersigni, on behalf of J-Tan, confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,115,811.10. That balance was false. A copy of this confirmation is attached to the Complaint as <u>Exhibit W.</u>

58. Kathleen Carland and John Tersigni knew that the purpose of the audit was to provide financial information on which LaSalle could rely upon in making its examination.

59. In February of 2004, LaSalle conducted a field examination of Gitto Global.

60. As part of the February 2004 field examination, Frank Miller and William Deakin, and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, Emerson Nobbee, that Velco, Zebulon, Hitachi, Hemisphere, J-Tan and CCC were Gitto Global's largest customers, representing over 75% of its business. To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review the confirmation letters described above, and fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

61. In July, 2004, LaSalle conducted an audit of Gitto Global.

62. As a part of the July audit, LaSalle tested 30 invoices to examine the shipping (invoicing) of products. Frank Miller gave to LaSalle's examiner, David Sweeney, fictitious invoices of CCC, Hitachi, J-Tan, Velco and Zebulon that were created in the Secret Garden. LaSalle also examined cash applications by reviewing checks, bank statements and cash reconciliations. In addition, Frank Miller gave to LaSalle's examiner for review fictitious checks

270055.2 042314-34311

issued by CCC, Hitachi, J-Tan, Velco, Zebulon, and Hemisphere that were created in the Secret Garden, none of which were cashed by Gitto Global.

63. LaSalle relied upon each of these representations made during the audit and field examinations to continue its lending relationship with Gitto Global.

64. There is a substantial likelihood and reasonable expectation that LaSalle will be awarded judgment against the defendants, exclusive of all costs, in excess of $30,000,000 or at least one-third thereof.

65. Affiant is aware of no liability insurance coverage available to any of the above-named defendants to satisfy a judgment against them in this action.

66. Upon information and belief, there exists an immediate risk that the defendants will liquidate or dispose of their assets, and thereby be unable to satisfy a judgment to be obtained by LaSalle.

67. There is an immediate danger that the defendants will dissipate the credits to be attached on trustee process.

68. LaSalle will suffer substantial and irreparable harm if it is not granted the relief requested in the Complaint and in the motions filed therewith because Affiant knows of no other assets of the defendants from which the ultimate judgment can be satisfied.

**FURTHER AFFIANT SAYETH NOT.**

_____
Matthew Stilwell

Subscribed and sworn to before me
this 21st day of October, 2004.

_____
Notary Public

My commission expires:

NOTARIAL SEAL
ANNE L. GROMBALL, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 30, 2006

270055.2 042314-34311