## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC f/k/a )
LASALLE BUSINESS CREDIT, INC.,　　)
　　　　　　　　　　　　　　　　 )
　　　　　　　　Plaintiff,　　　　 )
　　　v.　　　　　　　　　　　　　 )　　Case No. 04-12227-DPW
　　　　　　　　　　　　　　　　 )
GARY C. GITTO, et al.,　　　　　　 )
　　　　　　　　　　　　　　　　 )
　　　　　　　　Defendants,　　　　 )
　　　and　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　 )
FLEET NATIONAL BANK, et al.,　　　 )
　　　　　　　　　　　　　　　　 )
　　　Trustee Process Defendants,　 )
　　　　　　　　　　　　　　　　 )
　　　and　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　 )
FIDELITY INVESTMENTS, INC., et al., )
　　　　　　　　　　　　　　　　 )
　　　Reach-and-Apply Defendants.　 )

## PLAINTIFF'S PRE-HEARING MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff, LaSalle Business Credit, LLC ("LaSalle"), for its Pre-Hearing Memorandum in

further support of its motion for preliminary injunction against defendants Gary C. Gitto ("Gary

Gitto"), Frank Miller, Charles N. Gitto, Jr. ("Charles Gitto"), John D. Tersigni ("John Tersigni"),

Kathleen M. Carland ("Kathleen Carland"), William Deakin, Janice Chaisson, Helen Kozak,

Kingsdale Corp. d/b/a J&J Chemical Distributors ("J&J Chemical"), and Tradex Corporation

("Tradex") (collectively "Defendants").

## I.
## INTRODUCTION

Defendants defrauded LaSalle for over $30 million through a sophisticated scheme in

which Gitto Global Corporation ("Gitto Global") was portrayed as a successful, credit-worthy

business in false borrowing base certificates based upon an elaborate check-kite scheme, inflated inventory reports and fraudulent accounts receivable records created for Gitto Global. Defendants in carrying out their scheme created fictitious documents, checks from phony companies and sales records for non-existent customers to justify the loan amounts Gitto Global obtained from LaSalle.

When Defendants' scheme began to unravel, certain Defendants removed corporate documents from Gitto Global in an effort to cover up their wrongdoing and to hide the trail for the funds they had obtained from Gitto Global. LaSalle has identified nine individuals as participants in the scheme and named them as Defendants[1]. Three of those individuals, John Tersigni, Janice Chaisson (through admissions to Matthew Stilwell of LaSalle), and William Deakin[2] have admitted their roles in the scheme. Other than John Tersigni and Nancy Gitto Panagiotes, all of the Defendants have invoked the Fifth Amendment. LaSalle is entitled to the preliminary injunction it is seeking to preclude Defendants from further dissipating or hiding the money and other assets they obtained through their fraudulent conduct.

## II.
## FACTS

On or about July 25, 2002, LaSalle and Gitto Global entered into a loan and security agreement (the "Loan Agreement") wherein LaSalle made a revolving loan not to exceed $27,000,000, and a term loan of $3,000,000 to Gitto Global. (Stilwell Aff.,¶3) Pursuant to the terms of the Loan Agreement, Gitto Global, LaSalle and Fleet National Bank ("Fleet") entered into a Three-Party Blocked Account Service Agreement, under which Gitto Global established a

---

[1] The injunction against Nancy Gitto Panagiotes was voluntarily vacated without prejudice, but she remains a defendant in the action.

[2] William Deakin's admission was made in an interview with James Ring and Craig Jalbert. the investigator and accountant, respectively, retained by the Bankruptcy Examiner for Gitto Global. LaSalle intends to subpoena Mr. Jalbert to testify as to the statement of William Deakin, but understands that the Bankruptcy Examiner may oppose the subpoena.

deposit account at Fleet. On a daily basis, Gitto Global was to deposit the payments it received from its customers directly into the Fleet Blocked Account. Fleet was to then deposit the available funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan. This permitted the disbursement of new loan funds to Gitto Global. (Stilwell Aff.,¶19) Gitto Global sent borrowing base certificates setting out its financial status to LaSalle on a daily basis to obtain such additional funds.

The Gitto Global borrowing base certificates submitted to LaSalle showed a steady increase in Gitto Global's sales (from $400,054.47 in June, 2002 to $4,098,570.80 in June, 2004) and raw material inventory (from $2,958,954.18 in June, 2002 to $7,000,806.73 in June of 2004). (See Stilwell App. Ex.[3] L and O) LaSalle reasonably relied upon these and other representations contained in the borrowing base certificates and advanced additional funds to Gitto Global. (Stilwell Aff., ¶¶23, 24)

The information contained on the borrowing base certificates was false. The inventory values were grossly overstated (Merchant Aff.,¶¶5-7; Stilwell Aff., ¶23) and a majority of the sales were fictitious (Bartlett Aff.,¶7; Stilwell Aff.,¶6)

Defendants used three schemes to inflate the value of Gitto Global's inventory. One, the labels on the packaging would be changed to indicate different, more valuable inventory than what was in the package. Two, inventory levels would be increased or the price per pound of the inventory would be changed in the computer. Three, legitimate inventory from major chemical suppliers was not recorded in the computer system as an account payable. (Merchant Aff., ¶¶5-7; Bartlett Aff., ¶6; Minardi Aff., ¶¶4-5)

---

[3] "Stilwell App. Ex." as used herein refers to the Appendix of Documents to Affidavit of Matthew Stilwell.

