## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC f/k/a )
LASALLE BUSINESS CREDIT, INC.,    )
                                               )
              Plaintiff,       )
   v.                                  )   Case No. 04-12227-DPW
                                              )
GARY C. GITTO, et al.,         )
                                              )
            Defendants,    )
  and                                      )
                                              )
FLEET NATIONAL BANK, et al.,  )
                                              )
  Trustee Process Defendants,    )
                                              )
  and                                      )
                                              )
FIDELITY INVESTMENTS, INC., et al.,  )
                                              )
  Reach-and-Apply Defendants.   )

### AFFIDAVIT OF MATTHEW STILWELL

Matthew Stilwell, being duly sworn on oath, states and affirms the following facts:

1. I am the regional audit manager and vice president for LaSalle Business Credit LLC ("LaSalle") and have authority to make this affidavit on its behalf.

2. If sworn as a witness, I could competently testify to the facts herein.

3. On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan, not to exceed $27,000,000 and a term loan of $3,000,000 to Gitto Global. In addition, Gitto Global had a disbursement account with LaSalle. As of December 2, 2004, there is due and owing a principal amount of $30,683,467.23, plus interest and costs.

4. On September 20, 2004, I went to Gitto Global Corporation ("Gitto Global") to be in charge of an investigation of the financial condition of the company and the business operations over the last few years while LaSalle had been in a lending relationship with the company under a revolving loan.

5. On September 20, 2004, I interviewed Janice Chaisson, who was the accounts receivable supervisor for Gitto Global.

6. I asked Chaisson for the most recent receivable aging. She gave me a document purporting to be the most recent receivable aging. I looked at the first account listed on the receivable aging, Zebulon Industries ("Zebulon"), and asked to call them. Chaisson said that the receivable balances of Zebulon and the next five customers on the list were not correct. These five customers were Color Compound and Consultants Inc. ("CCC"), Hemisphere Distribution, Inc. ("Hemisphere"), Hitachi Cable, Inc. ("Hitachi"), J-Tan Sales and Marketing, Inc. ("J-Tan") and Velco Chemicals, Inc. ("Velco"). Chaisson said that of those purported customers, only Hitachi owed any money to Gitto Global, and the amount it owed was far less than the amount shown on the receivable aging.

7. During my investigation at Gitto Global, I found an invoice submitted to Hemisphere from Louis J. Pellegrine, Jr., Gitto Global's accountant, for professional services relating to the creation of Hemisphere. A copy of that invoice is incorporated herein by reference to Appendix[1] Exhibit A.

8. Janice Chaisson then e-mailed to me a file that tracked the check-kite scheme. A print out of that file is incorporated herein by reference to Appendix Exhibit B.

---

[1] The documents referred to herein are contained in a separately bound appendix, Appendix to the Affidavit of Matthew Stilwell ("Appendix"), which accompanies this Affidavit

276586.2 042314-34311

9. I then reviewed the e-mailed file with Chaisson. She explained a standard operating procedure at Gitto Global that had existed since at least 2001. Under the direction or supervision of Frank Miller, William Deakin and Helen Kozak, Chaisson tracked J&J Chemical checks paid to Gitto Global in relation to open invoices. This file lists the J&J Chemical check numbers and amounts and relates each check to a fictitious customer invoice/payment. After approximately August, 2002, three J&J Chemical checks relate to one fictitious invoice.

10. With respect to the purported receivable payments by J&J Chemical, Chaisson said she would prepare the J&J Chemical checks, place the signature stamp of John Tersigni on the checks, place the Gitto Global endorsement stamp on the back of each check, prepare the deposit slip to deposit into the Gitto Global account, and give the checks and deposit slip daily to Kozak. Kozak or Miller, if Kozak was unavailable, would deposit the J&J Chemical checks at Fleet Bank's ATM machine. The J&J Chemical checks she had were given to her by Miller or Kozak.

11. With respect to the purported payables, Rita Bartlett, or if she was not available then Deakin, would prepare the Gitto Global checks made payable to J&J Chemical based on a one-page list prepared by Deakin or Miller. Chaisson printed out an example of the one page list, incorporated by reference to Appendix Exhibit C.

12. LaSalle, in the ordinary course of business, retained copies of the Gitto Global checks made payable to J&J Chemical from the LaSalle disbursement account. I reviewed those checks. A summary of the checks I reviewed, including the date and amount of the disbursements and is incorporated by reference to Appendix Exhibit D.

13. Chaisson stated that from September 13-17, 2004, Kozak asked her to make the deposits of the J&J Chemical checks to the Gitto Global account.

276586.2 042314-34311

14. I found copies of the J&J Chemical checks, related invoices and bills of lading in Deakin's office at Gitto Global during my investigation. A summary of the checks I reviewed is incorporated by reference to Appendix Exhibit E. I further found near Deakin's office blank checks from the accounts of Zebulon, Velco, and Hemisphere, and a blank invoice and a blank bill of lading. A copy of the blank checks is incorporated by reference to Appendix Exhibit F.

