THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

Case No.  04CV12227DPW

_____
LASALLE BUSINESS CREDIT, LLC f/k/a       )
LASALLE BUSINESS CREDIT, IN.,            )
        Plaintiff                                )
                                         )
v.                                       )
                                         )
GARY C. GITTO, et als                    )
        Defendants                               )
                                         )
and                                      )
                                         )
FLEET NATIONAL BANK, et als              )
        Trustee Process Defendants               )
                                         )
and                                      )
                                         )
FIDELITY INVESTMENTS, INC., et als       )
        Reach and Apply Defendants               )
_____   )

**DEFENDANTS', CHARLES N. GITTO, JR. AND TRADEX CORPORATION, POST HEARING MEMORANDUM IN SUPPORT OF PROPOSED FINDINGS AND RULINGS**

**The Elements of a Civil Conspiracy Claim**

To state a claim for civil conspiracy, the plaintiff must satisfy two elements. First, there must be an agreement or "common design" between the defendant and other parties to commit a tortious act and second, the defendant must have "substantially assisted" in contributing to the tortious plan. *Aetna Casualty Surety Company v. P&B Autobody*, 43 F. 3d 1546, 1564 (1st Cir. 1994); *See Also Copperbeech Partnership, Ltd. V. Seegel Lipshutz and Wilchins,* 17 Mass. L. Rep. 701 (May 5, 2004) (a person may be held liable for civil conspiracy if he has knowledge of a tortious act **and** gives

"substantial assistance" to the act). (emphasis added). One is subject to liability for civil conspiracy, "…if he knows that the other's conduct constitutes a breach of duty **and** gives substantial assistance or encouragement to the other…" *Restatement (Second) of Torts § 876(b)*(1977) (emphasis added). A general awareness is not sufficient to show the level of knowledge that would give rise to liability for conspiracy. "Evidence of the defendant's knowledge of its substantial, supporting role in an unlawful enterprise is required." *Kyte v. Philip Morris Inc.,* 408 Mass. 162, 168 (1990) (defendant's motion for summary judgment was allowed where minor plaintiffs were alleging that the defendant was engaged in a civil conspiracy with a retail store, and therefore, responsible for their addiction to cigarettes bought illegally at the retail store) . Thus, *Aetna*, *Copperbeech*, and *Kyte* make clear that mere knowledge alone is not enough to prove civil conspiracy.

## The Standard for Injunctive Relief

A preliminary injunction should be granted where the moving party establishes: (1) that is likely to succeed on the merits of its claim; (2) that it has no adequate remedy at law such that it will suffer irreparable harm without the injunction; (3) that such harm is greater than the injury defendants will suffer if an injunction is granted; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611 (1st Cir. 1988); *Planned Parenthood League of Mass. v. Belotti,* 641 F2d 1006, 1009 (1st Cir. 1981). As set forth below, plaintiff has failed to satisfy these requirements and thus, a preliminary injunction should not enter.

**Argument**

I.  <u>LaSalle has Failed to Establish a Likelihood of Success on The Merits of Its Claim Against Charles Gitto and/or Tradex</u>.

LaSalle contends (1) that Charles Gitto knew of the scheme to defraud, (2) that he participated in the scheme by making loans to Kingsdale Corporation to facilitate replenishment of the Fleet Blocked Account and thus, the alleged check kite activities, (3) that he benefited from the fruits of the conspiracy, and (4) that he attempted to cover-up his role in the conspiracy by removing documents from the premises of Gitto/Global.

