IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a) <br> LASALLE BUSINESS CREDIT, INC.,   ) <br> ) <br> Plaintiff,   ) <br> v.   ) <br> ) <br> GARY C. GITTO, et al.,   ) <br> ) <br> Defendants,   ) <br> and   ) <br> ) <br> FLEET NATIONAL BANK, et al.,   ) <br> ) <br> Trustee Process Defendants,   ) <br> ) <br> and   ) <br> ) <br> FIDELITY INVESTMENTS, INC., et al., ) <br> ) <br> Reach-and-Apply Defendants.   ) <br> ) | Case No. 04-12227-DPW |

**LASALLE BUSINESS CREDIT, LLC'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW FOR ATTACHMENTS AND PRELIMINARY INJUNCTION
FOR CHARLES N. GITTO, JR. AND TRADEX CORPORATION**

**Proposed Findings of Fact**

**Plaintiff**

1.  LaSalle Business Credit, LLC ("LaSalle"), f/k/a LaSalle Business Credit, Inc., is a limited liability company organized and existing under the laws of the State of Delaware, with executive offices in Chicago, IL and a locus of operations in New York, N.Y. LaSalle is a wholly owned subsidiary of LaSalle National Leasing Corporation, which is a wholly owned subsidiary of LaSalle Bank National Association, a federally insured national banking association, which provides funding to LaSalle.

- 2 -

**Defendants**

2. Gitto Global Corporation ("Gitto Global"), is a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Lunenburg, Mass. It is a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, styrenic and thermoplastic olefin compounds that conform to strict industry guidelines. Gitto Global's product is used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems. (Stillwell 10/21/04 Aff., ¶4)

3. Charles N. Gitto, Jr., ("Charles Gitto") was the chairman of the board of Gitto Global. (Snyder Aff., Ex. A) He is also an owner and officer of Tradex Corporation ("Tradex"), which was Gitto Global's landlord.

4. Gary C. Gitto ("Gary Gitto") was the chief executive officer and treasurer of Gitto Global. He is the son of Charles Gitto and one of the three listed owners of Gitto Global. (Stillwell 10/21/04 Aff., ¶4)

5. Frank Miller was the chief operating officer and president of Gitto Global. He is also the sole owner of Defendant Kingsdale Corporation, d/b/a J&J Chemical Distributors. He is one of the three listed owners of Gitto Global. (Stillwell 10/21/04 Aff., ¶4)

6. Helen Kozak was the executive assistant for Frank Miller and Gary Gitto at Gitto Global. (Bartlett Aff., ¶5)

7. Nancy Gitto Panagiotes was vice president/public relations with Gitto Global. She is one of the three listed owners of Gitto Global. (Stillwell 10/21/04 Aff., ¶4)

8. John D. Tersigni ("John Tersigni") is the sole officer and director of J-Tan Sales and Marketing, Inc. ("J-Tan"), a Massachusetts corporation. (Tersigni Aff., ¶6)

9. Kathleen M. Carland ("Carland") is the president of Hemisphere Distribution Corporation ("Hemisphere"), a Massachusetts corporation.

10. William Deakin was the controller of Gitto Global.

11. Janice Chaisson was the accounting clerk handling accounts receivables for Gitto Global.

12. Tradex is a Massachusetts corporation with its principal place of business located at 18 Nancy Court, Leominster, Mass, which is the home of Charles Gitto. Charles Gitto is an officer of Tradex. Tradex owns the property at 140 Leominster Shirley Road, Lunenburg, Mass, where Gitto Global's business is located.

