LOAN AND SECURITY AGREEMENT

DATED AS OF JULY 25, 2002

BETWEEN

LASALLE BUSINESS CREDIT, INC.

THE LENDER,

AND

GITTO GLOBAL CORPORATION

THE BORROWER

::ODMA\PCDOCS\BALT01\522662\6



EXHIBIT

A

ALL-STATE® INTERNATIONAL

## TABLE OF CONTENTS

Page

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this **"Agreement"**) made this 25th day of July, 2002 by and between LASALLE BUSINESS CREDIT, INC., a Delaware corporation (**"Lender"**), whose address is 565 Fifth Avenue-27th floor, New York, New York 10017, and GITTO GLOBAL CORPORATION, a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Gianna Park, Lunenburg, Massachusetts 01462 (**"Borrower"**).

### WITNESSETH:

WHEREAS, Borrower may, from time to time, request Loans from Lender, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Lender, shall be made;

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrower, the parties agree as follows:

1.    DEFINITIONS.

**"Account"**, **"Account Debtor"**, **"Chattel Paper"**, **"Documents"**, **"General Intangibles"**, **"Goods"**, **"Instruments"**, **"Inventory"**, and **"Investment Property"** shall have the respective meanings assigned to such terms, as of the date of this Agreement, in the Illinois Uniform Commercial Code.

**"Affiliate"** shall mean any Person (i) which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Borrower, (ii) which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of Borrower, or (iii) five percent (5%) or more of the voting control or equity interests of which is beneficially owned or held by Borrower.

**"Applicable Margin"** shall have the meaning specified in Section 4(a)(iii).

**"Applicable Margin for LIBOR Rate Loans"** shall have the meaning specified in Section 4(a)(iii).

**"Applicable Margin for Prime Rate Loans"** shall have the meaning specified in Section 4(a)(iii).

**"Assignment of Life Insurance"** and **"Assignments of Life Insurance"** mean the collective reference to those certain assignments of life insurance as collateral dated the date hereof from Borrower for the benefit of Lender, which Assignments of Life Insurance assigns to Lender all of the right, title and interest of Borrower in, and to, the Life Insurance Policies, as those assignments are amended, restated, reissued, supplemented or otherwise modified in writing at any time and from time to time.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or (i) with respect to all matters, determinations, fundings and payments in connection with LIBOR Rate Loans, any day on which banks in London, England or Chicago, Illinois are required or permitted to close, and (ii) with respect to all other matters, any day that banks in Chicago, Illinois are required or permitted to close.

"**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrower during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrower.

"**Collateral**" shall mean all of the property of Borrower described in <u>Section 5</u> hereof, together with all other real or personal property of any Obligor or any other Person now or hereafter pledged to Lender to secure, either directly or indirectly, repayment of any of the Liabilities.

"**Commitment Letter**" shall mean that certain Commitment Letter, executed by Borrower in favor of Lender.

"**EBITDA**" shall mean, with respect to any period, Borrower's net income after taxes for such period (excluding any after-tax gains or losses on the sale of assets and excluding other after-tax extraordinary gains or losses) <u>plus</u> interest expense, income tax expense, depreciation and amortization for such period, <u>less</u> gains and losses attributable to any fixed asset sales made during such period, <u>plus</u> or <u>minus</u> any other non-cash charges or gains which have been subtracted or added in calculating net income after taxes for such period.

"**Eligible Account**" shall mean an Account owing to Borrower which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider an Account to be an Eligible Account if it meets, and so long as it continues to meet, the following requirements:

        (i)      it is genuine and in all respects what it purports to be;

        (ii)     it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Lender or assign it to Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

        (iii)    it arises from (A) the performance of services by Borrower in the ordinary course of Borrower's business, and such services have been fully performed and acknowledged and accepted by the Account Debtor thereunder; or (B) the sale or lease of Goods by Borrower in the ordinary course of Borrower's business, and (x) such Goods have been completed in accordance with the Account Debtor's specifications (if any) and delivered to the Account Debtor, (y) such Account Debtor has not refused to accept, returned or offered to return, any of the Goods which are the subject of such Account, and (z) Borrower has possession of, or Borrower has delivered to Lender (at Lender's request) shipping and delivery receipts evidencing delivery of such Goods;

(iv)    it is evidenced by an invoice rendered to the Account Debtor thereunder, is due and payable within thirty (30) days after the date of invoice and does not remain unpaid the lesser of ninety (90) days past the invoice date thereof or sixty (60) days past the due date thereof; provided, however, that if more than twenty-five percent (25%) of the aggregate dollar amount of invoices owing by a particular Account Debtor remain unpaid the lesser of ninety (90) days after the respective invoice dates thereof or sixty (60) days after the due dates thereof, then all Accounts owing by that Account Debtor shall be deemed ineligible;

(v)    it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and is not subject to setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or to any claim by such Account Debtor denying liability thereunder in whole or in part;

(vi)    it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

(vii)    the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate;

(viii)    it is not an Account with respect to which the Account Debtor is the United States of America or any state or local government, or any department, agency or instrumentality thereof, unless Borrower assigns its right to payment of such Account to Lender pursuant to, and in full compliance with, the Assignment of Claims Act of 1940, as amended, or any comparable state or local law, as applicable;

(ix)    it is not an Account with respect to which the Account Debtor is located in a state which requires Borrower, as a precondition to commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) Borrower has taken one of the actions described in clauses (A) or (B); (y) the failure to take one of the actions described in either clause (A) or (B) may be cured retroactively by Borrower at its election; or (z) Borrower has proven, to Lender's satisfaction, that it is exempt from any such requirements under any such state's laws;

(x)    the Account Debtor is located within the United States of America, except that with respect to Accounts which the Account Debtor is not located within the United States of America ("Eligible Foreign Account Debtors") and meet all other requirements for inclusion among Eligible Accounts, shall be considered Eligible Accounts ("Eligible Foreign Accounts"), but only if the Debtor has obtained, and the Lender has reviewed, original executed letter agreements, in form and substance acceptable to Lender in its sole discretion, from the Parent (who is also an Account Debtor and located within the United States of America, "U.S. Parent") of each Eligible Foreign Account Debtor guarantying payment of the Eligible Foreign Accounts, provided however that the Eligible Foreign Accounts shall not exceed $500,000 in the aggregate for all Eligible Foreign Account Debtors;

(xi)    it is not an Account with respect to which the Account Debtor's

obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(xii)   it is not an Account (A) with respect to which any representation or warranty contained in this Agreement is untrue; or (B) which violates any of the covenants of Borrower contained in this Agreement;

(xiii)   it is not an Account which, when added to a particular Account Debtor's (U.S. Parent and Eligible Foreign Account Debtor considered as one Account Debtor for purposes of calculating the limits of this clause (xiii)) other indebtedness to Borrower, exceeds: 15% of all Accounts of Borrower (except in the case of Accounts listing Hitachi Cable Manchester, Inc. as the Account Debtor, in which case such credit limit shall be 17.5%), or a credit limit determined by Lender in its sole discretion for that Account Debtor (except that Accounts excluded from Eligible Accounts solely by reason of this clause (xiii) shall be Eligible Accounts to the extent of such credit limit); and

(xiv)   it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in its sole discretion.

"**Eligible Inventory**" shall mean, new materials and finished goods Inventory of Borrower which is acceptable to Lender in its sole discretion for lending purposes.  Without limiting Lender's discretion, Lender shall, in general, consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(i)   it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

(ii)   it is located on one of the premises listed on Exhibit A (or other locations of which Lender has been advised in writing pursuant to subsection 12(b)(i) hereof) and is not in transit;

(iii)   if held for sale or lease or furnishing under contracts of service, it is (except as Lender may otherwise consent in writing) new and unused and free from defects which would, in Lender's sole determination, affect its market value;

(iv)   it is not stored with a bailee, consignee, warehouseman, processor or similar party unless Lender has given its prior written approval and Borrower has caused any such bailee, consignee, warehouseman, processor or similar party to issue and deliver to Lender, in form and substance acceptable to Lender, such Uniform Commercial Code financing statements, warehouse receipts, waivers and other documents as Lender shall require;

(v)   Lender has determined, in accordance with Lender's customary business practices, that it is not unacceptable due to age, type, category or quantity;

(vi)    it is not Inventory (A) with respect to which any of the representations and warranties contained in this Agreement are untrue; or (B) which violates any of the covenants of Borrower contained in this Agreement; and

(vii)    It is not Inventory that is determined by the Lender in its sole discretion to be packaging materials, supplies, obsolete or dated.

**"Eligible Life Insurance Policies"** means the collective reference to each Life Insurance Policy which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider a Life Insurance Policy to be one of the Eligible Life Insurance Policies if it meets, and so long as it continues to meet, the following requirements:

(viii)    the Life Insurance Policy arose in the ordinary course of Borrower's business from a bona fide transaction between Borrower and the Life Insurance Policy issuer;

(ix)    the Life Insurance Policy is an issued, valid, legally enforceable obligation of the Life Insurance Policy issuer, is in full force and effect and requires no further act on the part of any Person under any circumstances (other than the payment of premiums) to make cash surrender value payable at any time, and the death benefits and other benefits payable as set forth in the Life Insurance Policy, by the Life Insurance Policy issuer;

(x)    all premiums have been fully paid when due, without giving effect to and without relying on any grace period;

(xi)    the Life Insurance Policy is not subject to any present or contingent (and no facts exist which are the basis for any future) offset, claim, deduction or counterclaim, dispute or defense in law or equity on the part of the issuer including, without limitation, those arising on account of a breach of any express or implied representation or warranty;

(xii)    the Life Insurance Policy issuer is not a Subsidiary or Affiliate of Borrower or an employee, officer, director of shareholder of Borrower or any Subsidiary or Affiliate of Borrower;

(xiii)    the Life Insurance Policy issuer is not incorporated or primarily conducting business or otherwise located in any jurisdiction outside of the United States of America;

(xiv)    the Life Insurance Policy issuer with respect to such Life Insurance Policy is not insolvent or the subject of any receivership, conservatorship, bankruptcy or insolvency proceedings of any kind or of any other proceeding or action, threatened or pending;

(xv)    the Life Insurance Policy issuer is not a Governmental Authority;

(xvi)    Borrower is not indebted in any manner to the Life Insurance

Policy issuer (as creditor, lessor, supplier otherwise), with the exception of premiums which are not past due;

(xvii)  the title of Borrower to the Life Insurance Policy is absolute and is not subject to any prior assignment, claim, Lien, or security interest;

(xviii)  Borrower has the full and unqualified right and power to assign and grant a security interest in, and Lien on, the Life Insurance Policy to Lender as security and collateral for the payment of the Obligations;

(xix)  the Life Insurance Policy does not by its terms nor by operation of applicable Laws, forbid or make void or unenforceable the applicable Assignment of Life Insurance as Collateral;

(xx)  the Life Insurance Policy is subject to the lien and assignment in favor of Lender, which lien and assignment is perfected as to the Life Insurance Policy by the filing of the applicable Assignment of Life Insurance as Collateral with the Life Insurance Policy issuer and constitutes a first priority security interest and a first assignment;

(xxi)  the Life Insurance Policy issuer has acknowledged the applicable Assignment of Life Insurance as Collateral; and

Lender in the good faith exercise of its sole and absolute discretion has not deemed the Life Insurance Policy ineligible because of uncertainty as to the creditworthiness of the Life Insurance Policy issuer or because Lender otherwise considers the collateral value of such Life Insurance Policy to Lender to be impaired or its ability to realize such value to be insecure.

