**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC f/k/a  <br>LASALLE BUSINESS CREDIT, INC., <br>  <br>   Plaintiff, <br>     v. <br>GARY C. GITTO, et al., <br>  <br>   Defendant, <br>  and <br>  <br>FLEET NATIONAL BANK, et al., <br>  <br>   Trustee Process Defendants, <br>  <br>  and <br>  <br>DIRECT WOOD & PAPER PRODUCTS, et al., <br>  <br>   Reach and Apply Defendants. | Case No. 04-12227-DPW |

**MOTION FOR EQUITABLE ATTACHMENTS IN THE
FORM OF REACH-AND-APPLY INJUNCTIONS REGARDING THE
INTEREST OF CHARLES N. GITTO, JR. IN TRADEX CORPORATION**

Pursuant to Fed.R.Civ.P. 64, Mass Gen. L. ch. 214, § 3, plaintiff LaSalle Business Credit, LLC f/k/a LaSalle Business Credit, Inc. ("LaSalle") hereby requests that this Court approve the equitable attachment of the rights and interests of Charles N. Gitto, Jr. ("Charles Gitto") in and to defendant Tradex Corporation ("Tradex"), by entering injunctive relief as follows:

*That Tradex, and its officers, agents, servants, employees, attorneys, beneficiaries, successors, assigns and all persons in active concert or participation with it who receive actual notice of the Order, by personal service or otherwise shall:*

*a.   be enjoined from paying in whole or in part, offsetting, assigning,*

> *alienating, selling, transferring, pledging, encumbering, concealing, hypothecating or otherwise disposing of any money, property or payments owed to Charles Gitto or taking any act to consent to or otherwise facilitate or permit the transfer of Charles Gitto's interest in Tradex;*
>
> b.  *be enjoined from making any payment or transfer, directly or indirectly, to Charles Gitto, arising from his interest in Tradex; and*
>
> c.  *reach and apply, and pay directly to LaSalle any amounts due to LaSalle as a result of the claims underlying the Complaint filed herewith.*

*Further, that Charles Gitto shall be enjoined from accepting any payments on account of any interest in the Tradex and from selling, transferring, pledging, encumbering, concealing, hypothecating or otherwise disposing of any money, property or payments received on account of any interest in Tradex, or any interest in Tradex, and that any person in possession of certificated securities of Tradex shall be appointed as and deemed to be keepers of those certificated securities for benefit of LaSalle, pending further order of this Court.*

In support hereof, LaSalle refers the Court to the Second Amended Complaint and the Affidavits of Matthew Stilwell[1], Steven Snyder [#143], Oren White [#144], Roger DeLisle [#145], Rita Bartlett [#147], Robyn Merchant [#140] and David Minardi [#141], the Depositions of Robert Paulhus [#159], Michael Tenaglia [#159] and Michael Angelini, [Ex. A to #179] a letter agreement by and among Clinton Savings Bank, Gitto Global, and Tradex dated August 18, 2004 (the "Letter Agreement") all filed previously

---

[1] LaSalle has filed four affidavits for Mr. Stilwell, dated October 21, 2004 ("Stillwell 1") [#4], November 8, 2004 ("Stilwell 2") [#62], December 6, 2004 ("Stilwell 3") [#152] and January 18, 2005 ("Stilwell 4") [#184].

in this action and incorporated herein by reference.

In addition LaSalle relies on and refers the Court to the evidence and exhibits presented at the hearing on December 12, 2004 regarding claims against Charles Gitto, and the motions previously filed seeking pre-judgment security against Charles Gitto and incorporates the same herein by reference. LaSalle further states:

I. <u>SUMMARY OF RELEVANT FACTS</u>

1.  Charles Gitto was an employee of, or otherwise had a relationship with Gitto Global Corporation ("Gitto Global"), a Massachusetts corporation owned by Frank Miller, Gary Gitto and Nancy Gitto Panagiotes. (Stilwell 1 ¶¶ 4, 30, 4.)

