# LOAN AND SECURITY AGREEMENT

## DATED AS OF JULY 25, 2002

### BETWEEN

## LASALLE BUSINESS CREDIT, INC.

### THE LENDER,

### AND

## GITTO GLOBAL CORPORATION

### THE BORROWER

::ODMA\PCDOCS\BALT01\522662\6



EXHIBIT

A

ALL-STATE® INTERNATIONAL

# TABLE OF CONTENTS

**Page**

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this **"Agreement"**) made this 25th day of July, 2002 by and between LASALLE BUSINESS CREDIT, INC., a Delaware corporation (**"Lender"**), whose address is 565 Fifth Avenue-27th floor, New York, New York 10017, and GITTO GLOBAL CORPORATION, a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Gianna Park, Lunenburg, Massachusetts 01462 (**"Borrower"**).

### WITNESSETH:

WHEREAS, Borrower may, from time to time, request Loans from Lender, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Lender, shall be made;

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrower by Lender, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Borrower, the parties agree as follows:

1.    DEFINITIONS.

**"Account"**, **"Account Debtor"**, **"Chattel Paper"**, **"Documents"**, **"General Intangibles"**, **"Goods"**, **"Instruments"**, **"Inventory"**, and **"Investment Property"** shall have the respective meanings assigned to such terms, as of the date of this Agreement, in the Illinois Uniform Commercial Code.

**"Affiliate"** shall mean any Person (i) which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Borrower, (ii) which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of Borrower, or (iii) five percent (5%) or more of the voting control or equity interests of which is beneficially owned or held by Borrower.

**"Applicable Margin"** shall have the meaning specified in Section 4(a)(iii).

**"Applicable Margin for LIBOR Rate Loans"** shall have the meaning specified in Section 4(a)(iii).

**"Applicable Margin for Prime Rate Loans"** shall have the meaning specified in Section 4(a)(iii).

**"Assignment of Life Insurance"** and **"Assignments of Life Insurance"** mean the collective reference to those certain assignments of life insurance as collateral dated the date hereof from Borrower for the benefit of Lender, which Assignments of Life Insurance assigns to Lender all of the right, title and interest of Borrower in, and to, the Life Insurance Policies, as those assignments are amended, restated, reissued, supplemented or otherwise modified in writing at any time and from time to time.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or (i) with respect to all matters, determinations, fundings and payments in connection with LIBOR Rate Loans, any day on which banks in London, England or Chicago, Illinois are required or permitted to close, and (ii) with respect to all other matters, any day that banks in Chicago, Illinois are required or permitted to close.

"**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by Borrower during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of Borrower.

"**Collateral**" shall mean all of the property of Borrower described in <u>Section 5</u> hereof, together with all other real or personal property of any Obligor or any other Person now or hereafter pledged to Lender to secure, either directly or indirectly, repayment of any of the Liabilities.

"**Commitment Letter**" shall mean that certain Commitment Letter, executed by Borrower in favor of Lender.

"**EBITDA**" shall mean, with respect to any period, Borrower's net income after taxes for such period (excluding any after-tax gains or losses on the sale of assets and excluding other after-tax extraordinary gains or losses) <u>plus</u> interest expense, income tax expense, depreciation and amortization for such period, <u>less</u> gains and losses attributable to any fixed asset sales made during such period, <u>plus</u> or <u>minus</u> any other non-cash charges or gains which have been subtracted or added in calculating net income after taxes for such period.

"**Eligible Account**" shall mean an Account owing to Borrower which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider an Account to be an Eligible Account if it meets, and so long as it continues to meet, the following requirements:

(i)     it is genuine and in all respects what it purports to be;

(ii)     it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Lender or assign it to Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

(iii)     it arises from (A) the performance of services by Borrower in the ordinary course of Borrower's business, and such services have been fully performed and acknowledged and accepted by the Account Debtor thereunder; or (B) the sale or lease of Goods by Borrower in the ordinary course of Borrower's business, and (x) such Goods have been completed in accordance with the Account Debtor's specifications (if any) and delivered to the Account Debtor, (y) such Account Debtor has not refused to accept, returned or offered to return, any of the Goods which are the subject of such Account, and (z) Borrower has possession of, or Borrower has delivered to Lender (at Lender's request) shipping and delivery receipts evidencing delivery of such Goods;

(iv)     it is evidenced by an invoice rendered to the Account Debtor thereunder, is due and payable within thirty (30) days after the date of invoice and does not remain unpaid the lesser of ninety (90) days past the invoice date thereof or sixty (60) days past the due date thereof; provided, however, that if more than twenty-five percent (25%) of the aggregate dollar amount of invoices owing by a particular Account Debtor remain unpaid the lesser of ninety (90) days after the respective invoice dates thereof or sixty (60) days after the due dates thereof, then all Accounts owing by that Account Debtor shall be deemed ineligible;

(v)     it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and is not subject to setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or to any claim by such Account Debtor denying liability thereunder in whole or in part;

(vi)     it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

(vii)     the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate;

