## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC f/k/a LASALLE BUSINESS CREDIT, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GARY C. GITTO, FRANK MILLER, MARIA MILLER, CHARLES N. GITTO, JR., LOUIS J. PELLEGRINE, JR., JOHN D. TERSIGNI, KATHLEEN M. CARLAND, WILLIAM DEAKIN, JANICE CHAISSON, HELEN KOZAK, KINGSDALE CORP. d/b/a J&J CHEMICAL DISTRIBUTORS, TRADEX INTERNATIONAL CORPORATION, and TRADEX CORPORATION, | ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) Case No. 04-12227-DPW ) |
| FLEET NATIONAL BANK, CLINTON SAVINGS BANK, SOVEREIGN BANK, COMMERCE BANK & TRUST COMPANY, FIDELITY COOPERATIVE BANK, BANKNORTH, N.A., LEOMINSTER CREDIT UNION, FIDELITY INVESTMENTS, INC., FIDELITY BROKERAGE SERVICES, LLC, LEHMAN BROTHERS, INC., TD WATERHOUSE, TD WATERHOUSE INVESTOR SERVICES, INC., LEGG MASON, INC. and LEGG MASON WOOD WALKER, INC. | ) ) ) ) ) ) ) ) ) ) ) |
| Trustee Process Defendants, | ) ) |
| and | ) ) |
| DIRECT WOOD & PAPER PRODUCTS, INC., GITTO SALES CORPORATION, J-TAN SALES & MARKETING, INC., HEMISPHERE DISTRIBUTION CORP., FIDELITY INVESTMENTS, INC., FIDELITY BROKERAGE SERVICES, LLC, AWG, LLC, LEHMAN BROTHERS, INC., TD WATERHOUSE, TD WATERHOUSE INVESTOR SERVICES, INC., SUPERIOR POLYMERS CORPORATION, LEGG MASON, INC., LEGG MASON WOOD WALKER, INC., TRADEX CORPORATION, and EAST COAST TRADING, INC. | ) ) ) ) ) ) ) ) ) ) ) |
| Reach-and-Apply Defendants. | ) |

## THIRD AMENDED COMPLAINT

Plaintiff, LaSalle Business Credit, LLC ("LaSalle"), f/k/a LaSalle Business Credit, Inc.,
by its attorneys, for its Third Amended Complaint against Defendants, Gary C. Gitto, Frank
Miller, Maria Miller, Charles N. Gitto, Jr., Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M.
Carland, William Deakin, Janice Chaisson, Helen Kozak, Kingsdale Corp., d/b/a J&J Chemical
Distributors, Tradex International Corporation, and Tradex Corporation; against Trustee Process
Defendants, Fleet National Bank ("Fleet"), Clinton Savings Bank ("Clinton Bank"), Sovereign
Bank, Commerce Bank & Trust Company ("Commerce Bank"), Fidelity Cooperative Bank,
BankNorth, N.A., Leominster Credit Union, Fidelity Investments, Inc., Fidelity Brokerage
Services, LLC (together with Fidelity Investments, Inc., "Fidelity"), Lehman Brothers, Inc., TD
Waterhouse, TD Waterhouse Investor Services, Inc. (together with TD Waterhouse, "TD
Waterhouse"), Legg Mason, Inc. and Leg Mason Wood Walker, Inc. (together with Legg Mason,
Inc., "Legg Mason"); and against Reach-and-Apply Defendants, Direct Wood & Paper Products,
Inc., Gitto Sales Corporation, J-Tan Sales & Marketing, Inc. ("J-Tan"), Hemisphere Distribution
Corp. ("Hemisphere"), Fidelity, AWG, LLC, Lehman Brothers, Inc., TD Waterhouse, Superior
Polymers Corporation, Legg Mason, Tradex Corporation and East Coast Trading, Inc., states as
follows:

## JURISDICTION

1.     Original jurisdiction over the claims asserted in this matter exists by virtue of 28
U.S.C. §1331, in that the cause of action arises under the laws of the United States, and 28
U.S.C. §1332(a), in that the matter in controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between citizens of different states.

## VENUE

2.     Venue exists under 28 U.S.C. §1391(b) in that a substantial part of the events
giving rise to the claim occurred in this District.

## PARTIES

**Plaintiff**

3.     LaSalle is a limited liability company organized and existing under the laws of the State of Delaware, with executive offices in Chicago, IL and a locus of operations in New York, NY.  LaSalle is a wholly-owned subsidiary of LaSalle National Leasing Corporation, which is a wholly-owned subsidiary of LaSalle Bank National Association, a federally insured national banking association, which provides funding to LaSalle.

**Defendants**

4.     Gary C. Gitto ("Gary Gitto") is an individual, residing at 51 Meyer Hill Drive, Acton, Massachusetts.  Gary Gitto was the chief executive officer and treasurer of Gitto Global Corporation ("Gitto Global"), a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Lunenburg, Massachusetts.

5.     Frank Miller is an individual, residing at 95 Kettle Hole Road, Bolton, Massachusetts and was the chief operating officer and president of Gitto Global.  He is the sole owner of Kingsdale Corporation, d/b/a J&J Chemical Distributors.

6.     Maria Miller is an individual, residing at 95 Kettle Hole Road, Bolton, Massachusetts and was an employee of Gitto Global.  Maria Miller is married to Frank Miller.

7.     Charles N. Gitto, Jr., ("Charles Gitto") is an individual, residing at 18 Nancy Court, Leominster, Massachusetts and was the chairman of the board of Gitto Global.  He is also an officer and owner of Tradex International Corporation and Tradex Corporation, which was Gitto Global's landlord.

8.     Louis J. Pellegrine, Jr. ("Louis Pellegrine") is an individual, who, upon information and belief, is a citizen of Massachusetts.  He was the accountant for Gitto Global and was involved in forming various corporations involved with Gitto Global.

9.     John D. Tersigni ("John Tersigni") is an individual, residing at 24 Field Road, Leominster, Massachusetts.  He is the sole officer and director of J-Tan Sales and Marketing, Inc. ("J-Tan"), a Massachusetts corporation.

10.     Kathleen M. Carland ("Kathleen Carland") is an individual, residing at 11 South Street, Auburn, Massachusetts.  She is the president of Hemisphere Distribution Corporation ("Hemisphere"), a Massachusetts corporation.

11.     William Deakin is an individual, residing at 206 Hathaway Road, Acushnet, Massachusetts.  He was the controller of Gitto Global.

12.     Janice Chaisson is an individual, residing at 17 Grove Street, Clinton, Massachusetts.  She was the accounting clerk handling accounts receivables for Gitto Global.

13.     Helen Kozak is an individual, residing at 87 Greenwood Place, Gardner, Massachusetts.    She was the executive assistant for Charles Gitto and Gary Gitto at Gitto Global.

14.     Kingsdale Corporation is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business located at 77 Snead Drive, Mashpee, Massachusetts. Kingsdale is doing business as J&J Chemical Distributors ("J&J Chemical").  Its original principal place of business was Frank Miller's brother's residence.  It is owned by Frank Miller.

15.     Tradex International Corporation ("Tradex International") is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business located at 18 Nancy Court, Leominster, Massachusetts, which is the home of Charles Gitto.  Charles Gitto is an officer and owner of Tradex International.

16.     Tradex Corporation is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business located at 18 Nancy Court,

Leominster, Massachusetts, which is the home of Charles Gitto.  Charles Gitto is an officer and owner of Tradex Corporation.  Tradex Corporation owns the property at 140 Leominster-Shirley Road, Lunenburg, Massachusetts, where Gitto Global's business is located.  Tradex International and Tradex Corporation (collectively "Tradex") were used interchangeably by Gitto Global and its employees.

**Trustee Process and Trustee Process / Reach and Apply Defendants**

17.    Trustee Process Defendant Fleet is, on information and belief, a national banking association, with places of business throughout the Commonwealth of Massachusetts.  Fleet maintains an office at 100 Federal Street, Boston, Massachusetts.  Upon information and belief, Fleet holds goods, effects, or credits of Defendants Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, Helen Kozak and Tradex.

18.    Trustee Process Defendant Clinton Bank has places of business throughout the Commonwealth of Massachusetts.  Clinton Bank maintains an office at 200 Church Street, Clinton, Massachusetts.  Upon information and belief, Clinton Bank holds goods, effects, or credits of Defendants Gary Gitto, Frank Miller, Maria Miller and Charles Gitto.

19.    Trustee Process Defendant Sovereign Bank has places of business throughout the Commonwealth of Massachusetts.  Sovereign Bank maintains an office at One Federal Street, Boston, Massachusetts.  Upon information and belief, Sovereign Bank holds goods, effects, or credits of Defendants William Deakin, Charles Gitto, Tradex International and Tradex.

20.    Trustee Process Defendant Commerce Bank has places of business throughout the Commonwealth of Massachusetts.  Commerce Bank maintains an office at 386 Main Street, Worcester, Massachusetts.  Upon information and belief, Commerce Bank holds goods, effects, or credits of Defendant Gary Gitto.

21.     Trustee Process Defendant Fidelity Co-Operative Bank has places of business throughout the Commonwealth of Massachusetts.  Fidelity Co-Operative Bank maintains an office at 675 Main Street, Fitchburg, Massachusetts.  Upon information and belief, Fidelity Co-Operative Bank holds goods, effects, or credits of Defendant John Tersigni.

22.     Trustee Process Defendant BankNorth, N.A. is a national banking association with places of business throughout the Commonwealth of Massachusetts.  BankNorth, N.A. maintains an office at 15 Broad Street, Boston, Massachusetts.  Upon information and belief, BankNorth, N.A. holds goods, effects, or credits of Defendant John Tersigni.

23.     Trustee Process Defendant Leominster Credit Union has places of business throughout the Commonwealth of Massachusetts and maintains an office at 20 Adams Street, Leominster, Massachusetts.  Upon information and belief, Leominster Credit Union holds goods effects, or credits of Defendant Janice Chaisson.

24.     Trustee Process and Reach and Apply Defendant Fidelity has places of business throughout the Commonwealth of Massachusetts and maintains an office at 82 Devonshire Street, Boston, Massachusetts.  Upon information and belief, Fidelity holds goods, effects, or credits of defendants Frank Miller and Maria Miller.

25.     Trustee Process and Reach and Apply Defendant Lehman Brothers, Inc. maintains an office at 260 Franklin Street, Boston, Massachusetts.  Upon information and belief, Lehman Brothers, Inc. holds goods, effects, or credits of defendant Gary Gitto.

26.     Trustee Process and Reach and Apply Defendant TD Waterhouse, a corporation organized under the laws of New York, is a wholly-owned subsidiary of TD Waterhouse Group, Inc., and directs all retail customer orders to its affiliated clearing firm, National Investor Services Corp., which is also a wholly-owned subsidiary of TD Waterhouse Group, Inc.  Both TD Waterhouse and National Investor Services Corp. have retained CT Corporation System, 101

Federal Street, Boston, Massachusetts to act as resident agent.  Upon information and belief, TD Waterhouse holds goods, effects, or credits of defendants Frank Miller and Maria Miller.

27.    Trustee Process and Reach and Apply Defendant Legg Mason is a Maryland corporation with its principal office at 100 Light Street, Baltimore, Maryland.  On information and belief, Legg Mason holds goods, effects, or credits of defendant Charles Gitto.

**Reach-and-Apply Defendants**

28.    Reach and Apply Defendant Direct Wood & Paper Products, Inc. is a Massachusetts corporation with a place of business at 5 Commonwealth Rd., Suite #2-A, Natick, Massachusetts. Upon information and belief, defendant Gary Gitto has an interest in Direct Wood & Paper Products, Inc.

29.    Reach and Apply Defendant Gitto Sales Corporation is a Massachusetts corporation with a place of business at 140 Leominster-Shirley Rd., Lunenburg, Massachusetts. Upon information and belief, defendant Gary Gitto has an interest in Gitto Sales Corporation.

30.    Reach and Apply Defendant J-Tan is a Massachusetts corporation with a place of business at 24 Field Rd., Leominster, Massachusetts.  Upon information and belief, defendant John Tersigni has an interest in J-Tan.

