## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC, f/k/a)
LASALLE BUSINESS CREDIT, INC.,    )
                                  )
              Plaintiff,          )
    v.                            )         Case No. 04-12227-DPW
                                  )
GARY C. GITTO, et al.,            )
                                  )
              Defendants.         )
_____    )

### LASALLE BUSINESS CREDIT, LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, LaSalle Business Credit, LLC, f/k/a LaSalle Business Credit, Inc. ("LaSalle"),
moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary
judgment on Counts I through IV of the Third Amended Complaint[1] against Gary C. Gitto
("Gary Gitto"), Frank Miller, Maria Miller, Charles N. Gitto, Jr. ("Charles Gitto"), and Louis J.
Pellegrine, Jr. ("Pellegrine") (all of the individuals are sometimes referred to herein as
"Defendants").

### Introduction

LaSalle's claims arise from a $27 million revolving loan LaSalle made in 2002 to Gitto
Global Corp. ("Gitto Global") that could be drawn on based upon Gitto Global's genuine
accounts receivable and inventory.  LaSalle thereafter for over two years advanced funds to Gitto
Global based upon a stream of false information concerning sales that were supported by a
sophisticated check-kiting[2] scheme and fabricated accounts receivable and inventory reports.

---

[1] The claims asserted are participation in a RICO conspiracy (Count I); participation in a conspiracy to defraud
through a check-kiting scheme (Count II); use of deceptive trade practices, in violation of Mass. Gen. L. c.93 A, 2
(Count III); and conspiracy to defraud (Count IV).  All of the nonmovants are named as Defendants in each Count,
except Charles N. Gitto, Jr. is not a Defendant in Count III.

[2] "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second
bank when neither account has sufficient funds to cover the amounts drawn.  Just before the checks are returned for
payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank.  Due

Frank Miller, with the assistance of other Gitto Global employees, and Pellegrine orchestrated the fraud through the wire and mail for over two years. Frank Miller, together with Gary Gitto, Charles Gitto and Pellegrine, conspired to defraud LaSalle by facilitating the fraud, the purpose of which was to funnel loan advances to support their extravagant lifestyles and pay personal expenses. During the lending relationship, fraudulently procured loan advances permitted the Defendants to divert $6,141,645.79 to their personal benefit: Gary Gitto - $2,874,644.41, Charles Gitto - $1,964,258.91, Frank and Maria Miller - $957,514.33, and Pellegrine - $345,238.14. The damage to LaSalle is currently $32,224,053.00.

<u>**Statement of Facts**</u>

**LaSalle's Revolving Loan**

LaSalle is a federally insured financial institution engaged in the business of making commercial loans. (Pl. Stmt. Facts, ¶1) On July 25, 2002, LaSalle provided to Gitto Global a revolving loan not to exceed $27 million, under which LaSalle lent up to 85% of Gitto Global's accounts receivable and 65% of Gitto Global's inventory not to exceed $6 million ("the LaSalle revolving loan"). (Pl. Stmt. Facts, ¶10) Pursuant to the LaSalle revolving loan, Gitto Global entered into a Blocked Account Agreement with LaSalle and Fleet Bank ("Fleet Blocked Account") under which Gitto Global would deposit payments of invoices directly into the Fleet Blocked Account and Fleet would transfer available funds to LaSalle to pay down the LaSalle revolving loan. (Pl. Stmt. Facts, ¶¶12-15) Thus, as funds were applied daily against the LaSalle revolving loan, funds would become available for LaSalle to advance to Gitto Global ("availability"). In order to receive advances of funds under the LaSalle revolving loan, Gitto Global would deliver daily borrowing base certificates to LaSalle. (Pl. Stmt. Facts, ¶16)

---

to the delay created by the collection of funds by one bank from the other, known as the 'float' time, an artificial balance is created." *U.S. v. Abboud*, 438 F.3d 554, 590 (6th Cir. 2006).

**Gitto Global's Structure and Operations**

Gitto Global was a Massachusetts corporation located in Lunenberg, Massachusetts that was engaged in business as a compounder of specialty polyvinyl chloride and similar compounds which it sold to customers in various states for use in products such as wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems.  (Pl. Stmt. Facts, ¶¶2, 9)

Gitto Global was created from the 1992 merger of Gitto Corp., which was owned by Gary Gitto, and Global Products, which was owned by Frank Miller.  (Pl. Stmt. Facts, ¶9)  Gary Gitto, his sister, and Frank Miller were the owners of the merged company.  *Id*.  Charles Gitto, formerly chairman of Gitto Corp., was chairman of Gitto Global and oversaw its manufacturing operations.  (Pl. Stmt. Facts, ¶129)  Gary Gitto was president and concentrated on sales.  Frank Miller acted as chief operating officer handling the financial affairs.  (Pl. Stmt. Facts, ¶122)  Maria Miller, Frank Miller's wife, did the invoicing and supervised inventory control.  (Pl. Stmt. Facts, ¶125)  Pellegrine was Gitto Global's outside accountant.  (Pl. Stmt. Facts, ¶141)

**Fraudulent Financial Information**

The fraud perpetrated on LaSalle by Gitto Global started at the inception of their relationship.  In May and July, 2002, when the initial field examination and take-out audit took place, the financial records furnished to LaSalle by Frank Miller and Pellegrine stated that Gitto Global's accounts receivable were $22-23 million, inventory was $6 million, and payables were $680,000-$1 million.  (Pl. Stmt. Facts, ¶¶87-90)  On July 5 and 25, 2002, from Massachusetts, Pellegrine faxed to LaSalle in New York purported account receivable confirmations from Hemisphere Distribution Corp. ("Hemisphere") showing a balance due of $3,161,866.40, from Zebulon Industries, Inc. ("Zebulon") showing a balance due of $2,960,058.43, and from Hitachi

Cable, Inc. ("Hitachi") showing a balance due of $4,440,999.21.  (Pl. Stmt. Facts, ¶¶94-95)  All of this information was false.

