# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC f/k/a )
LASALLE BUSINESS CREDIT, INC.,       )
                                                        )
            Plaintiff,          )
   v.                                              )        Case No. 04-12227-DPW
                                                        )
GARY C. GITTO, et al.,                      )
                                                        )
          Defendants.     )
_____ )

## LASALLE BUSINESS CREDIT, LLC'S STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

LaSalle Business Credit, LLC f/k/a LaSalle Business Credit, Inc. ("LaSalle"), by its attorneys, hereby submits it Statement of Material Undisputed Facts[1], pursuant to Local Rule 56.1.

## Parties

1.      LaSalle is a limited liability company organized and existing under the laws of the State of Delaware, with executive offices in Chicago, Illinois and a locus of operations in New York, New York.  LaSalle is a wholly-owned subsidiary of LaSalle National Leasing Corporation, which is a wholly-owned subsidiary of LaSalle Bank National Association, a federally-insured national banking association, which provides funding to LaSalle.  (Costanza Aff., ¶6)

2.      Gary C. Gitto ("Gary Gitto") is an individual, residing at 51 Meyer Hill Drive, Acton, Massachusetts.  Gary Gitto was the chief executive officer and treasurer of Gitto Global

---

[1] This Statement is supported by the affidavit of Eric S. Rein and discovery documents and affidavits attached thereto as Exhibits ("Rein Aff.").  The affidavits include: (a) the affidavit of Alyssa Whelpley ("Whelpley Aff."), (b) the affidavit of Craig Jalbert ("Jalbert Aff."), (c) the affidavit of Joseph R. Costanza ("Costanza Aff."), (d) the affidavits of Matthew Stilwell ("Stilwell Aff."), (e) the affidavit of Roger DeLisle ("DeLisle Aff."), (f) the affidavit of Oren White ("White Aff."), and (g) the affidavit of John Tersigni ("Tersigni Aff.").

Corporation ("Gitto Global"), a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Lunenburg, Massachusetts. (Costanza Aff., ¶7)

3.     Frank Miller is an individual, residing at the time of the lawsuit at 95 Kettle Hole Road, Bolton, Massachusetts and now residing in California. Frank Miller was the chief operating officer and president of Gitto Global. He is the sole owner of Kingsdale Corporation d/b/a J&J Chemical Distributors. (Costanza Aff., ¶8)

4.     Maria Miller is an individual, residing at the time of the lawsuit at 95 Kettle Hole Road, Bolton, Massachusetts and now residing in California. Maria Miller did the invoicing and supervised inventory at Gitto Global. She is married to Frank Miller. (Costanza Aff., ¶9; Deakin dep., p. 18:8-17)

5.     Charles N. Gitto, Jr. ("Charles Gitto") is an individual residing at 18 Nancy Court, Leominster, Massachusetts and was the chairman of the board of Gitto Global. He is also an officer and owner of Tradex International Corporation ("Tradex International") and Tradex Corporation ("Tradex"), which was Gitto Global's landlord. (Stilwell 11/8/04 Aff., ¶4)

6.     Louis J. Pellegrine, Jr. ("Pellegrine") is an individual who resides at 906 West Park Drive, Celebration, Florida. He was the accountant for Gitto Global and was involved in forming various corporations involved with Gitto Global. (Costanza Aff., ¶10)

7.     None of the foregoing individuals has filed an answer to the original complaint or any of the subsequent amended complaints. Each of the foregoing individuals have, through counsel, stated that if asked any questions in a deposition concerning any activities at, or which could be linked in any manner to activities at, Gitto Global, they would decline to answer on the grounds that their answer might tend to incriminate them. (Rein Aff., ¶3)

8.    Kingsdale Corporation is a corporation organized and existing under the laws of the State of Massachusetts with its principal place of business located at 77 Snead Drive, Mashpee, Massachusetts.  Kingsdale is doing business as J&J Chemical Distributors ("J&J Chemical").  Its original place of business was Frank Miller's brother's residence.  It is owned by Frank Miller.  (Costanza Aff., ¶11)

### LaSalle Loan

9.    Gitto Global was the product of a merger in 1992 between Gitto Corp, owned by Gary Gitto, and Global Products Corporation, owned by Frank Miller.  It was based in Lunenburg, Massachusetts and was a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, styrenic and thermoplastic olefin compounds that conform to strict industry guidelines.  Gitto Global's product was used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems.  Gitto Global was owned by Frank Miller, Gary Gitto and Nancy Gitto-Panagiotes.  (Stilwell 10/21/04 Aff., ¶4; Costanza Aff., ¶5)

10.    On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement ("Loan Agreement"), wherein LaSalle made a revolving loan not to exceed $27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's Eligible Accounts, as defined, and 65% of the lower cost or market value of Gitto Global's Eligible Inventory, as defined, or $6,000,000, whichever was less ("LaSalle revolving loan").  Eligible Accounts was defined, inter alia, under the Loan Agreement to be "genuine," to arise from the performance of services by Gitto Global and evidenced by an invoice that was due and payable within 30 days and not less than 90 days past due.  Eligible Inventory was defined, inter alia, as being owned by Gitto Global, located at one of its premises and held for sale.  In

addition, LaSalle agreed to make a term loan to Gitto Global in the original principal amount of $3,000,000 ("LaSalle term loan").  (Stilwell 10/21/04 Aff., ¶5)

11.    As part of the Loan Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, and a Term Note in the original principal sum of $3,000,000.  (Stilwell 10/21/04 Aff., ¶7)

12.    Pursuant to the terms of the Loan Agreement, Gitto Global was required to enter into a blocked account agreement with LaSalle and Gitto Global's depository bank in order to perfect LaSalle's security interest in Gitto Global's deposit accounts.  (Stilwell 10/21/04 Aff., ¶10)

13.    On or about July 25, 2002, Gitto Global, LaSalle and Fleet Bank ("Fleet") entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account Agreement").  (Stilwell 10/21/04 Aff., ¶11)

14.    Under the terms of the Blocked Account Agreement, Gitto Global established a deposit account bearing account number 9429271277 at Fleet ("Fleet Blocked Account").  (Stilwell 10/21/04 Aff., ¶12)

15.    The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account.  Also on a daily basis, Fleet was to deposit the available funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan.  (Stilwell 10/21/04 Aff., ¶13)

16.    The Loan Agreement provided that Gitto Global shall deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan,

accompanied by Gitto Global's sales, cash receipts and credit memo journals.  (Stilwell 10/21/04 Aff., ¶6)

17.     Beginning in July, 2002 and continuing through September, 2004, Gitto Global deposited numerous checks into the Fleet Blocked Account, on a daily basis, that were purportedly received as payment for invoices for goods sold.  (Stilwell 10/21/04 Aff., ¶16)

18.     Fleet, on a daily basis, would transfer the funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle ("LaSalle Account"), which LaSalle applied to pay down the LaSalle revolving loan.  (Stilwell 10/21/04 Aff., ¶18)

19.     As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global.  (Stilwell 10/21/04 Aff., ¶19)

## False Borrowing Base Certificates

20.     In order to receive advances of funds pursuant to the Loan Agreement, Frank Miller or Janice Chaisson ("Chaisson"), on behalf of Gitto Global, delivered daily borrowing base certificates to LaSalle, together with Gitto Global's sales, cash receipts, credit memo journals, and inventory valuation.  Each of these daily borrowing base certificates represented and warranted above the signature line as follows:

> The undersigned hereby represents and warrants to LaSalle Business Credit, LLC that the information set forth herein is true and correct as of the date made, that any Accounts Receivable or Inventory classified as "Eligible Accounts" or "Eligible Inventory" conform in all respects to the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth in the Loan and Security Agreement (or similar agreement) entered into by and between LaSalle Business Credit, LLC and the undersigned, as amended, modified or supplemented from time to time).

(Stilwell 10/21/04 Aff., ¶25)

21.     From July 25, 2002 to January 16, 2004, daily borrowing base certificates bearing Frank Miller's name were delivered nightly first by William Deakin, Gitto Global's controller,

and after September/October, 2002 by Chaisson, the account receivables clerk, with the detailed supporting documents, by fax and e-mail from Massachusetts to LaSalle in New York. From January 17, 2004 to September 15, 2004, Chaisson, sent the borrowing base certificates from Gitto Global in Massachusetts to LaSalle in New York via e-mail. Frank Miller would approve each borrowing base certificate before it was sent. (Chaisson dep., pp. 67:1-68:9, 74:13-75:15; Deakin dep., pp. 14:9-13, 16:14-17)

22.    In order to prepare daily borrowing base certificates to LaSalle, Chaisson would input the amount of sales and amount of deposits for the day. This information would come from the sales report and would include actual and fictitious sales. The deposits included deposits from J&J Chemical and from customers. (Deakin dep., pp. 82:9-83:9, 262:1-263:8, 264:17-22; Chaisson dep., pp. 29:23-30:7, 66:3-67:12, 71:17-72:5, 75:12-15)

23.    On or about July 25, 2002, Frank Miller provided the first borrowing base certificate to LaSalle. (Stilwell 10/21/04 Aff., ¶36)

24.    In the first borrowing base certificate submitted to LaSalle, Frank Miller knowingly represented Gitto Global's sales to be $28,477,170.80. Frank Miller included in this figure fictitious sales that never occurred. These false sales representations were that:

(a)    Zebulon Industries, Inc. ("Zebulon") made payments to Gitto Global totaling $362,750.25 for goods sold;

(b)    Velco Chemicals, Inc. ("Velco") purchased $133,292.65 in goods; and

(c)    Hemisphere Distribution Corporation ("Hemisphere") purchased $206,940.40 in goods.

