## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————————  )
)
LA SALLE BUSINESS CREDIT, LLC f/k/a  )
LA SALLE BUSINESS CREDIT, INC.,      )      Case No. 04-12227-DPW
)
            Plaintiff,   )
   v.                            )
)
GARY C. GITTO, et al.,               )
)
            Defendants,  )
   and                           )
)
FLEET NATIONAL BANK, et al.,         )
)
   Trustee Process Defendants,   )
)
   and                           )
)
FIDELITY INVESTMENTS, INC., et al.,  )
)
   Reach-and-Apply Defendants.   )
—————————————————————————  )

## CHARLES GITTO'S MEMORANDUM OF LAW IN SUPPORT OF HIS RESPONSE OPPOSING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**I.    Introduction**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1(B)(1), the Defendant, Charles N. Gitto, Jr. ("Charles Gitto"), hereby submits this memorandum of law in support of his opposition to Plaintiff, LaSalle Business Credit's ("LaSalle"), Motion for Summary Judgment on Counts I through IV of the Third Amended Complaint. In the complaint, LaSalle has advanced three causes of action against Charles Gitto: a Civil RICO Conspiracy (Count I); a Conspiracy to Defraud through a check-kiting scheme (Count II); and a Civil Conspiracy to Defraud (Count IV). LaSalle argues that they are entitled to summary judgment on each of these counts. In opposition, Charles Gitto has filed with this memorandum a counterstatement of material facts.

This case arises from a revolving loan that LaSalle made to Gitto Global Corp. ("Gitto Global"). LaSalle claims that for two years funds were advanced to Gitto Global based upon false information regarding the company's sales. The allegations include a check-kiting scheme, fictitious accounts receivable and false inventory reports. The claim against Charles Gitto is that together with the defendants, Frank Miller, Gary Gitto, Maria Miller and Louis Pellegrine ("the Defendants"), he conspired to defraud LaSalle in order to obtain the loan advances.

## II.    Statement of Facts

Gitto Global was created in 1992 and the defendants, Gary Gitto and Frank Miller, were its owners. Each had specific roles in the operation of the business; Frank Miller primarily focused on the accounting and finances while Gary Gitto tended to the sales. The defendant, Charles Gitto (Gary Gitto's father) had no ownership interest, but held himself out as Chairman of the Board. He was involved with the production side, primarily scheduling. (Def. Counterstatement, ¶ 1 and 2)[1].

Initially, Charles Gitto played an active role in the operation of the business with a primary focus on manufacturing. However, there eventually came a time when Gary Gitto did not want his father involved in the operation. This period of time coincided with Charles Gitto's marriage as well as with an extended period of time in Florida. Subsequently, in April, 2001, Charles Gitto returned to Gitto Global, but in a more limited capacity. At that time, he was also approached by Frank Miller and Gary Gitto for a loan of $1.5 million. (Def. Counterstatement, ¶ 2, 30).

According to Helen Kozak, the administrative secretary, in the ten years she was

---

[1]  These cites within the document refer to the paragraphs in Defendant, Charles Gitto's Counterstatement of Material Facts in Support of his Opposition to Plaintiff's Motion for Summary Judgment.

employed at Gitto Global, the company was never financially sound. Evidently, it was not unusual for Charles Gitto to loan the company money. However, despite the sizeable loan, Charles Gitto never gained back any real authority as far as the day to day decision-making and operation of the company. It was clear that Frank Miller and Gary Gitto were the ones running the show. Charles Gitto was just doing whatever they allowed him to do which was basically the production meetings. (Def. Counterstatement, ¶ 3, 4).

**J&J Chemical Account/Fictitious Companies**

The Kingsdale Corporation, d/b/a J&J Chemical Distributors, was owned by Frank Miller. In April 2001, he set up the "J&J Chemical Account" at the Clinton Savings Bank with the monies he and Gary Gitto borrowed from Charles Gitto. Charles Gitto was never a signatory on this account. Additionally, the Gitto Global checks that were written and deposited to the J&J Chemical account were either stamped or signed by Frank Miller. (Def. Counterstatement, ¶ 12, 13, 14). Frank Miller directed the use of the J&J Chemical account. On a daily basis, he would instruct Deakin, as to what was needed and how much to put through the account. Deakin would give Rita Bartlett, the accounts payable clerk, a list of checks that needed to be made payable to J&J Chemical. At first, Frank Miller signed the checks, but then they used a stamp with his signature. (Def. Counterstatement, ¶ 16).

