**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| LA SALLE BUSINESS CREDIT, LLC f/k/a | ) | |
| LA SALLE BUSINESS CREDIT, INC., | ) | Case No. 04-12227-DPW |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GARY C. GITTO, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| FLEET NATIONAL BANK, et al., | ) | |
| | ) | |
| Trustee Process Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FIDELITY INVESTMENTS, INC., et al., | ) | |
| | ) | |
| Reach-and-Apply Defendants. | ) | |

_____)

**DEFENDANT CHARLES GITTO'S RESPONSE TO**
**PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS AND**
**DEFENDANT'S  COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56, and Local Rule 56.1, the defendant, Charles Gitto,

responds to the plaintiff, LaSalle Business Credit's ("LaSalle"), Local Rule 56.1 Statement of

Material Undisputed Facts and submits his Counterstatement of Material Facts of which he

contends there exists genuine issues to be tried.

**A.     Charles Gitto's Response to LaSalle's Statement of Material Undisputed**
**Facts in Support of its Motion for Summary Judgment**

**Parties**

1.     Based on the record, this statement is not disputed.

2.    This statement refers to the defendant, Gary Gitto.  Therefore, no response is required from Charles Gitto.

3.    This statement refers to the defendant, Frank Miller.  Therefore, no response is required from Charles Gitto.

4.    This statement refers to defendant, Maria Miller.  Therefore, no response is required from Charles Gitto.

5.    Based on the record, this statement is not disputed.

6.    This statement refers the defendant, Louis J. Pellegrine.  Therefore, no response is required from Charles Gitto.

7.    Based on the record, this statement is not disputed.

8.    This statement refers the defendant, Frank Miller and Kingsdale Corporation. The paragraph makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

**LaSalle Loan**

9.    Based on the record, this statement is not disputed.

10.    This statement refers to the Loan and Security Agreement between LaSalle and Gitto Global ("Loan Agreement").  In response, the defendant, Charles Gitto, states that the document speaks for itself.

11.    This statement refers to the Loan Agreement.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

12.    This statement refers to the Loan Agreement.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

13.     This statement refers to the Blocked Account Agreement entered into between LaSalle and Fleet Bank.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

14.     This statement refers to the terms of the Blocked Account Agreement.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

15.     This statement refers to the provisions Blocked Account Agreement.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

16.     This statement refers to the provisions of the Loan Agreement.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

17.     This statement refers to the checks deposited by Gitto Global into the Fleet Blocked Account.  The statement does not in any way reference the defendant, Charles Gitto. However, in response, he cites those portions of the record that support the contention that he had limited access to information regarding the financial activity at Gitto Global. (Chaisson Dep. pp. 61:3-23; Deakin Dep. pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12).

18.     This statement refers to the transfer of funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle.  The paragraph makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

19.     This statement refers to the LaSalle revolving loan.  The paragraph makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

**False Borrowing Base Certificates**

20.     This statement refers to the defendant, Frank Miller and the submission of daily borrowing base certificates to LaSalle, together with Gitto Global's sales, cash receipts, credit

memo journals and inventory valuation.  The paragraph also includes language from the borrowing base certificate that speaks for itself.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation or delivery of said borrowing base certificates.  (Chaisson Dep. pp. 66-67, 68-70, 71-72, 86-87, 96, 120).

21.    This statement refers to daily borrowing base certificates bearing Frank Miller's signature that were delivered nightly from July 25, 2002 to January 16, 2004.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation or delivery of said borrowing base certificates.  (Chaisson Dep. pp. 66-67, 71-72, 96, 120).

22.    This statement refers to Chaisson's preparation of the daily borrowing base certificates by inputting the amount of sales and amount of deposits for the day.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation or delivery of said borrowing base certificates.  (Chaisson Dep. pp. 66-67, 68-70, 71-72, 86-87, 96, 120).

23.    This statement refers to the specific conduct of the defendant, Frank Miller and does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

24.    This statement refers to the specific conduct of the defendant, Frank Miller and does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

25.    This statement refers to the specific conduct of the defendant Frank Miller as well as the conduct of Deakin and Chaisson.  The statement does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

26.    Based on the record, there is no dispute that LaSalle advanced funds to Gitto Global in accordance with the Loan Agreement and the LaSalle revolving loan.  However, this statement also refers to the borrowing base certificates submitted by Gitto Global to LaSalle and the J&J Account at Clinton Savings Bank.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation or delivery of borrowing base certificates and he had no access to information regarding the activity of the J&J account. (Chaisson Dep. pp. 13:17-24, 14-17. 20:16-24, 21. 30:20-24, 31:1-8, 68-70, 103:14-24, 104:1-3, 108:6-24; Deakin Dep. p. 60:8-14; Tenaglia Dep. pp.15:6-24, 16-17, 18:1-8).

27.    This statement refers to the Fleet Blocked Account and the purported inflated sales figures to fictitious customers and overstated sales to a legitimate customer.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he had limited access to information regarding the financial activity at Gitto Global. (Deakin Dep. pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12; Kozak Dep. pp. 247:1-24, 249: 1-13; Powell-Kotoch Dep. pp. 65: 17-24, 66-67).

28.    This statement refers to J&J Chemical, the funds transferred from the Fleet Block Account and representations in the borrowing base certificates.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he had limited access to information regarding the financial activity at Gitto Global, including the J&J Account. (Chaisson Dep. pp. 13:17-24, 14-17. 20:16-24, 21. 30:20-24, 31:1-8, 68-70, 103:14-24, 104:1-3, 108:6-24; Deakin Dep. pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12).

29.     Based on the record, this statement is not disputed.

30.     This statement refers to LaSalle's claim as to what is due and owing from Gitto Global.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he states that there is no basis in the record as to how this amount was determined.

## Accounts Receivable Fraud/Check-Kiting Scheme

**Evolution of the Fraud**

31.     This statement refers to the specific conduct of the defendants, Frank Miller and Maria Miller regarding the prebilling of orders.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in purported pre-billing or fictitious sales and invoices.  In fact, the record reveals that Charles Gitto had specifically asked the Millers to cease the prebilling.  (Kozak Dep. pp. 142:15-24, 143:1-7; Deakin Dep. pp. 53, 54-55, 57:24, 58:1-3, 59:16-24, 60:1-4, 81, 82:1-4, 279:15-21, 280:10-17).

32.     This statement refers to the defendants, Frank Miller and Gary Gitto, and Direct Wood & Products, Inc. (Direct Wood").  The statement makes no reference to the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he had no involvement with Direct Wood.  (Kozak Dep. pp. 252:17-24, 253; Deakin Dep. pp. 21:1-19. 33:21-24, 34:1-9).

33.     Based on the record, there is no dispute that Helen Kozak, was an administrative assistant at Gitto Global.  The remaining portions of this statement refer to the specific conduct of the defendant, Gary Gitto and Direct Wood.  The statement makes no reference to the defendant, Charles Gitto.  However, in response, he cites those portions of the record that

support the contention that he had no involvement with Direct Wood.  (Kozak Dep. pp. 252:17-24, 253; Deakin Dep. pp. 21:1-19. 33:21-24, 34:1-9).

34.    This statement refers to the defendant, Gary Gitto, and the Direct Wood Account. The statement does not in any way reference the defendant, Charles Gitto.   Additionally, it encompasses a specific time period ("at the end of 2000") when Charles Gitto was not at all active in the company.  However, in further response, he also cites those portions of the record that support the contention that he had no involvement with or access to Direct Wood.  (Kozak Dep. pp. 252:17-24, 253; Deakin Dep. pp. 19:5-19; 21:1-19. 33:21-24, 34:1-9, 414:18-24).

**Creation of J&J Chemical and Use to Inflate Sales Revenue**

35.    Based on the record, there is no dispute that in 2001, Charles Gitto loaned $1.5 million to Gary Gitto and Frank Miller.  However, the remaining portions of this statement refer to the J&J Chemical account and the specific conduct of the defendant, Frank Miller. In response, the defendant, Charles Gitto, cites those portions of the records that support the contention that he had no connection with J&J Chemical and was not an authorized signatory on any account.  (Chaisson Dep. pp. 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8; Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

36.    This statement refers to Gitto Global's borrowing under the LaSalle revolving loan and activity with the J&J Chemical Account.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he had no connection with activity of the J&J Chemical account and for that matter was not an authorized signatory on any account.  (Chaisson Dep. pp. 108:13-24;

Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8; Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

37.    This statement refers to the specific conduct of the defendants, Frank Miller and Maria Miller.  The statement also refers to Deakin's preparation of daily reports and fictitious sales.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation of the daily reports and the purported fictitious sales. (Bartlett Dep. pp. 50:14-24, 51-52; Deakin Dep. pp. 60:18-24, 61:1-11).

38.    This statement refers to the specific conduct of the defendant, Frank Miller and it references Gitto Global checks payable to J&J Chemical.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical or the signing of any checks. (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8;  Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

39.    This statement refers to the specific conduct of the defendant, Frank Miller and the activity with J&J Chemical checks.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical or the signing of any checks. (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8;  Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

40.    This statement refers to the specific conduct of the defendant, Frank Miller, and the depositing of Gitto Global checks made payable to J&J Chemical.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical or the depositing of any checks.  (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8;  Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

41.    This statement refers to the depositing of Gitto Global checks made payable to J&J Chemical.  The paragraph does not in any way reference the defendant, Charles Gitto. However, in response, he cites those portions of the record that support the contention that he was not involved with  J&J Chemical or the signing and depositing of any checks.  (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8;  Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

**Creating Fictitious Sales**

42.    This statement refers to the specific conduct of the defendant, Frank Miller.  The statement does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

43.    This statement refers to the specific conduct of the defendants, Frank Miller and Maria Miller and purported fictitious sales orders and invoices.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with sales orders and invoices.

