UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a, LASALLE BUSINESS CREDIT, INC. )<br><br>Plaintiff )<br><br>v. )<br><br>GARY C. GITTO, et al., )<br><br>Defendants ) | Case No. 04-12227-DPW |

## DEFENDANT GARY GITTO'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE REQUEST TO DEFER DECISION ON SUMMARY JUDGMENT

### Introduction

In this action, LaSalle Business Credit, LLC ("LaSalle") claims, essentially, that Gary Gitto joined with others in a conspiracy to defraud LaSalle. LaSalle now moves for summary judgment against Gary Gitto. Summary judgment must be denied, however, because LaSalle cannot establish that there are no genuine disputes as to material facts nor that it is entitled to judgment as a matter of law. Alternatively, since plaintiff's motion seeks to exploit defendant's invocation of his Fifth Amendment rights, this Court should defer ruling on plaintiff's motion until such time as the pending criminal investigation, and any criminal prosecution, are complete.

### Argument

**I.    Applicable Law**

**A.    The Summary Judgment Standard**

Summary judgment is only proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must, in evaluating whether those criteria have been met, "pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact." Marrero v. Hospital Hermanos Melendez, Inc., 253 F.Supp.2d 179, 186 (D. Puerto Rico 2003), citing Perez v. Volvo Car Corporation, 247 F.3d 303, 310 (1st Cir. 2001) (additional citations omitted).[1] In making these determinations, the court construes the record and all reasonable inferences from it in favor of the non-moving party. Id. (citations omitted). During the summary judgment phase of the proceedings, there is "no room for credibility determinations, no room for measured weighing of conflicting evidence . . . , no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Id., quoting Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987) (additional citation omitted).

It therefore follows that "[s]ummary judgment is rarely granted when the moving party is the one that bears the burden of proof at trial." Hussey v. Quebecor Printing Providence Inc., 2 F.Supp.2d 217, 225 (D. R.I. 1998) (citation omitted). This is particularly true when the issues raised "involve the adverse party's state of mind, knowledge, or depend on the credibility of witnesses." In re Caucus Distributors, Inc., 83 B.R. 921, 924 (E.D. Va. 1988) (citation omitted). This is so, in part, because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Alicea v. Ondeo de Puerto Rico, 389 F.Supp.2d 269, 271 (D. Puerto Rico 2005) (citation omitted).

---

[1] A fact is "material" if it "potentially affect[s] the suit's determination." Id.

Indeed, "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment." Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (citation omitted).

### B.    Laws Applicable to Plaintiff's Substantive Legal Claims

#### 1.    Count I: Civil RICO

Plaintiff seeks summary judgment on its allegation, in Count I, that defendant is liable for conspiracy to violate the RICO statute, 18 U.S.C. §1962(d), by conspiring to conduct the affairs of the Gitto Global corporation through a pattern of racketeering activity, to wit, financial instititution fraud (18 U.S.C. §1344) and wire fraud (18 U.S.C. §1343). See Pl. Mot. p. 9. To establish liability on this theory, plaintiff must prove, first, that defendant participated in conspiracy in violation of the statute and, second, that the violation proximately caused defendant's damage. Holmes v. Securities Investor Protection Corporation, 503 U.S. 258 (1992).    To show that the defendant is responsible for a violation of the statute under this theory, the plaintiff must show (1) the existence of an enterprise affecting interstate commerce;[2] (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise; (3) that the defendant participated in the conduct of the affairs of the enterprise;[3] and (4) that the defendant did so through a pattern of racketeering activity [4] by

---

[2] An "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individual associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

[3] In other words, the defendant must "participate in the operation or management of the enterprise." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993); accord In re: Lupron Marketing and Sales Practices Litigation, 295 F.Supp.2d 148, 164 (D. Mass. 2003).

[4] To prove a "pattern of racketeering activity," a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal

agreeing to commit, or in fact committing, two or more predicate offenses.[5/]  E.g., Aetna

Casualty Surety Co. v. P & B Autobody, 43 F.3d 1546, 1561 (1st Cir. 1994) (citation omitted);

Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 (1st Cir. 1991) ("Each defendant in a RICO

conspiracy case must have joined knowingly in the scheme and been involved, directly or

indirectly, in the commission of at least two predicate offenses" (emphasis added)) (citation

omitted); Sebago, Inc. v. Beazer East, Inc., 18 F.Supp.2d 70, 85 (D. Mass. 1998).   On a

conspiracy theory, a defendant is liable for the acts of his co-conspirators, acting in furtherance

and within the scope of the conspiracy, even if the defendant was not aware of the particular acts

committed.  See Pinkerton v. United States, 328 U.S. 640, 646 (1946).  However, a defendant

cannot be liable for acts of his co-conspirators that were committed before he became a member

of the conspiracy.  See United States v. Munoz, 36 F.3d 1229, 1233-1234 (1st Cir. 1994)

(defendant is liable for acts of co-conspirator, in furtherance of conspiracy, made "while the

defendant is a member of the conspiracy") (emphasis added) (citation omitted); United States v.

Alvarez, 626 F.2d 208, 210 (1st Cir. 1980) (same);  Southern Union Co. v. Southwest Gas Corp.,

165 F.Supp.2d 1010, 1026 (D. Ariz. 2001) (defendant cannot be liable for torts which occurred

before he joined conspiracy) (citation omitted).

