Exhibit 1

1

1

2    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
3    ---------------------------------------------X
     LASALLE BUSINESS CREDIT, LLC f/k/a
4    LASALLE BUSINESS CREDIT,

5                                        PLAINTIFF,

6                              Case No.:
                               04-12227-DPW
7
                       -against-
8
     GARY C. GITTO, et. al. and FLEET NATIONAL
9    BANK, et. al and DIRECT WOOD & PAPER PRODUCTS,
     et. al,
10
                                        DEFENDANTS.
11   ---------------------------------------------X

12

13                       DATE:  March 23, 2006

14                       TIME:   9:45 a.m.

15

16            EXAMINATION BEFORE TRIAL of the

17    Plaintiff, by THOMAS FURST, taken by the

18    Defendants, held at the offices of

19    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, L.L.P.,

20    150 East 42nd Street, New York, New York 10017,

21    before FRANCINE DELFINO, a Notary Public of the

22    State of New York.

23

24

25

2

```
1

2    A P P E A R A N C E S:

3

4

5        SCHWARTZ COOPER GREENBERGER KRAUSS
             Attorneys for the Plaintiff
6            180 N LaSalle Street       ·
             Chicago, Illinois 60601
7            BY:  ERIC S. REIN, ESQ.

8

9

10       STERN, SHAPIRO, WEISSBERG & GARIN, L.L.P.
             Attorneys for the Defendant
             - GARY C. GITTO, et. al -
11           90 Canal Street
             Boston, Massachusetts 02114
12           BY:  MAX D. STERN, ESQ.

13

14

15                *            *            *

16

17

18                                    ·

19

20

21

22

23

24

25
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

12

```
1                    T. FURST
2              MR. STERN:    Please mark this document
3         and mark this document.
4              (Whereupon, the aforementioned
5         documents were marked as Defendant's Exhibits
6         A and B for identification as of this date by
7         the Reporter.)
8
9         Q.    I will show you a document and ask you
10   if you recognize it.
11        A.    Right, I recall this.  The transfer
12   never happened.
13        Q.    The author of this E-mail is
14   Joseph Costanza?
15        A.    Yes.
16        Q.    Who was he?
17        A.    He was the group senior vice-president.
18        Q.    What was he in charge of?
19        A.    The Northeast region.
20        Q.    Was he in charge of all asset-based
21   lending in the Northeast region?
22        A.    Yes.
23        Q.    He was your boss?
24        A.    Yes.
25        Q.    Does that E-mail indicate that he
```

```
 1                    T. FURST

 2    from this for a long time.  I don't·really recall.

 3        Q.      If you can turn to, if you look at the

 4    page LBC 002159, does it indicate that the sales

 5    for the previous twelve months was one hundred

 6    eighteen thousand five hundred sixty?

 7        A.      Okay.

 8        Q.      Approximately a hundred and twenty

 9    million dollars in sales?

10        A.      Yes.

11        Q.      Did you also review the loan agreement?

12        A.      Basically.  The first pass on a loan

13    agreement would be to see what the parameters were

14    for monitoring the collateral, the eligibility

15    criteria.  It's not going to be a review as if we

16    were documenting a deal new.  The deal was already

17    on the book, so basically we're going to be looking

18    for the control parameters for advance rates.

19        Q.      Were these loan agreements standard?

20        A.      Well, I mean, there's nuances to every

21    deal, so they're standard and they're not

22    standard.  That's why we have outside counsel

23    working on them.  They're not necessarily cookie

24    cutter.  There's boiler plate in any loan

25    agreement.  But to compare one to the other,
```

```
 1                    T. FURST

 2       Q.      Did you go to the plant at Ludenberg,

 3   Massachusetts?

 4       A.      Yes.

 5       Q.      Who did you meet there?

 6       A.      Principally Frank Miller is the one

 7   that we really spent all of our time with.  I think

 8   we had a five minute conversation with Gary Gitto,

 9   but he was not present for the line share.

10       Q.      Other than Frank Miller and Gary Gitto

11   did you meet anybody else?

12       A.      No.

13       Q.      Other than on this occasion did you

14   ever meet Gary Gitto on any other occasions?

15       A.      No.

16       Q.      So you met with him for about five

17   minutes in January of 2003 and never again?

18       A.      That's correct.

19       Q.      Did you ever meet Charles Gitto?

20       A.      No.

21       Q.      Did you ever speak to Gary Gitto after

22   this occasion?

23       A.      I can't recall if he was on -- I

24   received a call, I don't know, a month or so after

25   I took over the account from Charles, saying that
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

```
 1                    T. FURST
 2   he was sorry he wasn't there for the meeting and if
 3   we ever got up to Boston again we should all go to
 4   dinner.  I don't recall if it was on the box and
 5   Gary was there or not.  But he may have been on
 6   that call.
 7        Q.    So it was pleasantries?
 8        A.    It was pleasantries.
 9        Q.    There wasn't any business conducted at
10   that time?
11        A.    Not at all.
12        Q.    And they didn't give you any
13   substantive information and you didn't have any
14   questions for them, I take it?
15        A.    No, no, they initiated the call and it
16   was strictly pleasantries.
17        Q.    Was Frank Miller on that call?
18        A.    No, I don't believe he was.
19        Q.    So it was Charles and possibly Gary?
20        A.    Charles and possibly Gary.
21        Q.    Did you ever have another conversation
22   with Gary Gitto?
23        A.    No.
24        Q.    Did you ever have any other form of
25   communication with Gary Gitto?
```

```
 1                    T. FURST
 2      A.     No.
 3      Q.     Did you ever have any other
 4   conversation or form of communication with
 5   Charles Gitto?
 6      A.     No.                .
 7      Q.     What did you understand the position of
 8   Frank Miller to be at the company?
 9      A.     Frank was the president of the company
10   and he was our principal contact.
11      Q.     What were his responsibilities at the
12   company?
13      A.     I would assume he was the president of
14   the company, unless there is a CEO above him, he is
15   pretty much the guy in charge.
16      Q.     What did you understand the position of
17   Gary Gitto to be?
18      A.     I believe he was the treasurer of the
19   company.  Probably the CEO.  I think he was the CEO
20   and treasurer.  Again, I didn't get involved in a
21   day-to-day with him, I got involved with Frank.  I
22   don't know if Frank had another title besides
23   president, I'm not sure.  I know there was
24   controller, I don't know if he was theoretically
25   the CFO too in that regard.
```

```
 1                    T. FURST

 2        Q.       Well, it refers to net sales.  Do you

 3   see that entry there?

 4        A.       Right.

 5        Q.       That indicates that sales had increased

 6   32.6 percent from one fiscal year to the next,

 7   correct?

 8        A.       Correct.

 9        Q.       Up to a hundred sixty million dollars,

10   correct?

11        A.       Yes.

12        Q.       Where at the beginning was -- we

13   reviewed when LaSalle first made the loan it was

14   approximately 120 million, correct?

15        A.       Right.

16        Q.       And this document says, "The majority

17   of the increase can be attributed to Gitto Global's

18   continued expansion of its business within its

19   existing customers by the introduction of new

20   formulas and addition of new customers"?

21        A.       Right.

22        Q.       So I take it this is an explanation

23   that had been given by Gitto to someone, either a

24   field examiner, yourself or someone else at

25   LaSalle?
```

```
 1                    T. FURST

 2   impatient with the company; is that right?

 3        A.     There's some degree of impatience is

 4   evidence.

 5        Q.     You just weren't getting the kind of

 6   information that you thought you should get from

 7   Frank Miller, correct?

 8        A.     Well, I mean, he doesn't produce the

 9   financial statements, but he is the point of

10   contact, so yes.

11        Q.     Not getting it from Frank Miller, did

12   it ever occur to you to call Gary Gitto, who was

13   the CEO and treasurer of the company?

14        A.     No, actually, Frank was -- Gary was

15   never a point of contact either for myself or for

16   my predecessor on the account, so Frank Miller was

17   the point.

18        Q.     And that's because Gary Gitto was

19   involved in sales?

20        A.     Well, I know he wasn't -- he wasn't the

21   provider of the information flow that we had in

22   terms of financial statements and the like.  It ran

23   Frank to Bill Decon, which was the pecking order.

24        Q.     If you weren't getting the information

25   from Frank or Bill Decon, did it ever occur to you
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

```
 1                    T. FURST
 2   November.
 3        Q.     So this was for a five-month period
 4   through November; is that right?
 5        A.     Yes.
 6        Q.     During that period sales grew by 277
 7   percent?
 8        A.     That's what it says, yes.
 9        Q.     To over 200 to a million; is that
10   correct?
11        A.     That's correct.
12        Q.     When it started, as you understood it,
13   at 120 million when the loan began?
14        A.     That's correct.
15        Q.     And this is -- LaSalle was told that
16   the reason for this was because of a fundamental
17   shift in the business?
18        A.     That's correct.
19        Q.     What was the nature of this fundamental
20   shift?
21        A.     Well, it was all driven by the Vitrotec
22   sale of the product push of their product.
23        Q.     They were selling lots of Vitrotec?
24        A.     That's correct.
25        Q.     But you say that in your memorandum
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

```
1                    T. FURST
2    that because of the fundamental shift the examiner
3    was requested to review sales and cash
4    documentation purchases and customer purchases and
5    detail; is that correct?
6         A.    That's correct.
7         Q.    Because when there is a fundamental
8    shift it is important to find out whether it's
9    really supported by the actual facts, right?
10        A.    Well, there's degrees, yes.
11        Q.    If the company is reporting to you that
12   we have increased our sales by almost 300 percent
13   and it's because we made a fundamental shift in our
14   business, you want to do some due diligence whether
15   that explanation is supported by the facts?
16        A.    Which is exactly why we had the
17   examiner go up.
18        Q.    So now according to this examination
19   report the concentration of the accounts receivable
20   is essentially the same as it had been before;
21   isn't that right?
22        A.    The same customer base, I believe so.
23        Q.    Except it's a little more concentrated,
24   correct?
25        A.    Slightly more.
```

80

```
 1                    T. FURST
 2      Q.      If you look at page three -- what page
 3 are you looking at?
 4      A.      I'm looking at concentration analysis.
 5              MR. REIN:    2038.
 6      Q.      The top ten customers now have 84.4
 7 percent, right?
 8      A.      Yes.
 9      Q.      And before it was around 74 percent, so
10 now it's even increased?
11      A.      That's correct.
12      Q.      And the top customer is now Velco
13 Chemicals, correct?
14      A.      Correct.
15      Q.      And then the next one is Sebulon?
16      A.      Right.
17      Q.      And the next one is Hitachi?
18      A.      Right.
19      Q.      And next one is Hemisphere?
20      A.      Yes.
21      Q.      And the next one is Jaytan (phonetic)?
22      A.      Correct.
23      Q.      You are not aware of any inquiry that
24 was made concerning the nature of those particular
25 companies, correct?
```

1                    T. FURST

2        A.      That's correct.

3        Q.      Are you aware of a Dun & Bradstreet

4   inquiry ever being made?

5        A.      As part of the field examination the

6   examiner puts in the most current D&B rating, if in

7   fact they're listed in Dun & Bradstreet.

8        Q.      If they're not listed would you

9   indicate they're not listed?

10       A.      That's right.

11       Q.      Is there somewhere in this examination

12  where it indicates what the D&B ratings were or if

13  they were rated?

14       A.      Right.  On the page in front of you,

15  yes.  Where it says D&B, 1R3NL, not listed, 482,

16  right, those are the ratings provided by the field

17  examiner.  They have a set of --

18       Q.      Under what circumstances is a company

19  not rated by Dun & Bradstreet?

20       A.      They're just not listed.  If a company

21  chooses -- it's a privately held company and they

22  choose not to disclose financial information to Dun

23  & Bradstreet they are not listed.  It's common.

