Exhibit 6

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(WESTERN DIVISION)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 04-45386 (JBR) |
| GITTO GLOBAL CORPORATION | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**MOTION OF LASALLE BUSINESS CREDIT LLC FOR ORDER LIFTING THE**
**AUTOMATIC STAY TO AUTHORIZE LASALLE TO FORECLOSE UPON**
**CERTAIN PERSONAL PROPERTY OF THE DEBTOR**

LaSalle Business Credit, LLC ("**LaSalle**" or the "**Pre-Petition Lender**"), pre-petition lender to Gitto Global Corporation, the debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Case**"), presents this motion (the "**Motion**"), pursuant to section 362(d)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 4001(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court, District of Massachusetts, for entry of an Order lifting the automatic stay to permit LaSalle to foreclose on certain personal property of the Debtor. In support of the Motion, LaSalle states as follows:

**BACKGROUND**

1.     On September 24, 2004 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is now operating its business and managing its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "**Committee**") and an examiner (the "**Examiner**") have been appointed in the Case.

2.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

3.    The statutory predicates for the relief requested herein are section 362(d)(2) Bankruptcy Code, Bankruptcy Rule 4001(a), and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court, District of Massachusetts.

4.    On October 1, 2004, the Court entered an Interim Order[1] authorizing the Debtor to obtain post-petition financing from LaSalle. On October 20, 2004, this Court entered the Final Order[2] authorizing the Debtor to obtain post-petition financing from LaSalle. Pursuant to both Orders, LaSalle has loaned funds to the Debtor, and continues to do so.

5.    LaSalle is also a secured creditor of the Debtor's estate pursuant to that certain Loan and Security Agreement dated as of July 25, 2002, as amended, modified or supplemented (the "**Pre-Petition Credit Agreement**"), between LaSalle and the Debtor, and related agreements and documents (collectively, with the Pre-Petition Credit Agreement, the "**Pre-Petition Financing Documents**"). Pursuant to the Pre-Petition

---

[1]    The Interim Order is the Agreed Interim Order (a) Authorizing Debtor-In-Possession to Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (b) Granting Liens, Security Interests and Superpriority Claims, and (c) Scheduling a Final Hearing, entered by the Court in the Case on October 1, 2004.

[2]    The Final Order is the Agreed Final Order (a) Authorizing Debtor-In-Possession to Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code and (b) Granting Liens, Security Interests and Superpriority Claims, entered by the Court in the Case on October 20, 2004. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Final Order.

Financing Documents, as of the Petition Date, the Debtor owed LaSalle approximately $31,389.963.91 (the "**Pre-Petition Indebtedness**").

6.     To secure the Pre-Petition Indebtedness, pursuant to the Pre-Petition Financing Documents, the Debtor granted to LaSalle a security interest in, and a right of set-off against, the following property of the Debtor (defined as "Borrower" in the Pre-Petition Credit Agreement), whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:

> all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, security interests, security deposits and rights to indemnification); (c) all inventory (whether or not Eligible inventory); (d) all Investment Property (e) all bank accounts, deposits, deposit accounts and cash; (f) all Life Insurance Policies; (g) any of the property of the Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with lender in loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (h) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all Borrower's books and records relating to any of the foregoing and to Borrower's business.

(Pre-Petition Credit Agreement, section 5(a) (all capitalized terms defined therein)). All of the foregoing collateral generally described above, and all proceeds thereof, shall be referred to herein collectively as the "**Pre-Petition Collateral**." LaSalle properly perfected the foregoing security interest in the Pre-Petition Collateral by filing a UCC-1 financing statement with the Massachusetts Secretary of Commonwealth on July 26, 2002.

7.    From May, 2003 through December 2003, VitroTech Corporation ("**VitroTech**") delivered certain mineral products known as Vitrolite to the Debtor for use in manufacturing Debtor's products, pursuant to the Debtor's agreement with VitroTech to purchase such mineral products.  The Debtor presently has in its possession approximately 1,452,158 pounds of Vitrolite (the "**Minerals**").[3]

8.    Pursuant to the Pre-Petition Financing Documents, the Minerals constitute Pre-Petition Collateral which is covered by, and is subject to, LaSalle's valid and properly perfected senior pre-petition liens and security interest.

9.    On November 10, 2004, the Court entered the Order on Expedited Motion by Debtor for Approval of Bidding Procedures and Termination Fee Provision in Connection with Motion by Debtor to Sell Assets by Private Sale Free and Clear of liens, Claims, Encumbrances and Interests (the "**Bid Procedures Order**").    The Bid Procedures Order provides for an auction sale of substantially all of the Debtor's assets, to be followed by a hearing, scheduled on December 8, 2004, on the Debtor's motion to sell substantially all of its assets (the "**Sale Motion**").

---

[3]    LaSalle recently learned that VitroTech has made a demand on the Debtor for the return of the Minerals on the asserted grounds that the Minerals are held by the Debtor on consignment.  LaSalle rejects such assertion.  According to VitroTech's demand, VitroTech sold the Minerals to the Debtor at a time when both parties purported to have a vendor/customer relationship.  Subsequently, in a series of suspicious activities in the months leading up to the Petition Date, the Debtor purportedly conveyed the minerals back to VitroTech and remained in possession of the Minerals on an alleged consignment basis.  VitroTech did not file any UCC-1 financing statement to evidence or perfect the alleged consignment.  Accordingly, under UCC §9-319, title to the Minerals remains with the Debtor and subject to the liens of LaSalle, and LaSalle's liens on the Minerals continue to be prior to any interest VitroTech may assert.  *See* UCC §9-324. Furthermore, the Examiner is investigating both VitroTech and the suspicious dealings between VitroTech and the Debtor prior to the Petition Date.

10.     The Sale Motion seeks authority for the Debtor to sell substantially all the assets of the Debtor as a going concern (collectively, the "**Going Concern Assets**") to GGC Acquisition, LLC for approximately $8,550,000 (the "**Stalking Horse Purchase Price**"), subject to higher and better bids.   However, the asset purchase agreement attached to the Sale Motion excludes the Minerals from the assets to be sold by the Debtor

11.     LaSalle has been advised that the Debtor estimates the Minerals to have a value of no more than $.30 a pound.  This estimate is based on an offer made by a third party to purchase 100,000 pounds of the Minerals at a price of $.30 per pound.  Hence, it is unlikely that the maximum aggregate gross amount that could be realized from a sale of the Minerals would exceed $436,000 (the "**Estimated Maximum Minerals Value**").

