Exhibit 8

Page 1

# COPY

VOLUME:  I
PAGES:  1 - 138
EXHIBITS:  Per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 04-12227-DPW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LASALLE BUSINESS CREDIT, LLC            )
f/k/a LASALLE BUSINESS CREDIT,          )
INC.,                                   )
     Plaintiff                         )
                                        )
vs.                                     )
                                        )
                                        )
GARY C. GITTO, et al.,                  )
     Defendants                        )
                                        )
       and                         )
                                        )
FLEET NATIONAL BANK, et al.,            )
     Trustee Process Defendants,       )
                                        )
       and                         )
                                        )
FIDELITY INVESTMENTS, INC., et al., )
     Reach-and-Apply Defendants.       )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF JANICE M. CHAISSON
JANUARY 12, 2006
TEN O'CLOCK A.M.

Page 2

1

DEPOSITION OF JANICE M. CHAISSON,

2

taken on behalf of the Plaintiff, pursuant

3

to the applicable provisions of the

4

Federal Rules of Civil Procedure, before

5

Denise M. Rae, a Certified Shorthand

6

Reporter and Notary Public within and for

7

the Commonwealth of Massachusetts, at the

8

Law Offices of Craig and Macauley, P.C.,

9

600 Atlantic Avenue, Boston, Massachusetts,

10

on Thursday, January 12, 2006, commencing at

11

9:04 a.m.

12
13
14
15
16
17
18
19
20
21
22
23
24

Page 115

1      interviewed by Mr. Rein here?  Did you talk

2      to him before today?

3  A.  No.

4  Q.  Have you been interviewed by any person

5      about the matters you've discussed here

6      today, other than your own attorney, before

7      today?

8  A.  Yes.

9  Q.  All right.  Who did you talk to?

10 A.  The Attorney General.  No.

11 Q.  The United States Attorney's office?

12 A.  Yes.

13 Q.  Who was that; a man or woman?

14 A.  It was a woman.

15 Q.  Laurie Holik, H-o-l-i-k?

16 A.  Yes, yes.

17 Q.  When was that?

18 A.  I don't remember if it was last December.

19     I think, November or December.  I think it

20     was December.  I'm not positive.

21 Q.  Okay, and what did you discuss with her?

22 A.  I more or less discussed it with Mr. Grady.

23     She just sat in.

24 Q.  Kevin Grady?

Page 116

1   A.   Yes.

2   Q.   FBI agent?

3   A.   Yes.

4   Q.   He was there?

5   A.   Yes.

6   Q.   Was this over at the Federal Courthouse?

7   A.   Yes.

8   Q.   Was anyone else in the room?

9   A.   My attorney.

10  Q.   Your attorney?

11  A.   Yes.

12  Q.   And any other FBI agents, other than Mr.

13       Grady?

14  A.   No.

15  Q.   Was there a stenographer there?

16  A.   No.

17  Q.   On how many occasions did you meet with any

18       person from the federal government?

19  A.   Just once.

20  Q.   How long was that meeting?

21  A.   I think it was a couple of hours.

22  Q.   What was the nature of your discussion?

23  A.   Gitto Global activities.

24  Q.   Okay.  You discussed what you've discussed

Page 134

1   A.   I don't know what he was objecting to.

2   Q.   Well, they told you he objected to it; is

3        that right?

4   A.   Right.

5   Q.   Now, you have a document in front of you and

6        this is a Settlement Agreement that you

7        signed today?

8   A.   Yes.

9   Q.   I take it that you have agreed with LaSalle

10       that, if you waive your Fifth Amendment

11       privilege and you come and testify at this

12       deposition today, they will drop the lawsuit

13       against you; is that right?

14  A.   Yes.

15            MR. STERN:  No further questions.

16            CROSS-EXAMINATION

17       by Mr. McIntyre:

18  Q.   How were you compensated when you went to

19       work for Gitto Global?  Weekly, hourly?

20  A.   Weekly.

21  Q.   Weekly.  What was your compensation when you

22       were hired by Gitto Global?

23  A.   I think it was like thirty-three thousand.

24  Q.   And when they went into the tank in 2004,

Exhibit 9

```
                       VOLUME:     I
                       PAGES:   1-223
                       EXHIBITS:  1-35
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. 04-12227-DPW

```
                              )
LASALLE BUSINESS CREDIT, LLC, )
f/k/a LASALLE BUSINESS        )
CREDIT, INC.,                 )
      Plaintiff,              )
                              )
vs.                           )
                              )
GARY C. GITTO, ET AL.,        )
      Defendants,             )
                              )
AND                           )
                              )
FLEET NATIONAL BANK, ET AL.,  )
      Trustee Process         )
      Defendants,             )
                              )
AND                           )
                              )
FIDELITY INVESTMENTS, INC.,   )
ET AL.,                       )
      Reach-and-Apply         )
      Defendants.             )
```

DEPOSITION OF WILLIAM DEAKIN, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the Federal
Rules of Civil Procedure, before Jill
Shepherd, Registered Professional Reporter
and Notary Public, in and for the
Commonwealth of Massachusetts, at the offices
of Craig & Macauley, 600 Atlantic Avenue,
Boston, Massachusetts, on Tuesday,
November 15, 2005, commencing at 9:43 a.m.

1326731c-fce7-496c-ac2c-6012a773d612

