**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

LASALLE BUSINESS CREDIT, LLC, f/k/a)
LASALLE BUSINESS CREDIT, INC.,    )
                                )
         Plaintiff,        )
                                )
                                )
      v.                  )     Case No. 04-12227-DPW
                                )
                                )
                                )
GARY C. GITTO, et al.,      )
                                )
         Defendants.    )
                                )

**LaSALLE BUSINESS CREDIT, LLC'S
REPLY MEMORANDUM IN SUPPORT OF
<u>ITS MOTION FOR SUMMARY JUDGMENT</u>**

Eric S. Rein                    Christopher J. Panos (BBO# 555273)
John L. Conlon             Richard A. Sugarman (BBO# 646791)
Bethany N. Schols          Craig and Macauley Professional Corporation
Schwartz Cooper Chartered     Federal Reserve Plaza
180 N. LaSalle Street, Suite 2700    600 Atlantic Avenue
Chicago, IL  60601           Boston, MA 02210
Ph:  (312) 346-1300         Ph:  (617) 367-9500
Fax: (312) 782-8416        Fax:  (617) 742-1788

*Attorneys for LaSalle Business Credit, LLC.*

Dated:  September 25, 2006

## INTRODUCTION

Defendants Gary C. Gitto ("Gary") and Charles N. Gitto, Jr. ("Charles") have filed responses in opposition to LaSalle's Motion for Summary Judgment.[1]  Neither one of them disputes that over a span of at least nine years fraud was endemic at Gitto Global.  Gary concedes that LaSalle "has produced considerable evidence that it was victimized by a fraud." (Gary Br. p. 8)  Fraud tainted every aspect of Gitto Global's operations, its sales, cash receipts, accounts receivable, inventory, and accounts payable.  Every day, numerous employees with responsibilities in those areas produced a flood of documents and computer entries involving millions of dollars to support the fraud.  Gary and Charles (together, the "Defendants") argue that they did not personally submit the false borrowing base certificates to LaSalle, or create the phony sales records, or misidentify the inventory or personally do any of the other acts through which the fraud was implemented.  LaSalle, however, has never claimed that Defendants personally did any of those things.  The fact that Defendants did not perform acts constituting the substantive violations does not exonerate them from liability.

The claims against Defendants are that they participated in a conspiracy to defraud LaSalle in which they knew about, promoted, and benefited from the fraud.  As Defendants acknowledge, a co-conspirator does not have to perform the acts constituting the substantive violation to be liable for the damages caused by the conspiracy.  As to their liability as co-conspirators, Defendants argue that LaSalle has not presented sufficient evidence to show that they, two reasonably intelligent businessmen, knew of the widespread fraud that took place around them every day or that they participated in it.  In making this argument, Defendants ask

---

[1] No response to LaSalle's Motion for Summary Judgment has been filed by Defendants  Frank Miller, Maria Miller, or Louis J. Pellegrine, Jr.

the Court to ignore undisputed deposition testimony because the witnesses supposedly are not credible and to accept that Defendants were duped into taking actions supportive of the conspiracy by their co-defendant, Frank Miller, when there is no evidence Frank Miller urged them to take those actions.

Summary judgment should not be denied on the non-movants' hopes that the testimony against them may not be believed by a jury.  As stated in the very decisions cited by Defendants in their Briefs, the non-movant must make some showing that there is contrary evidence.  When facts have been presented that show the non-movants to have been participants in a conspiracy, the non-movants cannot preclude summary judgment against them by proffering speculation about what others might have done to induce Defendants to do what they did.  There must be admissible evidence.  Defendants have not presented anything to counter the evidence showing their role as financial supporters and beneficiaries of the fraud conducted through Gitto Global.  On that basis, summary judgment should be entered against Defendants.

## I
## SUMMARY JUDGMENT SHOULD BE
## ENTERED ON COUNT I (CIVIL RICO CONSPIRACY)

LaSalle set forth the necessary elements for an individual to be found liable for participation in a civil RICO conspiracy at pages 9-10 of its initial Brief.  Defendants have not claimed that the elements as stated are inaccurate.  Both Defendants, however, include expositions on summary judgment, RICO, and conspiracy in their opposition briefs.  While many of their statements are correct, some are not.  Some of the incorrect statements are corrected by Defendants elsewhere in their briefs.  Ultimately, however, Defendants never dispute that a conspiracy existed to operate Gitto Global's affairs through a pattern of racketeering activity utilizing false borrowing base certificates that caused LaSalle to loan money to Gitto Global.  (Defs. Resps. Stmt. Facts ¶¶ 31-84; Gary Resp. Stmt. Facts p. 15: "The record on summary

judgment amply establishes that Frank Miller was adept at running a complicated, fraudulent scheme.")  Defendants' argument to avoid entry of summary judgment against them is that they did not know of or participate in that conspiracy.  (Gary Br. p. 8; Charles Br. pp. 13-14)  This defense is not consistent with the facts.

