Page 1

# ORIGINAL

VOLUME:  I

PAGES:  1 - 42

EXHIBITS:  2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA NO. 04-12227-DPW

*  *  *  *  *  *  *  *  *  *

LASALLE BUSINESS CREDIT, LLC,

        Plaintiff,

vs.

GARY C. GITTO, ET AL,

        Defendants.

*  *  *  *  *  *  *  *  *  *

THE DEPOSITION OF DR. ALFRED L.
ARCIDI, called on behalf of the Plaintiff,
pursuant to the Massachusetts Rules of Civil
Procedure, before Aida Correia, Court
Reporter and Notary Public within and for
the Commonwealth of Massachusetts, at Craig
& Macauley, The Federal Reserve Building,
600 Atlantic Avenue, Boston, Massachusetts,
commencing at 2:20 p.m. on Thursday,
May 19, 2005.

1     now described in connection with discussions

2     about you investing money in Gitto/Global?

3  A.  After that all, he called me.

4  Q.  Okay.

5  A.  And he says, I got the dough from a bank in

6     Holland.  I says, Jesus, Thank God, and that

7     was it.  I didn't know anymore after that.

8  Q.  Did you have any telephone calls with

9     Charlie about discussing the investment?

10  A.  No.  Never.

11  Q.  Did you ever have a telephone call when you

12     said to Charlie, how could a bank in Texas

13     loan you 25 million when you only have

14     8 million in assets?

15  A.  This is what I was told afterwards.

16  Q.  Told afterwards by who?

17  A.  Actually, basically -- can I tell you?

18     Charlie kind of mentioned that to me.  He

19     didn't say 8, but he said his son had been

20     spending so much money and Miller and doing

21     this.  And he says, I'm not involved that

22     much with the company to see the financial

23     and stuff, and he says -- but that's what --

24     I don't want my son to go to jail.

1  Q.  Okay.

2  A.  So that's what he said.  He said, our assets

3      are less than what we borrowed from the

4      bank.

5  Q.  When did he say that to you?

6  A.  He said that to me when he come to me and he

7      says, I need your help.  I will give you a

8      partnership and all that.

9  Q.  That was before the meeting with Gary and

10     Frank?

11 A.  Yes.

12 Q.  That was in a telephone conversation?

13 A.  I can't honestly tell you.  I don't know.  I

14     don't remember.  But it was prior to that

15     where he told me, geez, he says, my kid.  I

16     guess -- he told me -- I didn't know this.

17     I guess he used to lease Bentleys and buy

18     these cars and -- I don't know.  I don't

19     even know if -- Charlie used to be kind of

20     upset about it to be honest with you.  I

21     felt bad for him.

22 Q.  So Charlie came to you initially saying --

23 A.  Like he just found out.

24 Q.  And I don't know how this bank could be

# ORIGINAL

VOLUME:      I
PAGES:    1-153
EXHIBITS:  1-11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. 04-12227-DPW

|  |  |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a LASALLE BUSINESS CREDIT, INC., Plaintiff, | ) ) ) ) ) ) |
| vs. | ) ) |
| GARY C. GITTO, ET AL., Defendants, | ) ) ) |
| AND | ) ) |
| FLEET NATIONAL BANK, ET AL., Trustee Process Defendants, | ) ) ) ) |
| AND | ) ) |
| FIDELITY INVESTMENTS, INC., ET AL., Reach-and-Apply Defendants. | ) ) ) ) |

DEPOSITION OF RITA BARTLETT, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the Federal
Rules of Civil Procedure, before Jill
Shepherd, Registered Professional Reporter
and Notary Public, in and for the
Commonwealth of Massachusetts, at the offices
of Craig & Macauley, 600 Atlantic Avenue,
Boston, Massachusetts, on Tuesday,
February 28, 2006, commencing at 9:30 a.m.

Page 23

1    A.   Same thing.

2    Q.   His house?

3    A.   In the -- yeah, the house.  Anything done at

4         the house, yeah.

