IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a<br>LASALLE BUSINESS CREDIT, INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>GARY GITTO, et al.,<br><br>        Defendants,.<br>and<br><br>FLEET NATIONAL BANK, et al.,<br><br>   Trustee Process Defendants,<br><br>and<br><br>FIDELITY INVESTMENTS, INC., et al.,<br><br>   Reach-and-Apply Defendants. | Case No. 04-12227-DPW |

**PLAINTIFF'S RESPONSE TO CHARLES GITTO'S
COUNTERSTATEMENT OF MATERIAL FACTS**

LaSalle Business Credit, LLC, f/k/a LaSalle Business Credit, Inc. ("LaSalle"), by its attorneys, hereby submits its Response to Defendant Charles Gitto's ("Charles") Counterstatement of Material Facts, pursuant to local rule 56.1.

14. The J&J Chemical Account was basically used in the same manner as the Direct Wood Account. Deakin knew that the purpose of the account was so that they could pay down invoices. Frank Miller didn't have to specifically explain it to him because Deakin knew what Miller was doing. Frank Miller did reveal to Deakin that Charlie Gitto had loaned him the money to put in this account. In Deakin's opinion, if Charles Gitto had known the true purposes of the account, he wouldn't have invested the $1.5 million. (Deakin Dep. pp. 35-36; 420:24; 421-422; 423:1-2).

**RESPONSE:** There is no testimony that if Charles Gitto had known the true purposes of the J&J Chemical Account, he would not have invested $1.5 million. Therefore, that sentence is denied. The balance of the paragraph is admitted.

16. Frank Miller directed the use of J&J Chemical Account. He instructed Deakin and Bartlett regarding the Gitto Global checks made payable to J&J Chemical. On a daily basis, without invoices, he instructed Deakin as to what was needed and how much to put through the account. Deakin would give Bartlett a list of checks for J&J Chemical from information that he would generate off the computer. There would be an invoice number, with the day's date, how many pounds of material it was and how much a pound. The check was written for that amount and made payable to J&J Chemical. At first, Frank Miller signed the checks, but then there was a stamp used with his signature. The stamp was actually used for all checks not just J&J. Charles Gitto had absolutely no authority to sign checks and it would be on only rare occasions that Gary Gitto would sign one. (Chaisson Dep. p. 57:12-16; Bartlett Dep. pp. 50:5-24, 51-52, 53:8-24; 54:1-3; 56; 57:12-17, 74:15-16; Deakin Dep. p. 60: 8-14).

**RESPONSE**: The statement that Gary Gitto would sign checks only on rare occasions is denied. Rather, the testimony of Janice Chaisson was that "if Frank wasn't around, Gary could sign checks." (Chaisson Dep. p. 57:15-16.)

35. During the course of Gitto Global's dealings with Guaranty Business Credit Corp. ("Guaranty Credit"), Michael Haddad, the President of Guaranty Credit, received correspondence, dated May 24, 2002, purportedly from Charles Gitto. Attached to said correspondence was a receivable aging summary which included fictitious customers. Upon review of the letter, Helen Kozak felt that Charles Gitto did not dictate the contents because of the specific language contained therein. Kozak didn't believe that Charlie would have use words such as, "If you have a need for further elaboration" or "No receivables of consequence." Kozak concluded that Frank Miller probably dictated the letter to her and Charlie simply signed it. As to the attachment containing the financial information, it would have been given to her by Frank Miller or Bill Deakin. It was not information that Charlie Gitto would have generated. He would not have compiled the numbers and put them on spread sheets. It was not an aspect of what he did at Gitto Global. Kozak was not absolutely certain that the aging summary was attached to the letter at the time she presented it to Charles Gitto. (Kozak Dep. pp. 119:5-24; 120; Kozak Dep. pp. 255; 256; 257). Additionally according to Deakin, the aging summary that was attached to the letter represented the time frame in which Charlie Gitto, by specific instruction, was cut out of the financial loop unless Gary Gitto gave approval. (Deakin Dep. pp. 409:7-24; 410:1-12).