277246.3 042314-34311

As to the ever-increasing sales reported in the borrowing base certificates, this was achieved through the use of a multi-million dollar check-kite. The Defendants' check-kiting scheme operated as follows. Gitto Global deposited into the Fleet Blocked Account checks drawn on a purported customer, J&J Chemical. Before those J&J Chemical checks cleared, the funds were swept into the LaSalle controlled disbursement account to pay down the revolving loan, thus making more loan funds available to Gitto Global. Gitto Global submitted a borrowing base certificate to LaSalle requesting additional funds. Based upon the pay down of the revolving loan and the representations in the borrowing base certificate, LaSalle advanced funds to Gitto Global. (Stilwell Aff., ¶¶22-24)

To cover the J&J Chemical checks, the Defendants deposited checks from Gitto Global's account at LaSalle to the J&J Chemical account at Clinton Bank. Before Gitto Global's LaSalle account checks cleared, Defendants started another round by depositing J&J Chemical checks into the Fleet Blocked Account and the kite continued, with millions of dollars floating between the accounts generated by paper. Funds from the J&J Chemical check-kite were used as payments from nonexistent companies for whom Defendants had created false sales records. To give credence to the checks issued to J&J Chemical, Defendants created a second set of records when audits by LaSalle occurred fictitious checks, invoices, bills of lading were created and shown to LaSalle. The second set of receivable records dramatically inflated the company's sales. (Stilwell Aff., ¶25)

Defendants siphoned money out for themselves through purported interest payments, consulting fees, prepaid rent payments, and undisclosed disbursements. (Stilwell Aff., ¶18)

Each of the Defendants played a critical role in the execution of the fraud.

- 4 -

## A.    GARY GITTO

### 1.    Gary Gitto Controlled Gitto Global.

Gary Gitto controlled company information and the issuance of checks from Gitto Global and Tradex Corporation. (J45-45, 56, 62, 75 and 76)  Since 1998, Gary Gitto controlled payments to third parties and payments for personal bills. (J70, 75)  For instance, in 1999, Gary Gitto demanded that no checks be issued during his absence. (J72)  He tried to countermand his father, Charles, in June 2003, from reviewing and paying invoices. (J73)

Gary Gitto facilitated the check kite by transferring money to J&J Chemical's account at Clinton Bank in 2002 and in 2004, by pledging $500,000 and later providing an unlimited guaranty. (Testimony of Michael Tenaglia and Robert Paulhus of Clinton Bank)

Gary Gitto knew that Gitto Global had no current profits/loss statements, had no current financial statements and had not filed income tax returns for 2002 or 2003. (J55)  He was in charge of outside sales at Gitto Global and he received the production reports. (DeLisle Aff., ¶2; Merchant Aff., ¶3)  He also knew that false accounts receivable reports were being given to third parties. (Snyder Aff., ¶5, Ex. A)

### 2.    Gary Gitto Benefited from the Scheme.

Gary Gitto directed Helen Kozak to have payments issued to him. (J31-35, 37-40, 42-43, 47-48, 52-53, 57-58, 60, 68)  Gary Gitto controlled the amount of the checks and the date on which he or Helen Kozak would deposit them. (Id.)  Payments to Gary Gitto were sometimes made to Equitech Technologies ("Equitech"), one of his companies. (Bartlett Aff., ¶5)  Gary Gitto knew that these payments had to be coordinated with LaSalle's line of credit. (J50)  He also knew that these payments were being made when Gitto Global had no available funds. (J61, 66-67)  In 2003-2004 alone, Gary Gitto received $2,170,931.78. (Stilwell Aff., ¶15, App. Ex. H)

Gary Gitto directed that certain, non-business-related expenses be paid by Gitto Global on his behalf, including payments for his house, his personal credit cards, personal items on company credit cards, his personal boat and to pay Nancy Gitto Panagiotes, his sister. (Barlett Aff., ¶5; J51, 54) Gary Gitto knew this practice was improper when he sought out customers who would be "willing to write letters confirming that they have been on your [i.e., his] boat for business meetings." (J49)

Gary Gitto knew that Clinton Bank was extending credit to Kingsdale on uncollected funds and that Gitto Global needed this practice to continue so that the check kiting scheme did not end. In 2002, he transferred funds to the J&J Chemical account to insure that the check-kite scheme could continue when Clinton Bank refused to extend credit for uncollected funds. (Testimony of Michael Tenaglia, Clinton Bank) As Frank Miller told Gary Gitto, "the vice president of Clinton Savings called me last night at 9:00 p.m. He is getting real nervous. . . . your money and my money are going to be at risk soon." (J65) That risk was the result of Gary Gitto granting to Clinton Bank an unlimited guarantee and pledging $500,000 to secure J&J Chemical's $8.4 million obligation to Clinton Bank for extending credit on uncollected funds. (J65; Testimony of Paulhus)