15. Chaisson further explained that she kept two sets of account receivable agings for Gitto Global – actual and fictitious. The fictitious receivable aging was based on a 99 code. She then printed out for me, which are incorporated by reference to Appendix Exhibits G and H, a copy of the actual aging and the Code 99 aging.

16. Chaisson said that Deakin would help Bartlett and her with the J&J Chemical check scheme. However, Chaisson said, "nothing happens without Gary's knowledge. Gary does not do anything without Charles' knowledge."

17. During my investigation, I found checks made payable from Gitto Global to Charles Gitto, Gary Gitto, Frank Miller, Equitech Technologies, John Tersigni, Louis Pellegrine, Tradex International and others, which were not supported by documentation and therefore were believed to be a part of the conspiracy. I made a chart of these checks which is incorporated by reference to Appendix Exhibit I.

18. In 2003-04 alone, the following funds were transferred to the defendants:

   (a) Gary Gitto: Unaccounted for disbursements of $459,358.43 and interest payments of $2,888.88 directly and disbursements totaling $1,708,684.47 through a fictitious entity known as Equitech Technologies;

   (b) Tradex and Tradex International: Interest payments of $230,090, prepaid rent of $217,061, consulting fees of $34,000 and unaccounted for disbursements of $134,546;

   (c) Charles Gitto: Interest payments of $10,000, consulting fees of $44,300 and unaccounted for disbursements of $320,948;

276586.2 042314-34311

    (d)    Frank Miller: Interest payments of $3,733 and unaccounted for disbursements of $683,696; and

19. A memo concerning Equitech Technologies was found in Kozak's desk drawer toward the end of the week of September 20th and is incorporated by reference to Appendix Exhibit J.

20. The relevant portions of the general ledger statement for 2004 that I found in Deakin's office is incorporated by reference to Appendix Exhibit K.

21. The J&J Chemical checks were deposited in the Fleet Blocked Account and then those funds were transferred, on a daily basis, to a controlled disbursement account for Gitto Global at LaSalle, which LaSalle applied to pay down the revolving loan.

22. As funds were applied daily against the revolving loan, funds became available to advance to Gitto Global.

23. From July 25, 2002 through January 16, 2004, borrowing base certificates signed by Miller and from January 17, 2004 through September 15, 2004 borrowing base certificates e-mailed by Chaisson were sent to LaSalle to support Gitto Global's request for additional funds under the revolving loan. These borrowing base certificates contained fictitious sales, fictitious accounts receivable aging and inflated inventory values. The first and last borrowing base certificates from Miller are incorporated by reference to Appendix Exhibits L and M. The first and last borrowing base certificates from Chaisson are incorporated by reference to Appendix Exhibits N and O.

24.     Gitto Global's monthly deposits of the purported sales proceeds from J&J Chemical and the funds advanced by LaSalle to Gitto Global based upon those monthly deposits and borrowing base certificates were as follows:

| Month | Deposits | Advances |
|---|---|---|
| July - 02 | $ 2,206,314 | $ 31,676,094 |
| August - 02 | $ 8,058,446 | $ 7,830,571 |
| September - 02 | $ 6,906,243 | $ 6,853,652 |
| October - 02 | $ 11,911,623 | $ 11,676,236 |
| November - 02 | $ 11,076,928 | $ 10,921,079 |
| December - 02 | $ 10,825,588 | $ 10,469,837 |
| January - 03 | $ 11,307,584 | $ 11,076,445 |
| February - 03 | $ 13,428,035 | $ 13,370,847 |
| March - 03 | $ 17,989,492 | $ 17,051,892 |
| April - 03 | $ 16,861,179 | $ 16,682,760 |
| May - 03 | $ 17,315,021 | $ 17,575,707 |
| June - 03 | $ 21,454,438 | $ 21,352,037 |
| July - 03 | $ 26,243,609 | $ 24,893,301 |
| August - 03 | $ 31,548,658 | $ 32,463,644 |
| September - 03 | $ 39,132,440 | $ 38,793,490 |
| October - 03 | $ 56,432,129 | $ 55,831,065 |
| November - 03 | $ 50,144,000 | $ 50,425,294 |
| December - 03 | $ 63,338,487 | $ 62,982,818 |
| January - 04 | $ 62,414,067 | $ 62,408,403 |
| February - 04 | $ 64,349,419 | $ 64,156,518 |
| March - 04 | $ 84,177,796 | $ 83,702,822 |
| April - 04 | $ 87,493,856 | $ 87,445,682 |
| May - 04 | $ 74,263,805 | $ 74,069,272 |
| June - 04 | $ 91,703,488 | $ 91,553,653 |
| July - 04 | $ 91,966,853 | $ 91,590,499 |
| August - 04 | $ 90,761,602 | $ 90,829,260 |
| September 15, 2004 | $ 41,190,439 | $ 37,152,378 |
| | | |
| Total | $ 1,104,501,539 | $ 1,124,835,256 |