The evidence material to each of these contentions, is summarized below:

1.  <u>Evidence of Knowledge</u>

As evidence of knowledge, LaSalle relies heavily upon the affidavits of former Gitto/Global employees David Minardi, (purchasing), Robyn Merchant (inventory control), and of Roger DeLisle, (former Vice President of Engineering).  According to David Minardi, Frank Miller and his wife managed the inventory at Gitto/Global.  Frank Miller directed Minardi to change the identity of certain compounds in preparation for upcoming bank audits.  Charles Gitto conducted production meetings at which he would direct discussions about sales orders, production scheduling and inventory to produce the product to fill the orders.  (*Id*, ¶6)  Discussions about difficulty obtaining product from vendors due to nonpayment of invoices occurred regularly. (*Id*).  Charles Gitto would instruct Minardi to talk to Frank Miller about paying the vendors and Miller would tell Minardi that "we are working on it."  (*Id*.)  Minardi would then report Miller's response to Charles Gitto.  There was nothing in the Minardi affidavit to suggest that Charles Gitto was aware that Miller had directed Minardi to mislabel compounds, that Charles Gitto

3

played any role in the mislabeling of compounds or that Charles Gitto was aware that the sales figures Miller was providing to LaSalle did not comport with the sales figures Miller was providing to Charles Gitto. In short, the Minardi affidavit fails to provide any link between Charles Gitto and the LaSalle fraud.

The Robyn Merchant Affidavit is equally unavailing. Ms. Merchant prepared the daily production reports and gave them to Charles Gitto, Frank Miller, Gary Gitto, and others (Merchant Affidavit, ¶3). At the daily production meetings Charles Gitto would instruct the staff what to produce, which orders to fill, what schedule to keep and when to ship. Charles Gitto also received copies of the sales orders. (¶8).

Ms. Merchant was also responsible for the inventory reports. Maria Miller instructed her to adjust the prices for production quantities appearing on the month end inventory reports. (Id., ¶5). After the adjustments were made, the revised reports went to William Deakin. (Id, ¶6). Adjustments were also made to the inventory reports in anticipation of upcoming bank audits. The adjusted reports were given to Frank and Maria Miller. (¶7). Noticeably absent from Ms. Merchant's affidavit is any suggestion that Charles Gitto engaged in, was supplied with, or was even aware of the adjusted inventory reports. There was no evidence that Robyn Merchant ever informed Charles Gitto that she had been falsifying inventory reports and no evidence that she ever gave the revised reports to Charles Gitto. There was also no evidence that the daily production reports and copies of the sales orders supplied to Charles Gitto were altered or falsified in any way. Indeed, the only inference that may be drawn from Ms. Merchants affidavit is that Charles Gitto was making decisions based upon legitimate daily production reports and sales orders.

4

The affidavit of Roger DeLisle is similar in nature. The DeLisle Affidavit suggests that Charles Gitto knew Gitto/Global's customers and ran the production meetings when he was in the office. (¶6). There is no inference to be drawn from the DeLisle affidavit that Charles Gitto was aware that inventory reports had been falsified or that false borrowing certificates had been submitted to LaSalle. The DeLisle affidavit also fails to support an inference that the production reports Charles Gitto relied upon in conducting the production meetings were, in any way, false. None of the production reports were offered into evidence at the hearing.

LaSalle also relies upon a document appended to the affidavit of Steven Snyder, a private investigator for LaSalle. It is important to note at the outset that the letter attached to the affidavit of Steven Snyder pre-dates the LaSalle loan by approximately two months, is not addressed to any officer, agent or employee of LaSalle and was clearly not intended to induce LaSalle to take any action whatsoever with respect to Gitto/Global. LaSalle appears to suggest that the letter is relevant to show that Charles Gitto was aware that at least one Gitto/Global accounts receivable ageing summary contained false information as early as May 24, 2002 when he sent the summary to Guaranty Business Credit.[1] However, even if this court were to accept that proposition as true, it cannot properly infer that Charles Gitto was aware, several months later, that Frank Miller and his cohorts were providing false reports to LaSalle. LaSalle also ignores an e-mail sent from Gary Gitto to Frank Miller, Rita Bartlett and Bill Deakin, dated April 8, 2002, in which he directs that, "…no information regarding the company or personal information is given to [Charles Gitto] from this point on." (Exhibit J0079)

---

[1] Charles Gitto does not concede that he signed the disputed letter.