13. Kingsdale Corporation is a Massachusetts corporation with its principal place of business located at 50 Independence Drive, Ayer, Mass. Kingsdale purportedly did business as J&J Chemical Distributors, and will be referred to herein as J&J Chemical. (Tersigni Aff., ¶¶22-23)

**LaSalle's Loan**

14. On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement (the "Loan Agreement"), wherein LaSalle made a revolving loan not to exceed $27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's Eligible Accounts, as defined, and 65% of the lower cost or market value of Gitto Global's Eligible Inventory, as defined, ("LaSalle revolving loan"). Eligible Accounts was defined, *inter alia*, under the Loan Agreement to be "genuine," to arise from the performance of services by Gitto Global and evidenced by an invoice that was due and payable within 30 days and not less than 90 days past due. Eligible Inventory was defined, *inter alia*, as being owned by Gitto Global, located at one of its premises and held for sale. (Stillwell 10/21/04 Aff., ¶5; Cmplt. Ex. A, Section 1)

277351.1 042314-34311

15. The Loan Agreement provided that Gitto Global would deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan, accompanied by information on Gitto Global's sales, cash receipts and inventory value. (Stillwell 10/21/04 Aff., ¶6; Cmplt. Ex. A, Section 9)

16. On or about July 25, 2002, pursuant to the terms of the Loan Agreement, Gitto Global, LaSalle and Fleet National Bank ("Fleet") entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account Agreement"). Pursuant to the terms of the Blocked Account Agreement, Gitto Global established a deposit account at Fleet ("Fleet Blocked Account"). (Stillwell 10/21/04 Aff., ¶¶10-12)

17. The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account. Also on a daily basis, Fleet was to deposit the available funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan. (Stillwell 10/21/04 Aff., ¶13)

**The Conspiracy to Defraud LaSalle**

18. From July 25, 2002 through September 15, 2004, Gitto Global submitted to LaSalle daily borrowing base certificates, together with Gitto Global's purported sales, cash receipts, inventory valuation and other substantiation for loan funds. (Stillwell 10/21/04 Aff., ¶¶20, 25-27, 35; Cmplt. Exs. J, K, L, M) These borrowing base certificates were false and overstated Gitto Global's sales, inventory, cash receipts and other information. (Stillwell 12/06/04 Aff., ¶23; Stillwell 10/21/04 Aff., ¶¶25-37)

19. LaSalle relied upon the representations in the borrowing base certificates to make loan advances to Gitto Global. (Stillwell 10/21/04 Aff., ¶37)

20. A major portion of the purported sales supporting the borrowing base certificates were fictitious and with entities that had been created by some of the Defendants. These fictitious customers included Color Compounds & Consultants, Inc., Hemisphere Distribution Corp., Hitachi Cable, Inc., J/Tan Sales & Marketing, Inc., Zebulon Industries, Inc., and Velco Chemicals, Inc. (Stillwell, 10/21/04 Aff., ¶¶28-34) During the period July, 2002 through September, 2004, Gitto Global represented to LaSalle that the cumulative total amount of its sales was $1,101,204,678 when they actually were only $73,698,029—a difference of $1,027,506,649. (Stillwell 10/21/04 Aff., ¶39)

21. Gitto Global created a picture of increasing sales for its borrowing base certificates through a check-kiting scheme in which it deposited over 600 checks in the Fleet Blocked Account from J&J Chemical drawn on an account at Clinton Savings Bank ("Clinton Bank"). The total cumulative amount of the deposits of J&J Chemical checks was $1,104,501,539. (Stillwell 10/21/04 Aff., ¶38) Between July, 2002 and August, 2004, Gitto Global, as part of a check-kiting operation, provided checks payable to J&J Chemical totaling over $34 million that were deposited to J&J Chemical's account at Clinton Bank. (Stillwell 10/21/04 Aff., ¶¶16-17; 21-22; Cmplt. Exs. G, H, I)

22. Gitto Global had been matching J&J Chemical checks to generate check-kite funds for fictitious customer invoices as a standard operating procedure for at least a year prior to the Loan Agreement. (Stillwell 12/6/04 Aff., ¶9)