**"Environmental Laws"** shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to Borrower's business or facilities owned or operated by Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

**"Event of Default"** shall have the meaning specified in Section 15 hereof.

**"Excess Cash Flow"** shall have the meaning specified in Section 2 (c)(iii)(B).

**"Fiscal Year"** shall mean each twelve (12) month accounting period of Borrower, which ends on June 30th of each year.

**"Fixed Charges"** shall mean for any period, without duplication, scheduled

payments of principal during the applicable period with respect to all indebtedness of Borrower for borrowed money, plus scheduled payments of principal during the applicable period with respect to all capitalized lease obligations of Borrower, plus scheduled payments of interest during the applicable period with respect to all indebtedness of Borrower for borrowed money including capital lease obligations, plus unfinanced Capital Expenditures of Borrower during the applicable period, plus payments during the applicable period in respect of income or franchise taxes of Borrower.

"**Guaranties**" shall mean the collective reference to the unconditional, unlimited guaranties of payment of Frank Miller and Gary Gitto, as such guaranties may be amended, restated, modified, substituted, extended and renewed from time to time.

"**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

"**Indemnified Party**" shall have the meaning specified in Section 18 hereof.

"**Interest Period**" shall have the meaning specified in subsection 4(a)(ii) hereof.

"**LaSalle Bank**" shall mean LaSalle Bank National Association, Chicago, Illinois.

"**Letter of Credit**" shall mean any Letter of Credit issued on behalf of Borrower in accordance with this Agreement.

"**Letter of Credit Obligations**" shall mean, as of any date of determination, the sum of (i) aggregate undrawn face amount of all Letters of Credit, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit not already converted to Loans hereunder.

"**Liabilities**" shall mean any and all obligations, liabilities and indebtedness of Borrower to Lender or to any parent, affiliate or subsidiary of Lender of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (including, without limitation, obligations of performance), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

"**LIBOR Rate**" shall mean, with respect to any LIBOR Rate Loan for any Interest Period, a rate per annum equal to the offered rate for deposits in United States dollars for a period equal to such Interest Period as it appears on Telerate page 3750 as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period. "Telerate page 3750" means the display designated as "Page 3750" on the Telerate Service (or such other page

as may replace page 3750 of that service or such other service) as may be nominated by the British Bankers' Association as the vendor for the purpose of displaying British Bankers' Association interest settlement rates for United States dollar deposits).

**"LIBOR Rate Loans"** shall mean the Loans bearing interest with reference to the LIBOR Rate.

**"Life Insurance Policy"** individually and **"Life Insurance Policies"** collectively mean the life insurance policies described in Schedule 1 to this Agreement.

**"Loans"** shall mean all loans and advances made by Lender to or on behalf of Borrower hereunder.

**"Lock Box"** and **"Lock Box Account"** shall have the meanings specified in subsection 8(a) hereof.

**"Material Adverse Effect"** shall mean a material adverse effect on the business, property, assets, prospects, operations or condition, financial or otherwise, of a Person.

**"Maturity Date"** shall mean July 25, 2005.

**"Maximum Loan Limit"** shall mean Thirty Million and No/100 Dollars ($30,000,000)

**"Maximum Revolving Loan Limit"** shall have the meaning specified in subsection 2(a) hereof.

**"Obligor"** shall mean Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Liabilities.

**"Original Term"** shall have the meaning specified in Section 10 hereof.

**"Other Agreements"** shall mean all agreements, instruments and documents, other than this Agreement, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Lender or to any parent, affiliate or subsidiary of Lender in connection with the Liabilities or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

**"Parent"** shall mean any Person now or at any time or times hereafter owning or controlling (alone or with any other Person) at least a majority of the issued and outstanding equity of Borrower and, if Borrower is a partnership, the general partner of Borrower.

**"PBGC"** shall have the meaning specified in subsection 12(b)(v) hereof.

**"Permitted Liens"** shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder;

(ii) liens or security interests in favor of Lender; (iii) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrower's ability to use such real property for its intended purpose in connection with Borrower's business; (iv) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to the Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which is the subject of such capitalized leases; (vi) security interests described in Schedule 1.1 to this Agreement; and (v) liens specifically permitted by Lender in writing.

**"Permitted Officer Loans"** shall mean loans from the Borrower to the officers of the Borrower, provided that the total principal amount of all loans from the Borrower to the officers of Borrower shall at no time exceed the aggregate principal sum of $125,000. Provided further that such Permitted Officer Loans shall not exceed $50,000 on the last day of any fiscal year.

**"Person"** shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

**"Plan"** shall have the meaning specified in subsection 12(b)(v) hereof.

**"Prime Rate"** shall mean LaSalle Bank's publicly announced prime rate (which is not intended to be LaSalle Bank's lowest or most favorable rate in effect at any time) in effect from time to time.

**"Prime Rate Loans"** shall means the Loans bearing interest with reference to the Prime Rate.

**"Renewal Term"** shall have the meaning specified in Section 10 hereof.

**"Revolving Loan Limit"** shall have the meaning specified in subsection 2(a) hereof.

**"Revolving Loans"** shall have the meaning specified in subsection 2(a) hereof.

**"Subsidiary"** shall mean any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by Borrower or any partnership of which Borrower is a general partner.

**"Tangible Net Worth"** shall mean Borrower's shareholders' equity (including retained earnings) less the book value of all intangible assets as determined solely by Lender on a

consistent basis plus the amount of any LIFO reserve, plus any debtor subordinated to the Liabilities in form and substance satisfactory to the Lender in the exercise of its sole and absolute discretion from time to time, all as determined under generally accepted accounting principles applied on a basis consistent with the financial statement dated June 30, 2001, except as set forth herein.

"**Tax**" shall mean, in relation to any LIBOR Rate Loans and the applicable LIBOR Rate, any tax, levy, impost, duty, deduction, withholding or charges of whatever nature required to be paid by Lender and/or (ii) to be withheld or deducted from any payment otherwise required hereby to be made by Borrower to Lender; provided, that the term "Tax" shall not include any taxes imposed upon the net income of Lender.

"**Term Loan**" shall have the meaning specified in subsection 2(b) hereof.

2.    LOANS.

(a)    Revolving Loans.

Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term and any Renewal Term, Lender may, in its sole discretion, make revolving loans and advances (the "**Revolving Loans**") in an amount up to the sum of the following sublimits (the "**Revolving Loan Limit**"):

(i)    Up to eighty-five percent (85%) of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of Borrower's business) of Borrower's Eligible Accounts; plus

(ii)    Up to sixty-five percent (65%) of the lower of cost or market value of Borrower's Eligible Inventory or Six Million and No/100 Dollars ($6,000,000), whichever is less; minus

(iii)    such reserves as Lender elects, in its sole discretion to establish from time to time;

provided, that the Revolving Loan Limit shall in no event exceed Twenty-seven Million and No/100 Dollars ($27,000,000) (the "**Maximum Revolving Loan Limit**") except as such amount may be increased or decreased by Lender, in its sole discretion.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of the (i) Revolving Loan Limit minus the Letter of Credit Obligations and (ii) the Maximum Revolving Loan Limit minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either the Revolving Loan Limit or the Maximum Revolving Loan Limit, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within the Revolving Loan Limit, Borrower shall immediately, and without the necessity of demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess and Lender shall apply such payment to the Revolving Loans in such order as Lender shall determine in its sole discretion.

Borrower hereby authorizes Lender, in its sole discretion, to charge any of Borrower's accounts or advance Revolving Loans to make any payments of principal, interest, fees, costs or expenses required to be made under this Agreement or the Other Agreements. All Revolving Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in form and substance satisfactory to Lender. However, if such Revolving Loans are not so evidenced, such Revolving Loans may be evidenced solely by entries upon the books and records maintained by Lender.

A request for a Revolving Loan shall be made or shall be deemed to be made, each in the following manner: Borrower shall give Lender same day notice, no later than 10:30 A.M. (Chicago time) for such day, of its request for a Revolving Loan as a Prime Rate Loan, and at least three (3) Business Days prior notice of its request for a Revolving Loan as a LIBOR Rate Loan, in which notice Borrower shall specify the amount of the proposed borrowing and the proposed borrowing date; provided, however, that no such request may be made at a time when there exists an Event of Default or an event which, with the passage of time or giving of notice, will become an Event of Default. In the event that Borrower maintains a control disbursement account at LaSalle Bank, each check presented for payment against such control disbursement account and any other charge or request for payment against such control disbursement account shall constitute a request for a Revolving Loan as a Prime Rate Loan. As an accommodation to Borrower, Lender may permit telephone requests for Revolving Loans and electronic transmittal of instructions, authorizations, agreements or reports to Lender by Borrower. Unless Borrower specifically directs Lender in writing not to accept or act upon telephonic or electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Lender by Borrower and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Borrower hereby irrevocably authorized Lender to disburse the proceeds of each Revolving Loan requested by Borrower, or deemed to be requested by Borrower, as follows: the proceeds of each Revolving Loan requested under Section 2(a) shall be disbursed by Lender in lawful money of the United States of America in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower and Lender from time to time, or elsewhere if pursuant to a written direction from Borrower.