2.  Charles Gitto played a prominent role in the operations of Gitto Global. (DeLisle Aff., ¶2) Since 1997, he conducted the company's production meetings, which were held daily during the period LaSalle advanced funds. (Merchant Aff., ¶8; Minardi Aff., ¶6; FM-01-00071) At these meetings, Charles Gitto discussed various aspects of the company's sales and orders. He also set the production and product delivery schedules. (Minardi Aff., ¶6) Charles Gitto knew who Gitto Global's customers were and was familiar with their needs. (DeLisle Aff., ¶6)

3.  On May 24, 2002, Charles Gitto sent a letter to Michael Haddad, President-CEO of Guaranty Business Credit. The letter is on the printed stationery of Gitto Global and identifies Charles Gitto as the Chairman of Gitto Global. In the letter, Charles Gitto states he is providing a summary of Gitto Global's accounts receivable aging, which showed "there are no receivables of consequence going over 90 days on May 31." Among the purported customers on the list with the largest amounts due for purchases were: Hitachi Cable, Inc. ($3,065,672.89), Hemisphere Dist. Corp.

($3,013,801.75) Zebulon Industries ($2,780,545.60), J/Tan Sales & Marketing ($2,743,746.05), Velco Chemicals, Inc. ($2,688,013.15), and Colors Compounds & Consultants ($1,079,586.29). (Snyder Aff. Ex. A) These are the same fictitious customers that were used to evidence fictitious sales supporting the borrowing base certificates presented to LaSalle under a subsequent loan arrangement.

4. With his intimate knowledge of Gitto Global's customers, Charles Gitto must have known that the information he was submitting to Guaranty Business Credit was false. The reasonable inference from Charles Gitto's letter, which was just two months before Gitto Global's loan agreement with LaSalle, is that Charles Gitto knew Gitto Global was fabricating its accounts receivable with nonexistent sales to obtain loans.

5. On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan not to exceed $27,000,000, secured by certain of Gitto Global's accounts receivable and inventory ("LaSalle Revolving Loan"). In addition, LaSalle agreed to make a term loan to Gitto Global in the original principal amount of $3,000,000 ("LaSalle Term Loan"). The LaSalle Revolving Loan required Gitto Global to make certain ongoing representations in order to continue borrowing against the loan. In addition, Gitto Global was required to make certain deposits of payments received from customers into an account (the "Fleet Blocked Account") established with Fleet National Bank ("Fleet"). (Stilwell 1 ¶¶ 5 – 6, 11-13)

6. Gitto Global filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Massachusetts (Docket #04-45386) on September 24, 2004. On

or about October 15, 2004 the Bankruptcy Court appointed an Examiner to investigate the existence of pre-petition fraud or other mismanagement in the affairs of Gitto Global.

7.  Beginning in July of 2002, and continuing through September of 2004, Charles Gitto and others engaged in a scheme to have Gitto Global improperly obtain money from LaSalle through the LaSalle Revolving Loan. (Stilwell 1 ¶¶ 16 – 19, 21 – 24)

8.  Charles Gitto exercised such control over operations at Gitto Global that he had company funds diverted for his personal benefit. Gitto Global paid for maintenance and repair work done at Charles Gitto's home. (DeLisle Aff., ¶3) On June 13, 2003, Charles Gitto instructed that any invoices related to him or his house be viewed only by him and he would decide how to pay the bill, whether it be by Tradex, Gitto Global or personally. "No one else will make those determinations." (J73)

9.  Gitto Global's records disclose that during 2003 and the first nine months of 2004 the company disbursed $320,948 to Charles Gitto for which there is no explanation in the company's records. (Stillwell 3, ¶18a) In addition, Gitto Global's records disclose that Tradex received during the same period reported interest payments of $230,090, prepaid rent of $217,061 and payments totaling $134,546 for which no explanations are given. (Stillwell 3, ¶18b)

10.  Neither Charles Gitto nor any representative of Tradex has offered any justification for the unexplained disbursements.

11.  Gitto Global had been using the J&J Chemical account at Clinton Bank prior to borrowing from LaSalle. Clinton Bank's policy was to allow customers to draw against uncollected funds. (Tenaglia Dep., p. 11) In April, 2002, some checks deposited

by J&J Chemical at Clinton Bank were returned for insufficient funds. (CSB 2) This prompted Clinton Bank to suspend its policy of permitting withdrawals as uncollected funds for J&J Chemical. (Tenaglia Dep., p. 11) As a result, J&J Chemical needed funds to cover its checks. Charles Gitto on June 4 and 6, 2002 initiated wire transfers that provided $300,000 to J&J Chemical's account. (CSB 72; SB 76) Clinton Bank reverted to its regular policy after six months. (Tenaglia Dep., pp. 13-14)