(viii)     it is not an Account with respect to which the Account Debtor is the United States of America or any state or local government, or any department, agency or instrumentality thereof, unless Borrower assigns its right to payment of such Account to Lender pursuant to, and in full compliance with, the Assignment of Claims Act of 1940, as amended, or any comparable state or local law, as applicable;

(ix)     it is not an Account with respect to which the Account Debtor is located in a state which requires Borrower, as a precondition to commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) Borrower has taken one of the actions described in clauses (A) or (B); (y) the failure to take one of the actions described in either clause (A) or (B) may be cured retroactively by Borrower at its election; or (z) Borrower has proven, to Lender's satisfaction, that it is exempt from any such requirements under any such state's laws;

(x)     the Account Debtor is located within the United States of America, except that with respect to Accounts which the Account Debtor is not located within the United States of America ("Eligible Foreign Account Debtors") and meet all other requirements for inclusion among Eligible Accounts, shall be considered Eligible Accounts ("Eligible Foreign Accounts"), but only if the Debtor has obtained, and the Lender has reviewed, original executed letter agreements, in form and substance acceptable to Lender in its sole discretion, from the Parent (who is also an Account Debtor and located within the United States of America, "U.S. Parent") of each Eligible Foreign Account Debtor guarantying payment of the Eligible Foreign Accounts, provided however that the Eligible Foreign Accounts shall not exceed $500,000 in the aggregate for all Eligible Foreign Account Debtors;

(xi)     it is not an Account with respect to which the Account Debtor's

obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(xii)    it is not an Account (A) with respect to which any representation or warranty contained in this Agreement is untrue; or (B) which violates any of the covenants of Borrower contained in this Agreement;

(xiii)    it is not an Account which, when added to a particular Account Debtor's (U.S. Parent and Eligible Foreign Account Debtor considered as one Account Debtor for purposes of calculating the limits of this clause (xiii)) other indebtedness to Borrower, exceeds: 15% of all Accounts of Borrower (except in the case of Accounts listing Hitachi Cable Manchester, Inc. as the Account Debtor, in which case such credit limit shall be 17.5%), or a credit limit determined by Lender in its sole discretion for that Account Debtor (except that Accounts excluded from Eligible Accounts solely by reason of this clause (xiii) shall be Eligible Accounts to the extent of such credit limit); and

(xiv)    it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in its sole discretion.

"**Eligible Inventory**" shall mean, new materials and finished goods Inventory of Borrower which is acceptable to Lender in its sole discretion for lending purposes.   Without limiting Lender's discretion, Lender shall, in general, consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(i)    it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Liens;

(ii)    it is located on one of the premises listed on Exhibit A (or other locations of which Lender has been advised in writing pursuant to subsection 12(b)(i) hereof) and is not in transit;

(iii)    if held for sale or lease or furnishing under contracts of service, it is (except as Lender may otherwise consent in writing) new and unused and free from defects which would, in Lender's sole determination, affect its market value;

(iv)    it is not stored with a bailee, consignee, warehouseman, processor or similar party unless Lender has given its prior written approval and Borrower has caused any such bailee, consignee, warehouseman, processor or similar party to issue and deliver to Lender, in form and substance acceptable to Lender, such Uniform Commercial Code financing statements, warehouse receipts, waivers and other documents as Lender shall require;

(v)    Lender has determined, in accordance with Lender's customary business practices, that it is not unacceptable due to age, type, category or quantity;

(vi)     it is not Inventory (A) with respect to which any of the representations and warranties contained in this Agreement are untrue; or (B) which violates any of the covenants of Borrower contained in this Agreement; and

(vii)     It is not Inventory that is determined by the Lender in its sole discretion to be packaging materials, supplies, obsolete or dated.

"Eligible Life Insurance Policies" means the collective reference to each Life Insurance Policy which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall, in general, consider a Life Insurance Policy to be one of the Eligible Life Insurance Policies if it meets, and so long as it continues to meet, the following requirements:

(viii)     the Life Insurance Policy arose in the ordinary course of Borrower's business from a bona fide transaction between Borrower and the Life Insurance Policy issuer;

(ix)     the Life Insurance Policy is an issued, valid, legally enforceable obligation of the Life Insurance Policy issuer, is in full force and effect and requires no further act on the part of any Person under any circumstances (other than the payment of premiums) to make cash surrender value payable at any time, and the death benefits and other benefits payable as set forth in the Life Insurance Policy, by the Life Insurance Policy issuer;

(x)     all premiums have been fully paid when due, without giving effect to and without relying on any grace period;

(xi)     the Life Insurance Policy is not subject to any present or contingent (and no facts exist which are the basis for any future) offset, claim, deduction or counterclaim, dispute or defense in law or equity on the part of the issuer including, without limitation, those arising on account of a breach of any express or implied representation or warranty;

(xii)     the Life Insurance Policy issuer is not a Subsidiary or Affiliate of Borrower or an employee, officer, director of shareholder of Borrower or any Subsidiary or Affiliate of Borrower;

(xiii)     the Life Insurance Policy issuer is not incorporated or primarily conducting business or otherwise located in any jurisdiction outside of the United States of America;