31.    Reach and Apply Defendant Hemisphere is a Massachusetts corporation with a place of business at 434 Old Connecticut Path, Framingham, Massachusetts.  Upon information and belief, defendant Kathleen Carland has an interest in Hemisphere.

32.    Reach and Apply Defendant AWG, LLC is a Massachusetts Limited Liability Company with a place of business at 140 Leominster-Shirley Road, Lunenberg, Massachusetts. Upon information and belief, defendant Gary Gitto has an interest in AWG, LLC.

33.    Reach and Apply Defendant Superior Polymers Corporation is a Massachusetts Corporation with a principal office at 51 Meyer Hill Road, Acton, Massachusetts.  On

information and belief, defendant Gary Gitto either owns or has an interest in Superior Polymers Corporation.

34.    Reach and Apply Defendant Legg Mason is a Maryland corporation with its principal office at 100 Light Street, Baltimore, Maryland.  On information and belief, Legg Mason holds goods, effects, or credits of defendant Charles Gitto.

35.    On information and belief, Reach and Apply Defendant is a New Hampshire corporation with a principal office located at 98 Adams Street, Leominster, Massachusetts.  East Coast Trading, Inc. is the defendant in lawsuit filed by defendant John Tersigni in Worcester Superior Court and styled *Tersigni v. East Coast Trading, Inc.*

## GENERAL FACTUAL ALLEGATIONS

**LaSalle Loan**

36.    Gitto Global is a corporation organized in 1991 and existing under the laws of Massachusetts.  It is based in Lunenburg, Massachusetts and is a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, styrenic and thermoplastic olefin compounds that conform to strict industry guidelines.  Gitto Global's product is used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems.  Gitto Global is owned by Frank Miller, Gary Gitto and Nancy Gitto Panagiotes.

37.    On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement ("Loan Agreement"), wherein LaSalle made a revolving loan not to exceed $27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's Eligible Accounts, as defined, and 65% of the lower cost or market value of Gitto Global's Eligible Inventory, as defined, or $6,000,000, whichever was less ("LaSalle revolving loan").  Eligible Accounts was defined, inter alia, under the Loan Agreement to be "genuine," to arise

from the performance of services by Gitto Global and evidenced by an invoice that was due and payable within 30 days and not less than 90 days past due. Eligible Inventory was defined, inter alia, as being owned by Gitto Global, located at one of its premises and held for sale. In addition, LaSalle agreed to make a term loan to Gitto Global in the original principal amount of $3,000,000 ("LaSalle term loan"). A copy of the Loan Agreement is attached hereto as Exhibit A.

38.    As part of the Loan Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, a copy of which is attached hereto as Exhibit B, and a Term Note in the original principal sum of $3,000,000, a copy of which is attached hereto as Exhibit C.

39.    In consideration of the credit being extended by LaSalle to Gitto Global, Gary Gitto executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, a copy of which is attached hereto as Exhibit D.

40.    In consideration of the credit being extended by LaSalle to Gitto Global, Frank Miller executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, a copy of which is attached hereto as Exhibit E.

41.    Pursuant to the terms of the Loan Agreement, Gitto Global was required to enter into a blocked account agreement with LaSalle and Gitto Global's depository bank in order to perfect LaSalle's security interest in Gitto Global's deposit accounts.

42.    On or about July 25, 2002, Gitto Global, LaSalle and Fleet entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-

Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account Agreement").

43.    Under the terms of the Blocked Account Agreement, Gitto Global established a deposit account bearing account number 9429271277 at Fleet ("Fleet Blocked Account").

44.    The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account.  Also on a daily basis, Fleet was to deposit the available funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan.

45.    The Loan and Security Agreement provided that Gitto Global shall deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan, accompanied by Gitto Global's sales, cash receipts and credit memo journals.

46.    As set forth hereafter, LaSalle was induced to enter into the Loan Agreement and the Term Note by false representations made in May and July, 2002 concerning Gitto Global's financial condition and operations.

47.    Subsequent to the entry of Gitto Global and LaSalle into the Loan Agreement, false borrowing base certificates were submitted on behalf of Gitto Global in which Gitto Global's sales, accounts receivable and the value of its inventory were misrepresented.  The false sales figures were supported by fictitious sales to six companies.  Gitto Global's sales were made to appear legitimate through the creation of and use of fictitious invoices, bills of lading and checks.  The misrepresentations were made to induce LaSalle to advance additional funds under the LaSalle revolving loan and to support the check-kiting scheme from which the defendants profited.  The check-kiting scheme operated using J&J Chemical checks drawn upon its account at Clinton Bank and reciprocal Gitto Global checks drawn upon the LaSalle Account, with funds being siphoned out by the defendants.

48.     Between July, 2002 and September, 2004, and in furtherance of the check-kiting scheme, false information regarding Gitto Global's financial condition and operations was presented to LaSalle on behalf of Gitto Global during audits and field examinations conducted by LaSalle.

49.     LaSalle, in reasonable reliance upon the false information contained in the borrowing base certificates submitted for Gitto Global and the false information presented to LaSalle during the field examinations and audits, advanced funds to Gitto Global in accordance with the Loan Agreement.

50.     On September 24, 2004, Gitto Global filed bankruptcy.

51.     As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $30,683,467.23, plus interest and costs.

## COUNT I
## CIVIL RICO
(Against Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr.,
Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland, William Deakin,
Janice Chaisson, Helen Kozak, Kingsdale Corp., d/b/a J&J Chemical Distributors,
Tradex Corporation and Tradex International Corporation)

52.     LaSalle restates the allegations contained in the previous paragraphs as if set forth fully herein.

53.     LaSalle is owned by a financial institution insured by the FDIC.

54.     At all relevant times, Gitto Global was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and was engaged in and its activities affected interstate commerce.  Gitto Global was an ongoing entity having an existence distinct from the pattern of racketeering activity alleged herein.

55.     Throughout the period described herein, Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin, J&J Chemical, and Tradex (the "Conspirators") engaged in a conspiracy to

conduct Gitto Global's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

56.    During the relevant period described herein, each of the Conspirators was a "person" within the meaning of 18 U.S.C. § 1961(3).

57.    Commencing at some date prior to May, 2002 and continuing until at least September 24, 2004, the Conspirators engaged in a conspiracy to conduct the affairs of Gitto Global so as to defraud LaSalle by means of false representations, through interstate wire transmissions and the use of the U.S. Mail.

58.    Pursuant to and in furtherance of the conspiracy alleged herein, the Conspirators engaged in the acts set forth in the following paragraphs of this Count.

**False Borrowing Base Certificates**

59.    In order to receive advances of funds pursuant to the Loan Agreement, Frank Miller or Janice Chaisson, on behalf of Gitto Global, delivered daily borrowing base certificates to LaSalle, together with Gitto Global's sales, cash receipts, credit memo journals, and inventory valuation.  Each of these daily borrowing base certificates represented and warranted above the signature line as follows:

> The undersigned hereby represents and warrants to LaSalle Business Credit, LLC that the information set forth herein is true and correct as of the date made, that any Accounts Receivable or Inventory classified as "Eligible Accounts" or "Eligible Inventory" conform in all respects to the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth in the Loan and Security Agreement (or similar agreement) entered into by and between LaSalle Business Credit, LLC and the undersigned, as amended, modified or supplemented from time to time).

60.    From July 25, 2002 to January 16, 2004, daily borrowing base certificates bearing Frank Miller's name were delivered nightly by Gitto Global to LaSalle with the detailed supporting documents.

61.    From January 17, 2004 to September 15, 2004, Janice Chaisson sent the borrowing base certificates from Gitto Global in Massachusetts to LaSalle in New York via e-mail.

### (a)    Sales Misrepresentations

62.    On or about July 25, 2002, Frank Miller provided the first borrowing base certificate to LaSalle.

63.    In the first borrowing base certificate submitted to LaSalle, Frank Miller knowingly represented Gitto Global's sales to be $400,054.47. Frank Miller included in this figure fictitious sales that never occurred. These false sales representations were that:

(a)    Zebulon made payments to Gitto Global totaling $362,750.25 for goods sold;

(b)    Velco purchased $133,292.65 in goods; and

(c)    Hemisphere purchased $206,940.40 in goods.

64.    Frank Miller and Janice Chaisson knowingly and intentionally made similar misrepresentations in the subsequent borrowing base certificates submitted to LaSalle with respect to Gitto Global's sales, collections and invoices, the magnitude of which only increased, in each subsequent Certificate from July 26, 2002 through September 15, 2004.

65.    LaSalle reasonably relied on the representations in the borrowing base certificates to make loan advances on the LaSalle revolving loan.

### (b)    Fictitious Customers

66.    The accounts receivable listed in the borrowing base certificates included substantial amounts for fictitious sales to Color Compounds & Consultants, Inc. ("CCC"), Hemisphere, Hitachi Cable, Inc. ("Hitachi"), J-Tan, Velco Chemicals, Inc. ("Velco"), and Zebulon Industries, Inc. ("Zebulon").

67.     CCC is a corporation doing business in New Hampshire, but was not a customer of Gitto Global.  Rather, it was a supplier of raw materials.  None of the checks from CCC to Gitto Global were ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

68.     Hemisphere was a fictitious customer.  It is a corporation set up by Frank Miller, Kathleen Carland, Louis Pellegrine and others.  Hemisphere was run out of Kathleen Carland's home.  Louis Pellegrine advanced money to open the checking account and the money market account for Hemisphere.  Louis Pellegrine received at least one Verizon cellular telephone invoice at his office on behalf of Hemisphere and paid that Verizon invoice out of his funds.  None of the checks from Hemisphere to Gitto Global were ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

69.     Zebulon was a fictitious customer purportedly located in New Jersey.  The fictitious checks of Zebulon showed the same bank account as on the Velco checks.  None of the checks from Zebulon to Gitto Global were ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

70.     Velco was a fictitious customer purportedly located in New York.  The fictitious checks of Velco showed the same bank account as on the Zebulon checks. None of the checks from Velco to Gitto Global were ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

71.     Hitachi is a company located in New Hampshire.  While Hitachi is a genuine customer of Gitto Global, a majority of the sales purportedly made to Hitachi are not genuine. The majority of sales to Hitachi were supported by invoices and bills of lading which were incomplete and usually unsigned.  The checks for these incomplete and unsigned invoices and

bills of lading were not cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

72.    J-Tan was a fictitious customer purportedly located in Massachusetts. J-Tan is owned by John Tersigni, who appears as a signatory on J&J Chemical checks and who received payments from Gitto Global purportedly for "consulting service". J-Tan has never purchased any goods from Gitto Global. Further, J-Tan received funds from Frank Miller and Gary Gitto and operated under the direction of Frank Miller and Gary Gitto.

### (c)    The "Secret Garden"

73.    In order to generate the spurious documents for the fictitious customers, Frank Miller, Helen Kozak, Rita Bartlett and William Deakin maintained a drawer in Rita Bartlett's desk at Gitto Global and a room at Gitto Global, upstairs and away from the regular business operations, both of which they called the "Secret Garden."

74.    In the Secret Garden upstairs, Frank Miller, Helen Kozak and William Deakin kept blank checks purportedly from the accounts of Zebulon, Velco, Hemisphere, CCC, Hitachi and J-Tan; blank invoices; and blank bills of lading. From these blank checks, blank invoices and blank bills of lading, Frank Miller, Helen Kozak, William Deakin and Janice Chaisson would create fictitious checks, invoices and bills of lading to support the fictitious sales.

### (d)    Inventory Misrepresentations

75.    At the direction of Frank Miller, David Minardi, an employee of Gitto Global, changed the labels on the packages of certain Gitto Global inventory to inflate the value of the inventory. Janice Chaisson and Frank Miller knowingly and intentionally represented these inflated values on the borrowing base certificates in order to borrow additional funds under the LaSalle revolving loan.