**False Borrowing Base Certificates**

On almost every business day from July 25, 2002 through September 15, 2004, advances on the LaSalle revolving loan were obtained through false borrowing base certificates submitted by fax and e-mail from Massachusetts to LaSalle in New York by Frank Miller and by Janice Chaisson, the account receivable clerk, after approval by Frank Miller.  (Pl. Stmt. Facts, ¶¶20-21, 25, 60)  The borrowing base certificates were false because they included fictitious sales to fictitious customers, Hemisphere, J-Tan Sales and Marketing, Inc. ("J-Tan"), Color Compounds & Consultants, Inc. ("CCC"), Velco Chemicals, Inc. ("Velco"), Zebulon, and Hitachi (collectively "the fictitious customers").  (Pl. Stmt. Facts, ¶¶42-44, 60)  Pellegrine helped to organize Hemisphere.  (Pl. Stmt. Facts, ¶¶46-50)  Gary Gitto and Frank Miller were instrumental in starting J-Tan.  (Pl. Stmt. Facts, ¶52)  Hemisphere and J-Tan did not conduct any legitimate business.   CCC and Hitachi were actual customers, but purchased substantially less than reported.  (Pl. Stmt. Facts, ¶¶54-57)  Zebulon and Velco were not customers, but suppliers of raw materials.  (Pl. Stmt. Facts, ¶¶58-59)

In order to create availability so Gitto Global could continue to borrow under the LaSalle revolving loan through these borrowing base certificates, Gitto Global deposited in the Fleet Blocked Account checks payable to Gitto Global from Kingsdale Corporation, d/b/a J&J Chemical ("J&J Chemical"), issued from an account at Clinton Savings Bank ("J&J Chemical Account).  (Pl. Stmt. Facts, ¶¶8, 35-36, 41)  J&J Chemical was owned by Frank Miller and originally funded through a loan from Charles Gitto to Frank Miller and Gary Gitto.  (Pl. Stmt. Facts, ¶¶8, 35)  It was not a legitimate business.  (Pl. Stmt. Facts, ¶35)  Its funds came from Gitto Global checks deposited in the J&J Chemical Account.  (Pl. Stmt. Facts, ¶36)

Each day, based upon a daily report prepared by Gitto Global's controller, William Deakin, Frank Miller determined how much in fictitious sales needed to be shown on that day's borrowing base certificate to create availability. (Pl. Stmt. Facts, ¶37) Frank Miller would then tell Maria Miller how much in fictitious sales to generate on the books and instruct the accounts payable clerk what volume or amount of Gitto Global checks she should write to J&J Chemical. (Pl. Stmt. Facts, ¶¶37-38) After the accounts payable clerk prepared the checks to J&J Chemical, she would give those checks to the accounts receivable clerk who would make out reciprocal J&J Chemical checks for the same dollar amount payable to Gitto Global. (Pl. Stmt. Facts, ¶38) Frank Miller or William Deakin would deposit the Gitto Global checks payable to J&J Chemical in the J&J Chemical Account. (Pl. Stmt. Facts, ¶40) Between July, 2002 and September, 2004, Gitto Global deposited in the Fleet Blocked Account checks issued by J&J Chemical totaling $1,009,659,366. (Pl. Stmt. Facts, ¶27) Based upon Gitto Global's monthly deposits of purported sale proceeds created by J&J Chemical checks, LaSalle advanced $1,124,835,256 on the LaSalle revolving loan in reliance upon the false borrowing base certificates. (Pl. Stmt. Facts, ¶28) LaSalle is currently owed in excess of $32,000,000 on the LaSalle revolving loan. (Pl. Stmt. Facts, ¶30)

**Check-Kite Scheme**

The check-kite scheme utilizing the J&J Chemical Account began in February, 2001 after a similar scheme involving Direct Wood and Paper Products, Inc. ("Direct Wood"), a company owned by Gary Gitto, had been discovered and shut-down by Fleet Bank at the end of 2000. (Pl. Stmt. Facts, ¶¶32-35) By December 1, 2003, the check-kite scheme at Clinton Savings Bank had risen to $2-$3 million per day. (Pl. Stmt. Facts, ¶65) By July, 2004, the scheme had risen to $8.4 million. (Pl. Stmt. Facts, ¶68) When Clinton Savings Bank put pressure on Frank Miller to terminate the check-kite, Frank Miller, Maria Miller, Gary Gitto and Charles Gitto pledged assets

and signed guaranties for Clinton Savings Bank to continue to pay on uncollected funds and to allow the check-kiting scheme to continue to operate. (Pl. Stmt. Facts, ¶¶70-74) Previously, in 2002, they had transferred funds to the J&J Chemical Account in order to create an appearance of availability when Clinton Savings Bank refused to pay on uncollected funds. (Pl. Stmt. Facts, ¶64) When the check-kite scheme collapsed on September 17, 2004, Clinton Savings Bank dishonored and returned J&J Chemical checks in the amount of $11,895,588 to LaSalle. (Pl. Stmt. Facts, ¶75)

**Account Payable Fraud**

Beginning in 1997, Frank Miller and Gary Gitto instructed the Gitto Global accounts payable clerk to place invoices from large suppliers (representing 95% of all payables) into a cabinet drawer and not to enter those invoices into the computer system. Gary Gitto, William Deakin, or Frank Miller would tell the accounts payable clerk when to hand-cut checks to pay those invoices. These checks would be signed by either Gary Gitto or Frank Miller. As a result of the arrangement, Gitto Global's financial records never reflected inventory purchases of roughly $8-9 million from 2002 to 2004. Instead, the financial records revealed an increase in inventory without any corresponding increase on the expense side for the accounts payable. (Pl. Stmt. Facts, ¶¶76-77)