(Stilwell 10/21/04 Aff., ¶35-36, Exh. J)

25.    Frank Miller, Deakin and Chaisson knowingly and intentionally made similar misrepresentations in the subsequent borrowing base certificates submitted to LaSalle with respect to Gitto Global's sales, collections and invoices, the magnitude of which only increased, in each subsequent Certificate from July 26, 2002 through September 15, 2004.  The fictitious accounts receivables were approximately $16.5 million.  (Stilwell 10/21/04 Aff., ¶37; Deakin dep., p. 165:4-5)

26.    LaSalle, in reasonable reliance upon the false information contained in the borrowing base certificates submitted by Gitto Global, advanced funds to Gitto Global in accordance with the Loan Agreement and the LaSalle revolving loan.  Gitto Global, on a daily basis, deposited numerous checks into the Fleet Blocked Account that it purportedly received as payment of invoices for goods sold.  Unbeknownst to LaSalle, the vast majority of these checks were drawn upon the J&J Chemical account at Clinton Savings Bank ("the J&J Chemical Account").  Between July, 2002 and September, 2004, Gitto Global disbursed $1,024,543,246 to J&J Chemical, which funds were deposited in the J&J Chemical Account.  (Jalbert Aff., ¶4; Stilwell 10/21/04 Aff., ¶¶16-17, 20)

27.    Fleet, on a daily basis, transferred the funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle which funds were then applied to pay down the revolving loan.  As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global which were deposited to the LaSalle account of Gitto Global.  LaSalle advanced funds on the revolving loan, relying on (a) the funds transferred from the Fleet Blocked Account and (b) the representations in the daily borrowing base certificates.  Between July, 2002 and September, 2004, $1,009,659,366 in checks issued by J&J Chemical from its account were deposited in the Fleet Blocked Account by Gitto

Global. This amount was reflected on Gitto Global's books as inflated sales figures to fictitious customers and overstated sales to one legitimate customer. (Jalbert Aff., ¶¶6-7; Stilwell 10/21/04 Aff., ¶¶17-20, 27, Exh. G)

28.    Based upon Gitto Global's monthly deposits of purported sales proceeds from J&J Chemical, the funds transferred from the Fleet Blocked Account and representations in the borrowing base certificates, LaSalle advanced $1,124,835,256 on the LaSalle revolving loan. (Stilwell 10/21/04 Aff., ¶38)

29.    On September 24, 2004, Gitto Global filed bankruptcy. (Stilwell 10/21/04 Aff., ¶14)

30.    As of July 26, 2006, there was due and owing from Gitto Global $32,224,053.00, plus interest and costs. (Costanza Aff., ¶12)

<u>**Account Receivable Fraud/Check-Kiting Scheme**</u>

**Evolution of the Fraud**

31.    In or around 1995, Frank Miller began prebilling orders in order to access more money on the line of credit with Gitto Global's bank. Frank Miller directed Maria Miller to release legitimate sales orders before they shipped and then to generate an invoice, as opposed to generating an invoice upon shipment. Accordingly, the sale was shown as a receivable earlier than it should have been. Frank Miller told Chaisson to hold the invoices and to keep track of the actual date of shipment so as not to demand payment from the customer before the product shipped. When there were not enough legitimate sales to prebill, Frank Miller devised a new scheme by directing the creation of fictitious sales and invoices against which to borrow. (Chaisson dep., pp. 126:17-128:10; Deakin dep., pp. 53:7-55:1, 59:7-60:7; Fuller dep., p. 65:7-24)

32.    This new scheme started in 1997, when Direct Wood & Paper Products, Inc. ("Direct Wood") was organized by Gary Gitto and an account was opened at Fleet to operate a check-kite scheme.  When a fictitious receivable became 90 days old, and therefore could no longer be used to borrow against, Frank Miller directed Rita Bartlett ("Bartlett"), Gitto Global's accounts payable clerk, to prepare a Gitto Global check for deposit in the Direct Wood account. Knowing that this was not legitimate, Frank Miller further directed that the checks be made out to Direct Chem, not Direct Wood, so that they could be mixed in with the chemical purchases and would not stand out.  Either Frank Miller or Gary Gitto signed these checks.  There were no invoices or shipping documents prepared for the checks to Direct Wood, unless there was an audit, then Frank Miller and Deakin created invoices and shipping records to substantiate the payments to Direct Wood.  (Kozak dep., pp. 49:22-50:2, 101:10-102:2, 105:20-106:10, 107:4-108:6; Chaisson dep., p. 57:9-16; Deakin dep., pp. 21:21-22:7, 25:9-20, 26:11-23, 28:24-33:1, 74:24-75:6, 284:8-286:23; Rein Aff. ¶4, Exh. 1)

33.    In turn, Helen Kozak ("Kozak"), Charles Gitto's and Gary Gitto's administrative assistant, would prepare a Direct Wood check payable to Gitto Global for Gary Gitto's signature. These checks would be applied against whichever fictitious invoice was to be taken off the books.  The Direct Wood checks all bore the signature of Gary Gitto.  (Deakin dep., pp. 284:8-286:23)

34.    At the end of 2000, Kozak received a call from Fleet questioning the activity in the account.  Since a blocked account was maintained at Fleet, it observed that Gitto Global was depositing money in its account and issuing checks in the same amount to Direct Wood.  Fleet requested that the account be closed and Kozak told Gary Gitto about that request.  Gary Gitto then instructed Kozak to close the Direct Wood account effective January 15, 2001.  (Kozak

dep., pp. 50:22-51:2, 101:10-102:2, 105:20-106:10, 107:4-108:6; Chaisson dep., p. 57:9-16; Deakin dep., pp. 20:24-21:9; Rein Aff. ¶4, Exh. 2)

**Creation of J&J Chemical and Use to Inflate Sales Revenue**

35.     J&J Chemical was created in April, 2001 to replace Direct Wood as a vehicle for purportedly paying invoices.  Frank Miller set up the J&J Chemical Account in his nephew's name, Thomas Sullivan, because he did not want anybody looking into the corporation as it did no real business.  When Marvin Miller, Sullivan's father-in-law, learned that Frank Miller had involved Sullivan in this enterprise, he demanded that Frank Miller take Sullivan's name off the account.  Frank Miller became the authorized signatory on the account.  The J&J Chemical Account was started through a loan of $1.5 million by Charles Gitto to Gary Gitto and Frank Miller.  The checkbook for the J&J Chemical Account was maintained in Chaisson's office. Frank Miller signed the checks from Gitto Global to J&J Chemical.  (Kozak dep., p. 118:18-23; Kozak dep., Exh. 41; Chaisson dep., p. 59:1-10; Deakin dep., pp. 19:20-20:5, 20:21-24; 34:15-20, 35:18-20, 36:24-37:15, 394:14-22, 396:18-23, 398:16-20)

36.     In order for Gitto Global to borrow under the LaSalle revolving loan, there needed to be collateral availability.  In order to artificially create availability, Gitto Global would inflate accounts receivable from fictitious customers and boost sales volume by applying payments against the loan from cash receipts received from J&J Chemical.  There was no money in J&J Chemical and its source of funds, for the most part, was Gitto Global.  The cash receipts from J&J Chemical would reduce the amount owed on the loan so that more money could be borrowed and the receivables created the basis to borrow this additional money.  (Deakin dep., pp. 82:5-83:18, 89:21-90:20, 161:23-162:9)

37.     Each day, Deakin would prepare a daily report based upon checks written the prior day and a separate page for checks that were mailed but not yet deposited for payment.

This daily report would be given to Frank Miller so he could determine how much in fictitious sales needed to be put on the borrowing base to create availability. He also needed to determine how much to pay down on the borrowing base to obtain that availability. Miller would then tell his wife, Maria Miller, how much in fictitious sales to "generate" on the books and tell Bartlett what volume or amount of checks she should write to J&J Chemical. (Deakin dep., pp. 17:2-3, 51:23-52:17, 60:8-61:11, 62:8-63:6)

38.    At Frank Miller's daily direction, and without an invoice, shipping receipt or purchase order, Bartlett would then prepare Gitto Global checks payable to J&J Chemical. The checks were either signed by Frank Miller or Frank Miller's signature stamp was affixed to the checks by Bartlett. These checks were invariably to be under $100,000 so that there would be same day availability. Deposits also were to be less than $4,000,000 a day so that there could be same day credit. (Deakin dep., pp. 60:8-17, 64:9-65:3, 65:5-16; Bartlett dep., pp. 51:6-11, 53:16-22; Chaisson dep., p. 16:6-12)

39.    After Bartlett prepared the checks, she would keep a copy in a file that she maintained and she would give the originals to Chaisson. Chaisson, at Frank Miller's direction, would make out reciprocal J&J Chemical checks for the same dollar amounts payable to Gitto Global. Deakin or Chaisson stamped the J&J Chemical checks with the signature of "John Tersigni." Chaisson recorded those checks as payments from fictitious customers on fictitious invoices that were going to be over 90 days. (Deakin dep., pp. 51:13-18, 65:4-16, 67:6-12, 68:3-11, 74:12-75:6; Bartlett dep., pp. 54:3-55:3; Chaisson dep., pp. 15:5-20, 16:23-18:24)

40.    Frank Miller or Deakin would deposit the Gitto Global checks made payable to J&J Chemical in the J&J Chemical Account by depositing with a teller or, if the bank was closed, in an ATM. (Deakin dep., pp. 65:17-66:21)

41.    The checks made payable to Gitto Global from J&J Chemical were added with the other cash receipts for the day.  Chaisson prepared the deposit slip and the checks were deposited into the Fleet Blocked Account by Frank Miller or other Gitto Global employees. (Chaisson dep., pp. 16:23-18:24; Deakin dep., pp. 65:17-66:10, 67:6-12)