Janice Chaisson worked in accounts receivable. On almost a daily basis, she was instructed by Frank Miller to type up J&J checks for deposit. Frank Miller would give her an amount and she would type up the checks made payable to Gitto Global. She would determine which invoices to apply by the aging that she maintained. She stamped the checks with John Tersigni's name and they were deposited into the account at Fleet Bank. Then, on a spreadsheet Chaisson would list the checks, the name of the company and their corresponding

invoices. This information was stored in her computer and only Deakin and Frank Miller had

access. To her knowledge, Charlie Gitto did not know she was maintaining a spreadsheet with

this type information. They were just never given to him. (Def. Counterstatement, ¶ 17).

Chaisson was told by Frank Miller that the reason they were issuing J&J checks to cover

fictitious sales was more or less to boost volume. To support the sales by Gitto Global, Frank

Miller directed Maria Miller to create sales orders for fictitious customers. Maria Miller would

pick a product, choose an amount and dollar value, and generate an invoice. This information

went to shipping and they would create a packing slip and bill of landing. Chaisson explained

that Charles Gitto would get a production report on daily basis that would contain the legitimate

orders to be made. As to the fictitious companies, there wouldn't be any legitimate orders to

those companies so he wouldn't see any of those. (Def. Counterstatement ¶ 18, 19).

At first, the real receivables and the fictitious receivables were combined into one

aging schedule. Then, at some point, Chaisson segregated the real sales from the fictitious

ones on the aging report by using the customer code – "99." She would give the legitimate

receivables and the "99" report to Deakin and Frank Miller. There would be times when

Charles Gitto would request a copy of an aging report before a production meeting in order to

see what invoices were owed. Chaisson explained that she was more apt to say that the aging

she would provide Charles Gitto would not include the fictitious sales – she would have

printed the actual report. In fact, she doesn't think she ever gave Charles Gitto a report with

the phony information. (Def. Counterstatement, ¶ 20, 21).

Similarly, according to Bill Deakin, there were actually no records going to Charles

Gitto where the financial improprieties were apparent. He explained that if you looked at an

aging schedule, you could not tell the real from the false. Deakin also recalled that at the point

when the aging schedules included the fictitious information, they were not going to Charles

Gitto because it was during the time when he was not allowed access to any financial

information. Deakin believed that Charles Gitto never saw any of those schedules. (Def.

Counterstatement ¶ 22).

**Accounts Payable/Adjusted Inventory/Changing Compounds**

Frank Miller would instruct Bartlett as to which suppliers to enter into the system. The

unpaid invoices that were not stored in the system were compiled in Bartlett's desk drawer.

Eventually, Frank Miller would determine which invoices to pay, pull them from the drawer,

and instruct Bartlett to send the companies post dated checks. According to Deakin, he never

told Gary Gitto or Charles Gitto about the invoices that would go in the drawer and this

information would not show up on any type of report generated. As a joke, Bartlett named the

drawer "secret garden," but there really wasn't anything secret about it. However, the only

people that would have any business going in the drawer were Bartlett, Frank Miller, Deakin,

or David Minardi, the purchasing agent. (Def. Counterstatement, ¶ 23).

Robyn Merchant was in charge of inventory control. She did the production paperwork

and reports. She would run a month-end report that would indicate the compound and/or raw

material and set forth the pounds and the values. At first, Merchant would give the report to an

employee, "Karen," but eventually it was given to the defendant, Maria Miller. She would

make handwritten changes and Merchant would change the figures in the report. There would

be adjustments to the value of the inventory as well as changes to the pricing. During the last

two or three years of activity, Maria Miller would tell Merchant to go to Deakin for the

adjustments. Deakin stated that he never discussed the "phony" inventories with Charles Gitto.

(Def. Counterstatement, ¶ 25).