(Chaisson Dep. pp. 34:1-24, 35-38:1-6, 39-40, 40-44:1-14; Deacon Dep. p. 18:12-17; Minardi Dep. p. 12:6-24).

44.     This statement refers to fictitious sales purportedly made to J-Tan Sales and Marketing, Inc. ("J-Tan"), Hemisphere, Color Compounds & Consultants ("CCC"), Velco, Zebulon and Hitachi Cable Inc.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved or aware of sales orders to said companies or of the "99" coding.  (Chaisson Dep. pp. 25-27, 28-29, 39:6-24, 40:1-21, 42:7-24, 43-44, 122:10-24, 123:1-18; Deakin Dep. pp.; 43-44, 46, 69, 120:22-24; 232:13-21; Moritz Dep. p. 49:9-24).

45.     This statement refers to the specific conduct of the defendants, Maria Miller and Frank Miller.  The statement also refers to fictitious customers and the maintenance of two sets of books.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with purported fictitious customers or the maintenance of two sets of books.  In fact, the record reveals that Charles Gitto was not involved in any of the financial aspects of the company.  (Kozak Dep. pp. 247:1-24, 249:1-13; Bartlett Dep. p. 74:15-16; Chaisson Dep. pp. 25-27, 28-29, 39:6-24, 40:1-21, 42:7-24, 43-44, 122:10-24, 123:1-18; Deakin Dep. pp.; 43-44, 46; 78:12-24, 79:1-20, 80:16-24, 81:1-8, 120:22-24; 121: 1-8, 232:13-24, 233:1-12; Moritz Dep. p. 49:9-24; Powell-Kotoch Dep. pp. 65:17-24, 66-67).

### Fictitious Customers

**Hemisphere**

46.     This statement refers to the specific conduct of the defendants, Frank Miller and Louis J. Pellegrine ("Pellegrine").  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

47.     This statement refers to the specific conduct of the defendants, Frank Miller and Pellegrine.  The paragraph does not in any way reference the defendant, Charles Gitto. Therefore, no response is required.

48.     This statement refers to the specific conduct of the defendant, Pellegrine.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

49.     This statement refers to the specific conduct of the defendant, Pellegrine.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

50.     This statement refers to the defendant, Pellegrine's girlfriend Carland.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

**J-Tan**

51.     This statement refers to John Tersigni and the formation of J-Tan.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

52.     This statement refers to the defendants Frank Miller and Gary Gitto. The paragraph does not in any way references the defendant, Charles Gitto.  Therefore, no response is required.

53.     This statement refers to the specific conduct of the defendant, Frank Miller.  The paragraph makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

**Hitachi**

54.     Based on the record, there is no dispute that Hitachi was a customer of Gitto Global.  But, the remaining portion of the statement refers to sales to Hitachi.  The paragraph makes no reference to the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with information regarding any sale orders for any company. (Chaisson Dep. pp. 34:1-24, 35-38:1-6, 39-40, 40-44:1-14,122-123; Deakin Dep. pp. 120:22-24, 121:1-8, 232:13-24, 233:1-12).

55.     This statement refers to the specific conduct of the defendant, Frank Miller.  The statement does not in any way reference to the defendant, Charles Gitto.  Therefore, no response is required.

**CCC**

56.     Based on the record, there is no dispute that CCC was a customer of Gitto Global.  But, the remaining portion of the statement refers to sales to CCC.  The paragraph makes no reference to the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with information regarding any sale orders for any company. (Chaisson Dep. pp. 34:1-24, 35-38:1-6, 39-40, 40-44:1-14,122-123; Deakin Dep. pp. 120:22-24, 121:1-8, 232:13-24, 233:1-12).

57.     This statement refers to the specific conduct of the defendant, Frank Miller.  The statement does not in any way reference to the defendant, Charles Gitto.  Therefore, no response is required.

**Velco**

58.    Based on the record, there is no dispute that Velco sold raw materials to Gitto Global at one time. However, the remaining portions of the statement refer to the defendant, Frank Miller.  The statement makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

**Zebulon**

59.    Based on the record, there is no dispute that Zebulon sold raw materials to Gitto Global at one time. However, the remaining portions of the statement refer to the defendant, Frank Miller.  The statement makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

**Daily Borrowing Base Certificates**

60.    This statement refers to the specific conduct of the defendants, Frank Miller and Maria Miller and the daily borrowing base certificates.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved in the preparation or delivering of said borrowing base certificates.  (Chaisson Dep. pp. 34-38; 66-67, 68-70, 71-72, 86-87, 96, 120).

## Clinton Savings Bank Credit Agreement

61.    This statement refers to the J&J Chemical Account described as a "brokerage account."  Based on the record, there is no dispute that the copy of Frank Miller's letter to Antony Gordon of Golden International Corp., dated November 20, 2002, with attached financial information, indicated that it was copied to Charles Gitto.  However, the record is not clear as to whether he actually received it or whether he even understood the financial information.  In

further response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical. (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 30:20-24, 31:1-8, 68-70, 103:14-24, 104:1-3, 108:6-24; Deakin Dep. p. 60: 8-14; Bartlett Dep. 34:12-24, 35:1-15, 147:10-24, 148:1-14; Tenaglia Dep. pp. 15:6-24, 16-17, 18:1-8).

62.     Based on the record, this statement is disputed in that it is based simply on the statement of Clinton Savings Bank officer, Michael Tenaglia, and there is no further evidence in the record whatsoever of Clinton Savings Bank's policies. Therefore, no response is required.

63.     This statement refers to the J&J Chemical checks and Clinton Savings Bank. The statement makes no reference to the defendant, Charles Gitto. However, in response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical or the depositing of any checks into Clinton Bank. (Chaisson Dep. pp. 13:17-24, 14-17, 20:16-24, 21, 108:13-24; Deakin Dep. pp. 57, 60:8-14, 80:16-24; 81:1-8; Bartlett Dep. pp. 53:8-24, 54:1-3, 56, 57:12-17, 74:15-16; Tenaglia Dep. pp. 15:6-24, 16,-17, 18:1-8).

64.     This statement relies on conclusory allegations and unsupported speculation in connection with Charles Gitto's wire transfers of $150,000 to the Clinton Saving's Bank on June 4, 2002 and June 6, 2002. (Moritz Dep. pp. 30:11-13, 100:7-19, 101:1-13; Kozak Dep. p. 52:6-22, 258:11-24; Deakin Dep. pp, 19:20-24, 20:1-7, 36:11-14)

65.     This statement refers to the defendant, Frank Miller's communications and meetings with Clinton Savings Bank officers, Michael Tenaglia and Robert Paulhus. The meeting was to review the activity in the J&J Chemical Account. The paragraph makes no reference to the defendant, Charles Gitto. However, LaSalle indicates in this paragraph that the recollections of the bank employees who attended the meeting differed as to the explanation

offered by Frank Miller.  Therefore, based on the record, the contents of the communications are in dispute.  (Paulhus Dep. pp. 11:21-24, 12, 13:1-18; Tenaglia Dep. pp. 24:17-24, 25:1-5).

66.    This statement refers to the defendant, Frank Miller's communications with Clinton Savings Bank.  The statement in no way references the defendant, Charles Gitto. Therefore, no response is required.

67.    Based on the record, this statement is not disputed.

68.    Based on the record, this statement is not disputed.

69.    Based on the record, this statement is not in dispute.

70.    This statement refers to the specific conduct of the defendant, Gary Gitto.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

71.    This statement refers to the specific conduct of the defendants, Frank and Maria Miller.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

72.    Based on the record, there is no dispute that Charles Gitto attended the closing of the J&J Chemical credit agreement with Clinton Savings Bank and that he signed a limited non-recourse guaranty and security agreement on behalf of Tradex.  However, the remaining portions of the statement contain conclusory allegations, unsupported speculation and improbable inferences.  In further response, Charles Gitto states that the claims made therein are not supported by the portions of the record cited by LaSalle.  (See Paulhus Dep. pp. 43-45).

73.    Based on the record, there is no dispute that on August 18, 2004, Charles Gitto signed an extension letter and a guaranty and that Clinton Savings Bank extended the maturity date of the credit agreement to September 15, 2004.  However, the remaining portions of the

statement contain conclusory allegations, unsupported speculation and improbable inferences.  In further response, Charles Gitto states that the claims made therein are not supported by the portions of the record cited by LaSalle. (See Paulhus Dep. pp. 78-81)

74.    This statement refers to the specific conduct of the defendant, Gary Gitto.  The paragraph does not in any way reference the defendant, Charles Gitto.  Therefore, no response is required.