　　　　To recover, the plaintiff must then prove a "direct causal connection" between the

---

activity."  Salkind v. Wang, 1995 WL 170122, *7 (D. Mass. Mar. 30, 1995), quoting H.J. Inc. v.
Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis in original).  "There must also
be evidence of 'continuity' sufficient to show that the predicate acts constituted a 'pattern,' that
is, a 'closed period of repeated conduct' or 'a regular way of conducting the enterprise.'" In re:
Lupron, 295 F.Supp.2d at 164 (citations omitted).

　　　　[5/] To be clear, "agreeing to commit" does not mean that the defendant must have agreed
to commit the predicate offenses himself; it means that the defendant "agreed with one or mother
others that two predicate offenses would be committed."  Aetna Cas. Sur. Co., 43 F.3d at 1562.

statutory violation and its damages.  Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991, 1998

(2006).  Plaintiff seeks to make this connection by proving its reliance on false borrowing base

certificates submitted by Gitto Global to induce LaSalle to advance funds.  (Pl. Mot. p. 9, ¶(d)).[6/]

Where reliance is the basis for causation, it must be shown to have been reasonable.  Trifiro v.

New York Life Ins. Co., 845 F.2d 30, 33,n.1 (1st Cir. 1988).

### 2.    Counts II and IV: Check-Kiting Conspiracy to Defraud and Civil Conspiracy to Defraud [7/]

In order to recover on these counts, the plaintiff must prove both the conspiracy and the

fraud.  To prove the conspiracy, it must show "first, a common design or an agreement, although

not necessarily express, between two or more persons to do a wrongful act and, second, proof of

some tortious act in furtherance of the agreement."  Platten v. HG Bermuda Exempted Ltd., 437

F.3d 118, 131 (1st Cir. 2006), quoting Aetna Cas. Sur. Co., 43 F.3d at 1564; accord Sheeler v.

Select Energy & NEChoice, LLC, 2003 WL 21735496, *6 (D. N.H. July 28, 2003) ("The

elements of a civil conspiracy claim are (1) two or more persons ...; (2) an object to be

accomplished (i.e., an unlawful object to be obtained by lawful or unlawful means or a lawful

object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4)

one or more overt acts; and (5) damages as the proximate result thereof" (internal quotation

marks and citation omitted)).   For liability to attach on this basis, the defendant must

---

[6/] The Supreme Court has expressly reserved the question of whether proof of reliance is always required in a Civil RICO case predicated on mail or wire fraud. Anza, at 1998. The First Circuit has decided that it is not, but noted that proving reliance is the most common way of proving causation.  Systems Management, Inc. v. Loiselle, 303 F.3d 100, 104 104 (1st Cir. 2002).

[7/] Because there is no apparent difference between the two claims for purposes of this legal analysis, defendant will address them together.

substantially assist another, knowing that his assistance is contributing to the tortious plan.
Haemonetics Corp. v. Dupre, 238 B.R. 224, 228 (D. Mass. 1999) (citation omitted); Varney v.
R.J. Reynolds Tobacco Co., 118 F.Supp.2d 63, 72 (D. Mass. 2000) (defendant liable for
conspiracy if he "substantially assist[s] or encourage[s] others to commit torts"); accord Grant v.
John Hancock Mut. Life Ins. Co., 183 F.Supp.2d 344, 363 (D. Mass. 2002) (the plaintiff must
establish a "common plan to commit a tortious act where the participants know of the plan and
its purpose and take affirmative steps to encourage the achievement of the result" (emphasis
added) (internal quotation marks and citation omitted)).[8]

In order to prove that it was damaged by fraud, plaintiff must how that a member of the
conspiracy "'made a false representation of a material fact with knowledge of its falsity for the
purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the
representation as true and acted upon it to his damage.'" Eureka Broadband Corp. v. Wentworth
Leasing Corp., 400 F.3d 62, 68 (1st Cir. 2005) quoting Russell v. Cooley Dickinson Hosp., 437
Mass. 443 (2002).

### 3.    Count III: Deceptive Trade Practices

Unfair and deceptive conduct, while not explicitly defined by statute, includes conduct

---

[8] It is important to note that "knowledge and participation ... are conceptually distinct.
Knowledge that another is committing a tort does not confer liability"; only knowledge
coupled with participation does.  Haemonetics Corp., 238 B.R. at 228; cf. United States. v.
Richardson, 225 F.3d 46, 55 (1st Cir. 2000) ("conspiracy conviction requires that a defendant's
membership in the conspiracy can be proved on the basis of his own words and actions (not on
the basis of mere association or knowledge of wrongdoing)" (internal quotation marks and
citations omitted)); United States v. Glenn, 828 F.2d 855, 859 (1st Cir. 1987) ("mere association
with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple
knowledge, approval of, or acquiescence in the object or purpose of the conspiracy ... is not
sufficient to make one a conspirator" (quoting United States v. Melchor-Lopez, 627 F.2d 886,
891 (9th Cir. 1980)).

which is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or is "immoral, unethical, oppressive, or unscrupulous." Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989), quoting PMP Assoc., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). "The objectionable conduct must obtain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 503 (1979). Importantly, "liability under Chapter 93A does not attach to a party simply because it had a relationship to the defendant that engaged in the complained-of conduct; each defendant must have taken an 'active role' in that conduct." Speakman v. Allmerica Financial Life Ins., 367 F.Supp.2d 122, 142 (D. Mass. 2005) (citations omitted).

As plaintiff's case under c.93A is based upon the claim of fraudulent misrepresentation, it must show that it reasonably relied upon the representations. Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988); Atlantic Cement Co., Inc. v. South Shore Bank, 730 F.2d 831, 835 (1st Cir. 1984).