24       Q.      Given that these ten customers account

25  for almost 80 percent -- 85 percent of the sales, I

```
 1                    T. FURST
 2   take it your understanding that this almost 300
 3   percent increase in sales was accounted for by
 4   these same customers mostly, right?
 5        A.     Yes.
 6        Q.     So these same customers are now buying
 7   Vitrotec from Gitto Global at this fantastic rate;
 8   is that right?
 9        A.     Yes.
10        Q.     Do you know if you or anyone else at
11   the company made any kind of inquiry to find out
12   why these companies are buying so much Vitro Lite?
13        A.     Well, I didn't go to any of the
14   companies specifically.  I think our concern in
15   this field examination was to ensure or to test to
16   the extent possible that the sales were legitimate
17   and the cash and the other dynamics were tied out
18   to the books and records.  Why the particular
19   buttons and whistles on Vitrotec or their product
20   which would make it so highly desirable in terms of
21   operating efficiencies is really the story line
22   that was purported from the company and that's what
23   accounted for the increase in sales.  I'm not a
24   chemist, I don't know what it does to extrusion
25   lines or anything else.
```

```
 1                    T. FURST
 2   account.
 3                    MR. STERN:    Mark this next document
 4        as Exhibit Y.
 5                    (Whereupon, the aforementioned document
 6        was marked as Defendant's Exhibit Y for
 7        identification as of this date by the
 8        Reporter.)
 9
10        Q.      Exhibit Y is an E-mail from
11   Mr. Costanza to Matthew Stillwell; is that right?
12        A.      That's correct.
13        Q.      He talks about having done research
14   about Jaytan and Hemisphere and so forth, right?
15        A.      Yes.
16        Q.      And basically says that Jaytan and
17   Hemisphere are nonexistent?
18        A.      That's what it says here.
19        Q.      He says, "I can't believe how easy this
20   would have been," right?
21        A.      That's what it says.
22        Q.      Meaning how easy this would have been
23   to do before everything fell apart, correct?
24        A.      That's what it says.
25        Q.      Did you receive any criticism from him?
```

Exhibit 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

REDACTED

In re:                                    )        Chapter 11
                                          )        Case No. 04-45386-JBR
GITTO/GLOBAL CORPORATION,                 )
                                          )
                        Debtor            )
                                          )

CORRECTED REPORT OF
CHARLES L. GLERUM AND CHOATE, HALL & STEWART,
CHAPTER 11 EXAMINER

February 23, 2005

Charles L. Glerum, P.C.
John F. Ventola, P.C.
James A. Ring
Lisa E. Herrington, Esq.
Choate, Hall & Stewart
53 State Street
Exchange Place
Boston, Massachusetts 02109
Telephone:  (617) 248-5000
Facsimile:  (617) 248-4000

The Examiner, and in particular, James A. Ring ("Ring"), the Director of Business Information Services at CH&S, interviewed four professionals and reviewed several other resumes to identify the professionals best suited to assist the Examiner. The Examiner also consulted with the CRO, counsel to the Debtor, counsel to the Committee, and counsel to LaSalle. Based on the interviews conducted by Ring and these consultations, the Examiner selected the firm of Verdolino & Lowey, P.C. ("V&L") as best qualified to review Gitto Global's financial and computer records and review and secure Gitto Global's documents at the lowest cost to the Estate.

On October 29, 2004, the Examiner filed the *Examiner's Application for Authority to Retain Verdolino & Lowey, P.C. as Forensic Accountants* (the "Accountants Motion"). The Court approved the Accountants Motion on November 12, 2004, and authorized the Examiner to retain V&L, *nunc pro tunc* to November 4, 2004, *inter alia*, to create a detailed inventory of the Gitto Global's records, including all computer files, to secure and analyze information stored on Gitto Global's computers related to Gitto Global's accounting practices and to perform forensic accounting services to determine the methods used by Gitto Global to mislead its creditors.

## III.    PARTIES

The focus of this Report are the three principals of Gitto Global, Charles Gitto, Gary Gitto and Frank Miller (collectively, the "Gitto Principals"). Numerous other persons and business entities are referenced or discussed in the following pages, particularly in the "Examiner's Findings" section that begins on page 21:

### A.    Corporate Entities

1.    **Gitto Global.** Gitto Global Corporation, a Massachusetts corporation, was formed in 1992 and maintained its principal place of business in Lunenburg, Massachusetts. Gitto Global was a plastics manufacturer and injection molder that sold products to the telecommunications, footwear, automotive, electrical, aerospace, construction, and petrochemical

5

industries. Gitto Global's compounds were used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems.

Gitto Global appears to have come into existence as a result of the merger of companies owned and/or controlled by Frank Miller, Gary Gitto and Charles Gitto. Global Products Corporation ("Global Products"), which was controlled by Frank Miller, was incorporated in 1985. On September 21, 1992, Global Products changed its name to Gitto Global Corporation. Based on the public records and the records of Gitto Global available to the Examiner, it is not clear how Gary Gitto and Charles Gitto came to have an interest in and/or be employed by Gitto Global. As of July 25, 2002, Gitto Global reported to LaSalle that Frank Miller was the President and Clerk of Gitto Global; Gary Gitto was the Treasurer of Gitto Global; Michael Angelini was the Assistant Secretary of Gitto Global; and each of Frank Miller and Gary Gitto was a director of Gitto Global. As of July 25, 2002, Frank Miller owned 50% of the outstanding shares of Gitto Global, Gary Gitto owned 40% of the outstanding shares of Gitto Global and Nancy Gitto-Panagiotes owned 10% of the outstanding shares of Gitto Global.[2]

2.  **Tradex Corp.** Gitto Global's offices and manufacturing plant are located at 140 Leominster-Shirley Road in Lunenberg, Massachusetts (the "Gitto Plant"). Tradex Corp., a Massachusetts corporation which is controlled, and appears to be wholly-owned by Charles Gitto, leased the Gitto Plant to Gitto Global as of the Petition Date.

---

[2] The percentage ownership of Gitto Global's stock by Gary Gitto and Nancy Gitto-Panagiotes is the subject of some confusion. Both Gary Gitto and Nancy Gitto-Panagiotes have stated that they own 40% and 10%, respectively, of the outstanding capital stock of Gitto Global, while Frank Miller owns the remaining 50%. For example, in paragraph 14 of the Affidavit of Nancy Gitto-Panagiotes (the "Gitto-Panagiotes Affidavit"), a copy of which is submitted herewith as Exhibit 1, Ms. Gitto-Panagiotes states that she owns "110 shares of [Gitto Global] (approximately 10%)." Further, in paragraph 3 of the Opposition of Gary Gitto to Motion of Worcester Telegram & Gazette Corporation to Intervene, a copy of which is attached hereto as Exhibit 2, Gary Gitto states that he is "owner of 40% of the stock of [Gitto Global]." There is also evidence, however, that Gary Gitto, Ms. Gitto-Panagiotes and Frank Miller own 45%, 5% and 50%, respectively, of the capital stock of Gitto Global. Gitto Global's "Security Ledger," produced to the Examiner by Ms. Gitto-Panagiotes and attached hereto as Exhibit 3, states that Gary Gitto owns 990 shares of Gitto Global's capital stock, Ms. Gitto-Panagiotes owns 110 shares of Gitto Global's capital stock, and Frank Miller owns 1100 shares of Gitto Global's capital stock. In addition, documents produced by Ms. Gitto-Panagiotes include Gitto Global stock certificates issued to Gary Gitto and Ms. Gitto-Panagiotes, copies of which are attached hereto as Exhibit 4, which indicate that Gary Gitto owns 990 shares of Gitto Global's capital stock and Ms. Gitto-Panagiotes owns 110 shares of Gitto Global's capital stock. Finally, it is worth noting that pursuant to a Voting Trust Agreement by and between Gary Gitto and Ms. Gitto-Panagiotes, dated November, 1994, a copy of which is attached as Exhibit B to the Gitto-Panagiotes Affidavit, Ms. Gitto-Panagiotes assigned her shares to Gary Gitto as Trustee. The Examiner, for the purposes of this Report, adopts the 40%/10%/50% allocation since that is what the shareholders appear to believe.

We feel there is a strong synergy between Legg Mason and Gitto/Global Corporation. I
have enclosed for your review the forecasted financial statement for the next (5) years
going forward, and I have given you the past (3) years of financials using actual sales and
margins and using restated expenses eliminating excess expenditures. We can back up
how we arrived at this point to any third party. I have also enclosed a list of assets with
the assumption that the bank debt and equipment debt will be retired at closing.

Attached to the cover letter are Gitto Global's income statements for the years ended June

30, 2001 and June 30, 2002 "Using Gross Margin & Excesses Eliminated." The statements

reflect total sales of $47,440,784 and $36,494,885 for 2001 and 2002, respectively. Forecasted

total sales for 2003 are shown as $51,287,836, increasing to $63,707,518 for fiscal 2007.

Gitto Global's internal records, stored on its Wang computer system, reflect annual sales

amounts that are even more drastically overstated:

| Year | Sales |
|------|-------|
| 1995 | $38,636,670.50 |
| 1996 | $42,866,143.37 |
| 1997 | $49,168,153.32 |
| 1998 | $52,635,223.88 |
| 1999 | $45,721,941.35 |
| 2000 | $52,235,190.63 |
| 2001 | $38,717,947.09 |
| 2002 | $95,402,321.60 |
| 2003 | $360,692,676.23 |
| 2004 | $688,800,392.61 |

The Examiner lacks sufficient information to reconcile fully the differences among the

sales figures reported in the company's financial statements, the Eliminations Report, Mr.

Miller's October 11, 2002 correspondence and its own accounting system.[19] From the

---

[19] It is of note that the company's records reflect strikingly implausible sales *increases* beginning in 2002, the time
at which, the Examiner has been advised, the company's actual sales materially *decreased* after the
telecommunications industry weakened and the events of September 11, 2001 occurred. This is consistent with the
Examiner's view that the contraction of Gitto Global's legitimate business operations, and presumably a
corresponding decrease in cash flow and profitability, forced the Gitto Principals to take more and more extreme
steps to mask the company's true financial condition and the sums being diverted to them.

3766137

Exhibit 3



**Joseph R Costanza**
09/18/2004 01:15 PM

To: Matthew Stilwell/US/ABNAMRO/NL@ABNAMRO
cc: (bcc: Michael F Aliberto III/US/ABNAMRO/NL)
Subject:

I have been on the web looking up these concentrations...J/Tan Sales.  Lets see could that be John Tangieri.  The guy who signed the cpa verification and the jj chemical check.

Colors, Compounds, and Consult..  What the hell kind of a name is this.  How did we verify this.  is there an invoice?  This is probably a dam rep/

Hemishpere, doesnt exist .  At least not on the Web.  i hope you have the workpapers from durkin.   Took me ten minutes to search all the concentrations.  Found two that look real, Zebulon and Hitachi.  I cant believe how easy this would have been.


Joseph R Costanza
Group Senior Vice President
North East/MidAtlantic Division HQ
LaSalle Business Credit, LLC
Two Commerce Square
2001 Market Street, Suite 2610
Philadelphia, Pa. 19103
Phone: 267-386-8831

New York Office
565 Fifth Avenue, 27th Floor
New York, NY 10017
Phone: 212-931-9737

With locations in Baltimore and Boston



LBC 001773

Exhibit 4

## SENIOR LOAN COMMITTEE
## REQUEST FOR LOAN APPROVAL
<u>Date</u>:  June 11, 2002

<u>DIVISION</u>:    **LBCI NEW YORK**

| | |
|---|---|
| **DIVISION HEAD:** | **M. Sharkey** |
| **REGION MANAGER:** | **J. Costanza** |
| **ORIGINATING OFFICER:** | **E. Paslawski** |
| **CREDIT UNDERWRITER:** | **K. Copenspire** |

Philadelphia conference room:  267-386-8810

<u>BORROWERS</u>:    **The Gitto/Global Corporation**
140 Leominster-Shirley Road
Gianna Park
Lunenburg, Massachusetts 01462

**NATURE OF BUSINESS:**   Gitto/Global, founded in 1992, is the industry's premier specialty compounder. The Company is a manufacturer of specialty polyvinyl chloride, polyethylene, polypropylene, and thermoplastic olefinic compounds. The Company excels in compounding technology through the use of highly advanced production equipment, comprehensive research and development laboratories, a state-of-the-art manufacturing facility, and a skilled team of industry professionals.