12.     The sum of Stalking Horse Purchase Price plus the Estimated Maximum Minerals Value falls far short of the amount of the Pre-Petition Indebtedness owed by the Debtor to LaSalle.  LaSalle submits that the value of the Going Concern Assets and the Minerals, realized by commercially reasonable sales, would be insufficient to pay LaSalle's secured claim against the Debtor in full.

## <u>RELIEF REQUESTED</u>

13.     By this Motion, LaSalle respectfully requests that the Court enter an Order lifting the automatic stay to permit LaSalle to foreclose on the Minerals.[4]

---

[4]     Following entry of an Order granting the Motion, LaSalle does not intend to interfere with the Debtor's use of any of the Minerals that the Debtor needs for continuing operations.

## BASIS FOR THE RELIEF REQUESTED

14.    Upon the filing of a petition under the Bankruptcy Code, section 362(a)(4) of the Bankruptcy Code stays "any act to . . . enforce any lien against property of the estate[.]" 11 U.S.C. § 362(a)(4).

15.    Section 362(d)(2) of the Bankruptcy Code provides as follows:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section . .
>
>> (2)    with respect to a stay of an act against property under subsection (a) of this section, if-
>>
>>> (A)    the debtor does not have equity in such property; and
>>>
>>> (B)    such property is not necessary to an effective reorganization.

16.    The Debtor has no equity in the Minerals.  While the Debtors owe LaSalle over $31 million in Pre-Petition Indebtedness, the actual value of the Going Concern Assets plus the Minerals is far less than that Indebtedness.

17.    After the impending sale of the Going Concern Assets, the Debtor's commercial operations will cease.  The Minerals are excluded from the contemplated sale.  Therefore, the Minerals are not necessary for an effective reorganization of the Debtor.

18.    Because (a) the Debtor does not have equity in the Minerals and (b) the Minerals are not necessary for an effective reorganization of the Debtor, LaSalle is entitled to relief from the automatic stay pursuant to section 362(d)(2) of the Bankruptcy Code.

GSDOCS-1429437-1

## NOTICE

19.    Notice of this Motion has been served upon (a)the Debtor, (b) counsel for the Committee, (c) counsel for the Debtor, (d) the United States Trustee for the District of Massachusetts, (e) the Examiner, (f) counsel to VitroTech (at the address on counsel's demand for return of the Minerals), and (g) all parties that have requested notice of all papers in the Case pursuant to the Bankruptcy Rules. No previous application for the relief herein has been made in this or any other court, except as described above.

## CONCLUSION

WHEREFORE, the LaSalle respectfully requests that this Court enter an Order in substantially the form attached hereto as Exhibit A, (i) lifting the automatic stay to permit LaSalle to foreclose on the Minerals and (ii) granting such other and further relief as is just and appropriate under the circumstances.

Dated:  November 23, 2004          Respectfully submitted,

/s/ Douglas B. Rosner
Douglas B. Rosner, Esq. (BBO #559963)
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA  02110
Tel:    (617) 482-1776
Fax:    (617) 574-4112
Email: drosner@goulstonstorrs.com

and

Richard M. Bendix, Jr. (IL #0168130)
Christopher M. Cahill (IL #6257370)
Schwartz Cooper Greenberger
& Krauss, Chartered
180 North LaSalle Street
Suite 2700
Chicago, Illinois  60601
Ph: (312) 346-5443
Fax: (312) 264-2418

Co-Counsel to LaSalle Business Credit, LLC

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(WESTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 04-45386 (JBR) |
|  | ) | Chapter 11 |
| GITTO GLOBAL CORPORATION | ) |  |
|  | ) |  |
| Debtor. | ) |  |

### MOTION OF LASALLE BUSINESS CREDIT LLC FOR ORDER LIFTING THE AUTOMATIC STAY TO AUTHORIZE LASALLE TO FORECLOSE UPON CERTAIN PERSONAL PROPERTY OF THE DEBTOR

LaSalle Business Credit, LLC ("**LaSalle**" or the "**Pre-Petition Lender**"), pre-petition lender to Gitto Global Corporation, the debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Case**"), presents this motion (the "**Motion**"), pursuant to section 362(d)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 4001(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court, District of Massachusetts, for entry of an Order lifting the automatic stay to permit LaSalle to foreclose on certain personal property of the Debtor. In support of the Motion, LaSalle states as follows:

### BACKGROUND

1.      On September 24, 2004 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is now operating its business and managing its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "**Committee**") and an examiner (the "**Examiner**") have been appointed in the Case.

# **EXHIBIT A**

Exhibit 7

**COPY**

Page 1

Volume: I
Pages: 1-177
Exhibits: 1-45

UNITED STATES DISTRICT COURT
For the District of Massachusetts

CIVIL ACTION NO. 04-12227-DPW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
LASALLE BUSINESS CREDIT, LLC f/k/a
LASALLE BUSINESS CREDIT, INC.,            :
          PLAINTIFF                      :
                                :
  v.                                          :
                                :
                                :
GARY C. GITTO, et al.,                      :
            DEFENDANTS                   :
     and                                       :
                                :
FLEET NATIONAL BANK, et al.,               :
     TRUSTEE PROCESS DEFENDANTS,       :
     and                                       :
                                :
FIDELITY INVESTMENTS, INC., et al.,        :
     REACH-AND-APPLY DEFENDANTS        :
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF HELEN KOZAK, a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Lisa McDonald Valdario, (CSR #130093), a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Craig and Macauley, P.C., 600 Atlantic Avenue, Boston, Massachusetts 02210, on Friday, April 7, 2006, commencing at 9:45 a.m.

Page 2

APPEARANCES:
    SCHWARTZ, COOPER, GREENBERGER, KRAUSS, CHARTERED
    180 N. LaSalle Street, Suite 2700
    Chicago, Illinois 60601
    BY:  Eric (Rick) S. Rein, Esquire
        rrein@schwartzcooper.com
            Attorney for the Plaintiff


    BURNS & LEVINSON, LLP
    125 Summer Street
    Boston, Massachusetts  02110
    BY:  David M. Losier, Esquire
        dlosier@burnslev.com
        (617) 345-3644
        Attorney for the deponent, Helen Kozak


    SEDER & CHANDLER
    339 Main Street
    Worcester, Massachusetts  01608
    BY:  Kevin C. McGee, Esquire
        kmcgee@sederlaw.com
        (508) 757-7721
            Attorney for the Clinton Savings Bank


    STERN, SHAPIRO, WEISSBERG & GARIN, LLP
    90 Canal Street
    Boston, Massachusetts  02114-2022
    BY:  Max D. Stern, Esquire
        mdstern@sswg.com
        (617) 742-5800
            Attorney for Gary C. Gitto


    BALLIRO & MONDANO
    99 Summer Street, Suite 1800
    Boston, Massachusetts  02110
    BY:  Frank Mondano, Esquire
        (617) 737-8442
            Attorney for Charles Gitto


ALSO PRESENT:
    Gary C. Gitto, Defendant
    Charles Gitto, Defendant

Page 28

1  Q  Can you tell me what you were doing for Gary?

2  A  Personally or for --

3  Q  Personally.

4  A  Personally?  Well, I handled his and his wife's

5     personal bills.  I paid their household

6     expenses.