```
 1   APPEARANCES:
 2   SCHWARTZ, COOPER, GREENBERGER, KRAUSS
          (By Eric S. Rein, Esquire)
 3        180 N. LaSalle Street
          Suite 2700
 4        Chicago, Illinois 60601
          Tel:  312.845.5106
 5        Fax:  312.264.2467
          E-mail:  rrein@schwartzcooper.com
 6        On Behalf of the Plaintiff.
 7
     STERN, SHAPIRO, WEISSBERG & GARIN, LLP
 8        (By Max D. Stern, Esquire)
          90 Canal Street
 9        Boston, Massachusetts 02114-2022
          Tel:  617.742.5800
10        Fax:  617.742.5858
          E-mail:  mdstern@sswg.com
11        On Behalf of the Defendant,
          Gary C. Gitto.
12
13   BALLIRO & MONDANO
          (By Frank Mondano, Esquire)
14        99 Summer Street
          Suite 1800
15        Boston, Massachusetts  02110
          Tel:  617.737.8442
16        Fax:  617.737.8443
          On Behalf of the Defendant,
17        Charlie Gitto.
18
     ROACH & CARPENTER, P.C.
19        (By Eve Piemonte Stacey, Esquire)
          24 School Street
20        Boston, Massachusetts  02108
          Tel:  617.720.1800
21        Fax:  617.720.0720
          E-mail:  eps@rc-law.com
22        On Behalf of the Trustee,
          Tradex Corporation
23
24
```

1326731c-fce7-496c-ac2c-6012a773d612

1    responsibility.

2            (Mr. McGee enters room.)

3  Q.  Mr. Deakin, did we cover your tasks as

4      controller?

5  A.  Pretty much.

6  Q.  Okay.  Did those tasks change over the years?

7  A.  In what way?

8  Q.  Did you add tasks, eliminate tasks, duties

9      and responsibilities, as controller?

10  A.  No, pretty much was always in the cash flow.

11      We never had any; things were very tight and

12      I had to stay on top of it.  Most of the

13      days, I was balancing and trying to get raw

14      materials in, talking to vendors and getting

15      released from, you know, cash on delivery.

16      You know, just keeping the plain open with

17      Frank basically.

18  Q.  How long, or when did you end your employment

19      at Gitto Global?

20  A.  That was 2004.

21  Q.  What was the date?

22  A.  It was --

23  Q.  Or the month if --

24  A.  It was September, the middle of September, I

1326731c-fce7-496c-ac2c-6012a773d612

1  A.  We went through so many banks.  Prior to the

2      Lasalle, there was Guaranty Bank; prior to

3      that, I think there was Bank of Canada.

4  Q.  National Bank of Canada?

5  A.  Yes.  And prior to that, I don't know whether

6      it was Bank Boston or it could have been --

7      there's an outfit in New York we were with

8      for a while, CIT.  May have been them.  I

9      forget which order now.

10 Q.  Okay.  So Frank would instruct you to write a

11     check for a certain amount to Direct Wood?

12 A.  Um-hum.

13 Q.  Would he also tell you which invoice to

14     remove from the list?

15 A.  Yeah.  If he had one he wanted to get rid of,

16     yeah, or we would just pick one.

17 Q.  Who is "we"?

18 A.  Janice would take care of that.  She would

19     look and see which ones, and give Frank the

20     list, one of which ones were going to be

21     going over, and Frank would make a decision

22     as to which ones he wanted to start doing.

23 Q.  And with this Direct Wood check, what would

24     you or others do physically with the check?

1326731c-fce7-496c-ac2c-6012a773d612

1    A.    None that I'm aware of.

2    Q.    Do you know who Ron Ruggerio was?

3    A.    He was the president of Hitachi.

4    Q.    What about Brian Griggs [phonetic]?

5    A.    He worked in some capacity over there.  I

6          don't know what his capacity was.  Buyer

7          maybe, engineer maybe.

8    Q.    Were there any payments being made to

9          Mr. Ruggerio and Mr. Griggs in connection

10         with transactions?

11   A.    They got commissions.

12   Q.    And how do you know that?

13   A.    Because Janice had a list that she had to

14         keep track of those sales on certain items,

15         and certain items they would get commissions

16         on.

17   Q.    So Griggs and Ruggerio were being paid

18         commissions for sales to their company?

19   A.    Yes.

20   Q.    Were there any payments coming back that you

21         know to Gary Gitto as a result of these

22         sales?

23   A.    None that I'm aware of.

24   Q.    You referred to J/Tan Sales.  What do you

Page 76

1          second page --

2     A.   Um-hum.

3     Q.   -- is an invoice register?

4     A.   Yes.

5     Q.   For that day?

6     A.   That's the day's register, yes.

7     Q.   And this register shows phoney and legitimate

8          invoices?

9     A.   Yes, it does.

10    Q.   And the phoney invoices would be those

11         companies that you listed:  J/Tan Sales --

12    A.   J/Tan, Zebulon.

13    Q.   -- Hemisphere?

14    A.   There's Hitachi on here, Colors Compounds on

15         there, J/Tan.

16    Q.   Hemisphere?

17    A.   Hemisphere.  There's a couple of Hemispheres

18         actually, a few J/Tans, and then the little

19         ones on the bottom are the legitimate sales.

20    Q.   Those would be starting from Whitney Blake on

21         down?

22    A.   Starting from Hitachi, 22,709.93.

23    Q.   It would be invoice no. 5759?

24    A.   Yes.

1326731c-fce7-496c-ac2c-6012a773d612

Page 233

1   A.   At that point when the fictitious customers

2        got on, I don't think I was allowed to give

3        Charlie any more financial information, so I

4        don't think he ever saw any of those or -- I

5        mean, there was, like, that financial -- that

6        aging schedule, I don't know who gave it to

7        him, whether I did or somebody else.  At the

8        time, it did have that Zebulon on there, but

9        I don't know if he even noticed it or even

10       read it or just attached it for whatever

11       purpose he was writing the letter.  I don't

12       know.

13  Q.   Did you ever discuss the phoney inventories

14       with Charlie?

15  A.   No.  I didn't have reason to.

16  Q.   Did you ever discuss the phoney inventories

17       with Gary?

18  A.   No, I had no reason to.  Well, actually,

19       other than the time that I went up there and

20       told him we had -- those three times that I

21       mentioned earlier, I told him that we had

22       that inventory on there and the prebills were

23       going on.  I did say it that time.

24  Q.   When did the inventory manipulation begin?

1   as authorized by him; is that right?

2 A. That's correct.

3 Q. In fact, I think you said yesterday, you used

4   the word "paranoid," that he was paranoid

5   about that?

6 A. Yes, sir.

7 Q. What do you mean by "he was paranoid"?

8 A. He was afraid that I could say something to

9   somebody in order -- for example, and walk

10   out of the conference room and he would walk

11   in five minutes later and be telling a

12   completely different story.  So as long as

13   there was only one person telling the story,

14   he knew what the story was and there would be

15   no foul-up.  So that's -- ever since I've

16   been there, I didn't want to talk to anybody.

17   I wasn't supposed to talk to anybody.  I just

18   let him talk.

19 Q. That includes persons within the

20   organization; isn't that right?

21 A. Well, I talked to people that worked there

22   because we were all involved with it.

23 Q. But other than people who were directly

24   involved with it, you were not to disclose

f0ac211c-568d-48d8-8273-02e5dcf560c4

1     parties.

2               On the record, he has not

3     supplemented his discovery; he is withholding

4     documents and now he's trying to blindside

5     witnesses by coming up and producing them.

6     Go ahead, Mr. Stern, ask your questions.

7   Q.   Do you recognize this document?

8   A.   I believe this came from inside sales.  They