Charles acknowledges that LaSalle need only "show that a defendant agreed with one or more of the co-conspirators to participate in the conspiracy." (Charles Br. p. 13, *citing Aetna Casualty Surety Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994))  The agreement does not have to be formal and can be inferred from the facts.  *U.S. v. Medina-Martinez*, 396 F.3d 1, 5 (1st Cir. 2005); *U.S. v Echeverri*, 982 F.2d 675, 679 (1st Cir. 1993).  As to the intent required for a defendant to be found to have participated in a conspiracy, Charles recognizes "it suffices that he adopt the goal of furthering or facilitating the criminal endeavor," (Charles Br. p. 13, *citing U.S. v. Cianci*, 378 F.3d 71, 90 (1st Cir. 1990)).  Similarly, Gary recognizes that "[o]n a conspiracy theory, a defendant is liable for the acts of his co-conspirators, acting in furtherance and within the scope of the conspiracy, even if the defendant is not aware of the particular acts committed." (Gary Br. p. 4)

Defendants in their arguments overlook the fact that "even slight evidence" of a connection between the defendant and the conspiracy is sufficient to prove the defendant's intentional involvement in the conspiracy.  *U.S. v. Smith*, 726 F.2d 852, 866 (1st Cir. 1984).  In cases where defendants assert the Fifth Amendment, plaintiffs frequently rely on evidence of this nature.  And, only a single act intended to advance the ends of a conspiracy is sufficient to show participation in the conspiracy.  *U.S. v. Acevedo,* 842 F.2d 502, 506 (1st Cir. 1988).  *See also, U.S. v. Crowder*, 36 F.3d 691, 695 (7th Cir. 1994).

- 3-

Notwithstanding Defendants' arguments, the undisputed facts when viewed in favor of Defendants, call for the entry of summary judgment on Count I.

**Alleged Lack of Credibility of Witnesses**
**Cannot Be Basis for Denial of Summary Judgment**

Admissions by a defendant constitute strong evidence. LaSalle has cited the admissions made by Charles and Gary during two automobile trips to New Jersey in 2002 to meet with a possible purchaser of Gitto Global. Martin Miller, who accompanied Charles, Gary, and Frank Miller, Martin's brother, on the trips, testified that among the subjects discussed were Gitto Global's overstated accounts receivable, its inflated inventory, and the use of J&J Chemical in triangulation with Clinton Savings Bank to hide the overstated sales. (Pl. Stmt. Facts ¶¶ 104-5; Charles Counter Stmt. Facts ¶¶ 50-53) Defendants respond to this testimony by attacking Martin Miller's veracity and moving to strike his testimony as hearsay. (Charles Br. pp. 9-10, 15-16; Gary Br. pp. 10, 20-21)

Martin Miller's testimony is not hearsay.[2]  Martin Miller, in his testimony, relates discussions in which Defendants participated. The statements made by Defendants are admissions, and admissions are specifically excluded from the definition of hearsay. F.R. Ev. 801(d)(2)(A). Also, Defendants' statements are not hearsay because they were made in furtherance of the conspiracy. F.R. Ev. 801(d)(2)(E). Martin Miller's statements are admissible to place the Defendants' statements in their context. *U.S. v. Walter*, 434 F.3d 30, 34 (1st Cir. 2006); *U.S. v. McDowell*, 918 F.2d 1004, 1007 (1st Cir. 1990). Statements made by Martin Miller are admissible to place Gary's and Charles' admissions in context. *Noviello v.*

---

[2] The admissibility of Martin Miller's testimony is more fully addressed in LaSalle's accompanying response to Gary's Motion to Strike.

*City of Boston*, 398 F.3d 76, 85 (1st Cir. 2005).  Furthermore, the statements are admissible to show the Defendants' state of mind about operations at Gitto Global.  F.R. Ev. 803(3).

Defendants' attack on Martin Miller's veracity as a means of avoiding summary judgment is equally futile.  As Gary points out, "[d]uring the summary judgment phase of the proceedings, there is 'no room for credibility determinations…'." (Gary Br. p. 2, *citing Greenberg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)) *See also, Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990) ("Mere allegations and conclusory statements that a witness is not credible are insufficient to preclude summary judgment.*** Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Gary argues that a witness' credibility and the inferences that can be drawn from such testimony must always be determined through a trial.  (Gary Br. pp. 10-11)  Charles concurs, stating that Martin Miller's testimony would "more than likely not withstand cross-examination," and, therefore, summary judgment must be denied.  (Charles Br. p. 16)  That is simply not the law and to accept such an argument would effectively repeal summary judgment proceedings whenever it is sought on the basis of testimony.

A party opposing summary judgment "may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."  *Curl v. International Business Machine Corp.,* 517 F.2d 212, 214 (5th Cir. 1975) (internal quotations omitted).  Rather, he must point to some "*facts* which…refute the proof of the moving party in some *material* portion."  *Rinieri v. Scanlon,* 254 F. Supp. 469, 474 (S.D.N.Y. 1966)(*emphasis added*).  He must demonstrate that a real controversy exists.  *Curl,*

- 5-

517 F.2d at 213. *See also, Strickland v. Watt,* 453 F.2d 393, 394 (9th Cir. 1972) (affiant's alleged lack of credibility as a convicted felon is insufficient to preclude summary judgment). Defendants fully cross-examined Martin Miller at his deposition and did not shake his testimony. On that basis, his testimony should be accepted. *Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 718 (2d. Cir. 1943).