5    Q.   Anything else?

6    A.   I was -- I had just a -- I just had a train

7         of thought and I might have lost it.  In the

8         beginning, I used to send the credit cards --

9         I used to take photos of their part of the

10        credit card and send them upstairs to be

11        okayed.  They would send them back to me

12        okayed and I knew it was okay to pay them.

13   Q.   But that process changed?

14   A.   Yeah.  Just, after a while, I just -- things

15        changed and I put everything to the loan

16        account that was personal.  They were going

17        to okay them anyway, so that's what I did.

18   Q.   What do you mean "the loan account"?

19   A.   They each had a loan accountant.  Charlie,

20        Gary and Frank all had a loan account.

21        Anything personal we used to charge it to the

22        loan account.  What happened after that, I

23        don't know.  That's what I did.

24   Q.   How was the loan accountant identified on the

Page 1

WALTER CARLSON
August 23, 2005

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    LASALLE BUSINESS

 5    CREDIT, LLC, f/k/a

 6    LASALLE BUSINESS

 7    CREDIT, INC,                    ORIGINAL

 8                    Plaintiff,

 9       vs.                      Case No. 04-12227-DPW

10    GARY GITTO, ET AL,

11                    Defendants.

12    _____

13

14

15       The Deposition of WALTER CARLSON,

16       Taken at 28400 Northwestern Highway, Suite 200,

17       Southfield, Michigan,

18       Commencing at 10:30 a.m.,

19       Tuesday, August 23, 2005,

20       Before Vincent F. Quaglia, CSR-4114, RPR.

21

22

23

24

25
```



Page 21

WALTER CARLSON
August 23, 2005

1        Do you recognize this document?

2    A.   These are my notes.

3    Q.   Is there a specific date?

4    A.   May 18th, '03.

5    Q.   And in what connection did you make these notes?

6    A.   These were notes of a meeting with Charlie Gitto and

7         Frank Miller.  It doesn't list on here who from our

8         office attended the meeting, but I would guess it

9         would have been Jess Booth, Glenn Easterbrook and

10        Steve Merry.

11   Q.   And you?

12   A.   And me.  I took the notes.

13   Q.   Do you recall what was discussed at the meeting?

14   A.   What is recorded in the notes were all the various

15        possibilities of selling product to them, how their

16        LaSalle bank loans worked.

17             This is post the refusal to do the asset

18        purchase offer, so we were looking for some other way

19        to possibly acquire the company.

20   Q.   Why did, at this point, Hi-Tech want to acquire the

21        company?

22   A.   As I previously discussed, we had been advised by

23        Steve Merry that Hi-Tech, to accelerate its growth in

24        the specialty processing or process additive industry,

25        we needed both national distribution, which is what



WALTER CARLSON
August 23, 2005

```
 1            the Seegott acquisition was to give us, and we were

 2            actively involved in the Seegott acquisition which was

 3            a $130 million dollar company, and we also needed to

 4            acquire a specialty compounder that would be

 5            substantially benefited by the use of our material.

 6                       And based upon Frank Miller's discussions

 7            earlier in the year with Jess, Glenn, Steve, whoever,

 8            he was excited about what Vitrolite did for their

 9            products, and they had formulated Vitrolite into 40 or

10            50 of their formulations, if I recall that number

11            correctly.

12   Q.       Where did this May 18th, 2003 meeting take place?

13   A.       Had to be in California, because I never went to

14            Massachusetts and never met them any place other than

15            our office, except for one dinner meeting.

16   Q.       What, if anything, was discussed concerning the entry

17            collateral gap?

18   A.       I think the only connection I could even conceive of

19            why that term would have been used, if you go later

20            into the notes when it discusses the terms of

21            LaSalle's loan document, which is on page 8, the top

22            of page 8, it says -- which is your 1881 page, talks

23            about the maximum portion of the $27 million dollar

24            line of credit that can be utilized for inventory is

25            $6 million dollars based upon 65 percent of inventory,
```



WALTER CARLSON
August 23, 2005

```
 1            which would have meant they could have used up to a

 2            maximum $9,230,769 times 65 percent to get to the $6

 3            million dollar maximum borrowing against the inventory

 4            on this asset-based lending line.