**RESPONSE**: LaSalle denies that Kozak was not absolutely certain that the aging summary was attached to the May 24, 2002 letter. Rather, she testified that, "More than likely, it [the attachment] would have been [attached to the letter when it was brought to Charlie to sign]."

LaSalle admits the remaining portion of paragraph 35.  In addition, Kozak definitively testified that the May 24, 2002 letter was signed by "Charlie".  Further, she always gave Charlie copies of everything, and therefore, he would have received a copy of the May 24, 2002 letter, which included the attachment.  (Kozak Dep. p. 119:10-11; 120:12-14, 19-24.)

43.    Gitto Global was paying some personal expenses for the principals, including Charles Gitto.  For example, there were bills for landscaping, snow removal, painting, plumbing and insurance.  Everything that was personal, Rita Bartlett, put to the loan account.  They each had a loan account and anything personal would be charged to that account.  Helen Kozak also handled Charles Gitto's personal checkbook up until the time he married.  (Kozak Dep. P. 26:11-22, 27:4-10; Bartlett Dep. P. 23:14-23).

**RESPONSE**:  Rita Bartlett put "everything to the loan account that was personal.  They were going to okay them anyway, so that's what I did." . . . "What happened after that, I don't know."  (Bartlett Dep. p. 23:15-17, 22-23)  LaSalle admits the remaining portion of the paragraph.

44.    All of Charles Gitto's airplane expenses were handled through Tradex International.  Since Gitto Global used the plane for business purposes there was an agreement that the company would cover a percentage of the expenses.  Gary Gitto and Charles Gitto agreed that the company would contribute towards one-half of the chief pilot, a quarter of the insurance, and half of the hangar.  It was spelled out in a handwritten memo from Gary Gitto that Kozak kept for reference.  (Kozak Dep. pp. 65:17-24; 66:1-13, 143:19-24; 144:1-10, Angelini Dep. pp. 128-129).

**RESPONSE**:  Beside invoicing for a portion of the plane's expenses, Kozak would also invoice for personal trips and bill it to Gitto Global, falsifying the bill as a business expense.  (Kozak Dep. p. 68:10-24, 69:1-2)  LaSalle admits the remaining portion of the paragraph.

46.    In and around April or May, 2002, Charles Gitto contacted his friend, Dr. Alfred Arcidi, and revealed to him that he was having money problems having to do with Guaranty Bank.  Gitto asked Arcidi if he would be interested in investing in the business and becoming a partner.  He told Arcidi that "my kids spend money too easy."  "You can make all the money in the world, but you have to know how to handle it."  Gitto further revealed to Arcidi that his son and Frank Miller were simply spending too much.  According to Arcidi, Gitto said that he wasn't involved that much with the company to see the financial and stuff - but he didn't want his son to go to jail.  Arcidi inferred from this comment that Gitto was simply concerned about his son because he had been using the money on personal items rather than on business expenses.  He was kind of upset with his kid.  (Arcidi Dep. pp. 12:3-11; 16:14-17,25:16-24; 26, 35-36).

**RESPONSE**: LaSalle denies the reference to what Arcidi inferred from Charles Gitto's comments. Rather, Arcidi testified that Charles Gitto told him, "His son had been spending so much money and Miller and doing this. And he says, I'm not involved that much with the company to see the financial and stuff, and he says – that but that's what – I don't want my son to go to jail." Charles Gitto further admitted to Dr. Arcidi that "our assets are less than what we borrowed from the bank." LaSalle admits the remaining portion of paragraph 46. (Arcidi Dep. p. 25:17-24; 26:2-3.)

48. By late 2003, the Gitto's and Frank Miller were focusing on attempts to sell the business. Stephen Merry, an investor, became involved in the negotiations between Vitrotech and Gitto Global. The plan was to develop a strategic partnership and see how it progressed. Merry talked spoke with Charles Gitto on various occasions, but at the end of the day, Charles Gitto was not one of the operating officers and Merry was forced to turn to Gary Gitto and Frank Miller. It became evident to Merry that Charles Gitto could not make any decisions for Gitto Global. (Merry Dep. p. 24:4-18).