### 3.    Gary Gitto Tried to Conceal the Scheme.

Gary knew the fraud that was being perpetrated and tried to conceal it. In 2000, he reprimanded all Gitto Global employees about spreading rumors and threatened "severe" punishment. (J78) In September of 2004, boxes were removed from his office and delivered to Charles Gitto's house before Argus Management, a turnaround consultant, was retained to operate the business. (White and DeLisle Affidavits)

**B.    FRANK MILLER**

Between July 25, 2002 and January 15, 2004, Frank Miller signed and submitted borrowing base certificates to LaSalle, which contained false inventory information and fictitious accounts receivable and sales information.  (Stilwell Aff., ¶23)

### 1.    Frank Miller Directed the Inventory Fraud.

Frank Miller managed the inventory at Gitto Global and knew the actual level and value of inventory on a daily basis.  (Minardi Aff., ¶4; Merchant Aff., ¶3).  As further explained in Robin Merchant's Affidavit, to increase the value of the inventory or to make the inventory count and the actual physical inventory consistent for the purpose of an audit, Frank Miller and Maria Miller directed Robin Merchant to increase the prices of items and/or to alter the inventory level of items.  (Merchant Aff., ¶¶3, 7)  As further explained in David Minardi's Affidavit, Frank Miller also directed David Minardi to make changes to the identity of certain compounds within the inventory in order to inflate the value of the inventory.  (Minardi Aff., ¶¶4, 5)  David Minardi kept notes of the "materials that have been put on the floor for inventory over the years that [were] made of one product and marked as another," and gave those notes to Frank Miller. (Minardi Aff., ¶5)

Also, Frank Miller and William Deakin controlled which invoices from the large chemical suppliers were put into the desk drawer of the accounts payable clerk, Rita Bartlett, which were entered into the Gitto Global computer system, and which were paid.  (Bartlett Aff., ¶6)  Frank Miller controlled when payments made to third parties should be deposited by them. (Tersigni Aff., ¶12)  Frank Miller controlled when Gary Gitto could deposit Gitto Global checks payable to Equitech and to him personally (e.g., J31, 33, 47, 61, 62, 63, 66, 68).

2.    **Frank Miller Directed the Accounts Receivable Fraud.**

Frank Miller set up Hemisphere Distribution, Inc. ("Hemisphere") with the help of Louis
Pellegrine, Gitto Global's account, and Kathleen Carland.  (Stilwell App. Ex. A)  Kathleen
Carland was installed as the president. Frank Miller took over J-Tan from the incorporator, John
Tersigni, and paid him $2,000 to do so.  (Tersigni Aff., ¶¶15-20)  Frank Miller purportedly sent
letters to J-Tan, Hemisphere, Zebulon Industries ("Zebulon"), Color Compound and Consultants
Inc. ("CCC") and Velco Chemicals, Inc. ("Velco") to confirm the balance due to Gary Gitto
from each entity, even though he knew all of these sales were fictitious.  (Stilwell App. Exs. W,
X, Y, AA, BB; Tersigni Aff., ¶20)

From July 25, 2002 to January 15, 2004, Frank Miller signed false borrowing base
certificates, containing the fictitious inventory, sales and accounts receivable information, which
were sent to LaSalle.  (Stilwell Aff., ¶23)

In order to move more money in and out of Gitto Global, in or about 2001, Frank Miller
set up J&J Chemical, with John Tersigni as the front person, paying him a $5,500 monthly
commission.  (Tersigni Aff., ¶¶22, 23, 25)  John Tersigni gave Frank Miller a signature stamp for
the purpose of signing J&J Chemical's checks drawn on Clinton Bank.  (Tersigni Aff., ¶23)
Frank Miller gave the blank J&J Chemical checks to Janice Chaisson for her to prepare them as
purported payments to Gitto Global.  (Stilwell Aff., ¶10)  Frank Miller dealt directly with
Clinton Bank regarding J&J Chemical's account.  (J65, 66, 69)  Frank Miller facilitated the
check kite by transferring money to J&J Chemical's account at Clinton Bank in 2002 and in
2004, by providing an unlimited guaranty and pledging a mortgage on his house in 2004.
(Testimony of Tenaglia and Paulhus)

Frank Miller, along with William Deakin and Helen Kozak, supervised and directed
Janice Chaisson in tracking J&J Chemical checks paid to Gitto Global in relation to open

- 8 -

invoices. (Stilwell Aff., ¶9)  Frank Miller, with William Deakin, determined what fictitious sales were necessary each day to cover the credit line with LaSalle and directed Janice Chaisson to issue J&J Chemical checks, with John Tersigni's stamped signature to cover the fictitious sales. (Stilwell Aff., ¶¶9, 10)  These checks were deposited daily by Frank Miller or Helen Kozak. (Stilwell Aff., ¶10)

Frank Miller directed when third parties could deposit checks.  For an example, John Tersigni would call daily to see if he could deposit certain checks payable to East Coast Distributors, Inc. (Tersigni ¶12)  When John Tersigni asked Gary Gitto for permission, instead of Frank Miller, Frank Miller got very upset and told John Tersigni that he handled all of the money matters for Gitto Global.  (Tersigni Aff., ¶14)[4]