276586.2 042314-34311

25. A summary of the fictitious sales and collections, and the actual sales and collections are as follows:

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| July – 02 | $ 1,278,810 | $ 78,810 | $ 2,206,314 | $ 206,314 |
| August – 02 | $ 8,815,527 | $ 3,619,632 | $ 8,058,446 | $ 2,862,550 |
| September – 02 | $ 6,552,837 | $ 2,678,900 | $ 6,906,243 | $ 3,032,307 |
| October – 02 | $ 12,557,440 | $ 1,826,091 | $ 11,911,623 | $ 1,160,274 |
| November – 02 | $ 11,206,090 | $ 4,940,552 | $ 11,076,928 | $ 4,811,390 |
| December – 02 | $ 10,621,281 | $ 3,217,464 | $ 10,825,588 | $ 3,421,770 |
| January - 03 | $ 11,285,811 | $ 2,912,933 | $ 11,307,584 | $ 2,934,706 |
| February – 03 | $ 13,767,617 | $ 1,639,129 | $ 13,428,035 | $ 1,299,546 |
| March – 03 | $ 17,111,121 | $ 4,333,268 | $ 17,989,492 | $ 5,211,639 |
| April – 03 | $ 16,393,943 | $ 2,129,290 | $ 16,861,179 | $ 2,596,526 |
| May – 03 | $ 17,676,634 | $ 3,503,422 | $ 17,315,021 | $ 3,141,809 |
| June – 03 | $ 21,337,796 | $ 4,204,053 | $ 21,454,438 | $ 4,320,695 |
| July – 03 | $ 25,902,881 | $ (486,000) | $ 26,243,609 | $ (145,272) |
| August – 03 | $ 31,725,765 | $ 1,957,613 | $ 31,548,658 | $ 1,780,506 |
| September – 03 | $ 38,077,352 | $ 1,033,873 | $ 39,132,440 | $ 2,088,961 |
| October – 03 | $ 55,968,861 | $ 5,918,637 | $ 56,432,129 | $ 6,381,904 |
| November – 03 | $ 50,994,495 | $ 5,811,804 | $ 50,144,000 | $ 4,961,309 |
| December – 03 | $ 63,380,646 | $ 380,646 | $ 63,338,487 | $ 338,487 |
| January – 04 | $ 62,723,884 | $ 3,210,133 | $ 62,414,067 | $ 2,900,316 |
| February – 04 | $ 63,745,043 | $ (302,115) | $ 64,349,419 | $ 302,261 |
| March – 04 | $ 83,804,496 | $ 2,811,831 | $ 84,177,796 | $ 3,185,132 |
| April – 04 | $ 86,088,250 | $ 3,500,669 | $ 87,493,856 | $ 4,906,274 |
| May – 04 | $ 74,422,760 | $ 2,698,662 | $ 74,263,805 | $ 2,539,708 |
| June – 04 | $ 91,495,847 | $ 3,215,151 | $ 91,703,488 | $ 3,422,792 |
| July – 04 | $ 92,079,534 | $ 3,220,424 | $ 91,966,853 | $ 3,107,743 |
| August – 04 | $ 90,819,019 | $ 4,205,334 | $ 90,761,602 | $ 4,147,917 |
| September 15, 2004 | $ 41,370,938 | $ 1,437,823 | $ 41,190,439 | $ 1,257,324 |
| Total | $ 1,101,204,678 | $ 73,698,029 | $ 1,104,501,539 | $ 76,174,888 |

26. From September 13-17, 2004, LaSalle advanced approximately $4 million based on deposits of J&J Chemical checks and daily borrowing base certificates.

276586.2 042314-34311

27. On or about September 17, 2004, Fleet returned checks totaling $11,890,588 for insufficient funds that had been returned by Clinton Savings Bank, resulting in an overdraft in the Fleet Blocked Account. A copy of the returned checks is incorporated by reference to Appendix Exhibit P.

28. Between July 2002 and July 2004, LaSalle conducted five field examinations and one audit, which are incorporated by reference to Appendix Exhibits Q, R, S, T, U and V. As part of the July 2002 examination, Louis Pellegrine, Gitto Global's accountant, sent to LaSalle by facsimile purported letters from Hitachi and Zebulon confirming accounts receivable balances, which are incorporated by reference to Appendix Exhibits W and X. And, in connection with the February 2004 field examination, Louis Pellegrine forwarded by facsimile purported letters from CCC, Zebulon, Hemisphere, Hitachi and J-Tan confirming account receivable balances, which are incorporated by reference to Appendix Exhibits Y, Z, AA, BB and CC.

**FURTHER AFFIANT SAYETH NOT.**

_____
Matthew Stilwell

Subscribed and sworn to before me
this /6th day of December, 2004.

_____
Notary Public

My commission expires:

```
NOTARIAL SEAL
ANNE L. GROMBALL, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 30, 2006
```

- 8 -

276586.2 042314-34311