LaSalle has submitted a considerable volume of documents in support of its request for continuation of the restraining order.  What is striking about LaSalle's evidentiary submissions is the complete absence of a single falsified document, either authored by Charles Gitto or bearing his name, that has anything to do with the LaSalle loan.  LaSalle has been unable to produce a single document or witness from which one could infer that Charles Gitto played any role in the preparation of false reports or the submission of those reports to LaSalle.  Indeed, the evidence is to the contrary.  Each and every allegation and each and every witness identify the Millers, William Deakin and Janice Chaisson as the perpetrators of the scheme to defraud.  Charles Gitto's name is noticeably absent from every averment in the Complaint concerning false documents and from every false document submitted to LaSalle in connection with the loan activity.  In short, the letter appended to the Snyder affidavit is a red herring designed to deflect this Court's attention from LaSalle's failure to produce any credible evidence suggesting that Charles Gitto played any role in the false documents submitted to LaSalle in connection with the Gitto/Global loan.

  2.  <u>The Loans to Kingsdale and Gitto/Global</u>

LaSalle contends that Charles Gitto facilitated the check kite scheme underlying the fraud when he transferred funds into the J & J Chemical Account at Clinton Savings Bank, and gave an unlimited guaranty to Clinton Savings Bank so that Clinton Savings Bank would allow payments on uncollected funds.  According to LaSalle, it was these payments on uncollected funds that funded the LaSalle account and allowed Gitto/Global to pay down the loan making more funds available to the company.  The evidence submitted at the hearing, however, refutes LaSalles claim.

6

The evidence reveals that Charles Gitto wired a total of $300,000 to the J & J Chemical account at Clinton Savings Bank in two separate transactions of $150,000 each on May 4 and May 6, 2002, approximately 2 and 1/2 months before LaSalle made its loan to Gitto/Global. (CSB 0072, 0076) These transfers comprised loans made from Charles Gitto to Frank Miller. (CNG 018-157). The reason for the loans were clear from the evidence presented.

In April 2002, Clinton Savings Bank informed Frank Miller that the Bank would no longer honor checks drawn on uncollected funds. This conversation followed the return of 3 large checks drawn on the account for insufficient funds. (Tenaglia Dep., pp. 10-14: CSB Exhibit 2 to Tenaglia Dep). For a period of six months, from April to November 2002, Clinton Savings Bank only paid checks drawn on collected funds. The evidence reveals that there were a number of loans made to the account in May 2002 to protect against returned checks. Nancy Gitto Panagiotis, Gary Gitto, Frank Miller and Charles Gitto, all made loans to fund that account. (CSB 0070-0080). Thus, if there is any inference to be drawn from the loans, it is that they were made to prevent, not to facilitate, a check kiting scheme. In any event, the loans could not have been made, as LaSalle alleges, to fund the LaSalle blocked account at Fleet, as neither the LaSalle loan nor the blocked account even existed until months later.

The guaranty, mortgage and pledge signed by Charles Gitto in the summer of 2004 also fails to support LaSalle's claim that Gitto facilitated a continuing fraud against LaSalle. First, there is no evidence that Charles Gitto was even aware of the loan from LaSalle bank when he executed the Clinton loan documents. Robert Paulhus, a vice president of commercial lending at Clinton Savings Bank was present when the

7

documents were signed and was well aware of the circumstances surrounding the closing. In June 2004, to facilitate the continued operation of the J & J account pending the anticipated sale of Gitto/Global to Vitrotech, Gitto/Global gave Clinton Savings Bank a security interest in its equipment and a guaranty of payment. (Paulhus Dep. pp., 22-24). In mid July 2004, when the Vitrotech sale was once again postponed, Clinton Savings Bank required additional collateral in order to continue its practice of clearing checks on uncollected funds. (Paulhus Dep. pp. 30). It was at that juncture that a very reluctant Charles Gitto gave Clinton Savings Bank a second mortgage on the Gitto/Global property owned by Tradex, an unlimited deficiency guaranty of the obligation to Clinton Savings Bank, and a pledge on Tradex's share of the Vitrolite inventory. (Paulhus Dep. pp. 31-32, 43-44, 60-63). Prior to the closing, Charles Gitto repeatedly attempted to avoid posting any collateral to guaranty the Clinton Savings Bank obligation and was described by Mr. Paulhus as ,"…trying his hardest not to give us anything." (Paulhus Dep. pp 78-82). This can hardly be described as the conduct of an individual intent on perpetrating a check kite scheme involving one bank in order to defraud another. The concern at the time on the part of both Clinton Savings Bank and Charles Gitto was eminently clear. Had Clinton Savings Bank closed that account, it would have seriously jeopardized the impending sale of Gitto/Global to Vitrotech. (Tenaglia Dep. pp. 50-51).[2] That sale was to include the purchase of the Tradex real estate. Charles Gitto, as an owner of Tradex, had a clear interest in insuring that the Clinton Savings Bank did not take any action that would jeopardize the sale of the Tradex property to Vitrotech. (FM-01-16302; CSB 11)