23. The borrowing base certificates submitted by Gitto Global were also based upon intentional overvaluations of Gitto Global's inventory. (Stillwell 12/6/04 Aff., ¶23; Stillwell 10/21/04 Aff., ¶40)

24. Between July, 2002 and July, 2004, LaSalle conducted five field examinations and one audit of Gitto Global. False confirmations of sales from fictitious customers, invoices, bills of lading, checks and other documents were provided to LaSalle on these occasions. (Stillwell, 10/21/04 Aff., ¶¶43-62); Stillwell 12/6/04 Aff., ¶28)

25. Defendants Gary C. Gitto, Frank Miller, John Tersigni, Kathleen M. Carland, William Deakin, Janice Chaisson and Helen Kozak participated in one or more ways in the submittal of the false borrowing base certificates, the conduct of the check-kiting scheme, the creation and presentation of false sales information and the falsification of Gitto Global's inventory as previously described. (Stillwell 10/21/04 Aff., ¶¶17, 20, 21, 22, 25-27, 30, 34, 35-37, 39, 40, 42, 43, 45, 46, 50-52, 54, 56-58, 60, 62; John Tersigni Aff.)

26. A conspiracy to defraud LaSalle existed among Gary C. Gitto, Frank Miller, John Tersigni, Kathleen M. Carland, William Deakin, Janice Chaisson and Helen Kozak from at least July 25, 2002 to September 24, 2004.

27. On September 24, 2004, Gitto Global filed bankruptcy.

**Participation of Charles N. Gitto, Jr./Tradex in the Conspiracy**

28. Charles Gitto played a prominent role in the operations of Gitto Global. (DeLisle Aff., ¶2) Since 1997, he conducted the company's production meetings, which were held daily during the period LaSalle advanced funds. (Merchant Aff., ¶8; Minardi Aff., ¶6; FM-01-00071) At these meetings, Charles Gitto discussed various aspects of the company's sales and orders. He also set the production and product delivery schedules. (Minardi Aff., ¶6) Charles Gitto knew who Gitto Global's customers were and was familiar with their needs. (DeLisle Aff., ¶6)

29. On May 24, 2002, Charles Gitto sent a letter to Michael Haddad, President-CEO of Guaranty Business Credit. The letter is on the printed stationery of Gitto Global and identifies Charles Gitto as the Chairman of Gitto Global. In the letter, Charles Gitto states he is providing

- 6 -

a summary of Gitto Global's accounts receivable aging, which showed "there are no receivables of consequence going over 90 days on May 31." Among the purported customers on the list with the largest amounts due for purchases were: Hitachi Cable, Inc. ($3,065,672.89), Hemisphere Dist. Corp. ($3,013,801.75) Zebulon Industries ($2,780,545.60), J/Tan Sales & Marketing ($2,743,746.05), Velco Chemicals, Inc. ($2,688,013.15), and Colors Compounds & Consultants ($1,079,586.29). (Snyder Aff. Ex. A) These are the same fictitious customers that were used to evidence fictitious sales supporting the borrowing base certificates presented to LaSalle. (See ¶20)

30.     With his intimate knowledge of Gitto Global's customers, Charles Gitto must have known that the information he was submitting to Guaranty Business Credit was false. The reasonable inference from Charles Gitto's letter, which was just two months before Gitto Global's Loan Agreement with LaSalle, is that Charles Gitto knew Gitto Global was fabricating its accounts receivable with nonexistent sales to obtain loans.

31.     Charles Gitto exercised such control over operations at Gitto Global that he had company funds diverted for his personal benefit. Gitto Global paid for maintenance and repair work done at Charles Gitto's home. (DeLisle Aff., ¶3) On June 13, 2003, Charles Gitto instructed that any invoices related to him or his house be viewed only by him and he would decide how to pay the bill, whether it be by Tradex, Gitto Global or personally. "No one else will make those determinations." (J73)

32.     Gitto Global's records disclose that during 2003 and the first nine months of 2004 the company disbursed $320,948 to Charles Gitto for which there is no explanation in the company's records. (Stillwell 12/6/04 Aff, ¶18a) In addition, Gitto Global's records disclose that Tradex received during the same period reported interest payments of $230,090, prepaid rent

of $217,061 and payments totaling $134,546 for which no explanations are given. (Stillwell 12/6/04 Aff., ¶18b)

33. Neither Charles Gitto nor any representative of Tradex has offered any justification for the unexplained disbursements.