(b)     **Term Loan**.

Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions to the initial Loans are satisfied, Lender shall make a term loan to Borrower in an amount equal to of Three Million and No/100 Dollars ($3,000,000.00) (the **"Term Loan"**).

(c)     **Repayments**.

Liabilities shall be repaid as follows:

(i)     Repayment of Revolving Loans. The Revolving Loans and all other Liabilities (other than the Term Loan) shall be repaid on the Maturity Date or the last day of any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof.

(ii)     Repayment of Term Loan. The Term Loan shall be repaid in thirty-six (36) equal monthly installments of Eighty-Three Thousand Three Hundred Thirty-Three Dollars ($83,333) each payable on the first day of each month hereafter until the Maturity Date. If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

(iii)     Mandatory Prepayments of the Term Loan.

(A) Sales of Assets. Upon receipt of the proceeds of the sale or other disposition of any equipment or real property of Borrower which is subject to a mortgage in favor of Lender, or if any of the equipment or real property subject to such mortgage is damaged, destroyed or taken by condemnation in whole or in part, the proceeds thereof shall be paid by Borrower to Lender as a mandatory prepayment of the Term Loan, such payment to be applied against the remaining installments of principal in the inverse order of their maturities until repaid in full, and then against the other Liabilities, as determined by Lender, in its sole discretion.

(B) Excess Cash Flow. Ten (10) days after receipt of Borrower's Fiscal Year end audited financial statements for each Fiscal Year of Borrower commencing with Borrower's Fiscal Year ended June 30, 2003 Borrower shall make a mandatory prepayment of the Term Loan in an amount equal to 50% of Borrower's "Excess Cash Flow" (as described below) for the Fiscal Year just ended, such prepayment to be applied against the remaining installments of principal in the inverse order of their maturities, such mandatory prepayments to continue until the date on which the Term Loan shall be repaid in full. For purposes hereof, "Excess Cash Flow" shall mean for each Borrower's Fiscal Year, Borrower's EBITDA for such period, minus Borrower's taxes during such period, minus non-PIK interest payable during such period, minus actual principal payments made with respect to long term debt during such period, minus all unfinanced Capital Expenditures by Borrower during such period.

## 3.     LETTERS OF CREDIT.

(a)     **General Terms:**

Subject to the terms and conditions of the Agreement and the Other Agreements, during the Original Term or any Renewal Term, Lender may, in its sole discretion, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower's request, commercial and/or standby Letters of Credit; provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed Five Hundred and No/100 Dollars ($500,000). Payments made by Lender to any Person on account of any Letter of Credit shall constitute Loans hereunder and Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by Borrower for a Loan

to reimburse such issuer. Borrower shall remit to Lender a Letter of Credit fee equal to twenty-five hundredths percent (0.25%) per month on the aggregate undrawn face amount of all Letters of Credit outstanding, which fee shall be payable monthly in arrears on the last Business Day of each month. Borrower shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for issuance, amendment, negotiation, renewal or extension of any Letter of Credit.

(a)    **Requests for Letters of Credit:**

Borrower shall make requests for Letters of Credit in writing at least three (3) Business Days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit. If any term of such application or reimbursement agreement is inconsistent with this Agreement, then the provisions of this Agreement shall control to the extent of such inconsistency.

(b)    **Obligations Absolute.**

Borrower shall be obligated to reimburse the issuer of any Letter of Credit, or Lender if Lender has reimbursed such issuer on Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (i) any lack of validity or enforceability of any Letter of Credit, (ii) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any Other Agreement, (iii) the existence of any claim, set off, defense or other right which Borrower or any other Person may have against any beneficiary of any Letter of Credit, Lender or the issuer of the Letter of Credit, (iv) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (v) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (vi) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, the Lender or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of Borrower's obligations hereunder. It is understood and agreed by Borrower that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any notice or information tot he contrary.

(c)    **Expiration Dates of Letters of Credit.**

The expiration date of each Letter of Credit shall be no later than the earlier of (i) one (1) year from the date of issuance and (ii) the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiration date for one or more one (1) year periods, so long as the issuer thereof has the right to terminate the Letter of Credit at the end of each one (1) year period and no extension period extends past the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term.

4.    **INTEREST, FEES AND CHARGES.**

**(a)    Interest Rate.**

Subject to the terms and conditions set forth below, the Loans shall bear interest at the per annum rate of interest pursuant to subsections (i), (ii), (iii) and (iv) below, as applicable:

(i)    The Term Loan shall bear interest at the rate of two and zero hundredths percent (2.00%) per annum in excess of the Prime Rate in effect from time to time, payable on the last Business Day of each month in arrears. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate.

(ii)    The Revolving Loan shall bear interest, at Borrower's option, at either: (a) the Prime Rate plus the "Applicable Margin for Prime Rate Loans" (as defined in the next paragraph) or the matrix following the next paragraph, as applicable or (b) the LIBOR Rate plus the "Applicable Margin for LIBOR Rate Loans" (as defined in the next paragraph) or the matrix following the next paragraph, if applicable, such rate to remain fixed for such Interest Period. **"Interest Period"** shall mean any continuous period of thirty (30), sixty (60), ninety (90) or one hundred eighty (180) days, as selected from time to time by Borrower by irrevocable notice (in writing, by telex, telegram or cable) given to Lender not less than three (3) Business Days prior to the first day of each respective Interest Period; provided that:  (A) each such period occurring after such initial period shall commence on the day on which the immediately preceding period expires; (B) the final Interest Period shall be such that its expiration occurs on or before the Maturity Date or the end of any Renewal Term, if applicable; and (C) if for any reason Borrower shall fail to timely select a period, then such Loans shall continue as, or revert to, Prime Rate Loans. Interest shall be payable on the last Business Day of each month in arrears and on the date of any payment hereon by Borrower.

(iii)    The Applicable Margin for (i) LIBOR Rate Loans shall be two and seventy-five hundredths percent (2.75%) per annum, and (ii) Prime Rate Loans shall be twenty-five hundredths percent (.25%) per annum unless and until a change is required by the operation of the "Combined Pricing Ratios" as defined in the matrix following this paragraph. Changes in the Applicable Margin shall be made not more frequently than annually based on the Combined Pricing Ratios, determined by the Lender from the Borrower's annual financial reports, except that the first such determination shall be made based on the Borrower's annual financial statements for the Borrower's fiscal year ending on June 30, 2003, and shall be effective as of the first day of the first month after the month in which Lender receives such statements. The Applicable Margin shall vary depending upon the Borrower's Combined Pricing Ratios, as follows:

| Combined Pricing Ratios | | Applicable Margin | |
|---|---|---|---|
| If both EBITDA and Net Worth are: | | Applicable Margin for Prime Rate Loans | Applicable Margin for LIBOR Loans |
| EBITDA | Net Worth | | |
| Greater than $6,000,000 | Greater than $6,500,000 | 0.00% | 2.50% |

| Greater than $5,500,000 but less than or equal to $6,000,000 | Greater than $5,750,000 but less than or equal to $6,500,000 | 0.25% | 2.75% |
|---|---|---|---|
| Greater than $5,000,000 but less than or equal to $5,500,000 | Greater than $5,500,000 but less than or equal to $5,250,000 | 0.50% | 3.00% |
| Greater than $4,500,000 but less than or equal to $5,000,000 | Greater than $5,250,000 but less than or equal to $5,000,000 | 0.75% | 3.25% |
| Less than or equal to $4,500,000 | Less than or equal to $5,000,000 | 1.00% | 3.50% |

(iv)    Upon the occurrence of an Event of Default and during the continuance thereof, the Loans shall bear interest at the rate of two and twenty-five hundredths percent (2.25%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360-day year.

(b)    **Other Libor Provisions.**

(i)    Subject to the provisions of this Agreement, Borrower shall have the option (A) as of any date, to convert all or any part of the Prime Rate Loans to, or request that new Loans be made as, LIBOR Rate Loans of various Interest Periods, (B) as of the last day of any Interest Period, to continue all or any portion of the relevant LIBOR Rate Loans as LIBOR Rate Loans; (C) as of the last day of any Interest Period, to convert all or any portion of the LIBOR Rate Loans to Prime Rate Loans; and (D) at any time, to request new Loans as Prime Rate Loans; provided, that Loans may not be continued as or converted to LIBOR Rate Loans, if the continuation or conversion thereof would violate the provisions of subsections 4(b)(ii) or 4(b)(iii) of this Agreement or if an Event of Default has occurred.

(ii)    Lender's determination of LIBOR as provided above shall be conclusive, absent manifest error. Furthermore, if Lender determines, in good faith (which determination shall be conclusive, absent manifest error), prior to the commencement of any Interest Period that (A) U.S. Dollar deposits of sufficient amount and maturity for funding the Loans are not available to Lender in the London Interbank Eurodollar market in the ordinary course of business, or (B) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the rate of interest to be applicable to the Loans requested by Borrower to be LIBOR Rate Loans or the Loans bearing interest at the rates set forth in subsection 4(a)(ii) of this Agreement shall not represent the effective pricing to Lender for U.S. Dollar deposits of a comparable amount for the relevant period (such as for example, but not limited to, official reserve requirements required by Regulation D to the extent not given effect in determining the rate), Lender shall promptly notify Borrower and (1) all

existing LIBOR Rate Loans shall convert to Prime Rate Loans upon the end of the applicable Interest Period, and (2) no additional LIBOR Rate Loans shall be made until such circumstances are cured.