   12. In July, 2004, Clinton Bank became concerned about payment for the millions of dollars that flowed through the J&J Chemical account on uncollected funds. (CSB 10) Defendant Frank Miller sought to satisfy Clinton Bank's concerns by advising that Gitto Global, the source of all of the checks deposited by J&J Chemical, was going to be acquired by Vitrotech on August 15, 2004. (Tenaglia Dep., pp. 25-26; Paulhus Dep., p. 74) On July 23, 2004, J&J Chemical and Clinton Bank entered into an $8.4 million revolving line of credit agreement, the sole purpose of which was to provide protection for payments made on uncollected checks deposited to J&J Chemical's account upon the acquisition of Gitto Global that was to occur August 15, 2004. (CSB 10)

   13. Charles Gitto attended the closing for the Clinton Bank loan and negotiated changes to certain documents. (Paulhus Dep., pp. 41-42) Also, as president and treasurer of Tradex, Charles Gitto had Tradex provide the Clinton Bank as security for the line of credit facility a limited non-recourse guarantee (CSB 32), a mortgage on the property occupied by Gitto Global (CSB 34) and a security interest in certain inventory. (CSB 35)

14. In August, 2004, Clinton Bank sought additional collateral to induce the bank to continue to pay on uncollected checks deposited in the J&J Chemical account. (Paulhus Dep., pp. 74-75) Clinton Bank's representative had three conversations with Charles Gitto on the subject between August 10 and 18, 2004. (Paulhus Dep., p. 78) Ultimately, on August 18, 2004, Charles Gitto gave Clinton Bank guarantees from him and Tradex, so that Clinton Bank would continue to allow payments on uncollected funds in the J&J Chemical account through September 15, 2004. (CSB 10, CSB 15, CSB 18, CSB 33)

15. Neither Charles Gitto or any representative of Tradex has offered any explanation for the guarantees and collateral they provided to Clinton Bank to permit J&J Chemical to continue drawing payments on uncollected checks. The legitimate inference from this is that Charles Gitto knew of the check kiting Gitto Global was engaging in to support its borrowings from LaSalle and that Tradex joined in that effort.

16. On September 15, 2004, just prior to Gitto Global's bankruptcy filing, seven to eight boxes of documents from Gary Gitto's office at Gitto Global and one box from Charles Gitto's office were taken to the basement of Charles Gitto's home. Charles Gitto came down to the basement to insure that these boxes were placed in the proper location. (White Aff., ¶3) On September 16, 2004, three to four boxes from William Deakin's office at Gitto Global, two boxes from Janice Chaisson's office and two to three boxes from Dean Childs' office were taken and unloaded in Charles Gitto's garage. (White Aff., ¶4)

## II. ARGUMENT IN SUPPORT OF EQUITABLE ATTACHMENT

This Motion should be granted in order to protect assets of Charles Gitto that may

be available to satisfy a judgment that LaSalle may obtain in the captioned action from being lost, concealed, injured, diminished in value or squandered.

    A.    <u>Standard for Granting Relief</u>

A creditor may "reach and apply" a debtor's interest in intangible property that cannot otherwise be executed against in an action at law. Mass. Gen. L. ch. 214, § 3(6); *Tilcon Capaldi, Inc. v. Feldman*, 249 F.3d 54, 59 (1st Cir., 2001). In an action to reach and apply, the court must engage in a two-step process to establish (1) the indebtedness of the defendant and (2) the defendant has property that can be reached by the plaintiffs in satisfaction of the defendant's debt. Mass. Gen. L. ch. 214 §§ 3 (6) and (7); *GMAC v. Camilleri Bros. Chevrolet of Holyoke*, Inc., 188 F. Supp. 2d 73, 76 (D. Mass., 2001). A plaintiff who has obtained a preliminary injunction in an action to reach and apply has established an equitable attachment constituting security for satisfaction of a judgment. *In re Borofsky*, 138 Bankr. 345, 347 (Bankr. D.Mass. 1992); *Foxborough Sav. Bank v. Ballarino (In re Ballarino)*, 180 B.R. 343, 348 (D. Mass. 1995).

Pursuant to Fed.R.Civ.P. 64, Mass Gen. L. ch. 214, § 3, and Mass. R. Civ. P. 4.1 an order may be granted approving attachment of property upon findings by the court that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater than the amount of the attachment over and above any liability insurance known or reasonably believed to be available to satisfy a judgment.