(xiv)     the Life Insurance Policy issuer with respect to such Life Insurance Policy is not insolvent or the subject of any receivership, conservatorship, bankruptcy or insolvency proceedings of any kind or of any other proceeding or action, threatened or pending;

(xv)     the Life Insurance Policy issuer is not a Governmental Authority;

(xvi)     Borrower is not indebted in any manner to the Life Insurance

Policy issuer (as creditor, lessor, supplier otherwise), with the exception of premiums which are not past due;

(xvii) the title of Borrower to the Life Insurance Policy is absolute and is not subject to any prior assignment, claim, Lien, or security interest;

(xviii) Borrower has the full and unqualified right and power to assign and grant a security interest in, and Lien on, the Life Insurance Policy to Lender as security and collateral for the payment of the Obligations;

(xix) the Life Insurance Policy does not by its terms nor by operation of applicable Laws, forbid or make void or unenforceable the applicable Assignment of Life Insurance as Collateral;

(xx) the Life Insurance Policy is subject to the lien and assignment in favor of Lender, which lien and assignment is perfected as to the Life Insurance Policy by the filing of the applicable Assignment of Life Insurance as Collateral with the Life Insurance Policy issuer and constitutes a first priority security interest and a first assignment;

(xxi) the Life Insurance Policy issuer has acknowledged the applicable Assignment of Life Insurance as Collateral; and

Lender in the good faith exercise of its sole and absolute discretion has not deemed the Life Insurance Policy ineligible because of uncertainty as to the creditworthiness of the Life Insurance Policy issuer or because Lender otherwise considers the collateral value of such Life Insurance Policy to Lender to be impaired or its ability to realize such value to be insecure.

"**Environmental Laws**" shall mean all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to Borrower's business or facilities owned or operated by Borrower, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

"**Event of Default**" shall have the meaning specified in <u>Section 15</u> hereof.

"**Excess Cash Flow**" shall have the meaning specified in Section 2 (c)(iii)(B).

"**Fiscal Year**" shall mean each twelve (12) month accounting period of Borrower, which ends on June 30th of each year.

"**Fixed Charges**" shall mean for any period, without duplication, scheduled

payments of principal during the applicable period with respect to all indebtedness of Borrower for borrowed money, plus scheduled payments of principal during the applicable period with respect to all capitalized lease obligations of Borrower, plus scheduled payments of interest during the applicable period with respect to all indebtedness of Borrower for borrowed money including capital lease obligations, plus unfinanced Capital Expenditures of Borrower during the applicable period, plus payments during the applicable period in respect of income or franchise taxes of Borrower.

"**Guaranties**" shall mean the collective reference to the unconditional, unlimited guaranties of payment of Frank Miller and Gary Gitto, as such guaranties may be amended, restated, modified, substituted, extended and renewed from time to time.

"**Hazardous Materials**" shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law).

"**Indemnified Party**" shall have the meaning specified in Section 18 hereof.

"**Interest Period**" shall have the meaning specified in subsection 4(a)(ii) hereof.

"**LaSalle Bank**" shall mean LaSalle Bank National Association, Chicago, Illinois.

"**Letter of Credit**" shall mean any Letter of Credit issued on behalf of Borrower in accordance with this Agreement.

"**Letter of Credit Obligations**" shall mean, as of any date of determination, the sum of (i) aggregate undrawn face amount of all Letters of Credit, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit not already converted to Loans hereunder.

"**Liabilities**" shall mean any and all obligations, liabilities and indebtedness of Borrower to Lender or to any parent, affiliate or subsidiary of Lender of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (including, without limitation, obligations of performance), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

"**LIBOR Rate**" shall mean, with respect to any LIBOR Rate Loan for any Interest Period, a rate per annum equal to the offered rate for deposits in United States dollars for a period equal to such Interest Period as it appears on Telerate page 3750 as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period. "Telerate page 3750" means the display designated as "Page 3750" on the Telerate Service (or such other page

as may replace page 3750 of that service or such other service) as may be nominated by the British Bankers' Association as the vendor for the purpose of displaying British Bankers' Association interest settlement rates for United States dollar deposits).

**"LIBOR Rate Loans"** shall mean the Loans bearing interest with reference to the LIBOR Rate.

**"Life Insurance Policy"** individually and **"Life Insurance Policies"** collectively mean the life insurance policies described in Schedule 1 to this Agreement.

**"Loans"** shall mean all loans and advances made by Lender to or on behalf of Borrower hereunder.

**"Lock Box"** and **"Lock Box Account"** shall have the meanings specified in subsection 8(a) hereof.

**"Material Adverse Effect"** shall mean a material adverse effect on the business, property, assets, prospects, operations or condition, financial or otherwise, of a Person.

**"Maturity Date"** shall mean July 25, 2005.

**"Maximum Loan Limit"** shall mean Thirty Million and No/100 Dollars ($30,000,000)

**"Maximum Revolving Loan Limit"** shall have the meaning specified in subsection 2(a) hereof.

**"Obligor"** shall mean Borrower and each other Person who is or shall become primarily or secondarily liable for any of the Liabilities.