76.    At the direction of Frank Miller and Maria Miller, Robyn Merchant, an employee of Gitto Global, changed the quantities or changed the price per pound of the inventory listed in the computer.  Frank Miller and Janice Chaisson represented these inflated quantities and/or prices on the borrowing base certificates in order to borrow additional funds under the LaSalle revolving loan.

77.    In or around the summer of 2003, Gitto Global acquired inventory from Vitrolite. Gitto Global, at the direction of Frank Miller and Maria Miller, valued this inventory at $5.25/lb. In reality, the Vitrolite inventory was worth only approximately $.30/lb.  By overvaluing this inventory in the borrowing base certificates after the summer of 2003, Frank Miller and Janice Chaisson inflated the value of Gitto Global's collateral in order to borrow additional funds under the LaSalle revolving loan.  Frank Miller and Janice Chaisson carried this inflated value of the Vitrolite inventory forward, without correcting it in subsequent days and months.

78.    LaSalle reasonably relied upon the inventory valuation in the borrowing base certificates to advance funds under the LaSalle revolving loan.

**Check Kite Scheme**

79.    Beginning in July, 2002 and continuing through September, 2004, Gitto Global, on a daily basis, deposited numerous checks into the Fleet Blocked Account that it purportedly received as payment of invoices for goods sold.

80.    Unbeknownst to LaSalle, the vast majority of these checks were drawn from J&J Chemical's account at Clinton Bank ("J&J Chemical Account") and bore the signature of John Tersigni.  These checks were prepared by Janice Chaisson at the request of Frank Miller, Helen Kozak or William Deakin.  Between July, 2002 and September, 2004, over 600 J&J Chemical checks were deposited to the Fleet Blocked Account by Gitto Global .

81.     Fleet, on a daily basis, without waiting until the J&J Chemical checks cleared, transferred the funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle ("LaSalle Account"), which LaSalle applied to pay down the LaSalle revolving loan.

82.     As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global.

83.     Each day, based on a daily borrowing base certificate, Frank Miller or Janice Chaisson requested an advance on the LaSalle revolving loan for Gitto Global.

84.     LaSalle advanced additional funds on the LaSalle revolving loan, relying on (a) the funds transferred from the Fleet Blocked Account and (b) the representations in the daily borrowing base certificates.

85.     From the LaSalle Account, a Gitto Global employee, Rita Bartlett, at the direction of Frank Miller, Helen Kozak or William Deakin, prepared Gitto Global checks payable to J&J Chemical between July, 2002 and August, 2004, which were deposited at Clinton Bank.

86.     Clinton Bank's policy was to allow its customers, including J&J Chemical, to draw against uncollected funds.

87.     Between July, 2002 and August, 2004, over $34 million went through the J&J Chemical Account, all based upon transactions with Gitto Global.

88.     The J&J Chemical Account was an integral part of the check-kiting scheme.

89.     In 2004, Clinton Bank became concerned about the large amounts that passed through the J&J Chemical Account daily.  Frank Miller sought to satisfy Clinton Bank's concerns by advising it that by August 15, 2004 Gitto Global, the source of most of the checks deposited in the J&J Chemical Account, was going to be acquired by Vitrotech Corporation.

Based on these representations, J&J Chemical and Clinton Bank entered into an $8.4 million revolving line of credit agreement to expire on August 16, 2004.

90.     To avoid Clinton Bank's suspending its policy of paying on checks deposited to the J&J Chemical Account before they cleared and thereby adversely affecting the operation of the check-kite, Charles Gitto attended the closing of the Clinton Bank revolving loan transaction with Clinton Bank.  As president and treasurer of Tradex, Charles Gitto had Tradex provide the Clinton Bank as security for the line of credit facility a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory.

91.     On or about August 9, 2004, Clinton Bank agreed to extend the revolving line of credit beyond its August 16, 2004 maturity date, only if additional collateral was pledged.

92.     On August 18, 2004, Charles Gitto, in order to preserve the operation of the check-kiting being conducted to induce LaSalle to provide loan funds to Gitto Global, gave Clinton Bank guarantees from him and Tradex, so that Clinton Bank would continue to allow payments on uncollected funds in the J&J Chemical account through September 15, 2004.

93.     In August, 2004, Frank Miller and Maria Miller, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account, pledged a third mortgage on their Bolton residence to secure J&J Chemical's debt to Clinton Bank.

94.     In August, 2004, Gary Gitto, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account, personally provided an unlimited guarantee to secure J&J Chemical's debt to Clinton Bank.

95.     In consideration of the security pledged by Gary Gitto, Frank Miller, Maria Miller, Charles Gitto and Tradex, Clinton Bank extended the revolving line of credit for J&J Chemical through September 15, 2004.

96.    Between September 13-17, 2004, Janice Chaisson, at the direction of Helen Kozak, Frank Miller or William Deakin, deposited into the Fleet Blocked Account over $12 million in additional checks from the J&J Chemical Account made payable to Gitto Global. Fleet wired those funds to LaSalle in three separate wire transfers.

97.    LaSalle advanced approximately $4 million dollars in response to Gitto Global's request for advance and in reliance on these deposits.

98.    Shortly after J&J Chemical's revolving line at Clinton Bank expired on September 15, 2004, the check-kite collapsed and Gitto Global filed bankruptcy.

99.    Subsequently, Fleet returned checks totaling $11,890,588 for insufficient funds that had been returned by Clinton Bank, resulting in an overdraft in the Fleet Blocked Account.

100.    Gitto Global's monthly deposits of the purported sales proceeds from J&J Chemical and the funds advanced by LaSalle to Gitto Global based upon those monthly deposits and borrowing base certificates were as follows:

| Month | Deposits | Advances |
|-------|----------|----------|
| July - 02 | $ 2,206,314 | $ 31,676,094 |
| August - 02 | $ 8,058,446 | $  7,830,571 |
| September - 02 | $ 6,906,243 | $  6,853,652 |
| October - 02 | $11,911,623 | $ 11,676,236 |
| November - 02 | $11,076,928 | $ 10,921,079 |
| December - 02 | $ 10,825,588 | $ 10,469,837 |
| January - 03 | $ 11,307,584 | $ 11,076,445 |
| February - 03 | $ 13,428,035 | $ 13,370,847 |
| March - 03 | $ 17,989,492 | $ 17,051,892 |
| April - 03 | $ 16,861,179 | $ 16,682,760 |
| May - 03 | $ 17,315,021 | $ 17,575,707 |
| June - 03 | $ 21,454,438 | $ 21,352,037 |
| July - 03 | $ 26,243,609 | $ 24,893,301 |
| August - 03 | $ 31,548,658 | $ 32,463,644 |
| September - 03 | $ 39,132,440 | $ 38,793,490 |
| October - 03 | $ 56,432,129 | $ 55,831,065 |
| November - 03 | $ 50,144,000 | $ 50,425,294 |
| December - 03 | $ 63,338,487 | $ 62,982,818 |

| Month | Deposits | Advances |
|---|---|---|
| January - 04 | $ 62,414,067 | $ 62,408,403 |
| February - 04 | $ 64,349,419 | $ 64,156,518 |
| March - 04 | $ 84,177,796 | $ 83,702,822 |
| April - 04 | $ 87,493,856 | $ 87,445,682 |
| May - 04 | $ 74,263,805 | $ 74,069,272 |
| June - 04 | $ 91,703,488 | $ 91,553,653 |
| July - 04 | $ 91,966,853 | $ 91,590,499 |
| August - 04 | $ 90,761,602 | $ 90,829,260 |
| September 15, 2004 | $ 41,190,439 | $ 37,152,378 |
| | | |
| **Total** | **$ 1,104,501,539** | **$ 1,124,835,256** |

101.    Janice Chaisson kept two sets of books to keep track of the real corporate activity

at Gitto Global versus the fictitious activity.  A summary of the fictitious sales and collections,

and the actual sales and collections is as follows:

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| July – 02 | $ 1,278,810 | $ 78,810 | $ 2,206,314 | $ 206,314 |
| August – 02 | $ 8,815,527 | $ 3,619,632 | $ 8,058,446 | $ 2,862,550 |
| September – 02 | $ 6,552,837 | $ 2,678,900 | $ 6,906,243 | $ 3,032,307 |
| October – 02 | $ 12,557,440 | $ 1,826,091 | $ 11,911,623 | $ 1,160,274 |
| November – 02 | $ 11,206,090 | $ 4,940,552 | $ 11,076,928 | $ 4,811,390 |
| December – 02 | $ 10,621,281 | $ 3,217,464 | $ 10,825,588 | $ 3,421,770 |
| January - 03 | $ 11,285,811 | $ 2,912,933 | $ 11,307,584 | $ 2,934,706 |
| February – 03 | $ 13,767,617 | $ 1,639,129 | $ 13,428,035 | $ 1,299,546 |
| March – 03 | $ 17,111,121 | $ 4,333,268 | $ 17,989,492 | $ 5,211,639 |
| April – 03 | $ 16,393,943 | $ 2,129,290 | $ 16,861,179 | $ 2,596,526 |
| May – 03 | $ 17,676,634 | $ 3,503,422 | $ 17,315,021 | $ 3,141,809 |
| June – 03 | $ 21,337,796 | $ 4,204,053 | $ 21,454,438 | $ 4,320,695 |
| July – 03 | $ 25,902,881 | $ (486,000) | $ 26,243,609 | $ (145,272) |
| August – 03 | $ 31,725,765 | $ 1,957,613 | $ 31,548,658 | $ 1,780,506 |
| September – 03 | $ 38,077,352 | $ 1,033,873 | $ 39,132,440 | $ 2,088,961 |
| October – 03 | $ 55,968,861 | $ 5,918,637 | $ 56,432,129 | $ 6,381,904 |
| November – 03 | $ 50,994,495 | $ 5,811,804 | $ 50,144,000 | $ 4,961,309 |
| December – 03 | $ 63,380,646 | $ 380,646 | $ 63,338,487 | $ 338,487 |
| January – 04 | $ 62,723,884 | $ 3,210,133 | $ 62,414,067 | $ 2,900,316 |
| February – 04 | $ 63,745,043 | $ (302,115) | $ 64,349,419 | $ 302,261 |
| March – 04 | $ 83,804,496 | $ 2,811,831 | $ 84,177,796 | $ 3,185,132 |
| April – 04 | $ 86,088,250 | $ 3,500,669 | $ 87,493,856 | $ 4,906,274 |

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| May – 04 | $    74,422,760 | $    2,698,662 | $    74,263,805 | $    2,539,708 |
| June – 04 | $    91,495,847 | $    3,215,151 | $    91,703,488 | $    3,422,792 |
| July – 04 | $    92,079,534 | $    3,220,424 | $    91,966,853 | $    3,107,743 |
| August – 04 | $    90,819,019 | $    4,205,334 | $    90,761,602 | $    4,147,917 |
| September 15, 2004 | $    41,370,938 | $    1,437,823 | $    41,190,439 | $    1,257,324 |
|  |  |  |  |  |
| **Total** | **$ 1,101,204,678** | **$    73,698,029** | **$    1,104,501,539** | **$    76,174,888** |

**The Distribution of Funds**

102.     As set forth in the preceding paragraphs, Gitto Global obtained loan advances from LaSalle under false pretenses and transferred those fraudulently obtained funds to the following persons or entities (at the very least for 2003-2004):

   (a)     Gary Gitto: Unaccounted for disbursements of $459,358.43 and interest payments of $2,888.88 directly, and disbursements totaling $1,708,684.47 through a fictitious entity known as Equitech Technologies;

   (b)     Tradex: Interest payments of $230,090, prepaid rent of $217,061, consulting fees of $34,000 and unaccounted for disbursements of $134,546;

   (c)     Charles Gitto: Interest payments of $10,000, consulting fees of $44,300 and unaccounted for disbursements of $320,948; and

   (d)     Frank Miller: Interest payments of $3,733 and unaccounted for disbursements of $683,696.

**Roles in the Submittal of False Borrowing Base Certificates**

103.     In the course of and in furtherance of their fraudulent schemes, Gary Gitto, Frank Miller, Maria Miller, William Deakin and Janice Chaisson used, or caused to be used, in connection with conducting the affairs of Gitto Global, falsified borrowing base certificates between July, 2002 and September 2004.