**Inventory Fraud**

Since 1994, Gitto Global also had been misrepresenting its inventory through four different procedures. (Pl. Stmt. Facts, ¶78) One, Frank Miller would instruct the purchasing manager to change the designations of the compounds that were being produced to a more expensive product and to maintain those changes in a book that was given to Frank and Maria Miller. *Id.* Two, Maria Miller would instruct the inventory control clerk to adjust the physical count on her inventory reports and to increase the price of the product in order to overstate the

amount of expensive products actually in inventory. (Pl. Stmt. Facts, ¶79) Three, beginning in June, 2003, Gitto Global purportedly purchased $12 million in Vitrolite product from Vitrotech, a California company. (Pl. Stmt. Facts, ¶82) Gitto Global never paid for this product because payment was through a series of promissory notes under which no payment was ever made. *Id*. The purchase of Vitrolite enabled Gitto Global to increase the inventory value under its borrowing base certificate to obtain the maximum advance on inventory from LaSalle of $6 million. *Id*. On April 1, 2004, the purchase was changed to a sale on consignment, but there was never any corresponding change in Gitto Global's books or on the borrowing base certificates to reflect that the maximum advance rate was not available. *Id*. Four, either inventory would be moved into the warehouse that was borrowed from another company or purchased early (and never shown as a payable) so that a LaSalle examiner coming to do a physical count would see an increase in physical inventory. (Pl. Stmt. Facts, ¶83)

**Efforts to Sell Gitto Global**

By late 2003, Charles Gitto, Gary Gitto, and Frank Miller recognized that their ability to generate funds through Gitto Global was not limitless. They undertook to find someone who would purchase the business. It was also decided that in searching for a buyer, the prospective buyer would be told the "truth" concerning Gitto Global's operations, with the expectation that the buyer would ultimately satisfy Gitto Global's obligations. Thus, Charles and Gary Gitto and Frank Miller in discussions concerning a possible sale of the business disclosed to third parties their participation in the fraudulent activities at Gitto Global. These third parties included Martin Miller, Vitrotech and its auditors and Dr. Alfred Arcidi. (Pl. Stmt. Facts, ¶¶102, 104-105, 108-111, 135, 136)

**Deliberate Cover-Up of Fraud**

When Clinton Savings Bank closed down the J&J Chemical Account on September 15, 2004, the next day, Gary Gitto and Charles Gitto deliberately directed, and thereby implicitly admitted their complicity in the fraud, the removal of records from Gitto Global that would have disclosed the fraud. They instructed Helen Kozak, their administrative assistant, to box and remove to Charles Gitto's home 20 banker's boxes of documents. These records included documents concerning Direct Wood, Equitech (a Gary Gitto owned company), J&J Chemical, the fictitious customers' invoices and bills of lading and altered inventory control records. Similarly, Frank Miller boxed and removed 8-9 boxes of records. (Pl. Stmt. Facts, ¶¶144-147)

<u>Argument</u>

**A.    Standard for Entry of Summary Judgment**

What must be shown to warrant the entry of summary judgment is undoubtedly well-known to the Court. Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The First Circuit has defined "material" to mean "a contested fact has the potential to change the outcome of the suit under governing law if the dispute over it is resolved favorably to the non-movant." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995). It has defined "genuine" as "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Id*.

The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact. Then, the burden shifts to the non-movant to demonstrate that a trial-worthy issue exists. *Branford and Petz P.C. v. Bank of America Commercial Finance Corp.*, 2005 U.S. Dist. Lexis 14243, *23 (D. Mass. June 13, 2005).

**B.      LaSalle is Entitled to Summary Judgment on Each of the Counts of the Complaint**

**(i)      Count I:  Civil RICO**

For the Court to grant summary judgment for LaSalle on Count I of the Amended Complaint, LaSalle must show as to each defendant against whom such judgment is sought that there is no genuine issue as to the following facts:

(a)      Gitto Global was a corporation that was engaged in or whose activities affected interstate commerce (18 U.S.C. §§ 1962(c), 1961(4)).

(b)      a conspiracy existed to conduct the affairs of Gitto Global through a continuous series of related acts of financial institution fraud (violations of 18 U.S.C. § 1344) or wire fraud (violations of 18 U.S.C. § 1343) perpetrated against LaSalle with respect to the revolving loan.  (18 U.S.C. §§ 1962(d), 1961(1)).

(c)      pursuant to that conspiracy, one or more of the members of the conspiracy participated in the operation or management of Gitto Global and caused Gitto Global's facilities to be used between July, 2002 and September, 2004 for a series of related, continuous acts of financial institution fraud and wire fraud.  *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184 (1993); *U.S. v. Marino*, 277 F3d, 11, 27 (1st Cir. 2002).

(d)      LaSalle in reliance on the false borrowing base certificates submitted by Gitto Global advanced funds to Gitto Global.

(e)      the individual was a knowing participant in the conspiracy.  *Salinas v. U.S.*, 522 U.S. 52, 65, (1997).

(f)      the acts of financial institution fraud or wire fraud conducted through Gitto Global proximately caused financial loss to LaSalle.  *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1998 (2006); *Holmes Securities Investor Protection Corp.*, 503

U.S. 258, 264-70 (1992); *Camelio v. American Federation*, 137 F.3d 666, 669-70 (1st Cir. 1998).

    (g)  the amount of such financial loss to LaSalle.

   Each of the necessary elements is present here. Gitto Global was a corporation that did business with customers in other states. The LaSalle revolving loan was an interstate financial transaction. A conspiratorial scheme to defraud LaSalle, a federally insured financial institution, was conducted from July 25, 2002 through September 15, 2004, through Gitto Global's interstate transmission of over 500 false borrowing base certificates by e-mail and facsimile, in violation of 18 U.S.C. §§ 1343, 1344. This use of Gitto Global's facilities constituted the conduct of its business through a pattern of racketeering activity. *Marino*, 277 F.3d at 27-28.