**Creating Fictitious Sales**

42.    No invoices were created on a daily basis for the fictitious sales from J&J Chemical to Gitto Global.  But, Frank Miller had blank J&J Chemical invoices printed.  When a bank examiner requested information on a specific purchase, with Frank Miller's consent, Deakin, or someone else at Gitto Global, created a corresponding invoice to substantiate the purchase.  On the accounts payable side, if an examiner wanted to see where an item was purchased, with Frank Miller's consent, Deakin, or someone else at Gitto Global, took an invoice and changed the price and the extension to agree with what was stated on the inventory report. (Deakin dep., pp. 89:21-90:20, 96:12-97:9)

43.    To support the fictitious sales by Gitto Global, Frank Miller would direct Maria Miller to create fictitious sales orders to fictitious customers for the amount of money that he needed that day.  Maria Miller would then create invoices on the computer for fictitious customers.  The invoices would then instruct Dean Childs, the shipping clerk, to prepare the shipping documents based upon the sales order number on the invoices.  Chaisson would then go into the computer and print the invoices.  After printing, Chaisson filed the bills of lading and the invoices in a filing cabinet in chronological order by customer name.  Maria Miller kept track of the open fictitious invoices by asking Chaisson about the details on a regular basis.  The computer system would automatically generate an aging once the invoice was entered into the system.  (Deakin dep., pp. 18:3-4, 62:10-17, 85:6-86:9, 88:23-89:6, 263:14-18, 264:17-22;

Chaisson dep., pp. 29:23-30:13, 33:8-34:20, 36:17-19, 37:2-8, 38:23-39:3, 44:20-45:21, 46:21-47:7; Chaisson dep., Exh. 6; Fuller dep., p. 60:13-23)

44.    The fictitious sales were purportedly made to J-Tan Sales and Marketing, Inc. ("J-Tan"), Hemisphere, Color Compounds & Consultants, Inc. ("CCC"), Velco, Zebulon, and Hitachi Cable, Inc. ("Hitachi") (also collectively "the fictitious customers").  These sales were segregated by customer code 99.  (Chaisson dep., pp. 25:22-29:22, 39:11-40:3; Deakin dep., p. 38:10-21)

45.    Maria Miller, Frank Miller and Deakin told Chaisson about the fictitious customers, and explained that they were maintained and tracked using a "99" customer code. Chaisson kept two sets of books to keep track of the real corporate activity at Gitto Global versus the fictitious activity.  A summary of the fictitious sales and collections, and the actual sales and collections is as follows:

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| July – 02 | $ 1,278,810 | $ 78,810 | $ 2,206,314 | $ 206,314 |
| August – 02 | $ 8,815,527 | $ 3,619,632 | $ 8,058,446 | $ 2,862,550 |
| September – 02 | $ 6,552,837 | $ 2,678,900 | $ 6,906,243 | $ 3,032,307 |
| October – 02 | $ 12,557,440 | $ 1,826,091 | $ 11,911,623 | $ 1,160,274 |
| November – 02 | $ 11,206,090 | $ 4,940,552 | $ 11,076,928 | $ 4,811,390 |
| December – 02 | $ 10,621,281 | $ 3,217,464 | $ 10,825,588 | $ 3,421,770 |
| January - 03 | $ 11,285,811 | $ 2,912,933 | $ 11,307,584 | $ 2,934,706 |
| February – 03 | $ 13,767,617 | $ 1,639,129 | $ 13,428,035 | $ 1,299,546 |
| March – 03 | $ 17,111,121 | $ 4,333,268 | $ 17,989,492 | $ 5,211,639 |
| April – 03 | $ 16,393,943 | $ 2,129,290 | $ 16,861,179 | $ 2,596,526 |
| May – 03 | $ 17,676,634 | $ 3,503,422 | $ 17,315,021 | $ 3,141,809 |
| June – 03 | $ 21,337,796 | $ 4,204,053 | $ 21,454,438 | $ 4,320,695 |
| July – 03 | $ 25,902,881 | $ (486,000) | $ 26,243,609 | $ (145,272) |
| August – 03 | $ 31,725,765 | $ 1,957,613 | $ 31,548,658 | $ 1,780,506 |
| September – 03 | $ 38,077,352 | $ 1,033,873 | $ 39,132,440 | $ 2,088,961 |
| October – 03 | $ 55,968,861 | $ 5,918,637 | $ 56,432,129 | $ 6,381,904 |
| November – 03 | $ 50,994,495 | $ 5,811,804 | $ 50,144,000 | $ 4,961,309 |
| December – 03 | $ 63,380,646 | $ 380,646 | $ 63,338,487 | $ 338,487 |

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| January – 04 | $    62,723,884 | $    3,210,133 | $    62,414,067 | $    2,900,316 |
| February – 04 | $    63,745,043 | $    (302,115) | $    64,349,419 | $    302,261 |
| March – 04 | $    83,804,496 | $    2,811,831 | $    84,177,796 | $    3,185,132 |
| April – 04 | $    86,088,250 | $    3,500,669 | $    87,493,856 | $    4,906,274 |
| May – 04 | $    74,422,760 | $    2,698,662 | $    74,263,805 | $    2,539,708 |
| June – 04 | $    91,495,847 | $    3,215,151 | $    91,703,488 | $    3,422,792 |
| July – 04 | $    92,079,534 | $    3,220,424 | $    91,966,853 | $    3,107,743 |
| August – 04 | $    90,819,019 | $    4,205,334 | $    90,761,602 | $    4,147,917 |
| September 15, 2004 | $    41,370,938 | $    1,437,823 | $    41,190,439 | $    1,257,324 |
|  |  |  |  |  |
| **Total** | **$ 1,101,204,678** | **$    73,698,029** | **$    1,104,501,539** | **$    76,174,888** |

(Chaisson dep., pp. 22:6-21, 31:9-13, 32:1-3, 38:17-19, 39:23-40:3, 40:18-19, 41:7-17; Chaisson dep., Exh. 1, 2, 3; Stilwell 10/21/04 Aff., ¶39; Stilwell dep., p. 34:12-19; Stilwell dep., Exh. 11)

## **Fictitious Customers**

**Hemisphere**

46.     Hemisphere was not a real company.  Pellegrine set up Hemisphere for Frank Miller.  Miller maintained the checkbook.  Its sole purpose was to bill fictitious invoices. (Deakin dep., p. 47:6-9; Chaisson dep., pp. 27:6-20, 48:7-9)

47.     In 2001, Pellegrine asked Kathleen Carland, his girlfriend, if she wanted to sit on the board of directors of a company because the company was looking for a minority director. After she expressed an interest, Carland met Frank Miller to make sure she was interested. (Carland dep., pp. 17:23-24, 18:8-9, 18:11-12, 20:23-21:3, 23:2-7)

48.     On or about July 23, 2001, Pellegrine told Carland to meet him at Sovereign Bank.  There, they met with a banker to set up a bank account for Hemisphere.  This was the first time Carland had ever heard the name.  Pellegrine told the banker the name of the company, that it had something to do with chemicals and gave the banker a check to open the account. Pellegrine told the banker that Carland was the president and the company address was Carland's

home in Marlborough, Massachusetts.  The Hemisphere account was later funded with a check for $5,000 from Pellegrine.  Pellegrine was eventually reimbursed for that expenditure by Gitto Global.  (Deakin dep., p. 48:1-12; Carland dep., pp. 26:10-11, 27:17-23, 28:1-7, 28:17-18, 29:2-3, 29:22, 31:23-24; Carland dep., Exh. 16, 17)

49.    After Hemisphere's account was established, Pellegrine's involvement with Hemisphere included:  (i) installing two telephone lines at his office, (ii) listing his office as the corporation's registered office, (iii) receiving all mail sent to Carland for Hemisphere, (iv) obtaining a signature stamp to be used in connection with the Hemisphere account, (v) maintaining the checkbook; and (vi) preparing the federal tax returns.  (Carland dep., pp. 41:2-9, 43:16-17, 44:14-16, 45:19-22, 46:11-13, 55:1-4; Rein Aff., ¶4, Exh. 3, 4)

50.    Carland never wrote any checks on the account and never made any deposits into the account.  In December, 2001, Carland received a call from Sovereign Bank to come to the bank to close the Hemisphere account.  In doing so, she was given a check for $1,005,878.23 that she endorsed and gave to Pellegrine's secretary at his office.  That check was deposited in Gitto Global's account.    (Carland dep., pp. 20:23-25:21, 54:16-21, 56:23-57:8, 59:5-8, 60:4-11; Carland dep., Exh. 20; Chaisson dep., p. 27:6-20)

**J-Tan**

51.    J-Tan was not a real company.  In September, 2001, John Tersigni formed J-Tan, for the purpose of serving as a distributor of certain virgin and certified plastics.  (Tersigni Aff., ¶6)

52.    In May, 2002, Frank Miller proposed that J-Tan handle several small accounts for Gitto Global.  To begin the arrangement, Frank Miller and Gary Gitto wire transferred the amount of $380,000 into J-Tan's bank account.  Subsequently, Frank Miller told John Tersigni that a pending Gitto Global deal had fallen through and that there would be no arrangement with

J-Tan.  J-Tan returned all but $2,000 to Frank Miller and Gary Gitto.  J-Tan never purchased nor sold any products from, or did any business with, Gitto Global.  (Tersigni Aff., ¶¶15-16, 19-20)

53.    Frank Miller maintained the J-Tan checkbook.  (Deakin dep., p. 96:5)

**Hitachi**

54.    Hitachi was a customer of Gitto Global, but for much less than the sales shown. (Chaisson dep., pp. 25:22-29:22, 39:11-40:3; Deakin dep., p. 38:10-21)

55.    Because Hitachi was a big company, Frank Miller could hide fictitious sales within the real sales, so long as the auditing bank did not send regular receivable confirmations to Hitachi.  (Deakin dep., pp. 43:14-44:20)