David Minardi had conversations with Frank Miller about changing the identification of compounds. There was a book where Minardi would change the formulations. At Frank Miller's direction, he would "white out" the product name and write in the new one. Minardi believed he was actually changing the name and not the compound. Charles Gitto was aware of the "renaming" of the formulas because it was at the production meeting the formulas had to be produced. But, he had no idea what it was previously or that it had been "whited out." All Charlie Gitto saw was the "relabeled" formula. The originals (with white-out) would not be shown at the production meeting. The only one seeing the relabeled formula was the lab, the people on the lines producing, the blenders and inventory. (Def. Counterstatement, ¶ 26).

**Borrowing Base Certificates/Access to Financial Information**

In order to receive funds pursuant to the Loan Agreement with LaSalle, Janice Chaisson, on behalf of Gitto Global, delivered to LaSalle daily borrowing base certificates. She would include the amount of sales for the day as well as the amount of deposits. Chaisson would get the information from the daily sales which would include both the actual and fictitious. Additionally, the deposits would include J&J Chemical as well other customers. Before Chaisson submitted the borrowing base certificate, she would show it to Bill Deakin or Frank Miller so that they would know where they stood with the line of credit. Sometimes, they would increase or decrease a figure and any increase would be supported by more invoicing. Whatever Chaisson was told to do, it was always under the direction of Frank Miller. She was never told by Gary Gitto or Charles Gitto to produce reports with phony information. In fact, Chaisson rarely communicated with Charles Gitto. He would sometimes call her to find out if a customer had paid. But, other than that, she didn't have much contact with him. (Def. Counterstatement, ¶ 27).

Charles Gitto had extremely limited access to the company's financial information.  In fact, there was an entire period of time beginning in the late 90's where he was cut off completely.  Deakin recalled receiving specific instructions not to give Charles Gitto any information unless he had Gary Gitto's permission.  Helen Kozak also recalled operating under specific instructions from Gary Gitto and Frank Miller not to release any information to Charles Gitto about anything having to with finances.  According to Sharon Powell-Kotoch, a secretary, Gary Gitto did not want Charlie to know how financially and deep in debt they were.  At one point, Deakin even needed approval before he could write a check out to Charles Gitto.  Similarly, Bartlett remembered receiving a memo telling her that nothing was to be paid to Charles Gitto unless Gary Gitto approved it.  (Def. Counterst. ¶ 29, 30, 31, 32, 33).

Charles Gitto was simply not involved with the inner workings of the company and was especially left out of the financial end of the business.  All Gitto Global checks were usually signed by Frank Miller (or stamped with his name).  Charles Gitto had absolutely no authority to sign checks.  (Def. Counterstatement, ¶ 7, 8, 9, 10, 11,16, 34).

Gitto Global did pay some of the personal expenses of the principals, including Charles Gitto.  For example, there were bills for landscaping, snow removal, painting,  plumbing and insurance.  They each had a loan account and anything personal would be charged to that account.   All of Charles Gitto's airplane expenses were handled through Tradex International, a company he owned.  Since Gitto Global used the plane for business purposes there was an agreement that the company would cover a percentage of the expenses.  (Def. Counterstatement, ¶ 42, 43, 44).

**Scanning Documents/Creating Checks**

In and around 2001, on a regular basis, Frank Miller would provide John Moritz

(a Gitto Global employee) with copies of documents to be altered. Moritz would use a scanner and manipulate the document per Miller's instructions. This scanning process allowed Moritz to change checks as well as invoices. The scanning was done in Frank Miller's office and they went to great lengths to ensure that it was kept quiet. Charles Gitto was not aware of the scanning or the manipulation of documents. Moritz had absolutely no conversation with him about what was happening. (Def. Counterstatement, ¶ 36).

Also under Frank Miller's direction, Deakin would create checks using the Versa Check program. Deakin did not believe that Charlie Gitto knew that they were creating checks. Deacon states that he didn't go to Charlie Gitto about this because he was under instructions not to tell Charlie anything about the finances. (Def. Counterstatement, ¶ 37-38).

**The Attempts to Sell the Company**

In April 2002, Clinton Bank began to question the activity in the J&J Chemical account. All the financial information the bank received came specifically from Frank Miller. They never received any information whatsoever from Charles Gitto. In an around this time, the relationship between Charles Gitto and Frank Miller became strained. It appeared that Charles Gitto felt that Frank Miller had put the company into a "nose-dive." (Def. Counterstatement, ¶ 45, 47).