75.    This statement references Gitto Global's deposits into the Fleet Bank Blocked Account of J&J Chemical account checks made payable to Gitto Global.  The statement does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with J&J Chemical or the depositing of any checks.  In fact, the record reveals that Charles Gitto was not involved in any of the financial aspects of the company.  (Chaisson Dep. pp. pp. 13:17-24, 14-17, 20:16-24, 21, 30:20-24. 31:1-8, 57:9-19,104:1-17, 108:13-24; Deakin Dep. pp. 43-44, 46, 57, 60:8-14, 78:12-24, 79:1-29, 80, 81:1-8, 114:1-19, 120:22-24, 121: 1-8, 232:13-24, 233:1-12, 375:14-24, 376, 377, 378:1-3;  Bartlett Dep. pp. 50-52, 53:8-24, 54:1-3, 56, 57:12-17, 68-70, 74:15-16; Kozak Dep. pp. 51:7-12, 249:1-13; Moritz Dep. p. 49:9-24; Paulhus Dep. pp. 102: 19-24, 103:1-5; Tenaglia Dep. pp.15:6-24, 16, 17, 18:1-8; Powell-Kotoch Dep. 65:17-24, 66-67).

## Accounts Payable Misrepresentations

76.    This statement references the specific conduct of the defendant, Frank Miller.  The statement refers to Miller's instructions to Rita Bartlett, the accounts payable clerk, that invoices from the large raw material suppliers were not to be entered into the computer system, but instead, kept in a file cabinet drawer ("secret garden").  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the

record that support the contention that he was not involved with said invoices or had knowledge of the drawer. (Bartlett Dep. pp. 17:8-14, 34:12-24, 35:1-15, 38-42, 44-45, 146-147, 148:1-14; Deakin Dep. pp. 130-131, 132).

77.    This statement refers to the purported accounts payable misrepresentations.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with invoicing and/or accounts payable. (Kozak Dep. p. 261: 6-10; Bartlett Dep. pp. 9:1-2, 17:8-14, 34:12-24, 35:1-15, 38-42, 44-45, 146-147, 148:1-14; Chaisson Dep. pp. 86-87; Deakin Dep. pp. 130-131, 132; Minardi Dep. pp. 60:8-24, 61).

**Inventory Misrepresentation**

78.    This statement refers to the specific conduct of the defendants, Frank Miller and Maria Miller.   The statement refers to the Millers' instructions to David Minardi, the purchasing manager, to change the identification of compounds being produced.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, in response, he cites those portions of the record that support the contention that he was not involved with the identification of compounds.  (Minardi Dep. pp. 8:8-24; 15:6-24, 16-17, 19:10-24, 20-21:1-17, 23:8-24, 24-25, 43-45, 47, 49-50).

79.    This statement refers to the specific conduct of the defendant, Maria Miller.   The statement refers to Miller's instructions to Robyn Merchant, the inventory clerk, to overstate inventory.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the purported overstatement of inventory.  (Merchant Dep. pp. 5:17-22, 17:18-

24, 18:1-11, 20:17-24, 21:21-25, 44, 45:1-9; Deakin Dep. pp. 18:12-17, 233:13-15; Minardi Dep. p. 12:6-16).

80.     This statement refers to the specific conduct of the defendant, Maria Miller and the purported inventory adjustment procedures.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the purported overstatement of inventory. (Merchant Dep. pp. 5:17-22, 17:18-24, 18:1-11, 20:17-24, 21:21-25, 44, 45:1-9; Deakin Dep. pp. 18:12-17, 233:13-15; Minardi Dep. 12:6-16).

81.     This statement refers to the specific conduct of the defendant, Maria Miller and the purported inventory adjustment procedures.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the purported overstatement of inventory. (Merchant Dep. pp. 5:17-22, 17:18-24, 18:1-11, 20:17-24, 21:21-25, 44, 45:1-9; Deakin Dep. pp. 18:12-17, 233:13-15; Minardi Dep. p. 12:6-16).

82.     This statement refers to the specific conduct of the defendant, Frank Miller, as to the Vitrolite product.  The paragraph does not in any way reference the defendant, Charles Gitto. However, he cites those portions of the record that support the contention that he did not have any involvement with the inventory and its inclusion and/or exclusion of the Vitrolite product. (Minardi Dep. pp. 29:16-24, 30, 31-33; Merchant Dep.. pp. 33:14-24, 34-36, 56:18-24, 57.).

83.     This statement refers to bank audits and the moving of inventory.  The paragraph does not in any way reference the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he was not involved with the inventory and/or bank audits.  (Merchant Dep. pp. 5:17-22, 17:18-24, 18:1-11, 20:17-24, 21:21-25, 44, 45:1-9; Deakin

Dep. pp. 18:12-17, 233:13-15; Minardi Dep12:6-16; Yancy Dep. pp. 10:13-16, 25:5-13, 20-21, 61:8-22; Stillwell Dep. pp. 8: 14-19, 68: 20-24, 69: 1-7; Powell-Kotoch Dep. p. 48:15-19).

84.     This statement refers to the specific conduct of the defendant, Frank Miller.  The statement makes no reference to the defendant, Charles Gitto.  Therefore, no response is required.

## False Audit and Examination Information

85.     This statement refers to the specific conduct of the defendant, Frank Miller and the purported creation of phony checks.  The statement in no way references the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the purported "phony checks."  (Deakin Dep. pp 99:21-24; 100:1-20).

86.     This statement refers to the specific conduct of the defendant, Frank Miller, and the manipulation of scanned documents.  The statement in no way references the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the purported scanning and manipulation of documents. (Mortitz Dep. pp. 42:4-24, 43, 44, 45:1-10, 47:5-24, 48:2-9, 50:10-19; 56:14-24, 57:22-24, 58:10-14, 60:9-14, 75:15-24, 76:1-6;  Deakin Dep. pp. 92:22-24, 93:1-8, 94:1-13; Kozak Dep. pp. 44:1-4, 50:3-12, 51:4-6)

87.     This statement refers to financial information provided to LaSalle by Gitto Global.  The paragraph in no way references the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the preparation of financial information nor did he participate in field audits.  (Deakin Dep.

pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12, Kozak Dep. p. 51:7-12;

Stillwell Dep. pp. 8:14-19, 68:20-24, 69:1-7; Powell-Kotoch Dep. p. 48:15-19).

88.     This statement refers to a take-out audit conducted by Alyssa Whepley, a field

examiner for LaSalle, on July 23-26, 2002.   The statement in no way references the defendant,

Charles Gitto.   However, he cites those portions of the record that support the contention that he

did not participate in any of the audits at Gitto Global or have access to any of the financial

information.   (Deakin Dep. pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24;

233:1-12, Kozak Dep. p. 51:7-12, 247:1-24, 249:1-13; Stillwell Dep. pp. 8:14-19, 68:20-24,

69:1-7; Powell-Kotoch Dep. p. 48:15-19).

89.     This statement refers to the specific conduct of the defendant, Frank Miller.   The

statement makes no reference to the defendant, Charles Gitto.   Therefore, no response is

required.

90.     This statement refers to financial information provided to LaSalle by Gitto

Global.   The paragraph in no way references the defendant, Charles Gitto.   However, he cites

those portions of the record that support the contention that he did not have any involvement

with the preparation of financial information nor did he participate in field audits.   (Deakin Dep.

pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12, Kozak Dep. p. 51:7-12,

247:1-24, 249:1-13; Stillwell Dep. pp. 8:14-19, 68:20-24, 69:1-7; Powell-Kotoch Dep. p. 48:15-

19).

91.     This statement refers to the specific conduct of the defendant, Pellegrine.   The

statement makes no reference to the defendant, Charles Gitto.   Therefore, no response is

required.

92.     This statement refers to the specific conduct of the defendant, Pellegrine, and the financial information on which LaSalle relied.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

93.     This statement refers to information provided to LaSalle by the defendant, Frank Miller and Deakin.  The paragraph in no way references the defendant, Charles Gitto.  However, he cites those portions of the record that support the contention that he did not have any involvement with the preparation of financial information or field examinations.  (Deakin Dep. pp. 78:12-24; 79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12, Kozak Dep. p. 51:7-12, 247:1-24, 249:1-13; Stillwell Dep. pp. 8:14-19, 68:20-24, 69:1-7; Powell-Kotoch Dep. p. 48:15-19).

94.     This statement refers to the specific conduct of the defendant, Pellegrine The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

95.     This statement refers to the specific conduct of the defendants, Frank Miller and Pellegrine.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

96.     This statement refers to the specific conduct of the defendants, Frank Miller and Pellegrine.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

97.     This statement refers to the provisions of the Loan Agreement between LaSalle and Gitto Global.  In response, the defendant, Charles Gitto, states that the document speaks for itself.  In further response, he states that it is unclear as to what "intent" refers to in this paragraph.

98.    This statement refers to the specific conduct of the defendant, Pellegrine.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

99.    This statement refers to the provisions of the Loan Agreement between LaSalle and Gitto Global.  In response, the defendant, Charles Gitto, states that the document speaks for itself.

100.    This statement refers to the specific conduct of the defendant, Pellegrine.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

101.    This statement refers to the specific conduct of the defendant, Pellegrine.  The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

## Efforts to Sell Gitto Global

**The Alpine Group**

102.    This statement refers to conversations between Frank Miller and his brother, Martin Miller.  In response, the defendant, Charles Gitto, cites those portions of the record that calls into question the contents of the conversation.  (Kozak Dep. pp. 143:19-24; 144:1-10; Angelini Dep. pp. 129).

103.    This statement refers to conversations between Frank Miller and Martin Miller. The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

104.    Based on the record, there is no dispute that in 2002, Martin Miller solicited interest from the Alpine Group in New Jersey and that Charles Gitto, Gary Gitto, Frank Miller and Martin Miller attended a meeting.  However, in response to the remaining portions of the statement, the defendant, Charles Gitto cites those portions of the record that call into question

Martin Miller's veracity. (Elbaum Dep. pp. 42:2-24, 43, 44-46:2-6; Karfunkel Dep. pp. 12:19-24, 13:1-7, 13:24-25, 14:1-18, 19:11-14).