## II.    Discussion

The overarching issue at this stage in the proceedings is whether LaSalle is entitled to summary judgment as a matter of law, i.e., whether a finder of fact would be required to find all of the elements of each claim against Defendant Gary Gitto on the evidence presented by plaintiff. See Fed.R.Civ.P. 56(c). This is manifestly not so.

**A.    The Plaintiff Has Failed to Demonstrate the Absence of a Genuine Issue of Fact as to Whether Defendant Committed or Agreed to the Commission of <u>Any Act Which Would Make Him Liable on Any of Plaintiff's Claims.</u>**

Plaintiff is not entitled to summary judgment because it is unable to demonstrate the absence of a genuine issue of fact as to whether Defendant Gary Gitto committed, or agreed to the commission of, any act which would make him liable on any of plaintiff's claims.  Plaintiff must show, as set forth above, that the undisputed facts establish that Defendant joined in a conspiracy to defraud plaintiff.  The "undisputed facts" set forth by plaintiff, however, establish no such thing.  While plaintiff has produced considerable evidence that it was victimized by a fraud conceived, directed and executed by Frank Miller, its submission lacks any credible evidence – in fact, it contains virtually no evidence at all –  that Gary Gitto ever knew of, much less participated in, the fraud.  In fact, what testimony the plaintiff has produced is offered by persons who indisputably have committed fraud, are in negotiations with the United States Attorney for their cooperation, and who have testified in return for forgiveness by LaSalle, or are simply wholly unreliable and lacking in credibility. [9/]

Plaintiff's central premise is that, although the fraud was executed by Miller, Gary Gitto, as the President and 50% shareholder,[10/] knew of it, took some steps to aid it, and was its principal beneficiary – "to the tune of $2,872,644.44."[11/]   But not even one of the components of

---

[9/] Chaisson, Deakin, and Kozak - whose testimony forms the basis for many of plaintiff's conclusions regarding Gary Gitto's alleged liability, all cooperated with the United States Attorney and all reached agreements with LaSalle to be dropped as defendants in the instant lawsuit.  <u>See</u> Defendant's Statement of Additional Facts (Def. St.) ¶¶ 1-3.

[10/] Plaintiff's Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment ("Pl.St.") ¶114

[11/] Pl.St. ¶ 121; Pl. Mot. 2, 12.

this argument is supported by undisputed fact.  In fact, Frank Miller was the majority

shareholder[12] and President[13] of the company and had exclusive responsibility for financial

operations.  And it was Miller who who reaped the profits: as we shall see below, plaintiff's

contention that Gitto took millions of dollars out the company is based on the very kind of funny

arithmetic which it attributes to defendants – plaintiff simply ignores the vast sums that Gitto

contributed from his own personal funds.  As for knowledge, the uncontradicted evidence is that

Miller ran a "secretive,"even "paranoid,"operation, insisting that information about the scheme

be kept within a tight circle – not including Gitto.[14]  Only Miller – never Gitto – communicated

with the banks.[15]  And, indeed, during the operative time (i.e., during the LaSalle loan), Miller

refused even to talk directly with Gitto at all.[16]

Gary Gitto's responsibility was sales.[17]  He was on the road at least  60% of the time,

and was never present during LaSalle's audits.[18]  He had no access to the computer systems

which Miller and Deakin used to carry out the fraud, or to the reports which were needed to

---

[12] Defendant's Response to Plaintiff's Statement of Facts ("Def. Resp. to Pl. St.") ¶ 114.

[13] Id.

[14] Defendant's Statement of Additional Facts in Support of His Opposition to Summary Judgment ("Def. St.") ¶ 5.

[15]  He was the only contact person for LaSalle and for Clinton Bank Def. St. ¶ 6.

[16] Def. St. ¶ 10.

[17]  Pl.St. ¶ 114 .

[18] Def. St. ¶ 7.

determine daily needs.[19] All he received was a periodic report listing the <u>real</u> sales.[20]  Even

Kozak, Gitto's former confidential assistant and one of LaSalle's principal cooperating

witnesses, conceded that he never said anything that indicated any awareness of the fraud.

Indeed, in her opinion, he was "not smart enough to be involved in defrauding the bank and he

hated detail."[21]

Before turning to the few specific factual allegations made by plaintiff against Gary

Gitto,

it is worth pointing out certain of the more general legal and logical flaws which underlie

plaintiff's contentions.  First, plaintiff appears to believe that testimony of a witness which is not

specifically contradicted by sworn counter-testimony, must be accepted as fact.  It also assumes

that any inferences it draws from that testimony must likewise be accepted.  However, it is black

letter law that a finder of fact is not obliged to accept the testimony of <u>any</u> witness, even if not

contradicted by other testimony[22] – especially where the proponent bears the burden of proof,

and particularly where the witness has admittedly committed a crime, is now bargaining for his

freedom with the government, and has already been forgiven from liability by the plaintiff in

return for the testimony.  And, as noted,  "the drawing of legitimate inferences from the facts" is

a <u>jury function</u>, not that of a judge.  <u>Alicea</u>, 389 F.Supp.2d at 271 (citation omitted).  In a case

---

[19] Def. St. ¶ 7.

[20] <u>Id</u>.

[21] Def. St. ¶ 9.

[22] <u>See</u>, <u>e.g.</u>, First Circuit Pattern Jury Instruction (Criminal) § 1.06: "In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe everything a witness says, or only a part of it or none of it."

like the present one, in which the evidence is almost all testimonial or inferential in nature, the

jury will have plenty of leeway to accept or reject both the testimony and any inferences

advanced by the plaintiff.