**LOAN REQUEST:**

| | Total Facility | LBCI Share | | | |
|---|---|---|---|---|---|
| A)  Secured Revolver | $27,000,000 | $27,000,000 | 100% | Secured | New |
| A1) Inventory Sublimit | ($6,000,000) | ($6,000,000) | 100% | Secured | New |
| A2) Letter of Credit Sublimit | ($1,000,000) | ($1,000,000) | 100% | Secured | New |
| B)  Amortizing Overadvance | $3,000,000 | $3,000,000 | 100% | Secured | New |
| Total Secured Facility (New) | $30,000,000 | $30,000,000 | 100% | Secured | New |

**BORROWER'S TOTAL OBLIGATION WITH SLC:**      $30,000,000

**GUARANTOR'S TOTAL OBLIGATION WITH SLC:**    $ 3,000,000

**RISK CODE RATINGS:**

| Rating Type | Obligor | | Recovery Rating | | Facility Rating | |
|---|---|---|---|---|---|---|
| | LR | Div. | LR | Div. | LR | Div. |
| Facility A | N/A | 4- | N/A | D | N/A | 4 |
| Facility B | N/A | 4- | N/A | E | N/A | 4- |



**DEFENDANT'S EXHIBIT**
D
3-23-06

**Rationale:**  The "4-" obligor rating is justified given the following:
- Company's history of continued profitability
- Satisfactory debt service coverage
- Declining leverage

The "D" rating is justified given the following:
- Daily borrowing base

**LBC 002150**

Gitto/Global

- **Barriers to entry** – Gitto/Global possesses the UL approvals, proprietary knowledge, and patents needed to solidify its position in the industry. Approvals can take in excess of a year to obtain for new compounds. This also has the effect of tying its customers to them due to the difficulty of qualifying new sources of compound.
- **Market position** – The Company is one of the larger and more sophisticated compounders in the business.
- **Solid collateral** – All sales age generated by purchase order, nothing is made for stock. Only 1.9% of receivables are aged 90 days and bad debt history is minimal. Inventory is of a commodity nature and can be resold or re-melted to gain maximum liquidation value.

## FACILTY:

A)  A $27,000,000 secured revolving line of credit
B)  A $3,000,000 three-year amortizing overadvance that is subject to a 50% cash flow recapture provision.

## SOURCES AND USES OF FUNDS AT CLOSING:

As of April 30, 2002:

| Sources: | | Uses: | |
|---|---|---|---|
| Revolver | 24,380 | Revolver | 24,713 |
| Overadvance facility | 3,000 | Term Loan | 2,417 |
| | | Closing costs | 250 |
| Total sources | $27,380 | Total uses | $27,380 |

Excess availability is $1.4MM (includes a $350M availability block at all times).

## MATURITY:          Three years from closing

## NEXT REVIEW DATE:       June 2003

## REPAYMENT:

A)  Principal due at maturity, accrued interest monthly
B)  Principal due in 36 equal payments, accrued interest monthly. In addition to the scheduled amortization, we will require 50% excess cash flow recapture.

## RATES:

A)    Facility A:    Reference Rate + 0.25%, LIBOR + 2.50%. Future pricing based on the following performance grid based on audited financials:

*Interest Rate Grid*

| | Ref. Rate | LIBOR | EBITDA | & | Net Worth |
|---|---|---|---|---|---|
| I | 0.00% | 2.50% | Greater than $6,000,001 | & | $6,500,000 |
| II | 0.25% | 2.75% | 5,500,001 to 6,000,000 | & | $5,750,000 |
| III | 0.50% | 3.00% | 5,000,001 to 5,500,000 | & | $5,500,000 |
| IV | 0.75% | 3.25% | 4,500,001 to 5,000,000 | & | $5,250,000 |
| V | 1.00% | 3.50% | Less than or = to 4,500,000 | & | $5,000,000 |

LBC 002151

MONITORING:        Conforming

- Borrowing Base        Daily
- A/R Agings           Monthly
- A/P Agings           Monthly
- Inventory reports    Monthly
- Interim Financials   Monthly
- Certified Audits     Annually
- Projections          Annually
- Field Exams          Quarterly      last audit May 2002
- Cash receipts        Blocked account with springing dominion based on terms to be Established.

GUARANTORS:        Gary Gitto and Frank Miller, Joint & Several to the extent of the outstanding balance under Term Loan B.

| | Date | Liquid Assets | Non-liquid Assets | Debt | Net Income | Outside Net Worth | Contingent Liabilities |
|---|---|---|---|---|---|---|---|
| Frank Miller | 5/31/02 | 125 | 20,000 | 1,685 | 284 | 5,125 | 2,417 |
| Gary Gitto | 12/31/01 | 3,286 | 25,750 | 1,483 | 413 | 10,618 | 2,417 |

## LOAN POLICY EXCEPTIONS:

65% Advance rate on RM and FG

$3MM Overadvance Facility

## MITIGATING FACTORS:

The Company's inventory is a commodity. All of the raw and finished inventory can be readily resold to competitors and others in the plastics business. All finished inventory is manufactured to purchase order. All finished inventory, scrap, and returned inventory can be re-melted and re-blended in new product. The facility will have a $350,000 permanent availability block.

Risk is significantly mitigated due to the strong and predictable cash flow, undrawn availability of $1.4MM at closing (projected to never fall below $1MM), a $350M availability block at all times, a 50% cash flow recapture requirement, joint & several guarantees by the principals and the Company's minimal CAPEX requirements.

## COVENANTS:

- Usual and customary including restrictions on dividends, officer loans, Fixed Charge Coverage ratio, maximum leverage, and limitation on CAPEX.

## CONDITIONS OF CLOSING:

- Minimum availability of $1,000,000 is required at closing.

LBC 002152

Gitto/Global

| TNW Reconciliation | | | | | | |
|---|---|---|---|---|---|---|
| Date: | 6/30/99 | 6/30/00 | 6/30/01 | 6/30/02 | 3/31/01 | 3/31/02 |
| Cap. Funds (Beg.) | 3,335 | 4,047 | 4,915 | 5,776 | 4,915 | 5,416 |
| Stock Issuance | 0 | 0 | 0 | 0 | 0 | 0 |
| Paid-in Capital | 0 | 0 | 0 | 0 | 0 | 0 |
| RE Adjustments | 0 | 0 | 0 | 0 | 0 | 360 |
| Net Income (Loss) | 712 | 868 | 861 | 1,077 | 501 | 644 |
| Cap. Funds (End) | 4,047 | 4,915 | 5,776 | 6,853 | 5,416 | 6,420 |
| Add: Sub Debt | 0 | 0 | 0 | 0 | 0 | 0 |
| Less: Intangibles | 388 | 343 | 412 | 600 | 432 | 475 |
| Tangible Net Worth | 3,659 | 4,572 | 5,364 | 6,253 | 4,984 | 5,945 |

| Auditors: Scope: | Pellegrine Unqualified | Pellegrine Unqualified | Pellegrine Unqualified | Company Proforma | Company Mngmnt | Company Mngmnt |
|---|---|---|---|---|---|---|

## DEBT SERVICE ANALYSIS:

| | Actual: | | | | Projected: | |
|---|---|---|---|---|---|---|
| | 12 months FYE 6/30/99 | 12 months FYE 6/30/00 | 12 months FYE 6/30/01 | 9 months YTD 3/31/02 | 12 months FYE 6/30/02 | 12 months FYE 6/30/03 |
| EBIT | 3,342 | 3,172 | 4,117 | 2,575 | 3,433 | 5,760 |
| plus: Depreciation | 1,219 | 1,482 | 1,448 | 1,170 | 1,560 | 1,620 |
| EBITDA | 4,561 | 4,654 | 5,565 | 3,745 | 4,993 | 7,380 |
| less: | | | | | | |
| Net CAPEX | 317 | 186 | 122 | 90 | 100 | 500 |
| Income Taxes | 655 | 159 | 652 | 363 | 484 | 1,638 |
| Net Cash Flow | 3,589 | 4,309 | 4,791 | 3,292 | 4,409 | 5,242 |
| Fixed charges: | | | | | | |
| Principal | 1,246 | 1,326 | 1,587 | 1,899 | 2,535 | 2,535 |
| Interest | 1,922 | 2,071 | 2,535 | 1,655 | 1,872 | 1,726 |
| Total Fixed Charges | 3,168 | 3,397 | 4,122 | 3,554 | 4,407 | 4,261 |
| Interest Coverage | 2.37 | 2.25 | 2.20 | 2.26 | 2.67 | 4.28 |
| Fixed Charge Coverage | 1.13 | 1.27 | 1.16 | 0.93 | 1.00 | 1.23 |
| Excess Cash Flow | $421 | $912 | $669 | ($262) | $2 | $981 |

LBC 002153

–Digital Control of Bulk Additions
–Extensive database of formulation and process information
–Process control based on running history
–Fully equipped Quality Control and Assurance laboratory
–Research & Development Laboratory
–Flammability testing equipment

**Products**:

Gitto/Global has evolved to become the industry's premier specialty compounder. Gitto/Global has a reputation based on a dual ability - to engineer revolutionary compounds and to customize existing products for diverse applications. With a well-defined product line to build upon, the team of highly skilled engineers at Gitto/Global uses its diverse skills to craft materials to meet the evolving needs of the industry.

Polyolefin and Specialty Compounds for:

- Wire and Cable
    - Flame Retardant Compounds for Wire & Cable
    - Flame Retardant-Specialty Wire
    - Non-Halogen, Flame Retardant
    - Flexible Cord/UL 62

- Molding/Specialty Products

Vinyl Compounds for:

- Wire and Cable

- General Purpose Molding and Extrusion

- Footwear

**Services**:

*Research & Development*

Gitto/Global maintains R&D facilities designed for the capabilities demanded by evolutionary engineering. To enhance proficiency and productivity, Gitto/Global maintains two product-focused R&D operations: one for polyolefins, and one for vinyl, alloys and specialty products. Technology breakthroughs are made here - in flame retardant and low-smoke compounds; cross-linkable, colorful, expandable, and halogen-free compounds; compounds that changed industries and enhance daily life.

*On-site technical assistance*

The Company takes great pride in manufacturing products that transition smoothly into production mode. To ensure equipment is optimized for production with Gitto/Global compounds, or to troubleshoot any problems you may encounter along the way, on-site technical assistance is available 24/7/365.

Gitto/Global

LBC 002154

Operating Expenses: Operating expenses increased by only $296M or 5.3% to $5,863 from $5,567 in the prior year. This is primarily due to the fact that the plant is highly automated and has excess capacity. Management believes that it will be able to maintain SG&A at the 6.9% level despite significant projected sales increases.

Interest Expense: Interest expense increased $464 or 22.4% to $2,535 from $2,071 largely due to increased borrowing to accommodate the 51.7% increase in sales.

Net Income: Pre tax income remained approximately the same despite pre tax income having increased $486M or 48.3% due to a $493M increase in the tax accrual.

**Operations – INTERIM 9 months ended 3/31/02 compared 3/31/01:**

Net Sales: Revenue increased $27.4MM or 42.6% for the nine months ended 3/31/02 versus the prior period. Gitto/Global took advantage of its competitor's weakness to secure additional business during the recent recession. The Company is in a position to continue to expand its business and is negotiating a representation arrangement with Sumitomo in the Far East.

Gross Profit: Gross Margin decreased $866M or (6.6)% to $12.1MM as compared to $13.0MM the previous period for the reasons stated above. Margins are expected to increase over the next twelve months due to greater shipments of its higher margin anti corrosive battery compounds due to a contract with Honda for its motorcycle battery boxes and a resumption of · . sales of fireproof battery box compounds to the wireless tower battery industry. The Company also implemented a 3% price increase effective June 1, 2002.

Operating Expenses: SG&A remained stable as compared to FYE 2001 and are expected to remain at 6 to 7% of sales.

Interest Expense:    Interest expense decreased $284M or (14.65)% to $1,655 versus $1,939 due primarily to lower borrowing costs.

Net Income: Net Income increased by $143M or 28.5% to $644 versus $501M due to the higher volume and controlled operating expense.

CAPITALIZATION:

|  | Proforma | % of Total |
|---|---|---|
| Senior Debt |  |  |
| Revolver | 25,000 | 57.05% |
| Term Loans & Leases | 3,000 | 6.85% |
| Capital Leases | 9,400 | 21.45% |
| Other | 0 | 0.00% |
| Total Senior Secured | 37,400 | 85.35% |
|  |  |  |
| Equity | 6,420 | 14.65% |
| Tangible Net Worth | 6,420 | 14.65% |
|  |  |  |
| Total Capitalization | 43,820 | 100.00% |

LBC 002155

Accounts Receivable ineligibles as of April 30, 2002:

| Category | Per Examiner $ Amount |
|---|---|
| Net Past Due Ineligible | 516 |
| 25% Cross Aging Rule | 30 |
| Excess Concentration (10%) | 732 |
| Foreign Receivables | 252 |
| | |
| Total Ineligibles | $      1,530 |

Inventory:
- Inventory consists of specialty polyvinyl chloride, polyethylene, polypropylene, and thermoplastic olefinic compounds.
- All of the raw materials are of a commodity nature and can readily be resold.
- Finished Goods may be re-melted and blended into other products or resold as raw.
- All finished goods are prepared to purchase order only; no inventory is built for stock.
- Inventory is valued at FIFO, actual cost plus overhead.
- No obsolete, stale, seasonal or slow moving inventory was noted on the audit.
- Cycle counts are done continuously and a full physical is taken annually.