7  Q  Wife being Lori?

8  A  Yes.  All of their credit card bills and

9     mortgages and vehicles, their properties, making

10    sure those notes were paid; tuition; and there

11    were boat expenses.

12 Q  Anything else you can think of?

13 A  Well, anything kind of related to his properties

14    and his --

15 Q  His properties being where?

16 A  Okemo, Nantucket.  He had some property in Vero

17    Beach, undeveloped, I think, and he had a boat

18    mooring.

19 Q  Where was the boat mooring?

20 A  Vero Beach, or that area.

21 Q  Would you handle his bank accounts?

22 A  Yes.

23 Q  Where were those bank accounts?

24 A  He had accounts at Fleet.  It's Bank America

1      now, I think.  And the one across the street.

2      Not Commerce.  It's not Commerce.  Commerce?  I

3      think.

4    Q    So you would have the checkbooks?

5    A    I had the checkbooks.

6    Q    You would reconcile the accounts?

7    A    Yeah.

8    Q    Did you handle any checkbooks for Gary other

9      than personal?

10   A    Over the years he had a couple little businesses

11     he started up.

12   Q    What were those businesses?

13   A    One was GCG Industries, Direct Wood, and

14     Equitech, and also, Sport Fishing Charters.

15   Q    Any other companies?

16   A    I think that's it.

17   Q    What would you do for these four companies that

18     you listed?  Would you handle the checkbook?

19   A    I would pay items out of those or make deposits

20     as I was instructed.

21   Q    Did you physically have the checkbooks?

22   A    Yes.

23   Q    Did you have any involvement in opening the

24     accounts?

Page 56

1    A    Well, now that I'm starting to think about this,

2         maybe in the last five years he was, he put in

3         maybe 200,000 here, a hundred thousand here or

4         so on.  Then when things became really ugly,

5         Nancy had made a loan to the company, and

6         Charlie had made a loan to the company, and

7         Frank and Maria.

8    Q    You said Gary would put money back and forth.

9         Would he put money in and get then paid back?

10   A    Well, he would get paid back -- see I -- he

11        would put money in, and he would take money out,

12        and on the accounting end of it, I never

13        understood where he stood as far as how much he

14        was paid back, or if he was paid back too much

15        or --

16   Q    Were you ever asked to try to make a

17        reconciliation of --

18   A    Well, there was the time in the last year that

19        Frank and Gary were squabbling over what Gary

20        was owed back, and Gary was certain that he had

21        loaned the company X number of dollars, I forget

22        how much, at the time that he had been out of

23        the country.  I didn't remember it, but he asked

24        me to try to reconcile that to prove that the

Page 57

1        company still owed him money.

2    Q   And what did you do to try to reconcile it?

3    A   My head was spinning like -- my head was

4        spinning because I could account for what I put

5        in by wires or checks, but I couldn't, -- it

6        was -- I don't know how they were recording

7        their information in accounting.  There's no way

8        for me to reconcile or get ahold of their

9        records.  I mean if he -- I could only identify

10       what I wired out.

11   Q   Okay.  Were you able to identify payments to

12       Gary or Equitech?

13   A   I had those records, but see, the difficulty

14       here is, when Gary would take, have a bill paid,

15       you know, maybe for the baby-sitter, let's just

16       say that for instance, I don't know how that was

17       being recorded in accounting.  I don't know if

18       that was taken off his tab?  Or his loan, I

19       guess you'd call it loan.

20   Q   Okay.

21   A   So I never really knew where he stood.

22   Q   And did you tell him that?

23   A   As far as -- I believe that I probably did.

24   Q   Did you tell him that after he had asked you to

Page 58

1          try and reconcile?

2    A    Well, I did, and then for a time he said, Well,

3          just forget about it, okay.  He just said,

4          Forget about it.  Don't bother trying to

5          reconcile.

6    Q    Were you aware that Frank would put money in and

7          get money back just like Gary?

8    A    It was my opinion that Frank wasn't putting in

9          as much as Frank (sic).

10   Q    Frank wasn't putting in as much as Gary?

11   A    Was not putting in as much as Gary.

12   Q    And that opinion was based on what?

13   A    Because it always seemed to me that Gary

14         couldn't get his money back, and I would say to

15         Gary, what's this guy doing?  Where is his money

16         going?  Why isn't he putting in money?

17   Q    What would Gary say in response?

18   A    I'm going to talk to him about that, you know,

19         or words to that effect.

20   Q    What about Charlie putting in money?

21   A    Charlie put in money in the last year or two

22         years.

23   Q    And how did you know that?

24   A    I had to type up some -- no, I had to -- there

Page 77

1    A    I'm not sure that I even really ever knew.

2    Q    -- "Contractual agreement between Tradex and

3         Gitto regarding one quarter aircraft share."

4    A    I prepared this, but -- $6000.  I don't know.  I

5         don't remember.

6    Q    Okay.  And then the following three invoices,

7         they contain the okay's from Gary?

8    A    Yes.

9    Q    So Gary is approving the payment.

10   A    Yes, he is.

11   Q    Exhibit 16, do you recognize that Process

12        Techniques Agreement?

13   A    Well, I must recognize it since I signed it.

14   Q    You signed it for who?

15   A    Gary.

16   Q    Did you prepare it?

17   A    I don't think I prepared it.

18   Q    Do you recall the circumstances surrounding your

19        signing the document?

20   A    No, but that's my signature.

21   Q    Do you know who asked you to sign it?

22   A    It probably would have had to have been Gary.

23        He probably said, "sign my name."  I signed a

24        lot of documents for Gary.

Page 106

1    A    Because from time to time I was given a dollar

2         amount to write a check from that account to

3         Gitto/Global.

4    Q    So the checks that you would write on the

5         account, were they always to Gitto/Global?

6    A    My recollection is that they were.

7    Q    So you recall writing checks to Gitto/Global,

8         and it's your recollection that deposits into

9         the account were coming from Gitto/Global.

10   A    That's what I thought.

11   Q    Okay.  Exhibits 35 and 36 also contain your

12        signature for having received the cashier's

13        checks?