9     would have produced this.

10  Q.   What's "inside sales"?

11  A.   That's the sales office that people inside

12    were taking sales orders and things like

13    that.

14  Q.   And do you know whose initials are on the

15    front of that?

16  A.   Frank Miller.

17  Q.   Do you recognize the writing on those

18    initials?

19  A.   That looks like his initials.

20  Q.   Can you tell us what that report is?

21  A.   It's just the amount of pounds we shipped and

22    dollar value on any given day, and it's just

23    a cumulative thing by month.

24  Q.   Have you seen a report of that nature before?

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 281

1  March 20, 1997, you knew that Charlie didn't
2  agree with prebilling, correct?  He said so.
3  A.  Well, I believe, you know, he didn't agree
4  with it.  But I think he knew about it but he
5  didn't agree with it.
6  Q.  And he thought it had to stop, right?
7  A.  Right.
8  Q.  That's what he said, right?
9  A.  Sure.
10  Q.  He said someone agreed with him according to
11  his memo, right?
12  A.  I think a lot of us people that worked there
13  agreed with him because this was an issue
14  with people in sales, inside sales.
15  Q.  This memo is directed to Frank, Gary and
16  Nancy Gitto-Panegiotis [phonetic], right?
17  A.  Um-hum.
18  Q.  And in this memo Charles is saying, "Everyone
19  is in agreement, but a few," right?
20  A.  I don't know who he's talking about.  "A few"
21  is maybe --
22  Q.  Well, at any rate, after this memo,
23  prebilling continued; is that right?
24  A.  Oh, sure.

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 282

1   Q.   And that was at the direction of Frank
2        Miller, correct?
3   A.   Yes, sir.
4   Q.   You could infer from that that Frank was the
5        one or one of the ones who did not agree with
6        stopping prebilling; is that right?
7   A.   Yes.
8   Q.   He wanted to continue with it, right?
9   A.   I don't know if he wanted to continue.
10  Q.   He did continue with it?
11  A.   He couldn't stop it.
12  Q.   He did continue with it?
13  A.   He did continue with it.  He couldn't stop
14       it.
15  Q.   And Charlie and someone else thought it
16       should stop, correct?
17  A.   We all wanted it -- thought it should stop.
18  Q.   At some point the prebilling turned into
19       phoney invoices; is that right?
20  A.   That's correct.
21  Q.   When was that?
22  A.   Now, looking at some of these statements,
23       must have been about -- around '99.
24  Q.   Do you have any recollection of when and how

f0ac211c-568d-48d8-8273-02e5dcf560c4

1        some time soon?

2                MR. STERN:  We can take a break

3        right now.

4                (A recess was taken from

5                11:18 a.m. to 11:28 a.m.)

6    Q.   Now, in November of 2003 is when you recall

7         going to Gary with the aging report which had

8         fictitious invoices referred to on it; is

9         that right?

10   A.   Yes.

11   Q.   The last time you had been to see Gary about

12        the improprieties was, would you say,

13        somewhere around '96 or '97?

14   A.   '97, maybe.

15   Q.   So between 1997 and November of 2003 you had

16        no communication with Gary concerning

17        improprieties?

18   A.   That's correct.

19   Q.   Or any communication with him in which there

20        was any reference to phoney invoices or

21        prebilling or inflated inventory; is that

22        right?

23   A.   I don't recall any of that.  I just know

24        those three times.

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 292

1   Q.   The only other communication you had with him

2        is the e-mail that you sent to him in June of

3        2004; is that right?

4   A.   Yes.

5   Q.   And that's Exhibit 11; is that right?

6             MR. HARRINGTON:  You said this is

7        the only communication he had with him on

8        anything after November 2003?

9             MR. STERN:  Concerning the issues.

10  A.   The increase and, you know, float.

11            MR. HARRINGTON:  Can you hold on one

12       moment.

13  A.   I mean, there are other correspondence I have

14       had with him.

15  Q.   I am referring to improprieties, what you

16       refer to as improprieties.

17  A.   I would say this is the only other one that I

18       sent him that did tell him that there was an

19       increase in it.

20  Q.   You never had a conversation with him about

21       Kingsdale or J & J; is that right?

22            MR. HARRINGTON:  At any time with

23       Gary Gitto?

24  A.   I don't think I ever discussed it with him,

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 293

1    no.

2  Q.  And so the only communication you had with

3      him ever about J & J was this e-mail you sent

4      to him on June 8, 2004?

5  A.  Yes.

6  Q.  And you received no reply to this?

7  A.  I didn't receive any reply.

8  Q.  You told us this morning that money was taken

9      out of the company for various personal

10     expenses of Frank Miller and Gary Gitto; is

11     that right?

12 A.  That's correct.

13 Q.  And I think what you said was that Frank

14     Miller would take out checks in his name?

15 A.  He's done that, sure.

16 Q.  And I think you said at one time Gary Gitto

17     must have done it?

18 A.  Sure.  Gary took out some in his name.

19 Q.  Well, did you mean it was one time or --

20 A.  No, various times over the years.  Could have

21     been many times.

22          MR. HARRINGTON:  You are asking just

23     for checks payable to Gary Gitto?

24 A.  In his name?

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 299

1    Q.   All right.  And I think you told us that

2         these payments to Gary Gitto were -- that you

3         were told that these were repayments of loans

4         or words to that effect?

5    A.   That's where we applied it, yes.

6    Q.   Right.

7    A.   Not a repayment, but as a loan receivable.

8    Q.   What do you mean by "a loan receivable"?

9    A.   When, Gary owes the money to the company.

10        Gitto Global's asset.

11   Q.   Who told you to apply it as a loan -- these

12        would be treated as loans?

13   A.   Well, we applied anything that Frank or Gary

14        took personally to the loan account.

15   Q.   Meaning, a loan to?

16   A.   Loan to Gary, a loan to Frank.

17   Q.   And did Frank tell you to apply those to the

18        loan account?

19   A.   Not specifically.  It was something we have

20        always done over the years.

21   Q.   All right.  So you knew that Gary had loaned

22        money to the company in the past; is that

23        right?

24   A.   Yes, he did.

f0ac211c-568d-48d8-8273-02e5dcf560c4

Page 300

1   Q.   All right.  And how did you know that?

2   A.   I saw the money came in.  I recorded the

3        money.

4   Q.   And what money did you see come in?

5   A.   There were times that Frank said he needed

6        some extra money.  We were real tight and

7        Gary would loan 2- or $300,000 to the

8        company, and then a month or two later he

9        would start withdrawing.

10  Q.   And when do you recall that happening?

11  A.   It was at various times over the years.  It

12       could be five or six times over the years, I

13       guess.

14  Q.   And each time was it 2- or $300,000?

15  A.   I guess the latest time would have been the

16       750 that he borrowed from Charlie, but it

17       didn't go into Gitto Global's books.  It was

18       off the books basically, but it was for Gitto

19       Global's benefits that went into the Clinton

20       Savings.

21  Q.   All right.  And Frank took care of directing

22       that money to the Clinton Savings Bank,

23       right?

24  A.   Yes, he did.

f0ac211c-568d-48d8-8273-02e5dcf560c4

Exhibit 10

00001