Finally, on this point, Defendants seek to make it appear that Martin Miller's testimony about the discussions during the two trips to New Jersey has been contradicted because his testimony about what occurred in the meetings that prompted the trips is supposedly contradicted by two participants, Messrs. Karfunkel and Elbaum. This argument must also be rejected. Martin Miller testified that Gitto Global's operating performance and financial improprieties were discussed at the meetings. (Charles Counter Stmt. Facts ¶ 53) Elbaum and Karfunkel did not deny that those subjects were discussed. Rather, they testified that, four years after the meetings, they did not recall discussions about those topics. (Charles Counter Stmt. Facts ¶ 56; Pl. Resp. Stmt. to Charles ¶ 56; Charles Counter Stmt. Facts ¶ 55; Pl. Resp. Stmt. to Charles ¶ 55) This is not a contradiction of Martin Miller, and does not create a real controversy. *Compare, McLendon v. Georgia Kaolin Co. Inc.,* 837 F. Supp. 1231 (M.D. Ga. 1993). Defendants have not presented any evidence to contradict his testimony, merely conjecture and unsupported allegations. Accordingly, Martin Miller's testimony is entitled to conclusive weight. *Corrugated Paper Prod., Inc. v. Longview Fibre Co.,* 868 F.2d 908, 914-15 (7th Cir. 1989).

Further, Martin Miller's testimony is also not the only testimony concerning Defendants' knowledge that Gitto Global was being used to defraud its lender. In March, 2002, Charles sought to have Dr. Alfred Arcidi help bail out Gitto Global. In his discussion with Dr. Arcidi,

- 6-

Charles told Dr. Arcidi that he did not want Gary to go to jail because of his use of borrowed funds for extravagant personal items.  (Pl. Stmt. Facts ¶ 136)  Charles contends that his comments to Dr. Arcidi have been taken out of context.  (Charles Br. p. 17; Charles Counter Stmt. Facts ¶ 46)

The testimony relied upon by LaSalle is not taken out of context.  Dr. Arcidi  clearly stated that Charles told him, "His son has been spending so much money … I'm not involved that much with the Company to see the financial and stuff … but that's what – I don't want my son to go to jail."  Charles further admitted to Arcidi "our assets are less than what we borrowed from the bank."  (Pl. Resp. Stmt. to Charles ¶ 46)  These statements show that Charles knew that Gary was engaged in criminal activities at Gitto Global.

Gary also seeks to preclude this testimony by arguing that it constitutes hearsay as to him. But, Charles' statements to Dr. Arcidi constitute statements by a co-conspirator in furtherance of a conspiracy and are admissible against Gary as well.[3]

Gary also argues that Dr. Arcidi's testimony "would be particularly unbelievable to a jury" for two reasons:  (i) Dr. Arcidi's testimony was "barely coherent," and (ii) on a prior occasion in which Dr. Arcidi sought a continuance in a case based on his medical condition, the trial judge did not believe him.  (Gary Br. p. 21)  Gary's arguments must be rejected.

First, the above testimony appears coherent.  Second, the fact that a state court trial judge did not believe Dr. Arcidi's testimony in a case cannot be given any weight.  Only admissible evidence can be considered in ruling on a motion for summary judgment.  *Noviello v. City of Boston,* 398 F.3d 76, 84 (1st Cir. 2005);  *Finn v. Consolidated Rail Corp.,* 782 F.2d 13, 16 (1st

---

[3] This issue is discussed in greater detail in LaSalle's response to Gary's Motion to Strike.

Cir. 1986). The finding in the state court case is precluded under Federal Rule of Evidence 608(b). *See e.g., U.S. v. Werbrouck,* 589 F.2d 273 (7th Cir. 1978).

**Defendants' Financial Support**
**Proves Their Participation in the Conspiracy**

Defendants do not dispute that they provided financial support for the fraud. Instead, they argue that their financial support was at the urging of Frank Miller and without knowledge that their funds were being used to support a fraud. (Gary Br. pp. 11-12)

Defendants' argument that they acted at the urging of Frank Miller must be rejected because there is no evidence of that having occurred. As Charles observes in his Brief, "The evidence illustrating the factual controversy cannot be conjectural or problematic. The non-movant must present substantial evidence that supports differing versions of the truth requiring resolution by a fact finder." (Gary Br. p. 10, *citing Mesick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). *See also, D'Amico v. The City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

**Other Evidence Confirming Gary's**
**Knowing Participation in the Conspiracy**

Gary's participation in the discussions of the fraudulent operations at Gitto Global during the two automobile trips in 2002 is not the only evidence of his knowing participation in the conspiracy.

(a)    Gary's Knowledge of the Inflated Sales and Inventory

Gary argues that he had no role in overstating Gitto Global's inventory or sales. (Gary Br. pp. 17-18) This argument is correct only to the extent that other individuals actually

implemented the inventory overstatement and fictitious sales. This does not relieve Gary of liability as a co-conspirator.

Gary does not dispute that as early as 1995, William Deakin, Gitto Global's controller, on three occasions told Gary that Gitto Global's inventory was inflated. (Pl. Stmt. Facts ¶ 116; Gary Resp. Stmt. Facts ¶ 116) Gary's response to this evidence is that Deakin, as a cooperating co-conspirator, is not credible and that when Gary met with Frank Miller after Deakin's complaints, Frank Miller probably "smoozed" Gary into believing nothing was amiss. (Gary Resp. Stmt. Facts ¶ 116) As set forth above, a claim that a witness is not credible is not sufficient to make the witness' testimony unacceptable for summary judgment. Also, Gary cannot rest upon speculation that Frank Miller might have told him some credible story when they met to discuss Deakin's complaints. There is simply no evidence Frank Miller ever deceived Gary about the inflated inventory or any of the other widespread illegal activities being conducted at Gitto Global.