 5                      It was represented at that time that their

 6            inventory level was $6.2 million dollars, so there was

 7            a collateral gap there of $3 million dollars.

 8                      If they had additional inventory, they

 9            should be able to borrow then approximately an

10            additional $2 million dollars.  I believe that's the

11            context of collateral gap.

12     Q.     And who was furnishing this information at the

13            meeting?

14     A.     They were reporting these numbers to me, and I was

15            writing these down.

16     Q.     They being who?

17     A.     I believe it was Frank Miller.  Charlie does not have

18            a grasp of the specifics of the day-to-day business.

19     Q.     And was there any discussion as to how this gap

20            occurred, or why this gap occurred?

21     A.     No.  The point was they did not have inventory greater

22            than $6 million dollars, so they were not able to

23            utilize their full $27 million dollar line.  They

24            wanted to acquire additional inventory and thereby be

25            able to borrow additional monies against their
```



Page 24

WALTER CARLSON
August 23, 2005

1            asset-based line.

2    Q.    Underneath on the first page where there's a line from

3          collateral gap, it goes to $12.6 million dollar

4          inventory.  What did that pertain to?

5    A.    That was the amount of inventory they were to purchase

6          from us.  That was $12.6 million dollars of inventory,

7          $4.25 a pound was the price that was discussed in that

8          meeting.

9    Q.    Is that a lot of inventory?

10   A.    Three million pounds of inventory is three million

11         pounds of inventory.  For them it was certainly a lot

12         of material.

13   Q.    Did they say why they needed to purchase $12.6 million

14         dollars in inventory?

15   A.    No.  No specifics as to why they wanted to buy that

16         amount.

17               I believe that, if you followed through the

18         other side of the transaction, and that is when the

19         transaction was finally done with the four separate

20         sales in June, July, August and September to them,

21         four separate notes were created, and they were

22         convertible notes.

23               They did not have to pay for the inventory,

24         and Hi-Tech at that time had the right to convert

25         those notes into -- up to as much as sixty percent of



WALTER CARLSON
August 23, 2005

1           the stock of the company:  On the other side of it, if

2           we didn't convert it, they would pay for that material

3           over some period of time.

4    Q.    Did you understand that, by purchasing this inventory,

5           it allowed Gitto Global to borrow additional funds

6           under the LaSalle line?

7    A.    Absolutely.  That's what page 8 is all about.  They

8           had $6 million dollars in inventory, they only needed

9           to expand it by $3 million dollars.

10                  They were talking about buying $12 million

11          dollars of inventory.  They believed that they had

12          substantial market opportunities with existing

13          customers and new opportunities to do work in the

14          halogen wire area and the flame retardant battery

15          compounding area for Exide Global Battery I think it's

16          called.

17                  There's two, three other European battery

18          manufacturers they were dramatically trying to

19          increase their business with, and for them to

20          penetrate those markets they wanted our material.

21   Q.    Do you have an opinion as to how long it would take to

22          use that amount of inventory?

23   A.    If in fact it was added at the rate of a half percent,

24          they would use -- of their existing business, and they

25          were selling approximately 50 million pounds of



Page 1

# ORIGINAL

VOLUME:  I
PAGES:  1 - 138
EXHIBITS:  Per index

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

Case No. 04-12227-DPW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LASALLE BUSINESS CREDIT, LLC          )
f/k/a LASALLE BUSINESS CREDIT,        )
INC.,                                 )
  Plaintiff                         )
              )
vs.                                   )
              )
              )
GARY C. GITTO, et al.,                )
  Defendants                       )
              )
    and                      )
              )
FLEET NATIONAL BANK, et al.,          )
  Trustee Process Defendants,      )
              )
    and                      )
              )
FIDELITY INVESTMENTS, INC., et al., )
  Reach-and-Apply Defendants.      )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF JANICE M. CHAISSON
JANUARY 12, 2006
TEN O'CLOCK A.M.



G&M Court Reporters, Ltd.
800-655-3663 - www.gmcourtreporters.com

1    if it was a real invoice or not.  If we were

2    going over the aging or something to that

3    effect.

4 Q.  What about Mr. Cale?

5 A.  No.

6 Q.  You didn't discuss with Mr. Cale?

7 A.  No.

8 Q.  What about Mr. Bower?

9 A.  No.

10 Q.  All right.  Any of the outside sales

11    representatives, did you have discussions

12    with them about it?

13 A.  No.

14 Q.  Now, these spreadsheets and reports that you

15    discussed that showed this phoney

16    information, those went to Frank Miller and

17    William Deakin; is that right?

18 A.  Yes.

19 Q.  And they were accessible, also, some of

20    them, by Maria Miller, you've told us?

21 A.  Yes.

22 Q.  You never circulated any of those to Gary

23    Gitto; did you?

24 A.  No.

1    Q.  And Charlie Gitto; did you circulate those

2        to Charlie Gitto?

3    A.  Not the spreadsheets.

4    Q.  All right.

5    A.  Like the aging --

6    Q.  Yes.

7    A.  -- he might have asked for a copy of that

8        that I would give him.

9    Q.  Do you have a memory of giving him an

10       aging?

11   A.  Yes.

12   Q.  When was that?

13   A.  Might have been -- within the last year of

14       business.

15   Q.  But before that, do you have a memory of

16       giving him an aging?

17   A.  No.

18   Q.  You never gave an aging to Gary Gitto,

19       though; right?

20   A.  I never did, no.

21   Q.  And you never gave a spreadsheet to Gary

22       Gitto?

23   A.  No.

24   Q.  And there was a sheet that showed a list of

1