**RESPONSE**: LaSalle admits the statements made in paragraph 48, but further states that on May 18, 2003, Charles Gitto, along with Frank Miller, Stephen Merry, Jesse Rae Booth and Glenn Easterbrook, attended a meeting to discuss the possibilities of VitroTech selling product to Gitto Global, and how the LaSalle Bank loan worked. With Charles Gitto in attendance, it was discussed that LaSalle's line of credit was $27 million and Gitto Global could borrow based upon 65% of inventory up to a $6 million maximum borrowing level. To reach that level, the inventory maximum could be $9,237,069, and presently the inventory level was $6.2 million, such that if they had additional inventory they could borrow approximately $2 million more. As a result, Gitto Global wanted to acquire additional inventory in order to borrow additional monies against their asset based loan. There was further discussion that Gitto Global would purchase $12.6 million of inventory from VitroTech at $4.25 per pound, to be paid through four notes where VitroTech had the right to convert those notes into as much as 60% equity in Gitto

Global. As a result of the notes, "they [Gitto Global] did not have to pay for the inventory." (Carlson Dep. p. 21:4 - 25:9.)

49. Merry spoke to Frank Miller about the financials and asked several due diligence questions. It concerned Merry that the financials were not readily available and that the payables were not computerized. Merry became frustrated with the information he was provided. However, he never made specific inquiry or requests of Charles Gitto with respect to the financial information he sought. Merry became aware that when it came to matters of acquiring financial information about Gitto Global, Frank Miller was the "key deliverer of such information." (Merry Dep. pp. 35:8-16, 36:14-18, 38:5-18, 66:21:24, 100:9-18).

**RESPONSE**: LaSalle denies the statement that Stephen Merry never made a specific inquiry or request of Charles Gitto with respect to the financial information. Instead, Merry testified that he talked to Charles Gitto that the information that he was receiving about Gitto Global was not accurate. Merry said to Charles Gitto that "if I don't get the right data, how can you make a qualified judgment?" Merry further stated as to the financial information he had received that "I told him it was a mess just in general." LaSalle admits the remaining portion of paragraph 49. (Merry Dep. p. 39:16-17, 24-25; 40:3.)

55. According to Karfunkel, the first meeting involved discussions about manufacturing a battery. No one said anything about Gitto Global being in dire financial states. Karfunkel didn't recall any type of discussion about the operating performance of Gitto Global. It was decided that Elbaum would send a technical person to the company. (Karfunkel Dep. p. 12, 14:1-18, 19:11-14, 24:25, 25:2-5).

**RESPONSE**: Karfunkel testified that it was discussed that Gitto Global had a product that would revolutionize the battery industry, not about manufacturing a battery. Further, Karfunkel said he did not remember discussing overstated sales and accounts receivable or specific financial information of Gitto Global. LaSalle admits the remaining portion of paragraph 55. (Karfunkel Dep. p. 12:21-23, 24:17-20)

56. According to Elbaum, Frank Miller made statements about the business, its capabilities and its market presence. Miller also talked about the business in terms of its operating profitably. At the time, Elbaum became aware of the company's poor performance during 2002. However, there was never a discussion about financial improprieties, improper financial treatment or possible fraud. Elbaum did have questions about the cash flows because

he couldn't match in his mind the inflows with the outflows. However, he did not conduct any due diligence on this issue. (Elbaum Dep. pp. 14-15, 17, 42-43).

**RESPONSE**: Elbaum had a "really vague recollection" that Miller indicated Gitto Global was having financial problems. But, he did not believe he discussed with Miller or the Gittos the quality of the financial information. Elbaum also did not recall any discussion about the receivables, inventory or financials. LaSalle admits the remaining portion of paragraph 56. (Elbaum Dep. pp. 25:23-27:5, 44:5-18)

Dated: September 25, 2006                Respectfully submitted,

                                                   LASALLE BUSINESS CREDIT, LLC

                                                   By      Richard A. Sugarman
                                                          One of its attorneys

Christopher J. Panos (BBO# 555273)
Richard A. Sugarman (BBO# 646791)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz Cooper Chartered
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

## CERTIFICATE OF SERVICE

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 25, 2006.

                                                                          /s/ Richard A. Sugarman

Case 1:04-cv-12227-DPW    Document 356    Filed 09/25/2006    Page 7 of 7