### 3.    Frank Miller Benefited from the Scheme.

Frank Miller received personal payments from Gitto Global, including payments on his personal credit cards, for personal items on company credit cards, without any supporting documents.  (Bartlett Aff., ¶5)  In 2003-04 alone, Frank Miller received a total of $687,429 in interest payments and unaccounted for disbursements.  (Stilwell Aff., ¶18)  In addition, Gitto Global employees did spring and fall projects (i.e. storage and placement of outdoor furniture and gas grill) at Frank Miller's house and at the expense of Gitto Global.  (DeLisle Aff., ¶4)

---

[4] If allowed to testify, Craig Jalbert would testify that William Deakin told him that since 2000, Frank Miller and William Deakin posted fictitious sales to Zebulon, CCC, Hitachi Cable, Inc., and Velco.  Frank Miller set up Hemisphere and maintained the checkbook.  He also had the checkbook for J&J Chemical.  Frank Miller would direct Maria Miller, his wife, to enter fictitious sales in the computer after directing Dean Childs to issue fictitious shipping orders.  Frank Miller also purchased special software that he had installed on his and William Deakin's computers to make fictitious checks, invoices, bills of lading, etc.

277246.3 042314-34311

#### 4.    Frank Miller Tried to Conceal the Scheme.

Frank Miller was told in 2002 that Clinton Bank would not extend credit to J&J Chemical for uncollected funds, therefore, Frank Miller transferred funds to insure the check-kite scheme would continue.  (Testimony of Tenaglia)

Miller knew Gitto Global had no money to pay to insiders.  As he said to Helen Kozak, "we have no money . . . . where does he (Gary) want his money to come from.  Also his father (Charles) is trying to take 25000 on Thursday and Friday."  (J61)  Frank Miller told Gary Gitto of his concern with Clinton Bank, shutting down the check kiting and risking his money.  (J65) This risk was from Miller's pledging of an unlimited guaranty, $500,000 and a third mortgage on his home to permit Clinton Bank in the summer of 2004 to extend credit on uncollected funds. (Testimony of Paulhus)  On or about September 14, 2004, 8-9 boxes of records were removed from his office and from Gitto Global before Argus Management was given authority to manage Gitto Global (DeLisle Aff., ¶8)

### C.    CHARLES GITTO

#### 1.    Charles Gitto Directed the Scheme.

Charles Gitto was intimately involved in the business at Gitto Global and in the fraud that occurred there.  As head of production, he ran the production meetings and directed what was to be produced, when production would be completed and for which customers.  (Merchant Aff., ¶8; Minardi Aff., ¶6)  He received daily sales and inventory reports.  (Merchant Aff., ¶8; Minardi Aff., ¶6)  He knew the customers and the business very well.  (DeLisle Aff., ¶6)  Yet, in 2002, he sent to Guaranty Business Credit a receivable ledger with such fictitious customers, such as J-Tan, Hemisphere and Zebulon showing multi-million dollar sales to them.  (Snyder Aff., ¶5)  He knew Gitto Global was disseminating false information.

- 10 -

Charles Gitto further facilitated the check kite when he transferred funds into the J&J Chemical account at Clinton Bank, gave an unlimited guaranty to Clinton Bank so that Clinton Bank would allow payments on uncollected funds. (Testimony of Paulhus) He had heated discussions with Clinton Bank over the J&J Chemical account and the need for collateral. (Id.) He also attended the original closing and proposed changes to the loan documents, which loan was necessary to allow the J&J Chemical account to continue to be used to facility the check kite. (Id.)

### 2.    Charles Gitto Benefited from the Scheme.

Charles Gitto had Gitto Global employees working for him, at Gitto Global's expense, at his house doing repairs, picking up trash and managing work being done to his house by contractors. (DeLisle Aff., ¶¶2-3) Charles Gitto directed that all invoices for him and his home were to be reviewed only by him and he would decide how the invoice was paid, whether by Tradex, Gitto Global or Charles Gitto personally. (J73)

Charles Gitto directed payments to himself and Tradex, which included monthly rent, monthly payments on a note, payments on personal credit cards, payments for personal items on company credit cards and other items, all without any documentary support. (Bartlett Aff., ¶5; J22, 27, 42, 45, 46, 61, 71)

In 2003-04, Charles Gitto received $375,248 in interest and unaccounted for disbursements and Tradex received $615,607 in interest, prepaid rent, consulting fees and unaccounted for disbursements. (Stilwell Aff., ¶18)

### 3.    Charles Gitto Tried to Conceal the Scheme.

On or about September 15 and 16, 2004, Charles Gitto directed the removal of boxes from Gitto Global to his home, before Argus Management assumed management of Gitto Global. (White Aff., ¶3)

- 11 -

### D.   JOHN TERSIGNI

#### 1.   John Tersigni Participated in the Scheme.

In May of 2002, John Tersigni entered into a business arrangement with Frank Miller, wherein J-Tan was used as a customer of Gitto Global. (Tersigni Aff., ¶¶15, 19)  John Tersigni confirmed this arrangement in a telephone conversation with LaSalle and confirmed that J-Tan would be doing approximately $3 million of business with Gitto Global.  (Tersigni Aff., ¶18)  J-Tan never did any business with Gitto Global.  (Tersigni Aff., ¶20)