---

[2] The relationship between J & J. Chemicals and Gitto/Global is explained in a letter from Frank Miller to Mike Tenaglia of Clinton Savings Bank dated June 25, 2004. (See CSB 7 to Tenaglia Deposition). LaSalle has presented no evidence that Charles Gitto had any knowledge of that explanation.

8

      (3)    <u>Neither Charles Gitto nor Tradex benefited From The Fruits of The Conspiracy</u>.

LaSalle has also failed to establish that either Charles Gitto or Tradex benefited from the conspiracy by knowingly receiving monies to which they were not entitled. LaSalle's case on this point is found in the affidavit (12/6/04, ¶ 18) and testimony of Matthew Stilwell. Stilwell testified that he created Exhibit I to his affidavit from cancelled checks he retrieved from the Gitto/Global premises. He then placed those checks into various categories according to the designation assigned them in the Gitto/Global general ledger. (Stilwell testimony, December 10, 2004, pp. 6-8 attached hereto as Exhibit A). Stilwell testified that he located checks made payable to Tradex and/or Tradex International as interest payments totaling $230,090. However, this averment is not borne out by the checks listed on Exhibit I. Exhibit I reveals that all of the Tradex checks other than those paid for rent only totaled $194,513.89 and that none of those checks are unaccounted for. The checks appearing in Exhibit I, other than those paid as rent were in the amounts of $3,125.00, $1,600, and two checks in the amount of $2,500 each. (Exhibit I). Those checks correspond almost without exception to the interest payment invoices and amortization schedules for Tradex admitted at the hearing as Exhibits CNG 018-141. All of the loans were made and all of the payments on the loan commenced prior to the date of the LaSalle loan. The loan documents reveal that, not only were the loans legitimate, but that Mr. Gitto had not been fully re-paid on those loans as of the date Gitto/Global declared bankruptcy. In short, if there is any inference to be drawn from the interest payments on the loans, it is an inference favorable to Mr. Gitto.

Gitto/Global entered into a lease with Tradex in connection with the Gitto/Global business property on September 18, 1992, approximately 10 years before the LaSalle loan was initiated. (Agreement of Lease attached hereto as Exhibit B)  The lease was amended on March 1, 1995 to provide for the payment of rent in the sum of $31,085.00 per month. (Amendment of Lease attached hereto as Exhibit C).  Exhibit I reveals payments from Gitto/Global on a monthly basis in the amount of $31,085.00 for eight of the months included in the 14 month period covered by the disbursements to Tradex in the exhibit. Thus, it would appear from Exhibit I that although Gitto/Global legitimately paid Tradex $248,680 in rent (an amount that exceeds that set forth in paragraph 18 (b) of the Stilwell affidavit) it also owed Tradex $186,510.00 (6 x $31,085.00) for rent not paid during the same period.