34. Gitto Global had been using the J&J Chemical account at Clinton Bank prior to borrowing from LaSalle. Clinton Bank's policy was to allow customers to draw against uncollected funds. (Tenaglia Dep., p. 11) In April, 2002, some checks deposited by J&J Chemical at Clinton Bank were returned for insufficient funds. (CSB 2) This prompted Clinton Bank to suspend its policy of permitting withdrawals as uncollected funds for J&J Chemical. (Tenaglia Dep., p. 11) As a result, J&J Chemical needed funds to cover its checks. Charles Gitto on June 4 and 6, 2002 initiated wire transfers that provided $300,000 to J&J Chemical's account. (CSB 72; SB 76) Clinton Bank reverted to its regular policy after six months. (Tenaglia Dep., pp. 13-14)

35. In July, 2004, Clinton Bank became concerned about payment for the millions of dollars that flowed through the J&J Chemical account on uncollected funds. (CSB 10) Defendant Frank Miller sought to satisfy Clinton Bank's concerns by advising that Gitto Global, the source of all of the checks deposited by J&J Chemical, was going to be acquired by Vitrotech on August 15, 2004. (Tenaglia Dep., pp. 25-26; Paulhus Dep., p. 74) On July 23, 2004, J&J Chemical and Clinton Bank entered into an $8.4 million revolving line of credit agreement, the sole purpose of which was to provide protection for payments made on uncollected checks deposited to J&J Chemical's account upon the acquisition of Gitto Global that was to occur August 15, 2004. (CSB 10)

277351.1 042314-34311

36. Charles Gitto attended the closing for the Clinton Bank loan and negotiated changes to certain documents. (Paulhus Dep., pp. 41-42) Also, as president and treasurer of Tradex, Charles Gitto had Tradex provide the Clinton Bank as security for the line of credit facility a limited non-recourse guarantee (CSB 32), a mortgage on the property occupied by Gitto Global (CSB 34) and a security interest in certain inventory. (CSB 35)

37. In August, 2004, Clinton Bank sought additional collateral to induce the bank to continue to pay on uncollected checks deposited in the J&J Chemical account. (Paulhus Dep., pp. 74-75) Clinton Bank's representative had three conversations with Charles Gitto on the subject between August 10 and 18, 2004. (Paulhus Dep., p. 78) Ultimately, on August 18, 2004, Charles Gitto gave Clinton Bank guarantees from him and Tradex, so that Clinton Bank would continue to allow payments on uncollected funds in the J&J Chemical account through September 15, 2004. (CSB 10, CSB 15, CSB 18, CSB 33)

38. Neither Charles Gitto or any representative of Tradex has offered any explanation for the guarantees and collateral they provided to Clinton Bank to permit J&J Chemical to continue drawing payments on uncollected checks. The legitimate inference from this is that Charles Gitto knew of the check kiting Gitto Global was engaging in to support its borrowings from LaSalle and that Tradex joined in that effort.