(iii)    If, after the date hereof, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over Lender or its lending offices (a "Regulatory Change"), shall, in the opinion of counsel to Lender, make it unlawful for Lender to make or maintain LIBOR Rate Loans, then Lender shall promptly notify Borrower and (A) the LIBOR Rate Loans shall immediately convert to Prime Rate Loans on the last Business Day of the then existing Interest Period or on such earlier date as required by law and (B) no additional LIBOR Rate Loans shall be made until such circumstance is cured.

(iv)    If, for any reason, a LIBOR Rate Loan is paid prior to the last Business Day of any Interest Period or if a LIBOR Rate Loan does not occur on a date specified by Borrower in its request (other than as a result of a default by Lender), Borrower agrees to indemnify Lender against any loss (including any loss on redeployment of the deposits or other funds acquired by Lender to fund or maintain such LIBOR Rate Loan) cost or expense incurred by Lender as a result of such prepayment.

(v)    If any Regulatory Change (whether or not having the force of law) shall (A) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of or loans by, or any other acquisition of funds or disbursements by, Lender; (B) subject Lender or the LIBOR Rate Loans to any Tax or change the basis of taxation of payments to Lender of principal or interest due from Borrower to Lender hereunder (other than a change in the taxation of the overall net income of Lender); or (C) impose on Lender any other condition regarding the LIBOR Rate Loans or Lender's funding thereof, and Lender shall determine (which determination shall be conclusive, absent any manifest error) that the result of the foregoing is to increase the cost to Lender of making or maintaining the LIBOR Rate Loans or to reduce the amount of principal or interest received by Lender hereunder, then Borrower shall pay to Lender, on demand, such additional amounts as Lender shall, from time to time, determine are sufficient to compensate and indemnify Lender from such increased cost or reduced amount.

(vi)    Lender shall receive payments of amounts of principal of and interest with respect to the LIBOR Rate Loans free and clear of, and without deduction for, any Taxes. If (A) Lender shall be subject to any Tax in respect of any LIBOR Rate Loans or any part thereof or, (B) Borrower shall be required to withhold or deduct any Tax from any such amount, the LIBOR Rate applicable to such LIBOR Rate Loans shall be adjusted by Lender to reflect all additional costs incurred by Lender in connection with the payment by Lender or the withholding by Borrower of such Tax and Borrower shall provide Lender with a statement detailing the amount of any such Tax actually paid by Borrower. Determination by Lender of the amount of such costs shall be conclusive, absent manifest error. If after any such adjustment any part of any Tax paid by Lender is subsequently recovered by Lender, Lender shall reimburse Borrower to the extent of the amount so

recovered. A certificate of an officer of Lender setting forth the amount of such recovery and the basis therefor shall be conclusive, absent manifest error.

(vii)    Each request for LIBOR Rate Loans shall be in an amount not less than One Million and No/100 Dollars ($1,000,000), and in integral multiples of, One Million and No/100 Dollars ($1,000,000) for amounts in excess of One Million and No/100 Dollars ($1,000,000).

(viii)    Unless otherwise specified by Borrower, all Loans shall be Prime Rate Loans.

(ix)    No more than five (5) Interest Periods may be in effect with respect to outstanding LIBOR Rate Loans at any one time.

(c)    **Fees And Charges.**

(i)    Collateral Management Fee: Borrower shall pay to Lender a collateral management fee in the amount of One Thousand and No/100 Dollars per month, which fee shall be full earned by Lender and payable monthly in advance on the first day of each month.

(ii)    Commitment Fee: Borrower shall pay to Lender a commitment fee of One Hundred Ninety-Five Thousand Dollars ($195,000), which fee shall be fully earned by Lender on the date the Commitment Letter was signed by Borrower, shall be non-refundable upon payment and shall be payable $50,000 on acceptance of the Commitment Letter, $15,000 at closing, $65,000 on the first day of the ninth month following closing and $65,000 on the first day of the eighteenth month following closing.

(iii)    Unused Line Fee: Borrower shall pay to Lender an unused line fee of three hundred seventy-five thousandths percent (.375%) of the difference between the Maximum Revolving Loan Limit and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month, which fee shall be fully earned by Lender and payable monthly in arrears on the first Business Day of each month. Said fee shall be calculated on the basis of a 360 day year.

(iv)    Costs and Expenses: Borrower shall reimburse Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees, incurred by Lender in connection with the (i) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Liabilities; and (iv) administration and enforcement of any of Lender's rights under this Agreement. Borrower shall also pay all normal service charges with respect to all accounts maintained by Borrower with Lender and LaSalle Bank and any additional services requested by Borrower from Lender and LaSalle Bank. All such costs, expenses and charges shall, if owed to LaSalle Bank, be reimbursed by Lender and in such event or in the event such costs and expenses are owed to Lender, constitute Liabilities hereunder,

shall be payable by Borrower to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(v)     Capital Adequacy Charge.  If Lender shall have determined that the adoption of any law, rule or regulation regarding capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or governmental authority enacted after the date hereof, does or shall have the effect of reducing the rate of return on such party's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by a material amount, then from time to time, after submission by Lender to Borrower of a written demand therefor ("**Capital Adequacy Demand**") together with the certificate described below, Borrower shall pay to Lender such additional amount or amounts ("**Capital Adequacy Charge**") as will compensate Lender for such reduction, such Capital Adequacy Demand to be made with reasonable promptness following such determination.  A certificate of Lender claiming entitlement to payment as set forth above shall be conclusive in the absence of manifest error.  Such certificate shall set forth the nature of the occurrence giving rise to such reduction, the amount of the Capital Adequacy Charge to be paid to Lender, and the method by which such amount was determined.  In determining such amount, Lender may use any reasonable averaging and attribution method, applied on a non-discriminatory basis.

(d)     **Maximum Interest.**

It is the intent of the parties that the rate of interest and other charges to Borrower under this Agreement shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrower.

5.     **COLLATERAL.**

(a)     **Grant of Security Interest to Lender.**

As security for the payment of all Loans now or in the future made by Lender to Borrower hereunder and for the payment or other satisfaction of all other Liabilities, Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible

Inventory); (d) all Investment Property; (e) all bank accounts, deposits, deposit accounts and cash; (f) all Life Insurance Policies, (g) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (h) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

      (b)     **Other Security.**

          Lender, in its sole discretion, without waiving or releasing any obligation, liability or duty of Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral. All sums paid by Lender in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, all court costs and all other charges relating thereto incurred by Lender shall constitute Liabilities, payable by Borrower to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

      (c)     **Possessory Collateral.**

          Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Chattel Paper, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

      6.     **PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.**

          Borrower shall, at Lender's request, at any time and from time to time, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing

statement shall be sufficient as a financing statement.

## 7.   **POSSESSION OF COLLATERAL AND RELATED MATTERS.**

Until an Event of Default has occurred, Borrower shall have the right, except as otherwise provided in this Agreement, in the ordinary course of Borrower's business, to (a) sell, lease or furnish under contracts of service any of Borrower's Inventory normally held by Borrower for any such purpose; and (b) use and consume any raw materials, work in process or other materials normally held by Borrower for such purpose; provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

## 8.   **COLLECTIONS.**

(a)    Promptly upon the direction of Lender following the occurrence of an Event of Default:

(i)    Borrower shall direct all of its Account Debtors to make all payments on the Accounts directly to a post office box (the **"Lock Box"**) designated by, and under the exclusive control of, Lender, at a financial institution acceptable to Lender. Borrower shall establish an account (the **"Lock Box Account"**) in Lender's name with a financial institution acceptable to Lender, into which all payments received in the Lock Box shall be deposited, and into which Borrower will immediately deposit all payments received by Borrower for Inventory or services in the identical form in which such payments were received, whether by cash or check.

(ii)    If Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of Borrower or any Affiliate or Subsidiary, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds of Accounts or other Collateral, Borrower and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. The financial institution with which the Lock Box Account is established shall acknowledge and agree, in a manner satisfactory to Lender, that the amounts on deposit in such Lock Box Account are the sole and exclusive property of Lender, that such financial institution has no right to setoff against the Lock Box Account or against any other account maintained by such financial institution into which the contents of the Lock Box Account are transferred, and that such financial institution shall wire, or otherwise transfer in immediately available funds to Lender in a manner satisfactory to Lender, funds deposited in the Lock Box Account on a daily basis as such funds are collected. Borrower agrees that all payments made to such Lock Box Account or otherwise received by Lender, whether in respect of the Accounts or as proceeds of other Collateral or otherwise, will be applied on account of the Liabilities in accordance with the terms of this Agreement. Borrower agrees to pay all fees, costs and expenses in connection with opening and maintaining the Lock Box Account. All of such fees, costs and expenses if not paid by Borrower, may be paid by Lender and in such event all amounts paid by Lender shall constitute Liabilities hereunder, shall be payable to Lender by Borrower upon demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(b)    All checks, drafts, instruments and other items of payment or proceeds of Collateral shall be endorsed by Borrower to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on Borrower's behalf.  For the purpose of this section, Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact (i) to endorse Borrower's name upon said items of payment and/or proceeds of Collateral and upon any Chattel Paper, Document, Instrument, invoice or similar document or agreement relating to any Account of Borrower or Goods pertaining thereto; (ii) to take control in any manner of any item of payment or proceeds thereof and (iii) to have access to any lock box or postal box into which any of Borrower's mail is deposited, and open and process all mail addressed to Borrower and deposited therein.

(c)    Borrower shall promptly enter into such blocked account agreements with Lender and Borrower's depositories as Lender may from time to time require to perfect Lender's security interest in Borrower's deposit accounts.

(d)    Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Liabilities, (i) enforce collection of any of Borrower's Accounts or other amounts owed to Borrower by suit or otherwise; (ii) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of Borrower or other amount owed to Borrower upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to Borrower; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement and to allow Lender to collect the Accounts or other amounts owed to Borrower. In addition to any other provision hereof, Lender may at any time, after the occurrence of an Event of Default, at Borrower's expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder.