    B.    <u>There is a Reasonable Likelihood that the Plaintiff Will Recover Judgment in an Amount Equal to or Greater than the Amount of the Attachment Over and Above any Liability Insurance Known or Reasonably Believed to be Available.</u>

8

Based upon the pattern of conduct of Charles Gitto, and the evidence alleged related thereto, there is a substantial likelihood and reasonable expectation that LaSalle will be awarded judgment against Charles Gitto, exclusive of all costs, in excess of $30,000,000. (Stilwell 1 ¶ 64)

In July, 2002, LaSalle agreed to provide Gitto Global a revolving loan for up to $27 million based upon Gitto Global's genuine sales and actual inventory. Under this arrangement, Gitto Global was to deposit its customers' payments into an account at Fleet Bank. These deposits would be applied to LaSalle's loan. In turn, Gitto Global, on a daily basis, provided LaSalle a signed daily loan report and a borrowing base certificate requesting a disbursement under the revolving loan.

After 26 months, Gitto Global was in bankruptcy with over $30 million owed to LaSalle on the revolving loan. The growth of the loan amount was fed by Gitto Global's reports of amounts due from fictitious customers of Gitto Global. The Defendants accomplished this through an elaborate, well-timed flow of paper that created a false impression that Gitto Global had increasing sales and revenue. Over the 26 months, Defendants created numerous false invoices, bills of lading and other documents that purported to evidence millions of dollars of sales to six companies. To generate funds to serve as payments for these fictitious sales, Defendants engaged in a check-kiting scheme. Gitto Global deposited checks drawn upon an account at Clinton State Bank by Kingsdale Corp., d/b/a J&J Chemical Distributors ("J&J Chemical"). Reciprocal checks from Gitto Global were deposited to J&J Chemical's account at Clinton Bank to cover the deposited J&J Chemical checks.

The misrepresentation of Gitto Global's accounts receivable did not begin with the LaSalle loan in 2002. Defendant Janice Chaisson, who had been Gitto Global's accounts receivable supervisor, admitted to Matthew Stillwell that the creation of false invoices and the complimentary check-kite using J&J Chemical had been going on since at least 2001. (Stillwell 12/6/04 Aff. ¶s 5-10) J&J Chemical's account at Clinton Bank was opened in February, 2001. Ex. CSB 1.

Charles Gitto knew of falsification of Gitto's accounts receivable and the operation of the check-kiting scheme. On May 24, 2002, Charles Gitto sent a letter to Guaranty Business Credit with which he submitted a schedule of Gitto Global's purported accounts receivables that showed over $15 million due from six companies that Charles Gitto, as head of Gitto Global's production, knew had not purchased anything from Gitto Global.

There is no evidence that J&J Chemical served any purpose other than to provide a critical point in the check-kite. Yet, on three occasions when the operation of the check-kite was threatened by actions at Clinton Bank, Charles Gitto intervened to keep the check-kite operating. In 2002, he wire transferred $300,000 to Clinton Bank. In 2004, he gave a personal guaranty and caused Tradex to provide a mortgage on the property it owned, a security interest in Tradex inventory and a guaranty. There is no basis for believing that this was done by Charles Gitto out of the goodness of his heart.

The only inference that can be drawn from the aid Charles Gitto and Tradex gave to maintain the smooth operation of the J&J Chemical account at Clinton Bank is that they were participants in the conspiracy to defraud LaSalle. Charles Gitto and Tradex are not mindless lenders. No documents have been found or produced that show either one

of them received anything for providing the money, the security and the guarantees that they did.

Charles Gitto has had an opportunity to rebut the inference that he was a participant in the conspiracy. Instead, he invoked the Fifth Amendment. This constitutes persuasive evidence that both Charles Gitto and Tradex were participants in the conspiracy. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *U.S. v. Tod*, 263 U.S. 149, 153-54 (1923) ("Silence is often evidence of the most persuasive character."), quoted with approval in *Baxter*; *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994); *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 664 (7th Cir. 2002), *cert. den.*, 537 U.S. 1188 (2003) (invocation of Fifth Amendment by corporation's former officers constituted evidence that employer engaged in price-fixing conspiracy).

In addition, the fact that five of the individual conspirators, all former Gitto Global employees, have also taken the Fifth Amendment provides further support for the adverse influence against Charles Gitto and Tradex. *LiButti v. U.S.*, 107 F.3d 110, 121-23 (2d Cir. 1997).