**"Original Term"** shall have the meaning specified in Section 10 hereof.

**"Other Agreements"** shall mean all agreements, instruments and documents, other than this Agreement, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of Borrower or any other Person and delivered to Lender or to any parent, affiliate or subsidiary of Lender in connection with the Liabilities or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

**"Parent"** shall mean any Person now or at any time or times hereafter owning or controlling (alone or with any other Person) at least a majority of the issued and outstanding equity of Borrower and, if Borrower is a partnership, the general partner of Borrower.

**"PBGC"** shall have the meaning specified in subsection 12(b)(v) hereof.

**"Permitted Liens"** shall mean (i) statutory liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder;

(ii) liens or security interests in favor of Lender; (iii) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrower's ability to use such real property for its intended purpose in connection with Borrower's business; (iv) liens in connection with purchase money indebtedness and capitalized leases otherwise permitted pursuant to the Agreement, provided, that such liens attach only to the assets the purchase of which was financed by such purchase money indebtedness or which is the subject of such capitalized leases; (vi) security interests described in Schedule 1.1 to this Agreement; and (v) liens specifically permitted by Lender in writing.

"**Permitted Officer Loans**" shall mean loans from the Borrower to the officers of the Borrower, provided that the total principal amount of all loans from the Borrower to the officers of Borrower shall at no time exceed the aggregate principal sum of $125,000. Provided further that such Permitted Officer Loans shall not exceed $50,000 on the last day of any fiscal year.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including, without limitation, any instrumentality, division, agency, body or department thereof.

"**Plan**" shall have the meaning specified in subsection 12(b)(v) hereof.

"**Prime Rate**" shall mean LaSalle Bank's publicly announced prime rate (which is not intended to be LaSalle Bank's lowest or most favorable rate in effect at any time) in effect from time to time.

"**Prime Rate Loans**" shall means the Loans bearing interest with reference to the Prime Rate.

"**Renewal Term**" shall have the meaning specified in Section 10 hereof.

"**Revolving Loan Limit**" shall have the meaning specified in subsection 2(a) hereof.

"**Revolving Loans**" shall have the meaning specified in subsection 2(a) hereof.

"**Subsidiary**" shall mean any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by Borrower, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by Borrower or any partnership of which Borrower is a general partner.

"**Tangible Net Worth**" shall mean Borrower's shareholders' equity (including retained earnings) less the book value of all intangible assets as determined solely by Lender on a

consistent basis plus the amount of any LIFO reserve, plus any debtor subordinated to the Liabilities in form and substance satisfactory to the Lender in the exercise of its sole and absolute discretion from time to time, all as determined under generally accepted accounting principles applied on a basis consistent with the financial statement dated June 30, 2001, except as set forth herein.

"Tax" shall mean, in relation to any LIBOR Rate Loans and the applicable LIBOR Rate, any tax, levy, impost, duty, deduction, withholding or charges of whatever nature required to be paid by Lender and/or (ii) to be withheld or deducted from any payment otherwise required hereby to be made by Borrower to Lender; provided, that the term "Tax" shall not include any taxes imposed upon the net income of Lender.

"Term Loan" shall have the meaning specified in subsection 2(b) hereof.

2.    LOANS.

(a)    Revolving Loans.

Subject to the terms and conditions of this Agreement and the Other Agreements, during the Original Term and any Renewal Term, Lender may, in its sole discretion, make revolving loans and advances (the "Revolving Loans") in an amount up to the sum of the following sublimits (the "Revolving Loan Limit"):

(i)    Up to eighty-five percent (85%) of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith in the ordinary course of Borrower's business) of Borrower's Eligible Accounts; plus

(ii)    Up to sixty-five percent (65%) of the lower of cost or market value of Borrower's Eligible Inventory or Six Million and No/100 Dollars ($6,000,000), whichever is less; minus

(iii)    such reserves as Lender elects, in its sole discretion to establish from time to time;

provided, that the Revolving Loan Limit shall in no event exceed Twenty-seven Million and No/100 Dollars ($27,000,000) (the "Maximum Revolving Loan Limit") except as such amount may be increased or decreased by Lender, in its sole discretion.

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of the (i) Revolving Loan Limit minus the Letter of Credit Obligations and (ii) the Maximum Revolving Loan Limit minus the Letter of Credit Obligations. If at any time the outstanding Revolving Loans exceeds either the Revolving Loan Limit or the Maximum Revolving Loan Limit, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans and Letter of Credit Obligations exceeds any applicable sublimit within the Revolving Loan Limit, Borrower shall immediately, and without the necessity of demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess and Lender shall apply such payment to the Revolving Loans in such order as Lender shall determine in its sole discretion.

Borrower hereby authorizes Lender, in its sole discretion, to charge any of Borrower's accounts or advance Revolving Loans to make any payments of principal, interest, fees, costs or expenses required to be made under this Agreement or the Other Agreements. All Revolving Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in form and substance satisfactory to Lender. However, if such Revolving Loans are not so evidenced, such Revolving Loans may be evidenced solely by entries upon the books and records maintained by Lender.