104.     Frank Miller knowingly participated in the scheme by providing false information to LaSalle, for the purpose of obtaining funds from LaSalle under false pretenses. Between July 25, 2002 and January 16, 2004, borrowing base certificates with Frank Miller's signature affixed

were sent to LaSalle on a daily basis seeking fund advances, while Frank Miller knew that the sales inventory information and the collections information contained therein was false and that LaSalle would rely on that information in advancing funds under the LaSalle revolving loan.

105.    Janice Chaisson knowingly participated in the scheme by providing false information to LaSalle for the purpose of obtaining funds from LaSalle under false pretenses. Between January 17, 2004 and September 15, 2004, Janice Chaisson, at the direction of Gary Gitto, sent borrowing base certificates to LaSalle on a daily basis seeking fund advances, while Janice Chaisson knew that the sales collections information contained therein was false and that LaSalle would rely on that information in advancing funds under the LaSalle revolving loan.

106.    Maria Miller knowingly participated in the scheme by preparing false information to be provided to LaSalle.  Maria Miller knowingly entered data into the computer systems at Gitto Global relating to fictitious sales to CCC, Hitachi and Velco in order to generate fictitious invoices.  Maria Miller knowingly directed Robyn Merchant to inflate the value of the inventory at Gitto Global by increasing the quantity or the price per pound of certain products.

107.    Gary Gitto, William Deakin and Helen Kozak knowingly participated in the scheme by directing Janice Chaisson to provide false information to LaSalle for the purpose of obtaining funds from LaSalle under false pretenses.  Between January 17, 2004 and September 15, 2004, Gary Gitto, William Deakin and Helen Kozak knew that the daily borrowing base certificates contained false sales and collection information and LaSalle would rely on that information to advance funds under the LaSalle revolving loan.

108.    Each of the aforesaid activities, as well as others, was made or caused to be made by Gary Gitto, Frank Miller, Maria Miller, Janice Chaisson and William Deakin as part of and in furtherance of the scheme to defraud LaSalle.

109.    Each of the aforesaid violations by Gary Gitto, Frank Miller, Maria Miller, Helen Kozak, Janice Chaisson, and William Deakin of the bank fraud statute, 18 U.S.C. § 1344, constitutes an instance of racketeering activity as defined in 18 U.S.C. § 1961(1).

**Roles in the Check Kite Scheme**

110.    Between July, 2002 and September 15, 2004, John Tersigni knowingly participated in the fraud scheme by regularly signing or allowing his signature to be affixed on checks made payable to Gitto Global, drawn from the J&J Chemical Account, at the direction of Gary Gitto, Frank Miller and Helen Kozak, for the purpose of obtaining funds from LaSalle under false pretenses and causing those checks to be deposited into the Fleet Blocked Account. In doing this:

(a)    John Tersigni signed or allowed his signature to be affixed to hundreds of checks knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks and knowing that J&J Chemical did not owe any money to Gitto Global.

(b)    John Tersigni caused these checks to be deposited in the Fleet Blocked Account knowing that the amounts of the checks would be used on borrowing base certificates to represent Gitto Global collections, knowing that the borrowing base certificates would be sent to LaSalle, and knowing that the LaSalle would rely on the funds in the Fleet Blocked Account and the borrowing base certificates in continuing its lending relationship with Gitto Global.

111.    Between July, 2002 and September, 2004, Gary Gitto knowingly participated in the fraud scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

(a)    Gary Gitto directed the check-kiting scheme continuously for two years for the purpose of obtaining funds from LaSalle under false pretenses.

(b)    Gary Gitto regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    Gary Gitto on a daily basis directed that J&J Chemical checks be deposited in the Blocked Account.

(d)    Gary Gitto directed that the amounts of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections knowing that such figures were not true.

(e)    Gary Gitto regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, (i) to the J&J Chemical Account, thereby completing the check-kite, and (ii) directly to him and companies in which he was doing business.

(f)    Gary Gitto regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check-kite.

(g)    Gary Gitto regularly directed that funds obtained by false pretenses from LaSalle be paid to him directly or companies in which he was doing business.

(h)    Gary Gitto attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(i)    Gary Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

112.    Between July, 2002 and September, 2004, Frank Miller knowingly participated in the scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account. In doing this:

(a)    Frank Miller directed the check-kiting scheme continuously for over two years for the purpose of obtaining funds from LaSalle under false pretenses.

(b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    Frank Miller on a daily basis directed that J&J Chemical checks be deposited in the Blocked Account.

(d)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's Collections.

(e)     Frank Miller regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, (i) to the J&J Chemical Account, thereby completing the check-kite, and (ii) directly to him.

(f)     Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections from customers knowing that the deposits did not, in fact, represent collections.

(g)     Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(h)     Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales, inventory, and collections information contained therein was false and knowing that LaSalle would rely on that information in auditing the financial situation of Gitto Global.

(i)     Frank Miller attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(j)     Frank Miller pledged a third mortgage on his Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

113.     Between July, 2002 and September, 2004, Maria Miller knowingly participated in the scheme by pledging a third mortgage on her Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

114.     Between July, 2002 and September, 2004, Charles Gitto knowingly participated in the scheme by perpetuating the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account. In doing this:

(a)     Charles Gitto attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in negotiating the terms of the agreement, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(b)    Charles Gitto provided, on behalf of Tradex, a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(c)    Charles Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

115.    Between July, 2002 and September, 2004, Helen Kozak knowingly participated in the scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

(a)    Helen Kozak regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(b)    Helen Kozak, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

(c)    Helen Kozak directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's Collections.

(d)    Helen Kozak directed the check-kiting scheme continuously for more than two years for the purpose of obtaining funds from LaSalle under false pretenses.

116.    Between July, 2002 and September, 2004, William Deakin knowingly participated in the scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account, at the direction of Frank Miller. In doing this:

(a)    William Deakin regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(b)    William Deakin, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

      (c)     William Deakin ensured that the amount of the J&J Chemical deposits were reflected on the borrowing base certificates representing Gitto Global's Collections.

117.    Between July, 2002 and September, 2004, Janice Chaisson knowingly participated in the scheme by affixing the signature of John Tersigni on the J&J Chemical checks and keeping track of the fictitious sales and collections of Gitto Global.  In doing this:

      (a)     At the direction of William Deakin, Frank Miller and Helen Kozak, Janice Chaisson regularly created checks made payable to Gitto Global, drawn from J&J Chemical's account at Clinton Bank, knowing that the checks were not for the payment of goods.

      (b)     At the direction of William Deakin, Frank Miller and Helen Kozak, Janice Chaisson regularly created checks made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

      (c)     At the direction of William Deakin, Frank Miller and Helen Kozak, Janice Chaisson regularly affixed the signature of John Tersigni, using a signature stamp, to the checks made payable to Gitto Global, drawn from the J&J Chemical Account, knowing the checks were being used to further a check-kiting scheme.

      (d)     Janice Chaisson kept track of the check-kiting scheme by keeping two sets of Accounts Receivable Aging Details.  One set contained fictitious sales and receipts, including the J&J Chemical checks.  The second set contained the actual sales and receipts.

118.    Between July, 2002 and September, 2004, J&J Chemical, through Frank Miller or John Tersigni, knowingly participated in the scheme by (i) allowing its checks to be deposited in the Fleet account, while knowing these checks were not for payment of goods; (ii) allowing Gitto Global checks payable to J&J Chemical to be deposited in the J&J Chemical Account, knowing the checks were being used to further a check-kiting scheme; and (iii) entering into a loan agreement with Clinton Bank to further perpetuate the check-kiting scheme.

119.    Between July, 2002 and September, 2004, Tradex, through Charles Gitto, knowingly participated in the scheme by providing a guarantee, a mortgage on the property

occupied by Gitto Global and a security interest in certain inventory to Clinton Bank to keep the check-kite operating through the J&J Chemical Account.

120.    Each of the aforesaid activities was made or caused to be made by Gary Gitto, Charles Gitto, John Tersigni, Frank Miller, Helen Kozak, William Deakin, Janice Chaisson, Tradex and J&J Chemical as part of and in furtherance of the scheme to defraud LaSalle.

**False Audit and Examination Information**

121.    Between May 2002 and July 2004, LaSalle conducted six field examinations and one audit at Gitto Global.  In connection with and at each audit and examination, at Gary Gitto's and Frank Miller's direction, Helen Kozak, William Deakin, Janice Chaisson, Maria Miller and Frank Miller misrepresented Gitto Global's sales, inventory, accounts receivable, collections and general financial condition to LaSalle.  LaSalle reasonably relied upon these representations in entering into the Loan Agreement and continuing to loan funds to Gitto Global under the LaSalle revolving loan.

**May 15-17, 2002 Examination**

122.    On May 15-17, 2002, in connection with and prior to making the loans to Gitto Global, LaSalle, by John Helldorfer, field examiner, conducted a field examination of Gitto Global's financial condition.

123.    As part of the May, 2002 field examination, William Deakin and Frank Miller represented to LaSalle that five of Gitto Global's top customers were Hemisphere, J-Tan, Hitachi, Velco, and Zebulon, accounting for 52.6%, or $15,000,000.00, of Gitto Global's accounts receivable.  These representations were made to induce LaSalle to enter into the LaSalle term loan and the LaSalle revolving loan with Gitto Global, thereby furthering the scheme to defraud LaSalle.

**July 23-26, 2002 Examination**

124.   On July 23-26, 2002, in connection with making the loans to Gitto Global, LaSalle, by Alyssa Whelpley, field examiner, conducted a field examination of Gitto Global's financial condition.

125.   As part of the July, 2002 field examination, the examiner requested telephone verifications of Gitto Global's accounts receivable balance, and on July 25, 2002, William Deakin represented to the examiner that he called the top seven customers of Gitto Global, including Hitachi, Zebulon, J-Tan, Velco, and CCC.   William Deakin represented to the examiner that the people with whom he spoke verified the accounts receivable balance.  William Deakin had not called those top seven customers – he misrepresented his actions to the examiner to induce LaSalle to enter into the LaSalle term loan and the LaSalle revolving loan with Gitto Global, thereby furthering the scheme to defraud LaSalle.

126.   To further support William Deakin's misrepresentations, on or about July 25, 2002, Louis Pellegrine sent from his office in Massachusetts to LaSalle in New York via facsimile, the following spurious confirmation letters from Hitachi and Zebulon which purportedly confirmed the false accounts receivable balances due to Gitto Global:

      (a)    On or around July 11, 2002, Zebulon confirmed that the balance due to Gitto Global as of June 30, 2002 was $2,960,058.40.

      (b)    On or around July 11, 2002, Hitachi confirmed that the balance due to Gitto Global as of June 30, 2002 was $4,440,999.21.

**November 11-15, 2002 Examination**

127.   On November 11-15, 2002, LaSalle conducted a field examination of Gitto Global.

128.   As part of the examination, LaSalle requested to "test" invoices by examining the purchase records of specific product and to "test" the cash applications by reviewing checks, bank statements and cash reconciliation for certain sales.

129.    As part of the November, 2002 field examination, Frank Miller and William Deakin, and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, falsely represented to LaSalle's examiner, John Helldorfer, that Velco, Zebulon, J-Tan, Hitachi, Hemisphere and CCC were Gitto Global's largest customers, representing over 69% of Gitto Global's sales when they had not purchased any product from Gitto Global.  To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

**April 14-17, 2003 Examination**

130.    On April 14-17, 2003, LaSalle conducted a field examination of Gitto Global.

131.    As part of the April 2003 field examination, Frank Miller, William Deakin, Maria Miller and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, George Blyth, that Velco, Zebulon, J-Tan, Hemisphere, Hitachi and CCC were Gitto Global's largest customers, representing over 78% of its business.  To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

**August 19-22, 2003 Examination**

132.    On August 19-22, 2003, LaSalle conducted a field examination of Gitto Global.

133.    As part of the August 2003 field examination, Frank Miller, William Deakin, Maria Miller and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, Emerson Nobbee, that Hitachi, Velco, Hemisphere, Zebulon and CCC were Gitto Global's largest customers, representing over 60% of its business.  To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review fictitious invoices, bills of lading and checks for these fictitious customers that were created in the Secret Garden.