   To be liable as a conspirator, an individual need only have adopted the goal of furthering or facilitating the fraudulent scheme, which can be proved through circumstantial evidence. *Salinas*, 522 U.S. at 65; *U.S. v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004). It is not necessary for a conspirator to know all of the details or the full extent of the conspiracy. *Aetna Casualty Sur. Co. v. P&B Auto Body*, 43 F.3d 1566, 1562 (1st Cir. 1994). Nor does a participant in a RICO conspiracy have to commit any RICO predicate acts. *Cianci*, 378 F.3d at 90. All that is necessary is to prove he or she agreed with one or more co-conspirators to participate in the conspiracy -- a large fraudulent scheme. *Id.* As discussed in greater detail in the following pages, each of the Defendants participated in the conspiracy.

   LaSalle, in reliance upon those false borrowing base certificates, advanced millions of dollars to Gitto Global, which directly resulted in a loss of $32,224,053.00 to LaSalle as of July 26, 2006.

**Gary Gitto**

When Gary Gitto signed the Loan Agreement with LaSalle in 2002, he knew that Gitto Global was inflating its inventory and conducting a check-kite. (Pl. Stmt. Facts, ¶116) William Deakin told Gary Gitto on several occasions as early as 1995 about misstated and inflated inventory records. *Id.* Gary Gitto also had helped set up the structure for the check-kite. Gary Gitto had previously set up a company called Direct Wood and signed checks for it to operate a check-kite and pay down invoices. (Pl. Stmt. Facts, ¶32) When Fleet Bank detected this check-kite in 2000, he closed the account and in 2001, borrowed money from Charles Gitto to start J&J Chemical. (Pl. Stmt. Facts, ¶34-35) Gary Gitto deemed J&J Chemical so important to keeping Gitto Global operating that in 2002, he transferred $390,000 to capitalize the J&J Chemical Account. (Pl. Stmt. Facts, ¶64) In June, 2004, Gary was informed that the J&J Chemical check-kite was climbing each day. (Pl. Stmt. Facts, ¶115) When Clinton Savings Bank in July, 2004, threatened to discontinue paying J&J Chemical checks on uncollected funds (which was required for the check-kite to operate), Gary pledged $500,000 as collateral security and signed a personal guarantee. (Pl. Stmt. Facts, ¶70)

Gary Gitto was also fully aware of the use of fictitious sales invoices. He initially capitalized J-Tan, one of the fictitious customers falsely shown in Gitto Global's records as owing millions of dollars. (Pl. Stmt. Facts, ¶52) In 2003, Gary Gitto was shown a receivable aging report that contained fictitious invoices of $16.5 million by William Deakin, who wanted Gary Gitto to know about the size and extent of the false reporting. (Pl. Stmt. Facts, ¶116) In 2004, when one of the fictitious invoices was mistakenly mailed to Hitachi, he asked "is that one of those phony invoices." *Id.* Gary Gitto was aware that John Moritz was being used to manipulate Gitto Global's records, and on one occasion, he asked that Moritz manipulate Gary Gitto's records. (Pl. Stmt. Facts, ¶117)

When Gary Gitto was aware that Gitto Global was losing money and inflating the amount of inventory shown on its books, in 2004, he participated in arranging for Gitto Global to buy $12 million in inventory from Vitrotech under long term notes which were not included in the figures provided in the borrowing base certificates submitted to LaSalle. (Pl. Stmt. Facts, ¶¶108, 119) This maximized the inventory advance rate obtained from LaSalle. *Id.* Gary Gitto admitted that the deal was specially structured "to avoid any fallout" with LaSalle. (Pl. Stmt. Facts, ¶111) The "fallout" was further avoided when Vitrotech indicated it would purchase Gitto Global's assets and Gary Gitto entered into an agreement to convert the $12 million sale into a consignment. (Pl. Stmt. Facts, ¶112) Nevertheless, Gitto Global continued to borrow against that $12 million in inventory as if it still owned it. (Pl. Stmt. Facts, ¶82)

Gary Gitto also participated in hiding payables. Since 1997, large suppliers' invoices were not entered on Gitto Global's computer system and payments were later paid by handwritten checks. Gary would direct when payments were to be made and intermittently signed the checks. (Pl. Stmt. Facts, ¶76)

Gary Gitto participated in the fraud in order to support his lavish lifestyle. From July, 2002 through September, 2004, when Gitto Global had no cash flow and was in serious financial distress, Gary Gitto demanded that his personal expenses be paid and funds transferred to his company, Equitech Technologies L.L.C., and him to the tune of $2,872,644.44. (Pl. Stmt. Facts, ¶¶120-121) These payments covered work on and furniture for his real estate holdings, the mooring for his boat, boat expenses charged by his captain, groceries, vacations, private school donations, country club dues, automobile lease, car maintenance, jewelry, clothing, health/beauty spa services and dining. *Id.*

**Charles Gitto**

Charles Gitto's role in the conspiracy was the lifeline that prevented the fraud from collapsing. He was identified with Gitto Global, knew it had financial problems, knew its accounts receivable were inflated, provided critical support for the check-kite that produced funds for Gitto Global, maneuvered Gitto Global's inventory to falsely present what Gitto Global owned in order to obtain funds from LaSalle, and reaped the benefit of over $1.9 million of Gitto Global's funds over the period of the loan.

Charles Gitto owned Tradex Corp., the real estate holding company that owned the building Gitto Global leased for its operations. (Pl. Stmt. Facts, ¶¶5, 137) In the division of responsibilities at Gitto Global, Charles Gitto was in charge of production and knew who the company's major customers were. (Pl. Stmt. Facts, ¶¶129, 131) He also knew that the company's accounts receivable included fictitious customers. (Pl. Stmt. Facts, ¶¶132-133) He received copies of purchase orders to schedule actual production and knew what was actually being produced and for whom. (Pl. Stmt. Facts, ¶131) He also did not have any qualms about misrepresenting Gitto Global's accounts receivable. In May, 2002, prior to the LaSalle Loan Agreement, Charles Gitto sent a printout of Gitto Global's accounts receivable to Guaranty Business Credit that listed receivables due from sales to Velco of $2,688,013, from Zebulon of $2,785,045, and from CCC of $1,079,586. (Pl. Stmt. Facts, ¶132) These were prominent accounts in the list as they were among Gitto Global's largest customers. All of these sales, however, were fictitious. (Pl. Stmt. Facts, ¶44) The inflated accounts receivables were sustained by the J&J Chemical check-kite, whose operation Charles Gitto nurtured and protected.