**CCC**

56.    CCC was a customer of Gitto Global, but for much less than the sales shown. (Deakin dep., pp. 38:10-21, 120:4-5, 121:12-13)

57.    Frank Miller could hide fictitious sales, so long as the auditing bank did not send regular receivable confirmations to CCC.  (Deakin dep., pp. 43:18-44:4)

**Velco**

58.    Velco sold raw materials to Gitto Global at one time, but were not customers. Frank Miller told Chaisson not to send any invoices to Velco because the invoices were not for real sales.  (Chaisson dep., pp. 25:22-29:22, 39:11-40:3; Deakin dep., pp. 49:13-50:17, 120:1-3, 121:9-11)

**Zebulon**

59.    Zebulon sold raw materials to Gitto Global at one time, but were not customers. Frank Miller told Chaisson not to send any invoices to Zebulon because the invoices were not for real sales.  (Chaisson dep., pp. 25:22-29:22, 39:11-40:3; Deakin dep., p. 38:10-21, 120:1-3, 121:9-11)

**Daily Borrowing Base Certificate Fraud**

60.    The daily borrowing base certificates submitted to LaSalle were submitted by either Frank Miller or Deakin and then later by Chaisson.  Before Chaisson submitted the certificates, either Frank Miller or Deakin reviewed them.  The borrowing base certificates included fictitious sales, as well as actual sales, and deposits from J&J Chemical, as well as actual deposits.  On occasion, Frank Miller or Deakin made changes to the certificates increasing sales.  In order to support the increase in sales, Frank Miller or Deakin would process more phony sales by having Maria Miller issue a fictitious invoice and Childs prepare a fictitious bill of lading.  Once Frank Miller or Deakin approved the certificate, Chaisson submitted to LaSalle a summary of the sales for the day, which included fictitious sales from the fictitious customers, and the borrowing base certificate.  Frank Miller and Deakin told Chaisson to whom at LaSalle to submit the certificates.  When the borrowing base certificates were submitted via facsimile, Frank Miller's signature was affixed on them.  (Chaisson dep., pp. 66:3-75:15; Chaisson dep., Exh. 6, 7; Doherty dep., pp. 22:18-23:7)

<u>**Clinton Savings Bank Credit Agreement**</u>

61.    The J&J Chemical Account was also described as the "brokerage account."  The brokerage business was used as a mechanism to separate the fictitious receivables and inventory from the legitimate receivables and inventory.  For instance, on November 20, 2002, Frank Miller sent Antony Gordon of Golden International Corp. financial information, a "breakdown of brokerage business from compound business" and indicated that the brokerage business would be closed if the compound business could be sold.  The letter and financial information were copied to Charles Gitto.  When letters were copied to Charles Gitto, Kozak made sure he got them.  (Deakin dep., pp. 39:9-16, 154:6-10, 172:16-22, 187:16-22; Kozak dep., p 126:17-19; Rein Aff. ¶4, Exh. 5)

62.     Clinton Savings Bank had a policy of allowing all of its business customers to "draw against uncollected funds" in an unlimited amount.  (Tenaglia dep., pp. 11:15-24)

63.     In April and May, 2002, J&J Chemical checks were returned for insufficient funds.  As a result, Clinton Savings Bank required for six months until November, 2002, that J&J Chemical checks be paid only when there was sufficient funds in the J&J Chemical Account. (Williams dep., pp. 14:4-15:10, 16:14-17:6, 18:10-19:19)

64.     To ensure that the J&J Chemical Account had cleared funds in order for the check-kite scheme to be able to operate despite Clinton Savings Bank's control, Frank Miller wire transferred to J&J Chemical the sum of $250,000 on May 24, 2002, and $130,000 and $330,000 on November 13, 2002.  Similarly, Charles Gitto wire transferred $150,000 on June 4, 2002 and $150,000 on June 6, 2002, to the J&J Chemical Account.  Gary Gitto wire transferred $250,000 on May 24, 2002, $130,000 on June 4, 2002, $160,000 on June 5, 2002 and $100,000 on November 13, 2002 to the J&J Chemical Account.  (Kozak dep., p. 118:18-23; Kozak dep., Exh. 41; Chaisson dep., p. 59:1-10; Williams dep., pp. 16:11-17:6, 18:8-14; Tenaglia dep., pp. 10:17-11:21; Rein Aff., ¶4, Exh. 6, 7)

65.     On December 1, 2003, Clinton Savings Bank met with Frank Miller to review the activity in the J&J Chemical Account, which had risen to $2-3 million per day.  Clinton Savings Bank thought the activity was "unusual" and had become too large for a bank Clinton Savings Bank's size.  Recollections of the Clinton Savings Bank employees who attended that meeting differed as to Frank Miller's subsequent explanation.  Michael Tenaglia, a bank officer, recalls Frank Miller saying that the activity between Gitto Global and J&J Chemical was the result of licensing – one company licensed to purchase certain raw materials and the other licensed to process the raw materials.  On the other hand, Robert Paulhus, another bank officer, recalled that

Frank Miller explained that the activity was due to licensing agreements with certain vendors and/or customers and to enable materials to be acquired from certain vendors when those vendors knew that the materials would be sold to a competitor. The activity was also based on the advice of accountants. Paulhus did not understand this explanation. Nonetheless, both Tenaglia and Paulhus recall that Frank Miller was asked to stop the activity, to which Frank Miller responded by asking that Clinton Savings Bank wait to take action until Gitto Global could be sold to a company in California, Vitrotech, after the first of the year, at which time he would close the J&J Chemical Account. (Tenaglia dep., pp. 24:1-26:15; Paulhus dep., pp. 11:21-13:21)

66.     In March, 2004, Frank Miller told Clinton Savings Bank that a purchase and sale agreement between Gitto Global and Vitrotech was about to be signed and that the purchases of raw materials between J&J Chemical and Gitto Global was expected to "wind-down and close after the sale." (Tenaglia dep., pp. 29:24-32:22; Clinton dep., Exh. 3)

67.     On June 30, 2004, Clinton Savings Bank agreed to pay checks presented against the J&J Chemical Account on uncollected funds until July 15, 2004, in part, based upon Gitto Global's execution of a guaranty and security agreement. (Clinton dep., Exh. 35)

68.     On July 23, 2004, Clinton Savings Bank provided J&J Chemical with an $8.4 million credit line for the sole purpose of providing payment for checks drawn on the account. The line was only to be utilized if checks drawn against uncollected funds were returned. It was not a loan, only a way to cover uncollected funds. In almost 30 years of banking experience, Joseph Guercio had never documented a similar transaction. (Guercio dep., p. 26:7-10, Clinton Dep., Exh. 14)

69.    This credit line was secured by various pieces of collateral.  As Guercio indicated, "we really didn't care what the collateral was and we weren't thinking in terms of perfecting it. We will just take whatever they'll give us.  I mean, we looked at it that we already had exposure so whatever collateral we could get that would lessen the exposure we are going to take." (Guercio dep., pp. 22:7-23:15)

70.    At the loan closing, Gary Gitto was unwilling to collaterally assign proceeds of Gitto Global from the sale to Vitrotech because it may put a chill on the pending sale.  Gary Gitto confirmed the strong desire for the sale to take place and that "was important for them."  In consideration for the line of credit given to J&J Chemical, Gary Gitto executed and delivered a limited non-recourse guaranty and wire transferred $500,000 that was deposited in an account at Clinton Savings Bank and pledged to the bank.  (Paulhus dep., pp. 41:6-23, 42:1-8, 42:24-43:19, 58:13-16, 58:24-59:14, 82:10-15, Clinton dep., Exh. 25, 26, 27, 28, 29)

71.    Frank Miller and Maria Miller executed a mortgage in favor of Clinton Savings Bank to secure the J&J Chemical line of credit and pledged $500,000 as collateral to Clinton Savings Bank.  (Clinton dep., Exh. 23, 24)

72.    Charles Gitto also attended the closing of the J&J Chemical credit agreement with Clinton Savings Bank.  He confirmed the need to keep the J&J Chemical Account open in order to allow Gitto Global to be sold and "for everything to come together."  Charles Gitto further confirmed that his company, Tradex, which owned the real estate where Gitto Global operated, also owned certain Vitrolite inventory that was being pledged as collateral to Clinton Savings Bank.  Charles Gitto signed a limited non-recourse guaranty and security agreement on behalf of Tradex that enabled the J&J Chemical Account to continue to be able to draw checks on

uncollected funds and therefore continue the check-kite scheme. (Paulhus dep., pp. 44:8-16, 45:3-12; Clinton dep., Exh. 32, 35)

73.    Subsequently, between August 9 and 18, 2004, Charles Gitto spoke several times with Paulhus at Clinton Savings Bank concerning the need for more collateral in order for Clinton Savings Bank to agree to extend the credit agreement. Eventually, on August 18, 2004, Charles Gitto signed an extension letter and a guaranty in order to induce Clinton Savings Bank to extend the maturity date of the credit agreement to September 15, 2004, preserving the check-kite scheme. (Paulhus dep., pp. 78:13-81:21, 87:3-6; Clinton dep., Exh. 15, 18)

74.    Also in response to Clinton Savings Bank's need for additional collateral to continue the credit agreement and the operation of the check-kite, in August, 2004, Gary Gitto executed and delivered an unlimited guaranty. (Paulhus dep., p. 87:18-20; Clinton dep., Exh. 30)

75.    Between September 13-17, 2004, Gitto Global deposited into the Fleet Blocked Account over $12,000,000 in J&J Chemical Account checks made payable to Gitto Global. Fleet wired those funds to LaSalle in three separate wire transfers. In reliance upon these deposits, and in response to Gitto Global's request for advances, LaSalle advanced approximately $4,000,000. When J&J Chemical did not pay the amount of its revolving loan, Clinton Savings Bank dishonored $11,890,588 in checks drawn on the J&J Chemical Account that Gitto Global had deposited in the Fleet Blocked Account and Fleet returned the checks for insufficient funds, resulting in an overdraft in the Fleet Blocked Account. (Stilwell 10/21/04 Aff., ¶¶22-24)