By late 2003, the Gitto's and Frank Miller were focusing on attempts to sell the business. Stephen Merry, an investor, became involved in the negotiations between Vitrotech and Gitto Global. Merry spoke to Charles Gitto on various occasions, but soon realized that Charles Gitto was not one of the operating officers or major decision maker. Merry became aware that when it came to matters of acquiring financial information, Frank Miller was the "key deliverer of such information." (Def. Counterstatement, ¶ 48, 49).

In 2002, Martin Miller, introduced his brother, Frank Miller, to George Karfunkel who arranged a meeting with Stephen Elbaum at the Alpine Group (a holding company that invested in businesses). The negotiations between Alpine and Gitto Global occurred sometime in April through June of 2002. Martin Miller claimed that from the start his brother revealed to him that there were problems with the company's financials. According to Martin Miller, even before the first meeting with Elbaum and Karfunkel, he knew from his brother that in addition to reckless spending there was a "hole" in capital. His brother told him that the hole was getting bigger because money was being taken out of the corporation by the Gittos. (Def. Counterstatement, ¶ 50, 51).

Martin Miller explained further that while driving to the meetings, there were open discussions in the car amongst and between the Gittos and Millers regarding the revised financials, the "hole" of $17 million, and the expenses that were being passed through the corporation. According to Miller, each of these issues was also discussed with Elbaum and Karfunkel. Martin Miller claimed that he knew the situation described by his brother embraced a glaring impropriety at best and a fraud at worst and that he had discussed this with Karfunkel. In fact, Miller claimed that it was clearly explained to both Karfunkel and Elbaum that receivables that were not receivables were causing a "hole" in the company. Additionally, Miller stated that he knew LaSalle was the lender before the first meeting with Elbaum and Karfunkel (April, 2002) and that he ever understood how LaSalle didn't know about the "hole." Interestingly, the loan with LaSalle wasn't executed until July, 2002. (Def. Counterstatement, ¶ 52, 53, 54).

In sharp contrast to Martin Miller's claims, according to Karfunkel, the first meeting involved discussions about manufacturing a battery. No one said anything about Gitto Global

being in dire financial states.  Karfunkel didn't recall any type of discussion about the

operating performance of Gitto Global.  Similarly, according to Elbaum there was never a

discussion about financial improprieties, improper financial treatment or possible fraud.  (Def.

Counterstatement, ¶ 55, 56, 57).

## III.    Summary Judgment Standard

The role of summary judgment is to pierce the pleadings and to assess the proof in

in order to see whether there is a genuine need for trial.  Fed. R.Civ.P. 56(e); *see Mesnick v.*

*General Electric Co.,* 950 F.2d 816, 822 (1st Cir. 1991).  Summary judgment is appropriate

only where there is no genuine issue as to any material fact and the moving party is entitled to

a judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Terry* v. *Bayer Corp.*, 145 F.3d

28, 34 (1st Cir. 1998).  The party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and identifying those portions of the pleadings,

depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp.* v.

*Catrett*,  477 U.S. 317, 323 (1986); *Anderson* v. *Liberty Lobby Inc.*, 477 U.S. 242, 247-48, 106

S.Ct. 2505 (1986).  A fact is material if it "might affect the outcome of the suit under the

governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could

return a verdict for the non-moving party."  *Anderson*, 477 U.S. at  247-48 (1986).

Once the moving party has satisfied its burden, the burden shifts to the non-moving

party to set forth specific facts to show that there is a genuine issue for trial.  *Celotex, supra* at

322-25.  The evidence illustrating the factual controversy cannot be conjectural or problematic.

The non-movant must present substantial evidence that supports differing versions of the truth

requiring resolution by a factfinder.  *Mesnick,* 950 F.2d at 822.  In culling the essential facts, the

record is considered in the light most favorable to the nonmoving party, indulging all

reasonable inferences in that party's favor. *Griggs-Ryan* v. *Smith*, 904 F.2d 112 (1st Cir. 1990).