105.    In response to this statement, the defendant, Charles Gitto cites those portions of the record that call into question Martin Miller's veracity. (Elbaum Dep. pp. 42:2-24, 43, 44-46:2-6; Karfunkel Dep. pp. 12:19-24, 13:1-7, 13:24-25, 14:1-18, 19:11-14).

**Vitrotech**

106.    Based on the record, this statement is not disputed.

107.    Based on the record, there is no dispute that on May 18, 2003, there was a meeting in California with Vitrotech, Frank Miller and Charles Gitto. However, in response to the remaining portions of this statement, the defendant, Charles Gitto, cites those portions of the record that support the contention that he was not part of the discussions with Vitrotech in connection with the financial information.  (Carlson Dep. pp. 23:12-25; Merry Dep. pp. 24:4-18, 35:8-24, 36:1-7, 66-67).

108.    Based on the record, there is no dispute that on June 30, 2003, Gitto Global entered into a purchase and sale agreement with Vitrotech and the document speaks for itself. However, in response to the remaining portions of this statement, the defendant, Charles Gitto, cites those portions of the record that support the contention that he was not part of the discussions with Vitrotech in connection with the financial information.  (Carlson Dep. pp. 23:12-25; Merry Dep. pp. 12:19-24, 13:1-7, 13:24-25, 14:1-18, 19:11-14).

109.    This statement refers to conversations between Charles Gitto and Stephen Merry. In response, the defendant, Charles Gitto, cites those portions of the record that support the contention that the statements attributed to him are inaccurate, taken out of context, not supported by the record cited, and repudiated by the fact that he did not have access to Gitto

Global's financial information.  (Merry Dep. pp. 39:16-24; 40:1-15; Deakin Dep. pp. 78:12-24;

79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12; See also, Deakin Dep. pp. 78:12-24;

79:1-20; 80:16-24; 81:1-8; 114:1-19; 232:13-24; 233:1-12; Kozak Dep. pp. 247:1-24, 249: 1-13;

Powell-Kotoch Dep. pp. 65: 17-24, 66-67).

110.    This statement references the specific conduct of the defendants, Frank Miller and

Maria Miller and their instructions to Merchant.  The paragraph in no way references the

defendant, Charles Gitto.  Therefore, no response is required.

111.    This statement refers to correspondence written by the defendants, Frank Miller

and Gary Gitto.  The statement and/or letter in no way reference the defendant, Charles Gitto.

Therefore, no response is required.

112.    Based on the record, the statement is disputed in that the portion of the record

cited (LaSalle's Exhibit 14) does not reference, incorporate or include in anyway the portion of

the statement referring to Charles Gitto not warranting that the balance sheets for Gitto Global

were prepared in accordance with GAAP, as they contained the "brokerage business..." (See

LaSalle's Exhibit 14).

113.    This statement refers to documents executed by the defendant, Gary Gitto. The

paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

**Defendants' Knowledge of and Benefit from the Fraud and Conspiracy**

**Gary Gitto**

114.    This statement refers to LaSalle's claims against the defendant, Gary Gitto.

Therefore, no response is required of Charles Gitto.

115.    This statement refers to LaSalle's claims against the defendant, Gary Gitto.

Therefore, no response is required of Charles Gitto.

116.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

117.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

118.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

119.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

120.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

121.     This statement refers to LaSalle's claims against the defendant, Gary Gitto.
Therefore, no response is required of Charles Gitto.

**Frank Miller**

122.     This statement refers to LaSalle's claims against the defendant, Frank Miller.
Therefore, no response is required of Charles Gitto.

123.     This statement refers to LaSalle's claims against the defendant, Frank Miller.
Therefore, no response is required of Charles Gitto.

124.     This statement refers to LaSalle's claims against the defendant, Frank Miller.
Therefore, no response is required of Charles Gitto.

**Maria Miller**

125.     This statement refers to LaSalle's claims against the defendant, Maria Miller.
Therefore, no response is required of Charles Gitto.

126.    This statement refers to LaSalle's claims against the defendant, Maria Miller. Therefore, no response is required of Charles Gitto.

127.    This statement refers to LaSalle's claims against the defendant, Maria Miller. Therefore, no response is required of Charles Gitto.

128.    This statement refers to LaSalle's claims against the defendant, Maria Miller. Therefore, no response is required of Charles Gitto.

**Charles Gitto**

129.    Based on the record there is no dispute that Charles Gitto was Chairman of Board for Gitto Global. However, in response to the remaining portions of the statement, Charles Gitto cites those portions of the record that conflict with the statement that he "oversaw" the manufacturing side of the business. (Moritz Dep. p. 124:14-24, 125; Casper Dep. pp. 40:16-25, 41:1-4; Deakin Dep. pp. 19:4-6, 113:11-24, 114:1-19, 376:13-24, 377, 378:1-3, 432:19-20; Kozak Dep. p. 18:4; Merchant Dep. pp 53-54, 55;1-11).

130.    Based on the record, it is not disputed that between 1997 and 2001, Charles Gitto was not active in the company. Further, based on the record, it is not disputed that in 1994, Charles Gitto loaned Gitto Global $1,500,000. However, the defendant cites those portions of the record that stand for the contention that there were many occasions when he had to loan money to the company.   (Kozak Dep. pp. 52:6-22, 258:11-24, Moritz Dep. pp. 30:11-13, 100:7-19; 101:1-13).

131.    Based on the record, this statement is not disputed.

132.    In response to this statement, the defendant, Charles Gitto, states that the portions of the record cited by LaSalle reflect only that there was a letter dated, May 24, 2002, to Michael Haddad, the President of Guaranty Business Credit. The defendant cites those portions of the

record that address the creation and circumstances of the letter and its attachment. (Kozak Dep.pp.119:5-24, 120, 255-257; Deakin Dep. pp. 407:5-24, 408-410).

133.    In response, the defendant, Charles Gitto, states that the portions of the record cited by LaSalle do not support the contents of this paragraph. In further response, the defendant cites those portions of the record that conflict with this statement. (Chaisson Dep. pp. 122:10-24, 123:1-18; Deakin Dep. pp. 78:12-24, 79:1-21, 80, 81:5-8, 114:1-19, 232:13-21).

134.    Based on the record, there is no dispute that Charles Gitto knew that Gitto Global had financial problems. However, in further response, he cites to those portions of the record that conflicts with the erroneously created impression that the existing cash flow problem was unique to the particular time frame. (Kozak Dep. pp. 54:19-24; 55:1-3, 92:21-23).

135.    In response to this statement, the defendant, Charles Gitto, cites those portions of the record that supports the contention that Kozak's memory as to her concerns regarding Gary were uncertain. Additionally, the quote attributed to Helen Kozak is taken out of context and does not accurately reflect what she said. (Kozak Dep. pp. 139:2-24, 140:1-22).

136.    Based on the record, there is no dispute that Charles Gitto spoke with Dr. Alfred Arcidi about investing money in Gitto Global. However, the remaining portions of the statement are taken out of context and do not accurately set forth the deposition testimony of Dr. Arcidi. (Arcidi Dep. pp. 12:13-24, 13:1-9, 18:8-10, 25:16-24, 26, 35-36).

137.    Based on the record, this statement is not disputed.

138.    Based on the record, there is no dispute that Charles Gitto owned Tradex International, through which a portion of the airplane expenses were handled. However, the defendant, Charles Gitto, states that the citations to the record by LaSalle do not support the

remaining portions of this statement regarding personal trips.  (Kozak Dep. pp. 65:17-24, 67:24, 68:1-16, 74:3-23).

139.    In response to this statement, the defendant, Charles Gitto, states that those portions of the record cited do not support the claims therein.  Therefore no response is required.

140.    In response to this statement, the defendant, Charles Gitto, states that those portions of the record cited do not support the claims therein.  Additionally, LaSalle relies on the affidavit of Craig Jalbert, a certified insolvency and restructuring advisor, whose only source of data was merely Gitto Global's computer-generated general ledger and other company records. This makes the documents relied on by Jalbert suspect since the record is replete with evidence of Frank Miller's falsification of company records.   (See LaSalle's Exhibit 23, Affidavit of Craig Jalbert, ¶¶ 14-18; See Moritz Dep. pp. 42:4-24, 43, 44:1-15, 60:9-14, 56:14-24, 57:22-24; Deakin Dep. pp. 92:22-24; 93:1-8).

**Louis Pellegrine**

141.    This statement refers to LaSalle's claims against the defendant, Louis Pellegrine. Therefore, no response is required of Charles Gitto.

142.    This statement refers to LaSalle's claims against the defendant, Louis Pellegrine. Therefore, no response is required of Charles Gitto.

143.    This statement refers to LaSalle's claims against the defendant, Louis Pellegrine. Therefore, no response is required of Charles Gitto.

## Efforts to Conceal Fraud and Conspiracy

144.    This statement refers to the defendant, Gary Gitto's instructions to Helen Kozak. Therefore, no response is required of Charles Gitto.

145.    Based on the record, there is no dispute that boxes were removed from Gitto Global and taken to Charles Gitto's house.  However, the defendant, Charles Gitto, cites those portions of the record that support the contention that said boxes were not removed at his direction.  (Kozak, Dep. pp 149:7-17; 157:4-70).