Second, as we note both above and below, plaintiff cannot prove defendant's knowledge

of the fraud. But even if it could, plaintiff erroneously treats knowledge as the equivalent of

participation in the conspiracy. It is not. Haemonetics Corp., 238 B.R. at 228. There must be

agreement on the ends of the conspiracy. See Sheeler, 2003 WL 21735496, *6 (an essential

element of a conspiracy is "an agreement on the object or course of action"); Johnstone v. First

Bank System, Inc., 947 F.Supp. 1220, 1226 (N.D. Ill. 1996) ("for a conspiracy to exist, there

must be, at a minimum[,] facts that show some agreement, explicit or otherwise, between the

alleged conspirators on the common end sought and some cooperation toward the attainment of

that end" (emphasis added) (internal quotation marks and citations omitted)). Although, the

agreement need not be express, it must exist, and while a jury might, in a given case, be able to

infer an agreement if the defendant had knowledge, an inference is clearly not the same as

"undisputed" evidence.

Third, plaintiff also equates actions taken by this defendant at the urging of Frank Miller

– which it asserts advanced the ends of the conspiracy –  as the equivalent of knowing

participation. In each of these instances, as we shall demonstrate below, plaintiff has not

produced any evidence of what Miller told the defendant in order to induce the particular act.

But the evidence is undisputed that Miller was a master at fabricating complex rationales to

cover his fraud and succeeded in convincing an array of experienced financial officers and

auditors at both the LaSalle and Clinton banks to overlook even the most glaring of indicators.[23]
By comparison, deceiving Gary Gitto, acknowledged to have no financial aptitude[24], would be
child's play.  In any event, a finder of fact, would hardly be obliged to conclude that Miller did
not deceive Gary Gitto just as he did so many others.

Turning to the specifics of plaintiff's assertions:

**1.    That From 2003 through 2004, Gitto Global paid to or on behalf of Gary Gitto the sum of $2,874,644.41.  ¶121**

This figure is taken from the affidavit of Craig Jalbert, an accountant employed by the
plaintiff.  Ex. 23, ¶13.  The major portion of this sum – $2,318,901.98 - is derived from Jalbert's
review of the records of the Gitto Global corporation which are now in the custody of his firm
(Id. ¶2), from which he determined that the company had "issued non-payroll checks to Gary
Gitto, to Equitech Technologies LLC ("Equitech") and to cash for Gary Gitto's benefit in the
aggregate of $2,318,901[.]".   There is a glaring flaw in this analysis, however, in that Jalbert
fails to account for the many hundreds of thousands of dollars which Gary Gitto indisputably
contributed to the company, and thus there is no attempt to show what net amount Gitto
received.   Without making a complete accounting of his contributions, it is clear based on
plaintiff's own facts that Gary Gitto contributed at least $1.75 million to Gitto Global, and as
much as $2.4 million if Helen Kozak's estimate is accurate.  See Def. Resp. to Pl. St., ¶ 121.

**2.    That at various points in time, Gary Gitto contributed funds which were used to fund aspects of the fraudulent scheme:**

•    Frank Miller and Gary Gitto wire transferred $380,000 into J-Tan's bank

---

[23] See Def. Resp. to Pl. St. ¶ 116.

[24] Id.

account.  Pl. St. ¶52;
- Gary Gitto, in several transactions, wire transferred $640,000 to the J&J Chemical account.  Pl. St. ¶64; and
- Gary Gitto and Frank Miller borrowed $1.5 million to start the J&J Chemical account.  Pl. St. ¶35

As noted above, Gary Gitto contributed an enormous amount of money to the company from his personal funds, and even borrowed money to invest in the company.  Each time he contributed funds, however, it was Frank Miller who unilaterally directed where the funds would go.  According to Kozak, from time to time, Frank Miller, who was in charge of all of the company's finances, would ask Gitto to put up money, Gitto would agree, and would tell Helen to have the money wired from his personal investment account.  Each time, Frank Miller would then tell Kozak where the money should go, providing her with wiring instructions.  Def. St. ¶ 11.  There was no evidence that Gary Gitto knew or believed that the funds he invested were being used in any way other than for the lawful business of the company.

### 3.    The Specific Elements of the Fraud.

#### (a)  False borrowing based certificates.

On a daily basis, Miller, William Deakin, the controller, and Janice Chaisson, the accounts receivable clerk, prepared and submitted false borrowing base certificates in order to permit borrowing needed for that day's operations.  Pl. St. ¶¶ 20, 21.  There is no evidence that Gary Gitto participated in this conduct in any way.

#### (b)  Fictitious sales.

The borrowing base certificates reflected phony accounts receivable, which were based upon fictitious sales to both real and phantom companies.  Phony invoices and shipping documents were prepared.  This part of the scheme was conducted by Frank Miller, William

-13-

Deakin and Janice Chaisson. Pl. St. ¶¶ 22, 25, 31. Again, there is no evidence that Gary Gitto participated in this conduct.

Lacking evidence of Gitto's participation, LaSalle attempts to establish that Gitto at least knew about it, relying upon on testimony by William Deakin that in 1995-96, long before the LaSalle loan, Deakin – on three occasions – told Gitto about "pre-billing" (the practice of counting a job as an account receivable before completed and invoiced) and inflated inventory. Each time, Gitto said that he would talk to Frank Miller about it, but the practices continued. Deakin admitted, however, that he could not say what Gitto did as a result of these conferences or, indeed, whether he told Miller to stop. Deakin dep., at 276-77. He acknowledged that Gitto seemed surprised that the practice had continued and that an e-mail from Charles Gitto implied that Gary was opposed to it. Id. at 281-82. Deakin claims that in November 2003, he gave Gitto an "aging," which listed fictitious invoices. Id. at 287. He says that he just left it with Gitto, for Gitto to review later. Deakin did not go over it with Gitto or call his attention to anything. Id. at 290. In fact, he acknowledged, he never discussed phony invoices with Gary. Def. St. ¶ 8. Thus, even if Deakin's testimony were accepted, there is no evidence that Gitto ever read or understood the significance of this document.