## Inventory

| Description | Current Apr-02 | % of total inventory | Prior year Mar-01 | % of total inventory | FYE Jun-01 | % of total inventory |
|---|---|---|---|---|---|---|
| Raw Mat'ls | $3,090,137 | 50.1% | $3,383,180 | 48.5% | $3,260,542 | 48.8% |
| Containers | 33,454 | 0.5% | | 0.0% | | 0.0% |
| Fin. Goods | 2,785,685 | 45.2% | 3,589,354 | 51.5% | 3,416,553 | 51.2% |
| OH Raw | 15,600 | 0.3% | | 0.0% | | 0.0% |
| OH FG | 239,779 | 3.9% | | 0.0% | | 0.0% |
| Total Inventory | 6,164,655 | 100.0% | 6,972,534 | 100.0% | 6,677,095 | 100.0% |
| Total reserves | 33,453 | 0.5% | - | 0.0% | - | 0.0% |
| | | | | | | |
| Net eligible inventory | $6,131,202 | 99.5% | $6,972,534 | 100.0% | $6,677,095 | 100.0% |

| Location | Address | $ Value | % of total inventory |
|---|---|---|---|
| Main Offices/Factory | 140 Leominster-Shirley Rd, Lunenberg, MA | 6,164,655 | |
| Public Warehouse | 232 Airport Dr, Fitchburg, MA | - | |

Accounts payable:    A/P balances are kept at a very low level in order to maintain excellent trade relations, insure delivery of product in periods of shortages, and obtain the highest discounts possible.

LBC 002156

## List of Appendices

Appendix A        FAMAS Spreads

Appendix B        Field Exam

Appendix C        Monthly Projected Financial Statements

Gitto/Global

LBC 002157

The Gitto/Global Corporation
Detailed Financials

SIC Code:

| | UNQUAL | UNQUAL | UNQUAL | PRELIM |
|---|---|---|---|---|
| Auditor:  Louis J. Pellegine | | | | |
| Analyst: Kevin Copenspire | Jun 30 | Jun 30 | Jun 30 | Mar 31 |
| | 1999 | 2000 | 2001 | 2001 |
| Amounts in Thousands of Dollars | 12 Mths | 12 Mths | 12 Mths | 9 Mths |
| | $ | $ | $ | $ |
| **LIABILITIES** | | | | |
| Notes Payable - S/T BANK | 13,845 | 18,867 | 21,002 | 28,973 |
| CURRENT MATURITIES LTD | 1,246 | 1,326 | 1,587 | 2,535 |
| Accounts payable - Trade | 7,216 | 3,991 | 5,352 | 3,732 |
| Accrued expense | 468 | 431 | 1,061 | 573 |
| Other | 0 | 0 | 948 | 288 |
| TOTAL CURRENT LIABILITIES | 22,775 | 24,615 | 29,950 | 36,101 |
| TOTAL SENIOR LIABILITES | 15,091 | 20,193 | 22,589 | 31,508 |
| | | | | |
| Long Term Debt | 6,285 | 5,063 | 4,802 | 6,220 |
| Other | 1,544 | 1,216 | 1,154 | 571 |
| Subordinated Debt | 0 | 0 | 0 | 0 |
| TOTAL LIABILITIES | 30,604 | 30,894 | 35,906 | 42,892 |
| | | | | |
| Common Stock | 150 | 150 | 150 | 150 |
| APIC | 2,100 | 2,100 | 2,100 | 2,100 |
| Retained Earnings | 1,797 | 2,665 | 3,526 | 4,170 |
| NET WORTH | 4,047 | 4,915 | 5,776 | 6,420 |
| | | | | |
| TOTAL LIABILITES & NET WORTH | 34,651 | 35,809 | 41,682 | 49,312 |
| | | | | |
| Inventory Method 1=L. 2=F. 3=LF. 4=0 | | | | |
| Tangible Net Worth | 3,659 | 4,572 | 5,364 | 5,945 |
| Working Capital | (42) | (384) | (131) | 2,230 |

LBC 002158

# Gitto/Global Corporation
PROFORMA INCOME STATEMENT
FY September 2003
(000's omitted)

| | Oct | Nov | Dec | 1Q 2003 | Oct | Nov | Dec | 2Q 2003 | 6 months Mar-03 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 9,880 | 9,880 | 9,880 | 29,640 | 9,880 | 9,880 | 9,880 | 29,640 | 59,280 | |
| 0.0% Sales | | | | | | | | | | |
| 9,880 | | | | | | | | | | |
| Cost of Sales | 8,715 | 8,715 | 8,715 | 26,145 | 8,715 | 8,715 | 8,715 | 26,145 | 52,290 | |
| Gross Margin | 1,165 | 1,165 | 1,165 | 3,495 | 1,165 | 1,165 | 1,165 | 3,495 | 6,990 | |
| GM % | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | |
| SG&A | 685 | 685 | 685 | 2,055 | 685 | 685 | 685 | 2,055 | 4,110 | |
| SG&A % | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | |
| OPERATING INCOME | 480 | 480 | 480 | 1,440 | 480 | 480 | 480 | 1,440 | 2,880 | |
| OI % | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | |
| Other Expenses/(Income) | | | | | | | | | | |
| Interest | 144 | 144 | 143 | 431 | 187 | 144 | 144 | 143 | 574 | |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Total Other charges | 144 | 144 | 144 | 432 | 187 | 144 | 144 | 475 | 907 | |
| PRE TAX INCOME | 336 | 336 | 336 | 1,008 | 293 | 336 | 336 | 965 | 1,973 | |
| Income Tax Provision | 136 | 136 | 137 | 409 | 136 | 136 | 137 | 409 | 818 | |
| NET INCOME /(LOSS) | 200 | 200 | 199 | 599 | 157 | 200 | 199 | 556 | 1,155 | |
| EBITDA | 610 | 610 | 609 | 1,829 | 610 | 610 | 610 | 1,830 | 3,659 | |
| EBITDA Margin | 6.17% | 6.17% | 6.16% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | |
| Adjusted EBITDA | 610 | 610 | 609 | 1,829 | 610 | 610 | 610 | 1,830 | 3,659 | |
| Addbacks/Non-recurring | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Depreciation and Amort | 130 | 130 | 130 | 390 | 130 | 130 | 130 | 390 | 780 | |
| CAPEX | 50 | 50 | 50 | 150 | 50 | 50 | 50 | 150 | 300 | |
| ## Unfunded CAPEX | 13 | 13 | 13 | 38 | 13 | 13 | 13 | 38 | 75 | |

136.5

| | Oct | Nov | Dec | 3Q 2003 | Oct | Nov | Dec | 4Q 2003 | 6 months Sep-03 | 12 months Sep-03 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 9,880 | 9,880 | 9,880 | 29,640 | 9,880 | 9,880 | 9,880 | 29,640 | 59,280 | 118,560 |
| Sales | | | | | | | | | | |
| Cost of Sales | 8,715 | 8,715 | 8,715 | 26,145 | 8,715 | 8,715 | 8,715 | 26,145 | 52,290 | 104,580 |
| Gross Margin | 1,165 | 1,165 | 1,165 | 3,495 | 1,165 | 1,165 | 1,165 | 3,495 | 6,990 | 13,980 |
| GM % | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% |
| SG&A | 685 | 685 | 685 | 2,055 | 685 | 685 | 685 | 2,055 | 4,110 | 8,220 |
| SG&A % | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 5.93% |
| OPERATING INCOME | 480 | 480 | 480 | 1,440 | 480 | 480 | 480 | 1,440 | 2,880 | 5,760 |
| OI % | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% |
| Other Expenses/(Income) | | | | | | | | | | |
| Interest | 144 | 144 | 144 | 432 | 144 | 144 | 143 | 431 | 863 | 1,726 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other charges | 144 | 144 | 144 | 432 | 144 | 144 | 143 | 431 | 863 | 1,726 |
| PRE TAX INCOME | 336 | 336 | 336 | 1,008 | 336 | 336 | 337 | 1,009 | 2,017 | 4,034 |
| Income Tax Provision | 137 | 136 | 137 | 410 | 136 | 136 | 137 | 409 | 819 | 1,638 |
| NET INCOME /(LOSS) | 199 | 200 | 199 | 598 | 200 | 200 | 200 | 600 | 1,198 | 2,396 |
| EBITDA | 610 | 610 | 610 | 1,830 | 610 | 610 | 610 | 1,830 | 3,660 | 7,320 |
| EBITDA Margin | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% | 6.17% |
| Adjusted EBITDA | 610 | 610 | 610 | 1,830 | 610 | 610 | 610 | 1,830 | 3,660 | 7,320 |
| Addbacks/Non-recurring | 0 | 0 | 0 | 0 | 130 | 130 | 130 | 390 | 780 | 1,560 |
| Depreciation and Amort | 130 | 130 | 130 | 390 | 50 | 50 | 50 | 150 | 300 | 600 |
| CAPEX | 50 | 50 | 50 | 150 | 13 | 13 | 13 | 38 | 75 | 150 |
| ## Unfunded CAPEX | 13 | 13 | 13 | 38 | | | | | | |

LBC 002159

**Gitto/Global Corporation**
PROFORMA INCOME STATEMENT
FY September 2005
(000's omitted)

| | Oct | Nov | Dec | 1Q 2005 | Oct | Nov | Dec | 2Q 2005 | 6 months Mar-05 |
|---|---|---|---|---|---|---|---|---|---|
| 10.0% Sales | 11,955 | 11,955 | 11,955 | 35,864 | 11,955 | 11,955 | 11,955 | 35,864 | 71,729 |
| 88.21% Cost of Sales | 10,545 | 10,545 | 10,545 | 31,636 | 10,545 | 10,545 | 10,545 | 31,636 | 63,272 |
| Gross Margin | 1,409 | 1,409 | 1,409 | 4,228 | 1,409 | 1,409 | 1,409 | 4,228 | 8,457 |
| GM % | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% |
| 6.93% SG&A | 828 | 828 | 828 | 2,485 | 828 | 828 | 828 | 2,485 | 4,971 |
| SG&A % | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% |
| OPERATING INCOME | 581 | 581 | 581 | 1,743 | 581 | 581 | 581 | 1,743 | 3,486 |
| OI % | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% |
| Other Expenses/(Income) | | | | | | | | | |
| Interest | 130 | 130 | 130 | 390 | 130 | 130 | 130 | 390 | 780 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other charges | 130 | 130 | 130 | 390 | 130 | 130 | 130 | 390 | 780 |
| PRE TAX INCOME | 451 | 451 | 451 | 1,353 | 451 | 451 | 451 | 1,353 | 2,706 |
| 40.61% Income Tax Provision | 183 | 183 | 183 | 549 | 183 | 183 | 183 | 549 | 1,099 |
| NET INCOME /(LOSS) | 268 | 268 | 268 | 804 | 268 | 268 | 268 | 804 | 1,607 |
| EBITDA | 721 | 721 | 721 | 2,163 | 721 | 721 | 721 | 2,163 | 4,326 |
| EBITDA Margin | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% |
| Adjusted EBITDA | 721 | 721 | 721 | 2,163 | 721 | 721 | 721 | 2,163 | 4,326 |
| Addbacks/Non-recurring | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Depreciation and Amort | 140 | 140 | 140 | 420 | 140 | 140 | 140 | 420 | 840 |
| CAPEX | 50 | 50 | 50 | 150 | 50 | 50 | 50 | 150 | 300 |
| ## Unfunded CAPEX | 13 | 13 | 13 | 38 | 13 | 13 | 13 | 38 | 75 |

| | Oct | Nov | Dec | 3Q 2005 | Oct | Nov | Dec | 4Q 2005 | 6 months Sep-05 | 12 months Sep-05 |
|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 11,955 | 11,955 | 11,955 | 35,864 | 11,955 | 11,955 | 11,955 | 35,864 | 71,729 | 143,458 |
| Cost of Sales | 10,545 | 10,545 | 10,545 | 31,636 | 10,545 | 10,545 | 10,545 | 31,636 | 63,272 | 126,544 |
| Gross Margin | 1,409 | 1,409 | 1,409 | 4,228 | 1,409 | 1,409 | 1,409 | 4,228 | 8,457 | 16,914 |
| GM % | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% | 11.79% |
| SG&A | 828 | 828 | 828 | 2,485 | 828 | 828 | 828 | 2,485 | 4,971 | 9,942 |
| SG&A % | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% | 6.93% |
| OPERATING INCOME | 581 | 581 | 581 | 1,743 | 581 | 581 | 581 | 1,743 | 3,486 | 6,972 |
| OI % | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% | 4.86% |
| Other Expenses/(Income) | | | | | | | | | | |
| Interest | 130 | 130 | 130 | 390 | 130 | 130 | 130 | 390 | 780 | 1,560 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other charges | 130 | 130 | 130 | 390 | 130 | 130 | 130 | 390 | 780 | 1,560 |
| PRE TAX INCOME | 451 | 451 | 451 | 1,353 | 451 | 451 | 451 | 1,353 | 2,706 | 5,412 |
| Income Tax Provision | 183 | 183 | 183 | 549 | 183 | 183 | 183 | 549 | 1,099 | 2,198 |
| NET INCOME /(LOSS) | 268 | 268 | 268 | 804 | 268 | 268 | 268 | 804 | 1,607 | 3,214 |
| EBITDA | 721 | 721 | 721 | 2,163 | 721 | 721 | 721 | 2,163 | 4,326 | 8,652 |
| EBITDA Margin | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% | 6.03% |
| Adjusted EBITDA | 721 | 721 | 721 | 2,163 | 721 | 721 | 721 | 2,163 | 4,326 | 8,652 |
| Addbacks/Non-recurring | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Depreciation and Amort | 140 | 140 | 140 | 420 | 140 | 140 | 140 | 420 | 840 | 1,680 |
| CAPEX | 50 | 50 | 50 | 150 | 50 | 50 | 50 | 150 | 300 | 600 |
| ## Unfunded CAPEX | 13 | 13 | 13 | 38 | 13 | 13 | 13 | 38 | 75 | 150 |

LBC 002160

Accounts Payable

- Accounts payable levels decreased $2.4MM to $1.1MM as of 3/31/02 compared to $3.5MM for the same prior period. The Company posts most of it's purchases directly to expenses by issuing a check upon receipt, rather than entering into accounts payable first. The Company takes all vendor discounts. Future exams will need to pay close attention to held checks.
- At 3/31/02 $258M or total A/P of $1.1MM was over 90 days past due. The majority of the delinquent balance is related to an engineering company and a few other disputed invoices.