14   A    Um hmm.  Yes.

15   Q    Yes?

16   A    Yes.

17   Q    And what did you do after receipt?

18   A    I probably took this check downstairs.  I would

19        have given this check to whoever was in

20        accounting, Janice or Bill or -- 1998.  You

21        know, I don't know.  I don't know.  I probably

22        would have taken it to accounting.

23   Q    Okay.  Now, the Exhibit 36 is to close the

24        account.  It says, "Closing per Kirk McGee and

Page 110

1    A    Gary had loaned, had taken a loan from Commerce,

2         or maybe he had a freeze put on some funds he

3         had there.  Not a freeze.  I can't think of the

4         right terminology.

5    Q    This references an interest payment to Commerce

6         on an $800,000 loan?

7    A    But it could be that he had $800,000 in the

8         bank, and I can't remember for sure right now.

9         And they were holding that or they were using it

10        somehow, and -- or maybe it was a note for 90

11        days until VitroTech took off, but in the

12        meantime, there were interest payments due.

13   Q    Do you know what the money was borrowed for?

14   A    To keep the company afloat?

15   Q    Did Gary go borrow money and give the money to

16        Gitto/Global?

17             MR. STERN:  Excuse me, the last answer had

18        a question mark at the end, right?

19   A    Because I'm trying to remember.

20             MR. STERN:  So the stenographer gets it.

21   Q    Did Gary borrow money and give the money to

22        Gitto/Global?

23   A    Yes.

24   Q    Do you understand why money was given to

1       went and paid $6600 was for?

2    A   It is one of his notes that he had.  I don't

3       remember.  I just know it was due and it was due

4       now, and I had to get it covered.

5    Q   Do you know of the company by the name of J & J

6       Chemical?

7    A   J & J, was Jacky's, Jacky Tersigni's company.

8    Q   And how do you know that?

9    A   Jacky would come by, pick up the checkbook, make

10      calls to Frank about the checkbook.  I just knew

11      it.  I mean, we just knew it.

12    Q   So Frank had the checkbook?

13    A   Frank had the checkbook somewhere.

14    Q   Do you know if that company did any kind of

15      business?

16    A   All I know, knew about it was that Jacky would

17      call from time to time trying to sell or broker

18      some polypropylene, or off-grade, or something

19      like that, and that's what I thought its purpose

20      was.

21    Q   Do you know if Gitto/Global did any business

22      with J & J Chemical?

23    A   I thought it was for that purpose.

24    Q   And your understanding is based on what?

1   A   Calls that Jacky would call, and you know, tell,

2       advise Gary that he had his, you know, he had

3       some information on a trailer load of this, or

4       you know, rail car of this, other product, to

5       see if, you know, maybe we wanted to use it

6       there.

7   Q   So did you ever talk to Jacky Tersigni about J &

8       J Chemical?

9   A   Only to relay messages about the checkbook, that

10      he needs the checkbook, or --

11         MR. STERN:  When you say "he."

12   A   He, Jack Tersigni.

13   Q   Jack Tersigni would call you?

14   A   Not call me specifically, but whoever answered

15      upstairs, either Charlene or I, to relay

16      messages to Frank.

17         (Off the record.)

18         (Question read back.)

19   Q   Jack Tersigni would call to talk to Frank, and

20      when you would pick up the phone and answer, he

21      would not talk to Frank, he would just relay the

22      message through you?

23   A   It was very difficult to find Frank, so we would

24      take messages.

Page 115

1    Q    Do you recall occasions where he would call

2         other than just to ask for the checkbook

3         concerning J & J Chemical?

4    A    Other than J & J?

5    Q    No.  Do you recall calls that Jack Tersigni

6         would make where his request or discussion with

7         you was something other than just asking for the

8         checkbook as to J & J Chemical?

9    A    He had some involvement with East Coast Trading,

10        and there were monies owed to East Coast, and

11        so, for a while he would be calling trying to

12        collect those payments and leaving messages

13        relating to that.

14   Q    Do you know if Gary Gitto had any involvement

15        with J & J Chemical?

16   A    I don't know what his involvement was.

17   Q    What about Charlie Gitto, do you know if he had

18        any involvement with J & J?

19   A    I don't know what his involvement was with them.

20   Q    Do you know if Gary Gitto gave J & J Chemical

21        any money?

22   A    Through -- I don't know.

23   Q    Through any of his accounts?

24   A    Through any of his accounts?  J & J.  There

Page 116

1      were -- we may have done a wire, but I'd have to

2      have some documents in front of me.

3   Q  Did you, in handling Gary's personal affairs,

4      handle his accounts at Lehman Brothers?

5   A  Yes.

6   Q  Would you, in handling the accounts, request

7      wire transfers?

8   A  Yes, I would.

9   Q  So is that what you're trying to recall is

10     whether you had requested a wire transfer

11     through Lehman Brothers?

12  A  That is what I'm trying to remember.

13  Q  Okay.  Did you also handle Charlie's accounts at

14     Lehman Brothers?

15  A  Up to a time.  Up until he was married.

16  Q  Do you recall requesting wire transfers to J & J

17     on Charlie's behalf from Lehman Brothers?

18  A  I don't recall it.

19  Q  Did you ever ask for wire transfers from the

20     Lehman Brothers' account on Charlie's behalf at

21     any time?

22  A  From Lehman Brothers?

23  Q  Yes.

24  A  Yes.  Yeah, I believe I did.

Page 117

1    Q    Do you recall to where the wires were being

2         transferred?

3    A    It could be to one of his personal checking

4         accounts, or perhaps at the time of these loans,

5         it could have been into Gitto/Global.  I can't

6         remember now.

7    Q    Do you recall ever requesting a wire transfer to

8         Clinton Savings Bank?

9    A    I remember a wire transfer to Clinton, but I

10        don't remember who initiated it or --

11   Q    Is this wires by Charlie we're talking about

12        that you remember to Clinton Savings Bank?

13   A    All my wiring instructions came from Frank

14        Miller.  I mean, how they went about, how he

15        went about getting me those directions, and who

16        was involved, how he gave me those instructions,

17        I can't tell you.

18   Q    So you recall wiring money to Clinton Savings

19        Bank.  Do you recall from whose account?

20   A    No.

21   Q    Okay.  But you recalled that the wiring of money

22        to Clinton Savings Bank came at the request of

23        Frank Miller?

24   A    I can't remember anymore.  I just can't

1    accomplished.  That was the kind of thought I

2    put into it.

3    Q    Did you have any interaction with the auditors

4         when they came?