```
 1                VOLUME:    I
                 PAGES:  1-153
 2               EXHIBITS:  1-11

 3
         IN THE UNITED STATES DISTRICT COURT
 4       FOR THE DISTRICT OF MASSACHUSETTS

 5               C.A. 04-12227-DPW

 6
                            )
 7  LASALLE BUSINESS CREDIT, LLC,  )
    f/k/a LASALLE BUSINESS         )
 8  CREDIT, INC.,                  )
       Plaintiff,                  )
 9                                 )
     vs.                           )
10                                 )
    GARY C. GITTO, ET AL.,         )
11      Defendants,                )
                                   )
12  AND                           )
                                   )
13  FLEET NATIONAL BANK, ET AL.,  )
       Trustee Process            )
14      Defendants,               )
                                   )
15  AND                           )
                                   )
16  FIDELITY INVESTMENTS, INC.,   )
    ET AL.,                        )
17      Reach-and-Apply           )
    Defendants.                   )
18

19
         DEPOSITION OF RITA BARTLETT, a
20  witness called on behalf of the Plaintiff,
    pursuant to the provisions of the Federal
21  Rules of Civil Procedure, before Jill
    Shepherd, Registered Professional Reporter
22  and Notary Public, in and for the
    Commonwealth of Massachusetts, at the offices
23  of Craig & Macauley, 600 Atlantic Avenue,
    Boston, Massachusetts, on Tuesday,
24  February 28, 2006, commencing at 9:30 a.m.
```

**Bartlett.txt**                                    **Page 1**

00002
```
 1  APPEARANCES:

 2  SCHWARTZ, COOPER, GREENBERGER, KRAUSS
       (By Eric S. Rein, Esquire)
 3     180 N. LaSalle Street
       Suite 2700
 4     Chicago, Illinois 60601
       Tel:  312.845.5106
 5     Fax:  312.264.2467
       E-mail:  rrein@schwartzcooper.com
 6     On Behalf of the Plaintiff.

 7
    BALLIRO & MONDANO
 8     (By Frank Mondano, Esquire)
       99 Summer Street
 9     Suite 1800
       Boston, Massachusetts  02110
10     Tel:  617.737.8442
       Fax:  617.737.8443
11     On Behalf of the Defendant,
       Charlie Gitto.