It is also undisputed that in November, 2003, Deakin told Gary that the phony invoices had risen to $16.5 million and gave him a list of those invoices. (Pl. Stmt. Facts ¶ 116; Gary Resp. Stmt. Facts ¶ 116) In 2004, Gary specifically asked Janice Chaisson, Gitto Global's accounts receivable clerk, whether an invoice to Hitachi Cable was "one of those phony invoices." She told him it was and that she would take care of it. (*Id.*) Also, in 2004, Deakin sent Gary an e-mail that the "J&J checks have increased to $414,000 since 5/27/04 and each day it is climbing because more money is going out than coming in." (*Id.*)

Gary asks this Court to speculate that he did not receive the e-mail, or that if he did receive it, he did not read it, or that if he read it, he may not have understood it. (Gary Resp. Stmt. Facts ¶ 116) It is presumed that a properly addressed communication sent by reliable

means is received by the recipient. *Kennell v. Gates,* 215 F.3d 825, 829 (8th Cir. 2000). There is also no basis for speculating that Gary would not have read the e-mail or did not understand it, especially since J&J Chemical was discussed by Gary in the trips to New Jersey and in 2002, Gary made four wire transfers totaling $640,000 to the J&J Chemical account at Clinton Bank. (Pl. Stmt. Facts ¶ 64; Gary Resp. Stmt. Facts ¶ 64)

Gary cannot assume the posture of an ostrich, claiming his head was buried in other things and therefore he did not know what was going on around him. The inescapable picture from the undisputed evidence is that Gary knew, throughout the period of LaSalle's loans, that Gitto Global's sales and inventory were both being inflated. No legitimate argument can be made that Gary did not understand what Deakin told him. While Gary as the CEO and at least 40% owner of Gitto Global (Gary Resp. Stmt. Facts ¶ 114) did not dirty his hands by creating or personally directing others to prepare the false invoices and inventory, his consent to the conduct of the fraud at Gitto Global and his enjoyment of the funds generated by it is sufficient for him to be liable for LaSalle's loss due to the fraud.

(b)    Gary's Financial Assistance to the Conspiracy

Gary does not dispute that when the operation of the check-kite through Clinton Savings Bank was jeopardized on two occasions he came to the rescue. (Pl. Stmt. Facts ¶¶ 63-64, 67-70; Gary Resp. Stmt. Facts ¶¶ 67-70) In 2002, when Clinton Savings Bank suspended J&J Chemical's ability to draw on uncollected funds, Gary provided four payments totaling $640,000 (on May, 24, June 4, June 5, and November 13) that helped maintain the J&J Chemical account. (Pl. Stmt. Facts ¶ 64; Gary Resp. Stmt. Facts ¶ 64) Again, in July and August, 2004, when collateral was needed to keep the check-kite operating, Gary provided first a limited guaranty

and $500,000 and later an unlimited guaranty. (Pl. Stmt. Facts ¶¶ 70, 74; Gary Resp. Stmt. Facts ¶¶ 70, 74)

Gary's claims that while he authorized the wire totaling $640,000, Helen Kozak physically initiated the wire transfers at the direction of Frank Miller. (Gary Resp. Stmt. Facts ¶ 64) This is meaningless. As to why he was so generous with $1,140,000 and provided the unlimited guaranty for a company that had no legitimate business, Gary's only response is that any conclusion he took these actions for the check-kite to continue to operate is unsupported. (Gary Resp. Stmt. Facts ¶¶ 64, 74) What is unsupportable is any conclusion that Gary provided the $1,140,000 and the unlimited guaranty for any reason other than to abet the continued operation of the check-kite.

The financial rescues by Gary cannot be viewed in isolation. There is direct evidence through Martin Miller and Deakin that Gary knew full well that the J&J Chemical Account was not legitimate. There is also no logical explanation that can be drawn from the record for Gary to have provided the funds other than to support the check-kite. To even think that there could be some other reason would be to engage in the kind of fanciful speculation that cannot be raised to deny a properly supported motion for summary judgment.

(c)    Removal of Corporate Records

It is undisputed that when the check-kite collapsed, Gary told Helen Kozak to put Gitto Global records and Gary's personal papers into boxes. (Gary Resp. Stmt. Facts ¶ 144) Approximately 20 boxes of records were then delivered to Charles' home. (Pl. Stmt. Facts ¶¶ 145, 146) These boxes contained company records and no claim is made that Gary was authorized to take these records or had the records removed on the advice of his counsel. While Gary said he was taking the records for his attorney, it was not until two months later that his

attorney wrote to the Assistant U.S. Attorney that he had "certain documents" that Gary was prepared to produce if he receives act-or-production immunity.  (Stern Aff. Ex. 16)  The only reason Gary had for taking the records was to hide or remove incriminating information.  An innocent individual would have had no reason to take 20 boxes of documents.  While Gary, through his counsel, has offered to turn over "certain documents" to the government, there is no proof that Gary is prepared to turn over all of the Gitto Global documents he took.  Significantly, Gary has not returned any of the Gitto Global records to any representative of Gitto Global.