```
1

2     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
3     Case No: 04-12227-DPW
      -------------------------------------------X
4     LASALLE BUSINESS CREDIT, LL. f/k/a LASALLE
      BUSINESS CREDIT, INC.,

5
                                     PLAINTIFF,
6
                    v.
7
      GARY C. GITTO, et al.,
8
                                     DEFENDANT,
9
                    -and-
10
      FLEET NATIONAL BANK, et al.,
11
                          TRUSTEE PROCESS DEFENDANTS,
12
                    -and-
13
      DIRECT WOOD & PAPER PRODUCTS, et al.,
14
                          REACH AND APPLY DEFENDANTS.
15    -------------------------------------------X

16                        DATE: November 8, 2005

17                        TIME: 11:29 a.m.

18

19            EXAMINATION BEFORE TRIAL of the

20    NON-PARTY WITNESS, STEVEN S. ELBAUM, taken by the

21    Respective Parties, pursuant to a Subpoena, held at

22    the offices of BECKER LAW, One Penn Plaza, New

23    York, New York, before a Notary Public of the State

24    of New York.

25
```

1                       S. ELBAUM

2     company has to reconstruct its profit and loss

3     statement and do addbacks or takeouts, which are

4     sometimes not uncommon in family-held businesses,

5     but nonetheless it creates some concern as to what

6     the true economic performance of the business is.

7                     I don't know whether that's responsive

8     to your question but that was my attitude. So I

9     -continued to have a, I would say, a declining level

10    of interest in the business. My interest hadn't

11    been eliminated but some of these issues of quality

12    of financial information, the intricacies of the

13    ownership and what appeared to surface as maybe

14    different goals that some of these owners had.

15                    Charles Gitto was the oldest of the

16    three, and I think he had retired from the business

17    and perhaps was looking for total noninvolvement in

18    the business, and the others were younger and had

19    continued to be involved in the business and I

20    think it's --

21                    MR. STERN: Can you get a little closer

22          to the speaker, please.

23    A.        (Continuing) And I think at some point,

24    and again this borders on on really vague

25    recollection, someone, I think Frank Miller,

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1                         S. ELBAUM

2       indicated that he was having financial problems and

3       that combined with some of the quality issues

4       connected with the financials that I saw and the

5       intricacies connected with them just continued to

6       lower my level of interest in the business.  It

7       didn't eliminate it but it lowered my level of

8       interest.

9            Q.     Did you have any discussion with

10      Charles Gitto concerning the quality of the

11      financial information?

12           A.     No, I don't believe so.

13           Q.     Did you have any discussion with Gary

14      Gitto concerning the quality of the financial

15      information?

16           A.     I don't believe so.

17           Q.     Did you have any discussion with Frank

18      Miller concerning the quality of the financial

19      information?

20           A.     I don't think so.

21           Q.     Did you have any discussion with anyone

22      associated with Gitto Global concerning the

23      accounts receivable information shown on the

24      financial information?

25           A.     I don't recall a specific discussion

27

1                       S. ELBAUM

2    about the receivables other than the question

3    concerning the collectability of the receivables

4    along the lines of just trying to understand the

5    quality of the other assets, including the

6    inventory and the true value of the property, plant

7    and equipment.

8         Q.    What discussion did you have with

9    anyone at Gitto Global concerning the true value of

10   the inventory?

11        A.    I can't recall.  I can't recall a

12   specific discussion.  That's an issue that would

13   have been taken up in much more detail if we had

14   proceeded to a, I'd say, a more definitive level of