#### 2.   John Tersigni Benefited from the Scheme.

John Tersigni received $2,000 for the use of J-Tan as a fictitious customer of Gitto Global.  (Tersigni Aff., ¶19)  John Tersigni was also paid $5,500 per month for his services to J&J Chemical.  (Tersigni Aff., ¶25)

Since 2001, John Tersigni served as treasurer/secretary of J&J Chemical.  (Tersigni Aff., ¶22)  John Tersigni used his business address and set up a telephone line with an answering machine for J&J Chemical at his place of business.  (Tersigni Aff., ¶23)  John Tersigni had a stamp made with his signature for the purpose of signing J&J Chemical's checks and gave the stamp to Frank Miller.  (Tersigni Aff., ¶23)

### E.   KATHLEEN CARLAND

Kathleen Carland, with Louis Pellegrine, incorporated Hemisphere to be run out of her home.  (Stilwell Aff., ¶7; Stilwell App. Ex. A)  Hemisphere was listed as a customer of Gitto Global, but did not do any business with Gitto Global and owed Gitto Global no money. (Stilwell Aff., ¶6)

On or about February 3, 2004, Kathleen Carland confirmed that the balance due to Gitto Global from Hemisphere was $2,415,032.35 as of December 31, 2003, even though Hemisphere did not owe any money to Gitto Global.  (Stilwell App. Ex. AA; Stilwell Aff., ¶28).

## F.    WILLIAM DEAKIN

### 1.    William Deakin Directed the Inventory Fraud.

William Deakin reviewed the production report from Robyn Merchant, after Maria Miller adjusted the values, and told Robyn Merchant what further inventory changes should be made in order to inflate the value of the inventory enough to support the credit line with LaSalle.  (Robyn Merchant Aff., ¶6)[5]

Frank Miller and William Deakin controlled which invoices from the large chemical suppliers were put into Rita Bartlett's drawer, which were entered into the Gitto Global computer system as an account payable, and which were paid.  (Bartlett Aff., ¶6)

### 2.    William Deakin Directed the Accounts Receivable Fraud.

William Deakin gave Rita Bartlett a list of J&J Chemical invoices, without the supporting invoices or their documents, for which she was to prepare checks.  (Stilwell App. Ex. C; Bartlett Aff., ¶8)  William Deakin sometimes directed that multiple checks be prepared to pay a certain invoice, as indicated on the list.  (Bartlett Aff., ¶8)  William Deakin kept track of and planned the deposits of Gitto Global checks payable to Gary Gitto, Charles Gitto, Equitech, Blakely Hutchinson and others to make sure they were able to keep the kite afloat.  (J2-30)

William Deakin knew that Gitto Global had no money and that the kite was going to collapse as he wrote to Gary Gitto "[t]he J&J checks have increased by $414,000.00 since 5/27/04.  Each day is climbing because more money is going out than coming in."  (J67)

---

[5] As pointed out in footnote 3, William Deakin has admitted his participation in the fraud and his role in creating fictitious inventory and accounts receivables.

G.    **JANICE CHAISSON**

1.    **Janice Chaisson has Knowledge of the Scheme.**

While Janice Chaisson has asserted her Fifth Amendment right against self-incrimination, Janice Chaisson made statements to Matthew Stilwell, LaSalle's Regional Audit Manager.   In her statement, Janice Chaisson explained the use of accounts receivable aging and the check-kite scheme.

2.    **Janice Chaisson Participated in the Scheme.**

Janice Chaisson was the accounts receivable supervisor for Gitto Global.  (Stilwell Aff., ¶5)  Chaisson kept two sets of account receivable agings for Gitto Global – actual and fictitious. The fictitious receivable aging contained fictitious invoices and sales and was based on a 99 code. (Stilwell Aff., ¶15)

Under the direction or supervision of Frank Miller, William Deakin and Helen Kozak, Janice Chaisson tracked J&J Chemical checks paid to Gitto Global in relation to the fictitious invoices to ensure they matched.  (Stilwell Aff., ¶9)

With respect to the payments from J&J Chemical, Janice Chaisson prepared the J&J Chemical checks knowing they correspond to fictitious sales.   Janice Chaisson placed the signature stamp of John Tersigni on the checks, placed the Gitto Global endorsement stamp on the back of each check, prepared the deposit slip to deposit into the Gitto Global account, and gave the checks and deposit slip daily to Helen Kozak to deposit.  (Stilwell Aff., ¶10)  From September 13-17, 2004, at the direction of Helen Kozak, Janice Chaisson made the deposits of the J&J Chemical checks to the Gitto Global account. (Stilwell Aff., ¶13)

In order to obtain additional advances from LaSalle, between January 17, 2004 and September 15, 2004, Janice Chaisson e-mailed borrowing base certificates to LaSalle, knowing they contained fictitious accounts receivable, sales and information.  (Stilwell App. Ex. N, O)

- 14 -

**H.    HELEN KOZAK**

   **1.    Helen Kozak Acted to Siphon Money Out of Gitto Global.**

   Helen Kozak was the administrative assistant for Gary and Charles Gitto (Bartlett Aff.,