Similar discrepancies also appear between the Stilwell Affidavit and Exhibit I as they pertain to checks made payable to Charles Gitto.  In his affidavit, Stilwell claims that Charles Gitto received "unaccounted for disbursements of $320,948." (¶18(c) of Stilwell Aff., 12/6/04).  However, a careful review of Exhibit I reveals checks made payable to Charles Gitto totaling only $243,638.69.  Thus, if one subtracts from that sum the interest payments of $10,000 and consulting fees of $44,300 appearing in paragraph 18(c) of the affidavit, the resulting figure is less than $190,000.  This figure, although not insubstantial, is a far cry from $320,948.  Finally, Stilwell admitted that he had no way of knowing whether the unaccounted for disbursements were legitimate or illegitimate. (Stilwell testimony, December 10, 2004, p. 23, Exhibit A).

The above exercise reveals the misleading nature of LaSalle's claim of unjust enrichment against Mr. Gitto and Tradex.  The fact is that Gitto/Global also failed in its

obligations to both Tradex and Charles Gitto, obligations that arose long before the commencement of the LaSalle loan.

    (4)    <u>The Alleged Coverup</u>

LaSalle has neither alleged, nor has it proven any participation by Tradex in a coverup. As to Charles Gitto, LaSalle relies on the affidavits of Roger DeLisle, Oren White and Rita Bartlett. Mr. DeLisle avers that, on September 14, 2004, Helen Kozak asked him to get Oren White to remove boxes from Gary Gitto's office. He saw approximately 20 banker file boxes in Gary Gitto's office. (DeLisle Affidavit, ¶7). Later that day Maria Miller asked DeLisle to bring 8-9 boxes from Frank Miller's office to the lobby. (*Id*).

Rita Bartlett averred that she saw Helen Kozak packing boxes in William Deakin's office on September 16, 2004. (Bartlett Affidavit, ¶7). She also saw Oren White move those boxes with a hand truck. (Id. ¶8).

Oren White averred that on September 15, 2004, he moved several boxes from Gary Gitto's office and a single box from Charles Gitto's office (along with his model airplane) and took them to Charles Gitto's basement. Later that day he loaded several additional boxes from William Deakin's office, Janice Chaisson's office and Dean Child's office and, at the instruction of Charles Gitto, transported them to his garage. (White Affidavit, ¶4).

LaSalle contends that Charles Gitto's role in the removal of documents from the premises of Gitto/Global establishes that he knew about the conspiracy and actively participated therein.

11

As stated previously, knowledge is not enough to sustain a claim of civil conspiracy. To succeed on its claim for injunctive relief LaSalle must demonstrate that Charles Gitto and/or Tradex substantially assisted in the scheme to defraud by knowingly and actively participating in the conduct that induced LaSalle to make the loan to Gitto/Global. Conduct that takes place after the conclusion of the conspiracy, in this case the removal of boxes to Charles Gitto's home, does not constitute an act in furtherance of the conspiracy and is not a substitute for the requirement of substantial assistance in the underlying fraud.

Similarly, although this Court is permitted to draw a negative inference from the fact that Charles Gitto has asserted his Fifth Amendment Privilege in response to discovery requests served upon him, such an assertion is not a substitute for proof of the elements of the conspiracy as alleged by LaSalle. In this case, LaSalle has been able to acquire the vast majority of the documents it sought from Charles Gitto from Tradex Corporation, Tradex International Corporation, the examiner in the Bankruptcy court, the relevant banking institutions and Frank Miller. Thus, LaSalle has suffered little, if any, prejudice as a result of Mr. Gitto's assertion of the Fifth Amendment. Finally, Tradex Corporation has not asserted a fifth amendment protection and has made documents sought by LaSalle available for inspection and copying. Thus, a negative inference against Tradex is not permissible.

<div style="text-align:center"><u>Conclusion</u></div>

Based upon the foregoing, LaSalle's request to extend the preliminary injunction should be denied.

<div style="margin-left: 50%">
RESPECTFULLY SUBMITTED,<br>
Charles Gitto and Tradex,<br>
By their attorney,
</div>

December 31, 2004

<div style="margin-left: 50%">
/s/ Juliane Balliro<br>
Juliane Balliro (BBO#028010)<br>
Barbara Green Whitbeck (BBO#634343)<br>
Perkins Smith & Cohen LLP<br>
One Beacon Street, 30th Floor<br>
Boston, MA  02108<br>
617-854-4000
</div>