39. On September 15, 2004, just prior to Gitto Global's bankruptcy filing, seven to eight boxes of documents from Gary Gitto's office at Gitto Global and one box from Charles Gitto's office were taken to the basement of Charles Gitto's home. Charles Gitto came down to the basement to insure that these boxes were placed in the proper location. (White Aff., ¶3) On September 16, 2004, three to four boxes from William Deakin's office at Gitto Global, two

boxes from Janice Chaisson's office and two to three boxes from Dean Childs' office were taken and unloaded in Charles Gitto's garage. (White Aff., ¶4)

**LaSalle's Claims**

40. On October 25, 2004 LaSalle filed its Complaint herein, naming in addition to the Defendants herein, nine Trustee Process Defendants and seven Reach-and-Apply Defendants. The Complaint contains seven substantive Counts: Count I: RICO violation (18 U.S.C. § 1962 (d)); Count II: Bank Fraud; Count III, Deceptive Practices; Count IV: Common Law Conspiracy to Defraud; Count V: Civil Conspiracy; Count VI: Breach of Guaranty (against Gary C. Gitto), and Count VII: Breach of Guaranty (against Defendant Frank Miller).

41. On December 30, 2004, LaSalle filed a First Amended Complaint herein.

42. The attachments effected as to Charles Gitto are real property located in Massachusetts and accounts at Fleet National Bank and Clinton Bank. The attachment effected as to Tradex is for any real property located in Massachusetts.

43. On October 25, 2004, the Court entered a temporary restraining order preserving the status quo. In addition, the Court allowed LaSalle's motions for the attachment of real estate belonging to Charles Gitto and Tradex, as well as attachments on trustee process of assets of Charles Gitto. On November 5, 2004, the Court converted the temporary restraining order into a Preliminary Injunction, subject to further proceedings on December 10, 2004. The Court enjoined Charles Gitto and Tradex (along with the other Defendants) and each of their officers, agents, servants, employees, attorneys, beneficiaries and all persons in active concert or participation with them who received actual notice of the Order, by personal service or otherwise, from assigning, alienating, selling, transferring, pledging, encumbering, concealing, hypothecating or disposing of any of their assets pending further order of this Court.

277351.1 042314-34311

44. On November 10, 2004, the Court entered the First Supplement to the Preliminary Injunction, modifying the terms thereof as they applied to Gary C. Gitto, Charles Gitto and William Deakin.

45. On December 10, 2004, the Court continued the Preliminary Injunction until further order of Court.

46. Neither Charles Gitto nor Tradex Corporation submitted any evidence at the December 10, 2004 hearing that the attachments or the injunction entered by the Court has imposed any hardship on them.

47. Charles Gitto, as well as Defendants Gary C. Gitto, Frank Miller, Kathleen M. Carland, William Deakin, and Helen Kozak, have invoked the Fifth Amendment herein with respect to the matters alleged in this case.

48. LaSalle sought through discovery from Charles Gitto in this case to obtain access to and the return of the Gitto Global files that had been removed to Charles Gitto's home. Charles Gitto asserted that he could not be compelled to produce the records because his act of producing them would violate his rights under the Fifth Amendment not to incriminate himself. This Court sustained Charles Gitto's invocation of the Fifth Amendment.

49. It is a fair inference that by having the Gitto Global documents brought to his residence and by later refusing to produce them based upon his Fifth Amendment rights, Charles Gitto is concealing (and may even have destroyed) records that implicate him in the fraud conspiracy.

50. As of December 2, 2004, there was due and owing under the LaSalle revolving loan, a principal of $30,683,467.23, plus, interest and costs.  (Stillwell 12/6/04 Aff. ¶3)

**Conclusions of Law**

51. Pursuant to Federal Rule of Civil Procedure 64, Mass. Gen. L. Ch. 223, §42 *et seq.* and Mass. Rule Civil Procedure 4.1, a court may enter an order approving the attachment of real estate upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal or greater than the amount of the attachment. *International Assoc. of Bridge, Structural and Ornamental Iron Workers v. Burtman Iron Works, Inc.*, 164 F.R. D. 305, 306 (D. Mass. 1995); *The Aetna Casualty and Surety Co. v. Rodco Autobody*, 138 F.R.D. 328, 332 (D. Mass. 1991), *affd.*, 43 F.3d 1546 (1st Cir. 1994).