(e)    For purposes of calculating interest and fees, Lender shall, within two (2) Business Days after receipt by Lender at its office in Chicago, Illinois of cash or other immediately available funds from collections of items of payment and proceeds of any Collateral, apply the whole or any part of such collections or proceeds against the Liabilities in such order as Lender shall determine in its sole discretion.  For purposes of determining the amount of Loans available for borrowing purposes, checks and cash or other immediately available funds from collections of items of payment and proceeds of any Collateral shall be applied in whole or in part against the Liabilities, in such order as Lender shall determine in its sole discretion, on the day of receipt, subject to actual collection.

(f)    On a monthly basis, Lender shall deliver to Borrower an account statement showing all Loans, charges and payments, which shall be deemed final, binding and conclusive upon Borrower unless Borrower notifies Lender in writing, specifying any error therein, within thirty (30) days of the date such account statement is sent to Borrower and any such notice shall only constitute an objection to the items specifically identified.

9.  **COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.**

(a)  **Daily Reports.**

Borrower shall deliver to Lender an executed daily loan report and certificate in Lender's then current form on each day on which Borrower requests a Revolving Loan, and in any event at least once each week, which shall be accompanied by copies of Borrower's sales journal, cash receipts journal and credit memo journal for the relevant period. Such report shall reflect the activity of Borrower with respect to Accounts for the immediately preceding week, and shall be in a form and with such specificity as is satisfactory to Lender and shall contain such additional information concerning Accounts and Inventory as may be requested by Lender including, without limitation, but only if specifically requested by Lender, copies of all invoices prepared in connection with such Accounts.

(b)  **Monthly Reports.**

Borrower shall deliver to Lender, in addition to any other reports, as soon as practicable and in any event: (i) within fifteen (15) days after the end of each month, (A) a detailed trial balance of Borrower's Accounts aged per invoice date, in form and substance reasonably satisfactory to Lender including, without limitation, the names and addresses of all Account Debtors of Borrower, and (B) a summary and detail of accounts payable (such Accounts and accounts payable divided into such time intervals as Lender may require in its sole discretion), including a listing of any held checks; and (ii) within ten (10) days after the end of each month, the general ledger inventory account balance, a perpetual inventory report and Lender's standard form of Inventory report then in effect or the form most recently requested from Borrower by Lender, for Borrower by each category of Inventory, together with a description of the monthly change in each category of Inventory.

(c)  **Financial Statements.**

Borrower shall deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied, and shall be accompanied by a compliance certificate in the form of Exhibit B hereto, which compliance certificate shall include a calculation of all financial covenants contained in this Agreement: (i) no later than thirty (30) days after each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income, retained earnings and cash flow of Borrower, certified by the Chief Financial Officer of Borrower; (ii) no later than thirty (30) days after the end of each of the first three quarters of Borrower's Fiscal Year, copies of internally prepared financial statements including, without limitation, balance sheets, statements of income, retained earnings, cash flows and reconciliation of surplus, certified by the Chief Financial Officer of Borrower and (iii) no later than ninety (90) days after the end of each of Borrower's Fiscal Years, audited annual financial statements with an unqualified opinion by independent certified public accountants selected by Borrower and reasonably satisfactory to Lender, which financial statements shall be accompanied by (A) a letter from such accountants acknowledging that they are aware that a primary intent of Borrower in obtaining such financial statements is to influence Lender and that Lender is relying upon such financial statements in connection with the exercise of its rights hereunder and (B) copies of any management letters sent to the Borrower by such accountants;

(d)    **Annual Projections**.

As soon as practicable and in any event prior to the beginning of each Fiscal Year, Borrower shall deliver to Lender projected balance sheets, statements of income and cash flow for Borrower, for each of the twelve (12) months during such Fiscal Year, which shall include the assumptions used therein, together with appropriate supporting details as reasonably requested by Lender.

(e)    **Explanation of Budgets and Projections**.

In conjunction with the delivery of the annual presentation of projections or budgets referred to in subsection 9(d) above, Borrower shall deliver a letter signed by the President or a Vice President of Borrower and by the Treasurer or Chief Financial Officer of Borrower, describing, comparing and analyzing, in detail, all changes and developments between the anticipated financial results included in such projections or budgets and the historical financial statements of Borrower.

(f)    **Public Reporting**.

Promptly upon the filing thereof, Borrower shall deliver to Lender copies of all registration statements and annual, quarterly, monthly or other regular reports which Borrower or any of its Subsidiaries files with the Securities and Exchange Commission, as well as promptly providing to Lender copies of any reports and proxy statements delivered to its shareholders.

(g)    **Other Information**.

Promptly following request therefor by Lender, such other business or financial data, reports, appraisals and projections as Lender may reasonably request.

10.    **TERMINATION; RENEWAL**.

**THIS AGREEMENT SHALL BE IN EFFECT FROM THE DATE HEREOF UNTIL THE MATURITY DATE (THE "ORIGINAL TERM") AND FOR ANY ADDITIONAL TERM THAT IS (IN THE EXERCISE OF THE LENDER'S SOLE AND ABSOLUTE DISCRETION FROM TIME TO TIME) THE SUBJECT OF AN AMENDMENT TO THIS AGREEMENT THAT HAS BEEN EXECUTED AND DELIVERED BY LENDER, BORROWER AND OTHER PARTIES REQUIRED BY LENDER (ANY AND EACH SUCH RENEWAL BEING REFERRED TO HEREIN AS A "RENEWAL TERM") UNLESS (A) THE DUE DATE OF THE LIABILITIES IS ACCELERATED PURSUANT TO SECTION 16 HEREOF; OR (B) BORROWER ELECTS TO TERMINATE THIS AGREEMENT AT THE END OF THE ORIGINAL TERM OR AT THE END OF ANY RENEWAL TERM BY GIVING LENDER WRITTEN NOTICE OF SUCH ELECTION AT LEAST NINETY (90) DAYS PRIOR TO THE END OF THE ORIGINAL TERM OR THE THEN CURRENT RENEWAL TERM AND BY PAYING ALL OF THE LIABILITIES IN FULL ON THE LAST DAY OF SUCH TERM.** If one or more of the events specified in clauses (a), (b) and (c) occurs, then (i) Lender shall not make any additional Loans on or after the date identified as the date on which the Liabilities are to be repaid; and (ii) this Agreement shall terminate on the date thereafter that the Liabilities are paid in full. At such time as Borrower has repaid all of the

Liabilities and this Agreement has terminated, Borrower shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, parents, subsidiaries and affiliates to Borrower, and if Borrower is obtaining new financing from another lender, Borrower shall deliver such lender's indemnification of Lender, in form and substance satisfactory to Lender, for checks which Lender has credited to Borrower's account, but which subsequently are dishonored for any reason or for automatic clearinghouse or wire transfers not yet posted to Borrower's account. If, during the term of this Agreement, Borrower prepays all of the Liabilities from any source other than income from the ordinary course operations of Borrower's business and this Agreement is terminated, Borrower agrees to pay to Lender as a prepayment fee, in addition to the payment of all other Liabilities, an amount equal to (i) one percent (1%) of the Maximum Loan Limit if such prepayment occurs two (2) years or more prior to the end of the Original Term, (ii) one-half percent (.5%) of the Maximum Loan Limit if such prepayment occurs less than two (2) years, but at least one (1) year prior to the end of the Original Term, or (iii) zero percent (0%) of the Maximum Loan Limit if such prepayment occurs less than one (1) year prior to the end of the Original Term or any then current Renewal Term. Notwithstanding the foregoing sentence, if, such prepayment and termination are in connection with a "change of control" (as defined below) then instead of the prepayment fee set forth in the preceding sentence, Borrower agrees to pay to Lender as a prepayment fee, in addition to the payment of all other Liabilities, an amount equal to (i) $100,000 if such prepayment occurs two (2) years or more prior to the end of the Original Term, (ii) $50,000 if such prepayment occurs less than two (2) years, but at least one (1) year prior to the end of the Original Term, or (iii) $0 of the Maximum Loan Limit if such prepayment occurs less than one (1) year prior to the end of the Original Term or any then current Renewal Term. As used in the preceding sentence, the term "change of control" means any of (A) the sale of a substantially all of the assets of Borrower, or (B) any disposition of securities that would constitute an Event of Default under Section 15(m) (Change of Control).

## 11.    REPRESENTATIONS AND WARRANTIES.

Borrower hereby represents and warrants to Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of Borrower's execution hereof and the closing of the transactions described herein or related hereto, shall remain true until the repayment in full and satisfaction of all the Liabilities and termination of this Agreement, and shall be remade by Borrower at the time each Loan is made pursuant to this Agreement.

(a)    **Financial Statements and Other Information**.

The financial statements and other information delivered or to be delivered by Borrower to Lender at or prior to the date of this Agreement accurately reflect the financial condition of Borrower, and there has been no adverse change in the financial condition, the operations or any other status of Borrower since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement. All written information now or heretofore furnished by Borrower to Lender is true and correct as of the date with respect to which such information was furnished.

(b)    **Locations**.

The office where Borrower keeps its books, records and accounts (or copies

thereof) concerning the Collateral, Borrower's principal place of business and all of Borrower's other places of business, locations of Collateral and post office boxes and locations of bank accounts are as set forth in Exhibit A and at other locations within the continental United States of which Lender has been advised by Borrower in accordance with subsection 12(b)(i). The Collateral is kept, or, in the case of vehicles, based, only at the addresses set forth on Exhibit A, and at other locations within the continental United States of which Lender has been advised by Borrower in writing in accordance with subsection 12(b)(i) hereof.

(c)    **Loans by Borrower**.

Borrower has not made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of Borrower for travel and other expenses arising in the ordinary course of Borrower's business and Permitted Officer Loans.

(d)    **Accounts and Inventory**.

Each Account, item of Inventory and Life Insurance Policy which Borrower shall, expressly or by implication, request Lender to classify as an Eligible Account, as Eligible Inventory or Eligible Life Insurance Policy, respectively, shall, as of the time when such request is made, conform in all respects to the requirements of such classification as set forth in the respective definitions of "Eligible Account," "Eligible Inventory" and "Eligible Life Insurance Policy" as set forth herein and as otherwise established by Lender from time to time.

(e)    **Liens**.