Other facts also point to Charles Gitto being a member of the conspiracy. Just prior to Gitto Global's bankruptcy, on September 15 and 16, 2004, 11 to 13 boxes of records were removed from Gitto Global and taken to Charles Gitto's home. As this Court is aware from the proceedings held herein on December 3, 2004, Charles Gitto has refused to produce those records based upon his Fifth Amendment right. A number of inferences can be drawn from these facts:

Case 1:04-cv-12227-DPW    Document 255    Filed 05/04/2005    Page 12 of 15

1.	The missing Gitto Global records implicate Charles Gitto in the scheme to defraud LaSalle. *Rogers v. U.S.* 340 U.S. 307, 372-73 (1951) ("the privilege against self-incrimination presupposes a real danger of legal detriment arising from the disclosure."); *Nation-wide Check Corporation, Inc. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217 (1st Cir. 1982) ("where the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or distribution as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him"); *Knightsbridge Marketing Services, Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572, 575 (1st Cir. 1984) (same); *Welsh v. U.S.*, 844 F.2d 1239, 1247 (6th Cir. 1988) ("where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court should draw the strongest allowable inferences in favor of the aggrieved party"); *Bogan v. Northwestern Mutual Life Ins. Co.*, 144 F.R.D. 51, 55 (S.D.N.Y. 1992) ("Adverse inferences might also be drawn from failure to produce evidence within the control of a party; such inferences might refer to specific matters or to the entire case.").

2.	Charles Gitto was a major participant in the operation of Gitto Global and the conspiracy to defraud LaSalle. The records brought to Charles Gitto came from the offices of a number of the Defendants who were at Gitto Global. It is reasonable to infer that the participants in the fraud would want any incriminating records removed and placed with a confederate they could trust. LaSalle does not know what Charles Gitto has done with the records, but his possession or destruction of them has served to obstruct LaSalle's investigation of what occurred at Gitto Global.

12

There is also circumstantial evidence of Charles Gitto's participation in the fraud conspiracy. Usually, those who are at the top of a fraud conspiracy reap the rewards of the fraud. Charles Gitto's cavalier use of Gitto Global as a personal piggy bank is indicative of his being a knowing participant in the fraud. The company paid for work done at his home. During 2003 and the first nine months of 2004, he received $320,948 for which no explanation is given in the company's records.

The uncontradicted facts and the inferences that can be drawn from the actions of Charles Gitto in hiding records and refusing to testify on the ground that he might incriminate himself taken together indicate that LaSalle will succeed in its claims against Charles Gitto and Tradex.

    C.    <u>Absent Injunctive Relief, LaSalle will Suffer Irreparable Injury</u>

LaSalle is aware of no liability insurance coverage available to Charles Gitto to satisfy a judgment against them in this action. (Stilwell 1 ¶ 65) LaSalle will suffer substantial and irreparable harm if it is not granted injunctive relief because LaSalle knows of no other assets other than those upon which LaSalle has sought attachments, of Charles Gitto from which the ultimate judgment can be satisfied. (Stilwell 1 ¶ 68) In such a situation, LaSalle would have no viable remedy at law. The harm to LaSalle is far greater than any harm that may befall Charles Gitto by granting this injunction. Given the nature of the claims against Charles Gitto and the evidence that is unfolding supporting these claims, there is a clear risk that Charles Gitto will conceal, convey or dissipate assets pending determination of these claims.

WHEREFORE, LaSalle Business Credit, LLC respectfully requests that this Court enter an Order in the form attached hereto:

a. enjoining Tradex from paying in whole or in part, offsetting, assigning, alienating, selling, transferring, pledging, encumbering, concealing, hypothecating or otherwise disposing of any money, property or payments owed to Charles Gitto or taking any action to consent to or otherwise facilitate or permit a transfer of Charles Gitto's interest in Tradex;

b. enjoining Tradex from making any payment or transfer, directly or indirectly, to Charles Gitto, arising from his interest in Tradex;

c. ordering Tradex to reach and apply and pay directly to LaSalle any amounts due to LaSalle as a result of the claims underlying the Second Amended Complaint filed herewith;

d. enjoining Charles Gitto from accepting any payments on account of any interest in Tradex and from selling, transferring, pledging, encumbering, concealing, hypothecating or otherwise disposing of any money, property or payments received on account of any interest in Tradex, or any interest in Tradex;

e. appointing any person in possession of certificated securities of Tradex as keepers of those certificated securities for benefit of LaSalle; and

f. granting such other relief as is just and proper.

Dated: May 4, 2005                                  Respectfully submitted,

                                                    LASALLE BUSINESS CREDIT, LLC


                                                    By:     /s/ Patrick W. Manzo
                                                              One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416