A request for a Revolving Loan shall be made or shall be deemed to be made, each in the following manner: Borrower shall give Lender same day notice, no later than 10:30 A.M. (Chicago time) for such day, of its request for a Revolving Loan as a Prime Rate Loan, and at least three (3) Business Days prior notice of its request for a Revolving Loan as a LIBOR Rate Loan, in which notice Borrower shall specify the amount of the proposed borrowing and the proposed borrowing date; provided, however, that no such request may be made at a time when there exists an Event of Default or an event which, with the passage of time or giving of notice, will become an Event of Default. In the event that Borrower maintains a control disbursement account at LaSalle Bank, each check presented for payment against such control disbursement account and any other charge or request for payment against such control disbursement account shall constitute a request for a Revolving Loan as a Prime Rate Loan. As an accommodation to Borrower, Lender may permit telephone requests for Revolving Loans and electronic transmittal of instructions, authorizations, agreements or reports to Lender by Borrower. Unless Borrower specifically directs Lender in writing not to accept or act upon telephonic or electronic communications from Borrower, Lender shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Lender by Borrower and Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Borrower hereby irrevocably authorized Lender to disburse the proceeds of each Revolving Loan requested by Borrower, or deemed to be requested by Borrower, as follows: the proceeds of each Revolving Loan requested under Section 2(a) shall be disbursed by Lender in lawful money of the United States of America in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower and Lender from time to time, or elsewhere if pursuant to a written direction from Borrower.

(b)    **Term Loan**.

Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions to the initial Loans are satisfied, Lender shall make a term loan to Borrower in an amount equal to of Three Million and No/100 Dollars ($3,000,000.00) (the "**Term Loan**").

(c)    **Repayments**.

Liabilities shall be repaid as follows:

(i)    Repayment of Revolving Loans.    The Revolving Loans and all other Liabilities (other than the Term Loan) shall be repaid on the Maturity Date or the last day of any Renewal Term if this Agreement is renewed pursuant to Section 10 hereof.

(ii)    Repayment of Term Loan.    The Term Loan shall be repaid in thirty-six (36) equal monthly installments of Eighty-Three Thousand Three Hundred Thirty-Three Dollars ($83,333) each payable on the first day of each month hereafter until the Maturity Date.    If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

(iii)    Mandatory Prepayments of the Term Loan.

(A) Sales of Assets.    Upon receipt of the proceeds of the sale or other disposition of any equipment or real property of Borrower which is subject to a mortgage in favor of Lender, or if any of the equipment or real property subject to such mortgage is damaged, destroyed or taken by condemnation in whole or in part, the proceeds thereof shall be paid by Borrower to Lender as a mandatory prepayment of the Term Loan, such payment to be applied against the remaining installments of principal in the inverse order of their maturities until repaid in full, and then against the other Liabilities, as determined by Lender, in its sole discretion.

(B) Excess Cash Flow.    Ten (10) days after receipt of Borrower's Fiscal Year end audited financial statements for each Fiscal Year of Borrower commencing with Borrower's Fiscal Year ended June 30, 2003 Borrower shall make a mandatory prepayment of the Term Loan in an amount equal to 50% of Borrower's "Excess Cash Flow" (as described below) for the Fiscal Year just ended, such prepayment to be applied against the remaining installments of principal in the inverse order of their maturities, such mandatory prepayments to continue until the date on which the Term Loan shall be repaid in full.    For purposes hereof, "Excess Cash Flow" shall mean for each Borrower's Fiscal Year, Borrower's EBITDA for such period, minus Borrower's taxes during such period, minus non-PIK interest payable during such period, minus actual principal payments made with respect to long term debt during such period, minus all unfinanced Capital Expenditures by Borrower during such period.

3.    **LETTERS OF CREDIT.**

(a)    **General Terms:**

Subject to the terms and conditions of the Agreement and the Other Agreements, during the Original Term or any Renewal Term, Lender may, in its sole discretion, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower's request, commercial and/or standby Letters of Credit; provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed Five Hundred and No/100 Dollars ($500,000).    Payments made by Lender to any Person on account of any Letter of Credit shall constitute Loans hereunder and Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by Borrower for a Loan

to reimburse such issuer. Borrower shall remit to Lender a Letter of Credit fee equal to twenty-five hundredths percent (0.25%) per month on the aggregate undrawn face amount of all Letters of Credit outstanding, which fee shall be payable monthly in arrears on the last Business Day of each month. Borrower shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for issuance, amendment, negotiation, renewal or extension of any Letter of Credit.

(a)    **Requests for Letters of Credit:**

Borrower shall make requests for Letters of Credit in writing at least three (3) Business Days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit. If any term of such application or reimbursement agreement is inconsistent with this Agreement, then the provisions of this Agreement shall control to the extent of such inconsistency.

(b)    **Obligations Absolute.**

Borrower shall be obligated to reimburse the issuer of any Letter of Credit, or Lender if Lender has reimbursed such issuer on Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (i) any lack of validity or enforceability of any Letter of Credit, (ii) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any Other Agreement, (iii) the existence of any claim, set off, defense or other right which Borrower or any other Person may have against any beneficiary of any Letter of Credit, Lender or the issuer of the Letter of Credit, (iv) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (v) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (vi) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, the Lender or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of Borrower's obligations hereunder. It is understood and agreed by Borrower that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any notice or information tot he contrary.