**February 2004 Examination**

134.    In or around January of 2004, Frank Miller sent requests for confirmation of accounts receivable purportedly to CCC, Zebulon, Hemisphere, Hitachi, and J-Tan by mail using the United States Postal Service. Louis Pellegrine sent the confirmation letters from his office in Massachusetts to LaSalle in New York, via facsimile, in connection with Gitto Global's upcoming February, 2004 field examination.  The confirmations falsely represented that:

(a)    On or around January 27, 2004, CCC confirmed that the balance due to Gitto Global as of December 31, 2003 was $2,537,868.53.

(b)    On or around January 20, 2004, Steve Johnson, on behalf of Zebulon, confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,167,545.55.

(c)    On or around February 3, 2004, Kathleen Carland, on behalf of Hemisphere, confirmed that the balance due to Gitto Global as of December 31, 2003 was $2,415,032.35.

(d)    On or around January 27, 2004, Hitachi confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,113,012.26.

(e)    On or around January 23, 2004, John Tersigni, on behalf of J-Tan, confirmed that the balance due to Gitto Global as of December 31, 2003 was $3,115,811.10.

135.    Kathleen Carland and John Tersigni knew that the purpose of the examination was to provide financial information on which LaSalle could rely upon in making its examination.

136.    In February, 2004, LaSalle conducted a field examination of Gitto Global.

137.    As part of the February, 2004 field examination, Frank Miller, William Deakin and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, represented to LaSalle's examiner, Emerson Nobbee, that Velco, Zebulon, Hitachi, Hemisphere, J-Tan and CCC were Gitto Global's largest customers, representing over 75% of its business.  To confirm these sales, Frank Miller and William Deakin gave to LaSalle's examiner for review the confirmation letters described above, and fictitious invoices, bills of lading and checks for these fictitious customers

that were created in the Secret Garden. Maria Miller participated in creating these fictitious invoices and inventory documents.

**July, 2004 Audit**

138.    In July, 2004, LaSalle conducted an audit of Gitto Global.

139.    As a part of the July audit, LaSalle tested 30 invoices to examine the shipping (invoicing) of products. Frank Miller gave to LaSalle's examiner, David Sweeney, fictitious invoices of CCC, Hitachi, J-Tan, Velco and Zebulon that were created in the Secret Garden. LaSalle also examined cash applications by reviewing checks, bank statements and cash reconciliations. In addition, Frank Miller gave to LaSalle's examiner for review fictitious checks issued by CCC, Hitachi, J-Tan, Velco, Zebulon, and Hemisphere that were created in the Secret Garden, none of which were cashed by Gitto Global.

**Mail/Wire Fraud Employed During the Examinations and Audit**

140.    In the course of and in furtherance of their scheme to defraud LaSalle, described in the foregoing paragraphs, Frank Miller, John Tersigni, and Kathleen Carland used, or caused to be used, in connection with conducting the affairs of Gitto Global, mail delivered by the United States Postal Service two or more times, including the five requests for confirmation sent on January 15, 2004 by Frank Miller, the confirmation sent on February 3, 2004 by Kathleen Carland and the confirmation sent on January 23, 2004 by John Tersigni.

141.    In the course of and in furtherance of their scheme to defraud LaSalle, described in the foregoing paragraphs, Frank Miller, Louis Pellegrine, and Janice Chaisson also communicated, or caused communications to be made, in connection with conducting the affairs of Gitto Global, by interstate wire two or more times, including, the facsimile sent on July 25, 2002 from Louis Pellegrine, at the direction of Frank Miller, to LaSalle containing the July 11, 2002 confirmations of Zebulon and Hitachi; the facsimile sent on February 12, 2004 from Louis

Pellegrine, at the direction of Frank Miller, to LaSalle containing the January and February confirmations of J-Tan, Hemisphere, Zebulon, Hitachi and CCC; and the daily borrowing base certificates sent via e-mail by Janice Chaisson from January 17, 2004 to September 15, 2004 in furtherance of their efforts to defraud LaSalle.

142.    Frank Miller and Gary Gitto knowingly participated in the scheme to defraud LaSalle, described in the foregoing paragraphs,  using the mail, wire and interstate telephone communications to further the fraud by directing Louis Pellegrine to send confirmations to LaSalle by facsimile transmission on July 25, 2002 and to LaSalle by facsimile transmission in February 2004, knowing that the confirmations were false, that the companies had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global by or at the direction of Frank Miller, Gary Gitto or Helen Kozak were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

143.    Kathleen Carland knowingly participated in the scheme to defraud LaSalle, described in the foregoing paragraphs, by using the mail to further the fraud by sending a fictitious confirmation of invoices by mail using the United States Postal Service in which she falsely confirmed that Hemisphere owed $2,415,032.35 to Gitto Global as of December 31, 2003.  Kathleen Carland sent the fictitious confirmation knowing that Hemisphere had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global by or at the direction of Frank Miller, Gary Gitto or Helen Kozak were false, knowing that Hemisphere did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

144.    John Tersigni knowingly participated in the scheme to defraud LaSalle, described in the foregoing paragraphs, by using the mail to further the fraud by sending a fictitious

confirmation of invoices by mail using the United States Postal Service in which he falsely confirmed that J-Tan owed $3,115,811.10 to Gitto Global as of December 31, 2003.  John Tersigni sent the fictitious confirmation knowing that J-Tan had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global by or at the direction of Frank Miller, Gary Gitto or Helen Kozak were false, knowing that J-Tan did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

145.    Louis Pellegrine knowingly participated in the schemes, described in the foregoing paragraphs, by using the mail and interstate wire communications to further the fraud by sending fictitious confirmations to LaSalle by facsimile transmission on July 25, 2002 and in February, 2004 at the request or under the direction of Gary Gitto and Frank Miller, knowing that the companies had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global by or at the direction of Frank Miller, Gary Gitto or Helen Kozak were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

146.    Janice Chaisson knowingly participated in the scheme to defraud LaSalle, described in the foregoing paragraphs, by using the interstate wire communications to further the fraud by sending borrowing base certificates seeking fund advances to LaSalle by email on a daily basis between January 17, 2004 and September 15, 2004, knowing that the sales and collections information contained therein was false and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

147.    Each of the aforesaid communications, as well as others, was made or caused to be made by Frank Miller, Louis Pellegrine, John Tersigni, Janice Chaisson and Kathleen Carland as part of and in furtherance of the scheme to defraud LaSalle.

148.    Each of the aforesaid violations by Frank Miller, Louis Pellegrine, John Tersigni, Janice Chaisson and Kathleen Carland of the mail and wire fraud statutes (18 U.S.C. §§ 1341 and 1343) constitute an instance of racketeering activity as defined in 18 U.S.C. § 1961(1).

149.    The acts of racketeering activity performed, engaged in, and committed by Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, Louis Pellegrine, John Tersigni, Helen Kozak, Kathleen Carland, Janice Chaisson, William Deakin and J&J Chemical have caused substantial injury to LaSalle.  As a result, said activity constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

150.    By reason of the conduct described herein, LaSalle has been damaged in an amount in excess of $30,000,000.00, before trebling, the exact amount of which shall be proved at trial.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants, Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., Louis J. Pellegrine, Jr., John D. Tersigni, Helen Kozak, Kathleen M. Carland, Janice Chaisson, William Deakin and Kingsdale Corp. d/b/a J&J Chemical Distributors Tradex Corporation and Tradex International Corporation:

A.    Compensatory damages in an amount exceeding $30,000,000.00, together with interest thereon;

B.    Treble damages for violation of RICO, together with interest thereon;

C.    An award of attorneys' fees;

D.    An award of costs and disbursement herein; and

E.    Such and further relief as may be just and equitable under the circumstances.

## COUNT II
## CONSPIRACY TO DEFRAUD
(Against Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr.,
Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland,
William Deakin, Janice Chaisson, Helen Kozak, Kingsdale Corp.
d/b/a J&J Chemical Distributors, Tradex International Corp. and Tradex Corporation)

151.    LaSalle restates the allegations contained in the previous paragraphs as if set forth fully herein..

152.    Beginning in July, 2002, and continuing through September, 2004, Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin, J&J Chemical, and Tradex conspired to defraud LaSalle, misrepresented Gitto Global's business activities and gave false financial information concerning Gitto Global to LaSalle to induce LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan.

153.    Between July, 2002 and September, 2004, Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, John Tersigni, Janice Chaisson, Helen Kozak, William Deakin, J&J Chemical, and Tradex directed and/or actively participated in a check-kiting scheme between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account in order to obtain funds from LaSalle to which they were not entitled.

154.    To further this check-kiting scheme, Gary Gitto, Frank Miller, John Tersigni, Janice Chaisson, Helen Kozak and William Deakin were involved in the creation of checks made payable to Gitto Global from the J&J Chemical account at Clinton Bank knowing there were insufficient funds to satisfy the checks in the J&J Chemical account.

155.    Gary Gitto, Frank Miller, John Tersigni, Janice Chaisson, Helen Kozak and William Deakin caused the J&J Chemical checks to be deposited in the Fleet Blocked Account.

156.    Gary Gitto, Frank Miller, John Tersigni, Janice Chaisson, Helen Kozak and William Deakin represented to LaSalle that these funds from the J&J Chemical checks deposited in the Fleet Blocked Account were from various customers as payment for invoices. Gary Gitto, Frank Miller, John Tersigni, Janice Chaisson, Helen Kozak and William Deakin were involved in the creation of fictitious invoices, bills of lading and checks to support the representations to LaSalle, which were furnished to LaSalle's examiners at field examinations and audits. In addition, Louis Pellegrine, Kathleen Carland, and John Tersigni knowingly created letters confirming the fictitious sales, which were furnished to LaSalle in connection with those examinations and audits.

157.    Between July, 2002 and September, 2004, Frank Miller and later at the direction of Gary Gitto and Frank Miller, Janice Chaisson sent borrowing base certificates to LaSalle on a daily basis. These borrowing base certificates contained fictitious sales, collections and inventory figures for the purpose of inducing LaSalle to advance funds to Gitto Global under the LaSalle revolving loan

158.    Between July of 2002, and September of 2004, Gary Gitto knowingly participated in the conspiracy to defraud LaSalle as follows:

   (a)    Gary Gitto directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account for two years for the purpose of obtaining funds from LaSalle under false pretenses.

   (b)    Gary Gitto regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

   (c)    Gary Gitto, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

   (d)    Gary Gitto directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's Collections.

(e)    Gary Gitto regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check kite.

(f)    Gary Gitto regularly directed that funds obtained by false pretenses from LaSalle be paid to him directly or companies in which he was doing business.

(g)    Gary Gitto attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(h)    Gary Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

159.    Between July of 2002 and September of 2004, Frank Miller knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)    Frank Miller, with Gary Gitto, directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account continuously for two years for the purpose of obtaining funds from LaSalle under false pretenses.

(b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    Frank Miller, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

(d)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's Collections.

(e)    Frank Miller regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check kite.

(f)    Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(g)    Frank Miller attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in

order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(h)     Frank Miller pledged a third mortgage on his Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(i)     Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales inventory and collections information contained therein was false and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

(j)     Frank Miller, at the request of Gary Gitto, knowingly sent requests for fictitious confirmations of invoices to J-Tan, Hitachi, Velco, Hemisphere and Zebulon to credit the appearance that the amounts for the accounts receivable due Gitto Global reported to LaSalle were legitimate.

(k)     Frank Miller sent these requests for fictitious confirmations knowing that the companies had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global, knowing that the fictitious confirmations would be sent to LaSalle, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

160.    Between July, 2002 and September, 2004, Maria Miller knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)     Maria Miller directed Robyn Merchant to adjust the quantities or prices of certain inventory items in order to inflate the value of those items, while knowing those values would be provided to LaSalle and knowing LaSalle would rely on the inventory valuations in determining whether to advance funds to Gitto Global.