In April, 2001, Charles Gitto advanced $1.5 million to Gary Gitto and Frank Miller to fund J&J Chemical. (Pl. Stmt. Facts, ¶35) In June, 2002, when Clinton Savings Bank suspended its practice of paying J&J Chemical's checks based on uncollected funds and thereby threatened

the collapse of the check-kite, Charles Gitto came to the rescue with two wire transfers totaling $300,000 to shore up the J&J Chemical Account until Clinton Savings Bank reverted to its former policy. (Pl. Stmt. Facts, ¶64) Again, in July, 2004, when Clinton Savings Bank wanted security to continue paying J&J Chemical checks on uncollected funds, Charles Gitto provided a limited non-recourse guaranty and a security agreement from Tradex. (Pl. Stmt. Facts, ¶72) He followed this up in August, 2004 by signing an extension letter for the Clinton Savings Bank's line of credit and also providing an unlimited guaranty. (Pl. Stmt. Facts, ¶73-74) This was extraordinary support for a company in which Charles Gitto ostensibly had no interest of any kind.

Charles Gitto knew J&J Chemical's role in supporting Gitto Global's inflated accounts receivable. In 2002, Frank Miller enlisted the help of his brother, Martin Miller, a 36-year former vice president at Wang Laboratories who ran the risk management department, was deeply involved in corporate finance and had developed significant contacts in the investment arena, in an effort to find a purchaser or investor for Gitto Global. (Pl. Stmt. Facts, ¶102) Martin Miller joined his brother, Charles Gitto and Gary Gitto in two automobile trips from Massachusetts to New Jersey to meet with representatives of The Alpine Group as a potential buyer or investor. (Pl. Stmt. Facts, ¶¶104-105) In those automobile trips, the Gittos and Frank Miller discussed how they had to modify the original Gitto Global financial statements to remove "a hole" of roughly $17 million, representing the overstatement of accounts receivable and inventory. *Id.* They identified J&J Chemical as the vehicle used to run up the accounts receivable and how Clinton Savings Bank was involved in the "triangulation" of the receivables. *Id.*

Charles Gitto was also involved in falsely representing Gitto Global's inventory to LaSalle. On May 18, 2003, Charles Gitto and Frank Miller met with representatives of Vitrotech that made Vitrolite, a volcanic ash rylite material refined and sold to the plastics industry. (Pl. Stmt. Facts, ¶107) In that meeting, the participants discussed LaSalle's $27 million line of credit and that LaSalle would lend up to 65% against Gitto Global's inventory to a maximum of $6 million. *Id*. It was pointed out by Frank Miller that Gitto Global was looking to acquire additional product for its inventory so it could borrow additional funds against the line of credit. *Id*. As a result, Gitto Global in June, 2003, entered into a purchase and sale agreement with Vitrotech in which Vitrotech purportedly sold $12.6 million in Vitrolite product to Gitto Global for four promissory notes on which no payments were due until three years from their dates. (Pl. Stmt. Facts, ¶108) The Vitrolite was included in the inventory reported in Gitto Global's borrowing base certificates as if owned free and clear without any offsetting obligation for payment. (Pl. Stmt. Facts, ¶82) This provided a basis for Gitto Global to obtain funds from LaSalle under the LaSalle revolving loan.

Charles Gitto knew that the operations at Gitto Global involved criminal conduct. In early 2002, he commented to Dr. Alfred Arcidi, a potential investor, that he did not want Gary Gitto to go to jail for what he was doing at Gitto Global. (Pl. Stmt. Facts, ¶136)

By providing this substantial assistance to allow the check-kite scheme to operate for over two years, Charles Gitto received in excess of $1.9 million of Gitto Global funds paid to or on his behalf, when Gitto Global had significant cash shortages. (Pl. Stmt. Facts, ¶140) These funds went toward the lease of Gitto Global's facilities, Charles Gitto's airplane expenses, maintenance of his home, insurance on his car, pharmacy expenses, credit card charges, and to pay Charles Gitto's personal taxes and tax penalties. (Pl. Stmt. Facts, ¶139)

**Frank Miller**

A successful fraud involving daily phony sales orders, false borrowing base certificates, and checks for a multi-million dollar check-kite requires a skilled traffic manager to coordinate all of the aspects of the fraud to keep it from collapsing. Frank Miller filled that role in the fraud carried out through Gitto Global with consummate skill. As Gitto Global's chief operating officer, Frank Miller managed the financial aspects of Gitto Global's business. (Pl. Stmt. Facts, ¶122) In doing so, he created the fictitious transactions necessary to support the fraudulent borrowing base certificates submitted to LaSalle.

LaSalle was the last of a series of lenders going back to 1995 to whom Gitto Global submitted false financial data to obtain loan funds. (Pl. Stmt. Facts, ¶31) The process started out relatively small with Frank Miller arranging for the pre-billing of legitimate sales. *Id*. This involved the generation of customer invoices and the recordation of an account due before the product was shipped. *Id*. Frank Miller instructed that these invoices be held until shipment so that the customers would not receive premature requests for payment. *Id*.