### Account Payable Misrepresentations

76.    Beginning in 1997, when Bartlett was first hired by Gitto Global as the accounts payable clerk, she was instructed by Frank Miller and Gary Gitto that invoices from the large raw materials suppliers were not to be entered into the computer system, but instead, kept in a

file cabinet drawer. She called this drawer the "secret garden". Deakin and Frank Miller would tell her which invoices to put in the "secret garden" and when to pay those invoices. When Bartlett was told by Frank Miller to pay the invoices, she would take them out of the "secret garden", hand cut the checks and then keep a copy of the check with a copy of the invoice in each customer's folder. Prior to using a signature stamp and when Frank Miller was unavailable, Gary Gitto would sign checks for suppliers that came out of the drawer. (Bartlett dep., pp. 16:23-17:14, 30:2-15, 30:24-31:9, 31:14-18, 38:21-43:15, 45:1-20, 55:19-57:13; Deakin dep., pp. 128:17-129:6, 129:24-130:5, 130:17-131:22)

77.    Therefore, Gitto Global would be purchasing product and not showing the account payable. The inventory value would increase, but there would be no corresponding entry on the expense side for the account payable. Ninety-five percent of the raw materials purchased were not being shown on Gitto Global's payables records. From 2002-2004, the unrecorded payables were roughly $8-9 million. (Deakin dep., pp. 128:11-131:22)

### Inventory Misrepresentation

78.    Since 1994, there were several ways in which Gitto Global misrepresented its inventory. First, Gitto Global would mark the product packaging with the product code for a more expensive product. Since 2000, Frank and Maria Miller would do so by instructing David Minardi, the purchasing manager, to change the identification of compounds being produced to more expensive ones. Although the proper fabrication formula was followed, the lot number and description of the product were changed to indicate a different, more expensive product than the product actually contained in the package. For example, Frank Miller directed that the Gitto Global supply of calcium carbonate or PVC resin on hand be mislabeled Teflon. This drastically increased the value of the product as PVC resin cost approximately $.40 per pound and Teflon cost from $6 to $21 per pound. Minardi maintained a book in which these changes were

recorded that he would give to Frank and Maria Miller after inventory was taken.  (Minardi dep., pp. 8:6-9, 8:18-9:5, 15:24-20:23, 23:6-24:13, 25:23-24, 53:14-19; Minardi dep., Exh. 1; Fuller dep., p. 57:6-11; Moritz dep., pp. 66:9-67:24)

79.    Second, Gitto Global overstated the cost of product inventory on the valuation. Maria Miller would instruct Robyn Merchant, the inventory control clerk, to increase the physical count on her monthly inventory reports.  Maria Miller would also tell Merchant to increase the price of the product.  Merchant would then generate a new report with these inflated amounts.  As a result, Gitto Global overstated the amount of expensive products, such as Viton B-600, actually in inventory.  This overstatement, in turn, significantly inflated the value of Gitto Global's inventory.  The inventory values of Vitrolite products, a volcanic ash rylite material refined and sold to the plastics industry, were also changed every month by increasing the value of the products and pounds in inventory.  As time went on, the number of adjustments made at Maria Miller's direction increased and the higher value inventory was adjusted on a more consistent basis than lower value inventory.  (Merchant dep., pp. 5:17-22, 18:10-26:2, 29:6-30:5, 32:11-15, 39:6-41:1, 44:10-45:24; Deakin dep., p. 119:2-7; Fuller dep., p. 57:12-23; Booth dep., pp. 13:25-14:6)

80.    In or around 2002, this inventory adjustment procedure changed.  Maria Miller directed Merchant to talk to Deakin about whether the adjustments made per her direction were sufficient.  Deakin reviewed the adjustments and decided whether the adjustments needed to "go up" or "go down".  Merchant relayed Deakin's comments to Maria Miller who then made further adjustments based upon Deakin's review until both were satisfied that the inventory value was as it needed to be.  (Merchant dep., pp. 18:10-26:2, 29:6-30:5, 39:6-41:1)

81.     Because of the monthly inventory adjustments that Maria Miller directed, the actual inventory level at Gitto Global was unknown.  As such, in or around May of 2004, Gitto Global had to conduct a physical inventory.  After that time, Maria Miller made no further monthly adjustments to the inventory level, she only directed changes in inventory pricing to change the value of the inventory.  (Merchant dep., pp. 37:1-8, 37:13-18, 44:16-45:11)

82.     Third, the Vitrolite product was included in inventory initially in June, 2003, when it was bought through a series of promissory notes.  These notes were not reflected on the financial statements because Frank Miller did not want "to do any more playing around with the inventory."  As a result, the purported Vitrolite purchase enabled Gitto Global to increase the inventory value under its borrowing base certificate from $6,244,253 on June 30, 2003 to $9,012,009 on September 4, 2003.  This increased the amount Gitto Global could borrow based upon its inventory from $4,010,940 to $5,816,481.  On April 1, 2004, the purchase was changed to a sale on consignment, but that change was not reflected in Gitto Global's books.  It should have been removed as inventory, which would have reduced the inventory figure by $2-3 million.  (Fuller dep., p. 58:8-10; Deakin dep., pp. 168:7-18, 216:4-217:19; Booth dep., Exh. 6, 25)

83.     Fourth, inventory would be moved into the warehouse from another company whenever a bank examiner was coming to Gitto Global to do a physical count.  Or, inventory would be purchased early so it could be on hand when the count occurred.  These invoices would go in the "secret garden" so that a bank would not know of the payables.  (Fuller dep., pp. 56:3-57:1; Deakin dep., p. 153:9-13)

84.     Specifically, when LaSalle would come to perform an inventory audit, Frank Miller would (i) increase the volume on some of the quantities of certain items, (ii) increase

prices on certain items, (iii) fill up the tanks with resin and (iv) purchase more inventory without reflecting increased accounts payable.  (Deakin dep., pp. 235:24-236:12)

<u>**False Audit and Examination Information**</u>

85.    In 1999, in order to generate phony checks to substantiate phony sales and fictitious invoices for auditors, Frank Miller bought a software program called "Versa Check Writer" and had it installed on Deakin's computer.  Deakin made out the checks and Frank Miller ensured that a signature was affixed on the checks.  (Deakin dep., pp. 97:20-99:24, 101:5-19; Deakin dep., Exh. 8, 9)

86.    In 2001, Frank Miller had a scanner installed in his office, along with a software package called PaperPort Suite, which allowed the manipulation of scanned documents.  Using the scanner and software, John Moritz ("Moritz"), at one time Gitto Global's vice president of research and development, was able to alter various items on invoices and checks, including the terms, quantity and amount.  When bank examiners came to Gitto Global, Moritz would sit in Frank Miller's office and either Deakin or Frank Miller would bring him a copy of a document that they wanted altered.  Moritz would alter the documents as requested, Deakin, Frank Miller and Maria Miller would review the altered document for accuracy and Frank Miller or Deakin, would provide the documents to the examiner.  Moritz did this for the fictitious customers and J&J Chemical.  Afterwards, Moritz would shred the documents.  (Moritz dep., pp. 7:13-18, 8:1-7, 11:10-12:1, 42:4-52:9, 59:6-11, 72:10-73:19, 75:22-76:6; Moritz dep., Exh. 1; Deakin dep., pp. 93:4-96:2, 162:19-24)

87.    In initially considering whether to provide financing, LaSalle conducted a field audit at Gitto Global from May 15-17, 2002.  At the time, Gitto Global provided financial information to LaSalle, including that accounts receivable was $22,065,600, inventory was $6,131,202 and accounts payable was $1,098,030.  (Costanza Aff., ¶4)

88.    On July 23-26, 2002, Alyssa Whelpley, a field examiner for LaSalle, conducted a take-out audit of Gitto Global's financial condition in order to bring the collateral information current for the closing of the revolving loan.  (Whelpley Aff., ¶4-5)

89.    On July 25, 2002, Frank Miller, in a series of conference calls, purportedly called the top seven customers with account receivable balances to confirm the amount of each of their receivable in which Whelpley participated.  Those top seven included Hitachi, Zebulon, J-Tan, Velco and CCC.  (Whelpley Aff., ¶6; Stilwell 10/21/04 Aff., ¶45)

90.    During the take-out audit, Gitto Global provided LaSalle with financial information showing that accounts receivable was $23,714,705, inventory was $6,290,138 and accounts payable was $680,775.  (Stilwell 12/6/04 Aff., ¶28, Ex. Q)

91.    In deciding to provide the financing, LaSalle relied upon the audited financial statement of Gitto Global as of June 30, 2001 prepared by Pellegrine, which Pellegrine represented were free of material misstatements.  That balance sheet showed accounts receivable of $21,375,595 and inventory of $6,677,095.  (Rein Aff., ¶4, Exh. 8)

92.    LaSalle relied upon the representations made to begin its lending relationship with Gitto Global.  (Stilwell 10/21/04 Aff., ¶47)

93.    The field examiners of LaSalle were also told by Deakin that J&J Chemical was paying Gitto Global on a COD basis, which was why there were daily checks.  Deakin never said that J&J Chemical was not selling any product.  He did, however, give them invoices showing that J&J Chemical was the supplier of Viton B-600 inventory, when it was not.  These invoices had been printed in blank by Frank Miller and Deakin would merely type in the information based upon the material selected.  He would enter a quantity based on its unit price so that it equaled the amount of the check.  (Deakin dep., pp. 89:21-90:20, 194:21-196:4)