## IV. LaSalle is not entitled to Summary Judgment as to its Civil RICO Claim against Charles Gitto (Count I).

In its complaint, LaSalle asserts a Civil Rico claim against the defendants. The

substantive RICO claim is found in 18 U.S.C. § 1962(c) and the RICO conspiracy cause of

action falls under 18 U.S.C. § 1962(d). Section 1962 (c) provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate
> or foreign commerce, to conduct or participate, directly or indirectly, in the
> conduct of such enterprise affairs through a pattern of racketeering activity…

For an individual defendant to be liable of a RICO substantive violation under this section,

LaSalle must show that (1) Gitto Global was an enterprise affecting interstate or foreign

commerce, (2) the defendant under consideration associated with the enterprise, (3) that the

defendant participated in the conduct of the enterprise's affairs, and (4) that the defendant's

participation was through a pattern of racketeering activity. A*etna Cas. Sur. Co. v. P & B

Autobody*, 43 F.3d 1546, 1561 (1st Cir. 1994); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479, 105 S.Ct. 3275 (1985).

Under the statute, a "pattern of racketeering activity" requires at least two predicate acts.

The two predicate acts must be acts chargeable or indictable under any one or more of certain

specified federal laws. Offenses that will serve as RICO acts of racketeering or predicate

offenses are enumerated in 18 U.S.C. §1961(1).[2] *McEvoy Travel Bureau, Inc. v. Heritage

Travel Bureau, Inc.*, 904 F.2d 786, 788 (1st Cir. 1990).

---

[2] Offenses that will serve as RICO acts of racketeering or predicate offenses are enumerated in 18 U.S.C. § 1961(1), and include mail, wire, and bank fraud. *See 18 U.S.C. §§ 1341, 1343, 134.*

LaSalle argues that they have met each of the elements needed to prove a violation of 18 U.S.C. § 1962(c). More specifically, they claim that they have shown that a scheme to defraud LaSalle, a federally insured financial institution, was conducted through Gitto Global's interstate transmission of over 500 false borrowing base certificates by e-mail and facsimile, in violation of the mail, wire and fraud statutes. *18 U.S.C. §§ 1341, 1343, 1344.* Although it appears that the claim against Charles Gitto is that he was a co-conspirator in the alleged scheme, it is important to note that any 18 U.S.C. § 1962(c) claim against him would fail. It is abundantly clear from the record that the facts surrounding Charles Gitto's level of participation in the affairs of Gitto Global are in dispute. Moreover, the record further reveals that Charles Gitto had no involvement in the preparation or delivery of the borrowing base certificates. (Def. Resp. to Pl. Stmt. Facts, ¶ 20, 21, 22, 26, 27).[3] Thus, there is no evidence of the predicate acts required to show a "pattern of racketeering activity" as to Charles Gitto.

The RICO conspiracy claim is that the individual defendants, with others, conspired to devise a scheme of racketeering activity to defraud LaSalle. This invokes 18 U.S.C. § 1962(d) which serves to make unlawful conspiracies to violate section 1962(c) above. The necessary elements include: (1) the existence of an enterprise affecting interstate commerce; (2) the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise; (3) the defendant participated in the affairs of the enterprise; and, (4) that he did so through a pattern of racketeering activity by agreeing to commit or committing two or more predicate offenses. *United States v. Boylan*, 898 F.2d. 239, 241 (1st Cir. 1990), *cert.*

---

[3] These cites within the document refer to the paragraphs contained in the Defendant Charles Gitto's Responses to Plaintiff's Statement of Undisputed Facts.

*denied*, 498 U.S. 849 (1990); A*etna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1561 (1st Cir. 1994); *see also Sedima, S.P.R.L.*, *supra* at  496.

The major difference between a violation of section 1962(c) cited above and section 1962(d) is the additional required element that the defendant knowingly joined a conspiracy to violate 1962(c).  The other difference is that to prove a defendant violated section 1962(c), it is necessary to prove two predicate offenses.  Whereas, under section 1962(d), it is enough to prove that a defendant agreed with one or more others that two predicate offenses are committed.  *See Boylan,* 898 F.2d at 252.  All that is necessary is to show that a defendant agreed with one or more of the co-conspirators to participate in the conspiracy.  A*etna Cas. Sur.,* 43 F.3d  at 1562.   However, there must be a knowing participation.  Each conspirator must specifically intend to engage in the alleged pattern of racketeering activity.  *U.S. v. Winter*, 663 F2d 1120 (1st Cir 1981).  He must intend to "further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  *U.S. v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004).