146.    Based on the record, there is no dispute the boxes were placed in Charles Gitto's garage.  The defendant cites those portions of the record that support the contention that the boxes did not belong to Charles Gitto.  (Kozak, Dep. pp 149:7-17; 157:4-70)

147.    This statement refers to the conduct of the defendants, Frank Miller and Maria Miller. The paragraph in no way references the defendant, Charles Gitto.  Therefore, no response is required.

**B.    Charles Gitto's Counterstatement of Material Facts in Support of his Opposition to Plaintiff's Motion for Summary Judgment**

**Gitto Global's Structure**

1.    Gary Gitto and Frank Miller are the owners of Gitto Global.  Charles Gitto has no ownership interest in the company, but holds himself out to be the Chairman of the Board.  Each assumed specific roles within the corporation.  Frank Miller primarily focused on the accounting and financial end of the business while Gary Gitto tended to the sales.  Charles Gitto was involved with the production side, primarily scheduling.  Maria Miller, Frank's wife, also worked for the corporation and did the invoicing and supervision of inventory.  (Deakin Dep. pp. 18:12-17, 19:1-3; Kozak Dep.pp. 18:1-6; 51:7-12, 246:1-9; Minardi Dep. p.12; Bartlett Dep. p. 9:18-20).

**Charles Gitto's Involvement in Gitto Global**

2.    In the beginning, Charles Gitto played an active role in the operation of the business and focused on manufacturing.  However, there came a time when Gary Gitto did not

want his father as involved in the business. Therefore, Charles Gitto took a back seat for awhile. This coincided with his marriage and an extended period of time in Florida. In April, 2001, he returned to Gitto Global in a more limited capacity. At the time, he was approached by Frank Miller and Gary Gitto for a loan of $1.5 million. (Deakin Dep. pp. 19:4-16; 113:11-24; 114:1-19; Kozak Dep. pp. 18:4; 52:6-22; Bartlett Dep. 100:23-24; 101).

3.      Charles Gitto's return to the company overlapped with the loans he made to Gary and Frank Miller of $750,000 apiece. According to Helen Kozak, "this happened because we had an issue with the Guaranty Bank, where they …almost closed the doors on Gitto/Global. Gary and Frank approached Charlie because their backs were against the wall. They approached Charlie because …they knew that he had funds and contacts, and to try and help save the company." Evidently, they would always approach Charles Gitto when they needed money. In fact, in the past he had loaned the company funds in order to buy product they needed to fill orders. He would often come to the rescue to save the company from a cash shortfall. Kozak's opinion was that in the ten years of her employment, the company was never that financially sound. They were always teetering, but somehow they managed to pull through. Global went through several banks and was often not paying their bills on time. (Kozak Dep. p. 52:6-22; 54:19-24; 55:1-3; Moritz Dep. pp. 30:11-13; 100:7-19; 101:1-13).

4.      Charles Gitto never gained back any real authority as far as the day to day decision-making and operation of the company. It was clear that Frank Miller and Gary Gitto were the ones running the show. At first, they were all "bosses" – "Charlie's request was as good as Gary's or Frank's." But, as things progressed, the final say was Gary and Frank. (Bartlett Dep. pp. 98-100; 101; 102:1-5). Charles Gitto was basically just doing whatever they allowed him to do which was primarily the production meetings. There would be numerous

times when Charles Gitto would give an order or issue an edict and Gary Gitto or Frank Miller would overrule it.   (Deakin Dep. pp. 113:11-24; 114:1-19; 432:19-20; Moritz Dep. pp. 124:14-24; 125; Carlson Dep. p. 23:17-18).

5.     Basically, Charles Gitto would run the production meetings.  The attendees would be the plant manager, scheduler, purchaser, shipping, salespeople and operations.  In these meetings, they would evaluate the open orders to assess what needed to be made and determine if raw materials were needed to complete jobs.  Additionally, they review the production from the day before, to see if there were problems. The open order reports would be made available so that they knew which orders needed to be made.  Charles Gitto did not direct what orders would be produced when.  Instead, there was usually a discussion because the report would have certain dates so you could determine what was late and prioritize for scheduling purposes.  (Merchant Dep. pp. 53; 54; 55:1-11; Minardi Dep. pp. 37-39).

6.     In 2001, a typical day for Charles Gitto, unless he was out of town, was arriving at the facility mid-morning, at approximately 10:00 a.m.  Typically he would have a production meeting at around lunchtime and then leave at 2 or 3 o'clock.  (Kozak Dep. p. 263:1-9).

**Direct Wood Account**

7.     William Deakin was the Controller and worked closely with Frank Miller.  Direct Wood & Paper Products ("Direct Wood" or "Direct Chem") was organized in 1997 and an account was opened at Fleet Bank.  Deakin didn't really know what Direct Wood did, but he had noticed that Frank Miller used it to pay invoices.  At the end of 2000, Frank Miller informed him that Fleet Bank was noticing Gitto Global was depositing  monies in its account and issuing checks in the same amount to Direct Wood.  Fleet requested that the account be closed. (Deakin Dep. pp. 21-23).

8.      Charles Gitto had no connection whatsoever with the Direct Wood account.  In fact, he was not actively involved in Gitto Global during the existence of this entity.  Deakin testified that he never discussed Direct Chem or Direct Wood with Charles Gitto.  All Deakin's instructions and communications concerning the transactions between Direct Chem/Direct Wood and Gitto Global came from Frank Miller.  (Deakin Dep. pp. 34: 1-9).  Similarly, Helen Kozak never had a conversation with Charles Gitto about Direct Wood.  Gitto never gave her any instructions with respect to any deposits or withdrawals having to do with that account.  (Kozak Dep. pp. 252:17-24; 253).

**Prebilling**

9.      As far back as 1995, Frank Miller was involved with the pre-billing.  At first it started out with having legitimate sales orders and just billing a week ahead of time.  Later, it got to the point where Miller didn't have any orders to pre-bill so he started to make up invoices.  He would instruct Maria Miller as to how much he needed in sales and she would inform Deakin.  Once the deliveries were put in the system, an invoice would be generated.  (Deakin Dep. pp. 53-59, 60:1-4; Fuller Dep. p. 64).

10.      Deakin never spoke to Charles Gitto about pre-billing.  However, in the early 1990's, Deakin did give Charles Gitto aging schedules that included prebilled invoices.  But, Deakin explained that the document would not have reflected what was prebilled.  There was no way to discriminate off the report what was and wasn't a prebill.  Additionally, at that point the reports given to Charles Gitto did not show fictitious customers.  There were just legitimate customers that were being prebilled.  (Deakin Dep. pp. 57:24; 58:1-3; 81; 82:1-4).  When the issue was brought to Charles Gitto's attention, he immediately asked Frank Miller and Maria Miller to cease the activity.  (Deakin Dep. p. 280:10-17, 281:1-14).

11.    Kozak also remembered that Charlie was "hot about prebilling," and he would address Frank Miller about it.  "Charlie use to chase Frank Miller up and down the halls telling him, "No more prebills."  "No more prebills."  (Kozak Dep. pp. 142: 15-24; 143:1-7).

**J&J Chemical**

12.    Kingsdale Corporation, d/b/a J&J Chemical Distributors (J&J Chemical), was owned by Frank Miller.  In April 2001, Frank Miller set up the Kingsdale Account at the Clinton Savings Bank with the monies he and Gary borrowed from Charles Gitto.  Miller was a corporator of Clinton Bank and he informed Stephen Cash, the President, that he was looking to support the bank but that Gitto Global's business account was too large for Clinton.  However, he told Cash that he had a subsidiary account he sometimes used to purchase raw materials (Kingsdale).  (Deakin Dep. pp. 19:20-24; 20:1-7; 34:16-20, 36:11-14; Cash Dep. pp. 35:16-24, 36:1-20; Paulhus Dep. p. 54:11-19).

13.    The original signature cards used to open the account in the name of Kingsdale Corp, d/b/a J&J Chemical ("J&J Chemical Account"), had signers of Thomas Sullivan and Frank Miller.  In August 2002, John Tersigni was added as a signer and Thomas Sullivan was deleted.  Charles Gitto was never a signatory on this account.  The Gitto Global checks that were written and deposited to the J&J account were either stamped or signed by Frank Miller (Tenaglia Dep. pp. 15:6-24, 16-17; Chaisson Dep. pp. 108:6-24, 109:1-2).

14.    The J&J Chemical Account was basically used in the same manner as the Direct Wood Account.  Deakin knew that the purpose of the account was so that they could pay down invoices.  Frank Miller didn't have to specifically explain it to him because Deakin knew what Miller was doing.  Frank Miller did reveal to Deakin that Charlie Gitto had loaned him the money to put in this account.  In Deakin's opinion, if Charles Gitto had known the true purposes

of the account, he wouldn't have invested the $1.5 million. (Deakin Dep. pp. 35-36; 420:24; 421-422; 423:1-2).

15.     Rita Bartlett was the accounts payable clerk. She had the authority to pay car loans, credit cards and basically everyday monthly bills. However, when it came to regular invoices from suppliers, she was specifically told when to pay them by either Deakin or Frank Miller. (Bartlett Dep. pp. 9:1-2; 17:8-14).