> (c) <u>False Revenue From Fictitious Sales – the J&J Clinton Bank account</u>.

Since accounts receivable more than 90 days old did not constitute collateral under the loan agreement, Miller devised a scheme to make it appear that old invoices were being paid off. Pl. St. ¶32. He incorporated the Kingsdale Sales Corporation which, doing business as J&J Chemical Distributors, opened an account at the Clinton Savings Bank. He presented J&J as a "brokerage" business. Pl. St. ¶ 35. On a daily basis, Miller would draw checks from Gitto

Global and have them deposited into the J&J account.  Pl. St. ¶ 38.  He would then have J&J

checks drawn – which he signed as an authorized signatory on the account, and then later, in the

name of John Tersigni.   Pl. St. ¶¶ 35, 39.  These checks were then deposited into a "blocked"

account at the Fleet Bank, which LaSalle had set up to receive sales proceeds.  Pl. St. ¶ 41.

Miller then attributed these amounts to particular stale false receivables, making it appear that

the phony customers were paying off the invoices.  Pl. St. ¶¶ 42, 43.

       This part of the fraud was executed by Miller and the persons with whom he worked,

without any participation by Gary Gitto.  Miller alone dealt with the Clinton Bank.  He alone

dealt with Tersigni.[25/]  LaSalle attempts to tie Gary Gitto into this aspect of the fraud in four

ways.  First, it contends that the J&J scheme was a continuation of a prior one – before LaSalle

made its loan – which used Gary Gitto's company, Direct Wood & Paper Products, Inc. Pl. St.

¶31-34.   Gitto Global checks were deposited in the Direct Wood account and, according to

plaintiff,  "[e]ither Frank Miller or Gary Gitto signed these checks," and "[t]he Direct Wood

checks all bore the signature of Gary Gitto."  Pl. St.¶¶ 32-33.  This is utterly disingenuous and

misleading.

       In contrast to J&J, Direct Wood was a legitimate business opened by Gitto to deal in

wooden pallets.  (And it did, in fact, sell these pallets).  Def. Resp. To Pl. St. at ¶ 32.  There is no

evidence that he had any involvement in using the Direct Wood account for the fraudulent

scheme.  His only role was to <u>stop</u> the use of account, when he learned of a complaint by the

bank.  Pl. St. ¶ 34.  There is no evidence that he signed any of the Gitto Global checks.  And the

---

    [25/] According to Kozak, Tersigni communicated with Gary Gitto only about legitimate
business – i.e. selling "off-spec" product and the like.  Kozak dep. at 113-14, 202-03.  But when
he called about J&J, it was only to talk with Miller.  <u>Id</u>. at 204.

Direct Wood checks "bore" his name only because they were signed in his name by Kozak, Def. St. ¶ 10. Frank Miller, William Deakin or Janice Chaisson would ask Kozak to issue and sign a Direct Wood check back to Gitto Global. The scheme ended when the bank called regarding insufficient funds for a check. Kozak informed Gitto, who, reacting angrily, summoned Frank and directed that the account be closed. Def. Resp. to Pl. St. ¶ 34.

Next, plaintiff contends that, of the thousands of Gitto Global checks issued to J&J, Gary Gitto's signature is on two of them. Kozak dep. at 222-223, Plaintiff's Ex. 92. But this signature is indistinguishable from the "Gary Gitto" signature Kozak admitted to making on numerous other documents. In any event, even assuming the signature was Gitto's, there is absolutely no evidence of the circumstances concerning these two checks and what Gitto was told as to their purpose. J&J, after all, was presented by Frank Miller as a means for Gitto Global to acquire needed raw materials and avoid certain licensing problems. Pl. St. ¶ 65, Tenaglia dep. at 25, Paulhus dep. at 12-13.

Plaintiff also relies on an e-mail which Deakin says he sent to Gary Gitto on June 4, 2004, which stated, "the J&J checks have increased by $414,000.00 since 5/27/04. Each day it is climbing because more money is going out than coming in." Pl. St. ¶ 116. But Deakin did not claim to have any other discussion about this with Gitto. If Gitto received and read this e-mail – and there is no evidence that he did – there is no way that a jury could infer from this cryptic message that he had any idea what Deakin was talking about.

Finally, plaintiff argues that when, at the end of July 2004, Gary Gitto transferred $500,000 to Clinton Savings Bank as collateral for its $8.4 million line of credit, and in August, when he provided the Clinton Bank with an unlimited guarantee, he enabled the J&J checks to

continue.  Pl. St. ¶¶ 70, 74.  Again, plaintiff lacks any evidence as to how the matter was
presented to Gitto.   There is no evidence whatsoever about what was discussed with Miller on
the one hand, and between Charles and Gary Gitto on the other.  Even assuming a fact-finder
could infer that at this point, Gary Gitto had learned that the J&J account had been used to
perpetrate a fraud, the purpose of this line of credit was only to enable the company to continue
in business long enough for a pending sale to be accomplished.  And the whole purpose of the
sale was to use the proceeds to pay off creditors, particularly the plaintiff.  Deakin deposition at
210.  Thus, the most a fact-finder could infer from Gary Gitto's actions in the summer of 2004
would be that, once he knew of the scheme, his only efforts were to save plaintiff, not defraud it
– and he did this by <u>contributing</u> a half-million dollars of his own money and an unlimited
guarantee.   This hardly constitutes an agreement to commit fraud.