Comments:

- Current loans receivable from officers is $1,407M as of 3/31/02. The owners take advances during the year against future earnings. LBCI will restrict the amount of advances by covenant.

## ANALYST ISSUE SUMMARY AND RECOMMENDATIONS

Analyst Comments:

o   Sales have increased 42% from the same period in the prior year. The prospect is raising prices $0.03/lb because they have lost gross margin due to increased costs.

o   A/R is strong, with average over 90 balances of only 4% for the last two years. The current A/R has 94% of the outstanding A/R under 60 days from invoice. A/R turnover is 74 days for the 12 month period ended 3/31/02.

o   Company management calls customers 2 weeks before an invoice is due to gather information to plan cash flow. They then make follow-up calls weekly to track customer's payment plans.

o   All cash receipt transactions appear in order.

o   Inventory turnover is 25 days for the 9 months YTD 3/31/02. Inventory is made to order, and purchases made to support requirements.

o   The Company's production cycle takes only several hours from raw material to finished goods. The products are generally commodities that can be sold or recycled easily.

o   The top 10 customers comprise 81% of the total A/R. The examiner has included a 10% concentration reserve of $732M.

o   The examiner believes that the dilution calculated of 0.3% for the 12 month period ended 3/31/02 is understated. Credits per the G/L for the months reviewed during credit memo testing are less than the credits selected for testing. The prospect's management team is looking into this. Per management, all credits are reported separately in the G/L by their understanding. However, this is not the case. In at least one instance a credit was entered as a negative invoice.

o   Examiner noted 3 prebillings in the shipping test. In all 3 instances, the customer was the same, and the shipping method was Gitto/Global truck. Per management, the invoice is issued when the truck leaves the factory, but the truck arrives at the customer's location the following day, which is when the BOL is dated. The invoice does not indicate an FOB point. No reserve is suggested.

o   The Company is making monthly estimated tax payments of $25M, rather than quarterly estimates based on the prior year's tax. Management did not provide a clear reason for this.

o   Examiner noted very heavy officer loan activity. Current loans receivable from officers is $1,407M as of 3/31/02.

Analyst Recommendations:
o   Prior to funding the credits per the G/L should be verified.

o   Landlord waivers should be obtained for the public warehouse in Fitchburg, MA.

o   A tax lien search should be performed for the Company and officers.

o   Officer loans should be repaid to the Company prior to closing, and a limit imposed on the activity in officer's loans going forward. Per management, officer's loans are repaid prior to year end, which is less than a month away.

Analyst/Date written:        John Helldorfer/June 4, 2002

LBC 002162

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Business Summary

**Nature of Business:** Gitto/Global Corp. is a compounder of various high quality resins. It's products are used by plastic molders for applications ranging from boot soles to flame retardent battery cases. Clients include Hitachi Industries, Timberland Outdoor Footwear, and SC Johnson requires their suppliers to use Gitto/Global products in the manufacture of Glade plug-ins.

**Business History:** Global Products Corp. was incorporated in July 1985 as a C-Corporation in the state of Massachussets for the purpose of engaging in the business of manufaturing plastics and plastic compounds to customers' specifications.  In September 1992, the Corporation acquired the assets of The Gitto Corporation, which had been incorporated in Massachussetts in 1991 for the purpose of manufacturing specialty polyvinylchloride, polypropolene and polyethylene plastic compounds, and thermoplastic olefinic compounds. The consolidation occurred to strengthen the Company's position in the marketplace and improve the service it can provide to its customers.

## Ownership of Account

| Name | % Ownership | Title or Business |
|---|---|---|
| Frank Miller | 50% | Pres./COO |
| Gary Gitto | 50% | CEO/Treasurer |
| | | |

**Subsidiaries or Affiliates:**    **None**

| Name | % Ownership | Title or Business |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Prior Examiner(s) | Field Days | Write-up Days | Total Days |
|---|---|---|---|
| | | | 0 |
| | | | 0 |
| | | | 0 |
| Totals | 0 | 0 | 0 |

| Current Examiner(s) | Field Days | Write-up Days | Total Days |
|---|---|---|---|
| John Helldorfer | 4 | 3 | 7 |
| | | | 0 |
| | | | 0 |
| Totals | 4 | 3 | 7 |

| | |
|---|---|
| Prospect | X |
| Existing Client | |
| Business Started | 1985 |
| Last FYE | Jun-01 |

| | |
|---|---|
| Audit Fee | $750/day + |
| Coll. Mgmt. Fee | $1,000/mo. |
| Interest Rate | Prime + 0.25 - 1.00% |
| Collection Days | 2 |
| Min. Availability | $1MM |

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
AR Ineligibles

| A/R Reconciliation & Ineligibles - 4/30/02 |
|---|

| Ineligibles | | |
|---|---|---|
| Category | Per Client $ Amount | Per Examiner $ Amount |
| Over 90 Days From Invoice Date | | 516,023 |
| Over 60 Days Past Due Date | | See comment below |
| Net Past Due Ineligible | - | 516,023 |
| 25% Cross Aging Rule | | 30,104 |
| Excess Concentration (10%) | | 731,918 |
| Finance Charges 1 - 90 Days | | - |
| Contra Reserve | | - |
| Government Accounts 1 - 90 Days | | - |
| Credits in PD Reserve | | - |
| Foreign Receivables | | 252,371 |
| Disputes 1 - 90 Days | | |
| Total Ineligibles | $          - | $     1,530,416 |

**Comments:** Examiner noted several customers had due on receipt terms per the A/R aging, but invoices showed net 30 terms.  Per management, all customers receive at least 30 day terms.  The customers with the same date for invoice and due dates have no information entered in the customer set-up area in the prospect's accounting software per management.  No reserve is suggested because the invoices grant 30 day terms.

Foreign receivables ineligibles does not include Canadian customers.

LASALLE BUSINESS CREDIT, INC.
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
AR Aging Trends

## AR Aging Trends

| Month | Total | Current | | 31-60 | | 61-90 | | Over 90 | |
|---|---|---|---|---|---|---|---|---|---|
| 7/31/00 | 17,316,185 | 6,103,658 | 35.2% | 6,814,921 | 39.4% | 3,375,248 | 19.5% | 1,022,358 | 5.9% |
| 8/31/00 | 19,819,563 | 8,524,823 | 43.0% | 5,179,905 | 26.1% | 5,087,216 | 25.7% | 1,027,619 | 5.2% |
| 9/30/00 | 18,968,728 | 8,026,546 | 42.3% | 6,409,363 | 33.8% | 3,464,711 | 18.3% | 1,068,108 | 5.6% |
| 10/31/00 | 19,738,248 | 7,229,673 | 36.6% | 6,216,374 | 31.5% | 5,241,290 | 26.6% | 1,050,911 | 5.3% |
| 11/30/00 | 19,736,463 | 8,196,943 | 41.5% | 5,842,002 | 29.6% | 4,456,962 | 22.6% | 1,240,556 | 6.3% |
| 12/31/00 | 20,070,592 | 7,204,061 | 35.9% | 7,118,123 | 35.5% | 5,010,713 | 25.0% | 737,695 | 3.7% |
| 1/31/01 | 20,190,859 | 7,870,637 | 39.0% | 6,426,836 | 31.8% | 5,224,832 | 25.9% | 668,554 | 3.3% |
| 2/28/01 | 19,973,378 | 7,779,300 | 38.9% | 5,283,983 | 26.5% | 6,350,385 | 31.8% | 559,710 | 2.8% |
| 3/31/01 | 19,454,612 | 7,449,489 | 38.3% | 6,656,307 | 34.2% | 3,967,023 | 20.4% | 1,381,793 | 7.1% |
| 4/30/01 | 21,259,493 | 8,314,033 | 39.1% | 6,503,945 | 30.6% | 5,535,538 | 26.0% | 905,977 | 4.3% |
| 5/31/01 | 21,189,456 | 9,087,816 | 42.9% | 7,256,730 | 34.2% | 4,157,697 | 19.6% | 687,213 | 3.2% |
| 6/30/01 | 21,467,149 | 11,541,557 | 53.8% | 7,024,237 | 32.7% | 2,331,257 | 10.9% | 570,098 | 2.7% |
| 7/31/01 | 21,163,112 | 5,260,030 | 24.9% | 9,277,010 | 43.8% | 5,944,387 | 28.1% | 681,685 | 3.2% |
| 8/31/01 | 20,987,358 | 7,645,455 | 36.4% | 4,416,233 | 21.0% | 8,227,641 | 39.2% | 698,029 | 3.3% |
| 9/30/01 | 21,584,619 | 10,193,535 | 47.2% | 6,401,717 | 29.7% | 3,300,521 | 15.3% | 1,688,846 | 7.8% |
| 10/31/01 | 25,131,501 | 9,850,589 | 39.2% | 9,011,176 | 35.9% | 5,402,650 | 21.5% | 867,086 | 3.5% |
| 11/30/01 | 24,220,781 | 8,150,309 | 33.7% | 7,891,760 | 32.6% | 7,442,625 | 30.7% | 736,087 | 3.0% |
| 12/31/01 | 25,219,033 | 10,557,537 | 41.9% | 6,755,042 | 26.8% | 7,225,058 | 28.6% | 681,396 | 2.7% |
| 1/31/02 | 25,632,093 | 11,579,120 | 45.2% | 9,816,534 | 38.3% | 3,678,805 | 14.4% | 557,634 | 2.2% |
| 2/28/02 | 26,028,730 | 12,498,287 | 48.0% | 11,208,681 | 43.1% | 1,922,005 | 7.4% | 399,757 | 1.5% |
| 3/31/02 | 26,613,948 | 19,060,220 | 71.6% | 6,190,698 | 23.3% | 701,557 | 2.6% | 661,473 | 2.5% |
| 4/30/02 | 27,187,334 | 9,781,993 | 36.0% | 15,906,688 | 58.5% | 982,630 | 3.6% | 516,023 | 1.9% |
| Averages | 21,952,420 | 9,177,528 | 41.4% | 7,436,739 | 33.6% | 4,501,398 | 21.1% | 836,755 | 4.0% |



GittoGlobal Corp - 4-30-02

30,000,000
25,000,000
20,000,000
15,000,000
10,000,000
5,000,000

AR Aging Trends

LBC 002165

LASALLE BUSINESS CREDIT, INC.
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
AR Concentrations