5    A    I don't think I ever did besides, Hi, how are

6         you; have a nice day.

7    Q    Did you ever see any interaction between Gary

8         and the auditors?

9    A    I don't remember seeing any.

10    Q    How about between Charlie and the auditors?

11    A    I don't recall seeing any besides maybe some

12         social talk.

13    Q    Were the auditors, what sort of access did the

14         auditors have to the plant when they came, and

15         the offices?

16    A    I don't know.  We had two levels.  I was

17         upstairs in the far corner.  I came into the

18         day, and I almost never took a lunch, so I don't

19         know what kind of access they had, you know, and

20         besides me overhearing Maria that they were

21         going to the warehouse, or that they had to

22         bring somebody, you know, maybe into the

23         factory, I really have no idea.

24    Q    Did they ever come into Charlie's office and

Page 181

1           P R O C E E D I N G S

2        (Settlement Agreement marked Kozak

3        Exhibit No. 46 for identification.)

4                    HELEN KOZAK

5      A witness called for examination, having been

6      previously duly sworn, testified as follows:

7                 CROSS-EXAMINATION

8    BY MR. STERN:

9    Q   Good morning, Miss Kozak.  Remember me?  I'm Max

10       Stern and I'm representing Gary Gitto.  I'd like

11       to show you a document which has been marked as

12       Exhibit No. 46 and ask you if you recognize

13       that.

14   A   Yes.

15   Q   And that's the agreement that you entered into

16       with the plaintiff in this case, the Lasalle

17       Bank, is that right?

18   A   That's correct.

19   Q   And what's the nature of your agreement, in your

20       own words, with them?

21   A   That I would be released from this lawsuit upon

22       my, upon completion of my deposition in this

23       case.

24   Q   All right.  And you would be released from the

1    lawsuit, and in return for your doing what?

2  A    For giving my deposition.

3  Q    Okay.  And before giving the deposition, did

4    you, were you interviewed by an attorney for the

5    bank?

6  A    Yes.

7  Q    Was that Mr. Rein?

8  A    Yes, it was.

9  Q    And where did that interview take place?

10 A    At my attorney's --

11        THE WITNESS:  It was at --

12 Q    At your attorney's office?

13 A    My attorney's office.

14 Q    And when did that interview take place?

15 A    About, I think it was the end of January.

16 Q    All right.  Was it one time or more than one

17    time?

18 A    Once.

19 Q    How long was it?

20 A    It lasted about four or five hours.

21 Q    Was there anybody making notes?

22 A    Yes.  Mr. Rein's attorney, partner, but I can't

23    recall his name.

24 Q    And did you sign this agreement before or after

Page 183

1      this interview with Mr. Rein?

2  A   After.

3  Q   So was it understood that they first wanted to

4      hear what you had to say?

5  A   Yes.

6  Q   Now, have you been interviewed by any law

7      enforcement official?

8  A   Yes.

9  Q   All right.  Who has interviewed you and when

10     have you been interviewed?

11 A   I was interviewed by U.S. Attorney Lori Holick,

12     and the gentleman from the FBI, I think his name

13     was Brady.  I can't remember his name.  I have

14     his card.  Kevin Brady, I think.  And I met with

15     them before I left Massachusetts in December of

16     '04.

17 Q   All right.

18 A   And again, late last year.

19 Q   So in December of '04 and again in 2005.

20 A   Yes.

21 Q   Is that right?  How many times all together?

22 A   Two times.

23 Q   All right.  And in December 2004, where did that

24     interview take place?

Page 184

1   A   At the federal building, the Federal Courthouse.

2   Q   All right.  And who was present there?

3   A   It was myself, David Losier, the two individuals

4       I just named, and a representative from the IRS.

5   Q   So it was another special agent, is that who it

6       was?

7   A   Um hmm.

8   Q   Do you remember what his or her name was?

9   A   No, I don't remember.  It was a gentleman.

10  Q   And how long did -- did you enter into any kind

11      of an agreement with them concerning the ground

12      rules for that interview?

13  A   The term they used was a proffer.

14  Q   You signed a proffer agreement?

15  A   I don't think that I signed a proffer.  I don't

16      remember signing it.

17  Q   Well, was there a letter from the United States

18      attorney?

19  A   I can't remember now.

20  Q   Well, did someone tell you that nothing that you

21      said in that interview could be used against you

22      directly, or some words to that effect?

23  A   Words to that effect.

24  Q   Okay.  And how long was that interview?

Page 185

1    A    I'm sorry, the first one or the second?

2    Q    First one.  We're still on the first one.

3    A    Well, okay, then I have to change my answer.

4         Agent from the IRS was not at the first one.  He

5         was at the second meeting.

6    Q    So staying with the first one, it was only the

7         four of you that time.

8    A    Correct.

9    Q    Miss Holick, Mr. Brady, Mr. Losier and yourself?

10   A    Correct.  And that meeting I think was about

11        four to five hours as well.

12   Q    Just generally speaking, what happened at that

13        interview?

14   A    They asked me questions about different people,

15        and just -- they asked me about different people

16        that came through the doors of Gitto/Global.

17        They asked me about Jack Tersigni and J & J;

18        asked me about the operation.

19   Q    Did you tell them in substance what you told us

20        here at your last day of deposition?

21   A    Yes.

22   Q    Tell them anything in addition to what you told

23        us at the deposition?

24   A    Well, they may have asked about certain

Page 196

1    company, correct?

2  A  For the most part.

3  Q  He didn't have responsibility for the financial

4     end of the company.  His responsibility was

5     sales, is that right?

6  A  Yes.

7  Q  And he was on the road a good deal of the time,

8     isn't that right?

9  A  Yes.

10  Q  About what percentage of his time was he on the

11     road?

12  A  At least 60.

13  Q  And he had a good way with customers, wouldn't

14     you say?

15  A  I would say yes.

16  Q  And he created personal relationships with

17     customers, correct?

18  A  Yes.

19  Q  One way he did it was, he was a big entertainer,

20     isn't that right?

21  A  Yes, he was.

22  Q  And he would take people out to dinner,

23     sometimes every night of the week, isn't that

24     right?

Page 197

1   A   Frequently.

2   Q   Frequently.  Many nights in a week, right?

3   A   Yes.

4   Q   He would go on trips with customers.

5   A   Yes.

6   Q   He would take them on his boat.

7   A   Sometimes.

8   Q   And in fact, sometimes you would, when he would

9       entertain customers, you would go out too, isn't

10      that right?

11  A   Twice.

12  Q   Just twice?

13  A   Not -- well -- sometimes, okay.  Not often.

14  Q   Okay.  Now, Frank Miller was in charge of the

15      finances; right?