12

13  ALSO PRESENT:   ROBYN LEE MERCHANT,
           Witness
14

15

16

17

18

19

20

21

22

23

24
```

**Bartlett.txt**                                    **Page 2**

00018

1  A.  Well, I think basically it had to be Frank

2      and Tracy together.  I think it was mostly

3      Frank that made the decisions at that time

4      about what suppliers would be paid.

5  Q.  Now, how would Frank communicate that to you?

6      In writing, in person, by computer?

7  A.  Of course, the invoices that were not entered

8      into the system, I would be told to pull 10

9      invoices for this one, five for that one and

10     cut those checks.

11  Q.  We'll get to that in a second, the payments

12     of supplier invoices.

13  A.  This was the two ways to do it.  One of them,

14     you would run the cash requirements and they

15     would highlight certain things off of there

16     that I would pay.  And the second method was

17     to pull certain things out of the drawer and

18     pay those.

19  Q.  Let's talk about the first method.

20  A.  Yeah.

21  Q.  What is it that you would run?

22  A.  I think it was called a cash requirements,

23     which was everything that was entered into

24     the system would print on that.

**Bartlett.txt**                                    **Page 18**

Exhibit 11

00001
1               VOLUME I
               PAGES 1-131
2

3
    IN THE UNITED STATES DISTRICT COURT
4     FOR THE DISTRICT OF MASSACHUSETTS

5

6  LASALLE BUSINESS      )Case No.04-12227DPW
   CREDIT, LLC f/k/a    )
7  LASALLE BUSINESS     )
   CREDIT, INC.,        )
8     Plaintiff,    )
                        )
9     v.          )
                        )
10  GARY C. GITTO, et.al., )
       Defendant,     )
11                     )
       and         )
12                     )
   FLEET NATIONAL BANK,  )
13  et.al.,             )
       Trustee Process )
14      Defendants,    )
                        )
15      and        )
                        )
16  DIRECT WOOD & PAPER  )
   PRODUCTS, et.al.,    )
17      Reach and    )
       Apply Defendants.)
18

19      DEPOSITION of MARTIN MILLER, a
   witness called on behalf of the Defendant
20  pursuant to the applicable provisions of the
   Federal Rules of Civil Procedure, before
21  Sandra Correia, a Professional Shorthand
   Reporter and Notary Public within and for
22  the Commonwealth of Massachusetts, at the
   Law Offices of Garnick & Scudder, 32 Main
23  Street, Hyannis, Massachusetts, on Monday,
   December 5, 2005, commencing at 1:17 p.m.
24

**Martin Miller.txt**                    **Page 1**

00002

1  APPEARANCES:

2  SCHWARTZ, COOPER, GREENBERGER, KRAUSS

3  By:  Eric S. Rein, Esq.

4  180 N. LaSalle Street, Suite 2700

5  Chicago, Illinois 60601

6  312.845.5106

7  On behalf of LaSalle Business Credit, LLC

8

9  CRAIG AND MACAULEY, PC

10  By:  Patrick W. Manzo, Esq.

11  600 Atlantic Avenue

12  Boston, Massachusetts 02210

13  617.367.9500

14  On behalf of LaSalle Business Credit, LLC

15

16  ROACH & CARPENTER, PC

17  By:  Eve Piemonte Stacey, Esq.

18  24 School Street

19  Boston, Massachusetts 02108

20  617.720.1800

21  On behalf of Trustee Trader Corp.

22

23

24

**Martin Miller.txt**                                   **Page 2**

00018
1   discussions.

2  Q. So at the second meeting at Mr. Elbaum's

3     office, what, if anything, did Frank say?

4  A. The financial statements were presented.

5     There were open discussions with Mr. Elbaum

6     about the problems in the company and the

7     hole.

8  Q. What was discussed about the problems in the

9     company?

10 A. That the overstatement of receivables and

11    sales, I believe, would -- obviously was a

12    problem -- would present a problem with the

13    borrowing base that was being used to lend

14    on by the bank.

15       Now, you could correct that problem

16    by taking out the bank.  And that was the

17    whole thrust of going down there, if they

18    bought the company, take the bank out.

19 Q. So the borrowing base was overstated because

20    the receivables reflected on that borrowing

21    base?

22 A. If the receivables are overstated, your

23    borrowing base has got to be overstated,

24    because it's based upon receivables and

**Martin Miller.txt**                                **Page 18**

Exhibit 12

1

1

2     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
3     Case No: 04-12227-DPW
      ------------------------------------------------X
4     LASALLE BUSINESS CREDIT, LL. f/k/a LASALLE
      BUSINESS CREDIT, INC.,
5
                                        PLAINTIFF,
6
                          v.
7
      GARY C. GITTO, et al.,
8
                                        DEFENDANT,
9
                          -and-
10
      FLEET NATIONAL BANK, et al.,
11
                          TRUSTEE PROCESS DEFENDANTS,
12
                          -and-
13
      DIRECT WOOD & PAPER PRODUCTS, et al.,
14
                          REACH AND APPLY DEFENDANTS.
15    ------------------------------------------------X

16                        DATE: November 8, 2005

17                        TIME: 11:29 a.m.

18

19            EXAMINATION BEFORE TRIAL of the

20    NON-PARTY WITNESS, STEVEN S. ELBAUM, taken by the

21    Respective Parties, pursuant to a Subpoena, held at

22    the offices of BECKER LAW, One Penn Plaza, New

23    York, New York, before a Notary Public of the State

24    of New York.

25

2

1

2    A P P E A R A N C E S :