**Other Facts Showing**
**Charles' Participation in the Conspiracy**

Charles tries to cast his actions in support of the fraud as having been taken in  ignorance of what was really going on and  not with any intent to participate in the conspiracy.  However, he misstates the record trying to do so.  He says for a period of time he was not involved in the company and then he was only involved in conducting production meetings.  (Charles Br. p. 14) It is true that Charles' involvement was limited at one time, but that was not true after 2001 and clearly not when LaSalle extended financing in July, 2002.  Before then, Charles was busy trying to find investors, while knowing about Gitto Global's financial hole and the financial improprieties of his son.  Charles also tried to keep the prior lender, Guaranty Business Credit, at bay.  It is undisputed that Charles signed a letter dated May 24, 2002 that misrepresented the accounts receivable at Gitto Global by including fictitious customers.  Not only did he sign it, but Charles received a copy of the letter with the attached receivable aging. (Pl. Resp. Stmt. to Charles ¶ 35)

As to his financial support of the J&J Chemical Account, Charles tries to portray himself as an unknowing lender like LaSalle.  He asserts that he "had been called upon to support the company financially many times in the past."  (Charles Br. p. 15)  The "company" he refers to,

however, is Gitto Global—not J&J Chemical, a company that had no legitimate business and served only as a pillar in a check-kite to support the false borrowing base certificates. There is also no evidence that Charles had any motive for the assistance he provided the J&J Chemical Account except to enable the check-kite scheme to continue to support the RICO conspiracy. Charles' substantial assistance is uncontroverted.

### LaSalle Does Not Have to Prove Reasonable Reliance on the Borrowing Base Certificates

Gary, at various points in his brief, claims that summary judgment should be denied because there is a genuine issue of material fact as to whether LaSalle reasonably relied on the misrepresentations contained in the borrowing base certificates. (Gary Br. pp. 5, 6, 22-23) But, as Gary concedes in his brief, the First Circuit has expressly held that civil RICO does not require reasonable reliance. (Gary Br. p. 5, n. 6)

> But RICO bases its own brand of civil liability simply on the commission of specified criminal acts – here, criminal fraud – so long as they comprise a "pattern of racketeering activity"; and criminal fraud under the federal statute does not require "reliance" by anyone: it is enough that the defendant sought to deceive, whether or not he succeeded.

*Systems Management, Inc. v. Loiselle,* 303 F.3d 100, 104 (1st Cir. 2002). The Court went on to hold that "nothing more than the criminal violation and resulting harm is required...There is no good reason here to depart from RICO's literal language by importing a reliance requirement into RICO" *Id.* Gary's reliance argument, therefore, must be rejected.

### The Charging of Personal Items to the Defendant's Loan Accounts Is Not a Defense

Charles points out that Gitto Global documented personal expense payments to a loan account for Charles, Gary and Frank Miller as if to justify the money he received. (Charles Br. p. 7) But, the loan account was merely for recording purposes. The bookkeeper, Rita Bartlett, admitted that "what happened after that, I don't know." (Pl. Resp. Stmt. to Charles ¶ 43) Most

importantly, however, the fact that the payments were recorded did not make them legitimate. As Helen Kozak admitted, invoices for Gary and Charles were doctored to make their personal expenses appear to be business expenses for reimbursement purposes. (Pl. Stmt. Facts ¶ 120; Pl. Resp. Stmt. to Charles ¶ 44)

**Defendants Were Participants in the**
**Conspiracy Throughout the Period of LaSalle's Loan**

Gary maintains that LaSalle is arguing in the alternative that he first joined the conspiracy in late July 2004. (Gary Br. p. 24) That statement is incorrect. The conspiracy started in or around 1995. (Pl. Stmt. Facts ¶ 31) Gary was involved as early as 1997 when Direct Wood was organized. Direct Wood was used as the vehicle to clear old receivables from Gitto Global's books so that the receivables could be borrowed against. Direct Wood did submit invoices for payment and was merely used as a check-kite scheme. (Pl. Stmt. Facts ¶ 32) From 1998-2001, Gary signed 64 checks from Gitto Global to Direct Wood or Direct Chem that were deposited in Direct Wood's account at Fleet Bank. (Pl. Resp. Stmt. to Gary ¶ 10) The only purpose of those checks was as one leg of the check-kite.

Before LaSalle's involvement, Gary continued to participate in the conspiracy. In May and June 2002, he provided funds to capitalize J-Tan and J&J Chemical, two major vehicles used for the fraud. (Pl. Stmt. Facts ¶¶ 52, 64) Hence, Gary was a participant in Gitto Global's rampant fraud well before LaSalle became the lender. Charles, too, joined the conspiracy in 2001-2002, when he sought outside investors to keep his son out of jail and provided capital to J&J Chemical to enable it to carry out its check-kite scheme. The record is clear that by the time LaSalle provided the financing in July 2002, Charles and Gary were actively involved in the fraud.

- 14-

**Defendants Reaped**
**the Benefits of the Fraud**

Gary claims he did not benefit from the fraud because LaSalle ignores the "many hundreds of thousands of dollars" Gary contributed to Gitto Global. (Gary Br. p. 12)  Gary relies upon testimony by Kozak and Deakin that he loaned money to the company.  Other than Kozak stating "from time to time," there is no evidence as to when Gary purportedly contributed funds to Gitto Global.  Gary's other references to contributions are to funds given to J-Tan (which were repaid, except for $2,000) (Pl. Stmt. Facts ¶ 52) and to J&J Chemical.  These were not contributions to Gitto Global.

Craig Jalbert's testimony is about funds paid to or on behalf of Gary from July, 2002 through September, 2004.  (Rein Aff. Ex. 23)  Gary has offered no evidence to rebut the clear documentation of these payments during this time frame.  Evidence of Gary reaping the benefits of the fraud, therefore, is without question.