15   interest in the business.  It would have been

16   addressed in due diligence, it would have been

17   addressed in a different circumstances.

18             I just wanted some assurances that we

19   were -- that we had a balance sheet that at least

20   on the surface indicated that they had a certain

21   level of assets that the balance sheet indicated.

22        Q.    Besides the dinner meeting, did you

23   have any face-to-face meetings with anyone

24   associated with Gitto Global?

25        A.    Yes.

44

1                    S. ELBAUM

2    didn't know exactly why they didn't add up, nor was

3    it my goal to ascertain why they didn't add up, at

4    least at that point in of our discussions.

5         Q.    Did anyone elaborate on the issues

6    about the financials that they said were

7    ascertained?

8         A.    No, not to my recollection.

9         Q.    Any discussion about the receivables

10   being not the value that was being shown in the

11   financial statements?

12        A.    Not to my recollection.  Not to my

13   recollection.

14        Q.    Or that the inventory value was not

15   what was truly being shown on the financial

16   statement?

17        A.    Not to my recollection.  I don't recall

18   a specific statement like that being made to me.

19             MR. STERN:  Can you move a little

20        closer, please.

21        A.    (Continuing) I don't recall a specific

22   statement like that being made to me.  There were

23   more general statements about, we've got a lot of

24   pressure from our bank.  We need to refinance

25   them.  We want to refinance them and we have

1

1              UNITED STATES BANKRUPTCY COURT

2                 DISTRICT OF MASSACHUSETTS

3                    WESTERN DIVISION

4

5       - - - - - - - - - - - - - - - - - x

6

7       In re:                    Chapter 11
        GITTO/GLOBAL CORPORATION,  Case No: 04-45386-JBR
                    Debtor.
8                                 Volume: I
                                  Pages: 1-138
9

10      - - - - - - - - - - - - - - - - - x

11

12

13       2004 EXAMINATION OF NANCY GITTO-PANAGIOTES

14          Monday, November 15, 2004, 1:15 p.m.

15               CHOATE, HALL & STEWART

16                   53 State Street

17             Boston, Massachusetts 02109

18      ------- Reporter:  Toni F. Beckwith, RMR -------

19

20

21               K. L. GOOD & ASSOCIATES

22                 Post Office Box 367

23           Swampscott, Massachusetts 01907

24          Tel: 781-367-0815   Fax: 781-598-0815

8

1    sure I understand the question.

2           Q.   Could you explain to us, Gitto Corp.

3    was your brother, Gary C. Gitto?

4           A.   Right.

5           Q.   That's for whom you worked?

6           A.   Yes.

7           Q.   He was the owner?

8           A.   Yes.

9           Q.   And at this point it became

10   Gitto/Global?

11          A.   Yes.

12          Q.   Did that change ownership when it

13   became Gitto/Global?

14          A.   Yes.

15          Q.   Could you explain what the ownership

16   was at Gitto/Global?

17          A.   I believe it went -- Gary was still

18   the owner, along with a Mr. Frank Miller.

19          Q.   At some point in time did you come to

20   have any ownership of Gitto/Global?

21          A.   No.

22          Q.   Did you come to have any stock in the

23   company?

24          A.   Shares.

K. L. GOOD & ASSOCIATES

Page 1

1
2  UNITED STATES DISTRICT COURT
3  EASTERN DISTRICT OF WISCONSIN
   ----------------------------------------x
4

   LaSALLE BUSINESS CREDIT LLC f/k/a
5  LaSALLE BUSINESS CREDIT, INC.          COP
6                    Plaintiff,

                                          Case No.
7          -against-                      04-12227-DPW
8  GARY C. GITTO, et. al.
9                    Defendants
10 ----------------------------------------x
11

                    February 21, 2006
12                  11:00 a.m.
13

14 Deposition of GEORGE KARFUNKEL, taken by all
15 parties, pursuant to Subpoena, at the offices of The
16 American Stock Transfer & Trust Co., 6201 15th
17 Avenue, Brooklyn, New York, before Sabine Faustin, a
18 Shorthand Reporter and Notary Public within and for
19 the State of New York.
20
21
22
23
24
25