¶5)  Helen Kozak directed Rita Bartlett to prepare checks payable to Gary Gitto, Charles Gitto,

and Equitech, with no supporting documentation.  (Bartlett Aff., ¶5; J31-33, 35, 37-43)  Helen

Kozak, at Gary Gitto's direction, increased Gary Gitto's salary, without any documentation to

support an increase.  (J19)   Helen Kozak knew that payments had to be coordinated with

LaSalle's line of credit.  In an email, Helen Kozak stated to Gary Gitto, "I don't want to put them

over the line and LaSalle get involved."  (J50)  Helen Kozak acted as the go-between between

Gary Gitto and William Deakin as to the scheduling of deposits for Gary Gitto.  (E.g. J47, 50, 53,

62)

   **2.    Helen Kozak Implemented the Check-Kite Scheme.**

   Helen Kozak, along with Frank Miller and William Deakin supervised Janice Chaisson in

tracking the J&J Chemical checks.  Helen Kozak received the J&J Chemical checks to deposit

daily from Janice Chaisson and deposited them at Fleet Bank's ATM machine.  (Stilwell Aff.,

¶9)  From September 13-17, 2004, Helen Kozak directed Janice Chaisson to make the deposits of

the J&J Chemical checks to the Gitto Global accounts.  (Stilwell Aff., ¶11)

   **3.    Helen Kozak Tried to Conceal the Scheme.**

   Helen Kozak knew about the scheme and knew it was wrong.  She was "nervous" about

talking to auditors and requested "a dry run."  (J64)   Helen Kozak knew that there were no

current profit and loss statements, no current financial statements for Gitto Global and that Gitto

Global did not file tax returns for 2002 or 2003. (J55)  Helen Kozak believed that "someone was

spying" because "someone," not in the accounting department at Gitto Global, told her that Gary

Gitto had checks totaling $250,000.  She stated that "there is a serious information leak." (J1)

Between September 14, 2004 and September 16, 2004, Helen Kozak boxed up documents and materials from Janice Chaisson's and William Deakin's offices. (White Aff., ¶4; Bartlett Aff, ¶8)  She directed the removal of these boxes, as well as boxes from Gary Gitto's, Charles Gitto's and Dean Childs' offices at Gitto Global to Charles Gitto's home.  (White Aff., ¶¶3-4; DeLisle Aff., ¶7)

## I.     J&J CHEMICAL

J&J Chemical was a fictitious customer used to facilitate the check-kite through John Tersigni, its treasurer/secretary and Frank Miller. (Tersigni Aff., ¶22)  It allowed its bank account at Clinton Bank to be used as part of the check-kite.  J&J Chemical never sold any goods to Gitto Global, and it never purchased any goods from Gitto Global.  (Stilwell Aff., ¶¶9-10)  And yet, millions of dollars of checks went between J&J Chemical and Gitto Global, solely to facilitate the scheme.  (Stilwell App. Ex. D and E)

## J.     TRADEX

Tradex received money from Gitto Global without any supporting documentation.  In 2003-04 only, Tradex received $615,607 in interest payments, prepaid rent, consulting fees and unaccounted for disbursements.  (Stilwell Aff., ¶18)  Tradex facilitated the check-kite, through its President, Charles Gitto, by pledging collateral and a mortgage to Clinton Bank to secure the loan to J&J Chemical.  (Testimony of Paulhus)

## III.
## ARGUMENT

### THE EVIDENCE SHOWS THE ATTACHMENTS SHOULD BE CONTINUED AND THE PRELIMINARY INJUNCTION SOUGHT BY LASALLE SHOULD BE GRANTED

Pursuant to Federal Rule of Civil Procedure 64, Mass. Gen. L. Ch. 223, §42 *et seq.* and Mass. Rule Civil Procedure 4.1, a court may enter an order approving the attachment of real estate of a defendant upon a finding by the court that there is a reasonable likelihood that the

- 16 -

plaintiff will recover judgment in an amount equal or greater than the amount of the attachment. *International Assoc. of Bridge, Structural and Ornamental Iron Workers v. Burtman Iron Works, Inc.*, 164 F.R. D. 305, 306 (D. Mass. 1995); *The Aetna Casualty and Surety Co. v. Rodco Autobody*, 138 F.R.D. 328, 332 (D. Mass. 1991), *affd.*, 43 F.3d 1546 (1st Cir. 1994).

Under Federal Rule of Civil Procedure 64 and Mass. Gen. L. Ch. 214 §3, the court can enter a temporary restraining order and later a preliminary injunction equitably attaching the rights and interest that a defendant has with the reach and apply defendants upon a showing that there is a reasonable likelihood the plaintiff will recover a judgment in an amount equal to or greater than the amount of the attachment. *Tilcan Capaldi, Inc. v. Feldman*, 249 F.3d 54, 59 (1st Cir. 2001); *GMAC v. Camilleri Bros. Chevrolet of Holyoke, Inc.*, 188 F. Supp. 2d 73, 76 (D. Mass. 2001).