52. Under Federal Rule of Civil Procedure 64 and Mass. Gen. L. Ch. 214 §3, the Court can enter a temporary restraining order and later a preliminary injunction equitably attaching the rights and interests that a defendant has with the reach and apply defendants upon a showing that there is a reasonable likelihood the plaintiff will recover a judgment in an amount equal to or greater than the amount of the attachment. *Tilcan Capaldi, Inc. v. Feldman*, 249 F.3d 54, 59 (1st Cir. 2001); *GMAC v. Camilleri Bros. Chevrolet of Holyoke, Inc.*, 188 F. Supp. 2d 73, 76 (D. Mass. 2001). Under Federal Rule of Civil Procedure 65, the Court may enter injunctions preserving the status quo by prohibiting defendants, and those acting in concert with them, from transferring, diminishing, encumbrancing or hypothecating in any way the assets of the defendants that may be available to satisfy a judgment and may, directly or indirectly, represent "ill-gotten" gains.

53. For the Court to maintain the preliminary injunctions that have been entered, LaSalle must show (1) a reasonable likelihood that it will succeed in its claims against Charles Gitto and Tradex; (2) irreparable harm if the injunction is not maintained; (3) the harm to LaSalle if the preliminary injunction is not maintained will be greater than that to Charles Gitto and Tradex; and (4) the public interest favors the continuation of the preliminary injunction.

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 161-62 (1st Cir. 2004); *Coalition to Protest the Democratic National Convention v. City of Boston*, 327 F. Supp. 2d 61, 69 (D. Mass. 2004).

54. LaSalle has a reasonable likelihood of success on the merits of its claims against Charles Gitto and Tradex.

55. The evidence of the existence of the alleged conspiracies has not been challenged. In any event, that evidence presented by LaSalle and the adverse inferences that may reasonably be drawn from the invocation of the Fifth Amendment by the alleged conspirators provides a reasonable likelihood that LaSalle will prove that the alleged conspiracies existed.

56. With the existence of the conspiracies having been established, only slight evidence is required to prove the involvement of other participants. *U. S. v. Smith*, 726 F.2d 852, 866 (1st Cir. 1984).

57. The facts presented concerning Charles Gitto's conduct herein, including his role at Gitto Global over a period of years and his involvement in ensuring the maintenance of the check-kiting scheme at Clinton Bank, the inferences that can be drawn from his receipt and concealment of Gitto Global records, and the inferences from his invocation of the Fifth Amendment indicate there is a reasonable likelihood that LaSalle will meet the standard for Charles Gitto to be found to have been a participant in the alleged conspiracies.

58. The unexplained support provided by Tradex to the maintenance of the checking account employed in the check kite that sustained the fraud and the inferences from the fact that Tradex's president and treasurer, Charles Gitto, who entered into the transactions with Clinton Bank provide a reasonable likelihood that LaSalle will meet the standard for Tradex to be found to have participated in the alleged conspiracies.

- 14 -

59.     LaSalle has a justified concern that any judgment it obtains against Defendants could be rendered worthless by Defendants' dissipation or concealment of their non-exempt assets. This constitutes irreparable harm. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52-53 (1st Cir. 1986).

60.     The preliminary injunction freezes the status quo without depriving Charles Gitto and Tradex of the funds necessary for them to handle their normal affairs. To release the freeze, would permit Charles Gitto and Tradex to render themselves judgment-proof and destroy the benefit of any judgment against them. This tips the balance of hardship decisively in favor of the injunction. *Teradyne*, 797 F.2d at 53.

61.     The public interest is best served by discouraging schemes to defraud an order that preserves assets for which there is a reasonable likelihood LaSalle will prove were obtained by fraud.

Dated: December 31, 2004                    Respectfully submitted,

                                                  LASALLE BUSINESS CREDIT, LLC

                                                By:   /s/ Patrick W. Manzo
                                                         One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

277351.1 042314-34311