Borrower is the lawful owner of all Collateral now purportedly owned or hereafter purportedly acquired by Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens.

(f)    **Organization, Authority and No Conflict**.

If Borrower is a corporation, limited liability company or partnership, Borrower is duly organized, validly existing and in good standing in its state of organization and Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary. Borrower has the right and power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements and perform its obligations hereunder and thereunder. Borrower's execution, delivery and performance of this Agreement and the Other Agreements does not conflict with the provisions of the organizational documents of Borrower, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on Borrower, and Borrower's execution, delivery and performance of this Agreement and the Other Agreements shall not result in the imposition of any lien or other encumbrance upon any of Borrower's property under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which Borrower or any of its property may be bound or affected.

(g)    **Litigation**.

There are no actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower, and Borrower shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender;

    (h)    **Compliance with Laws and Maintenance of Permits**.

Borrower has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower. Borrower is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure to comply with which would have a Material Adverse Effect on Borrower.

    (i)    **Affiliate Transactions**.

Except as set forth on Schedule 11(i) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower is not conducting, permitting or suffering to be conducted, transaction with any Affiliate other than transactions with Affiliates for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to Borrower than the terms upon which such transfers or transactions would have been made had they been made to or with a Person that is not an Affiliate.

    (j)    **Names and Tradenames**.

Borrower's name has always been as set forth on the first page of this Agreement and Borrower uses no tradenames, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11(j) hereto.

    (k)    **Intentionally Deleted**.

    (l)    **Enforceability**.

This Agreement and the Other Agreements to which Borrower is a party are the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

    (m)    **Solvency**.

Borrower is, after giving effect to the transactions contemplated hereby, solvent, is able to pay its debts as they become due, has capital sufficient to carry on its business, now owns property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder.

    (n)    **Indebtedness**.

Except as set forth on Schedule 11(n) hereto, Borrower is not obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans.

(o)    **Margin Security and Use of Proceeds**.

Borrower does not own any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

(p)    **Parent, Subsidiaries and Affiliates**.

Except as set forth on Schedule 11(p) hereto, Borrower has no Parents, Subsidiaries or other Affiliates or divisions, nor is Borrower engaged in any joint venture or partnership with any other Person.

(q)    **No Defaults**.

Borrower is not in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does Borrower know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on Borrower.

(r)    **Employee Matters**.

There are no controversies pending or threatened between Borrower and any of its employees, agents or independent contractors other than the matters set forth in Schedule 11(r) attached hereto and made a part hereof and employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect on Borrower, and Borrower is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such non-compliance which would not have a Material Adverse Effect on Borrower.

(s)    **Intellectual Property**.

Borrower possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and tradenames to continue to conduct its business as heretofore conducted by it.

(t)    **Environmental Matters**.

Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and the operations of the Borrower comply in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.  There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person other than as set forth on Schedul 11(t) attached hereto and made a part hereof, nor is any pending or to the best of the Borrower's knowledge threatened with respect to

any non-compliance with or violation of the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Materials. Borrower has no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(u)     **ERISA Matters**.

Borrower has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, might result in the imposition of a lien against any of its properties or assets.

12.     **AFFIRMATIVE COVENANTS.**

Until payment and satisfaction in full of all Liabilities and termination of this Agreement, unless Borrower obtains Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower covenants and agrees as follows:

(a)     **Maintenance of Records**.

Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of Borrower's business activities, in accordance with sound accounting practices and generally accepted accounting principles consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Exhibit A;

(b)     **Notices**.

Borrower shall:

(i)     Locations. Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Lender of the proposed opening of an new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the location of Borrower's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which Borrower has previously advised Lender that such Goods will be used.

(ii)     Eligible Accounts, Life Insurance Policy and Inventory. Promptly upon becoming aware thereof, notify Lender if any Account, Life Insurance Policy, or Inventory identified by Borrower to Lender as an Eligible Account, Eligible Life Insurance Policy or Eligible Inventory becomes ineligible for any reason.

(iii)    Litigation and Proceedings.   Promptly upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened against Borrower which might have a Material Adverse Effect on Borrower.

(iv)    Names and Tradenames.  Notify Lender within ten (10) days of the change of its name or the use of any tradename, assumed name, fictitious name or division name not previously disclosed to Lender in writing.

(v)    ERISA Matters.   Promptly notify Lender of (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "PBGC") of any employee benefit plan ("Plan") covering any officers or employees of the Borrower, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

(vi)    Environmental Matters.  Immediately notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by Borrower or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects Borrower or its business operations or assets or any properties at which Borrower has transported, stored or disposed of any Hazardous Materials.

(vii)    Default; Material Adverse Change.   Promptly advise Lender of any material adverse change in the business, property, assets, prospects, operations or condition, financial or otherwise, of Borrower, the occurrence of any Event of Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (or both).

All of the foregoing notices shall be provided by Borrower to Lender in writing.

(c)    **Compliance with Laws and Maintenance of Permits.**

Borrower shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on Borrower and Borrower shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure with which to comply would have a Material Adverse Effect on Borrower. Following any determination by Lender that there is non-compliance, or any condition which requires any action by or on behalf of Borrower in order to avoid non-compliance, with any Environmental Law, at Borrower's expense cause an independent environmental engineer acceptable to Lender to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

(d)    **Inspection and Audits.**

Borrower shall permit Lender, or any Persons designated by it, to call at Borrower's places of business at any reasonable times, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from Borrower's books, records, journals, orders, receipts and any correspondence and other data relating to Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning Borrower's business as Lender may consider reasonable under the circumstances. Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement as Lender shall at any time and from time to time request. Lender, through its officers, employees or agents shall have the right, at any time and from time to time, in Lender's name, to verify the validity, amount or any other matter relating to any of Borrower's Accounts, by mail, telephone, telegraph or otherwise. Borrower authorizes Lender to discuss the affairs, finances and business of Borrower with any officers, employees or directors of Borrower or with its Parent or any Affiliate or the officers, employees or directors of its Parent or any Affiliate, and to discuss the financial condition of Borrower with Borrower's independent public accountants. Any such discussions shall be without liability to Lender or to Borrower's independent public accountants. Borrower shall pay to Lender all of Lender's customary fees (currently $750 per day per auditor) and all costs and out-of-pocket expenses incurred by Lender in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Liabilities hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder;

(e)    **Insurance.**

Borrower shall:

(i)    Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of Borrower, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be satisfactory to Lender. Original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender at least thirty (30) days written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, Borrower shall cause to be executed and delivered to Lender an assignment of proceeds of its business interruption insurance policies. Borrower hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Lender. Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations

and decisions with respect to such policies of insurance.

(ii)    Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Borrower with such companies and in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Lender and original (or certified) copies of such policies have been or shall be, within ninety (90) days after the date hereof, delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender at least thirty (30) days written notice before any such policy shall be altered or canceled.

If Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable. Such insurance, if obtained by Lender, may, but need not, protect Borrower's interests or pay any claim made by or against Borrower with respect to the Collateral. Such insurance may be more expensive than the cost of insurance Borrower may be able to obtain on its own and may be cancelled only upon Borrower providing evidence that it has obtained the insurance as required above. All sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrower to Lender and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder;

(f)    **Collateral and Equipment**.

Borrower shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained. Borrower shall permit Lender to examine any of the Collateral at any time and wherever the Collateral may be located and, Borrower shall, immediately upon request therefor by Lender, deliver to Lender any and all evidence of ownership of any of the equipment including, without limitation, certificates of title and applications of title. Borrower shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder.

(g)    **Use of Proceeds**.

All monies and other property obtained by Borrower from Lender pursuant to this Agreement shall be used solely for business purposes of Borrower.

(h)    **Taxes**.

Borrower shall file all required tax returns and pay all of its taxes when due, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that Borrower shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the

amount so contested is shown on Borrower's financial statements; (ii) the contesting of any such payment does not give rise to a lien for taxes; (iii) Borrower keeps on deposit with Lender (such deposit to be held without interest) an amount of money which, in the sole judgment of Lender, is sufficient to pay such taxes and any interest or penalties that may accrue thereon; and (iv) if Borrower fails to prosecute such contest with reasonable diligence, Lender may apply the money so deposited in payment of such taxes. If Borrower fails to pay any such taxes and in the absence of any such contest by Borrower, Lender may (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Lender shall constitute Loans hereunder, shall be payable by Borrower to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder;

(i)    **Intellectual Property**.

Borrower shall maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and tradenames to continue its business as heretofore conducted by it or as hereafter conducted by it.

(j)    **Life Insurance Policies**.

Borrower shall at all times maintain the Life Insurance Policies as Eligible Life Insurance Policies subject to the Assignments of Life Insurance.

13.    **NEGATIVE COVENANTS**.

Until payment and satisfaction in full of all Liabilities and termination of this Agreement, unless Borrower obtains Lender's prior written consent waiving or modifying any of Borrower's covenants hereunder in any specific instance, Borrower agrees as follows:

(a)    **Guaranties**.

Borrower shall not assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business.

(b)    **Indebtedness**.

Borrower shall not create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness of borrowed money other than the loans, except that Borrower may (i) borrow money from a person other than Lender on an unsecured and subordinated basis if a subordination agreement in favor of Lender and in form and substance satisfactory to Lender is executed and delivered to Lender relative thereto; (ii) maintain its present indebtedness listed on Schedule 11(n) hereto; (iii) incur unsecured indebtedness to trade creditors in the ordinary course of business; (iv) incur purchase money indebtedness or capitalized lease obligations in connection with Capital Expenditures permitted pursuant to subsection 14(h) hereof; and (v) incur operating lease obligations requiring payments not to exceed $100,000.00 in the aggregate during any Fiscal Year of Borrower.

(c)    **Liens**.

Borrower shall not grant or permit to exist (voluntarily or involuntarily) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than Permitted Liens.

(d) **Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business.**

Borrower shall not (i) enter into any merger or consolidation; (ii) sell, lease or otherwise dispose of any of its assets other than in the ordinary course of business; (iii) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (iv) enter into any other transaction outside the ordinary course of Borrower's business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest. Borrower shall not form any Subsidiaries or enter into any joint ventures or partnerships with any other Person.