(c)    **Expiration Dates of Letters of Credit.**

The expiration date of each Letter of Credit shall be no later than the earlier of (i) one (1) year from the date of issuance and (ii) the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiration date for one or more one (1) year periods, so long as the issuer thereof has the right to terminate the Letter of Credit at the end of each one (1) year period and no extension period extends past the thirtieth (30th) day prior to the end of the Original Term or any Renewal Term.

4.    **INTEREST, FEES AND CHARGES.**

**(a)    Interest Rate.**

Subject to the terms and conditions set forth below, the Loans shall bear interest at the per annum rate of interest pursuant to subsections (i), (ii), (iii) and (iv) below, as applicable:

(i)    The Term Loan shall bear interest at the rate of two and zero hundredths percent (2.00%) per annum in excess of the Prime Rate in effect from time to time, payable on the last Business Day of each month in arrears. Said rate of interest shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the effective date of each such change in the Prime Rate.

(ii)    The Revolving Loan shall bear interest, at Borrower's option, at either: (a) the Prime Rate plus the "Applicable Margin for Prime Rate Loans" (as defined in the next paragraph) or the matrix following the next paragraph, as applicable or (b) the LIBOR Rate plus the "Applicable Margin for LIBOR Rate Loans" (as defined in the next paragraph) or the matrix following the next paragraph, if applicable, such rate to remain fixed for such Interest Period. **"Interest Period"** shall mean any continuous period of thirty (30), sixty (60), ninety (90) or one hundred eighty (180) days, as selected from time to time by Borrower by irrevocable notice (in writing, by telex, telegram or cable) given to Lender not less than three (3) Business Days prior to the first day of each respective Interest Period; provided that: (A) each such period occurring after such initial period shall commence on the day on which the immediately preceding period expires; (B) the final Interest Period shall be such that its expiration occurs on or before the Maturity Date or the end of any Renewal Term, if applicable; and (C) if for any reason Borrower shall fail to timely select a period, then such Loans shall continue as, or revert to, Prime Rate Loans. Interest shall be payable on the last Business Day of each month in arrears and on the date of any payment hereon by Borrower.

(iii)    The Applicable Margin for (i) LIBOR Rate Loans shall be two and seventy-five hundredths percent (2.75%) per annum, and (ii) Prime Rate Loans shall be twenty-five hundredths percent (.25%) per annum unless and until a change is required by the operation of the "Combined Pricing Ratios" as defined in the matrix following this paragraph. Changes in the Applicable Margin shall be made not more frequently than annually based on the Combined Pricing Ratios, determined by the Lender from the Borrower's annual financial reports, except that the first such determination shall be made based on the Borrower's annual financial statements for the Borrower's fiscal year ending on June 30, 2003, and shall be effective as of the first day of the first month after the month in which Lender receives such statements. The Applicable Margin shall vary depending upon the Borrower's Combined Pricing Ratios, as follows:

| Combined Pricing Ratios | | Applicable Margin | |
|---|---|---|---|
| If both EBITDA and Net Worth are: | | Applicable Margin for Prime Rate Loans | Applicable Margin for LIBOR Loans |
| EBITDA | Net Worth | | |
| Greater than $6,000,000 | Greater than $6,500,000 | 0.00% | 2.50% |

| Greater than $5,500,000 but less than or equal to $6,000,000 | Greater than $5,750,000 but less than or equal to $6,500,000 | 0.25% | 2.75% |
|---|---|---|---|
| Greater than $5,000,000 but less than or equal to $5,500,000 | Greater than $5,500,000 but less than or equal to $5,250,000 | 0.50% | 3.00% |
| Greater than $4,500,000 but less than or equal to $5,000,000 | Greater than $5,250,000 but less than or equal to $5,000,000 | 0.75% | 3.25% |
| Less than or equal to $4,500,000 | Less than or equal to $5,000,000 | 1.00% | 3.50% |

(iv)    Upon the occurrence of an Event of Default and during the continuance thereof, the Loans shall bear interest at the rate of two and twenty-five hundredths percent (2.25%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand. All interest shall be calculated on the basis of a 360-day year.

(b)    **Other Libor Provisions.**

(i)    Subject to the provisions of this Agreement, Borrower shall have the option (A) as of any date, to convert all or any part of the Prime Rate Loans to, or request that new Loans be made as, LIBOR Rate Loans of various Interest Periods, (B) as of the last day of any Interest Period, to continue all or any portion of the relevant LIBOR Rate Loans as LIBOR Rate Loans; (C) as of the last day of any Interest Period, to convert all or any portion of the LIBOR Rate Loans to Prime Rate Loans; and (D) at any time, to request new Loans as Prime Rate Loans; provided, that Loans may not be continued as or converted to LIBOR Rate Loans, if the continuation or conversion thereof would violate the provisions of subsections 4(b)(ii) or 4(b)(iii) of this Agreement or if an Event of Default has occurred.