(b)     Maria Miller knowingly entered false data into the computer relating to fictitious sales to CCC, Hitachi and Velco in order to generate fictitious invoices while knowing LaSalle would rely on information relating to sales in determining whether to advance funds to Gitto Global.

(c)     Maria Miller pledged a third mortgage on her Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

161.    Between July of 2002 and September of 2004, Charles Gitto knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)    Charles Gitto attended the closing of the loan agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in negotiating the terms of the agreement, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(b)    Charles Gitto provided, on behalf of Tradex, a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to keep the check-kite operating through the J&J Chemical Account.

(c)    Charles Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August, 2004, in order to keep the check-kite operating through the J&J Chemical Account.

162.    Between July, 2002 and September 15, 2004, Louis Pellegrine knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)    Louis Pellegrine, in July, 2002 and February, 2004, knowingly sent and delivered fictitious confirmations to LaSalle in which Gitto Global's accounts receivable balances were misrepresented while knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

(b)    Louis Pellegrine sent the fictitious confirmations to LaSalle while knowing that the companies contained therein had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

163.    Between July, 2002 and September 15, 2004, John Tersigni knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)    John Tersigni on behalf of J&J Chemical signed or allowed his signature to be affixed to hundreds of checks knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks and knowing that J&J Chemical did not owe any money to Gitto Global.

(b)    John Tersigni caused these checks to be deposited in the Fleet Blocked Account while knowing that the amounts of the checks would be used on

borrowing base certificates to represent Gitto Global collections, knowing that the borrowing base certificates would be sent to LaSalle, knowing that LaSalle would rely on the funds in the Fleet Blocked Account and in the borrowing base certificates in continuing its lending relationship with Gitto Global.

(c)     John Tersigni knowingly sent a fictitious confirmation of invoices confirming that J-Tan owed $3,115,811.10 to Gitto Global as of December 31, 2003.

(d)     John Tersigni sent the fictitious confirmation while knowing that J-Tan had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that J-Tan did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

164.    Kathleen Carland knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)     Kathleen Carland sent a letter to Louis Pellegrine confirming that Hemisphere owed $2,415,032.35 to Gitto Global as of December 31, 2003 in order to give the appearance of legitimacy and to lessen the appearance of deception.

(b)     Kathleen Carland sent the fictitious confirmation while knowing that Hemisphere had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that Hemisphere did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

165.    Between July, 2002 and September, 2004, Janice Chaisson knowingly participated in the conspiracy to defraud LaSalle as follows:

(a)     At the direction of William Deakin and Frank Miller, Janice Chaisson regularly created checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that the checks were not for the payment of goods.

(b)     At the direction of William Deakin and Frank Miller, Janice Chaisson regularly created checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)     At the direction of William Deakin and Frank Miller, Janice Chaisson regularly affixed the signature of John Tersigni, using a signature stamp,

to the checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing the checks were being used to further a check-kiting scheme.

(d)    Janice Chaisson kept track of the check-kite by keeping two sets of Accounts Receivable Aging Details.  One set contained fictitious sales and receipts, including the J&J Chemical checks.  The second set contained the actual sales and receipts.

(e)    Between January 17, 2004 and September 15, 2004, Janice Chaisson, at the direction of William Deakin and Gary Gitto, sent borrowing base certificates to LaSalle on a daily basis seeking fund advances knowing that the sales, inventory and collections information contained therein was false, and knowing that LaSalle would rely on the information contained therein in advancing funds to Gitto Global pursuant to the LaSalle revolving loan and auditing the financial situation of Gitto Global.

166.    Between July, 2002 and September, 2004, Helen Kozak knowingly participated in

the conspiracy to defraud LaSalle as follows:

(a)    Helen Kozak, on a regular basis and under the direction of Frank Miller, knowingly created fictitious checks to evidence payments from Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that were never received.

(b)    Helen Kozak, on a regular basis and under the direction of Frank Miller, knowingly created fictitious invoices and bills of lading to evidence sales of goods to Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that never occurred.

167.    Between July, 2002 and September, 2004, William Deakin knowingly

participated in the conspiracy to defraud LaSalle as follows:

(a)    William Deakin, under the direction of Frank Miller, directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.

(b)    William Deakin regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    William Deakin, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

(d)    William Deakin ensured that the amount of the J&J Chemical deposits were reflected on the borrowing base certificates representing Gitto Global's Collections.

(e)     William Deakin, on a regular basis and under the direction of Frank Miller, created fictitious checks to evidence payments from Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that were never received.

(f)     William Deakin, on a regular basis and under the direction of Frank Miller, created fictitious invoices and bills of lading to evidence sales of goods to Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that never occurred.

168.    Between July, 2002 and September, 2004, J&J Chemical knowingly participated in the scheme by (i) allowing its checks to be deposited in the Fleet account, while knowing these checks were not for payment of goods and (ii) allowing Gitto Global checks payable to J&J Chemical to be deposited in its account at Clinton Bank, where knowing the checks were being used to further a check-kiting scheme.

169.    Between July, 2002 and September, 2004, Tradex, through Charles Gitto, knowingly participated in the conspiracy to defraud LaSalle by providing a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory to secure J&J Chemical's debt to Clinton Bank to keep the check-kite operating through the J&J Chemical Account.

170.    LaSalle continued to advance funds to Gitto Global under the LaSalle revolving loan on a regular basis in reliance upon the representations made in the confirmations and the borrowing base certificates.

171.    Gitto Global has not repaid LaSalle the amount LaSalle loaned to Gitto Global.

172.    As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $30,683,467.23, plus interest and costs.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants, Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland, William Deakin, Janice Chaisson, Helen

Kozak, Kingsdale Corp. d/b/a J&J Chemical Distributors, Tradex International Corp. and Tradex Corporation:

     A.    Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

     B.    Punitive damages;

     C.    An award of attorneys' fees;

     D.    An award of costs and disbursement herein; and

     E.    Such and further relief as may be just and equitable under the circumstances.

**COUNT III**
**USE OF DECEPTIVE TRADE PRACTICES**
**IN VIOLATION OF MASS. GEN. L. c. 93 A, § 2**
(Against Gary C. Gitto, Frank Miller, Maria Miller, Louis J. Pellegrine, Jr.,
John D. Tersigni, Kathleen M. Carland, William Deakin, Janice
Chaisson, Helen Kozak, and Kingsdale Corp. d/b/a J&J Chemical Distributors)

173.    LaSalle restates the allegations contained in the previous paragraphs as if set forth fully herein.

174.    Beginning in July, 2002, and continuing through September, 2004, Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical used deceptive trade practices, in violation of Mass. Gen. L. c. 93 A, §2, to induce LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan.

175.    LaSalle engages in the conduct of trade and commerce as a lending institution.

176.    Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical are persons under the Deceptive Trade Practices Act, Mass. Gen. L. c. 93 A, §2.

177.    Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical were engaged in trade or commerce in that they acted in connection with and to further a commercial loan arrangement between LaSalle and Gitto Global.

178.    Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical used unfair or deceptive acts or practices declared unlawful under Section 2 of the Deceptive Trade Practices Act.

179.    Between May, 2002, and September, 2004, Gary Gitto knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

    (a)    Gary Gitto directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account for two years for the purpose of obtaining funds from LaSalle under false pretenses.

    (b)    Gary Gitto regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

    (c)    Gary Gitto, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

    (d)    Gary Gitto directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections knowing that the deposits did not, in fact, represent collections.

    (e)    Gary Gitto regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check kite.

    (f)    Gary Gitto regularly directed that funds obtained by false pretenses from LaSalle be paid to him directly or companies in which he was doing business.

    (g)    Gary Gitto directed Louis Pellegrine to send fictitious confirmations to LaSalle knowing that the companies named therein or purporting to

submit them had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

180.    Between May, 2002 and September, 2004, Frank Miller knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)    Frank Miller directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account continuously for two years for the purpose of obtaining funds from LaSalle under false pretenses.

(b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    Frank Miller on a daily basis directed the J&J Chemical checks to be deposited in the Blocked Account.

(d)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections knowing that the deposits did not, in fact, represent collections.

(e)    Frank Miller regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check kite.

(f)    Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(g)    Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales information contained therein was false, knowing the that the inventory information contained therein was false, knowing that the collections information contained therein was false and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

(h)    Frank Miller knowingly sent requests for fictitious confirmations of invoices to J-Tan, Hitachi, Velco, Hemisphere and Zebulon knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

(i)     Frank Miller sent these requests for fictitious confirmations knowing that the companies to which they were sent had not purchased any goods from Gitto Global, while knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global, knowing that the fictitious confirmations would be sent to LaSalle, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

(j)     Frank Miller directed Louis Pellegrine to send fictitious confirmations to LaSalle knowing that the companies named therein had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

181.    Between May, 2002 and September, 2004, Maria Miller knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Maria Miller directed Robyn Merchant to adjust the quantities or prices of certain inventory items in order to inflate the value of those items, while knowing those values would be provided to LaSalle and knowing LaSalle would rely on the inventory valuations in determining whether to advance funds to Gitto Global.

(b)     Maria Miller knowingly entered false data into the computer relating to fictitious sales to CCC, Hitachi and Velco in order to generate fictitious invoices while knowing LaSalle would rely on information relating to sales in determining whether to advance funds to Gitto Global.

182.    Between July, 2002 and September 15, 2004, Louis Pellegrine knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Louis Pellegrine, in July, 2002 and February, 2004, knowingly sent and delivered fictitious confirmations to LaSalle in which Gitto Global's account receivable balances were misrepresented knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

(b)     Louis Pellegrine sent the fictitious confirmations to LaSalle while knowing that the companies purporting to submit them had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto

Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

183.   Between July, 2002 and September 15, 2004, John Tersigni knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)   John Tersigni on behalf of J&J Chemical signed or allowed his signature to be affixed to hundreds of checks purportedly as payment for goods, while knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks and knowing that J&J Chemical did not purchase any goods from Gitto Global.

(b)   John Tersigni caused these checks to be deposited in the Fleet Blocked Account while knowing that the amounts of the checks would be used on borrowing base certificates to represent Gitto Global collections, knowing that the borrowing base certificates would be sent to LaSalle, knowing that LaSalle would rely on the funds in the Fleet Blocked Account and the borrowing base certificates in continuing its lending relationship with Gitto Global.

(c)   John Tersigni knowingly sent a fictitious confirmation of invoices confirming that J-Tan owed $3,115,811.10 to Gitto Global as of December 31, 2003 in order to give the appearance of legitimacy and to lessen the appearance of deception.

(d)   John Tersigni sent the fictitious confirmation knowing that J-Tan had not purchased any goods from Gitto Global, while knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that J-Tan did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

184.   Kathleen Carland knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)   Kathleen Carland sent a letter to Louis Pellegrine confirming that Hemisphere owed $2,415,032.35 to Gitto Global as of December 31, 2003 in order to give the appearance of legitimacy and to lessen the appearance of deception.

(b)     Kathleen Carland sent the fictitious confirmation while knowing that Hemisphere had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that Hemisphere did not owe any money to Gitto Global, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

185.    Between July, 2002 and September, 2004, Janice Chaisson knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Janice Chaisson regularly created checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that the checks were not for the payment of goods.

(b)     Janice Chaisson regularly created checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)     Janice Chaisson regularly affixed the signature of John Tersigni, using a signature stamp, to the checks made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing the checks were being used to further a check-kiting scheme.

(d)     Janice Chaisson kept track of the check-kiting scheme by keeping two sets of Accounts Receivable Aging Details. One set contained fictitious sales and receipts, including the J&J Chemical checks. The second set contained the actual sales and receipts.

(e)     Between January 17, 2004 and September 15, 2004, Janice Chaisson sent borrowing base certificates to LaSalle on a daily basis seeking fund advances, while knowing that the sales information contained therein was false, knowing the that the inventory information contained therein was false, knowing that the collections information contained therein was false and knowing that LaSalle would rely on the information contained therein in advancing funds to Gitto Global under the LaSalle revolving loan and auditing the financial situation of Gitto Global.