By 1997, the fraud had been expanded to include inflated accounts receivables created from invoices for fictitious sales. (Pl. Stmt. Facts, ¶32) Checks drawn on a company called Direct Wood, which Gary Gitto created, were used to pay these fictitious invoices. *Id*. When fictitious invoices approached being unpaid for 90 days (after which they could no longer be used to borrow against), Frank Miller would have Gitto Global personnel create corresponding Direct Wood and Gitto Global checks in the same amounts in order to use a check-kite to provide funds to satisfy the outstanding invoices. *Id*. When the bank where the Direct Wood account was maintained suspected a check-kite, it required that the account be closed. (Pl. Stmt. Facts, ¶34) This led to Frank Miller's creation of J&J Chemical in 2001, as the replacement correspondent check-kite entity. (Pl. Stmt. Facts, ¶35)

J&J Chemical was the second pillar of the check-kite used to support the false borrowing base certificates. Frank Miller was the owner of J&J Chemical, the signatory on its bank account at Clinton Savings Bank and maintained its checkbook at Gitto Global.  (Pl. Stmt. Facts, ¶¶3, 35)  When problems were encountered with Clinton Savings Bank paying J&J Chemical checks on uncollected funds, Frank Miller provided funds to keep the J&J Chemical Account operating for the check-kite.  (Pl. Stmt. Facts, ¶64)  On three occasions in 2002, he made three wire transfer deposits totaling $710,000 to the J&J Chemical Account.  *Id.*  In July, 2004, when funds were again needed for Clinton Savings Bank to continue paying J&J Chemical checks on uncollected funds, Frank Miller guaranteed the credit arrangement, transferred $500,000 as collateral security and, along with Maria Miller, pledged a mortgage on their residence.  (Pl. Stmt. Facts, ¶71)

During the period of the LaSalle revolving loan, Frank Miller, from reports prepared for him, on a daily basis determined how many dollars in sales and cash receipts he needed to create for Gitto Global.  (Pl. Stmt. Facts, ¶37)  He entered into Gitto Global's computer system data for the fictitious sales and instructed the accounts receivable clerk to use a "99" customer code for these fictitious sales so they could be tracked separately from actual sales.  (Pl. Stmt. Facts, ¶43-44)  Frank Miller also instructed the accounts receivable clerk to prepare enough J&J Chemical checks payable to Gitto Global to cover a certain dollar amount (multiple checks under $100,000 had to be prepared so that they would clear the bank) and to apply those checks to accounts receivable balances of fictitious customers that were going to be outstanding for over 90 days.  (Pl. Stmt. Facts, ¶39)  These checks, along with the checks from actual customers, were then deposited in the Fleet Blocked Account.  (Pl. Stmt. Facts, ¶40)

Frank Miller, on a daily basis, also directed the accounts payable clerk to prepare the necessary Gitto Global checks payable to J&J Chemical to keep the J&J Chemical Account

sufficiently funded for the check-kite. (Pl. Stmt. Facts, ¶38) Pursuant to this practice, that clerk prepared between 40 and 50 checks a day, each under $100,000. *Id.* Frank Miller either signed the checks or had his signature stamp used on them. The checks were then deposited in the J&J Chemical Account. *Id.*

Frank Miller also helped to create some of the fictitious Gitto Global customers. He had Pellegrine set up Hemisphere and recruited Kathleen Carland, Pellegrine's girlfriend, to appear at a bank with Pellegrine as Hemisphere's president. (Pl. Stmt. Facts, ¶46-47) Frank Miller kept the checkbook for the Hemisphere account opened at the bank. (Pl. Stmt. Facts, ¶46) Frank Miller also recruited John Tersigni, Gary Gitto's long-time friend, so that his company, J-Tan, could be used as one of Gitto Global's fictitious purchasers. (Pl. Stmt. Facts, ¶52)

Further, Frank Miller directed the overstatement of inventory. He would instruct the scheduler to change the formula names and packaging markings to reflect ownership of more expensive products. (Pl. Stmt. Facts, ¶78) He would direct that the month-end reports be altered to increase the size and amount of inventory. *Id.* When a physical audit was to be made by a bank examiner, he would "borrow" inventory from other companies or purposely purchase new inventory without showing the cost of purchase to increase the amount of inventory. (Pl. Stmt. Facts, ¶83) Frank Miller admitted to Barbara Fuller, an auditor for Vitrotech, that Gitto Global was engaged in inflating its inventory. (Pl. Stmt. Facts, ¶78)

When Frank Miller through Gitto Global's inflated inventory figures, fictitious sales and check-kiting made it appear that Gitto Global was in a position to continue receiving revolving loan funds from LaSalle, Frank Miller had daily borrowing certificates incorporate this false information submitted to LaSalle. (Pl. Stmt. Facts, ¶60) When LaSalle's examiners questioned Gitto Global's records, Frank Miller had sales records for the fictitious customers and J&J

Chemical fabricated to satisfy the examiner's inquiries.  (Pl. Stmt. Facts, ¶86, 93)  Also, unbeknownst to LaSalle, Frank Miller had 95% of the accounts payable withheld from Gitto Global's records so as not to disclose to LaSalle the size and scope of those liabilities.  (Pl. Stmt. Facts, ¶¶76-77)

While Gitto Global struggled to survive, Frank Miller used the loan advances to have Gitto Global pay for his lavish personal expenses, including interest payments on personal loans, interior design work on his home, home utility expenses, automobile expenses, automobile insurance and credit card charges.  (Pl. Stmt. Facts, ¶¶123-124)  Frank Miller received from Gitto Global, directly or on his behalf, the amount of $951,514.33.  (Pl. Stmt. Facts, ¶124)

**Maria Miller**

Maria Miller was a knowing accomplice to her husband's efforts to manage the fraud. Her knowledge of the fraud is indisputable because at the end of 2003/beginning of 2004, Maria Miller had certain products, the inflated and false inventory, separated as "brokerage" products. (Pl. Stmt. Facts, ¶110)

Since 1995, Maria Miller was engaged in erroneous pre-billing.  She would release legitimate sales orders before shipping and separate the invoice.  (Pl. Stmt. Facts, ¶31)  The computer would show the sale as a receivable before the sale had even been shipped, thus increasing outstanding receivables.  *Id.*