94.     As part of the July, 2002 take-out audit, Pellegrine furnished several financial records to LaSalle on which it relied.  First, he prepared the 2001 federal income tax return for Hemisphere, which showed no accounts payable as of June 30, 2002.  However, on July 5, 2002, Pellegrine obtained an account receivable confirmation purportedly from Hemisphere dated July 12, 2002 that was furnished to LaSalle, which bore the signature of Carland and represented that Hemisphere owed Gitto Global $3,161,866.40 as of June 30, 2002.  Carland testified that this confirmation did not bear her signature.  (Carland dep., p. 63:1-5; Carland dep., Exh. 21)

95.     Third, on July 25, 2002, from Massachusetts, Pellegrine obtained and faxed to LaSalle in New York, at Frank Miller's direction, account receivable confirmations from Zebulon showing a balance due of $2,960,058.43 and from Hitachi showing a balance due of $4,440,999.21 as of June 30, 2002.  Those sales were fictitious.  (Stilwell 10/21/04 Aff., ¶46; Chaisson dep., pp. 25:24, 26:1-14, Rein Aff., ¶4, Exh. 9)

96.     Later, in connection with LaSalle's February 2004 field examination, on February 12, 2004, Pellegrine faxed from Massachusetts to LaSalle in New York a confirmation from Hemisphere bearing the signature of Carland and representing that it owed Gitto Global $2,415,032.35 as of December 31, 2003.  Carland testified that this confirmation did not bear her signature.  Yet, he prepared the Hemisphere federal tax return for the period covering December 31, 2003, which showed no accounts payable owed by Hemisphere.  He also faxed on February 12, 2004, at Frank Miller's direction, from Massachusetts to LaSalle in New York account receivable confirmations from Zebulon showing a balance due of $3,167,545.55, from Hitachi showing a balance due of $5,099,147.94, from J-Tan showing a balance due of $3,115,811.10, and from CCC showing a balance due of $2,537,868.53 as of December 31, 2003.  These sales

confirmations were false. (Carland dep., p. 63:17-21; Carland dep., Exh. 22; Stilwell 10/21/04 Aff., ¶57; Rein Aff., ¶4, Exh. 10)

97.     The Loan Agreement between LaSalle and Gitto Global provided, *inter alia*, that Gitto Global was to furnish audited annual financial statements by an independent CPA selected by Gitto Global, the intent of which was to "influence" LaSalle with the exercise of rights under the agreement. (Stilwell 10/21/04 Aff., Exh. A, Section 9(c))

98.     On December 2, 2002, Pellegrine furnished an audited financial statement as of June 30, 2002 that was furnished to LaSalle by Gitto Global pursuant to the Loan Agreement. The balance sheet showed accounts receivable of $27,432,953 and inventory of $6,322,174. Pellegrine represented that the financial statement was free of material misrepresentation. (Rein Aff., ¶4, Exh. 11)

99.     The Loan Agreement provides, *inter alia*, that Gitto Global shall pay all taxes when due and that the failure to do so constitutes a default under the agreement. (Stilwell 10/21/04 Aff., Exh. A, Sections 12(h), 15(b))

100.     On July 16, 2003, Pellegrine received a copy of a letter from the Internal Revenue Services notifying Gitto Global of tax assessments and penalties for 2000 and 2001 totaling $1,752,875. A part of the assessment included a "Civil Fraud Penalty" because the taxpayer had been informed and warned about similar tax issues in 1998 and 1999 and had continued to (i) substantially overstate deductions, (ii) deduct substantial amounts of personal expenditures with no substantiation; (iii) claim fictitious deductions, (iv) conceal records, (v) fail to reconcile books with tax return, (vi) fail to locate fixed asset journal, (viii) hinder examination and (ix) fail to follow advice of accountant. Pellegrine knew about the monies owed the Internal Revenue

Service since he was intimately involved in the audit.  (Deakin dep., pp. 179:22-180:7; Deakin dep., Exh. 21)

101.    On November 12, 2003, Pellegrine furnished an audited financial statement as of June 30, 2003 that was furnished to LaSalle by Gitto Global pursuant to the Loan Agreement. The balance sheet showed accounts receivable of $25,822,073 and inventory of $7,899,049.  The financial statement did not show the tax obligation.  Pellegrine represented that the financial statement was free of material misrepresentations.  (Rein Aff., ¶4, Exh. 12)

## Efforts to Sell Gitto Global

**The Alpine Group**

102.    In 2002, Frank Miller contacted his brother, Martin Miller, to help find an investor or buyer for Gitto Global.  Martin Miller was a former vice president for 36 years at Wang Laboratories, who ran the risk management department, was involved in corporate finance and therefore had significant contacts with potential investors.  Frank Miller asked for assistance from his brother because Gitto Global was paying for lavish personal expenses for which it did not have the available funds.  In his conversations with Martin Miller, Frank Miller explained that Gary Gitto bought a $600,000 boat and hired a captain for the boat all of which was paid for by Gitto Global; that Charles Gitto bought a plane paid for by Gitto Global; that Gitto Global paid Charles Gitto's daughter close to $100,000 per year but she rarely went into the office; and that Charles Gitto expensed $2-3,000 a month to the company from his shopping excursions at the CVS store in Florida.  Frank Miller told his brother that he had also taken moneys from Gitto Global for personal use.  (Deakin dep., pp. 370:20-371:10; Martin Miller dep., pp. 6:13-8:6, 10:18-22, 38:18-39:13, 55:12-17, 56:3-57:9, 57:21-58:1, 72:8-13, 73:12-14, 74:18-75:9)

103.    Frank Miller told Martin Miller that Gitto Global had a "two-fold problem".  First there was reckless spending.  Second, there was the overstatement of receivables and sales,

which caused overborrowing from the bank.  Martin Miller understood that his brother, Frank Miller, was involved in a fraud and agreed to help Frank Miller try to find a buyer so that the company could come out of the "hole" and that Frank Miller and others could "get themselves out of a problem that could basically put them in jail."  (Martin Miller dep., pp. 85:1-13, 86:5-7, 87:7-18)

104.    Subsequently, Martin Miller solicited interest from The Alpine Group in New Jersey.  In 2002, on the way to meet with The Alpine Group, Charles Gitto, Gary Gitto, Frank Miller and Martin Miller drove to the meeting together and discussed the revised financial statements that were going to be presented.  The financial statements were revised because the receivables and inventory in the original statements were overstated.  They discussed that there was "a hole" in the company of roughly $17 million, representing the overstatement of receivables and inventory.  (Martin Miller dep., pp. 8:10-12, 14:3-15:13, 16:19-17:16)

105.    When driving to another meeting with The Alpine Group, Gary Gitto, Charles Gitto, Frank Miller and Martin Miller discussed in the car ride together further refinement of the financial information.  They discussed that the brokerage business, J&J Chemical, was where the overstated receivables and sales would be placed and to then sell the business without the brokerage part.   It was also discussed that Clinton Savings Bank was involved in the "triangulation" of the receivables.  (Martin Miller dep., pp. 23:9-25:6, 26:9-28:18)

**Vitrotech**

106.    In early 2002, Jess Rae Booth of Vitrotech Corp., a non-metallic mineral mining company in California whose principal product was Vitrolite, had conversations with Frank Miller and Charles Gitto about acquiring Gitto Global.  Frank Miller and Charles Gitto wanted to sell the business, but Vitrotech was not interested.  (Booth dep., pp. 43:22-44:18; Carlson dep., p. 5:9-20)

107.    On May 18, 2003, at a meeting with Vitrotech in California attended by Frank Miller and Charles Gitto, there were discussions with Vitrotech about the possibility of purchasing Vitrotech products since Vitrotech was not interested in purchasing the assets of Gitto Global.  They discussed that the line of credit provided by LaSalle was $27 million and that LaSalle lent 65% against inventory to a maximum of $6 million.  Therefore, Gitto Global could purchase up to $9.2 million of inventory to achieve maximum borrowing.  Consequently, Gitto Global was looking to acquire an additional $3 million in inventory in order to borrow additional monies against the line of credit.  (Carlson dep., pp. 21:3-12, 22:12-23:11)

108.    Accordingly, on June 30, 2003, Gitto Global entered into a purchase and sale agreement with Vitrotech under which Vitrotech purportedly sold $12.6 million in Vitrolite product, but no money was paid by Gitto Global.  Instead, Gitto Global provided four promissory notes and the notes were constructed that each was due three years from the date of the note, with no interim payments and were convertible, at Vitrotech's sole discretion, into a total of 66% interest in Gitto Global.  Gary Gitto executed the agreement on behalf of Gitto Global.  It was discussed at the May 18, 2003 meeting that by purchasing the inventory in this fashion, Gitto Global could borrow additional funds under the LaSalle line without having to take possession of the Vitrolite.  (Carlson dep., pp. 20:23-25:20; Booth dep., Exh. 6)

109.    In deciding whether to convert the notes into an equity interest in Gitto Global, Vitrotech and its agents were reviewing the financial information of Gitto Global.  Part of the financial information was computerized, but the payables were on a written spreadsheet.  In or around November, 2003, Stephen Merry, who was reviewing the financial information, told Charles Gitto that the data was not accurate.  "I told him he has a mess just in general."  They further discussed the brokerage division that was detailed in the financials.  When asked whether

the brokerage business was involved in the deal, Charles Gitto replied that it was not.  (Merry

dep., pp. 35:8-21, 36:8-14, 37:10-18, 38:16-39:3, 88:22-89:8, 89:17-21)

110.    In the end of 2003 or the beginning of 2004, in connection with Vitrotech's

review of Gitto Global's financial records, Maria Miller told Merchant to separate certain

finished products out of the standard inventory count, to create a separate warehouse and to

consider those certain products "brokerage".  When Merchant asked what Maria Miller meant by

"brokerage", Maria Miller stated "Well, it's like a consignment-type thing…Don't ask."  At

Maria Miller's direction, Merchant created a separate report for the brokerage materials, in

addition to the reports for raw materials and finished materials.  In January of 2004, Maria

Miller, Frank Miller and Deakin directed Merchant to redo the month-end reports for the entire

previous year separating out the "brokerage" items.  (Merchant dep., pp. 33:17-34:24, 35:21-

36:3, 36:8-24, 38:18-20)

111.    On January 23, 2004, Gary Gitto and Frank Miller wrote to Jess Rae Booth of

Vitrotech that:

> We have been completely open with you from the very beginning
> of our discussions regarding our relationship with the Bank.  You
> know all about it and about our Company's financial situation
>
> Because of the sensitive nature of our Bank relationship, and your
> advice, we have carefully structured this transaction to avoid any
> fall-out.