 To support the contention that Charles Gitto participated in the conspiracy, LaSalle asserts that he was identified with Gitto Global, knew it had financial problems, knew its accounts receivable were inflated, provided critical support  for the check-kite scheme, maneuvered Gitto Global's inventory to falsely present what Gitto Global owned and reaped benefits of over $1.9 million of Gitto Global's funds over the period of the loan. However, a review of the record, in a light most favorable to the defendant, reveals evidence that conflicts with each of these claims.

First, LaSalle attempts to argue that Charles Gitto was "identified with" Gitto Global and knew of its inner workings. LaSalle contends that in the division of responsibilities Charles Gitto was "in charge" of production, knew of major customers and knew that the accounts receivable included fictitious customers. But, what LaSalle ignores is the fact that there was an extended period of time when Charles Gitto had absolutely no involvement with the company and even when he was present he was denied access to financial information and company accounts. (Def. Counterstatement, ¶ 2, 20, 21, 22, 29, 30, 31, 32, 33, 34). Additionally, Charles Gitto's involvement in production was primarily to conduct the daily meetings. These meetings did not involve major decision making, but instead were simply to review open orders and discuss scheduling. (Def. Counterstatement, ¶ 4, 5).

Second, LaSalle maintains that Charles Gitto had no qualms about misrepresenting Gitto Global accounts. In support of this contention, LaSalle refers to correspondence, dated May 24, 2002, to Guaranty Business Credit Corp with an attachment of aging receivables that included fictitious customers. Supposedly, this letter was signed by Charles Gitto. LaSalle totally disregards the deposition testimony of Helen Kozak who testified that Charles Gitto could not have dictated the contents of the letter because of the specific language contained therein. In fact, she felt that it sounded more like Frank Miller. Kozak also testified that the attachment containing the financial information would have been given to her by Frank Miller or Bill Deakin. It was not information that Charlie Gitto would have generated. Furthermore, she could not be absolutely certain that the aging summary was attached to the letter at the time she presented it to Charles Gitto. (Def. Counterstatement, ¶ 35).

Bill Deakin's testimony sheds further confusion on the circumstances of the letter in question. He testifies that the attachment represented a financial document that he would not

have given to Charles Gitto without Gary Gitto's permission.  Deakin also pointed out that Helen Kozak, as the administrative assistant, would often sign Charles Gitto's name on correspondence.  Additionally, Deakin acknowledged that Frank Miller's scanning and altering of documents could be used to change signatures on letters. (Def. Counterst. ¶ 35, 37).

LaSalle's third claim is that Charles Gitto's support of the check-kite scheme is evidenced by that fact that he advanced large sums of money to the company on various occasions.  LaSalle also points out that when Clinton Bank wanted security, Charles Gitto provided a limited non-recourse guaranty and security agreement from Tradex.  However, LaSalle totally ignores the testimony that this was not unusual.  Charles Gitto had been called upon to support the company financially many times in the past.  Kozak explained, Charlie "would often come to the rescue to save the company from a cash shortfall."  He was the one with the funds and the contacts so Gary and Frank went to him for financial assistance.  (Def. Counterstatement, ¶ 3).

Fourth, LaSalle advances the notion that Charles Gitto knew of J&J Chemical's role in supporting Gitto Global's inflated accounts receivable.[4]  In support, LaSalle cites to the deposition of Martin Miller who testified that his brother had revealed to him that there were problems with the company's financials.  In an effort to find a purchaser for Gitto Global, Martin Miller made contact with George Karfunkel and Stephen Elbaum (Alpine Group).  Miller testified that on the drive to meet with Elbaum and Karfunkel, there were open discussions in the car amongst and between the Gittos and Millers regarding the revised financials, a "hole" of $17 million, and expenses that were being passed through the

---

[4]  It should be noted that Charles Gitto had no involvement with J&J Chemical.  (Def. Counterstatement, ¶ 12, 13, 14, 16, 17).

corporation.  According to Miller, each of these issues was also discussed with Elbaum and

Karfunkel.  (Def. Counterstatement, ¶ 50, 51, 52, 53).