16.     Frank Miller directed the use of J&J Chemical Account. He instructed Deakin and Bartlett regarding the Gitto Global checks made payable to J&J Chemical. On a daily basis, without invoices, he instructed Deakin as to what was needed and how much to put through the account. Deakin would give Bartlett a list of checks for J&J Chemical from information that he would generate off the computer. There would be an invoice number, with the day's date, how many pounds of material it was and how much a pound. The check was written for that amount and made payable to J&J Chemical. At first, Frank Miller signed the checks, but then there was a stamp used with his signature. The stamp was actually used for all checks not just J&J. Charles Gitto had absolutely no authority to sign checks and it would be on only rare occasions that Gary Gitto would sign one. (Chaisson Dep. p. 57:12-16; Bartlett Dep. pp. 50:5-24, 51-52, 53:8-24; 54:1-3; 56; 57:12-17, 74:15-16; Deakin Dep. p. 60: 8-14).

17.     Janice  Chaisson worked as accounts receivable. On almost a daily basis, she was instructed by Frank Miller to type up J&J checks for deposit. Miller would give her an amount and she would type up the checks made payable to Gitto Global. It would be more than one check since it had to be under $100,000 to clear the bank. Frank Miller or Deakin would tell her to hit the oldest invoices on the accounts. She would determine which invoices to apply by the aging that she maintained. She stamped the checks with John Tersigni's name and they were

deposited into an account at Fleet Bank.  Then, on a spreadsheet she would list the checks, the name of the company and their corresponding invoices.  This information was stored in her computer and only Deakin and Frank Miller had access.  Chaisson never furnished the spreadsheet to anyone but the two of them.  To her knowledge, Charlie Gitto did not know she was maintaining a spreadsheet with this type information.  The spreadsheets were never given to him.  (Chaisson Dep. pp. 13-17, 18-22, 30-31; 104).

**Fictitious Companies**

18.    There were no invoices created for the daily sales from J&J Chemical to Gitto Global.  Chaisson was told by Frank Miller that they were doing this; issuing J&J checks to cover fictitious sales, more or less to boost volume.  To support the sales by Gitto Global, Frank Miller directed Maria Miller to create sales orders for fictitious customers.  Maria Miller would pick a product, choose an amount and dollar value, and generate an invoice.  This information went to shipping and they would create a packing slip and bill of lading.  Chaisson would then go to her computer and print out an invoice which she filed by customer name.  (Chaisson Dep. pp. 30:2-13, 34-38; Fuller Dep. p. 28:17-24, 29-30).

19.    Chaisson explained that the fictitious sales were made to J-Tan, Hemisphere, Color Compounds, Velco, Zebulon and Hitachi.  At Frank Miller's direction, invoices would not be sent, but they would be generated for the sales.  Chaisson knew by the large amounts invoiced that the companies were fictitious.  Charles Gitto would get a production report on daily basis that would contain the legitimate orders to be made.  So, if there were legitimate orders to Colors Compounds (an actual customer of Gitto Global) he would see that.  As to the fictitious companies, there wouldn't be any legitimate orders to those companies so he wouldn't see any of

those.  (Deakin Dep. pp. 120: 22-24; 121:1-8; Chaisson Dep. pp. 25:13-24, 26-29; Fuller Dep. pp. 22-23.).

20.    At first, the real receivables and the fictitious receivables were combined into one aging schedule.  Then, at some point, Chaisson segregated the real sales from the fictitious ones on the aging report by using the customer code – "99."  The "99" aging report would be printed at the end of the month when Chaisson did a closing which consisting of various reports.  She would give the legitimate receivables and the "99" report to Deakin and Frank Miller.  Then, they were filed in a cabinet located in Deakin's office.  (Chaisson Dep. pp. 39:4-24, 40:1-21; 43:5-24, 44:1-9; Deakin Dep. pp. 68, 69: 15-24).

21.    There would be times when Charles Gitto would request a copy of an aging report for his production meetings.  He would ask for it in order to see what invoices were owed.  For instance, if they couldn't get supplies from a company because they weren't paid, that would prompt Charlie to ask for an aging.  Chaisson was more apt to say that the aging she would provide Charles Gitto would not include the fictitious sales – she would have printed the actual report.  In fact, she doesn't think she ever gave Charles Gitto a report with the phony information and she never discussed the situation with him.  (Chaisson Dep. pp. 122:10-24, 123: 1-18; Kozak Dep. p. 133:16-23).

22.    There were really no records going to Charles Gitto where the financial improprieties were apparent.  You could look at an aging schedule, but you could not tell the real from the false, those that were prebills or when they went out.  You had to know and somebody had to keep track of it.  Deakin also recalled that at the point when the aging schedules included the fictitious information, they were not going to Charles Gitto because it was during the time

period when Deakin was not allowed to give Gitto any financial information.  Deakin believes

that Charlie never saw any of those.  (Deakin Dep. pp. 232:13-24; 233:1-12).

**Accounts Payable**

23.     Frank Miller would instruct Rita Bartlett as to which suppliers to enter into the

system.  The unpaid invoices/account payables that didn't show up on the stored financial

information were compiled in Bartlett's desk drawer.  Most of the time, the payables would only

be paid when Gitto Global needed to buy materials from a particular company.  If there was a

balance, the company would want their money before they shipped the next order.  Bartlett

would cut post-dated checks and try to strike a deal where the company would be willing to

deposit the checks at a later date.  Frank Miller would determine which invoices to pay because

Deakin and Bartlett had no idea which chemicals were more important than others in the process.

Miller would go to the drawer, pull out a particular invoice to see what his exposure was, and

then instruct  Bartlett to call the company to see if they would accept post dated checks.  Deakin

never told Gary Gitto or Charles Gitto about the invoices that would go in the drawer and this

information would not show up on any type of financial information that was generated.  As a

joke, Bartlett named the drawer "secret garden,' but there was really nothing secret about it.

However, the only people that would really have any business going in there are Bartlett, Frank

Miller, Deakin or the purchasing agent, David Minardi.  (Bartlett Dep. pp. 17:8-14, 34:12-24,

35:1-15, 38-42, 44-45, 146-147, 148:1-14; Deakin Dep. pp. 130-131, 132).

24.     Bartlett recalled that in 1997, not too long after she started, Charles Gitto was on

"a payables kick" for a month or two.  Bartlett would have to run a report for him, even though

he didn't know how to read it.  He would look at the payables on the report and see a name, but

he wouldn't understand anything else.  Bartlett never discussed with Gitto that only certain

payables were shown on the report.  She stated that "there was actually a comical element to the idea that Charlie would be helping her with payables."  He didn't understand how a cash requirement worked and he didn't know how to follow it.  (Bartlett Dep. pp. 34:12-24; 35:1-15; 147:10-24; 148; 1-14).

**Adjusted Inventory**

25.    Robyn Merchant was in charge of inventory control.  She did the production paperwork and reports.  One month-end report she ran would detail what the company had in inventory.  The report would indicate the compound and/or the raw material and would set forth the pounds, the value and the total value.  At first, Merchant would give the report to an employee, "Karen," but eventually it was given to Maria Miller.  Maria would give it back with handwritten changes for Merchant to enter.  Maria would change the figures in the report by taking from a different product and lessen what was there and adding that to the negative balance.  By adjusting the level, the value of the inventory was changed.  There were also changes made as to pricing.  If the inventory value needed to be increased that would be accomplished by increasing the price.  Then, Merchant would generate a new report and give it to Maria Miller.  During the last two or three years of activity, Maria Miller would tell Merchant to go to Deakin for the adjustments.  Deakin never discussed the "phony" inventories with Charles Gitto and wouldn't have any reason to.  (Merchant Dep. pp. 5:17-22, 17:18-24; 18:1-11; 20; 17-24; 21-25; 44; 45:1-9; Deakin Dep. p. 18:12-19, 233: 13-15; Fuller Dep. pp. 55-56; Minardi Dep. p. 12:6-16).

**Changing Compounds**

26.    David Minardi had conversations with Frank Miller about changing the identification of compounds.  There was a book where Minardi would change the formulations.

38

At Frank Miller's direction, he would change the name from one name to another. He would

also note the lot #s and the product's ship date. Minardi would white out the product name and

write in the new one. Minardi believed he was actually changing the name not the compound.

Charles Gitto was aware of the renaming of the formulas because it was at the production

meeting the formulas had to be produced. But, he didn't know what it was previously or that it

had been whited out. All Charlie Gitto saw was the "relabeled" formula. The originals (with

white-out) would not be shown at the production meeting. The only one seeing the relabeled

formula was the lab, the people on the lines producing, the blenders and inventory. (Minardi

Dep. pp. 15:16-24, 16, 17:1-5, 22:9-24, 23-25, 43-45, 47:2-24).

### Borrowing Base Certificates

27.     In order to receive funds pursuant to the Loan Agreement with LaSalle, Janice

Chaisson, on behalf of Gitto Global, delivered to LaSalle daily borrowing base certificates. She

would include the amount of sales for the day as well as the amount of deposits. Chaisson would

get the information from the daily sales which would include both the actual and fictitious.

Additionally, the deposits would include J&J Chemical as well other customers. Before

Chaisson submitted the borrowing base certificate, she would show it to Bill Deakin or Frank

Miller so that they would know where they stood with their line of credit. Sometimes, they

would increase or decrease a figure and any increase would be supported by more invoicing.

Whatever Chaisson was told to do, it was always under the direction of Frank Miller. She was

never told by Gary Gitto or Charles Gitto to produce reports with phony information. In fact,

Chaisson rarely communicated with Charles Gitto. He would sometime call her to find out if a

customer had paid. But, other than that, she didn't have much contact with him. (Chaisson Dep.

pp. 66-68; 70-72, 86-87; 96; 120).