(d)  <u>Inventory misrepresentation</u>.

Frank and Maria Miller misrepresented the quantity, quality and value of the inventory in
various ways.  ¶37.  Specifically, starting in about 2000, Frank and Maria Miller instructed Gitto
Global's purchasing manager to mark product packaging with the product code for a more
expensive product.  These changes were recorded by the product manager in a separate book.  At
Maria Miller's instruction, Gitto Global also overstated the cost of product inventory on the
valuation.  In 2002, Maria Miller and William Deakin revised the inventory adjustment
procedure.  Inventory was also moved or purchased early, at Frank Miller's behest, to prepare for
bank examiner inventory checks.  Due to these frequent adjustments, Gitto Global's actual
inventory level was difficult to calculate.  Pl. St. ¶ 78-84.

There is no evidence that Gitto had any role in the inventory inflation, however.  The

only evidence cited by plaintiff in this regard is that in June 2003, Gary Gitto executed an

agreement with Vitrotech by which Vitrolite was purchased with four promissory convertible

notes, convertible into an interest in Gitto Global. Plaintiff suggests that the underlying purpose

of the transaction was to enable additional borrowings. ¶107-08. But there is simply no

evidence that there was anything improper with this transaction. In any event, the cited

testimony about purpose (whether proper or not) is nothing more than the speculations of a

Vitrotech official. See Carlson deposition at 23. ("I think the only connection I could even

conceive of why that term would have been used . . . ."). Such conclusory allegations and

unsupported speculations do not warrant summary judgment in plaintiff's favor. See Cadle Co.

v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Moreover, they necessarily demand that the fact-

finder make certain inferences in order to reach a particular conclusion, which is, as previously

noted, a function of the jury, not the judge. Alicea, 389 F.Supp.2d at 271 (citation omitted).

        (e)  Accounts Payable Fraud.

Plaintiff contends that Rita Bartlett, the accounts payable clerk, was "instructed by Frank

Miller and Gary Gitto" to maintain what she called the "secret garden," a drawer where she

concealed invoices which were not entered on the computer system – and therefore not reported

to plaintiff as accounts payable. When invoices came out of the drawer, Gary Gitto would sign

checks for suppliers when Frank Miller was unavailable. ¶76.

But Bartlett's testimony was that these instructions were given by Miller and Deakin –

and not Gary Gitto. Def. Resp. to Pl. St. ¶ 76. Moreover, as for signing checks to suppliers

(which was hardly unlawful), Bartlett testified that Gary rarely did it, and, furthermore, that she

did not know if he knew about the "secret garden." Bartlett deposition at 57. In any event, there

is nothing illegal in deferring an invoice for later payment, much less in signing a check to pay it.

(f) <u>False audit information</u>.

When, from time to time, LaSalle conducted audits and examinations, Frank Miller,

Maria Miller and William Deakin orchestrated the provision of false information to verify each

component of the fraud, including the documentation of receivables and inventory. Pl. St. ¶ 42,

43. One aspect of the audit misconduct was the use of John Moritz, a computer expert, to

produce false documents to show the auditors. Pl. St. ¶ 86. Moritz would alter documents at

Deakin or Frank Miller's request; Deakin, Frank Miller, or Maria Miller reviewed the altered

documents for accuracy; and Deakin or Frank Miller then provided those documents to the bank

examiners. <u>Id</u>. Gary Gitto was not a part of this scheme. Def. Resp. to Pl. St. ¶ 117. Plaintiff

offers the deposition testimony of Kozak that Gary Gitto used Moritz's skills to create

documents for use in his divorce case, as evidence that he participated in the aforementioned

misconduct. Even assuming Kozak's testimony was accepted, however, it says nothing about

whether Gitto was involved in, or even knew of, the audit fraud, and is yet another example of

plaintiff's attempt to create "undisputed facts" out of tenuous and inferential connections.

**4.      That, according to Martin Miller, Frank Miller's brother, while on the way to a meeting with a potential buyer of the company, Frank Miller and both Gittos discussed the overstatement of receivables and <u>inventory. Pl. St. ¶ 104-05.</u>**

Martin Miller's testimony is of highly dubious credibility and a jury will not be obliged to

accept it. His brother, Frank, is cooperating with the government investigation and asked Martin

to testify. Plaintiff's statement of facts conveniently omits the fact that Martin Miller,

consistently, also went on to state that when they met with the potential buyer, they likewise

informed the prospect of the fraud. But the buyer, Steven Elbaum, when asked at his own

deposition, contradicted Miller and categorically denied that he had been told.  Def. Resp. to Pl.

St. ¶ 102.

> **5.**     **That in January, 2004 Gary Gitto and Frank Miller wrote a letter in which they referred to the "sensitive nature" of their bank <u>relationship</u>.**

Plaintiff cites a letter from Gary Gitto and Frank Miller of January 23, 2004, to the head of

Vitrotech, in which they claimed to have been "completely open . . . regarding our relationship

with the Bank.  You know all about it and about our Company's financial situation.  Because of

the sensitive nature our Bank relationship, and your advice, we have carefully structured this

transaction to avoid any fall-out."  Pl. St. ¶ 111.  Other than through plaintiff's surmise, however,

this letter reveals nothing about what Gary Gitto meant, or knew, when this letter was sent.