**A/R Concentrations**   As of:   4/30/02

| Customer Name | % | Total | Apr-02 1-30 | Mar-02 31-60 | Feb-02 61-90 | Jan-02 Over 90 | 10% Excess Concentration |
|---|---|---|---|---|---|---|---|
| HEMISPHERE DIST CORP | 11.1% | 3,013,802 | 990,937 | 2,022,865 | | | 295.069 |
| JITAN SALES & MARKETING | 10.6% | 2,894,030 | 1,012,494 | 1,881,536 | | | 175.297 |
| HITACHI CABLE, INC | 10.4% | 2,823,597 | 1,007,015 | 1,734,562 | 18,323 | 63,697 | 104,864 |
| VELCO CHEMICALS, INC | 10.3% | 2,813,610 | 630,725 | 2,182,885 | | | 94.877 |
| ZEBULON INDUSTRIES | 10.2% | 2,780,546 | 900,452 | 1,880,094 | | | 61,813 |
| ISOTEC | 9.2% | 2,507,771 | 837,166 | 1,549,311 | 69,204 | 52,090 | |
| GENESIS CABLE | 8.2% | 2,233,363 | 542,605 | 1,438,794 | 251,964 | | |
| COLORS COMPOUNDS & CONSULTA | 5.0% | 1,358,483 | 437,240 | 921,243 | | | |
| GNB INDUSTRIAL POWER - COMBIN | 3.2% | 881,253 | 642,591 | 235,512 | | 3,150 | |
| LAKE ELECTRONIC CABLE | 2.8% | 759,165 | 302,699 | 175,668 | 185,578 | 95,220 | |
| Total A/R Concentration | 81% | $22,065,620 | $7,303,924 | $14,022,470 | $ 525,069 | $214,157 | $ 731,918 |
| Percent | | 100% | 33% | 64% | 2% | 1% | 3% |
| Total A/R Aging | 100% | 27,187,334 | 9,781,993 | 15,906,688 | 982,630 | 516,023 | - |
| Percent | | 100% | 36% | 59% | 4% | 2% | 0% |

**Status of above items over 90 Days past due**

| | |
|---|---|
| HITACHI CABLE, INC | Quality problems, Tech. Dept. working to fix |
| ISOTEC | Net 90 terms |
| GNB INDUSTRIAL POWER - COMBIN | Slow payer |
| LAKE ELECTRONIC CABLE | Quality problems, Tech. Dept. working to fix |

**A/R Concentrations**   As of:   4/30/01

| Customer Name | % | Total | Apr-01 1-30 | Mar-01 31-60 | Feb-01 61-90 | Jan-01 Over 90 | |
|---|---|---|---|---|---|---|---|
| ISOTEC INC | 12.3% | 2,621,674 | 1,214,257 | 709,657 | 635,360 | 62,400 | 495,725 |
| HITACHI CABLE, INC | 12.0% | 2,550,748 | 903,984 | 773,605 | 873,159 | | 424,799 |
| ZEBULON INDUSTRIES | 11.4% | 2,432,469 | 1,006,070 | 500,370 | 926,029 | | 306,520 |
| COLORS COMPOUNDS & CONSULTA | 10.6% | 2,257,203 | 911,429 | 545,407 | 711,974 | 88,393 | 131,254 |
| VELCO CHEMICALS, INC | 9.9% | 2,107,885 | 1,005,550 | 376,610 | 725,725 | | |
| GNB INDUSTRIAL POWER | 8.4% | 1,788,674 | 642,309 | 621,677 | 377,728 | 146,960 | |
| ACCUMA | 5.1% | 1,084,605 | 212,400 | 399,132 | 338,989 | 134,084 | |
| GENSIS CABLE | 3.5% | 745,127 | 147,470 | 362,487 | 235,170 | | |
| HARDIGG BATTERY PRODUCTS | 3.1% | 658,384 | 252,770 | 166,974 | 119,320 | 119,320 | |
| GENERAL CABLE | 2.3% | 483,418 | 246,229 | 237,189 | | | |
| Total A/R Concentration | 78.7% | $16,730,187 | $6,542,468 | $ 4,693,108 | $4,943,454 | $551,157 | $ 1,358,297 |
| Percent | | 100% | 39% | 28% | 30% | 3% | 8% |
| Total A/R Aging | 100.0% | 21,259,493 | 8,314,033 | 6,503,945 | 5,535,538 | 905,977 | - |
| Percent | | 100% | 39% | 31% | 26% | 4% | 0% |

**Have concentration accounts changed from the prior period?**
**If so, why?** The two largest accounts as of 4/30/02 are distribution companies. Gitto/Global did not sell to these companies as of 4/30/01.

**Comments:** Examiner analyzed cash receipts for the largest 5 customers. Results were satisfactory.

LBC 002166

LASALLE BUSINESS CREDIT, INC.
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
AR Performance Charts

## 12 mo. sales comparison (000's)



## 12 mo. AR turnover comparison



Comments: Examiner noted that credit memos selected for testing exceeded the credits per the G/L. Per management, all credits should be listed separately in the G/L and not netted with sales. When given evidence that this is not the case, their research found that an invoice was entered as a negative amount rather than a credit being issued for the credit in question. Per management this was an isolated incidence because someone was filling in for the regular person. However, it appears that this happens more often than management believes. Examiner suggests that credits be recalculated manually prior to closing.
Postings to the G/L are in summary form. Credits are found by reviewing physical copies.

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Credit Memos

**Credit Memo Review**

|  | Selected | Properly documented |  |
|---|---|---|---|
| # of items | 14 | 14 | |
| $ amount | 357,651 | - | |
| Credits issued in period | $ 200,000 | | |
| % | 178.8% | 0.0% | A |
| Period tested | 01/01/02 to 04/30/02 | | |

|  | Maximum | Average |
|---|---|---|
| lag from return request date to credit memo date | 24 | ±0 |
| lag from the credit memo date to assignment date | - | |
| Total lag days | | 4.0 |
| Credit memo reserve recommended* | | $ - |

\* Average daily credits x credit lag over 30 days

| Reason | $ (000's) Amount | % of $ Tested | # |
|---|---|---|---|
| 1. Defective | $ 317,966 | 88.9% | 12 |
| 2. Invoice error | 11,485 | 3.2% | 1 |
| 3. Bad raw mtl from vendor | 28,200 | 7.9% | 1 |
| 4. | - | 0.0% | # |
| 5. | - | 0.0% | # |
| 6. | - | 0.0% | # |
| 7. | - | 0.0% | # |
| 8. | - | 0.0% | # |
| 9. | - | 0.0% | # |
| 10. | - | 0.0% | # |
| Totals | $ 357,651 | 100.0% | 14 |

### Analysis of Credit Memos




**Comments:** Prospect will rework defective goods and ship them to the customer for a subsequent order if possible. If the goods can not be reworked, they are used as filler in other products.

**(A)** See comments on page 10.

LBC 002168

LA SALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
PD & Crit Chart



Total PD & Critical

Legend:
- 1. Net 60 Terms
- 2. Net 90 Terms
- 3. To be returned for credit
- 4. Slow Payer
- 5. Subsequently Paid
- 6. Product quality problems
- 7.
- 8.
- 9.
- 10.

7. 0%
8. 0%
9. 0%
10. 0%

6. Product quality problems 18%

1. Net 60 Terms 11%

2. Net 90 Terms 12%

3. To be returned for credit 4%

5. Subsequently Paid 32%

4. Slow Payer 23%

LBC 002169

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Cash Receipts Review

Proof of Cash

(000's)

**Operating Account**        Guaranty Bank, Account 380-1723226

**Analysis of Cash Receipts**

| Source | Jan-02 | Feb-02 | Mar-02 | Apr-02 | Total | % of Total |
|---|---|---|---|---|---|---|
| Guaranty Bank | $ 12,374,944 | $ 11,378,962 | $ 18,494,080 | n/a | $42,247,986 | 100% |
| Money Market Fund | | | | | - | 0% |
| Credit Cards/Cash | | | | | - | 0% |
| ZBA Transfer | | | | | - | 0% |
| Total receipts | 12,374,944 | 11,378,962 | 18,494,080 | - | 42,247,986 | 100% |
| | | | | | | |
| Total per Bank Stmt | $ 12,374,944 | $ 11,378,962 | $ 18,494,080 | | $ 42,247,986 | 100% |
| Variance | $ - | $ - | $ - | $ - | $ - | 0% |

**Blocked Account**        Fleet Bank, Account 941850-8136

**Analysis of Cash Receipts**

| | Jan-02 | Feb-02 | Mar-02 | Apr-02 | Total |
|---|---|---|---|---|---|
| Gross Credit to A/R | $ 11,175,338 | $ 11,143,741 | $ 17,945,661 | n/a | $40,264,740 |
| Credits | $ 65,534 | $ 37,637 | $ 46,340 | | $149,511 |
| Discounts | | | | | $0 |
| Gross A/R Collections | $ 11,109,804 | $ 11,106,104 | $ 17,899,321 | | $40,115,229 |
| Customer Deposits | | | | | $0 |
| Misc Non-A/R Cash | | | | | $0 |
| Security Deposits | | | | | $0 |
| Adjustments | | | | | $0 |
| Net Cash Collections | $11,109,804 | $11,106,104 | $17,899,321 | $0 | $40,115,229 |
| | | | | | |
| Total per GL Loan Account | $ 12,646,194 | $ 11,055,216 | $ 17,418,354 | | |
| Total per Loan Statement | | | | | |
| Variance | ($1,536,390) | $50,888 | $480,967 | $0 | $40,115,229 |
| | | | | | |
| GL Cash in Blocked Acct, Beg. | (3,397,835) | (1,788,855) | (1,745,923) | n/a | |
| GL Cash in Blocked Acct, End. | 1,788,855 | 1,745,923 | 2,292,617 | | |
| Deposits recorded, not in lockbox | | | | | |
| Wire transfer receipts in Guaranty | 72,591 | 93,820 | 24,272 | | |
| A/R cash not sent to LBCI | | | | | |
| Officer loan repayment | | | $ (90,000) | | |
| Other non-A/R cash | | | | | |
| Total Variance | ($1,536,389) | $50,888 | $480,966 | $0 | $0 |
| Unreconciled Variance | (1) | 0 | 1 | 0 | |

**Payroll Account**        Fleet Bank, Account 005456-7425

**Analysis of Cash Receipts**

| Source | Jan-02 | Feb-02 | Mar-02 | Apr-02 | Total | % of Total |
|---|---|---|---|---|---|---|
| Operating | $ 258,348 | $ 406,430 | $ 396,192 | n/a | $1,060,970 | 0.98449356 |
| Misc (COBRA, other non-A/R) | 6,748 | 6,151 | 3,812 | | $16,711 | 2% |
| | | | | | $0 | 0% |
| Total receipts | $265,096 | $412,581 | $400,004 | $0 | $1,077,681 | 100% |
| | | | | | | |
| Total per Bank Stmt | $ 265,096 | $ 412,581 | $ 400,004 | | $ 1,077,681 | |
| Variance | $ - | $ - | $ - | $ - | $ - | |

**Automatic Debit Account**        Citizens Bank, Account 113097-272-8

**Analysis of Cash Receipts & Disbursements**

| | Jan-02 | Feb-02 | Mar-02 | Apr-02 | Total | % of Total |
|---|---|---|---|---|---|---|
| Beg. Bal. | $ 491 | $ 345 | $ 246 | n/a | $1,082 | 1.46612466 |
| | | | | | $0 | 0% |
| | | | | | $0 | 0% |
| Main Oper. Acct. | | | | | $0 | 0% |
| Disbursements | $ (146) | $ (99) | $ (99) | | ($344) | -47% |
| Ending Bal. per Bank Stmt | $345 | $246 | $147 | $0 | $738 | 100% |

Were any unusual deposits noted? No
If so, comment on it  The Company does receive non-A/R cash, such as COBRA reimbursements, refunds, etc...
These are deposited and accounted for properly.

Comments:

L.BC 002170

LASALLE BUSINESS CREDIT, INC.
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Inventory Inelig. & Locations

**Inventory Ineligibles**

| Description | Current Apr-02 | % of total inventory |
|---|---|---|
| Total inventory | 6,164,655 | 100.0% |
| | | |
| Work-in-process | | 0.0% |
| Slow moving/Obsolete | | 0.0% |
| Consigned | | 0.0% |
| Bill & Hold | | 0.0% |
| Foreign locations | | 0.0% |
| Contra | | 0.0% |
| Public warehouse | | 0.0% |
| Inventory/GL Rec. | | 0.0% |
| In-transit | | 0.0% |
| Packaging | 33,453 | 0.5% |
| Other | | 0.0% |
| Other | | 0.0% |
| Total ineligibles | 33,453 | 0.5% |
| | | |
| Net eligible inventory | $ 6,131,202 | 99.5% |

**Inventory locations**

| Location | Address | ($000's) Apr-02 $ Value | | Mar-00 $ Value | |
|---|---|---|---|---|---|
| Main Offices/Factory | 140 Leominster-Shirley Rd, Lunenberg, MA | 6,164,655 | 100% | | 0% |
| Public Warehouse | 232 Airport Dr, Fitchburg, MA | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| | - | - | 0% | | 0% |
| Totals | | $ 6,164,655 | 100% | $ - | 0% |

Comments:  Management states that the public warehouse landlord will issue a waiver to LBCI.