16  A   Yes.

17  Q   Now, could you explain to us what the physical

18      layout of the Gitto/Global Company was in

19      connection with who had their office where?

20  A   Executives offices were on the second floor.

21      Charlie, Gary, Frank and I and Charlene were on

22      the far end of the second floor.  Charlie had

23      the corner office.  I was seated between Charlie

24      and Gary.  Charlene was in front of me, and

1   A   Yes.

2   Q   So Frank was not routinely upstairs.  He was

3       routinely downstairs, is that right?

4   A   That's correct.

5   Q   Now, did you -- you didn't have the same kind of

6       relationship with Frank Miller as you did with

7       either of the Gittos, did you?

8   A   No.

9   Q   Frank did not entrust his finances to you; did

10      he?

11   A   No.

12   Q   His personal assistant was, what was her name?

13   A   Charlene.

14   Q   Charlene.  And her last name?

15   A   Charlene Enright Kotosh.

16   Q   Is it Charlene or Charlane?

17   A   Charlene.

18   Q   L E N E?

19   A   Correct.  L E N E.

20   Q   Now, Frank didn't trust his personal finances to

21      Charlene either, is that right?

22   A   No.

23   Q   In fact, in contrast to Gary, Frank was quite

24      secretive, is that right?

Page 200

1    A    Yes.

2    Q    You were upstairs in front of Gary and Charlie's

3         offices, is that right?

4    A    Between their offices.

5    Q    Between their offices.  And you were there

6         everyday, correct?

7    A    Yes.

8    Q    In fact, you were there the entire day because

9         you almost never took lunch, is that right?

10   A    That's correct.

11   Q    So if anybody came in to see Gary, for example,

12        that person would come to you, is that right, or

13        you would see that person come in?

14   A    For the most part.

15   Q    And if Gary wasn't there, that person would

16        leave a message with you, correct?

17   A    Yes.

18   Q    And you also would screen all Gary's calls, is

19        that right?

20   A    Yes.

21   Q    You would answer the phone for Gary?

22   A    Yes.

23   Q    And if Gary wasn't there, you would pass on a

24        message, is that right?

Page 202

```
 1   A   Yes.

 2   Q   And you told us that you had no knowledge that

 3       Gary Gitto was involved with J & J; is that

 4       right?

 5   A   I said that?

 6   Q   Didn't you say that?

 7   A   Did I?

 8           MR. LOSIER:  Have you got a transcript?

 9           MR. STERN:  I do.

10   Q   You were asked on page 115 of the deposition:

11           "Do you know if Gary Gitto had any

12       involvement with J & J Chemical?

13           "ANSWER:  I don't know what his

14       involvement was."

15   A   Okay.

16   Q   Did you say that?

17   A   Yes.

18   Q   So you didn't have any knowledge that he was

19       involved, correct?

20   A   Correct.

21   Q   You told us that Jack Tersigni would call from

22       time to time concerning car loads of off-spec

23       materials and that sort of thing, and when he

24       called for that, he would call for Gary,
```

Page 203

1    correct?

2  A  Yes.

3  Q  And he had this business called J/Tan in which

4     he would sell this polypropylene or off-spec

5     materials and that sort of thing, correct?

6  A  He, he, I don't -- he had -- he would make the

7     calls.  I don't know how they were processed.

8  Q  Well, you recall saying:

9         "All I know, knew about it was that Jacky

10    would call from time to time trying to sell or

11    broker some polypropylene or off grade or

12    something like that."

13        MR. REIN:  What page, Max?

14        MR. STERN:  Page 113.

15  Q  Right?

16  A  Yes.

17  Q  And then you said on page 114:

18        "Calls that Jacky would call, and you

19    know, tell, advise Gary that he had his, you

20    know, he had some information on a trailer load

21    of this, or you know, rail car of this other

22    product to see maybe we wanted to use it there,"

23    is that right?

24  A  Yes.

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

```
 1   A   No, I'm not.

 2   Q   In fact, when audits would happen, very

 3       frequently Gary wasn't even there on the

 4       premises.

 5   A   That's correct.

 6   Q   Because more often than not, he was traveling,

 7       isn't that right?

 8   A   I didn't know him to be involved in bank audits.

 9   Q   He had nothing to do with bank audits.

10   A   I didn't see him --

11   Q   You were not aware of.

12   A   I'm not aware of any involvement.

13   Q   And he never said anything to you that indicated

14       that he had any awareness of anything improper

15       being done with respect to bank audits, did he?

16   A   No, he didn't.

17   Q   And nobody ever told you that Gary had any

18       awareness of anything improper being done with

19       respect to bank audits.

20   A   I don't think anyone did.

21   Q   All right.  And similarly, Miss Kozak, you had

22       no awareness of Gary having done anything with

23       respect to phony or fraudulent invoices, isn't

24       that right, for the bank?
```

1    A    No.

2    Q    He never said anything to you that indicated any

3         awareness of any phony invoices being done for

4         the bank, right?

5    A    No.

6    Q    Or phony accounts receivable, correct?

7    A    No.

8    Q    And nobody ever said anything to you that Gary

9         Gitto was aware of or involved in anything like

10        that; isn't that right?

11   A    No.

12   Q    Now, you told us that Mr. Moritz used his

13        ability to scan documents into the computer for

14        various purposes; is that right?

15   A    Yes.

16   Q    And you saw, and you said you saw him in Frank's

17        office using the computer from time to time with

18        Frank Miller there and Maria Miller there;

19        right?

20   A    Yes.

21   Q    But those times that you saw him with Frank and

22        Maria, Gary wasn't with him, was he?

23   A    No.

24   Q    There wasn't a single time that you saw Gary

```
 1        together with them when they were working on the

 2        scanning, is that right?

 3    A   I don't believe so.

 4    Q   So the only thing you -- the only involvement

 5        or -- that you know of that Gary had with

 6        respect to scanning and falsifying documents was

 7        what you told us about the binder that was

 8        prepared for use in Gary's divorce proceeding,

 9        correct?

10    A   Yes.

11    Q   And that was -- and Gary had asked you to have

12        Mr. Moritz do that, is that right?

13    A   Yes.

14    Q   And it's fair to say that you were the one who

15        told Gary what Mr. Moritz was able to do with

16        his computer abilities, correct?

17    A   I did tell him that he was very capable.

18    Q   And you told him the kinds of things he can do,

19        correct?

20    A   I can't say specifically what I said.  I just

21        knew he was very talented in that area.

22    Q   And you knew that because you saw what he could

23        do.

24    A   Yes.
```

Page 208

1    Q    And that's what you reported to Gary.

2    A    Yes.

3    Q    And then Gary said, well, why don't you see if

4         he could change these documents for use in my

5         divorce proceeding, correct?