3         SCHWARTZ, COOPER, GREENBERGER & KRAUSS, ESQS.
              Attorneys for the Plaintiff
4             180 N. LaSalle Street - Suite 2700
              Chicago, Illinois 60601
5             BY: ERIC S. REIN, ESQ.
              File #: 42314/34311

6

7

         STERN, SHAPIRO, WEISSBERG & GARIN, ESQS.
8             Attorneys for the Defendant
              Gary C. Gitto
9             90 Canal Street - 5th Floor
              Boston, Massachusetts 02114
10            BY: MAX STERN, ESQ.

11

12        BALLIRO & MONDANO, ESQS.
              Attorneys for the Defendant
13            Charles Gitto
              99 Summer Street - Suite 1800
14            Boston, Massachusetts 02110
              BY: FRANK MONDANO, ESQ.

15

16

17            *           *           *

18

19

20

21

22

23

24

25

1                          S. ELBAUM

2    that.

3        Q.    And do you recall receive the summary

4    of expenses to be eliminated that's a part of this

5    fax?

6        A.    I do recall getting information, and it

7    may well have been was attached to this fax,

8    regarding those expenses that could be eliminated

9    by a new owner or what they regarded as excess

10   expenses.  I can't say with certainty that I got

11   the attachment here, but I think I did get

12   information along these lines.

13       Q.    If you'll look at the second to last

14   page which is Bates stamped 06454.

15       A.    Okay.

16       Q.    Do you recall having reviewed and

17   discussed the subject of kickbacks?

18       A.    No.

19       Q.    Do you recall ever seeing that in a

20   document that you reviewed concerning excess

21   expenses?

22       A.    No.  No.

23       Q.    Did you have any discussion with Frank

24   or Marty Miller, or anyone else associated with

25   Gitto Global, with respect to the veracity of the

1                          S. ELBAUM

2    financial figures that you were given?

3         A.      I didn't have a direct discussion with

4    them about the veracity of the figures.  As the --

5    as the discussions ensued, and I can't remember the

6    time frame over which they ensued, the nature of

7    the business, the quality of the financial

8    information, the references to, you know,

9    extraneous expenses and reconstruction of profit

10   and loss statements along with other factors made

11   me less and less interested in this business, and

12   my interest in the business was getting more and

13   more limited and my focusing on financial

14   information became more and more limited, as well.

15               I mean the business still had some

16   interest but it was not a high priority item for

17   me.

18        Q.      What was it that was being given to you

19   or being told to you that raised issues about the

20   quality of the financial information?

21        A.      To the best of my recollection, the

22   company did not have a top tier accounting firm,

23   did not have, and again this is to the best of my

24   recollection, audited financial statements.

25               There's always a concern for me when a

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1                          S. ELBAUM

2    indicated that he was having financial problems and

3    that combined with some of the quality issues

4    connected with the financials that I saw and the

5    intricacies connected with them just continued to

6    lower my level of interest in the business.  It

7    didn't eliminate it but it lowered my level of

8    interest.

9         Q.      Did you have any discussion with

10   Charles Gitto concerning the quality of the

11   financial information?

12        A.      No, I don't believe so.

13        Q.      Did you have any discussion with Gary

14   Gitto concerning the quality of the financial

15   information?

16        A.      I don't believe so.

17        Q.      Did you have any discussion with Frank

18   Miller concerning the quality of the financial

19   information?

20        A.      I don't think so.

21        Q.      Did you have any discussion with anyone

22   associated with Gitto Global concerning the

23   accounts receivable information shown on the

24   financial information?

25        A.      I don't recall a specific discussion

27

1                          S. ELBAUM

2    about the receivables other than the question

3    concerning the collectability of the receivables

4    along the lines of just trying to understand the

5    quality of the other assets, including the

6    inventory and the true value of the property, plant

7    and equipment.

8        Q.    What discussion did you have with

9    anyone at Gitto Global concerning the true value of

10   the inventory?

11       A.    I can't recall.  I can't recall a

12   specific discussion.  That's an issue that would

13   have been taken up in much more detail if we had

14   proceeded to a, I'd say, a more definitive level of

15   interest in the business.  It would have been

16   addressed in due diligence, it would have been

17   addressed in a different circumstances.

18              I just wanted some assurances that we

19   were -- that we had a balance sheet that at least

20   on the surface indicated that they had a certain

21   level of assets that the balance sheet indicated.

22       Q.    Besides the dinner meeting, did you

23   have any face-to-face meetings with anyone

24   associated with Gitto Global?

25       A.    Yes.