**LaSalle Has Been**
**Damaged in the Amount Claimed**

Gary seeks to set up an argument that LaSalle claims that he joined the conspiracy in July, 2004, when he provided collateral to allow the check-kite scheme to continue.  (Gary Br. p. 24)  He then maintains that any such damages based on that fact are akin to damages in a "deepening insolvency" case, in which the damages are the increased debt after the action of the tortfeasor.  Since Gitto Global had already reached its maximum loan amount by July, 2004, Gary argues he is not liable for any damages. (*Id.*)

LaSalle has never taken the position that Gary first joined the conspiracy in July, 2004 or pursued any deepening insolvency claim.  As noted earlier, Gary joined the conspiracy as early as 1997-1998.  He was actively involved in 2001-2002, before LaSalle provided financing, by providing capital to J&J Chemical and seeking out potential investors.  He also knew of and

- 15-

executed documents in 2003 to misrepresent Gitto Global's ownership of inventory to boost its borrowing base capabilities. (Pl. Stmt. Facts ¶ 108) As such, LaSalle is entitled to recover the full extent of damages suffered by the fraudulent conduct.

Finally, Gary questions the amount owed LaSalle, claiming that LaSalle has not accounted for funds received in the Gitto Global bankruptcy. As Joseph Costanza's supplemental affidavit clearly shows, the proceeds from the sale of Gitto Global's assets were applied to the loan balance and no funds were received from the sale of the Vitrolite product. The amount owed to LaSalle is net of the sale proceeds. (Rein Aff. ¶ 5)

## II
## SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST THE DEFENDANTS ON COUNT II (CHECK-KITING CONSPIRACY TO DEFRAUD)

Count II is LaSalle's alternative claim for participation in a conspiracy to conduct the check-kite through the J&J Chemical Account at Clinton Savings Bank that made Gitto Global's fictitious sales appear genuine. Defendants do not dispute that the check-kite occurred and that when the check-kite collapsed, LaSalle wound up with $11,890,588 in dishonored J&J Chemical checks on which LaSalle had made advances to Gitto Global. (Pl. Stmt. Facts ¶¶ 35-41, 74; Defs Resps. ¶¶ 35-41) As with the RICO conspiracy, Defendants assert that the check-kite account "was managed exclusively by Frank Miller" and they did not know of or participate in the check-kite. (Charles Br. pp. 17-18; Gary Br. pp. 5-6) The same general legal requirements for proof of participation in a civil RICO conspiracy are applicable to proof of participation in a check-kiting conspiracy. Thus, LaSalle does not have to show that Defendants prepared or personally directed the preparation of the checks used to implement the check-kite. LaSalle need only show that Defendants knew of the check-kite and took affirmative steps to help it succeed. (Gary Br. pp. 5-6) As with the RICO conspiracy, the undisputed facts point only to the Defendants' liability.

- 16-

Each day, for over three years, numerous J&J Chemical checks and Gitto Global checks for corresponding amounts were prepared at Gitto Global by various employees. (Pl. Stmt. Facts ¶¶ 38-39; Defs. Resps. ¶¶ 38-39) By December 1, 2003, these checks totaled $2-$3 million a day, and by July, 2004, $8.4 million. (Pl. Stmt. Facts ¶ 65; Defs. Resps. ¶ 65) Charles claims the evidence shows he "had no involvement whatsoever with the J&J Chemical Account …" and had no knowledge of what it was being used for. (Charles Br. p. 18) This is not true.

Charles loaned $1.5 million to Gary and Frank Miller to get the J & J Chemical Account started. (Pl. Stmt. Facts ¶ 35) Charles discussed the inflation of Gitto Global's sales figures and the use of the J&J Chemical Account during his two trips to New Jersey. When the operation of the J&J Chemical Account was impaired in 2002, Charles supplied $300,000 through two wire transfers (the first on June 4, 2002, and the other two days later). (Pl. Stmt. Facts ¶ 64) Then, in July, 2004, Charles again came to the rescue of the account by providing a limited non-resource guaranty and security from Tradex Corporation to Clinton Savings Bank. (Pl. Stmt. Facts ¶ 72) Finally, in August 2004, Charles gave Clinton Savings Bank an unlimited guaranty for the account. (Pl. Stmt. Facts ¶¶ 73-74) Charles at times may have been "'fanciful,' 'whimsical,' and 'confused,'" as he claims in his Brief (p. 18), but that does not mean he was incompetent. J&J Chemical was an empty shell (Gitto Global being its source of funds). (Pl. Stmt. Facts ¶ 36) No rational explanation exists for Charles providing the money, security and guarantees to a company whose only function was to serve a check-kite—except to promote the check-kite.

Charles' other arguments are similarly without merit. The fact that he was away from Gitto Global for a period of time does not indicate that he did not know about the use of the J&J Chemical Account during the years 2001-2004 when he had returned to the company. (Charles Counter Stmt. Facts ¶ 2) Internal disputes with Gary over Charles' ability to take company

money merely represent disagreements between co-conspirators over the use of the money they obtained. It does not mean that they did not have a unity of purpose in using a check-kiting scheme to defraud LaSalle.

As outlined in the preceding section, Gary's role with the J&J Chemical Account was similar to that of Charles. Gary helped to set it up, had discussions about it during the two trips to New Jersey, was informed about the increasing amounts flowing through the account by Deakin, and provided financial assistance when needed. For all of this, as with Charles, the only conclusion that can be drawn from the facts is that Gary participated in the check-kite conspiracy.