```
1                    GEORGE KARFUNKEL

2     about an initial telephone conversation with

3     Marty Miller.  Do you recall having any further

4     conversations with him on the phone, other than

5     the first one?

6          A     I mean regarding this item you're

7     talking about (indicating)?

8          Q     Right.

9          A     I don't recall.

10         Q     I had some contact from time to

11    time, but mostly social calls.  So were there --

12    was there any discussion on the telephone or at

13    this face-to-face meeting at the restaurant,

14    concerning the financial -- specific financial

15    information of Gitto Global?

16         A     I don't recall, sir.

17         Q     Was there any discussion, on the

18    telephone or in a meeting that the sales and

19    receivable numbers were overstated?

20         A     No, I don't remember, again.

21         Q     Was there any discussion at the

22    meeting with regard to the financing in place at

23    Gitto Global?

24         A     Again, I don't recall.

25         Q     So what you recall is that the
```

**Word Index**

Page 1

# ORIGINAL

Volume: I

Pages: 1-177

Exhibits: 1-45

UNITED STATES DISTRICT COURT

For the District of Massachusetts

CIVIL ACTION NO. 04-12227-DPW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LASALLE BUSINESS CREDIT, LLC f/k/a     :

LASALLE BUSINESS CREDIT, INC.,         :

    PLAINTIFF                       :

             :

 v.                                    :

             :

GARY C. GITTO, et al.,                  :

    DEFENDANTS                      :

  and                               :

             :

FLEET NATIONAL BANK, et al.,            :

   TRUSTEE PROCESS DEFENDANTS,      :

  and                               :

             :

FIDELITY INVESTMENTS, INC., et al.,     :

   REACH-AND-APPLY DEFENDANTS       :

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF HELEN KOZAK, a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Lisa McDonald Valdario, (CSR #130093), a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Craig and Macauley, P.C., 600 Atlantic Avenue, Boston, Massachusetts 02210, on Friday, April 7, 2006, commencing at 9:45 a.m.

Page 68