For the Court to continue the preliminary injunctions sought by LaSalle, LaSalle must show (1) a reasonable likelihood that it will succeed in its claims against the Defendants; (2) irreparable harm if the injunction is not granted; (3) the harm to LaSalle if the preliminary injunction is not granted will be greater than that to the Defendants if the preliminary injunction is granted; and (4) the public interest favors the granting of the preliminary injunction. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 161-62 (1st Cir. 2004); *Coalition to Protest the Democratic National Convention v. City of Boston*, 327 F. Supp. 2d 61, 69 (D. Mass. 2004). As to the "reach and apply" injunction, LaSalle must show only that LaSalle has a reasonable likelihood of success on the merits, because these injunctions are in the nature of equitable attachments.

**LaSalle has a Reasonable Likelihood of Success**

LaSalle has set forth seven substantive counts in its Complaint (Count I: Civil RICO; Count II: Bank Fraud; Count III: Use of Deceptive Trade Practices (Mass. Gen. L. ch. 93A, §§2,

- 17 -

11); Count IV: Common Law Conspiracy to Defraud; Count V: Civil Conspiracy; Count Vi: Breach of Guaranty against Gary Gitto; Count VII: Breach of Guaranty against Frank Miller).

For LaSalle to succeed on its civil RICO claim, it must prove (1) Gitto Global was an enterprise engaged in or affecting interstate commerce; (2) the Count I Defendants[6] participated in a conspiracy to conduct the affairs of Gitto Global through a pattern of related racketeering activity that had sufficient continuity; (3) a nexus existed between the pattern of racketeering activity and Gitto Global; and (4) injury to LaSalle resulting from the racketeering activity. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266-68 (1992); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-99 (1985); *Aetna Casualty Surety Co. v. P&B Auto Body*, 43 F.3d 1546, 1558 (1st Cir. 1994).

It is undisputed that Gitto Global was an enterprise as defined in 18 U.S.C. §1961(4) that was engaged in an affected interstate commerce.

The facts also confirm that the Defendants named in Count I participated in the affairs of Gitto Global through a pattern of racketeering. A pattern of racketeering activity exists where bank fraud (18 U.S.C. §1344(2)), mail fraud (18 U.S.C. §1341) or wire fraud (18 U.S.C. §1343) for the same purpose, victim or methods is carried on for a long period of time or is a part of an entity's course of business. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241-42 (1989); *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445-47 (1st Cir. 1990).

The Count I Defendants' conduct here was not sporadic criminal conduct. Their activities spanned two years and two months during which time over 600 phony J&J Chemicals checks were issued to support the check-kite (Cmplt. ¶¶44, 65). On a daily basis, Defendants Frank Miller or Janice Chiasson falsely represented Gitto Global's financial condition in

---

[6] Gary C. Gitto, Frank Miller, John D. Tersigni, Kathleen M. Carland, William Deakin, Janice Chiasson, Helen Kozak, and Kingsdale Corp. d/b/a J&J Chemical Distributors)

borrowing base certificates and false supporting documentation they submitted to LaSalle. (Cmplt. ¶¶52, 53)  The evidence of the involvement of each of the Count I Defendants in the RICO violation, as set out in the foregoing fact section, is strong.

In addition to the facts presented, Gary Gitto, Frank Miller, Kathleen Carland and Helen Kozak have all invoked the Fifth Amendment with respect to the allegations against them.  The Court can properly infer from this that these defendants participated in the RICO violation, profited from it and if given the opportunity would hide any property or assets obtained through their criminal conduct.  *Baxter v. Palmigiano,*  425 U.S. 308, 318, 318 (1975); *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994) (count entitled to conclude wife was acting in concert with husband's effort to hide assets when she received money from him, was the trustee of trusts that received payments from the husband and she invoked the Fifth Amendment to questions about her involvement).

The requisite relationships between the racketeering activity, Gitto Global and the damages to LaSalle are present.  The fraud here generated loan funds to Gitto Global that constitute LaSalle's damages.

LaSalle also has a reasonable likelihood of success on its fraud claim in Count II.  To prove the fraud claim, LaSalle will have to prove that the Count II Defendants, who are the same as those in Count I, (1) made misrepresentations of a material fact, (2) that they knew, or should have known, to be false, (3) which were made to induce LaSalle to act thereon, (4) that LaSalle did act thereon, (5) in reasonable reliance that the statements were true.  *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 85 (D. Mass 1998).  The facts cited earlier with respect to Count I also show that it is likely that LaSalle will succeed on Count II.

The Count I Defendants are also the Defendants in Count III, in which they are charged with having intentionally used deceptive trade practices in violation of Mass. Gen. L. ch. 93A, §§2, 11. Common law fraud is a basis for a claim of unfair or deceptive practices. *See Kanasallis Fin. v. Fern*, 40 F.3d 476 (1st Cir. 1994). Corporate officers and those aiding and abetting them in the violations are subject to liability. *Nader v. Citron*, 372 Mass. 96, 103 (1977). The facts showing the fraud underlying the civil RICO claim show that LaSalle has a reasonable likelihood of success on Count III.

The Count I Defendants are also the Defendants in Count IV, in which they are alleged to have participated in a conspiracy to defraud LaSalle into advancing loan funds to Gitto Global. (*Cmplt.* ¶¶158, 159) The conspiracy claim is a mirror image of the underlying fraud alleged in the civil RICO, and LaSalle's likelihood of success in Count IV is the same.