(e) **Dividends and Distributions.**

Borrower shall not declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock (if Borrower is a corporation) or on account of any equity interest in Borrower (if Borrower is a partnership, limited liability company or other type of entity).

(f) **Investments; Loans.**

Borrower shall not purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States; nor shall Borrower lend or otherwise advance funds to any Person except for advances made to employees, officers and directors for travel and other expenses arising in the ordinary course of business and Permitted Officer Loans.

(g) **Fundamental Changes, Line of Business.**

Borrower shall not amend its organizational documents or change its Fiscal Year or enter into a new line of business materially different from Borrower's current business.

(h) **Intentionally Deleted.**

(i) **Use of Proceeds.**

Neither Borrower nor any Affiliate shall use any portion of the proceeds of the Loans, either directly or indirectly, for the purpose of (i) purchasing any securities underwritten or privately placed by ABN AMRO Securities (USA) Inc. ("AASI"), an affiliate of Lender, (ii) purchasing from AASI any securities in which AASI makes a market, or (iii) refinancing or making payments of principal, interest or dividends on any securities issued by Borrower or any Affiliate, and underwritten, privately placed or dealt in by AASI.

(j) **Affiliate Transactions.**

Expect as set forth on Schedule 11(i) hereto or as permitted pursuant to subsection 11(c) hereof, Borrower shall not conduct, permit or suffer to be conducted, transactions with Affiliates for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are less favorable to Borrower than the terms upon which such transfers or transactions would have been made had they been made to or with a Person that is not an Affiliate.

14.    **FINANCIAL COVENANTS.**

Borrower shall maintain and keep in full force and effect each of the financial covenants set forth below

(a)    **Fixed Charge Coverage.**

Borrower shall not permit the ratio of its EBITDA to Fixed Charges, tested as of the last day of each of the 'Borrower's fiscal quarters for the four (4) quarter period ending on that date, to be less than the ratio set forth below for the corresponding period set forth below:

| Period | Ratio |
|---|---|
| Fiscal Year 2002 | 1.0 to 1.0 |
| Fiscal Year 2003 | 1.1 to 1.0 |
| Thereafter | 1.25 to 1.0 |

(b)    **Interest Coverage.**

Borrower shall not permit the ratio of its EBITDA to interest expense, tested as of the last day of each of the Borrower's fiscal quarters commencing June 30, 2002, for the four (4) quarter period ending on that date, to be less than 1.50 to 1.0.

(c)    **Tangible Net Worth.**

Borrower's Tangible Net Worth shall not at any time be less than the Minimum Tangible Net Worth; "Minimum Tangible Net Worth" being defined for purposes of this subsection as $5,500,000 at all times from the date hereof plus an amount equal to 80% of the 'Borrower's net income (without regard to any loss) from each Fiscal Year of the Borrower commencing with the Fiscal Year ending June 30, 2003.

(d)    **Capital Expenditure Limitations.**

Borrower shall not make any Capital Expenditures if, after giving effect to such Capital Expenditure, the aggregate cost of all such fixed assets purchased or otherwise acquired would exceed $350,000 during any Fiscal Year.

15.    **DEFAULT.**

The occurrence of any one or more of the following events shall constitute an "Event of Default" by Borrower hereunder:

(a)    **Payment.**

The failure of any Obligor to pay when due, declared due, or demanded by Lender, any of the Liabilities.

(b)    **Breach of this Agreement and the Other Agreements.**

The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under this Agreement or any of the Other Agreements.

(c)    **Breaches of Other Obligations.**

The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any other agreement with any Person if such failure might have a Material Adverse Effect on such Obligor.

(d)    **Breach of Representations and Warranties.**

The making or furnishing by any Obligor to Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the Other Agreements or in connection with any other agreement between such Obligor and Lender, which is untrue or misleading in any respect.

(e)    **Loss of Collateral.**

The loss, theft, damage or destruction of, or (except as permitted hereby) sale, lease or furnishing under a contract of service of, any of the Collateral.

(f)    **Levy, Seizure or Attachment.**

The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral.

(g)    **Bankruptcy or Similar Proceedings.**

The commencement of any proceedings in bankruptcy by or against any Obligor or for the liquidation or reorganization of any Obligor, or alleging that such Obligor is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of any Obligor's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving any Obligor; provided, however, that if such commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within thirty (30) days after the commencement of such proceedings.

(h)    **Appointment of Receiver.**

The appointment of a receiver or trustee for any Obligor, for any of the Collateral or for any substantial part of any Obligor's assets or the institution of any proceedings for the dissolution, or the full or partial liquidation, or the merger or consolidation, of any Obligor which is a corporation, limited liability company or a partnership; provided, however, that if such

appointment or commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such appointment is not revoked or such proceedings are not dismissed within thirty (30) days after the commencement of such proceedings.

(i)    **Judgment**.

The entry of any judgment or order against any Obligor which remains unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution.

(j)    **Death or Dissolution of Obligor**.

The death of any Obligor who is a natural Person, or of any general partner who is a natural Person of any Obligor which is a partnership, or any member who is a natural Person of any Obligor which is a limited liability company or the dissolution of any Obligor which is a partnership, limited liability company, corporation or other entity.

(k)    **Default or Revocation of Guaranty**.

The occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Lender pursuant to which such Person has guaranteed to Lender the payment of all or any of the Liabilities or has granted Lender a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Liabilities.

(l)    **Criminal Proceedings**.

The institution in any court of a criminal proceeding against any Obligor, or the indictment of any Obligor for any crime.

(m)    **Change of Control**.

The failure of (i) Frank Miller to own and have voting control of at least fifty percent (50%) of the issued and outstanding voting equity interests of Borrower, or (ii) Gary Gitto to own and have voting control of at least fifty percent (50%) of the issued and outstanding voting equity interest of Borrower.

(n)    **Material Adverse Change**.

Any material adverse change in the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise of any Obligor, as determined by Lender in its sole judgment or the occurrence of any event which, in Lender's sole judgment, could have a Material Adverse Effect.

(o)    **Officer Loans**.

Any one or more of the following: (i) any failure of the officers of the Borrower to pay when and as due any payment of principal or interest pursuant to the Permitted Officer Loans, (ii) any event of default under any document, note or other agreement evidencing the

Permitted Officer Loans, (iii) the total principal amount of all loans from the Borrower to the officers of Borrower at any time exceeds the aggregate principal sum of $125,000 and (iv) the total principal amount of all loans from the Borrower to the officers of Borrower exceeds the aggregate principal sum of $50,000 on the last day of any Fiscal Year.

## 16.   REMEDIES UPON AN EVENT OF DEFAULT.

(a)     Upon the occurrence of an Event of Default described in subsection 15(g) hereof, all of the Liabilities shall immediately and automatically become due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, all Liabilities may, at the option of Lender, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

(b)     Upon the occurrence of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may enter onto any of Borrower's premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Lender shall have the right to store the same at any of Borrower's premises without cost to Lender. At Lender's request, Borrower shall, at Borrower's expense, assemble the Collateral and make it available to Lender at one or more places to be designated by Lender and reasonably convenient to Lender and Borrower. Borrower recognizes that if Borrower fails to perform, observe or discharge any of its Liabilities under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed reasonably and properly given if given at least five (5) calendar days before such disposition. Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

## 17.   CONDITIONS PRECEDENT.

The obligation of Lender to fund the Term Loan, to fund the initial Revolving Loan, and to issue or cause to be issued the initial Letter of Credit, is subject to the satisfaction or waiver on or before the date hereof of the following conditions precedent:

(a)     Lender shall have received each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as Schedule 17(a) (the "Closing Document List") including, without limitation, the Assignments of Life Insurance and the Guaranties;

(b)    Since March 31, 2002, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect on any Obligor, as determined by Lender in its sole discretion;

(c)    Lender shall have received payment in full of all fees and expenses payable to it by Borrower or any other Person in connection herewith, on or before disbursement of the initial Loans hereunder;

(d)    Lender shall have determined that immediately after giving effect to (A) the making of the initial Loans, including without limitation the Term Loan and the Revolving Loans, if any, requested to be made on the date hereof, (B) the issuance of the initial Letter of Credit, if any, requested to be made on such date, (C) the payment of all fees due upon such date and (D) the payment or reimbursement by Borrower of Lender for all closing costs and expenses incurred in connection with the transactions contemplated hereby, and assuming all of Borrower's trade payables and outstanding debt which remain unpaid more than thirty (30) days after the due dates thereof on the date of determination, are paid by drawing additional Revolving Loans, on a pro forma basis, availability of Borrower to borrow additional Revolving Loans shall not be less than One Million and No/100 Dollars ($1,000,000) and after closing, the Borrower's unused availability under the Revolving Loans shall at all times equal or exceed Three Hundred and No/100 Dollars ($350,000);

(e)    The Obligors shall have executed and delivered to Lender all such other documents, instruments and agreements which Lender determines are reasonably necessary to consummate the transactions contemplated hereby.

## 18.    INDEMNIFICATION.

Borrower agrees to defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, each affiliate or subsidiary of Lender, and each of their respective officers, directors, employees, attorneys and agents (each an **"Indemnified Party"**) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any Other Agreement, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Loans or any Letters of Credit or the use or intended use of the proceeds of the Loans or any Letters of Credit; provided, however, that Borrower shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and, failing prompt payment, shall, together with interest thereon

at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Borrower, be added to the Liabilities of Borrower and be secured by the Collateral. The provisions of this Section 18 shall survive the satisfaction and payment of the other Liabilities and the termination of this Agreement.