(ii)    Lender's determination of LIBOR as provided above shall be conclusive, absent manifest error. Furthermore, if Lender determines, in good faith (which determination shall be conclusive, absent manifest error), prior to the commencement of any Interest Period that (A) U.S. Dollar deposits of sufficient amount and maturity for funding the Loans are not available to Lender in the London Interbank Eurodollar market in the ordinary course of business, or (B) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the rate of interest to be applicable to the Loans requested by Borrower to be LIBOR Rate Loans or the Loans bearing interest at the rates set forth in subsection 4(a)(ii) of this Agreement shall not represent the effective pricing to Lender for U.S. Dollar deposits of a comparable amount for the relevant period (such as for example, but not limited to, official reserve requirements required by Regulation D to the extent not given effect in determining the rate), Lender shall promptly notify Borrower and (1) all

existing LIBOR Rate Loans shall convert to Prime Rate Loans upon the end of the applicable Interest Period, and (2) no additional LIBOR Rate Loans shall be made until such circumstances are cured.

(iii)    If, after the date hereof, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over Lender or its lending offices (a "Regulatory Change"), shall, in the opinion of counsel to Lender, make it unlawful for Lender to make or maintain LIBOR Rate Loans, then Lender shall promptly notify Borrower and (A) the LIBOR Rate Loans shall immediately convert to Prime Rate Loans on the last Business Day of the then existing Interest Period or on such earlier date as required by law and (B) no additional LIBOR Rate Loans shall be made until such circumstance is cured.

(iv)    If, for any reason, a LIBOR Rate Loan is paid prior to the last Business Day of any Interest Period or if a LIBOR Rate Loan does not occur on a date specified by Borrower in its request (other than as a result of a default by Lender), Borrower agrees to indemnify Lender against any loss (including any loss on redeployment of the deposits or other funds acquired by Lender to fund or maintain such LIBOR Rate Loan) cost or expense incurred by Lender as a result of such prepayment.

(v)    If any Regulatory Change (whether or not having the force of law) shall (A) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of or loans by, or any other acquisition of funds or disbursements by, Lender; (B) subject Lender or the LIBOR Rate Loans to any Tax or change the basis of taxation of payments to Lender of principal or interest due from Borrower to Lender hereunder (other than a change in the taxation of the overall net income of Lender); or (C) impose on Lender any other condition regarding the LIBOR Rate Loans or Lender's funding thereof, and Lender shall determine (which determination shall be conclusive, absent any manifest error) that the result of the foregoing is to increase the cost to Lender of making or maintaining the LIBOR Rate Loans or to reduce the amount of principal or interest received by Lender hereunder, then Borrower shall pay to Lender, on demand, such additional amounts as Lender shall, from time to time, determine are sufficient to compensate and indemnify Lender from such increased cost or reduced amount.

(vi)    Lender shall receive payments of amounts of principal of and interest with respect to the LIBOR Rate Loans free and clear of, and without deduction for, any Taxes. If (A) Lender shall be subject to any Tax in respect of any LIBOR Rate Loans or any part thereof or, (B) Borrower shall be required to withhold or deduct any Tax from any such amount, the LIBOR Rate applicable to such LIBOR Rate Loans shall be adjusted by Lender to reflect all additional costs incurred by Lender in connection with the payment by Lender or the withholding by Borrower of such Tax and Borrower shall provide Lender with a statement detailing the amount of any such Tax actually paid by Borrower. Determination by Lender of the amount of such costs shall be conclusive, absent manifest error. If after any such adjustment any part of any Tax paid by Lender is subsequently recovered by Lender, Lender shall reimburse Borrower to the extent of the amount so

recovered. A certificate of an officer of Lender setting forth the amount of such recovery and the basis therefor shall be conclusive, absent manifest error.

(vii)    Each request for LIBOR Rate Loans shall be in an amount not less than One Million and No/100 Dollars ($1,000,000), and in integral multiples of, One Million and No/100 Dollars ($1,000,000) for amounts in excess of One Million and No/100 Dollars ($1,000,000).

(viii)    Unless otherwise specified by Borrower, all Loans shall be Prime Rate Loans.

(ix)    No more than five (5) Interest Periods may be in effect with respect to outstanding LIBOR Rate Loans at any one time.

(c)    **Fees And Charges.**

(i)    Collateral Management Fee:  Borrower shall pay to Lender a collateral management fee in the amount of One Thousand and No/100 Dollars per month, which fee shall be full earned by Lender and payable monthly in advance on the first day of each month.

(ii)    Commitment Fee: Borrower shall pay to Lender a commitment fee of One Hundred Ninety-Five Thousand Dollars ($195,000), which fee shall be fully earned by Lender on the date the Commitment Letter was signed by Borrower, shall be non-refundable upon payment and shall be payable $50,000 on acceptance of the Commitment Letter, $15,000 at closing, $65,000 on the first day of the ninth month following closing and $65,000 on the first day of the eighteenth month following closing.