186.    Between May, 2002 and September, 2004, Helen Kozak knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Helen Kozak, on a regular basis and under the direction of Frank Miller, knowingly created fictitious checks to evidence payments from

Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that were never received.

(b)    Helen Kozak, on a regular basis and under the direction of Frank Miller, knowingly created fictitious invoices and bills of lading to evidence sales of goods to Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that never occurred.

187.    Between July of 2002 and September of 2004, William Deakin knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)    William Deakin, under the direction of Frank Miller, directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.

(b)    William Deakin regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, while knowing that there was insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    William Deakin, on a daily basis, directed the J&J Chemical checks to be deposited in the Blocked Account.

(d)    William Deakin ensured that the amount of the J&J Chemical deposits were reflected on the borrowing base certificates representing Gitto Global's collections.

(e)    William Deakin, on a regular basis, created or caused to be created fictitious checks to evidence payments from Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that were never received.

(f)    William Deakin, on a regular basis, created or caused to be created fictitious invoices to evidence sales of goods to Hemisphere, Velco, Zebulon, J-Tan, Hitachi and CCC that never occurred.

188.    Between July, 2002 and September, 2004, J&J Chemical knowingly participated in the scheme to defraud LaSalle by (i) allowing its checks to be deposited in the Fleet account, while knowing these checks were not for payment of goods and (ii) allowing Gitto Global checks payable to J&J Chemical to be deposited in its account at Clinton Bank, while knowing the checks were being used to further a check-kiting scheme.

189.    In reliance on the false representations made to LaSalle by Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical, LaSalle entered into a Loan and Security Agreement with Gitto Global and LaSalle continued to advance funds to Gitto Global on a regular basis.

190.    As a result of the unfair or deceptive act or practices used by Gary Gitto, Frank Miller, Maria Miller, Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin and J&J Chemical, LaSalle entered into the Loan Agreement with Gitto Global and advanced funds to Gitto Global under the LaSalle revolving loan.

191.    Gitto Global has not repaid LaSalle the amounts LaSalle loaned to Gitto Global.

192.    As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $30,683,467.23, plus interest and costs.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants Gary C. Gitto, Frank Miller, Maria Miller, Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland, William Deakin, Janice Chaisson, Helen Kozak, and Kingsdale Corp. d/b/a J&J Chemical Distributors:

A.    Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

B.    Treble damages for knowing violation of Mass. Gen. L. c. 93A §2.

C.    An award of attorneys' fees;

D.    An award of costs and disbursement herein; and

E.    Such and further relief as may be just and equitable under the circumstances.

## COUNT IV
## CIVIL CONSPIRACY TO DEFRAUD
(Against Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr.,
Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland,

William Deakin, Janice Chaisson, Helen Kozak,  Kingsdale Corp.
d/b/a J&J Chemical Distributors, Tradex International Corp. and Tradex Corporation)

193.    LaSalle restates the allegations contained in the previous paragraphs as if set forth fully herein.

194.    Beginning in July, 2002, and continuing through September, 2004, Gary Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., Louis Pellegrine, John Tersigni, Kathleen Carland, Janice Chaisson, Helen Kozak, William Deakin, J&J Chemical, and Tradex participated in a civil conspiracy to obtain money from LaSalle through the LaSalle  revolving loan made under false pretenses to Gitto Global.

195.    In furtherance of the civil conspiracy, Gary Gitto and Frank Miller directed a check-kiting scheme between the Fleet Blocked Account, the LaSalle Account and the J&J Chemical Account.

196.    Between July, 2002 and September, 2004, on a daily basis and in furtherance of the check-kiting scheme, checks were issued from J&J Chemical payable to Gitto Global by or at the direction of Helen Kozak, John Tersigni, J&J Chemical and Janice Chaisson; checks were issued from Gitto Global payable to J&J Chemical by or at the direction of Frank Miller, Helen Kozak and William Deakin; fictitious invoices and bills of lading were created to conceal the check-kite by or at the direction of Frank Miller, Maria Miller, Helen Kozak and William Deakin; and fictitious checks, purportedly issued by customers, were created in the Secret Garden to conceal the check-kiting scheme by or at the direction of Frank Miller, Helen Kozak and William Deakin.

197.    Between July, 2002 and September, 2004, on a daily basis and in furtherance of the conspiracy, Frank Miller and Janice Chaisson, at the direction of Gary Gitto and Frank Miller, prepared borrowing base certificates on behalf of Gitto Global, which they knew contained misrepresentations, seeking an advance of funds from LaSalle.  The borrowing base

certificates contained misrepresentations regarding Gitto Global's collections, sales and inventory.

198.    Between July, 2002 and September, 2004, and in furtherance of the civil conspiracy, Maria Miller, at the direction of Frank Miller, directed Robyn Merchant to alter the quantities and/or price per pound of certain inventory items to inflate the value of the inventory Gitto Global represented to LaSalle.

199.    In furtherance of the civil conspiracy and at the direction of Gary Gitto, Frank Miller, Helen Kozak, William Deakin, Kathleen Carland, Louis Pellegrine, and John Tersigni created a fictitious customer, Hemisphere; represented that Hemisphere, Zebulon, CCC, J-Tan, Velco and Hitachi were the largest customers of Gitto Global; created invoices and bills of lading purporting to evidence sales to these alleged customers; created false confirmations of accounts receivable balances from the purported customers; and created checks purporting to evidence payments from the alleged customers.  The checks, invoices and bills of lading were prepared in the Secret Garden at Gitto Global.

200.    In furtherance of the civil conspiracy and at the direction of Gary Gitto, Frank Miller, and William Deakin, Janice Chaisson kept two sets of books to keep track of the real corporate activity versus the fictitious activity of the civil conspiracy.

201.    Charles Gitto, with knowledge that Gitto Global was misrepresenting its accounts receivable to LaSalle an in furtherance of the civil conspiracy assisted in the maintenance of the J&J Chemical Account for the check-kite in 2004 by providing a personal guaranty and causing Tradex to provide a guarantee and security to Clinton Bank.

202.    Tradex knowingly participated in and furthered the civil conspiracy by proving a guaranty and security to Clinton Bank so that the check-kite through the J&J Chemical Account could continue.

203.   Charles Gitto benefited from the conspiracy by receiving proceeds of the conspiracy, directly and through Tradex.   Charles Gitto directly received interest payments totaling $10,000, consulting fees of $44,300 and unaccounted for disbursements of $320,948, knowing that he was not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

204.   Tradex owned and operated solely by Charles Gitto, benefited from the conspiracy by receiving proceeds of the conspiracy.   Tradex received interest payments of $230,090, prepaid rent of $217,061, consulting fees of $34,000, and unaccounted for disbursements of $134,546, knowing that it was not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

205.   As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $30,683,467.23, plus interest and costs.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., Louis J. Pellegrine, Jr., John D. Tersigni, Kathleen M. Carland, William Deakin, Janice Chaisson, Helen Kozak, Kingsdale Corp. d/b/a J&J Chemical Distributors, Tradex International Corp. and Tradex Corporation:

A.   Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

B.   Punitive damages;

C.   An award of attorneys' fees;

D.   An award of costs and disbursement herein; and

E.   Such and further relief as may be just and equitable under the circumstances.

## COUNT V
## BREACH OF GUARANTY
(Against Gary C. Gitto)

206.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

207.    As alleged above, on or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan to Gitto Global.

208.    As part of the Loan and Security Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, and a Term Note in the original principal sum of $3,000,000.

209.    In consideration of the credit being extended by LaSalle to Gitto Global, Gary Gitto executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities.

210.    On September 26, 2004, Gitto Global declared bankruptcy.

211.    LaSalle is the owner and holder of the Revolving Note, the Term Note, Loan and Security Agreement, the Gary Gitto Limited Guaranty and all rights thereunder.

212.    As of October 13, 2004, there was due and owing (a) under the LaSalle revolving loan, principal of $18,803,353.61, interest of $34,062.77 and interest continues to accrue at the per diem rate of $2,611.58, (b) under the LaSalle term loan, principal of $833,333.42, interest of $1,984.39 and interest continues to accrue at the per diem rate of $156.25 and (c) overdraft of $11,890,588.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendant, Gary C. Gitto:

A.    Judgment in the amount of $3,000,000 against Gary C. Gitto;

B.      An award of attorneys' fees;

C.      An award of costs and disbursement herein; and

D.      Such and further relief as may be just and equitable under the circumstances

### COUNT VI
### BREACH OF GUARANTEES
(Against Frank Miller)

213.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

214.    As alleged above, on or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan to Gitto Global.

215.    As part of the Loan and Security Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, and a Term Note in the original principal sum of $3,000,000.

216.    In consideration of the credit being extended by LaSalle to Gitto Global, Frank Miller executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities.

217.    On September 26, 2004, Gitto Global declared bankruptcy.

218.    LaSalle is the owner and holder of the Revolving Note, the Term Note, Loan and Security Agreement, and the Frank Miller Limited Guaranty and all rights thereunder.

219.    As of October 13, 2004, there is due and owing (a) under the LaSalle revolving loan, principal of $18,803,353.61, interest of $34,062.77 and interest continues to accrue at the per diem rate of $2,611.58, (b) under the LaSalle term loan, principal of $833,333.42, interest of

$1,984.39 and interest continues to accrue at the per diem rate of $156.25 and (c) overdraft of $11,890,588.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendant, Frank Miller:

A.    Judgment in the amount of $3,000,000 against Frank Miller;

B.    An award of attorneys' fees;

C.    An award of costs and disbursement herein; and

D.    Such and further relief as may be just and equitable under the circumstances.

## COUNT VII
### TRUSTEE PROCESS
(Against Fleet National Bank – Gary C. Gitto)

220.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

221.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Gary Gitto.

222.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Gary C. Gitto in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Gary C. Gitto in this action.

## COUNT VIII
### TRUSTEE PROCESS
(Against Fleet National Bank – Frank Miller)

223.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

224.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Frank Miller.

225.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Frank Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Frank Miller in this action.

## COUNT IX
### TRUSTEE PROCESS
(Against Fleet National Bank – Maria Miller)

226.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

227.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Maria Miller.

228.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Maria Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Maria Miller in this action.

## COUNT X
### TRUSTEE PROCESS
(Against Fleet National Bank – Charles N. Gitto, Jr. )

229.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

230.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Charles Gitto.

231.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Charles N. Gitto, Jr. in an amount to be

determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Charles N. Gitto, Jr. in this action.

## COUNT XI
### TRUSTEE PROCESS
(Against Fleet National Bank – Helen Kozak)

232.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

233.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Helen Kozak.

234.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Helen Kozak in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Helen Kozak in this action.

## COUNT XII
### TRUSTEE PROCESS
(Against Fleet National Bank – Tradex Corporation)

235.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

236.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Tradex Corporation.

237.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Tradex Corporation in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Tradex Corporation.

## COUNT XIII
### TRUSTEE PROCESS
(Against Fleet National Bank – Tradex International Corporation)

238.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

239.    On information and belief, Fleet possesses or controls goods, effect or credits of defendant Tradex International.

240.    LaSalle requests this Court enter judgment adjudging Fleet National Bank a trustee of the goods, effects and credits of defendant Tradex International in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Tradex International in this action.

**COUNT XIV**
**TRUSTEE PROCESS**
(Against Clinton Savings Bank – Gary C. Gitto)

241.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

242.    On information and belief, Clinton Bank possesses or controls goods, effect or credits of defendant Gary Gitto.

243.    LaSalle requests this Court enter judgment adjudging Clinton Savings Bank a trustee of the goods, effects and credits of defendant Gary C. Gitto in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Gary C. Gitto in this action.

**COUNT XV**
**TRUSTEE PROCESS**
(Against Clinton Savings Bank – Frank Miller)

244.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

245.    On information and belief, Clinton Bank possesses or controls goods, effect or credits of defendant Frank Miller.