Beginning in 2000, Maria Miller supervised inventory control and was in charge of invoicing.  (Pl. Stmt. Facts, ¶122)  In that role, she created fictitious sales orders for the amount of money needed each day.  (Pl. Stmt. Facts, ¶37, 43)  She would then create invoices for fictitious customers reflecting these phony sales.  Maria Miller would track the open fictitious invoices on a regular basis on a spreadsheet.  *Id.*

She also instructed the inventory control clerk to change the physical count on the inventory reports that generally adjusted to a higher value inventory. (Pl. Stmt. Facts, ¶79-81) Maria Miller further directed that formula names be changed to reflect more expensive inventory. (Pl. Stmt. Facts, ¶78) On certain inventory audits, Maria Miller provided the bank examiners with the inventory reports, knowing full well that she had directed that the physical counts and values be misstated. (Pl. Stmt. Facts, ¶126)

She further participated in the fraud scheme by (i) transferring $300,000 with Frank Miller in 2002, to the J&J Chemical Account and (ii) pledging a third mortgage on her home in 2004, to secure the credit agreement between Clinton Savings Bank and J&J Chemical, all to allow the J&J Chemical check-kite scheme to continue to operate. (Pl. Stmt. Facts, ¶64, 71)

The purpose of these deceptive efforts was to enable Gitto Global to pay to or on behalf of Maria Miller, and her husband, the amount of $957,514.33. These funds were used to support her luxurious lifestyle. (Pl. Stmt. Facts, ¶128)

**Louis Pellegrine**

Pellegrine was the outside accountant for Gitto Global from 1998 through 2003. (Pl. Stmt. Facts, ¶141) Pellegrine was indebted to Gary Gitto for a loan of $80,000. (Pl. Stmt. Facts, ¶142) Meanwhile, from July, 2002 to September, 2004, Gitto Global paid him the amount of $345,238.14. (Pl. Stmt. Facts, ¶143) However, Pellegrine did minimal, if any work, to earn the substantial payments. He merely duplicated information furnished by William Deakin to produce purportedly audited financial statements. *Id*.

To show his gratitude, Pellegrine set up Hemisphere, a fictitious company, by using an unsuspecting girlfriend, Kathleen Carland. (Pl. Stmt. Facts, ¶47) Carland became the president and signatory on a bank account. (Pl. Stmt. Facts, ¶48) Pellegrine initially funded the account and was subsequently reimbursed by Gitto Global. *Id*. To legitimize Hemisphere, Pellegrine

installed two phone lines in his office, listed his office as the company's registered office, received the mail, obtained a signature stamp for the bank account and prepared the taxes.  (Pl. Stmt. Facts, ¶49)  When the bank account was closed, funds in the account in excess of $1 million were left at his office and ultimately deposited in Gitto Global.  (Pl. Stmt. Facts, ¶50)

Pellegrine prepared tax returns for Hemisphere that showed <u>no</u> accounts payable in 2001 and 2002.  (Pl. Stmt. Facts, ¶¶94, 96)  Yet, he forwarded to LaSalle account receivable confirmations, bearing the signature but not actually signed by Carland, which showed Hemisphere owed Gitto Global in excess of $3 million in 2002 and in excess of $2 million in 2003.  Pellegrine also faxed to LaSalle account receivable confirmations in 2002 and 2004 from several fictitious companies.  (Pl. Stmt. Facts, ¶95, 96)  The confirmations in 2002 were sent in connection with LaSalle's take-out audit when it was confirming financial information before deciding to initially fund the revolving loan.  (Pl. Stmt. Facts, ¶94)  The 2004 confirmations were sent to LaSalle in connection with its field examination to evaluate the financial condition of Gitto Global in order to determine whether to continue funding the revolving loan.  (Pl. Stmt. Facts, ¶96)

Pellegrine also furnished to LaSalle an audited financial statement for Gitto Global in 2002, that was required under the Loan and Security Agreement to "influence" LaSalle with the exercise of its rights under the agreement.  (Pl. Stmt. Facts, ¶98)  He represented that the financial information was free of material misrepresentations.  *Id*.  However, he represented that receivables were in excess of $27 million and inventory was in excess of $6 million, which were substantially overstated.  *Id*.  This financial statement was false.

Pellegrine also prepared an audited financial statement for Gitto Global that was furnished to LaSalle pursuant to the Loan and Security Agreement in 2003.  (Pl. Stmt. Facts,

¶101) That financial statement did not show any tax obligations, included overstated receivables and inventory and again represented that the financial statement was free of material misrepresentations. *Id.* However, Pellegrine had been notified three months earlier that the IRS had assessed taxes and a civil fraud penalty for the periods of 2000 and 2001. (Pl. Stmt. Facts, ¶100) This financial statement was false.

### (ii)    Count II:  Check-kiting Conspiracy to Defraud

LaSalle in Count II alleges that the Defendants engaged in a check-kiting conspiracy to obtain funds from LaSalle to which they were not entitled. For summary judgment to be granted on this Count, LaSalle must show the following as to each individual:

> (a)    between July, 2002 and September, 2004, a check-kiting conspiracy was conducted through the use of the J&J Chemical Account and the Fleet Blocked Account;

> (b)    the individual was a knowing participant in the conspiracy; and

> (c)    the conduct of the conspiracy caused financial loss to LaSalle.

This Count is an alternative pleading that focuses on the check-kite operated through the J&J Chemical Account, one of the means used to defraud LaSalle to advance funds under the revolving loan.

In order to obtain funds from LaSalle, Gitto Global had to show sales of its products. Gitto Global's business was suffering, yet the cash needs of the Defendants were increasing, so they were in a dilemma as to how to generate cash. To obtain more money than was warranted by Gitto Global's actual sales, the Defendants executed a scheme in which fictitious sales were reported and a check-kite provided the appearance of payments received from those sales. J&J Chemical was used to provide the flow of funds supposedly coming from customers, but actually from the check-kite with Gitto Global checks.