(Rein Aff., ¶4, Exh. 13)

112.    To avoid the "fall-out", in February of 2004, Vitrotech proposed to Charles Gitto,

Gary Gitto and Frank Miller to purchase the compound business of Gitto Global and as a

condition to the purchase, Gitto Global would transfer the Vitrolite inventory back to Vitrotech.

As a part of the due diligence leading up to the sale, Charles Gitto, Gary Gitto and Frank Miller

would not warrant that the balance sheets for Gitto Global were prepared in accordance with

GAAP, as they contained the "brokerage business". Instead, they prepared a "Preliminary Closing Balance Sheet, prepared solely" for the sale to Vitrotech "and dealing solely with the Compounding Business," excluding the "brokerage business." (Rein Aff., ¶4, Exh. 14)

113.    On March 31, 2004, Vitrotech and Gitto Global abandoned the Purchase and Sale Agreement and Gary Gitto executed an Asset Purchase Agreement with Vitrotech, wherein Vitrotech was to purchase Gitto Global's compounding business (not the "brokerage business", which was J&J Chemical). In addition, Vitrotech's earlier sale of Vitrolite to Gitto Global was converted to a consignment arrangement by that certain Settlement and Consignment Agreement dated April 1, 2004 executed by Gary Gitto on behalf of Gitto Global. (Booth dep., Exh. 24, 25; Rein Aff., ¶4, Exh. 15, 16)

### **Defendants' Knowledge of and Benefit from the Fraud and Conspiracy**

**Gary Gitto**

114.    Gary Gitto was the president and 50% shareholder of Gitto Global Corp. He was in charge of the sales side of Gitto Global's business. On the financial side, he would participate in meetings when there was a new banking relationship established. He was a signatory on the LaSalle Account. In June, 2003, he made clear that any payments to Charles Gitto, or his companies, had to be approved by Frank Miller or him. (Kozak dep., pp. 16:24, 18:1-2, 51:13-16; Rein Aff., ¶4, Exh. 17)

115.    On May 18, 2004, Gary Gitto was told that Clinton Savings Bank was "getting real nervous" and "ready to pull the plug." (Deakin dep. Ex. 32)

116.    Gary Gitto was told on several occasions about the fraud perpetrated at Gitto Global. <u>First</u>, in 1995, Deakin told Gary Gitto that "we're losing money here, and we have some pre-billed invoices and we have some inventory that's phony that Frank's got on the books." Deakin made this statement because Gary Gitto was taking money out of the company and

Deakin thought that nobody would take money out of the company if they knew about the situation.  As to the inventory, Deakin further explained to Gary Gitto that the inventory was inflated and did not exist on the books.  <u>Second</u>, six months later, Deakin wanted Gary Gitto to know that the pre-billing and the false inventory still existed.  He said to Gary Gitto that the inventory falsification figures had gotten higher.  <u>Third</u>, six months after that, Deakin again told Gary Gitto that the inventory fraud and pre-billing was continuing and had gotten higher. <u>Fourth</u>, in November, 2003, while discussions with Vitrotech and Gitto Global concerning sale of the assets were ongoing, Deakin brought to Gary Gitto in his office a receivable aging report covering only the fictitious invoices.  Deakin stated that "we've got phony invoices at $16.5 million."  It had gotten so high "it was mind-boggling."  Deakin wanted to convince Gary Gitto that the only way to stop the fraud was to complete the deal with Vitrotech.  <u>Fifth</u>, on June 8, 2004, Deakin sent Gary Gitto an e-mail that the "J&J checks have increased by $414,000 since 5/27/04 and each day it is climbing because more money is going out than coming in."  Deakin sent this e-mail because he wanted to let Gary Gitto know the phony invoicing was increasing further and the amount of float that Gitto Global had with Clinton Savings Bank also kept rising. Deakin was again hoping that Gary Gitto could stop the fraud.  <u>Sixth</u>, in 2004, Gitto Global mailed one of the fictitious invoices to Hitachi Cable, which called Gary Gitto inquiring about the invoice.  Gary Gitto asked Chaisson "is that one of those phony invoices?"  Chaisson responded affirmatively and said she would take care of it.  (Deakin dep., pp. 55:9-57:23, 256:3-19, 271:15-276:24, 288:1-21, 291:4-16, 104:23-105:22, 106:12-107:23; Deakin dep., Exh. 11)

117.    Gary Gitto knew that Moritz was using the computer in Frank Miller's office to scan and manipulate documents on behalf of Gitto Global.  In 2001-2002, Gary Gitto asked Kozak to prepare a binder of American Express bills to give to his wife's divorce attorney that

would purportedly show payment to Gitto Global for personal expenses and to ask Moritz, to "manipulate" checks so it would look like Gary Gitto had repaid Gitto Global.  Kozak typed checks showing reimbursement to Gitto Global and showed those checks to Gary Gitto.  Moritz manipulated the numbers at the bottom of the checks to show that they were processed by the bank.  Subsequently, when Helen Kozak gave Gary Gitto the binder with the American Express bills and reimbursement checks, Gary Gitto told her "it was a job well done."  Gary Gitto also asked Kozak for Moritz to manipulate bank statements, changing the closing bank balance, for his divorce proceedings.  When shown how Moritz could manipulate that data, Gary Gitto was convinced not to use the manipulated statements in the divorce proceedings as counsel would seek to validate the statements with the bank.   (Kozak dep., pp. 43:3-51:3; Moritz dep., pp. 52:21-54:4)

118.    In May, 2002, Gary Gitto told his sister, Nancy Gitto-Panagiotes, that "business was not good" and asked to borrow $150,000.  (Gitto-Panagiotes dep., pp. 17:15-18:11)

119.    In 2004, Gary Gitto knew that Gitto Global was in serious financial distress.  He was told in numerous e-mails that the account was overdrawn or that "we have no money".  (Kozak dep., pp. 98:13-20, 99:4-12; Deakin dep., Exh. 32)

120.    Gitto Global paid Gary Gitto for landscaping and carpentry work performed at his various pieces of real estate, home furnishings, the mooring for his boat, groceries, vacations, donations to schools, credit card expenses and country club dues.  In order to get reimbursed for purported company expenses, bills and expense reports needed to be submitted.  If the bills were to Gary Gitto, personally, Kozak would manipulate the bills and the description of the work performed such that they appeared to be bills to Gitto Global.  Kozak did this with Gary Gitto's knowledge and consent.  Moreover, with Gary Gitto's understanding and consent, Kozak would

prepare an expense report and fabricate the explanation for the expenses by making up an explanation or a customer and "writing it up as a business entertainment." Further, Gary Gitto directed and demanded that he receive corporate funds through checks payable to Equitech, Technologies, LLC ("Equitech"), which "rarely had any documentation." For instance, in May, 2004, when Gary Gitto knew of Gitto Global's cash shortage, he said to Deakin, "I want you to plan for the Equitech checks to the total of 3 a week. Do not bounce any more. This is my money and my company . . ." In order to issue checks to Equitech, since there was no money to cover those checks, Frank Miller would determine what J&J Chemical checks needed to be issued and deposit them in Gitto Global's account to cover the Equitech checks. (Kozak dep., pp 31:5-32:15, 33:9-36:6, 36:21-37:12, 37:17-23, 93:13-94:1; Bartlett dep., p. 21:20-23; Deakin dep., pp. 196:5-21, 197:12-16, 198:10-15, 228:14-229:1, 370:20-371:3; Deakin dep. Exh. 30)

121.    From July, 2002, through September, 2004, Gitto Global funds paid to or on behalf of Gary Gitto was $2,874,644.41. These payments were in the form of checks to Gary, Equitech and cash. These payments included reimbursement of personal expenses that Gary charged to six Gitto Global company credit cards totaling $472,112.55, which included vacations, clothing, a motorcycle, jewelry, furniture, dining and health/beauty spa services. In addition to using company credit cards to pay for personal/lifestyle expenses, Gary Gitto submitted and was paid $83,629.88 for club membership dues, an automobile lease, private school payments, car maintenance, golf fees and expenses charged by his boat captain. (Jalbert Aff., ¶¶10-13)

**Frank Miller**

122.    Frank Miller owned 50% of Gitto Global, was the COO/President and was responsible for the financial aspect of the business. The purchasing and scheduling departments

reported to Frank Miller.  (Deakin dep., pp. 16:2-7, 19:1-3; Gitto-Panagiotes dep., pp. 118:23-119:3; Kozak dep., pp. 18:4-6, 51:7-12)