Martin Miller testified further that he knew that the situation described by his brother

embraced a glaring impropriety at best and a fraud at worst and that he had discussed it with

Karfunkel.  In fact, Miller claimed that it was clearly explained to both Karfunkel and Elbaum

that receivables that were not receivables were causing a "hole" in the company.  Additionally,

Miller stated that he knew LaSalle was the lender before the first meeting with Elbaum and

Karfunkel.  He never understood how LaSalle didn't know about the "hole."  (Def.

Counterstatement, ¶ 53, 54).

Again, LaSalle fails to take into account the pertinent deposition testimony which

contradicts Martin Miller's recitation of the facts in almost every respect.  In fact, when

comparing Miller's testimony to that of Elbaum and Karfunkel, it becomes apparent that

Martin Miller is simply not credible and would more than likely not withstand cross-

examination.  According to Karfunkel, no one ever said anything about Gitto Global being in

dire financial states and he couldn't recall any discussion about the company's operating

performance.  Similarly, Elbaum specifically testified that there was never a discussion about

financial improprieties, improper financial treatment or possible fraud.  Most compelling is

Martin Miller's comment that he knew LaSalle was the lender before the first meeting with

Elbaum and Karfunkel (April, 2002) when in fact the relationship with LaSalle and Gitto

Global did not commence until July, 2002.  (Def. Counterstatement, ¶ 55, 56, 57).

Fifth, LaSalle argues that Charles Gitto was also involved in falsely representing Gitto

Global's inventory to LaSalle.  They relied on the fact that the Vitrolite product was included

in the inventory reported in the borrowing base certificates as if owned free and clear without

any offsetting obligation for payment. Again, the record reveals that Charles Gitto did not provide the information for inventory, did not discuss the "phony" inventories with Deakin and had no involvement in the preparation and delivery of borrowing base certificates. (Def. Counterstatement, ¶ 25, 27, 28; *see also* Def. Resp. to Pl. Stmt. Facts, ¶ 20, 21, 22 ).

Lastly, LaSalle points to a conversation between Charles Gitto and his friend, Dr. Alfred Arcidi, wherein Charles Gitto comments that he didn't want his son to go to jail. LaSalle takes this remark out of context and argues that it is evidence of Charles Gitto's awareness of criminal conduct. This inference is simply too far a stretch for a comment that is taken out of context. (Def. Counterstatement, ¶ 46).

The record cited above is totally at odds with LaSalle's contention that Charles Gitto provided substantial assistance to allow the check-kite scheme. In, fact, the contradictions in the record leave in dispute the following: whether Charles Gitto knowingly joined the conspiracy; whether he participated in the affairs of the enterprise; and, whether he did so through a pattern of racketeering activity by agreeing to commit or committing two or more predicate offenses. *United States v. Boylan*, 898 F.2d 239, 241 (1st Cir. 1990), *cert. denied*, 498 U.S. 849 (1990). Thus, summary judgment would not be appropriate.

## V.     LaSalle is not Entitled to Summary Judgment as to their Claim of Check-kiting Conspiracy to Defraud (Count II)

Count II is an alternative pleading that focuses on the check-kite operated through the J&J Chemical account. LaSalle needs to show as to each defendant (1) that a check-kiting conspiracy was conducted through the use of the J&J Chemical Account and the Fleet Blocked Account; (2) that the defendant was a knowing participant in the conspiracy; and, (3) that the conduct of the conspiracy caused injury to the plaintiff.

LaSalle alleges that there is no issue that Charles Gitto knew, or had notice of, the

check-kite and he acted to further its goals.  LaSalle also claims that Charles Gitto provided

the funds to capitalize J&J Chemical; knew Gitto Global was reporting fictitious sales; and,

knew that the company through which funds were generated to "pay" the amounts due (J&J

Chemical), was a sham.  However, as set forth in the preceding section, there is ample

evidence in the record to support the contention that Charles Gitto had no involvement

whatsoever with the J&J Chemical account or for that matter with any other account at Gitto

Global.  The J&J Chemical account was managed exclusively by Frank Miller.  (Def.