28.    Kozak never saw or heard anything form Charles Gitto that caused her to believe that he was involved in anything that was going on down in accounting.  (Kozak Dep. p. 261:6-10).

**Charles Gitto's Access to Financial Information**

29.    There was a period of time, beginning in the late 90's, where Gary Gitto did not want his father, Charles Gitto, to have any financial information.  Deakin received specific instructions not to give Charles Gitto anything unless he had Gary's permission.  Gary would only allow his father to see certain things.  (Deakin Dep. pp. 79:18-21, 80: 1-6, 81:5-8).  For example, Deakin recalled Charles Gitto requesting a cash flow report, but he doesn't know if he actually gave it to him because it was during the time when Gary Gitto instructed him not to give Charlie any financial information unless he approved it.  Charles Gitto may have asked for things, but it didn't mean that Deakin gave it to him.  Helen Kozak also recalled a period of time when she was operating under specific instructions from Gary Gitto and Frank Miller not to release any information to Charles Gitto about anything having to with finances.  (Deakin Dep. pp. 78:12-24; 79:1-20; 80: 16-24; 81:1-8; Kozak Dep. pp. 24:1-24, 249:1-13).

30.    Deakin also described a certain period of time when Charles Gitto was using his offices and participating in the business, and then the next thing, no one was to give him any information and he was out of the loop.  There were also a period of time he spent in Florida and he'd come to Massachusetts, conduct business with Helen Kozak, and then left.  During this time, he wasn't even calling production meetings.  Deakin related that first, Gary Gitto instructed him that Charles Gitto was not to get anymore money, then he was told not to give him any financial information, and then Charlie Gitto started to be absent on a semi-regular basis for an extended period of time.  Even after April, 2001, when Charles Gitto got back involved with Gitto Global,

Deakin was still not giving him any financial information without Gary Gitto's permission. (Deakin Dep. p. 114: 1-19, 376:13-24; 377; 378:1-3).

31.    While Charles Gitto was in Florida he would sometimes request information on the daily pounds sold and the daily dollars. Sharon Powell-Kotoch, a secretary, would fax him the numbers. Eventually, Gary Gitto instructed her not to do that. He would tell Charlie to get the numbers over the phone. Sharon was aware of Gary Gitto's edict that his father not be given information about the company. Her sense was that it was because Charlie was an explosive person and would not handle it in a calm manner. Sharon didn't think that Gary wanted Charlie to know how financially and deep in debt they were. Charlie would have been very upset. Gary kept the information from him by just telling Frank and Bill not to give him financial information. He wanted to sugarcoat it. (Powell-Kotoch Dep. pp. 65-67).

32.    The financial information of Gitto Global was stored on a computer on a Wang system. Only certain people could access it because it was password protected. Deakin was the only one who had the password. So you would have to know the right person to ask in order to obtain certain information. (Deakin Dep. pp. 268; 269:1-2; 410:23-24; 411:1-6).

33.    At a certain point, Deakin needed approval before he could write a check out to Charles Gitto. In the beginning, whenever Charles Gitto said, "Give me money," Deakin gave him the money. Then, Gary Gitto instructed him not to do this without prior approval. This was a separate instruction from the one forbidding him to release any financial information. Similarly, Bartlett remembered receiving a memo telling her that nothing was to be paid to Charles Gitto unless Gary Gitto approved it. (Bartlett Dep. pp. 68-70; Deakin Dep. pp. 375:14-24; 376:1-12).

34.    All Gitto Global checks were usually signed by Frank Miller (or stamped with his name).   If Frank Miller wasn't around then Gary Gitto could sign checks.   Charles Gitto had no authority to sign checks at all.   It was clear that the official authority to effect the distribution of monies belonging to Gitto Global was not Charlie Gitto.   Additionally, at various points in time, he was to a certain extent frozen out of the activities.   Then there was a period of time when even though he was there, he was just not particularly involved in the activities of the company. (Kozak Dep. p. 247:1-24; Chaisson Dep. p. 57:13-16; Bartlett Dep. p. 74:15-16; Carlson Dep. p. 23:17-18).

35.    During the course of Gitto Global's dealings with Guaranty Business Credit Corp. ("Guaranty Credit"), Michael Haddad, the President of Guaranty Credit, received correspondence, dated May 24, 2002, purportedly from Charles Gitto.   Attached to said correspondence was a receivable aging summary which included fictitious customers.   Upon review of the letter, Helen Kozak felt that Charles Gitto did not dictate the contents because of the specific language contained therein.   Kozak didn't believe that Charlie would have use words such as, "If you have a need for further elaboration" or "No receivables of consequence."   Kozak concluded that Frank Miller probably dictated the letter to her and Charlie simply signed it.   As to the attachment containing the financial information, it would have been given to her by Frank Miller or Bill Deakin.   It was not information that Charlie Gitto would have generated.   He would not have compiled the numbers and put them on spread sheets.   It was not an aspect of what he did at Gitto Global.   Kozak was not absolutely certain that the aging summary was attached to the letter at the time she presented it to Charles Gitto.   (Kozak Dep. pp. 119:5-24; 120; Kozak Dep. pp. 255; 256; 257).   Additionally according to Deakin, the aging summary that was attached to the letter represented the time frame in which Charlie Gitto, by specific

instruction, was cut out of the financial loop unless Gary Gitto gave approval.  (Deakin Dep. pp. 409:7-24; 410:1-12).

**Scanning Documents/Creating Checks**

36.     In and around 2001, on a regular basis, Frank Miller would provide John Moritz (a Gitto Global employee) with copies of documents to be altered.  Moritz would use a scanner and manipulate the document per Miller's instructions.  Moritz recalled altering checks as well as invoices.  This scanning process allowed Moritz to change an authentic check of a particular company so that it would match with the information that was on the aging schedule.  He would scan in a legitimate check and then cut and paste numbers.  The scanning was done in Frank Miller's office and they went to great lengths to ensure that what was being done was kept quiet.  Charles Gitto was not aware of the scanning or the manipulation of documents.  Moritz had absolutely no conversation with Charlie about what was happening.  (Moritz Dep. pp. 42:4-24; 43, 44:1-15, 60:9-14, 56:14-24; 57:22-24; Deakin Dep. pp. 92: 22-24; 93:1-8; Kozak Dep. p. 51: 4-6).

37.     The scanner would not only copy the checks as they were, but also the signatures on the check as well.  Deakin noted that this same technology could be used to copy a signature and change signatures on correspondence. (Deakin Dep. pp. 407:9-24; 408:1-50).

38.     At Frank Miller's direction, Deakin would create checks using the Versa Check program.   Deakin does not believe that anyone knew that they were creating these checks.  He specifically did not believe that Charlie Gitto knew.  Deacon states that he didn't go to Charlie Gitto about his concerns because he was under instructions not to tell Charlie anything financial unless he went through Gary first.  (Deakin Dep. pp. 99: 21-24; 100:1-20; 107).

**Charles Gitto's Management style**

39.     The consensus among Gitto Global employees was that Charles Gitto possessed an erratic personality.  It was a matter of common knowledge that his management style was "bombastic" and that people essentially just let him rant a little and then go about their business. Charlie was easily annoyed and prone to outbursts of anger.  He yelled considerably and didn't always make sense.  In fact, he was described as "fanciful," "whimsical" and even "confused." He had a tendency to "bluster a lot." (Minardi Dep. pp. 62-63; Deakin Dep. pp. 431: 23-24; 432:1-10; Kozak Dep. pp. 261:11-24; 262:1-17).

40.     Charles Gitto's tirades and erratic behavior were a standard joke.  He would fire people even though he didn't have that kind of authority.  If anything went wrong Charles Gitto had the fastest trigger finger on personnel.  People would get fired six or seven times and show up the next day.  (Bartlett Dep. pp. 102:6-24; 103-104; 105:6-19; Merchant Dep. pp. 64:5-24; 65:1-4; Mortiz Dep. p. 93:8-17).

41.     Charles Gitto had a tendency to raise his voice and issue blanket directives.  There were times when Deakin would get further clarification from Frank Miller in connection with certain of his directives.  On occasion it would happen that Charlie's directives would be countermanded by either Frank Miller or Gary Gitto.  According to Deakin, when push came to shove, Charlie was really not the boss.  (Deakin Dep. pp. 354: 23-24; 355; 356:1-14).

**Personal Loans Account**

42.     Attorney Michael P. Angelini represented Charlie in various personal and business matters.  In his view, Gary Gitto, Charlie Gitto and Frank Miller were not of one mind with respect to the operations and direction of Gitto Global.  Angelina recalled correspondence he had received from Charlie Gitto wherein Charlie addressed Gitto Global travel and

entertainment expenses.  Angelini inferred from that particular correspondence that Charlie thought Gary and Frank Miller were spending too much on travel and entertainment.  (Angelini Dep. pp. 9-10; 12-13; 70; Angelini Dep (Day 2) pp. 27-29).

43.    Gitto Global was paying some personal expenses for the principals, including Charles Gitto.  For example, there were bills for landscaping, snow removal, painting, plumbing and insurance.  Everything that was personal, Rita Bartlett, put to the loan account.  They each had a loan account and anything personal would be charged to that account.  Helen Kozak also handled Charles Gitto's personal checkbook up until the time he married.  (Kozak Dep. p. 26:11-22, 27:4-10; Bartlett Dep. p. 23:14-23).