> **6.**     **That Alfred Arcidi Claims Charles Gitto Wanted Him to Buy the <u>Company so Gary Gitto Would Not Go to Jail</u>.**

Plaintiff cites the testimony of Alfred Arcidi that Charles Gitto, in seeking out Arcidi to

purchase Gitto Global, told him that Gitto needed his help so that Gary would not go to jail.

Arcidi is a witness whose testimony would be particularly unbelievable to a jury, however.  His

deposition in this case was, to be generous, rambling and barely coherent.  (<u>E.g.</u>, in response to a

question regarding when he and Charles Gitto "struck up a social relationship," Arcidi testified,

"[i]t all – he started – he had – I think he had irritable bowl [*sic*] syndrome like I did, and I got it

in Munich, Germany.  They had the Oktoberfest.  Have you ever been there?"  Arcidi dep., at 7-8.

More importantly, Arcidi's sworn testimony has at least once been discredited by the Superior

Court of Massachusetts.  <u>See</u> <u>NM Construction Corp. v. Collari</u>, 1996 WL 1185153, *2 (Mass.

Super. Jan. 25, 2996)("This court disbelieve[d] Arcidi's testimony . . ." and "did not find it

credible . . .").

Even if Arcidi's testimony were credible, however, it is inadmissible against Gary Gitto. His testimony would only be admissible against Gary Gitto if the court found, independent of the testimony in question, that at the time the statements were made, Charles Gitto and Gary Gitto were both members of a conspiracy, and that the statement was made in furtherance of a conspiracy. United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002); United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). Since, as defendant has shown, there is a complete paucity of evidence for a court to infer (let alone find) that Gary Gitto was a member of any conspiracy, the statement would be inadmissible.

> **7.  That Gary Gitto instructed Helen Kozak to remove documents from Gitto Global.**

Nothing improper was done. Kozak testified that Gary Gitto asked her to remove documents so that he could provide them to his attorney. Def. Resp. to Pl. St. ¶ 144. His attorney, thereafter, offered them to the government. See Stern Affidavit, Exhibit 16.

> **B.  The Plaintiff Has Failed to Demonstrate the Absence of a Genuine Issue of Fact as to Whether it was Damaged by Any Act for Which the Defendant Could be Liable.**

> **1.  The Plaintiff Has Failed to Establish the Absence of a Genuine Issue of Fact as to the Reasonableness of Reliance in Respect to all of the Damages it Seeks.**

As set forth above, in order to claim damages for fraud, plaintiff must show - for each of its claims - that its reliance on the misrepresentations was reasonable. Since there is a genuine issue of fact as to whether plaintiff's reliance was reasonable, summary judgment must be denied. Plaintiff, in its statement of facts, merely asserts that its reliance was reasonable. While at the outset, it was clearly reasonable for LaSalle to rely on what Frank Miller told then, as time went

on it became increasingly unreasonable to rely on Gitto Global's statements that sales were increasing exponentially month-by-month, even though the company's customer base remained the same, a trend  which the Examiner appointed by the Bankruptcy Court described as "strikingly implausibe."  <u>See</u> Deft.'s Rep. to Pl. St., ¶ 26.  Indeed, Frank Miller offered barely an explanation for this growth. According to Miller, although Gitto Global's customer base remained small, with five companies making up the bulk of the supposed sales, <u>all</u> of those customers had switched to Vitrotech products, and were so astounded by their performance that they were buying ever-increasing amounts.[26]  <u>Id</u>.  At the very least, this is sufficient to demonstrate a genuine issue of fact as to whether plaintiff's reliance was reasonable.

> **2.    Plaintiff has Failed to Establish the Absence of a Genuine Issue of Fact as to its Damages Because it has Failed to Account for Other Recovery <u>Under its Security Interest</u>.**

Plaintiff asserts that its damages (at least as of July 26, 2006) are $32,224,053.00.  Summary judgment is inappropriate because plaintiff has failed to account for recovery under its security interest.   By order of the Bankruptcy Court, however, $8,346,056.51 from the sale of Gitto Global's assets was to be paid to LaSalle, subject to any claim filed by Clinton Savings Bank.  Def. Resp. to Pl. St. ¶ 30.  Plaintiff has failed to discuss, let alone account for, these sums.

---

[26] Despite this absurdly inadequate explanation for the implausible growth in Gitto Global's sales, it is undisputed that LaSalle never even took the step of telephoning Gary Gitto, who was in charge of sales, to understand the basis for this explanation.  <u>See</u> Def. Resp. to Pl. St. ¶ 36.

**3.    Plaintiff has Failed to Establish its Entitlement to Damages for any Period in Which Gary Gitto was Part of a Conspiracy to Defraud <u>Plaintiff.</u>**

Plaintiff appears to argue, in the alternative, that Gary Gitto joined the conspiracy to defraud LaSalle in late July 2004, when he learned of Clinton's threats to close the J&J Chemical Account and agreed to sign a loan guaranty. While defendant does not concede that this is so, even assuming <u>arguendo</u> that Gitto joined the conspiracy at that point, summary judgment should still be denied because plaintiff has failed to establish that it is entitled to damages for any period after July 2004. As noted above, defendant cannot be liable for acts of his co-conspirators that were committed <u>before</u> he became a member of the conspiracy. Thus, Gary Gitto could only be held liable for damages incurred after July 23, 2004.