LBC 002171

LASALLE BUSINESS CREDIT INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Inventory Comments

**What is the method of inventory valuation?**  Inventory is valued at FIFO, actual cost plus overhead.  This means that if a particular batch has usage in excess of standard, the value of the finished goods are overstated by the cost of the raw materials wasted in production.  For example, if a run produces 10,000 lbs of finished goods, but one tote of 1,000 lbs becomes contaminated, the remaining 9,000 lbs has the same value as if it were still 10,000 lbs.  This is done so that the Company can track profitability by order.  The overvaluation of the inventory is mitigated by the high turnover rate and the fact that inventory is usually made to order, not for stock.  The only time inventory is made to stock is if a customer orders a small quantity of a popular product.  The Company will produce an amount larger than the order to reduce the absorption rate for waste occurring at the start and the end of a run.  The Company will only do this if they believe there will be future orders for the same product.

**If standard costs are used, when were they last reviewed?**  Standard costs are used only for price quotes and production planning.

**Comment on the reliability and accuracy of the inventory records**  Because the Company runs 24 hours/day, the inventory records are always slightly behind, although postings are made daily.  In addition, the Company keeps pellet and oil inventories in silos and tanks, respectively.  The pellet inventory in the silos is measured by a new laser system.  However, because the pellets form an upward cone after delivery, and then change to an inverted cone as the product is used, inventory counts are really estimates.  The oil in tanks is counted via sight tubes located on each tank.  However, the amount of oil in pipes leading to production lines is not included in inventory counts.  Overall, the examiner found the inventory records to be reasonably accurate.

**Comment on the accuracy of inventory values reported on an interim basis**  The examiner found the perpetual inventory to be reasonably accurate.

**Is the inventory adequately insured, with LBCI named as loss payee?**

**Is the Company current with insurance premiums?**  Yes

**Does the Company have a return area?**  Yes
  **If so, was it reviewed?**  Yes.  Examiner found that returns are processed in a reasonable time frame.

**Describe the inventory production process and duration**  Raw materials are combined into hoppers based upon formulations designed to provide a final product which fulfills a customers specifications.  These formulations may or may not be proprietary.  The prospect tries to keep both the ingredients and the processing of each particular product secret to prevent their competitors from being able to produce the same or similar products.  This is particularly true of their flame resistant products.
The raw materials are then heated and mixed together in one of the five production lines.  The production line used is determined by the product being manufactured.  Further raw materials may be added at certain points during the processing.  The heat applied and other factors are carefully monitored to ensure consistent quality.  Once the product has solidified, the final steps of the process are to chop the resin into pellets and pack into a container.
The prospect makes every effort to prevent cross contamination between the various products.  Only new containers are used for packing.  Each manufacturing line is stripped down and cleaned between each run.  This is why the prospect will run inventory for stock if an order is small and they determine that there will be future demand for the product.  The prospect is able to lower costs by minimizing down time for cleaning.
The manufacturing process will run continuously until an order is filled.  The time it takes for the raw materials to be converted into finished goods is several hours.
Due to the nature of the prospect's manufacturing, many precautions have been taken to prevent any environmental damage, including building containment units around both the storage tanks and the truck pumping area, an air filteration system and an independent, full-time on-site environmental consultant.

LBC 002172

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Inventory Testing Results

**Gross Profit Test**

| # of items tested | 30 |
|---|---|
| Total sales value tested | 4,442,467 |
| Total cost | 3,395,725 |
| Total supporting docs | 27 |
| Total gross margin | 667,380 |
| Total gross margin % | 21.4% |
| # of positive GM | 27 |
| Maximum GM noted | 66.8% |
| # of negative GM | - |
| Minimum GM noted | 4.7% |
| GM per FS | 13.3% |
| Variance | 8.1% |

Comments: The costs provided for the gross margin test do not include overhead, but include only direct material costs. Overhead is applied to the entire perpetual at month end and is not allocated to individual products.

**Slow moving inventory test**

| Total inventory | 6,164,655 |
|---|---|
| # of items tested | - |
| Total value tested | - |
| % tested | - |
| Total excess inv. noted | - |
| Excess % | #DIV/0! |
| Average age in months | n/a |
| Max. age in months | n/a |
| Average months on hand | #DIV/0! |
| Max. months on hand | - |
| Inventory turnover days | - |
| Suggested reserve | * |

*Inventory is considered slow moving if the months on hand exceeds 12 months

Comments: Inventory turnover is 25 days for the 9 month period ended 3/31/02. Inventory is made only for open orders with very few exceptions.

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Accts Payable

## A.  Comparative Accounts Payable Agings
(Invoice date aging)

| | Current Mar-02 | | Prior Year Mar-01 | | Recent FYE Jun-01 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| 1-30 Days | 70,469 | 6.4% | 3,538,275 | 100.0% | 2,631,461 | 100.0% |
| 31-60 Days | 244,978 | 22.3% | | 0.0% | | 0.0% |
| 61-90 Days | 151,190 | 13.8% | | 0.0% | | 0.0% |
| Over 90 Days | 258,656 | 23.6% | | 0.0% | | 0.0% |
| Check issued | 372,737 | 33.9% | | 0.0% | | 0.0% |
| Total | 1,098,030 | 100.0% | 3,538,275 | 100.0% | 2,631,461 | 100.0% |
| GL Bal.  $ | 1,098,030 | | $  3,538,275 | | $  2,631,461 | |
| Variance  $ | - | 0.0% | $       - | 0.0% | $       - | 0.0% |

The prospect's accounting software does not allow the A/P aging as of certain date to be recreated.  The aging of the 3/31/02 payables was calculated manually.


**Due date or invoice date aging?**  Invoice
**Date the aging was last reconciled to the GL?**  3/31/02
**Any checks held?**  Yes, the prospect has significant held checks.  Please see the accounts payable statistics on the following page.
**Do major purchase commitments exist?**  No, per management
  **If so, explain**
**Any payables converted into notes?**  No
**Is the Company receiving pressure from creditors?**  None noted
**Is the Company getting open credit from suppliers?**  Yes
  **If not, explain**
**Did you review status on past due accounts?**  Yes
**Does the Company purchase any goods on letters of credit?**  No
  **If so, explain**
**Any goods purchased on consignment?**  No
  **If so, explain**


**Comments:**  The Company posts most of it's purchases directly to expenses by issuing a chack upon receipt, rather than entering into accounts payable first.  This is the reason that the BOD often exceeds A/P.

LBC 002174

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Accts Payable Testing

**Accounts Payable Concentrations**

| Vendor Name | Vendor Terms | % | Total $ | 0-30 | 31-60 | Aging 61-90 | 90 -120 | Over 120 |
|---|---|---|---|---|---|---|---|---|
| Mabbet & Associates, Inc | - | 12.4% | $ 136,452 | - | 11,742 | 14,677 | 84,371 | 25,662 |
| Trans-Link | - | 9.4% | 103,590 | 1,700 | 23,185 | - | 1,500 | 77,205 |
| St Laurent Packaging | - | 9.3% | 101,938 | - | 40,185 | 36,302 | 12,499 | 12,952 |
| Ameribrom, Inc | - | 6.3% | 68,850 | - | - | - | 68,850 | - |
| Unitel/FG&E | - | 6.2% | 67,595 | 25,795 | 25,432 | - | - | 16,368 |
| | | 43.6% | $ 478,425 | $ 27,495 | $ 100,544 | $ 50,979 | $ 167,220 | $ 132,187 |
| | | 100.0% | $1,098,030 | $70,469 | $244,978 | $151,190 | $258,656 | $372,737 |
| | | | 43.6% | 39.0% | 41.0% | 33.7% | 64.6% | 35.5% |

Comments: Mabbet & Associates provides environmental consulting and compliance services.

**Results of Accounts Payable Invoice Testing**

| | | |
|---|---|---|
| Aging Date | | March 31, 2002 |
| Total Accounts Payable | $ | 1,098,030 |
| # of items tested | | 15 |
| Total value tested | $ | 259,508 |
| % tested | | 23.6% |
| Proper Supporting Docs Rec'd | | 15 |
| Invoices do not agree to A/P Aging | | - |

Comments: No unusual items noted.

LBC 002175

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Taxes & Salaries

**Taxes**

| | Yes or No | Amt. Deliq. | Comment |
|---|---|---|---|
| Federal Income Tax current? | | | See below |
| State Income Tax current? | YES | | |
| Federal W/H Tax current? | YES | | |
| State W/H Tax current? | YES | | |
| Federal U/C Tax current? | YES | | |
| State Unemployment current? | YES | | |
| State Sales Tax current? | N/A | | |
| Personal Prop. Tax current? | N/A | | |

**Comments:** The Company is making estimated payments of $25/mo.

Did you obtain a copy of the latest real estate tax bill paid and proof of payment? Yes

**What documents were reviewed to substantiate last payment on all of the above items?**

| | | | |
|---|---|---|---|
| Cancelled checks | x | Tax returns | x |
| Receipted tax bills | x | Bank stmts | x |
| Depository receipts | | Other | ADP |

**Analysis of Payroll Tax Return:**

Company named  Gitto Global Corp
Head count  48
Date  3/31/02

**Officers Salaries:**

| Name | Title | Annual Salary | Add'l. Comp. |
|---|---|---|---|
| Frank Miller | COO/Pres. | 254,800 | - |
| Gary Gitto | CEO/Treasurer | 254,800 | - |

What is the amount of the periodic payroll?   $   100,000
When is it paid?        Hourly      Weekly
                        Salary      Weekly

**Comments:**

LBC 002176

LASALLE BUSINESS CREDIT INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
Balance Sheet

IX.  FINANCIAL ANALYSIS              (000's)

| | Internal Current 3/31/02 | Audited Recent FYE 6/30/01 | Increase (Decrease) |
|---|---|---|---|
| Balance Sheet as of: | 3/31/02 | | |
| Cash | $    2,314 | $    1,350 | $    964 |
| Accounts Receivable (net) | 26,508 | 21,376 | 5,132 |
| Inventory (at FIFO) | 7,303 | 6,677 | 626 |
| Prepaids & other current assets | 2,207 | 417 | 1,790 |
| Total Current Assets | 38,332 | 29,820 | 8,512 |
| | | | |
| Fixed Assets | 10,349 | 11,295 | (946) |
| Other Assets | 631 | 567 | 64 |
| Total Assets | 49,312 | 41,682 | 7,630 |
| | | | |
| Loans Payable - Line of Credit | 28,973 | 21,002 | 7,971 |
| Equip Loan & Current Portion LT Debt | 2,535 | 2,535 | - |
| Accounts Payable | 1,098 | 2,631 | (1,533) |
| Book Overdraft | 2,634 | 2,721 | (87) |
| Income Tax Payable | 420 | 695 | (275) |
| Accruals | 441 | 366 | 75 |
| Total Current Liabilities | 36,101 | 29,950 | 6,151 |
| | | | |
| Deferred Taxes | 571 | 1,154 | (583) |
| Long Term Debt | 6,220 | 4,802 | 1,418 |
| Total Liabilities | 42,892 | 35,906 | 6,986 |
| | | | |
| Subordinated Debt | | - | - |
| Capital Stock & APIC | 2,250 | 2,250 | - |
| Retained Earnings | 4,170 | 3,526 | 644 |
| Unrealized Gains - Securities | | - | - |
| Net Worth | 6,420 | 5,776 | 644 |
| Total Liabilities & Net Worth | $    49,312 | $    41,682 | $    7,630 |
| | - | - | - |
| Working Capital | 2,231 | (130) | 2,361 |
| Current Asset Ratio | 1.06 | 1.00 | 0.07 |
| Debt/Net Worth Ratio | 6.68 | 6.22 | 0.46 |

LBC 002177

LASALLE BUSINESS CREDIT, INC
FIELD EXAMINATION SUMMARY
GittoGlobal Corp - 4-30-02
P&L Stmt