6    A    Well, I don't know if it happened exactly that

7         way, but --

8    Q    In substance.

9    A    Yes.

10   Q    Now, you told us about the Direct Wood Company,

11        correct?

12   A    Yes.

13   Q    And this was a company you told us that Gary had

14        established to sell wooden pallets, correct?

15   A    Yes.

16   Q    And they did sell some wooden pallets, isn't

17        that right?

18   A    Yes.

19   Q    Now, who had the checkbook to the Direct Wood

20        company?

21   A    I kept that checkbook.

22   Q    What did you do with that checkbook?

23   A    I maintained that checkbook.

24   Q    Did you write checks?

Page 209

1    A    Yes.

2    Q    These were checks that were requested from

3         downstairs?

4    A    Yes.

5    Q    Who was it that requested these checks?

6    A    I'd be approached by either, well, primarily

7         Janice or Bill; sometimes Frank.

8    Q    What would they tell you?

9    A    They would hand me a number and ask me to type a

10        check to Gitto/Global for X dollar amount.

11   Q    How did that procedure begin?

12   A    I can't remember how it began but it was quite a

13        nuisance to me.

14   Q    But the persons who asked you to make out these

15        checks were Frank, Bill Deakin and Janice

16        Chaisson, isn't that right?

17   A    Yes.

18   Q    Anybody else?

19   A    No.

20   Q    And then what would happen after you would make

21        that check out?

22   A    I would just hand them that check.  I mean, I

23        didn't do anything else besides type a check

24        because I had the checkbook locked up.

Page 210

1    Q    Well, were deposits made in that account?

2    A    Well, I guess they probably were.

3    Q    You didn't make any deposits, is that right?

4    A    I -- no.

5    Q    At the time that this was going on, did you know

6         that something was wrong?

7    A    At the time, no.

8    Q    In fact, you told us that it was much later on

9         in 2004, that it occurred to you that this was a

10        form of check kiting, correct?

11   A    In that time frame, yup.

12   Q    And you didn't know this at the time.

13   A    No, I didn't.

14   Q    Now, at some point, there was a complaint from

15        the bank, is that right?

16   A    Yes.

17   Q    This had to do with there being insufficient

18        funds, is that right?

19   A    Yes.

20   Q    Was this a telephone call from the bank or --

21   A    I remember a phone call coming in for Gary, and

22        I believe that I passed it onto him, yes.

23   Q    In fact, when this phone call came in, Gary was

24        out of the country, isn't that right?

1   A   I don't remember.

2   Q   Well, would it refresh your recollection if I

3       suggested to you he was in Costa Rica with his

4       family at the time?

5   A   No, it wouldn't.

6   Q   At any rate, Gary wasn't in the office at the

7       time this call came in, is that right?

8   A   I can't honestly say yes or no to that.  I don't

9       remember.

10  Q   You told Gary about this call, right?

11  A   Yes.

12  Q   And this was the first conversation you had with

13      Gary about the use of this account in this way,

14      is that right?

15  A   It was the first call of that type that I ever

16      put through to him or gave to him.

17  Q   Well, did you talk to Gary in this conversation

18      about the fact that Frank had been having you

19      write out these checks on a frequent basis?

20  A   Well, I have to -- I would not have written

21      those checks out of that checkbook without

22      Gary's knowledge first.

23  Q   Well, did you have a talk with Gary about using

24      that check?

Page 212

1   A   Well, he must have directed me to do it

2       initially.  Otherwise, I would never have

3       written out checks carte blanche like that.

4   Q   Well, I'm asking you if you remember a

5       conversation with Gary about that.

6   A   Well, I don't remember the conversation, but I

7       wouldn't have done it without his knowledge.

8   Q   So you're inferring that you wouldn't have done

9       it, but for Gary telling you to do it, is that

10      right?

11  A   Exactly.

12  Q   But you don't have any memory of any specific

13      conversation.

14  A   Specifically, no.

15  Q   And when this call came in from the bank, Gary

16      was pretty upset, wasn't he?

17  A   Yes.

18  Q   He demanded to talk to Frank, is that right?

19  A   Frank was summoned to the office.

20  Q   And they had a kind of a heated conversation?

21  A   They had a conversation.

22  Q   Where did that conversation take place?

23  A   In Gary's office.

24  Q   Did you overhear that conversation?

Page 213

1    A    No.

2    Q    But you could hear that voices were raised?

3    A    No.

4    Q    You could overhear conversations from time to

5         time in that office, could you not?

6    A    If there were screaming, yes.

7    Q    Or if doors were left open?

8    A    Yes.

9    Q    I mean, it's not, you know, like any office,

10        right, you hear scuttlebutt, you overhear

11        conversations and that sort of thing, right?

12   A    Yes.

13   Q    So on this occasion, you know they had a

14        conversation.  You didn't hear screaming on this

15        occasion?

16   A    Not on that occasion, I don't remember.

17   Q    What happened after the conversation was over?

18   A    I was directed to close the account.

19   Q    Who directed you to close the account?

20   A    Gary.

21   Q    Gary told you he was angry with Frank, did he

22        not?

23   A    I don't remember specifically him saying that.

24   Q    Now, did you -- when was it that the end came

Page 214

1        for the Gitto/Global Company, when you had to

2        leave the office for the last time?

3    A   When I left the office for the last time?

4    Q   Yes.

5    A   When I was let go on Monday, I think it was the

6        19th of September of 2004.

7    Q   Do you remember shortly after that, you were

8        home, and before you engaged counsel, you had a

9        conversation with me on the phone?

10   A   Yes.

11   Q   Do you remember I called you and asked you

12       certain questions about it?

13   A   Yes.

14   Q   And I asked you whether you had any information

15       about whether Gary was involved in defrauding

16       the bank?

17   A   Yes.

18   Q   And do you remember that you told me, "I'm sorry

19       to say this, but Gary's not smart enough and he

20       hated detail"?

21   A   Yes.

22   Q   And that's true, isn't it?  I mean, in your

23       opinion, isn't that right?

24   A   That's what I said.

Page 215

1   Q   And in fact, that is your view, correct?

2   A   Yes.

3   Q   Gary is not good with figures, isn't that right?

4   A   I don't know about being good with figures.  I

5       just know he didn't, never liked to get into

6       detail.

7   Q   So at least as of September of 2004, when you

8       talked to me, you had no information that Gary

9       was involved in any fraudulent activities, is

10      that right?