```
1                      S. ELBAUM
2    I ha mentioned before.  I couldn't match in my mind
3    the inflows with the outflows and the results of
4    the company and the balances that were due the
5    bank, and I didn't do any due diligence on this.
6               This was in the nature of just scratch
7    your head and ask a question, and I had been told
8    by I think it was Frank and by all of them that
9    there were issues of a financial nature that was
10   causing liquidity problems and that there was also
11   I think a lack of trust on the part of the lender
12   and they were going to be refinancing, and a couple
13   of times references were made to refinancing
14   proposals that they had or expected to have
15   eminently, to which my reaction was, that's great,
16   you know, the business needs a solid interested
17   lender to support your growth; whether or not
18   anybody's interested in buying this business, you
19   still need to operate it.
20               So I didn't hear or see a direct
21   statement of the kind that you referred to but I
22   was, as a person with a lot of experience in buying
23   businesses and selling businesses, there was a
24   growing concern about the lack of quality of
25   financials and things that didn't add up and I
```

1                        S. ELBAUM

2    didn't know exactly why they didn't add up, nor was

3    it my goal to ascertain why they didn't add up, at

4    least at that point in of our discussions.

5         Q.      Did anyone elaborate on the issues

6    about the financials that they said were

7    ascertained?

8         A.      No, not to my recollection.

9         Q.      Any discussion about the receivables

10   being not the value that was being shown in the

11   financial statements?

12        A.      Not to my recollection.  Not to my

13   recollection.

14        Q.      Or that the inventory value was not

15   what was truly being shown on the financial

16   statement?

17        A.      Not to my recollection.  I don't recall

18   a specific statement like that being made to me.

19               MR. STERN:  Can you move a little

20        closer, please.

21        A.      (Continuing) I don't recall a specific

22   statement like that being made to me.  There were

23   more general statements about, we've got a lot of

24   pressure from our bank.  We need to refinance

25   them.  We want to refinance them and we have

Exhibit 13

00001

1    IN THE DISTRICT COURT OF THE UNITED STATES

2      FOR THE DISTRICT OF MASSACHUSETTS

3

4  LASALLE BUSINESS

5  CREDIT, LLC, f/k/a

6  LASALLE BUSINESS

7  CREDIT,INC,

8      Plaintiff,

9   vs.      Case No. 04-12227-DPW

10  GARY GITTO, ET AL,

11     Defendants.

12  _____

13

14

15  The Deposition of WALTER CARLSON,

16  Taken at 28400 Northwestern Highway, Suite 200,

17  Southfield, Michigan,

18  Commencing at 10:30 a.m.,

19  Tuesday, August 23, 2005,

20  Before Vincent F. Quaglia, CSR-4114, RPR.

21

22

23

24

25

00002

1 APPEARANCES:

2

3 ERIC S. REIN

4 Schwartz, Cooper, Greenberger, Krauss

5 180 North LaSalle Street

6 Suite 2700

7 Chicago, Illinois 60601

8 (312) 346-1300

9     Appearing on behalf of the Plaintiff.

10

11 KEVIN C. MCGEE

12 Seder & Chandler, L.L.P.

13 339 Main Street

14 Worcester, Massachusetts 01608

15 (508) 757-7721

16     Appearing on behalf of Clinton Savings Bank.

17

18 JULIANE BALLIRO (Via Telephone)

19 Wolf, Block, Schorr and Solis-Cohen, L.L.P.

20 1 Boston Place

21 Boston, Massachusetts 02108

22 (617) 226-4002

23     Appearing on behalf of Defendant Charles Gitto.

24

25

00021

1    Do you recognize this document?

2 A.   These are my notes.

3 Q.   Is there a specific date?

4 A.   May 18th, '03.

5 Q.   And in what connection did you make these notes?

6 A.   These were notes of a meeting with Charlie Gitto and

7    Frank Miller.  It doesn't list on here who from our

8    office attended the meeting, but I would guess it

9    would have been Jess Booth, Glenn Easterbrook and

10    Steve Merry.

11 Q.   And you?

12 A.   And me.  I took the notes.

13 Q.   Do you recall what was discussed at the meeting?

14 A.   What is recorded in the notes were all the various

15    possibilities of selling product to them, how their

16    LaSalle bank loans worked.

17        This is post the refusal to do the asset

18    purchase offer, so we were looking for some other way

19    to possibly acquire the company.

20 Q.   Why did, at this point, Hi-Tech want to acquire the

21    company?

22 A.   As I previously discussed, we had been advised by

23    Steve Merry that Hi-Tech, to accelerate its growth in

24    the specialty processing or process additive industry,

25    we needed both national distribution, which is what

**Carlson.txt**                                    **Page 21**

Exhibit 14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC f/k/a
LASALLE BUSINESS CREDIT, INC.,

    Plaintiff,

    v.

GARY C. GITTO, FRANK MILLER, CHARLES
N. GITTO, JR., NANCY GITTO-PANAGIOTES,
JOHN D. TERSIGNI, KATHLEEN M. CARLAND,
WILLIAM DEAKIN, JANICE CHAISSON, HELEN
KOZAK, KINGSDALE CORP. d/b/a J&J CHEMICAL
DISTRIBUTORS, and TRADEX CORPORATION,

    Defendants,

    and

FLEET NATIONAL BANK, CLINTON SAVINGS
BANK, SOVEREIGN BANK, COMMERCE BANK
& TRUST COMPANY, FIDELITY COOPERATIVE
BANK, BANKNORTH, N.A., FIDELITY
INVESTMENTS, INC., LEOMINSTER CREDIT
UNION, and LEHMAN BROTHERS, INC.,

    Trustee Process Defendants,

    and

FIDELITY INVESTMENTS, INC., DIRECT WOOD
& PAPER PRODUCTS, INC., GITTO SALES
CORPORATION, J-TAN SALES & MARKETING,
INC., HEMISPHERE DISTRIBUTION
CORPORATION, LEHMAN BROTHERS, INC., and
AWG, LLC,

    Reach-and-Apply Defendants.

Case No. 04-12227 DPW

## AFFIDAVIT OF NANCY GITTO-PANAGIOTES

I, Nancy Gitto-Panagiotes, under oath depose and state as follows:

1.    I make this affidavit in support of the *Motion of Nancy Gitto-Panagiotes to Dissolve Temporary Restraining Order and Equitable and Real Property Attachments and Opposition to Plaintiff's Motion for Preliminary Injunction.*

2.    Only one paragraph in the 277-paragraph Complaint in this action contains a substantive allegation against me personally.  Specifically, paragraph 182 alleges that:

Nancy Gitto-Panagiotes benefited from the conspiracy by receiving proceeds of the conspiracy.  Nancy Gitto-Panagiotes received interest payments totaling $37,623, knowing that she was not entitled to those interest payments and knowing that the funds derived from the proceeds of the civil conspiracy.

3.    While it is true that I received interest payments relating to loans I made to my brother, Gary Gitto, and Frank Miller, the allegation that I was not entitled to those payments and that I supposedly knew that the funds I received derived from an alleged conspiracy are false.  I know of no evidence that would support these allegations.

4.    The interest payments I received relate to loans I made to my bother, Gary Gitto, and to Maria and Frank Miller in 2002.  These loans are evidenced by demand notes.

5.    Specifically, in May 2002, my brother – an officer of Gitto Global Corporation ("Gitto Global") – called me and told me that Gitto Global was doing poorly financially.  He asked me if I would make a personal loan to him of $150,000.  I agreed to make this loan because it was my brother who asked me for it.  I was never told the purpose of the loan.

6.    After I agreed to make this loan, my brother Gary prepared and sent me a signed demand note memorializing the loan.  The demand note provided that a demand

2