**Reasonable Reliance Is Not**
<u>**an Element of a Check-Kite Conspiracy**</u>

Gary, in his Brief, addresses LaSalle's check-kite conspiracy (Count II) and civil conspiracy under Massachusetts law (Count IV) claims together as having no apparent difference. (Gary Br. p. 5, n. 7) In this section of his Brief, Gary argues that for LaSalle to prove it was damaged by fraud, it must show "a member of the conspiracy made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." (Gary Br. p. 6, *citing Eureka Broadband Corp. v. Wentworth, Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005), *quoting Russell v. Cooley Dickinson Hosp.*, 437 Mass. 443 (2002)) Neither *Eureka* nor *Russell* involved a check-kite. Both involved a claim of fraudulent misrepresentation. *Eureka*, 400 F.3d at 67; *Russell*, 437 Mass. at 458. Gary does not provide any explanation as to why a requirement for representational fraud is applicable to a check-kite.

Reasonable reliance is not an element of a check-kite claim. "Check-kiting" is the practice of opening one or more accounts in several banks with checks being drawn on the respective accounts and deposited in the other account when neither account has any substantial funds. *Mid-Cal Nat'l Bank v. Federal Reserve Bank*, 590 F.2d 761, 762 (9th Cir. 1979). Taking advantage of the delay in the check collection process, checks are exchanged daily between these accounts, which continually show credits of "uncollected funds." While a check might be deemed a representation by the drawer that he has good funds in the account upon which the checks are drawn, that is not the essence of a check-kite. The fraud depends on the practice of banks honoring checks drawn upon uncollected funds and the few days it takes to collect those funds. Check-kites do not involve fraudulent misrepresentations of the nature addressed by *Eureka* and *Russell*.

### III
### SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST GARY GITTO ON COUNT III (DECEPTIVE TRADE PRACTICES)

Gary's only argument against summary judgment on this Count under the Massachusetts Deceptive Trade Practices Act, Mass. G. L. c. 93A, is that there is a genuine issue of material fact whether LaSalle's reliance on the misrepresentations from Gitto Global was reasonable. (Gary Br. pp. 7, 22-23) However, reasonable reliance is not a required element for recovery under the Act. *International Fidelity Insur. Co. v. Wilson,* 387 Mass. 841, 850, 443 N.E.2d 1308-1314 (1983). LaSalle is only required to show a causal connection between the deception and the loss, and that the loss was foreseeable as a result of the deception. *Id.* at 850, 443 N.E.2d at 1314.

LaSalle has satisfied its burden, through testimony, evidence, and even the admissions of Gary in his brief. Gary does not dispute that "[i]n order to receive advances of funds pursuant to the Loan Agreement,…Gitto Global delivered daily borrowing base certificates to LaSalle,

- 19-

together with Gitto Global's sales, cash receipts, credit memo journals, and inventory valuation."
(Pl. Stmt. Facts ¶ 20; Gary Resp. Stmt. Facts ¶ 20)  Nor does he dispute that LaSalle, in reliance
upon the false information contained in the borrowing base certificates, advanced funds to Gitto
Global in accordance with the Loan Agreement and the LaSalle revolving loan.  (Pl. Stmt. Facts
¶ 26; Gary Resp. Stmt. Facts ¶ 26)  As such, there is no genuine issue of material fact remaining
and summary judgment should be granted.

**IV**
**SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST**
**<u>DEFENDANTS ON COUNT IV (CONSPIRACY TO DEFRAUD)</u>**

Charles claims LaSalle has failed to show he knowingly substantially assisted in the fraud
plan because Charles (i) did not make representations to LaSalle to induce it to initiate the line of
credit, (ii) was not involved in preparing financial statements or borrowing base certificates
provided to LaSalle, or (iii) knowingly participated in the scheme to defraud.  (Charles. Br. pp.
19-20)

The legal authority on which Charles relies is inapplicable because his cases pertain to a
form of civil conspiracy requiring coercion.  Here, LaSalle is alleging a different type of civil
conspiracy that requires proof of a common plan to commit a tortious act or give substantial
assistance and encouragement to each other's tortious conduct.  *See, Aetna Cas. Ins. Co.,* 43 F.3d
at 1564.  Charles does not challenge the existence of this conspiracy.  Under this cause of action,
liability extends to those "who merely assisted in or encouraged the tortious act."  *Ellis v.
Varney*, 2003 Mass. Super. Lexis 479, *154 (Mass. Sup. Ct. 2004).  Knowledge of the
conspiracy may come from a tacit understanding or be inferred from the conduct of the parties.
*Id.*  As the *Ellis* court pointed out:

> The tortious conduct of the defendant, of itself, does not have to
> cause or even be a substantial factor in causing the plaintiff's
> injury.  *Payton v. Abbott Labs*, 512 F. Supp. 1031, 1035 (D. Mass.

> 1981). Liability attaches whether the conspirator's role was large or comparatively small, and whether the conspirator is involved from the beginning or lends aid well after the conspiracy is under way. *Potter Press v. C.W. Potter, Inc.*, 303 Mass. 485, 492, 22 N.E.2d 68 (1939). "Each conspirator is liable for the acts of the others in pursuance of the conspiracy by which the wrong was finally accomplished." *General Mortgage & Loan Corp. v. Guaranty Mortgage & Securities Corp.*, 264 Mass. 253, 260, 162 N.E. 319 (1928).

*Id*. at *154-155

Charles substantially assisted and encouraged the fraud. He knew about the financial wrongdoing as evidenced by his participation in the discussion of the fraud during the automobile trips to New Jersey in 2002 and his statement to Dr. Arcidi. He substantially assisted the fraud by initially capitalizing J&J Chemical in 2001, providing additional funds in 2002 and encouraging Clinton Savings Bank to allow the check-kite scheme to continue to operate by pledging collateral and his guarantee in 2004. Through his financial support, Charles allowed the fraud to prosper and he is, therefore, liable as a co-conspirator under Count IV. Likewise, Gary's role in substantially assisting the fraud has been delineated several times in this Brief and proof of his liability as a co-conspirator is equally free from doubt.