```
 1        what would you be invoicing for?
 2    A   I would be invoicing on Tradex for a portion of
 3        the airplane note, a portion of the chief
 4        pilot's salary, a portion of the hangar.  I
 5        would sometimes prepare invoices for, prepare
 6        invoices to Gitto/Global with a description --
 7    Q   Keep going.  I'm sorry, I didn't mean to
 8        interrupt you.  You're invoicing for -- did you
 9        finish your answer?
10    A   Okay.  A portion of the plane expenses, which
11        would include the note, the insurance, the
12        hangar, and the chief pilot's salary, that would
13        be one thing.  I would also prepare invoices for
14        trips taken personally on the airplane and bill
15        it to the corporation using a different
16        description.
17    Q   What description would you --
18    A   I might say that some of our employees had
19        called on a particular customer.  What would
20        happen is the, I would work with the chief pilot
21        and look at the number of air miles, and try to
22        pick a destination of one of our customers with
23        the same air miles.
24    Q   So it would be used for personal purposes, not
```

Page 69

1       business purposes, and you would come up with a

2       business purpose.

3  A  Right.

4  Q  And would you prepare an expense report like we

5       were shown, I showed you before or --

6  A  I think that I just would put a little bit of a

7       backup behind it possibly, or just put the

8       description in the statement.

9  Q  Why don't we start with the Exhibits that are in

10      front of you; Exhibit No. 7, which is a

11      statement for interest payment loan number 1.

12  A  Well, I definitely did this but I don't remember

13      now what it was for, to tell you the truth.

14  Q  Okay.  Do you know what, that there was a loan

15      number 1?

16  A  It's the same amount.

17  Q  Exhibit 8 is for loan number 2.  Exhibit 9 is

18      for loan number 3.

19  A  What's the date on this?

20  Q  These are all in August of 2002.

21  A  July the 29th to August 19 to August 10 to

22      August 24.  These may be -- I see they were all

23      prepared on the same day, but they're due

24      different dates.  Seems to me these would be

Page 80

| | | |
|---|---|---|
| 1 | A | Did he know of every signature I signed for him? |
| 2 | | No. |
| 3 | Q | Did he authorize you to sign on his behalf? |
| 4 | A | Yes. |
| 5 | Q | And everytime you signed on his behalf, it's |
| 6 | | with your understanding that you had his |
| 7 | | approval. |
| 8 | A | Yes. |
| 9 | Q | Turn to Exhibit 20.  Now, that one is a -- |
| 10 | A | That's a different statement. |
| 11 | Q | Did you prepare this statement? |
| 12 | A | Yes. |
| 13 | Q | Do you recall what this pertains to? |
| 14 | A | It's the same $1600.  I don't know why the |
| 15 | | description changed. |
| 16 | Q | Do you know why the amount increased? |
| 17 | A | It's not increased.  It's not increased. |
| 18 | Q | Decreased. |
| 19 | A | Decreased. |
| 20 | Q | The one I showed you from Exhibit 15 was for |
| 21 | | $3340.70. |
| 22 | A | What page?  Which one?  I'm on Exhibit 15. |
| 23 | Q | Yes.  I think it's, if you go to the second from |
| 24 | | the back, invoice number 218, it's for $3340.70 |

Page 118

1    remember.

2  Q  Well --

3  A  I just, it's -- so much time has passed.

4  Q  I'm just trying to understand what you -- you

5    said Frank Miller would request wire transfers.

6    From who?

7  A  Quite often, Gary would come out and say,

8    Frank's going to -- how much money do we have

9    here or whatever.  Frank's going to give you

10    wiring instructions.  Okay.  That was the usual

11    scenario.

12  Q  Okay.  And when you got wiring instructions from

13    Frank, was that pertaining to Gary's accounts?

14  A  Gary's accounts.

15  Q  Did Frank ever give you wiring instructions for

16    Charlie's accounts?

17  A  I don't remember.

18  Q  Okay.  Showing you what's been marked as

19    Exhibit 41, which are copies of two checks from

20    Gitto/Global to J & J Chemical?

21  A  Um hmm.  Yes.

22  Q  Do you recognize the signature on the checks?

23  A  That's Gary's signature.

24  Q  That's Gary signing Gary's signature?

1    A    That is Gary signing Gary's signature.

2    Q    You had spoken earlier about Guaranty Bank, and

3         Charlie getting more involved after Guaranty

4         wanted to move its loan, shut down the

5         financing.  Do you recognize Exhibit 42?

6    A    Vaguely, yes.

7    Q    Is this a letter that you prepared on Charlie

8         Gitto's behalf?

9    A    Yes.

10   Q    Who signed the letter?

11   A    Charlie.

12   Q    In preparing this letter, did Charlie dictate

13        the contents to you?  How did you go about

14        preparing the letter?