LaSalle alleges in Count V that the Count I Defendants, plus Defendants Charles Gitto, Nancy Gitto Panagiotes and Tradex Corporation, participated in a civil conspiracy to obtain money from LaSalle through false representations in connection with LaSalle's revolving credit loan. The claim of civil conspiracy is that of joint liability and denotes liability in tort for concerted action. *Aetna Casualty*, 43 F.3d at 1564. For LaSalle to recover on this Count, it must show that the Defendants committed acts in furtherance of a common design to defraud LaSalle in connection with LaSalle's revolving credit loan. *Id.* The evidence to support this claim against the Counts I through IV Defendants is the same as for those Counts.

Charles Gitto was aware that Gitto Global was obtaining loan funds based on false information and helped it in those efforts. He directed the disbursement of those funds for his personal purposes. In 2002, he sent a false accounts receivable statement with an attached list of customers and the amounts due from them to LaSalle's predecessor lender to Gitto Global,

Guaranty Business Credit. The list represented that Gitto Global had supposedly made multi-million dollar sales to Hemisphere, J-Tan, and CCC, the same fictitious companies used in the representations to LaSalle. (Snyder Aff., ¶5) Charles Gitto was in charge of Gitto Global's production, received daily production and sales reports, is experienced in the market, and had to have known that these companies were not legitimate customers of Gitto Global.

LaSalle will also show by testimony on December 10, 2004 that when Clinton Savings Bank ("Clinton Bank") became suspicious about the J&J Chemical account maintained with it (the one used for the check kite), Charles Gitto transferred money to J&J Chemical's account at Clinton Bank to make the company appear solvent. He also later gave an unlimited guaranty to Clinton Savings Bank so the bank would allow payments on uncollected funds and permit the check kite to continue. He attended the original closing and refused to pledge certain collateral. He heavily negotiated the unlimited guaranty all the while knowing the importance of keeping the J&J Chemical account open and operational.

LaSalle has been hampered in its investigation of Charles Gitto's role at Gitto Global because he has taken the Fifth Amendment concerning the subject and, most significantly, has received corporate records with respect to which he has refused to testify or produce. The Court can legitimately infer from Charles Gitto's conduct that he was involved in defrauding LaSalle and that the records he is hiding implicate him in the fraud.

Tradex Corporation is a corporation owned by Charles Gitto, who is also the president. It received money from Gitto Global for which there are insufficient records of their purposes. Testimony from a representative of Clinton Savings Bank will show that when the operation of the check-kite was jeopardized, Charles Gitto used Tradex to pledge collateral and provide a mortgage.

LaSalle also has reasonable likelihood of succeeding on its claims in Count VI and VIII, claims based on the $3 million individual guarantees that Gary Gitto and Frank Miller each gave LaSalle for Gitto Global's repayment of the revolving loan and the term loan. Since Gitto Global is in default, having filed for bankruptcy relief, LaSalle is owed over $30 million.

**Irreparable Harm**

LaSalle has overwhelming evidence to support its claims. As this Court noted in *Coalition to Protest*, 327 F. Supp. 2d at 69: "The greater the likelihood of success on the merits, the less the risk of irreparable harm to the plaintiff must be shown." LaSalle has a justified concern that any judgment it obtains against Defendants could be rendered worthless by Defendants' dissipation or concealment of their non-exempt assets. This constitutes irreparable harm. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52-53 (1st Cir. 1986); *Fairview Machine Tool Co., Inc. v. Oakbrook Int'l, Inc.*, 77 F. Supp. 2d 199, 205 (D. Mass. 1999); *Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc.*, 475 F. Supp. 973, 978 (D. Mass. 1979).

**The Balance of Hardships**

The attachments and preliminary injunction freeze the status quo without depriving Defendants of the funds necessary for them to handle their normal affairs. To release the freeze, would permit the Defendants to render themselves judgment-proof and destroy the benefit of any judgment against them. This tips the balance of hardship decisively in favor of the injunction. *Teradyne*, 797 F.2d at 53.

**The Public Interest**

The public interest is best served by an order that preserves assets obtained by fraud for a recovery by the victim of the fraud.

- 22 -

## IV.

## EVIDENCE TO BE INTRODUCED AT HEARING

### List of Affidavits to be Introduced as Direct Testimony
Robyn Merchant
David Minardi
Roger DeLisle
Rita Bartlett
Oren White
Matthew Stilwell
Steven Snyder

### List of Testifying Witnesses
Michael Tenaglia
Robert Paulhus
Craig Jalbert, as Custodian of records of Gitto Global and as to interview of William
 Deakin
Derrick Flanagan or Thomas Doherty, as Custodian of records of Gitto Global

### List of Deposition Testimony, if permitted
Michael Tenaglia
Robert Paulhus

## V.
## CONCLUSION

For the foregoing reasons, the attachments should be continued and the requested
preliminary injunction entered.

277246.3 042314-34311

Dated: December 6, 2004

Respectfully submitted,

LASALLE BUSINESS CREDIT, LLC

By: /s/ Christopher J. Panos
           One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

### Certificate of Service

I hereby certify that a true copy of the above document was served upon each other party by via either electronic means or U.S. Mail on December 7, 2004.

/s/ Christopher J. Panos

- 24 -

277246.3 042314-34311