## 19.   NOTICE.

All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or delivered in person, and in the case of Lender shall be sent to it at 565 Fifth Avenue-27th floor, New York, New York 10017, Attention: Kevin D. Copenspire and in the case of Borrower shall be sent to the attention of Frank Miller, President at the Borrower's principal place of business set forth on Exhibit A hereto or as otherwise directed by Borrower in writing. All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

## 20.   CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION.

This Agreement and the Other Agreements are submitted by Borrower to Lender for Lender's acceptance or rejection at Lender's principal place of business as an offer by Borrower to borrow monies from Lender now and from time to time hereafter, and shall not be binding upon Lender or become effective until accepted by Lender, in writing, at said place of business. If so accepted by Lender, this Agreement and the Other Agreements shall be deemed to have been made at said place of business. **THIS AGREEMENT AND THE OTHER AGREEMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF ILLINOIS, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Lender to accept this Agreement, Borrower irrevocably agrees that, subject to Lender's sole and absolute election, **ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.** Borrower hereby irrevocably appoints and designates the Secretary of State of Illinois, whose address is Springfield, Illinois (or any other person having and maintaining a place of business in such state whom Borrower may from time to time hereafter designate upon ten (10) days written notice to Lender and whom Lender has agreed in its sole discretion in writing is satisfactory and who has executed an agreement in form and substance satisfactory to Lender agreeing to act as such attorney and agent), as Borrower's true and lawful attorney and duly authorized agent for acceptance of service of legal process. Borrower agrees that service of such process upon such person shall constitute personal service of such process upon Borrower. **BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST BORROWER BY LENDER IN ACCORDANCE WITH**

THIS SECTION.

### 21.    MODIFICATION AND BENEFIT OF AGREEMENT.

This Agreement and the Other Agreements may not be modified, altered or amended except by an agreement in writing signed by Borrower or such other person who is a party to such Other Agreement and Lender. Borrower may not sell, assign or transfer this Agreement, or the Other Agreements or any portion thereof, including, without limitation, Borrower's rights, titles, interest, remedies, powers or duties hereunder and thereunder. Borrower hereby consents to Lender's sale, assignment, transfer or other disposition, at any time and from time to time hereafter, of this Agreement, or the Other Agreements, or of any portion thereof, or participations therein, including, without limitation, Lender's rights, titles, interest, remedies, powers and/or duties and agrees that it shall execute and deliver such documents as Lender may request in connection with any such sale, assignment, transfer or other disposition.

### 22.    HEADINGS OF SUBDIVISIONS.

The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

### 23.    POWER OF ATTORNEY.

Borrower acknowledges and agrees that its appointment of Lender as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Liabilities are satisfied and paid in full and this Agreement is terminated.

### 24.    CONFIDENTIALITY.

Borrower and Lender hereby agree and acknowledge that any and all information relating to Borrower which is (i) furnished by Borrower to Lender (or to any affiliate of Lender); and (ii) non-public, confidential or proprietary in nature, shall be kept confidential by Lender or such affiliate in accordance with applicable law; provided, however, that such information and other credit information relating to Borrower may be distributed by Lender or such affiliate to Lender's or such affiliate's directors, officers, employees, attorneys, affiliates, assignees, participants, auditors, agents and regulators, and upon the order of a court or other governmental agency having jurisdiction over Lender or such affiliate, to any other party. Borrower and Lender further agree that this provision shall survive the termination of this Agreement. Notwithstanding the foregoing, Borrower hereby consents to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement.

### 25.    COUNTERPARTS.

This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.

### 26.    ELECTRONIC SUBMISSIONS.

Upon not less than thirty (30) days' prior written notice (the "**Approved Electronic**

Form Notice"), Lender may permit or require that any of the documents, certificates, forms, deliveries or other communications, authorized, required or contemplated by this Agreement or the Other Agreements, be submitted to Lender in "**Approved Electronic Form**" (as hereafter defined), subject to any reasonable terms, conditions and requirements in the applicable Approved Electronic Forms Notice. For purposes hereof "**Electronic Form**" means e-mail, e-mail attachments, data submitted on web-based forms or any other communication method that delivers machine readable data or information to Lender, and "**Approved Electronic Form**" means an Electronic Form that has been approved in writing by Lender (which approval has not been revoked or modified by Lender) and sent to Borrower in an Approved Electronic Form Notice. Except as otherwise specifically provided in the applicable Approved Electronic Form Notice, any submissions made in an applicable Approved Electronic Form shall have the same force and effect that the same submissions would have had if they had been submitted in any other applicable form authorized, required or contemplated by this Agreement or the Other Agreements.

## 27.    WAIVER OF JURY TRIAL; OTHER WAIVERS.

(a)    **BORROWER AND LENDER EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER AGREEMENTS, THE LIABILITIES, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER. IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

(b)    Borrower hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(c)    Borrower hereby waives the benefit of any law that would otherwise restrict or limit Lender or any affiliate of Lender in the exercise of its right, which is hereby acknowledged and agreed to, to set-of against the Liabilities, without notice at any time hereafter, any indebtedness, matured or unmatured, owing by Lender or such affiliate of Lender to Borrower, including, without limitation any deposit account at Lender or such affiliate.

(d)    **BORROWER HEREBY WAIVES ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO THE EXERCISE BY LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL OF BORROWER WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON SUCH COLLATERAL.**

(e)    Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement or any of the Other Agreements shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the Other Agreements shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the Other Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. No delay on the part of Lender in the exercise of any right or remedy under this Agreement or any Other Agreement shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the Other

Agreements and no Event of Default under this Agreement or default under any of the Other Agreements shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to Borrower specifying such suspension or waiver.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

WITNESS:                                     LENDER:


                                             LASALLE BUSINESS CREDIT, INC.

                                             By: _____ (SEAL)
                                             Name: Kevin D. Copenspire
                                             Title: VICE PRESIDENT


ATTEST:                                      BORROWER:


                                             GITTO GLOBAL CORPORATION


                                             By: _____ (SEAL)
                                             Frank Miller,
                                             President

## EXHIBIT A - BUSINESS AND COLLATERAL LOCATIONS

Attached to and made a part of that certain Loan and Security Agreement of even date herewith between GITTO GLOBAL CORPORATION ("**Borrower**") and LASALLE BUSINESS CREDIT, INC. ("**Lender**").

A.  Borrower's Business Locations (please indicate which location is the principal place of business and at which locations originals and all copies of Borrower's books, records and accounts are kept).

    1.  140 Leominster-Shirley Road, Lunenburg, MA 01462 (Main Corporate Office)

    2.

    3.

B.  Other locations of Collateral (including, without limitation, warehouse locations, processing locations, consignment locations) and all post office boxes of Borrower. Please indicate the relationship of such location to Borrower (i.e. public warehouse, processor, etc.).

    1.  232 Airport Road, Fitchburg, MA 01420 (Warehouse Facility)

    2.

    3.

C.  Bank Accounts of Borrower (other than those at LaSalle Bank National Association):

| | Bank (with address) | Account Number | Type of Account |
|---|---|---|---|
| 1. | Fleet Bank<br>1 Main Street<br>Leominster, MA 01453 | 9418508136 | Blocked Account |
| 2. | Fleet Bank<br>1 Main Street<br>Leominster, MA 01453 | 005467425 | Payroll Account |
| 3. | | | |

## EXHIBIT B - Compliance Certificate

Attached to and made a part of that certain Loan and Security Agreement, as it may be amended in accordance with its terms from time to time, including all exhibits attached thereto (the "Agreement") of even date herewith between GITTO GLOBAL CORPORATION ("Borrower") and LASALLE BUSINESS CREDIT, INC. ("Lender").

This Certificate is submitted pursuant to paragraph 11(b) of the Agreement.

The undersigned hereby certifies to Lender that as of the date of this Certificate:

1.    The undersigned is the _____ of the Borrower.

2.    There exists no event or circumstance which is or which with the passage of time, the giving of notice, or both would constitute an Event of Default, as that term is defined in the Agreement, or, if such an event or circumstance exists, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

3.    No material adverse change in the condition, financial or otherwise, business, property, or results of operations of Borrower has occurred since the date of the last Compliance Certificate or the date last financial statements delivered prior to closing, whichever is more recent, or, if such a change has occurred, a writing attached hereto specifies the nature thereof and the action that Borrower has taken or proposes to take with respect thereto.

4.    Borrower is in compliance with the representations, warranties and covenants in the Agreement, or, if Borrower is not in compliance with any representations, warranties or covenants in the Agreement, a writing attached hereto specifies the nature thereof, the period of existence thereof and the action that Borrower has taken or proposes to take with respect thereto.

5.    The financial statements of the Borrower being concurrently delivered herewith have been prepared in accordance with generally accepted accounting principles consistently applied and there have been no material changes in accounting policies or financial reporting practices of the Borrower since the date of the last Compliance Certificate or the date last financial statements delivered prior to closing, whichever is more recent or, if any such

change has occurred, such changes are set forth in a writing attached hereto.

28.    6.    Attached hereto is a true and correct calculation of the financial covenants contained in the Agreement.

BORROWER:

GITTO GLOBAL CORPORATION

By: _____(SEAL)
    Name: _____
    Title: _____

## SCHEDULE 1

## LIFE INSURANCE POLICIES

| INSURER | POLICY NO. | INSURED | OWNER |
|---|---|---|---|
| Jefferson-Pilot Life Insurance Company | JC5105478 | Frank Miller | Gary Gitto |
| Jefferson-Pilot Life Insurance Company | JC5105479 | Gary Gitto | Frank Miller |
| First Colony Life Insurance Company | 2,958,202 | Gary Gitto | Frank Miller |
| GE Life and Annuity Assurance Company | N02757323 | Frank Miller | Gary Gitto |

# SCHEDULE 1.1

## PERMITTED LIENS

**[None]**

# SCHEDULE 11(i)

## **AFFILIATE TRANSACTIONS**

### [None]

## SCHEDULE 11(j)

## NAMES AND TRADENAMES

**[None]**

## SCHEDULE 11(n)

### INDEBTEDNESS

**[None]**

## SCHEDULE 11(p)

## PARENTS, SUBSIDIARIES AND AFFILIATES

[None]

## SCHEDULE 11(r)

## EMPLOYEE MATTERS

[Attached]

SCHEDULE 11(r)

## SCHEDULE 11(r)

## <u>ENVIRONMENTAL</u>

[Attached]

## SCHEDULE 17(a)

## <u>CLOSING DOCUMENT LIST</u>

[Attached]