(iii)    Unused Line Fee:  Borrower shall pay to Lender an unused line fee of three hundred seventy-five thousandths percent (.375%) of the difference between the Maximum Revolving Loan Limit and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations for each month, which fee shall be fully earned by Lender and payable monthly in arrears on the first Business Day of each month. Said fee shall be calculated on the basis of a 360 day year.

(iv)    Costs and Expenses: Borrower shall reimburse Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees, incurred by Lender in connection with the (i) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Liabilities; and (iv) administration and enforcement of any of Lender's rights under this Agreement. Borrower shall also pay all normal service charges with respect to all accounts maintained by Borrower with Lender and LaSalle Bank and any additional services requested by Borrower from Lender and LaSalle Bank. All such costs, expenses and charges shall, if owed to LaSalle Bank, be reimbursed by Lender and in such event or in the event such costs and expenses are owed to Lender, constitute Liabilities hereunder,

shall be payable by Borrower to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(v)    Capital Adequacy Charge.    If Lender shall have determined that the adoption of any law, rule or regulation regarding capital adequacy, or any change therein or in the interpretation or application thereof, or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or governmental authority enacted after the date hereof, does or shall have the effect of reducing the rate of return on such party's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by a material amount, then from time to time, after submission by Lender to Borrower of a written demand therefor ("**Capital Adequacy Demand**") together with the certificate described below, Borrower shall pay to Lender such additional amount or amounts ("**Capital Adequacy Charge**") as will compensate Lender for such reduction, such Capital Adequacy Demand to be made with reasonable promptness following such determination.  A certificate of Lender claiming entitlement to payment as set forth above shall be conclusive in the absence of manifest error.  Such certificate shall set forth the nature of the occurrence giving rise to such reduction, the amount of the Capital Adequacy Charge to be paid to Lender, and the method by which such amount was determined.  In determining such amount, Lender may use any reasonable averaging and attribution method, applied on a non-discriminatory basis.

(d)    **Maximum Interest.**

It is the intent of the parties that the rate of interest and other charges to Borrower under this Agreement shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrower.

5.    **COLLATERAL.**

(a)    **Grant of Security Interest to Lender.**

As security for the payment of all Loans now or in the future made by Lender to Borrower hereunder and for the payment or other satisfaction of all other Liabilities, Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible

Inventory); (d) all Investment Property; (e) all bank accounts, deposits, deposit accounts and cash; (f) all Life Insurance Policies, (g) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (h) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

(b) **Other Security**.

Lender, in its sole discretion, without waiving or releasing any obligation, liability or duty of Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral. All sums paid by Lender in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, all court costs and all other charges relating thereto incurred by Lender shall constitute Liabilities, payable by Borrower to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(c) **Possessory Collateral**.

Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Chattel Paper, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

6. **PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.**

Borrower shall, at Lender's request, at any time and from time to time, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing

statement shall be sufficient as a financing statement.

## 7.    POSSESSION OF COLLATERAL AND RELATED MATTERS.

Until an Event of Default has occurred, Borrower shall have the right, except as otherwise provided in this Agreement, in the ordinary course of Borrower's business, to (a) sell, lease or furnish under contracts of service any of Borrower's Inventory normally held by Borrower for any such purpose; and (b) use and consume any raw materials, work in process or other materials normally held by Borrower for such purpose; provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

## 8.    COLLECTIONS.

(a)    <u>Promptly upon the direction of Lender following the occurrence of an Event of Default:</u>

(i)    Borrower shall direct all of its Account Debtors to make all payments on the Accounts directly to a post office box (the **"Lock Box"**) designated by, and under the exclusive control of, Lender, at a financial institution acceptable to Lender. Borrower shall establish an account (the **"Lock Box Account"**) in Lender's name with a financial institution acceptable to Lender, into which all payments received in the Lock Box shall be deposited, and into which Borrower will immediately deposit all payments received by Borrower for Inventory or services in the identical form in which such payments were received, whether by cash or check.

(ii)    If Borrower, any Affiliate or Subsidiary, any shareholder, officer, director, employee or agent of Borrower or any Affiliate or Subsidiary, or any other Person acting for or in concert with Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds of Accounts or other Collateral, Borrower and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Lender and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. The financial institution with which the Lock Box Account is established shall acknowledge and agree, in a manner satisfactory to Lender, that the amounts on deposit in such Lock Box Account are the sole and exclusive property of Lender, that such financial institution has no right to setoff against the Lock Box Account or against any other account maintained by such financial institution into which the contents of the Lock Box Account are transferred, and that such financial institution shall wire, or otherwise transfer in immediately available funds to Lender in a manner satisfactory to Lender, funds deposited in the Lock Box Account on a daily basis as such funds are collected. Borrower agrees that all payments made to such Lock Box Account or otherwise received by Lender, whether in respect of the Accounts or as proceeds of other Collateral or otherwise, will be applied on account of the Liabilities in accordance with the terms of this Agreement. Borrower agrees to pay all fees, costs and expenses in connection with opening and maintaining the Lock Box Account. All of such fees, costs and expenses if not paid by Borrower, may be paid by Lender and in such event all amounts paid by Lender shall constitute Liabilities hereunder, shall be payable to Lender by Borrower upon demand, and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.