246.    LaSalle requests this Court enter judgment adjudging Clinton Savings Bank a trustee of the goods, effects and credits of defendant Frank Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Frank Miller in this action.

## COUNT XVI
### TRUSTEE PROCESS
(Against Clinton Savings Bank – Maria Miller)

247.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

248.    On information and belief, Clinton Bank possesses or controls goods, effect or credits of defendant Maria Miller.

249.    LaSalle requests this Court enter judgment adjudging Clinton Savings Bank a trustee of the goods, effects and credits of defendant Maria Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Maria Miller in this action.

## COUNT XVII
### TRUSTEE PROCESS
(Against Clinton Savings Bank – Charles N. Gitto, Jr.)

250.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

251.    On information and belief, Clinton Bank possesses or controls goods, effect or credits of defendant Charles Gitto.

252.    LaSalle requests this Court enter judgment adjudging Clinton Savings Bank a trustee of the goods, effects and credits of defendant Charles N. Gitto, Jr. in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Charles N. Gitto, Jr.  in this action.

### COUNT XIII
### TRUSTEE PROCESS
(Against Sovereign Bank – William Deakin)

253.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

254.    On information and belief, Sovereign Bank possesses or controls goods, effect or credits of defendant William Deakin.

255.    LaSalle requests this Court enter judgment adjudging Sovereign Bank a trustee of the goods, effects and credits of defendant William Deakin in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against William Deakin in this action.

### COUNT XIX
### TRUSTEE PROCESS
(Against Commerce Bank & Trust Company – Gary C. Gitto)

256.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

257.    On information and belief, Commerce Bank possesses or controls goods, effect or credits of defendant Gary Gitto.

258.    LaSalle requests this Court enter judgment adjudging Commerce Bank a trustee of the goods, effects and credits of defendant Gary C. Gitto in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Gary C. Gitto in this action.

### COUNT XX
### TRUSTEE PROCESS
(Against Fidelity Co-Operative Bank – John D. Tersigni)

259.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

260.    On information and belief, Fidelity Co-Operative Bank possesses or controls goods, effect or credits of defendant John Tersigni.

261.    LaSalle requests this Court enter judgment adjudging Fidelity Co-Operative Bank a trustee of the goods, effects and credits of defendant John D. Tersigni in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against John D. Tersigni in this action.

## COUNT XXI
## TRUSTEE PROCESS
(Against BankNorth, N.A. – Kathleen M. Carland)

262.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

263.    On information and belief, BankNorth, N.A. possesses or controls goods, effect or credits of defendant Kathleen Carland.

264.    LaSalle requests this Court enter judgment adjudging BankNorth, N.A. a trustee of the goods, effects and credits of defendant Kathleen M. Carland in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Kathleen M. Carland in this action.

## COUNT XXII
## TRUSTEE PROCESS
(Against BankNorth N.A. – John D. Tersigni)

265.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

266.    On information and belief, BankNorth N.A. possesses or controls goods, effect or credits of defendant John Tersigni.

267.    LaSalle requests this Court enter judgment adjudging BankNorth N.A. a trustee of the goods, effects and credits of defendant John D. Tersigni in an amount to be determined by

the Court and charging the trustee in such amount to be applied towards any judgment obtained against John D. Tersigni in this action.

## COUNT XXIII
## TRUSTEE PROCESS
(Against Leominster Credit Union – Janice Chaisson)

268.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

269.    On information and belief, Leominster Credit Union possesses or controls goods, effect or credits of defendant Janice Chaisson.

270.    LaSalle requests this Court enter judgment adjudging Leominster Credit Union a trustee of the goods, effects and credits of defendant Janice Chaisson in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Janice Chaisson in this action.

## COUNT XXIV
## TRUSTEE PROCESS
(Against Fidelity – Frank Miller)

271.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

272.    On information and belief, Fidelity possesses or controls goods, effect or credits of defendant Frank Miller.

273.    LaSalle requests this Court enter judgment adjudging Fidelity a trustee of the goods, effects and credits of defendant Frank Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Frank Miller in this action.

## COUNT XXV
### TRUSTEE PROCESS
(Against Fidelity – Maria Miller)

274.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

275.    On information and belief, Fidelity possesses or controls goods, effect or credits of defendant Maria Miller.

276.    LaSalle requests this Court enter judgment adjudging Fidelity a trustee of the goods, effects and credits of defendant Maria Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Maria Miller in this action.

## COUNT XXVI
### TRUSTEE PROCESS
(Against Lehman Brothers, Inc. – Gary Gitto)

277.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

278.    On information and belief, Lehman Brothers, Inc. possesses or controls goods, effect or credits of defendant Gary Gitto.

279.    LaSalle requests this Court enter judgment adjudging Lehman Brothers, Inc. a trustee of the goods, effects and credits of defendant Gary Gitto in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Gary Gitto in this action.

## COUNT XXVII
### TRUSTEE PROCESS
(Against TD Waterhouse / National Investor Services Corp. – Frank Miller)

280.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

281.    On information and belief, TD Waterhouse / National Investor Services Corp. possess or controls goods, effect or credits of defendant Frank Miller.

282.    LaSalle requests this Court enter judgment adjudging TD Waterhouse / National Investor Services Corp. trustees of the goods, effects and credits of defendant Frank Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Frank Miller in this action.

## COUNT XXVIII
### TRUSTEE PROCESS
(Against TD Waterhouse / National Investor Services Corp. – Maria Miller)

283.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

284.    On information and belief, TD Waterhouse / National Investor Services Corp. possess or controls goods, effect or credits of defendant Maria Miller.

285.    LaSalle requests this Court enter judgment adjudging TD Waterhouse / National Investor Services Corp. trustees of the goods, effects and credits of defendant Maria Miller in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Maria Miller in this action.

## COUNT XXIX
### TRUSTEE PROCESS
(Against Legg Mason – Charles N. Gitto, Jr.)

286.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

287.    On information and belief, Legg Mason possess or controls goods, effect or credits of defendant Charles Gitto.

288.    LaSalle requests this Court enter judgment adjudging Legg Mason trustee of the goods, effects and credits of defendant Charles Gitto in an amount to be determined by the Court

and charging the trustee in such amount to be applied towards any judgment obtained against Charles Gitto in this action.

## COUNT XXX
### REACH AND APPLY
(Direct Wood & Paper Products, Inc.)

289.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

290.    On information and belief, defendant Gary Gitto has an interest in Direct Wood & Paper Products, Inc.

291.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Direct Wood & Paper Products, Inc. and Gitto's interest in Direct Wood & Paper Products, Inc. are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

292.    LaSalle requests that this Court enter judgment establishing Gary C. Gitto's right and interests in and to Direct Wood & Paper Products, Inc. and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXI
### REACH AND APPLY
(Gitto Sales Corporation)

293.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

294.    On information and belief, defendant Gary Gitto has an interest in Gitto Sales Corporation.

295.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Gitto Sales Corporation and Gary Gitto's interest in Gitto Sales Corporation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

296.    LaSalle requests that this Court enter judgment establishing Gary C. Gitto's right and interests in and to Gitto Sales Corporation and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXII
### REACH AND APPLY
(J-Tan Sales & Marketing, Inc.)

297.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

298.    On information and belief, defendant John Tersigni has an interest in J-Tan.

299.    On information and belief, the money, property or payments that may be paid or distributed to defendant John Tersigni by J-Tan and John Tersigni's interest in J-Tan are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

300.    LaSalle requests that this Court enter judgment establishing John D. Tersigni's right and interests in and to J-Tan Sales & Marketing, Inc. and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXIII
## REACH AND APPLY
(Hemisphere Distribution Corporation)

301.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

302.    On information and belief, defendant Kathleen Carland has an interest in Hemisphere.

303.    On information and belief, the money, property or payments that may be paid or distributed to defendant Kathleen Carland by Hemisphere and Kathleen Carland's interest in Hemisphere Distribution Corporation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

304.    LaSalle requests that this Court enter judgment establishing Kathleen M. Carland's right and interests in and to Hemisphere Distribution Corporation and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXIV
## REACH AND APPLY
(Fidelity)

305.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

306.    On information and belief, Fidelity holds interests, instruments, or equities for or for benefit of defendants Frank Miller and Maria Miller.

307.    On information and belief, the money, property or payments that may be paid or distributed to defendants Frank Miller and Maria Miller by Fidelity are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the

benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

308.     LaSalle requests that this Court enter judgment establishing Frank Miller's and Maria Miller's right and interests held by Fidelity in the name or for benefit of Frank Miller and Maria Miller and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXV
## REACH AND APPLY
(AWG, LLC)

309.     LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

310.     On information and belief, defendant Gary Gitto has an interest in AWG, LLC.

311.     On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by AWG, LLC and Gitto's interest in AWG, LLC are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

312.     LaSalle requests that this Court enter judgment establishing Gary C. Gitto's right and interests in and to AWG, LLC and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXVI
## REACH AND APPLY
(Lehman Brothers, Inc.)

313.     LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

314.    On information and belief, defendant Gary Gitto has an interest in Lehman Brothers, Inc.

315.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Lehman Brothers, Inc. and Gary Gitto's interest in Lehman Brothers, Inc. are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

316.    LaSalle requests that this Court enter judgment establishing Gary Gitto's right and interests in and to Lehman Brothers, Inc. and order that such rights and interests be reached and applied towards payment of judgment in this action.

**COUNT XXXVII**
**REACH AND APPLY**
(TD Waterhouse / National Investor Services Corp.)

317.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

318.    On information and belief, defendants Frank Miller and Maria Miller has an interest in TD Waterhouse / National Investor Services Corp.

319.    On information and belief, the money, property or payments that may be paid or distributed to defendants Frank Miller and Maria Miller by TD Waterhouse / National Investor Services Corp. and Frank Miller's interest in TD Waterhouse / National Investor Services Corp. are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

320.    LaSalle requests that this Court enter judgment establishing Frank Miller's and Maria Miller's right and interests in and to TD Waterhouse / National Investor Services Corp.

and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXVIII
### REACH AND APPLY
(Superior Polymers Corporation)

321.     LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

322.     On information and belief, defendant Gary Gitto has an interest in Superior Polymers Corporation.

323.     On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Superior Polymers Corporation and Gary Gitto's interest in Superior Polymers Corporation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

324.     LaSalle requests that this Court enter judgment establishing Gary Gitto's right and interests in and to Superior Polymers Corporation and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XXXIX
### REACH AND APPLY
(Legg Mason)

325.     LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

326.     On information and belief, defendant Charles Gitto has an interest in Legg Mason.

327.     On information and belief, the money, property or payments that may be paid or distributed to defendant Charles Gitto by Legg Mason are not subject to attachment or by an

execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

328.   LaSalle requests that this Court enter judgment establishing Charles Gitto's right and interests in and to Legg Mason and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XL
## REACH AND APPLY
### (Tradex)

329.   LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

330.   On information and belief, defendant Charles Gitto has an interest in Tradex.

331.   On information and belief, the money, property or payments that may be paid or distributed to defendant Charles Gitto by Tradex are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

332.   LaSalle requests that this Court enter judgment establishing Charles Gitto's right and interests in and to Tradex and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XLI
## REACH AND APPLY
### (*Tersigni v. East Coast Trading, Inc.*)

333.   LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

334.    On information and belief, defendant John Tersigni has an interest in certain litigation pending in Worcester Superior Court and styled *Tersigni v. East Coast Trading, Inc.* (the "Litigation").

335.    On information and belief, John Tersigni has alleged in the Litigation that Reach and Apply Defendant East Coast Trading, Inc. is indebted to Tersigni.

336.    On information and belief, the money, property or payments that may be paid or distributed to defendant John Tersigni on account of the Litigation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

337.    LaSalle requests that this Court enter judgment establishing John Tersigni's right and interests in and to the Litigation and Tersigni's claims against East Coast Trading, Inc. and order that such rights and interests be reached and applied towards payment of judgment in this action.

Dated:  November 1, 2005                          Respectfully submitted,

                                                 LASALLE BUSINESS CREDIT, LLC


                                                 By:_____/s/ Patrick W. Manzo_____
                                                          One of its attorneys
Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416