As set out in detail in the preceding section, each of the Defendants knew, or had notice, of the check-kite and acted to further its goals:

- Frank Miller set up the J&J Chemical Account and, with the assistance of Maria Miller, on a daily basis orchestrated the operation of the check-kite by arranging for the creation and deposit of the numerous requisite reciprocal checks.

- All of the Defendants knew Gitto Global was reporting fictitious sales and that the company through which funds were generated to "pay" the amounts due from those fictitious sales, J&J Chemical, was a sham.

- Charles Gitto provided the funds to capitalize J&J Chemical.

- When Clinton Savings Bank created potential problems that jeopardized use of the J&J Chemical Account for the check-kite, Charles Gitto, Gary Gitto, Frank Miller, and Maria Miller promptly provided the necessary funds to keep the account operating with their only conceivable motive being to maintain the check-kite.

- Pellegrine knew that Gitto Global was obtaining loan funds from LaSalle based upon fictitious transactions and that Gitto Global had to have been employing some method to generate payments for these transactions, a check-kite certainly being one of the ways to do that. Pellegrine's knowing facilitation of a fraud being perpetrated against LaSalle makes him a co-conspirator in the other details of that fraud.

By allowing the check-kite scheme to operate, $1,009,659,366 in checks issued by J&J Chemical were deposited and cleared the Fleet Blocked Account. (Pl. Stmt. Facts, ¶27) In turn, LaSalle advanced $1,124,256 on the revolving loan to Gitto Global. (Pl. Stmt. Facts, ¶28) When Clinton Savings Bank finally stopped paying J&J Chemical checks, the Fleet Blocked Account was overdrawn in the amount of $11,890,588. (Pl. Stmt. Facts, ¶75) LaSalle suffered a loss in excess of $32 million. (Pl. Stmt. Facts, ¶30)

(iii)    **Count III: Deceptive Trade Practices**

LaSalle in Count III alleges that the Defendants used deceptive trade practices, in violation of Mass. Gen. L. c.93A, § 2 to induce LaSalle to enter into and to advance funds under the revolving loan. To obtain summary judgment against a defendant on this claim, LaSalle must show:

(a)    he or she used a deceptive trade practice;

(b)    which induced LaSalle to enter into the revolving loan arrangement or to loan funds to Gitto Global; and

(c)    as a result of such deceptive conduct, LaSalle suffered a loss of money. *United Musical Instruments USA, Inc. v. Gordon Music, Inc.,* 2006 US App Lexis 8868 (1st Cir. 2006) [citeable under 1st Cir. Rules?]; *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F3d 47, 56 (1st Cir. 1998).

To constitute a violation of § 2, the conduct "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce" (*Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989)); have "an extraordinary quality that gives it the rancid flavor of unfairness" (*Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 598 N.E.2d 666, 670 (Mass. App. 1992)); or fall "within at least the penumbra of some common-law, statutory, or other established conduct of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous" (*Cambridge Plating Co. v. Napco Inc.*, 85 F.3d 752, 769 (1st Cir. 1996)).  For example, if a defendant knowingly acted in a business context, "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for Ch. 93A purposes."  *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998).  Where there is a knowing or willful violation, Chapter 93A allows for the recovery of multiple damages.  See:  Gen. L. c.93A, §11(5).

The conduct of the Defendants named in this Count indisputably falls under § 2:

- Pellegrine, acting in his business as an accountant, knowingly provided false accounts receivable confirmations and false audit reports;

- Frank Miller, for more than 2 years, submitted over 500 false borrowing base certificates to LaSalle;

- Maria Miller helped create the false records to support the false borrowing base certificates; and

- Gary Gitto helped to finance the structure for the fraud and kept it operating.

The conduct of these individuals supported an elaborate scheme through which they created a loss of over $30 million for LaSalle.

**(iv)      Count IV:  Civil Conspiracy to Defraud**

Count IV alleges that the Defendants participated in a form of civil conspiracy under Massachusetts law, more commonly viewed as a means of fixing joint liability in tort.  To obtain summary judgment on this claim, LaSalle must show:

> (a)      the individual performed a tortious act;

> (b)      pursuant to  a common design or agreement, express or implied, with one or more persons to defraud LaSalle; and

> (c)      LaSalle was injured as a result of conduct performed pursuant to the common design; *Aetna Cas. Ins. Co. v. P&B Auto Body*, 43 F.3d 1546, 1564 (1st Cir. 1994); *Heinrick v. Sweet*, 49 F. Supp.2d 27, 44 (D. Mass. 1999).

Liability for civil conspiracy extends to those who merely assist in or encourage the tortious act. *Rathore v. Kelly,* 15 Mass. L. Rep. 210 (Mass. Sup. J. Ct. 2002).

As previously detailed, each of the Defendants performed complimentary and substantial roles in a massive scheme to defraud LaSalle through LaSalle's revolving loan to  Gitto Global.  Each of them received substantial amounts of money for helping to inflict a loss of $30 million on LaSalle.  These facts demonstrate that each of them must be found liable for civil conspiracy.

## Conclusion

The intricate fraud scheme carried out by the Defendants for over two years against LaSalle was calculated to permit them to live an opulent, yet misleading, lifestyle.   The Defendants' conspiracy to defraud was solely motivated by greed.  There is no genuine issue of material fact.   The Defendants must be found liable for RICO conspiracy, deceptive trade practices and civil conspiracy.  As such, they are jointly and severally liable for $32 million in compensatory damages and multiple damages for their knowing and willful conduct.

Dated:  July 28, 2006                                    Respectfully submitted,

                                                         LASALLE BUSINESS CREDIT, LLC


                                                         By:_____/s/ Patrick W. Manzo_____
                                                                      One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone:  (617) 367-9500

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300


### Certificate of Service

        I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 28, 2006.

                                                _____/s/ Patrick W. Manzo_____