123.    Gitto Global paid housing related expenses for Frank Miller, some of which were classified as "building maintenance", including home heating and interior decorating.  Gitto Global also paid some of Frank Miller's car expenses and the monthly interest payments on the personal loans Frank Miller and Maria Miller received from Nancy Gitto-Panagiotes and Charles Gitto.    Frank Miller made every request for reimbursement verbally.    No checks for reimbursement for personal expenses to Frank Miller, or to Gary Gitto or Charles Gitto were issued without the approval of either Gary Gitto or Frank Miller.  (Deakin dep., pp. 228:9-229:1, 294:13-23, 295:17-296:9; Kozak dep., pp. 40:13-41:2, 63:8-13, 73:10-14; Kozak dep., Exh. 11, 12, 13; Bartlett dep., pp. 24:6-17, 26:16-27:18; Gitto-Panagiotes dep., pp. 19:2-19; 97:8-24)

124.    From July, 2002 through September, 2004, Frank Miller's and Maria Miller's personal expenses of $99,269.64 were paid after being charged to five Gitto Global company credit cards.  Total company funds paid to or on behalf of Frank Miller and Maria Miller from July, 2002 through September, 2004 was $957,514.33.  (Jalbert Aff., ¶¶20, 24; Kozak dep., pp. 40:13-41:2)

**Maria Miller**

125.    Beginning in or before 2000, Maria Miller supervised the inventory at Gitto Global and was in charge of invoicing at Gitto Global.  Maria Miller directed adjustments to the inventory levels of raw materials, the inventory levels of finished product and the pricing of inventory on a monthly basis to falsely create the desired inventory value.  (Minardi dep., p. 12:6-16; Kozak dep., p. 160:20-22, Deakin dep., p. 18:8-17; Merchant dep., pp. 18:10-26:2, 29:6-30:5, 39:6-41:1)

126.    Maria Miller brought the auditors to the warehouse to do inventory and provided the auditors with documents necessary for the audit, knowing that the inventory value was not correct.  (Kozak dep., pp. 160:20-161:2, 161:6-9)

127.    Maria Miller would review the spreadsheet kept by Chaisson to keep track of the J&J Chemical checks written against no invoices.  (Chaisson dep., pp. 31:9-13, 33:1-3, 38:17-19, 39:23-40:3, 40:18-19, 41:7-17; Chaisson dep., Exh. 1, 2, 3)

128.    From July, 2002 through September, 2004, Frank and Maria Miller's personal expenses of $99,269.64 were paid after being charged to five Gitto Global company credit cards. In addition, Frank and Maria Miller were reimbursed for personal/lifestyle expenditures and insurance totaling $133,288.36.  Total company funds paid to or on behalf of Frank and Maria Miller from July, 2002 through September, 2004 was $957,514.33.  (Jalbert Aff., ¶¶20, 24)

**Charles Gitto**

129.    Initially, Charles Gitto was Chairman of Gitto Global and oversaw the manufacturing side of the business.  (Kozak dep., p. 18:4-6; Moritz dep., p. 93:8-9; Deakin dep., pp. 19:4-9, 373:6-11)

130.    In 1994, Charles Gitto lent Gitto Global $1,500,000, which was repaid in 1997. Between 1997-2001, Charles Gitto was not active in the company.  (Deakin dep., pp. 19:4-19, 372:12-16, 374:6-375:3)

131.    Thereafter and until the business closed, Charles Gitto took a more active role in Gitto Global, focusing on production.  He would conduct daily production meetings where decisions were made on what to produce, when to produce and how much raw material to purchase in order to produce product. Charles Gitto would get a copy of the purchase orders in order to make those decisions.  Therefore, he knew to whom actual sales were being made.

(Deakin dep., pp. 19:22-20:20, 120:17-24, 414:18-24, 415:8-416:6; Kozak dep., p. 52:11-24; Minardi dep., pp. 38:19-39:23; Merchant dep., pp. 13:17-24, 14:8-13)

132.    On May 24, 2002, Charles Gitto signed a letter to Michael Haddad, president of Guaranty Business Credit, enclosing a summary of accounts receivable.  This summary included receivables of $2,688,013 owed to Velco, $2,785,045 owed to Zebulon and $1,079,586 owed to CCC.  All of these sales were fictitious.  (Kozak dep., pp. 119:7-120:24; Chaisson dep., pp. 25:22-26:17; Kozak dep., Exh. 42)

133.    In 2004, Charles Gitto was given accounts receivable aging reports and cash receipts reports.  The cash receipts reports showed actual and fictitious sales.  (Chaisson dep., pp. 92:10-94:1, 104:9-14)

134.    Charles Gitto knew that Gitto Global had financial problems due to cash flow shortage.  At the production meetings, Charles Gitto would have Minardi prepare a list of vendors that needed to be paid to enable the purchase of raw materials.  He would request post-dated checks to pay these vendors because there wasn't enough money in the bank account. These checks would be given to vendors with the expectation that money would come in by the time the vendors deposited the checks.  These post-dated checks were used as a way of encouraging the vendors to send raw materials.  (Kozak dep., pp. 85:21-86:7, 133:6-23; Bartlett dep., pp. 86:1-87:12)

135.    In or about March, 2002, Kozak visited Charles Gitto at his home to tell him that Kozak "had concerns about things that Gary was doing that might land him up in some trouble." The concern was about putting invoices through the company.  (Kozak dep., pp. 139:2-13, 140:7-9)

136.    About the same time, Charles Gitto spoke with Dr. Alfred Arcidi about investing money in Gitto Global.  Charles Gitto told Arcidi that Charles was concerned that his son, Gary, was using money that was being borrowed by Gitto Global on extravagant personal items.  He explained that his son had been building a boat for $1.1 million and leasing a Bentley for $2,000 a month. Charles Gitto further said "I don't want my son to go to jail."    (Arcidi dep., pp 25:17-24, 26:2-4, 36:9-19)

137.    Charles Gitto owned Tradex, a real estate holding company that owned the building in which Gitto Global operated.  Gitto Global paid it rent. (Kozak dep., p. 64:5-14)

138.    Charles Gitto owned Tradex International, through which all of the airplane expenses were handled.  Tradex International would invoice Gitto Global, and Gitto Global would pay, for a portion of the airplane note, a portion of the pilot's salary, a portion of the hanger costs, and for personal trips taken on the airplane.  (Kozak dep., pp. 65:17-24, 67:24-68:16, 74:3-23)

139.    Charles Gitto participated in "bleeding this company financially" by Gitto Global paying for landscaping, snow removal, plumbing, painting, and insuring Charles Gitto's home. Roger DeLisle, operations manager at Gitto Global, oversaw the work done at Charles Gitto's home, including contacting contractors, scheduling work, and arranging that the bills get paid by Gitto Global. Gitto Global would also pay for insurance on Charles' wife's vehicle, pharmacy expenses and credit cards.  When Charles Gitto owed the Internal Revenue Service $43,604 for underpayment of taxes and penalties, he had Gitto Global reimburse him.  Charles Gitto once told Deakin "It's his company, and don't be ever telling him not to take money out."  (Deakin dep., p. 431:12-17; Kozak dep., pp. 21:15-24, 26:11-24, 84:15-85:4; Rein Aff., ¶4, Ex. 18, 19, 20)

140.    From July, 2002 through September, 2004, Charles Gitto received checks payable to him of $409,502.33, payable to Tradex of $808,234.18 and payable to Tradex International of $537,968.38.  In addition, Charles Gitto's personal expenses of $111,091.36 were paid after being charged to four Gitto Global company credit cards.  Finally, Charles Gitto submitted and was reimbursed for personal/lifestyle expenditures and insurance totaling $97,462.66.  Total Gitto Global funds paid to and on behalf of Charles Gitto during from July, 2002-September, 2004 was $1,964,258.91.  (Jalbert Aff., ¶¶14-18)

**Louis Pellegrine**

141.    Louis Pellegrine was the outside CPA for Gitto Global Corp. from 1998 through 2003.  (Deakin dep., pp. 90:24-91:1, 317:14-318:1)

142.    In the early 2000's, Pellegrine borrowed $80,000 from Gary Gitto because Pellegrine was "in financial straits."  It was not repaid.  (Kozak dep., p. 124:2-14)

143.    Pellegrine was paid $345,238.14 for performing little or no work for Gitto Global in 2002-2004.  For 2002, he went to Gitto Global for the inventory audit and then prepared the audited financial statements based on documentation Deakin forwarded.  For 2003, Pellegrine took the financial statement Deakin prepared, copied the information, and "called" it an audited financial statement.  (Deakin dep., pp. 174:5-176:6, 177:9-178:3; Jalbert Aff., ¶25)

<u>Efforts to Conceal Fraud and Conspiracy</u>

144.    On or around September 16, 2004, one day after Clinton closed the J&J Chemical Account and days before Argus Management was retained to operate Gitto Global, Gary Gitto asked Helen Kozak to box up documents at Gitto Global and have them delivered to Charles Gitto's home.  (White Aff. ¶3; DeLisle Aff. ¶7; Kozak dep., pp. 149:7-157:16)

145.    In total, approximately 20 banker's boxes were removed from Gitto Global and taken to Charles Gitto's house.  These boxes included records from Gary Gitto's office involving

Equitech and Direct Wood, from Charles Gitto's office, and records from Deakin's, Chaisson's and Dean Child's offices involving J&J Chemical and the fictitious customers.  (White Aff. ¶3; DeLisle Aff. ¶7; Kozak dep., pp. 149:7-157:16)

146.    When taken to Charles Gitto's home, he directed the placement of the boxes. (White Aff. ¶¶3, 4; DeLisle Aff. ¶¶7, 8)

147.    Frank and Maria Miller also directed the removal of eight or nine boxes of documents and other items from Frank Miller's office at Gitto Global.  (DeLisle Aff. ¶8)


Dated:  July 28, 2006                         Respectfully submitted,

                                              LASALLE BUSINESS CREDIT, LLC


                                              By:____/s/ Patrick W. Manzo_____
                                                    One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone:  (617) 367-9500

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300

**<u>Certificate of Service</u>**

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 28, 2006.

                                          /s/ Patrick W. Manzo