Counterstatement, ¶ 12, 13, 14, 16, 17; *see also* Def. Resp. to Pl. Stmt. Facts, ¶ 26, 27, 28,

35, 36, 37, 38, 39, 40, 41).

The evidence further supports the notion that Charles Gitto could not have been a

knowing participant in the conspiracy because he had no knowledge of the fraudulent

schemes occasioned by Frank Miller.  Charles Gitto was simply not aware of the antics that

were taking place in accounting at Frank Miller's direction.  His awareness was impacted by

several factors, i.e., he had been away from the business for an extended period of time; the

financial information was kept from him; when he did obtain information, he didn't

understand it; and finally, he was often erratic, "fanciful," "whimsical," confused and didn't

make sense.  (Def. Counterstatement, ¶ 2, 22, 24, 27, 29, 30, 31, 32, 33, 34, 39, 40, 41).

Additionally, the evidence further suggests that not only did Frank Miller have Charles Gitto

fooled, but several bank officers also found his explanations plausible.

(Def. Counterst. ¶ 45).

In sum, since there is sufficient evidence in the record to establish that Charles Gitto

could not have knowingly participated in the conspiracy, LaSalle is not entitled to summary

judgment on this count.

**VI.    LaSalle is not entitled to Summary Judgment on the Civil Conspiracy to Defraud Claims (Count IV)**

LaSalle also alleges that the defendants engaged in a civil conspiracy to defraud LaSalle under Massachusetts law.  To state a claim for civil conspiracy, the plaintiff must allege one of two types of conspiracy.  The first type requires proof of coercion and the second requires proof of a common design to commit a tortious act.  *Kurker v. Hill*, 44 Mass.App.Ct. 184, 188-89 (1998).  Here, LaSalle has alleged the tort based conspiracy which is similar to claims made under a common law theory of joint tort liability.  The elements include (1) common design or agreement between two or more people to commit a wrongful act; and, (2) some tortious act done in furtherance of the agreement.  This type of conspiracy requires a predicate tort.  *Aetna Casualty Surety Company* v. *P. & B. Autobody*,  43 F.3d 1546, 1564 (1st Cir. 1994).

The key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan.  *Kurker*, 44 Mass.App.Ct. at 189; *see also Robinson v. Bodoff*, 355 F.Supp.2d 578, 585 (D.Mass.2005).  As stated in Restatement (Second) of Torts §876(b) (1977), "one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other…"  A general awareness is not sufficient to show the level of knowledge that would give rise to liability for conspiracy.  "Evidence of the defendant's knowledge of its substantial, supporting role in an unlawful enterprise is required."  *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 168 (1990).

Viewing the facts in a light most favorable to the defendant, the record makes clear that LaSalle fails to establish the necessary elements of a civil conspiracy.  There is little support in the record from which one could infer that Charles Gitto "substantially assisted" in

the tortious plan to defraud LaSalle.  Although, LaSalle details a scheme to defraud that involves each of the defendants, it is devoid of any facts that would support an inference that Charles Gitto made representations or misrepresentations to LaSalle in order to induce it to initiate the line of credit, that he played any role in the preparation of the financial statements or borrowing base certificates provided to LaSalle, or that he knowingly participated in the scheme to defraud.

In short, there is contradicting evidence as to whether Charles Gitto substantially assisted in the scheme to defraud by knowingly and actively participating in the conduct that induced  LaSalle to make the loan on false pretenses.  As such, LaSalle is not entitled to judgment as to Count IV as against Charles Gitto.

## VII.    Conclusion

For all of the foregoing reasons, it is evident that there exists genuine issues of material fact and that the Plaintiff, LaSalle, is not entitled to summary judgment on any of the claims set forth in the complaint against the Defendant, Charles Gitto..

RESPECTFULLY SUBMITTED,
CHARLES GITTO,
By his attorneys,


*/s/ Maria A. Luise*_____
Frank Mondano (BBO#351540)
Maria A. Luise (BBO#55753)
Balliro & Mondano
99 Summer Street, Suite 1800
Boston, MA  02110
(617) 737-8442

Dated: September 12, 2006

## <u>Certificate of Service</u>

     I, hereby certify that this document with attached memorandum filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2006.

/s/ *Maria A. Luise*

_____