44.    All of Charles Gitto's airplane expenses were handled through Tradex International.  Since Gitto Global used the plane for business purposes there was an agreement that the company would cover a percentage of the expenses.  Gary Gitto and Charles Gitto agreed that the company would contribute towards one-half of the chief pilot, a quarter of the insurance, and half of the hangar.  It was spelled out in a handwritten memo from Gary Gitto that Kozak kept for reference.  (Kozak Dep. pp. 65:17-24; 66:1-13, 143:19-24; 144:1-10, Angelini Dep. pp. 128-129).

**Clinton Bank**

45.    In April, 2002, Clinton began questioning the activity in the J&J Chemical Account.  There were several conversations between Frank Miller and officers of the bank, specifically, Joseph Guercio, Michael Tenaglia, and Stephen Cash.  Frank Miller offered different explanations as to why there were returned checks.  First, Miller explained that Gitto Global switching banks and that a new account had not yet been established so that checks were returned.  Another reason was that the transactions were necessary so that Gitto Global could

process certain of their products with some type of additive without creating patent problems with other manufacturers. Miller also stated that the business was being sold, but that the process was delayed because the interested party had gone public. Despite the varying explanations, both Cash and Tenaglia were satisfied. Although Guercio was suspicious, he felt that Frank Miller's explanations were plausible. Additionally, at that time, an FDIC examiner had come to the same conclusion. Similarly, Robert Paulhus, another Clinton Bank officer, felt that what Miller described was not out of line and practical. All the financial information the bank received came from Frank Miller. They never received any information whatsoever from Charles Gitto. (Cash Dep. p. 46:3-24, 60:11-24, 61:1-6; Guercio Dep. pp. 15:5-22, 26:7-24, 27:1-15, 31:10-24, 32:1-10; Tenaglia Dep. pp. 12:14-22, 25, 32, 95-96; Williams Dep. pp. 36:16-24, 37:1-6; Paulhus Dep. p. 102:15-24).

**Problems with Guaranty Bank**

46.    In and around April or May, 2002, Charles Gitto contacted his friend, Dr. Alfred Arcidi, and revealed to him that he was having money problems having to do with Guaranty Bank. Gitto asked Arcidi if he would be interested in investing in the business and becoming a partner. He told Arcidi that "my kids spend money too easy." "You can make all the money in the world, but you have to know how to handle it." Gitto further revealed to Arcidi that his son and Frank Miller were simply spending too much. According to Arcidi, Gitto said that he wasn't involved that much with the company to see the financial and stuff – but he didn't want his son to go to jail. Arcidi inferred from this comment that Gitto was simply concerned about his son because he had been using the money on personal items rather than on business expenses. He was kind of upset with his kid. (Arcidi Dep.pp. 12:3-11; 16:14-17, 25:16-24; 26, 35-36).

47.     The relationship between Charles Gitto and Frank Miller became strained. It appeared that Charles Gitto felt that Frank Miller had put the company into a nose-dive and that he had to loan the business money get it out of the nose-dive.  (Kozak Dep. pp. 262:21-24, 263:1-19).

**Vitrotech**

48.     By late 2003, the Gitto's and Frank Miller were focusing on attempts to sell the business.  Stephen Merry, an investor, became involved in the negotiations between Vitrotech and Gitto Global.  The plan was to develop a strategic partnership and see how it progressed. Merry talked spoke with Charles Gitto on various occasions, but at the end of the day, Charles Gitto was not one of the operating officers and Merry was forced to turn to Gary Gitto and Frank Miller.  It became evident to Merry that Charles Gitto could not make any decisions for Gitto Global.  (Merry Dep. p. 24:4-18).

49.     Merry spoke to Frank Miller about the financials and asked several due diligence questions.  It concerned Merry that the financials were not readily available and that the payables were not computerized.  Merry became frustrated with the information he was provided. However, he never made specific inquiry or requests of Charles Gitto with respect to the financial information he sought.  Merry became aware that when it came to matters of acquiring financial information about Gitto Global, Frank Miller was the "key deliverer of such information."  (Merry Dep. pp. 35:8-16, 36:14-18, 38:5-18, 66:21:24, 100:9-18).

**Alpine Group**

50.     In 2002, Frank Miller engaged his brother, Martin Miller, to assist in the solicitation of potential investors for Gitto Global.  Miller introduced his brother to George Karfunkel who then introduced them to Stephen Elbaum.  Elbaum was employed with Alpine

Group, which was essentially a holding company that invested in a variety of businesses.  There were various meetings set up between Charles Gitto, Gary Gitto, Frank Miller, Martin Miller, Elbaum and Karfunkel.  The negotiations occurred sometime in April through June of 2002. (Miller Dep. p. 7:5-16, 126:11-18; Karfunkel Dep. pp. 10:10-25, 11:1-12; Elbaum Dep. pp. 4:18-24, 7:18-25).

51.    Martin Miller makes various claims regarding what was said by his brother and Charles Gitto.  He claims that from the start his brother had revealed to him that there were problems with the audited financials.  According to Martin Miller, the financials did not accurately reflect the numbers of Gitto Global because they were overstated.  Even before the first meeting with Elbaum and Karfunkel, Martin Miller knew from his brother that in addition to reckless spending there was a "hole" in capital.  Martin felt this to be the overstatement of receivables and sales which caused over borrowing from the bank.  His brother told him that the hole was getting bigger because money was  being taken out of the corporation by the Gittos. His brother also told him that he was putting money in to cover the bills.  (Martin Miller Dep. pp. 10-11, 39, 85-86).

52.    Martin Miller further claimed that while driving to the various meetings with Elbaum and Karfunkel, there were open discussions in the car amongst and between the Gittos and Millers regarding the revised financials, the "hole" of $17 million, and expenses that were being passed through the corporation.  (Martin Dep. pp. 14-17, 22-24).

53.    Miller further claims that the problems with the financial statements were openly discussed with Elbaum and Karfunkel.  Martin Miller states that before the first meeting, he knew that the situation described by his brother embraced a glaring impropriety at best and a fraud at worst and he discussed it with Karfunkel.  In fact, Martin Miller claims that it was

48

clearly explained to both Karfunkel and Elbaum that receivables that were not receivables were causing the "hole" in the company.  Martin Miller indicated that Elbaum was well aware of the "the hole," but didn't seem to back away.  Elbaum knew in the first meeting that there was an on-going fraud with the bank.  According to Martin Miller, all Elbaum advised was, "you guys should get hold of as much cash as you can on a monthly basis and continue to pay down the hole, so it becomes manageable."  (Martin Miller Dep. pp. 18-19, 22-24, 37-38, 85-86).

54.    Miller stated that he knew that LaSalle was the lender before the first meeting with Elbaum and Karfunkel.  He never understood how LaSalle didn't know about the hole. (Martin Miller Dep. pp. 25:7-24, 26:1-8).[1]

55.    According to Karfunkel, the first meeting involved discussions about manufacturing a battery.  No one said anything about Gitto Global being in dire financial states. Karfunkel didn't recall any type of discussion about the operating performance of Gitto Global. It was decided that Elbaum would send a technical person to the company.  (Karfunkel Dep. p. 12, 14:1-18, 19:11-14, 24:25, 25:2-5).

56.    According to Elbaum, Frank Miller made statements about the business, its capabilities and its market presence.  Miller also talked about the business in terms of its operating profitably.  At the time, Elbaum wanted accurate responses but not a whole lot of detail.  In the discussions that followed, Elbaum became aware of the company's poor performance during 2002.  However, there was never a discussion about financial improprieties, improper financial treatment or possible fraud.  Elbaum did have questions about the cash flows because he couldn't match in his mind the inflows with the outflows.  However, he did not conduct any due diligence on this issue.  (Elbaum Dep. pp. 14-15, 17, 42-43).

---

[1] Miller claims that he was aware of Gitto Global's relationship with LaSalle before the first meeting with Elbaum and Karfunkel.  It is interesting to note that negotiations with Alpine group began in April, 2002 while the loan with LaSalle was in July, 2002.

57.    Elbaum did not recall any discussions about the receivables not being the value that was reflected on the financial statements or that the inventory value was not truly being shown.   Elbaum recalled more general statements, such as, "we've got a lot of pressure from our bank," "we need to refinance."  The conversations were really not a probing or profound and he couldn't even recall whether all parties were present.  Frank Miller was identified by Elbaum as the person who was responsible for getting the rudimentary financial information compiled. Elbaum did not believe he had any discussions with Charles Gitto concerning the quality of the financial information.  (Elbaum Dep. pp. 26, 44-45, 53-54).

**Boxing Items**

58.    Towards the end of her employment, at Gary Gitto's request, Kozak boxed up his documents.  She put all his personal papers in boxes and labeled them.  Charles Gitto did not have her box anything from his office.  He boxed up one box of his things for himself.  (Kozak Dep. pp. 149:7-17; 157:4-7).

Respectfully submitted,

CHARLES GITTO,

By his attorneys,

/s/Maria A. Luise
Frank Mondano (BBO#351540)
Maria A. Luise (BBO#557353)
Balliro & Mondano
99 Summer Street, Suite 1800
Boston, MA  02110
(617) 737-8442

Dated: September 12, 2006

## Certificate of Service

   I, hereby certify that this document with attached memorandum filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2006.

<em>/s/ Maria A. Luise</em>