The measure of damages in this matter would thus be akin to a "deepening insolvency" case. The deepening insolvency theory holds that prolonging the artificial solvency of a corporation, thus allowing to accrue more damages, is an injury. <u>Cf.</u> <u>Baena v. KPMG, LLP</u>, 389 F.Supp.2d 112, 117 (D.Mass. 2005). The measure of damages, in such cases, is the increased debt after the action of the tortfeasor. Here, there is no dispute that as of July of 2004, however, all or nearly all of the line of credit was exhausted. Indeed, availability at that point was only $78,831.00. <u>See</u> Def. St. ¶ 13. The amount of money LaSalle claims to have lost, in the end, was the same amount it had already lost before Gary Gitto learned of the conspiracy. He therefore did not cause LaSalle to incur any additional damages as a result of the scheme that had been operating – without his participation – prior to July of 2004.

**III.    The Court Should Make No Inference from Defendant's Failure to Contradict Plaintiff's Allegations and Should Deny Summary Judgment;  In the Alternative, Pursuant to F.R.Civ. P. 56(f), the Court Should Defer its Decision Until the Imminent Conclusion of the Pending Criminal Investigation and <u>Ensuing Criminal Proceedings, if Any.</u>**

Defendant Gary Gitto has heretofore invoked his Fifth Amendment privilege against self-incrimination because he faces the possibility of criminal charges for many of the same alleged activities set forth in Plaintiff's complaint and motion for summary judgment.  See Stern Affidavit, ¶ 1.  By arguing that testimony given by its witnesses is undisputed, plaintiff relies upon, or, at the least, exploits, defendant's assertion of his Fifth Amendment rights.

There are two problems with any exploitation of defendant's silence in this case.  First, while it is true that "a Court is entitled to draw an adverse inference against a party to a civil action that refuses to testify under the Fifth Amendment," it is not required to do so.  <u>Sampson v. City of Schenectedy</u>, 160 F.Supp.2d 336, 351 (N.D. N.Y. 2001), citing <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 320 (1976).  Indeed, "drawing an adverse inference against a litigant who invokes the Fifth Amendment is a harsh remedy that is normally employed to counter a defendant's desire to obstruct discovery or abuse the privilege against self-incrimination."  <u>Id</u>. (citations omitted).  In the instant case, Gary Gitto has invoked his Fifth Amendment privilege due to a concurrent criminal investigation into the demise of the Gitto-Global Corporation, in which the defendant is a target.  In such circumstances, assertion of one's Fifth Amendment rights is neither an admission of guilt or an attempt to obstruct discovery; it is – whether innocent or guilty – the only prudent thing to do.

In any event, "an adverse inference drawn against a party invoking the Fifth Amendment privilege is ordinarily <u>insufficient</u> to support summary judgment in the absence of other

independent, material and probative evidence." <u>State Farm Mutual Automobile Insurance Co. v. Abrams</u>, 2000 WL 574466 (N.D. Ill. 2000), citing <u>LaSalle Bank Lake View v. Seguban</u>, 54 F.3d 387, 391 (7th Cir. 1995) (additional citations omitted) (emphasis added); <u>cf. Avirgan v. Hull</u>, 932 F.2d 1572, 1580 (11th Cir. 1991) ("The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production"), cert. denied, 502 U.S. 1048 (1992). As shown above, the plaintiff here has failed to set forth other material or probative evidence linking Gary Gitto to the alleged conspiracy. Indeed, the bulk of its evidence is conclusory and speculative, which cannot – and does not – establish the existence of material facts as to which there is no genuine dispute. <u>See</u> <u>Cadle Co.</u>, 116 F.3d at 960.

Second, reliance in any way upon the defendant's failure to contradict the allegations would be especially inappropriate in this case where the criminal will be resolved in the finite future. As set forth in the Affidavit of Max D. Stern, the government prosecutor has stated that the criminal investigation is expected to be completed some time this Fall. At that point, if defendant is not charged, he would then be in a position to waive his Fifth Amendment rights, and give testimony in this case which would counter plaintiff's allegations. If he is indicted, then the criminal case will be resolved within a finite amount of time, at which point defendant would then be in a position to waive his rights and testify. The court in <u>Sampson v. City of Schenectady</u>, 160 F.Supp.2d 336 (N.D.N.Y. 2001), faced a similar situation. The defendant had declined to be deposed since he was a defendant in criminal proceedings. The court refused to treat plaintiff's factual assertions as admitted when it was likely that defendant would be able to testify in the near future and it was "highly likely that any such deposition of him might indicate that plaintiff's

version of events is contested ... ."  Sampson, 160 F.Supp.2d at 351-352.  Relying on F.R.Civ.P. 56(f), the court denied the plaintiff's summary judgment motion without prejudice.

In sum, this Court should deny summary judgment because the plaintiff may not no inference based on the defendant's invocation of the Fifth Amendment should be made, and certainly no such inference would be required to be made by the finder of fact – and because the plaintiff has not otherwise made the case for summary judgment at this stage.  Alternatively, under Rule 56(f), the Court should follow the approach of the Sampson court, and defer ruling or deny without prejudice at this time.

### Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment should be denied.  In the alternative, this Court should defer ruling on plaintiff's motion for summary judgment pursuant until such time as the criminal investigation, and any ensuing prosecution, has been resolved.

                              Respectfully submitted,

                              Gary Gitto,

                              By his attorney,

                               /s/ Max D. Stern
                              Max D. Stern, BBO No. 479560
                              Kenneth M. Resnik, BBO. No. 637527
                              Alexandra Deal, BBO No. 660645
                              Stern, Shapiro, Weissberg & Garin, LLP
                              90 Canal Street, 5th Floor
                              Boston, MA  02114-2022
                              (617) 742-5800

Dated: September 12, 2006

<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the EFT system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2006.

<u>/s/ Kenneth M. Resnik</u>