## IX.  FINANCIAL ANALYSIS

### Profit & Loss Statement

| | | Internal | | Internal | | Audited | |
|---|---|---|---|---|---|---|---|
| | Months | 9 | | 9 | | 12 | |
| | | Current YTD | | Previous YTD | | Recent FYE | |
| | | 3/31/02 | | 3/30/01 | | 6/30/01 | |
| | | $ Amount | % | $ Amount | % | $ Amount | % |
| Net Sales & Revenue | $ | 91,643 | 100.0% | $ 64,196 | 100.0% | $ 91,233 | 100.0% |
| Cost of Goods Sold | | 79,459 | 86.7% | 51,146 | 79.7% | 81,253 | 89.1% |
| Gross Profit | | 12,184 | 13.3% | 13,050 | 20.3% | 9,980 | 10.9% |
| Profit (Loss) from Oper | | 2,576 | 2.8% | 2,798 | 4.4% | 4,117 | 4.5% |
| Profit (Loss) before Taxes | | 1,008 | 1.1% | 859 | 1.3% | 1,512 | 1.7% |
| Profit (Loss) after Taxes | | 644 | 0.7% | 501 | 0.8% | 860 | 0.9% |
| | | | | | | | |
| Interest Expense (Net) | | 1,655 | 1.8% | 1,939 | 3.0% | 2,535 | 2.8% |
| Depreciation & Amortization | | 1,213 | 1.3% | 1,216 | 1.9% | 1,448 | 1.6% |

Unfunded Post Retirement

Proj. Revenue this FYE

Proj. Profit (Loss) FYE (Pre-tax)

| | | | | |
|---|---|---|---|---|
| Number of Months | 9 | | 9 | 12 |
| Ending Inventory | 7,303 | | 6,973 | 6,677 |
| Average COGS | 8,700 | | 5,600 | 6,771 |
| Turnover days | 25.2 | | 37.4 | 29.6 |

### Reconciliation of Retained Earnings

| | | Current YTD | Prev. YTD | Recent FYE |
|---|---|---|---|---|
| | As of: | 3/31/02 | 3/30/01 | 6/30/01 |
| | | $ Amount | $ Amount | $ Amount |
| Retained Earnings - Beg. | $ | 3,526 | $ 2,666 | $ 2,666 |
| Net Profit (Loss) | | 644 | 501 | 860 |
| (Dividends) | | | | |
| (Partners Drawing) | | | | |
| Distributions to Stockholders (Sub S) | | | | |
| Prior Year's Adjustments | | | | |
| Surplus Adjustment | | | | |
| Retained Earnings - End | $ | 4,170 | $ 3,167 | $ 3,526 |

LBC 002178

Exhibit 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| GITTO GLOBAL CORPORATION, | ) | Chapter 11 |
| | ) | Case No. 04-45386-JBR |
| Debtor | ) | |
| ——————————————— | ) | |

**ORDER APPROVING THE MOTION BY DEBTOR TO SELL ASSETS BY PRIVATE
SALE, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, AND FOR AUTHORITY TO ASSUME AND ASSIGN CERTAIN
<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

Gitto Global Corporation (the "<u>Debtor</u>") having filed its *Motion by Debtor to Sell Assets
by Private Sale, Free and Clear of Liens, Claims, Encumbrances and Interests, and for Authority
to Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "Sale Motion")
as contemplated under that certain asset purchase agreement (in the form attached hereto, the "
<u>Asset Purchase Agreement</u>"), dated November 1, 2004, by and between the Debtor and GGC
Acquisition, LLC ('GGC"); seeking entry of an order pursuant to Sections 363 and 365 of title
11 of the United States Code, 11 U.S.C. §101 <u>et seq.</u> (the "Bankruptcy Code") authorizing the
sale of substantially all of the Debtor's assets ("Assets"), and the assumption and assignment of
certain of the Debtor's executory contracts and unexpired leases ("Assumed Contracts"), free
and clear of all liens, claims, encumbrances, and interests; and upon the order of this Court dated
November 12, 2004, approving the bidding procedures in connection with the sale of the Assets
and notice of the hearing with respect to such sale (the "<u>Bidding Procedures Order</u>"); a
counteroffer having been received from Steven Graham and objections having been filed by

Tradex, Inc., Wells Fargo Equipment Finance, Inc., Orix Financial Services, Inc., and CIT Group/Equipment Financing, Inc.; and a hearing having been held on December 8, 2004 in connection with the Sale Motion (the "<u>Sale Hearing</u>"); and all parties in interest having been heard or having had the opportunity to be heard, regarding the sale of the Assets, including, without limitation, the assumption and assignment of the Assumed Contracts; and the Court having considered (x) the Sale Motion, (y) any objections and counteroffers to the Sale Motion, and (z) the arguments of counsel made and evidence proffered or adduced in support of approval of the sale of the Assets at the Sale Hearing; and it appearing that due and sufficient notice of the Sale Motion and the relief granted by this Order have been provided; and this Court being satisfied that the relief requested in the Sale Motion is in the best interests of the Debtor, its creditors and its estate; and any objections to the Sale Motion having been overruled or withdrawn; and this Court having considered all of the pleadings, memoranda, evidence and the entire record submitted in connection with the Sale Motion; and after due deliberation and good cause appearing therefore; it is hereby

FOUND, that the Court has jurisdiction to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§157 and 1334, and the Sale Motion constitutes a core proceeding within the meaning of 28 U.S.C. §157(b); and it is further

FOUND, that the Debtor has properly exercised its reasonable business judgment in determining to sell substantially all of its assets and in assuming and assigning certain executory contracts and unexpired leases; and it is further

FOUND, that S&E Acquisition, LLC (the "Buyer") submitted the highest and best bid at the auction, held on December 8, 2004, in the amount of $8,977,500.00 (as adjusted, if at all,

under Section 3.4 and Section 3.5 of the Asset Purchase Agreement) and it is further

FOUND, that due and adequate notice was provided of the Sale Motion and the right of third parties to attend the auction and submit counteroffers thereon, and the right of counterparties to Assumed Contracts to assert cure claims, all in accordance with §102(1) of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006 and 9006, and that no other or further notice is required; and it is further

FOUND, that the approval of the Sale Motion and the Asset Purchase Agreement attached as Exhibit A to the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest in that:

(a)    The Asset Purchase Agreement was negotiated, proposed and entered into in good faith, from arms-length bargaining positions by the Debtor, through its chief restructuring officer, and the Buyer;

(b)    The Debtor was free to deal with any other party interested in acquiring the Assets to be sold or the executory contracts and unexpired leases to be assumed and assigned pursuant to the Asset Purchase Agreement (collectively, the "Acquired Assets");

(c)    The bidding procedures approved in connection with the sale of the Acquired Assets enabled the Debtor to solicit higher and better offers for the Acquired Assets, and provided for adequate notice and an opportunity to be heard in connection with the sale of the Acquired Assets;

(d)    The Buyer is a third-party purchaser unrelated to the Debtor, its officers, directors or equity shareholders and is not a continuation of the Debtor's corporation; and

3

(e)    The purchase price for the Assets is fair and reasonably equivalent value for the

purchase of the Acquired Assets; and it is further

FOUND, that the Assumed Contracts are not in default, or if in default, such default will

be cured as of the closing of the Asset Purchase Agreement pursuant to §365(b) of the

Bankruptcy Code in the amounts set forth in Exhibit A to the notice of sale (and counterparties

to Assumed Contracts are barred from asserting cure claims in excess of the amounts set forth in

Exhibit A to the notice of sale, or the party to such executory contract or unexpired lease has

consented to the assumption and assignment of such contract or lease by the Debtor to the Buyer;

and it is further

FOUND, that pursuant to an agreement (the "UL Agreement") among the Debtor, the

Buyer and Underwriters Laboratories ("UL"), the Debtor shall assume and assign the Debtor's

contract(s) with UL to the Buyer, and the Buyer shall pay the cure amount associated with such

contract(s), which cure is fixed in the amount of $36,375.26, to UL; and it is further

FOUND, that the Debtor and the Buyer have demonstrated adequate assurance of future

performance within the meaning of Sections 365(b) and 365(f) of the Bankruptcy Code with

respect to the Assumed Contracts and the Debtor has satisfied the requirements under section

365(b)(1)(A) and (B) of the Bankruptcy Code; and it is further

FOUND, that all parties which assert liens, mortgages, leases or other rights or claims of

right to use or occupy, encumbrances, security interests, claims, charges, other legal or equitable

encumbrances and any other matters affecting title, or interests have consented to the sale or any

such objections have been withdrawn or overruled in accordance with 11 U.S.C. §363(f)(3)-(5) ;

and it is further

4

FOUND, that all other findings made by the Court during the Sale Hearing are incorporated herein by reference.

**NOW, THEREFORE, IT IS HEREBY,**

ORDERED, that the Sale Motion is granted and approved, and all objections thereto are overruled or withdrawn; and it is further

ORDERED, that the Debtor is hereby authorized to sell the Acquired Assets to the Buyer on the terms of, and in accordance with, the Asset Purchase Agreement, to enter into and perform under the Asset Purchase Agreement, and the UL Agreement,  to execute any and all additional conveyances, assignments, agreements, instruments, amendments, schedules and other documents, and to do all other things and take all further actions as may be necessary or appropriate for the purpose of performing its obligations under the Asset Purchase Agreement; and it is further

ORDERED, that the Acquired Assets shall be sold, and in the case of Assumed Contracts, assumed and assigned to the Buyer, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all Liens, and all Liens are hereby released, terminated and discharged with respect to the Acquired Assets and shall attach to the consideration paid by the Buyer pursuant to the Asset Purchase Agreement (the "Sale Proceeds") with the same validity, priority, force and effect that they now have as against the Acquired Assets; and it is further

ORDERED, that from the Sale Proceeds at closing, Wells Fargo Equipment Finance, Inc. shall be paid the sum of $65,000;

ORDERED, that from the Sale Proceeds at closing, The CIT Group/Equipment Finance, Inc. shall be paid the sum of $240,000;

ORDERED, that from the Sale Proceeds at closing, Orix Financial, Inc. shall be paid the sum of $1,700,000;

ORDERED, that the balance of the Sale Proceeds at closing shall be paid to Lasalle Business Credit, LLC (i) after reduction for amounts payable by the Debtor on account of cure claims (totaling $18,243.49),  the Termination Fee payable to GGC Acquisition, LLC in the amount of $256,500, and a reserve (to be held by the Debtor pending further order of the Court) in the amount of $50,000 for claims which may be asserted by disputed junior lienholders other than Wells Fargo, CIT and Orix; and (ii) subject to the right of Clinton Savings Bank to timely assert a claim, in accordance with a notice to subsequently be provided by the Debtor, against the balance of the Sale Proceeds paid to Lasalle;

ORDERED, that the objection to the sale and assumption and assignment of unexpired lease filed by Tradex Corporation has been resolved upon the terms set forth on the record;

ORDERED, that the closing of such sale shall occur on or before December 31, 2004; and it is further

ORDERED, that all persons, landlords, utilities and corporations are hereby prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer all of the Debtor's right, title and interest in the Acquired Assets to the Buyer as contemplated by the Asset Purchase Agreement; and it is further

ORDERED, that the Buyer shall not be liable for any claims against the Debtor except as specifically set forth in the Asset Purchase Agreement; and it is further

ORDERED, that this Order and the Asset Purchase Agreement shall be binding on any subsequent Chapter 11 or Chapter 7 trustee who may be appointed or elected in these cases or

6

any succeeding Chapter 7 case; and it is further

ORDERED, that the Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material or is to reflect the terms and provisions of this Order; and it is further

ORDERED, that this Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement; and it is further

ORDERED, that the Debtor shall escrow any amounts otherwise payable by Debtor for stamp or similar transfer taxes, if any, pending further administration of the case, such taxes to and confirmation not be payable in the event of a filing of a Chapter 11 plan on or before March 31, 2005, or such later date as approved by the Court;

ORDERED, that pursuant to Section 9.2(c) of the Asset Purchase Agreement, GGC Acquisition, LLC shall remain committed to consummate its Asset Purchase Agreement for a period of twenty (20) days following entry of this order by the Bankruptcy Court, subject only to

7

the objection by Tradex regarding adequate assurance of future performance by GGC Acquisition. The Debtor must deliver notice of this election to GGC Acquisition within fifteen (15) days of entry of the sale order in order to invoke this provision;ORDERED, that the Buyer shall be entitled to all of the benefits and protections provided by Section 363(m) of the Bankruptcy Code; and it is further

ORDERED, that the provisions of Fed. R. Bankr. P. 6004(g) and 6006(d) staying the effectiveness of this Order for 10 days are hereby waived, and this Order shall be effective immediately upon entry thereof; and it is further

ORDERED, that this Court shall retain jurisdiction (i) to interpret, enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and (ii) to resolve any disputes arising under, or related to, the Asset Purchase Agreement.

Dated: _12/10_____, 2004

_Joel B. Rosenthal_
Hon. Joel B. Rosenthal
                                    United States

Bankruptcy Judge
TRA 1979405v3


419173

8