11  A   Yes.

12  Q   Now, you told us the last time that from time to

13      time Gary would make significant contributions

14      of cash to the business; right?

15  A   Yes.

16  Q   I think you said something like he would give

17      200,000 here, a hundred thousand there, is that

18      right?

19  A   Yes.

20  Q   Do you remember how many times it was that Gary

21      gave 200 or a hundred thousand dollars?

22  A   There was always money being moved back and

23      forth.  I don't know.  Dozen?  Ten?

24  Q   Dozen times?

Page 216

1    A    Ten to twelve.  Just guessing.

2    Q    And Gary would also pay company bills on his

3         personal American Express card.

4    A    A few.

5    Q    And Gary would also borrow money to put in the

6         company, correct?

7    A    I think that he did borrow, yes.

8    Q    And what would happen was that Frank would say,

9         we need some more money, and Gary would agree to

10        put in some more money, and loan money to the

11        company, isn't that right, from time to time?

12   A    Well, if it happened that way I can't say.  But

13        what I remember is that Gary would ask me what

14        might be a balance in a particular checkbook,

15        and Frank would give -- and "Frank will give you

16        wiring instructions for X dollars."

17   Q    So it would be, Gary would give the okay for the

18        money to come out of his personal account or his

19        investment account, is that right?

20   A    Yes.

21   Q    And then Frank would say where this money would

22        go.

23   A    Yes.

24   Q    Right.  And you would do according to what Frank

1   would say.

2 A Yes.

3 Q And you believed that Gary put in more money

4   than Frank.

5 A That was my belief.

6 Q That was your impression.

7 A Yes.

8 Q And that was Gary's impression as well, right?

9 A I can't speak for Gary.

10 Q Well, Gary expressed that view, did he not?

11 A Yes.

12 Q And you would discuss that.  You would say to

13   Gary, You're putting in more than him, right?

14 A Something like that.

15 Q And sometimes when he was going to put in more

16   money, you'd say, Are you sure you want to do

17   this; correct?

18 A Yes.

19 Q And that was the, you said, Because you'd given

20   so much and Frank hasn't, right?

21 A It was my impression Frank hadn't given as much.

22 Q And now, Gary was supposed to be reimbursed for

23   the monies that he put in, correct?

24 A Yes.

Page 220

1   A   Towards the end.

2   Q   All right.  Well, from the time -- did you not

3       date it essentially from the time that the

4       Guaranty Bank came out and Lasalle Bank came in,

5       from that time forward there was animosity

6       between Gary and Frank?

7   A   Yes.

8   Q   And so from that time forward, the communication

9       between Gary and Frank was very poor.

10  A   It could get pretty hostile.

11  Q   Right.  And for the most part, you were put

12      right in between, correct?

13  A   I was the middle man messenger.

14  Q   Right.  So when Frank, when they wanted to

15      communicate with each other, they would go

16      through you as opposed to talking directly with

17      each other.

18  A   That's correct.

19  Q   Now, as for these checks, when these checks were

20      not cashed, per instructions of Frank, what

21      would happen to them?

22  A   What would, physically to the check?

23  Q   Yes.

24  A   I had a drawer I just kept them in.

Page 224

1      up records for Gary Gitto at the end; do you

2      recall that?

3   A  Yes.

4   Q  He asked you to box up various kinds of records;

5      correct?

6   A  Yes.

7   Q  He didn't ask you to destroy any records, did

8      he?

9   A  No.

10  Q  In fact, you understood that other people were

11     destroying records; correct?

12  A  I don't know if I understood other people

13     destroyed records.

14  Q  Well, was there a shredder machine in the

15     office?

16  A  Yes.

17  Q  Was someone using the shredder machine at the

18     end?

19  A  I didn't see anyone using it.

20  Q  Did you see someone close to it?

21  A  I saw someone standing by it.

22  Q  Who was that?

23  A  Bill Deakin.

24  Q  Did he say something when he was standing by it?

Page 225

1   A   Yes.

2   Q   What did he say?

3   A   He said, "The coverup is worse than the crime."

4   Q   Did you infer something from what he said?

5   A   Yes.

6   Q   What did you infer?

7   A   That he was going to try to hide some records

8       that could get him into a lot of trouble.

9   Q   All right.  And you told this to Gary Gitto,

10      correct?

11  A   I don't remember saying it.  Perhaps I did.

12  Q   And his response was, Please box up my documents

13      and get them out of there, right?

14  A   Gary asked me to box up his personal documents.

15  Q   Did you ever see Frank Miller or Maria Miller or

16      any of their relatives shredding documents?

17  A   No.

18  Q   At some point, you testified that it occurred to

19      you that what had happened with Direct Wood, the

20      Direct Wood account was a form of check kiting,

21      is that right?

22  A   Yes.

23  Q   And that hadn't occurred to you until the very

24      end of the company, correct?

Page 228

1    Q    That's the only thing he ever said to you about

2         the purpose of getting records for him.

3    A    Yes.

4    Q    Right?  To get them to his attorney, right?

5    A    Yes.

6    Q    Now, from time to time, Frank Miller would tell

7         you things about problems that had developed

8         over those last couple years and tell you,

9         Please don't tell Gary or Charlie about this;

10        didn't he?

11   A    He did?  I don't remember.

12   Q    I'm asking you.

13   A    I don't remember.

14   Q    Didn't you say, like, sometimes when suppliers

15        wouldn't ship because they hadn't been paid, and

16        issues like that, he would say, But don't tell

17        Gary?

18   A    I don't remember specifically.

19   Q    Is that the kind of thing that Frank would say?

20   A    I don't remember.

21   Q    Now, you told us the last time about an incident

22        in which you wrote a check to cover something

23        for Gary and then you wrote a check from his

24        account to cover, to reimburse yourself, is that

Page 238

1  Q  Did you know anything about his financial

2     condition?

3  A  No.

4  Q  You don't know whether he was well off or not

5     well off or anything of that kind?

6  A  Correct.

7  Q  Now, you understand the lay of the land here in

8     terms of what the allegations are, correct?

9  A  Yes.

10 Q  It's your -- you understand that Lasalle Bank is

11    claiming that they have been the victim of this

12    fraud, and that they've lost a lot of money, and

13    they have made the claim that a number of people

14    were responsible for that; correct?

15 A  Yes.

16 Q  And among those that were originally alleged to

17    be responsible was you?

18 A  Yes.

19 Q  By virtue of your agreement with them to do this

20    deposition, they are going to let you out of

21    this case, correct?

22 A  Yes.

23 Q  Now, similarly, you've had conversations with

24    people from the U.S. Attorney's Office, correct?