for payment by me could be made at any time, but while the note was outstanding, I would be paid monthly interest payments of 8% on the unpaid balance of the loans.

7.    I then sent Gary an amortization schedule which my accountant prepared to reflect the interest due on the loan. The monthly interest payments due according to this schedule averaged $1,033.33 per month.

8.    Approximately a month later, in June 2002, Gary once again told me that Gitto Global was doing poorly and asked me to make another loan – this time to Maria and Frank Miller in the amount of $300,000. Mr. Miller is also an officer of Gitto Global. Once again, because it was my brother who asked me, I agreed to make the loan. I was never told the purpose of this loan.

9.    After agreeing to make the loan to the Millers, I again received a demand note evidencing the loan with the same terms as the note for the loan to Gary. I again had my accountant prepare an amortization schedule which I sent to the Millers that set forth the monthly interest payments due on the loan. The interest payments on this loan averaged about $2,066.67 per month.

10.    The monthly interest payments for my brother's loan were made to me through October 15, 2003 and monthly payments for the Millers' loan were made through May 2004. Both loans were repaid in full only after my attorney made demand for payment. Gary responded to the demand by paying off the loan. The Millers, however, continued to refuse to pay, and I initiated litigation in Worcester Superior Court to collect on the demand note. A copy of the Complaint from that action is attached as Exhibit A, hereto.

11.     As to the allegation that I received these payments "knowing that the funds derived from the proceeds of the civil conspiracy," not only do I have no knowledge of any civil conspiracy involving any of the other defendants to this action, I was never in any position to know about any such civil conspiracy if it existed.

12.     While, as the Complaint alleges at paragraph 7, I was a vice president at Gitto Global, my sole responsibility was to coordinate the marketing initiatives of the company.

13.     At no time during my employment did I function as an officer of the company nor did I participate in the management decisions of the company.

14.     It is also true that, as the Complaint alleges at paragraph 31, I am a part owner of Gitto Global, but this ownership gives me no voting voice in or right to control Gitto Global.  Specifically, I own 110 shares of the Company (approximately 10%), but my acquisition of these shares was pursuant to a 1994 Voting Trust Agreement.  Under the Voting Trust Agreement, I have no voting rights or active voice in the running of Gitto Global.  A copy of the Voting Trust Agreement is attached hereto as Exhibit B, hereto.  A copy of the Stock Assignment whereby I transferred my 110 shares to my brother Gary as Trustee is attached as Exhibit C, hereto.

15.     I am not aware of any shareholder meetings that have ever taken place for Gitto Global and I certainly have not attended or even seen minutes for such meetings.

16.     In short, my involvement with the company was as an employee and was limited to the marketing sphere.  Since leaving Gitto Global in late 2003, I have not even been employed at Gitto Global.

4

17.    In the unlikely event the Plaintiffs recover a judgment against me for the amount of the interest payments I received (as set forth at paragraph 182 in the Complaint) of $37,623, I have sufficient assets to satisfy such a judgment.

18.    The attachment by trustee process entered by this Court has also affected my 70-year old mother, Barbara A. Gitto. Because I am a joint signer on her checking account at Fleet Bank, Fleet has frozen her account and she is unable to write checks or withdraw any money from her account with the bank. My mother has been divorced from my father, Charles N. Gitto, for nearly 20 years, is not the subject of any allegations in the Complaint, and has nothing to do with this matter.

Signed under the pains and penalties of perjury this 29 day of October, 2004.

Nancy Gitto-Panagiotes

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on 11/1/04 and 11/2/04

5

NGP0086

## Security Ledger

| Cert. No. | Security Holder Name | Type of Security | Date of Issuance | Basis of Issuance | Date of Disposition | Basis of Disposition | Outstanding | Number |
|---|---|---|---|---|---|---|---|---|
| 001 | Sumner Darman | Common Stock | 9/18/1992 | Original Issue | 9/18/1992 | Trans. to #4 | No | 550 |
| 002 | Peter L. Zimmerman | Common Stock | 9/18/1992 | Original Issue | 9/18/1992 | Trans. to #4 | No | 550 |
| 003 | Frank Miller | Common Stock | 9/18/1992 | Original Issue | | | Yes | 1,100 |
| 004 | Frank Miller | Common Stock | 9/18/1992 | Trans. from #1 and 2 | 9/18/1992 | Trans. to #5 | No | 1,100 |
| 005 | Gary C. Gitto | Common Stock | 9/18/1992 | Trans. from #4 | | Trans. to #6 | No | 1,100 |
| 006 | Nancy M. Gitto-Panagiotes | Common Stock | | Trans. from #5 | | Trans. to #8 | No | 110 |
| 007 | Gary C. Gitto | Common Stock | | Trans. from #5 | | | Yes | 990 |
| 008 | Gary C. Gitto, Trustee under Voting Trust Agreement dated _Nov_ 1994 | Common Stock | | Trans. from #6 | | | Yes | 110 |

**Total Outstanding Shares:**  2,200

Company Name:  Gitto Global Corporation
Report Date:  12/4/2001

1 of 1

Exhibit 15

ORIGINAL

VOLUME: I

PAGES: 1 to 134

EXHIBITS: 30 to 38


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Civil Action No. 05-CV-10268-DPW


LASALLE BUSINESS CREDIT,            )
LLC, f/k/a LASALLE BUSINESS         )
CREDIT, INC.,                       )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
CLINTON SAVINGS BANK,               )
            Defendant.              )


        DEPOSITION OF STEVEN P. CASH, called
as a witness on behalf of the Plaintiff,
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jeanette N. Maracas, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices
of Craig and Macauley, P.C., Federal Reserve
Plaza, 600 Atlantic Avenue, Boston,
Massachusetts, on Tuesday, September 13,
2005, commencing at 9:40 a.m.

1

2    APPEARANCES:

3

4

            SCHWARTZ, COOPER, GREENBERGER,

5    KRAUSS (by Eric S. Rein, Esq.), 180 N.

    LaSalle Street, Suite 2700, Chicago, Illinois

6    60601, for the Plaintiff.

    E-mail: Rrein@schwartzcooper.com

7

8

9            SEDER & CHANDLER (by Kevin C.

    McGee, Esq.), 339 Main Street, Worcester,

10    Mass. 01608, for the Defendant.

    E-mial: Kcmcgee@sederlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 48

1    Q.   Did you ask any questions about it of anyone?

2    A.   I had heard the practice, I guess, if

3         that's what you want to call it.  I had

4         heard from two parties that this was not an

5         unheard of practice in this business.

6    Q.   What two parties?

7    A.   One was a member of our board who's in the

8         plastics business.

9    Q.   Who is that?

10   A.   John Schmidt.

11   Q.   Who is the other?

12   A.   The other was the examiner of the FDIC.

13   Q.   You accepted this explanation as an

14        acceptable reason for the activity in the

15        account?

16   A.   Yes.  That didn't change our desire that

17        that activity stop.

18   Q.   Do you recall the next event, if you will,

19        in this dealing with the Kingsdale account

20        after January of 2004?

21   A.   No.  The dates are all and the time frames

22        are all jumbled up in my head.  I was going

23        to add one more thing regarding the process.

24        Now I've forgotten what that is.  I