## V
## THE SUMMARY JUDGMENT PROCEEDINGS SHOULD BE NOT BE DEFERRED

The Court in 2004 denied Gary's motion to stay further proceedings because he is the subject of a pending criminal investigation. Gary once again seeks to have these proceedings stayed. (Gary Br. pp. 24-26) His present request should also be denied.

Gary argues that LaSalle is seeking to exploit his invocation of the Fifth Amendment. He cites a number of cases in which it was held that invocation of the Fifth Amendment is ordinarily insufficient to support summary judgment in the absence of other probative evidence. LaSalle does not ask the Court to draw any inference against Gary in favor of LaSalle from Gary's

invocation of the Fifth Amendment.  LaSalle's motion for summary judgment rests upon the uncontradicted evidence and nothing else.

The primary case relied upon by Gary is *Sampson v. City of Schenectady*, 160 F. Supp. 2d 336 (N.D.N.Y. 2001).  This case is not remotely similar to *Sampson*.  In *Sampson*, the plaintiff sought to have the court treat the defendant's invocation of the Fifth Amendment as an admission of the plaintiff's version of the events involved in the case.  160 F. Supp. 2d at 351. The court refused to do this.  (*Id.*)  Most importantly, the court denied the plaintiff's motion for summary judgment as premature to permit the defendant to give his version of the events in a deposition.  The court expected that the deposition would take place very soon because the defendant had said he would testify when his criminal case was finished and his criminal case was "recently concluded."  (*Id.*)

In support of his request, Gary presents an affidavit from his counsel that the Assistant U.S. Attorney has informed him she expects the grand jury investigation to "be completed some time in the fall of this year."  (Stern Aff. ¶ 2)  If, in the unlikely event Gary is not indicted[4], Gary's counsel continues, "I expect that he will be in a position…to give testimony" in this matter.  (*Id.*)  If, however, Gary is indicted, "then I expect that he will similarly be in a position to give testimony after trial proceedings are concluded."  (*Id.*)  In either case, all that is presented is what counsel would "expect"—a nice term for pure speculation.  In reality, Gary is seeking to

---

[4] There are good reasons for believing that Gary will be among the defendants when an indictment is returned with respect to the RICO and fraud violations at Gitto Global.  In addition to the facts presented in support of LaSalle's present motion for summary judgment, Gary has presented a letter to his counsel sent to the Assistant U.S. Attorney in November, 2004, in which Gary offered to produce "certain documents" if he received act-of-production immunity for their production.  (Stern Aff. Ex. 16)  Although the Assistant U.S. Attorney expressed an interest in the documents, Gary's offer has not been accepted.  This is indicative of the government's interest in Gary as a defendant.

have the ruling on the motion for summary judgment deferred until some time years from now. (Gary Br. p. 25)  That should not be done.

While the Assistant U.S. Attorney reportedly expects the investigation to be completed this fall, it may not be.  But if Gary is indicted this year, there is no telling how long the pre-trial, trial and appellate proceedings may take – it could be years.  And, as Gary's counsel asserts, Gary would not be in a position to testify until "after the trial proceedings are concluded."  (Stern Aff. ¶ 2)

Also, the grand jury is not under any pressure to return an indictment against Gary this fall.  The statue of limitations for a violation of the Racketeering Influenced Corrupt Organizations Act affecting a financial institution is ten years.  18 U.S.C. §3293.  Thus, Gary is subject to prosecution until 2014.  Even if Gary is able to avoid being named a defendant in any indictment returned this year, that does not preclude the government from later seeking an indictment against him.  It is doubtful that Gary would choose to testify knowing he is still subject to prosecution.

Gary has no "constitutional right to a stay simply because a parallel criminal proceeding is in the works."  *Microfinancial, Inc. v. Premier Holidays, International, Inc.* 385 F.3d 72, 77-78 (1st Cir. 2004).  Discovery in this case proceeded, and is now complete.  Numerous depositions have been taken, during which Gary, as well as the other defendants, have had a full opportunity to examine each deponent.  After the close of discovery, LaSalle brought its motion for summary judgment based upon the evidence and testimony elicited during discovery.  As previously fully argued in LaSalle's opposition to the motion to stay[5], there are seven factors

---

[5] LaSalle Business Credit, LLC's Response in Opposition to the Motions of Defendants Gary C. Gitto, Kathleen M. Carland, William Deakin and Janice Chaisson to Stay Further Proceedings.

bearing on whether a stay should be granted.  *Id.* None of those factors support Gary's request for this Court to defer ruling on the motion for summary judgment.  Accordingly, Gary's motion in the alternative to defer the court's ruling should be denied, as it was denied earlier.

## VI
## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of LaSalle and against the Defendants.

Dated:  September 25, 2006                    Respectfully submitted,

                                                  LASALLE BUSINESS CREDIT, LLC


                                                  By:  _____/s/ Richard A. Sugarman_____
                                                       One of its attorneys

Christopher J. Panos (BBO #555273)
Richard A. Sugarman (BBO #646791)
Craig and MacCauley P.C.
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone:  (617) 367-9500
Fax:  (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper Chartered
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

<u>Certificate of Service</u>

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 25, 2006.

                          <u>/s/ Richard A. Sugarman      </u>

*385674.1 042314-34311*