15   A    I can tell you by reading this, I don't think

16        Charlie dictated this.  I think maybe Frank

17        Miller dictated this.

18   Q    Okay.

19   A    Because, in no offense to anyone, but I don't

20        believe that Charlie would have said, If you

21        need, "If you have a need for further

22        elaboration."  I don't think he would have ever

23        used that word, and I don't think he would use

24        the phrase, "No receivables of consequence."

Page 120

1   Q   So you think you prepared the letter --

2   A   I think that Frank probably dictated this to me

3       and Charlie signed it.

4   Q   And you brought it to Charlie to sign?

5   A   Um hmm.

6   Q   Yes?

7   A   Yes.

8   Q   And the Exhibit, the aging that's attached, was

9       that --

10  A   That would have been given to me by Frank or

11      Bill.

12  Q   And was that attached to the letter when you

13      brought it to Charlie to sign?

14  A   More than likely, it would have been.

15  Q   And after Charlie signed it, you mailed it out

16      to Mr. Haddad?

17  A   It may have been faxed.  It may have been filed.

18      Mailed or faxed.

19  Q   But the copy of the letter, what did you do with

20      it?

21  A   I always gave Charlie copies of everything.  He

22      was -- he always kept copies of everything he

23      had, he dictated.  He was -- he really liked

24      that.  He liked his hard copies.

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC, )
etc.,                         )
                              )
              Plaintiff,      )
                              )
     v.                       ) NO. 04-12227-DPW
                              )
GARY C. GITTO, et al.,        )
                              )
              Defendants,     )
      and                     )
                              )
FLEET NATIONAL BANK, et al., )
                              )
   Trustee Process Defendants,)
                              )
FLEET NATIONAL BANK, et al., )
                              )
   Reach-and-Apply Defendants. )
_____)

## DEPOSITION OF STEPHEN MERRY

November 30, 2005

211743

**BARKLEY**
Court Reporters

(310) 207.8000   Los Angeles        (916) 922.5777   Sacramento      (818) 702.0202   San Fernando Valley
(949) 955.0400   Orange County      (408) 885.0550   San Jose        (858) 455.5444   San Diego
(415) 433.5777   San Francisco      (951) 686.0606   Inland Empire   (760) 322.2240   Palm Springs

1           MR. MONDANO:   Thank you.

2           THE DEPONENT:   But you know, everybody that

3    was working there.

4       Q    BY MR. REIN:   And who did you hand it over to?

5    You said you stepped aside.

6       A    I really didn't.   I just said, "Look, this is

7    what's happening.   If you want to go forward with this,

8    you need to put a full due diligence process in place.

9    I" -- "you know, I can't deal with" -- I mean, I

10   couldn't even do a basic analysis because I didn't feel

11   the data I was getting was accurate.   So, you know, for

12   me -- I mean, you know, I'm a fairly simple guy.   It's

13   like either the assets are there and there's value, or

14   they're not.   And until I can get to that point, there's

15   nothing I can do anyway.

16      Q    Did you ever talk to Charlie Gitto that the

17   data was not accurate?

18      A    Yeah.

19      Q    When did you have that conversation?

20      A    You know, I generally would say through the

21   same period.

22      Q    What did you say to Charlie?

23      A    I mean, I don't recall specifically, but I

24   would guess it would have been along the lines of if I

25   don't get the right data, how can you make a qualified

                              39



1    judgment?

2       Q    Did you tell him what data was not --

3       A    I told him it was a mess just in general.

4       Q    Did you say that the payables on a spreadsheet

5    and the numbers were changing?

6       A    No.

7       Q    Did you ever talk to him about the numbers

8    changing?

9       A    I don't recall if I said that specifically,

10   no.

11      Q    When you complained or you made these

12   statements to Charlie Gitto, what did he respond to you?

13      A    I really don't remember.  I mean, you're

14   talking about something that -- conversations that took

15   place several years ago.

16      Q    Did you ever talk to Frank Miller that the

17   data you were getting --

18      A    Yeah.  I told Frank it was a joke and that he

19   needs to get his act together if he's going to -- or

20   words along those lines.  I don't know what I said

21   specifically, but I remember I got very frustrated with

22   the whole process.

23      Q    What, if anything, did Frank say to you in

24   response?

25      A    I don't remember.

40