## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LASALLE BUSINESS CREDIT, LLC f/k/a<br>LASALLE BUSINESS CREDIT, INC., | ) <br> ) <br> ) | |
| Plaintiff, | ) | |
| v. | ) <br> ) | |
| GARY C. GITTO, FRANK MILLER, MARIA<br>MILLER, CHARLES N. GITTO, JR., and LOUIS J.<br>PELLEGRINE, JR., | ) <br> ) <br> ) <br> ) | |
| Defendants,<br>and | ) <br> ) <br> ) | Case No. 04-12227-DPW |
| LEGG MASON, INC. and LEGG MASON WOOD<br>WALKER, INC., | ) <br> ) <br> ) | |
| Trustee Process Defendants, | ) <br> ) | |
| and | ) <br> ) | |
| GITTO SALES CORPORATION, AWG, LLC,<br>SUPERIOR POLYMERS, CORPORATION, LEGG<br>MASON, INC., LEGG MASON WOOD WALKER, INC.,<br>and TRADEX CORPORATION,[1] | ) <br> ) <br> ) <br> ) <br> ) | |
| Reach-and-Apply Defendants. | ) | |

## FOURTH AMENDED COMPLAINT

Plaintiff, LaSalle Business Credit, LLC ("LaSalle"), f/k/a LaSalle Business Credit, Inc.,

by its attorneys, for its Fourth Amended Complaint against Defendants, Gary C. Gitto, Frank

Miller, Maria Miller, Charles N. Gitto, Jr., and Louis J. Pellegrine, Jr., against Trustee Process

Defendants, Legg Mason, Inc., and Legg Mason Wood Walker, Inc. (together with Legg Mason,

---

[1]  Although Tradex Corporation is not named in this Fourth Amended Complaint as a primary defendant (Tradex Corporation remains a reach and apply defendant), LaSalle continues to assert and reserves all rights with respect to claims asserted in the Third Amended Complaint against Tradex as a primary defendant.  LaSalle anticipates entering into a stipulation dismissing LaSalle's claims against Tradex in this proceeding without prejudice under Fed. R. Civ. P. 41(a) so that LaSalle's claims against Tradex may be adjudicated in the Tradex bankruptcy case. LaSalle has circulated a draft stipulation to all primary defendants in this case.

Inc., "Legg Mason"); and against Reach-and-Apply Defendants, Gitto Sales Corporation, AWG, LLC, Superior Polymers Corporation, Legg Mason and Tradex Corporation, states as follows:

## JURISDICTION

1.    Original jurisdiction over the claims asserted in this matter exists by virtue of 28 U.S.C. §1331, in that the cause of action arises under the laws of the United States, and 28 U.S.C. §1332(a), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

## VENUE

2.    Venue exists under 28 U.S.C. §1391(b) in that a substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

**Plaintiff**

3.    LaSalle is a limited liability company organized and existing under the laws of the State of Delaware, with executive offices in Chicago, IL and a locus of operations in New York, NY.  LaSalle is a wholly-owned subsidiary of LaSalle National Leasing Corporation, a Delaware corporation, which is a wholly-owned subsidiary of LaSalle Bank National Association, a federally insured national banking association, which provides funding to LaSalle.

**Defendants**

4.    Gary C. Gitto ("Gary Gitto") is an individual, residing at 51 Meyer Hill Drive, Acton, Massachusetts.  Gary Gitto was the chief executive officer and treasurer of Gitto Global Corporation ("Gitto Global"), a Massachusetts corporation, having its principal place of business at 140 Leominster-Shirley Road, Lunenburg, Massachusetts.

5.    Frank Miller is an individual, was residing at 95 Kettle Hole Road, Bolton, Massachusetts when the original complaint was filed and is now residing in Irvine, California

and was the chief operating officer and president of Gitto Global.  He is the sole owner of Kingsdale Corporation, d/b/a J&J Chemical Distributors ("J&J Chemical").

6.    Maria Miller is an individual, residing at 95 Kettle Hole Road, Bolton, Massachusetts when the original complaint was filed and is now residing in Irvine, California and was an employee of Gitto Global.  Maria Miller is married to Frank Miller.

7.    Charles N. Gitto, Jr., ("Charles Gitto") is an individual, residing at 18 Nancy Court, Leominster, Massachusetts and was the chairman of the board of Gitto Global.  He is also an officer and owner of Tradex International Corporation ("Tradex International") and Tradex Corporation ("Tradex"), which was Gitto Global's landlord.

8.    Louis J. Pellegrine, Jr. ("Louis Pellegrine") is an individual, who, upon information and belief, is a citizen of Massachusetts.  He was the accountant for Gitto Global and was involved in forming various corporations involved with Gitto Global.

**Trustee Process Defendants**

9.    Trustee Process Defendant Legg Mason is a Maryland corporation with its principal office at 100 Light Street, Baltimore, Maryland.  On information and belief, Legg Mason holds goods, effects, or credits of defendant Charles Gitto.

**Reach-and-Apply Defendants**

10.    Reach-and-Apply Defendant Gitto Sales Corporation is a Massachusetts corporation with a place of business at 140 Leominster-Shirley Rd., Lunenburg, Massachusetts. Upon information and belief, defendant Gary Gitto has an interest in Gitto Sales Corporation.

11.    Reach-and-Apply Defendant AWG, LLC is a Massachusetts Limited Liability Company with a place of business at 140 Leominster-Shirley Road, Lunenberg, Massachusetts. Upon information and belief, defendant Gary Gitto has an interest in AWG, LLC.

12.     Reach-and-Apply Defendant Superior Polymers Corporation is a Massachusetts Corporation with a principal office at 51 Meyer Hill Road, Acton, Massachusetts.   On information and belief, defendant Gary Gitto either owns or has an interest in Superior Polymers Corporation.

13.     Reach-and-Apply Defendant Legg Mason is a Maryland corporation with its principal office at 100 Light Street, Baltimore, Maryland.   On information and belief, Legg Mason holds goods, effects, or credits of defendant Charles Gitto.

14.     Reach-and-Apply Defendant Tradex is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business located at 18 Nancy Court, Leominister, Massachusetts.   Charles Gitto is an officer and owner of Tradex.   Tradex owned the property where Gitto Global operated and for which Gitto Global paid rent.   Upon information and belief, defendant Charles Gitto has an interest in Tradex.

## GENERAL FACTUAL ALLEGATIONS

**LaSalle Loan**

15.     Gitto Global was a corporation organized in 1991 and which existed under the laws of Massachusetts.   It was based in Lunenburg, Massachusetts and was a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, styrene and thermoplastic olefin compounds that conform to strict industry guidelines.   Gitto Global's product was used in products including wire and cable, footwear, sheeting, industrial systems, utilities, back-up power systems, portable chargers, consumer products, construction and fluid-transfer systems.   Gitto Global was owned by Frank Miller, Gary Gitto and Nancy Gitto Panagiotes.

16.     On or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement ("Loan Agreement"), wherein LaSalle made a revolving loan not to exceed

- 4 -

$27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's Eligible Accounts, as defined, and 65% of the lower cost or market value of Gitto Global's Eligible Inventory, as defined, or $6,000,000, whichever was less ("LaSalle revolving loan"). Eligible Accounts was defined, <u>inter alia</u>, under the Loan Agreement to be "genuine," to arise from the performance of services by Gitto Global and evidenced by an invoice that was due and payable within 30 days and not less than 90 days past due. Eligible Inventory was defined, <u>inter alia</u>, as being owned by Gitto Global, located at one of its premises and held for sale. In addition, LaSalle agreed to make a term loan to Gitto Global in the original principal amount of $3,000,000 ("LaSalle term loan"). A copy of the Loan Agreement is attached hereto as <u>Exhibit A.</u>

17.    As part of the Loan Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, a copy of which is attached hereto as <u>Exhibit B</u>, and a Term Note in the original principal sum of $3,000,000, a copy of which is attached hereto as <u>Exhibit C</u>.

18.    In consideration of the credit being extended by LaSalle to Gitto Global, Gary Gitto executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, a copy of which is attached hereto as <u>Exhibit D</u>.

19.    In consideration of the credit being extended by LaSalle to Gitto Global, Frank Miller executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities, a copy of which is attached hereto as <u>Exhibit E</u>.

20.     Pursuant to the terms of the Loan Agreement, Gitto Global was required to enter into a blocked account agreement with LaSalle and Gitto Global's depository bank in order to perfect LaSalle's security interest in Gitto Global's deposit accounts.

21.     On or about July 25, 2002, Gitto Global, LaSalle and Fleet entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account Agreement").

22.     Under the terms of the Blocked Account Agreement, Gitto Global established a deposit account bearing account number 9429271277 at Fleet ("Fleet Blocked Account").

23.     The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account.  Also on a daily basis, Fleet was to deposit the available funds from the Fleet Blocked Account to Gitto Global's account at LaSalle described hereafter to pay down the LaSalle revolving loan.

24.     The Loan and Security Agreement provided that Gitto Global shall deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan, accompanied by copies of Gitto Global's sales, cash receipts and credit memo journals.

25.     Based on the borrowing base certificate, available funds were deposited daily by LaSalle  into Gitto Global's controlled disbursement account no. 5590055512 at LaSalle Bank, upon which Gitto Global would issue checks ("LaSalle Account").

26.     As set forth hereafter, LaSalle was induced to enter into the Loan Agreement and the Term Note by false representations made in May and July, 2002 concerning Gitto Global's financial condition and operations.

- 6 -

27.    Subsequent to the execution of the Loan Agreement between Gitto Global and LaSalle, false borrowing base certificates were submitted to LaSalle on behalf of Gitto Global in which Gitto Global's sales, accounts receivable and inventory value were misrepresented. The misrepresentations were made to induce LaSalle to advance additional funds under the LaSalle revolving loan and to support the check-kiting scheme from which the defendants profited. The check-kiting scheme operated using checks of J&J Chemical drawn upon its account at Clinton Savings Bank and reciprocal Gitto Global checks drawn upon the LaSalle Account, with funds being siphoned out by defendants, Frank Miller, Maria Miller, Gary Gitto and Charles Gitto.

28.    Between July, 2002 and September, 2004, and in furtherance of the check-kiting scheme, false information regarding Gitto Global's financial condition and operations was presented to LaSalle on behalf of Gitto Global during audits and field examinations conducted by LaSalle.

29.    LaSalle, in reliance upon the false information contained in the borrowing base certificates submitted for Gitto Global and the false information presented to LaSalle during the field examinations and audits, advanced funds to Gitto Global in accordance with the Loan Agreement.

30.    On September 24, 2004, Gitto Global filed bankruptcy.

31.    As of July 26, 2006, there is due and owing to LaSalle from Gitto Global $32,324,053.00, plus interest and costs.

## COUNT I
### CIVIL RICO CONSPIRACY (18 U.S.C. §1962(d), 1964(c))
(Against Gary C. Gitto, Frank Miller, Maria Miller,
Charles N. Gitto, Jr., and Louis J. Pellegrine, Jr.)

32.    LaSalle restates the allegations contained in the previous paragraphs as if set forth fully herein.

390253.1 042314-34311

33.    LaSalle is owned by a financial institution insured by the FDIC.

34.    At all relevant times, Gitto Global was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and was engaged in and its activities affected interstate commerce.  Gitto Global was an ongoing entity having an existence distinct from the pattern of racketeering activity alleged herein.

35.    Throughout the period described herein, Gary Gitto, Frank Miller, Maria Miller, Charles Gitto, Louis Pellegrine (the "Conspirators") and others, William Deakin, Helen Kozak, Janice Chaisson, John Tersigni and Kathleen Carland, engaged in a conspiracy to conduct Gitto Global's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

36.    During the relevant period described herein, each of the Conspirators was a "person" within the meaning of 18 U.S.C. § 1961(3).

37.    Commencing at some date on or about 1994 and continuing until at least September 14, 2004, the Conspirators engaged in a conspiracy to conduct the affairs of Gitto Global so as to defraud LaSalle by means of false representations, through interstate wire transmissions and the use of the U.S. Mail, in violation of 18 U.S.C. §§1341 and 1343 and by means of bank fraud, in violation of 18 U.S.C. §1344.

38.    Pursuant to and in furtherance of the conspiracy alleged herein, the Conspirators engaged in the acts set forth in the following paragraphs of this Count.

**Evolution of the Fraud**

39.    In or around 1995, Gitto Global had a revolving line of credit at U.S. Trust, an FDIC insured institution, and would obtain advances based on its outstanding accounts receivable.  In order to access money on the line of credit, Frank Miller directed Maria Miller to release legitimate sales orders before those orders were shipped and to then generate an invoice.

- 8 -

This allowed a receivable to be created early, before the sale had been completed, in order to access money quicker. When there were not enough legitimate sales to pre-bill, Frank Miller devised a new scheme by directing the creation of fictitious sales.

40.    In 1997, when Gitto Global had a revolving line of credit with Bank of Boston, an FDIC insured institution, Direct Wood & Paper Products, Inc. ("Direct Wood") was organized by Gary Gitto and an account for it was opened at Fleet Bank. When a receivable became 90 days old, and therefore could no longer be used to borrow against, Frank Miller directed Rita Bartlett ("Bartlett"), Gitto Global's accounts payable clerk, to prepare a Gitto Global check payable to Direct Chem for deposit in Direct Wood's account. Either Frank Miller or Gary Gitto would sign the Gitto Global checks. There were no invoices or shipping documents prepared for the checks deposited in Direct Wood's account, unless there was a bank audit and then Frank Miller and William Deakin ("Deakin"), Gitto Global's controller, created invoices and shipping records to substantiate the payments.

41.    In turn, Helen Kozak ("Kozak"), administrative assistant to Charles Gitto and Gary Gitto, would prepare a Direct Wood check payable to Gitto Global, bearing Gary Gitto's signature, with Gary Gitto's consent. These checks would be applied against whichever invoice was to be taken off Gitto Global's books.

42.    At the end of 2000, Kozak received a telephone call from Fleet Bank questioning the activity in the Direct Wood account. Since a blocked account was maintained at Fleet Bank, it observed that Gitto Global was depositing money in the Direct Wood account and checks for the same amount would be issued to Gitto Global from the Direct Wood account. Fleet Bank requested that the account be closed and Gary Gitto instructed Kozak to do so effective January 15, 2001.

**Creation of J&J Chemical and Use to Inflate Sales Revenue**

43.     J&J Chemical was created in April 2001 to replace Direct Wood as a vehicle for purportedly paying fictitious invoices.  Frank Miller set up the J&J Chemical bank account at Clinton Savings Bank ("J&J Chemical Account") in his nephew's name, Thomas Sullivan, because Miller did not want anybody looking into the corporation as it did no real business. When Marvin Miller, Sullivan's father-in-law, learned that Frank Miller had involved Sullivan in J&J Chemical, he demanded that Frank Miller take Sullivan's name off the account.  Frank Miller became an authorized signatory on the J&J Chemical Account, along with Gary Gitto's friend, John Tersigni.  J&J Chemical was started through a loan of $1,500,000 by Charles Gitto to Gary Gitto and Frank Miller.

44.     The checkbook for the J&J Chemical Account was maintained in the office of Janice Chaisson ("Chaisson"), Gitto Global's accounts receivable clerk, together with a stamp of John Tersigni's signature.

**Borrowing Base Certificates**

45.     In order to receive advances of funds pursuant to the Loan Agreement, Frank Miller, Deakin or Chaisson, on behalf of Gitto Global, delivered daily borrowing base certificates to LaSalle in New York, together with copies of Gitto Global's sales, cash receipts, credit memo journals, and inventory valuation.  Each of these daily borrowing base certificates represented and warranted above the signature line as follows:

> The undersigned hereby represents and warrants to LaSalle Business Credit, LLC that the information set forth herein is true and correct as of the date made, that any Accounts Receivable or Inventory classified as "Eligible Accounts" or "Eligible Inventory" conform in all respects to the respective definitions of "Eligible Account" and "Eligible Inventory" as set forth in the Loan and Security Agreement (or similar agreement) entered into by and between LaSalle Business Credit, LLC and the undersigned, as amended, modified or supplemented from time to time).

46.    From July 25, 2002, to January 16, 2004, daily borrowing base certificates bearing Frank Miller's name were delivered nightly by Gitto Global to LaSalle with the detailed supporting documents.

47.    From January 17, 2004, to September 15, 2004, Janice Chaisson sent the borrowing base certificates from Gitto Global in Massachusetts to LaSalle in New York via e-mail.

(a)    **Sales Misrepresentations**

48.    On or about July 25, 2002, Frank Miller provided the first borrowing base certificate to LaSalle.

49.    In the first borrowing base certificate submitted to LaSalle, Frank Miller knowingly represented Gitto Global's sales to be $28,477,170.80.  Frank Miller included in this figure fictitious sales that never occurred.  These false sales representations were that:

    (a)    Zebulon Industries, Inc. ("Zebulon") made payments to Gitto Global totaling $362,750.25 for goods sold;

    (b)    Velco Chemicals, Inc. ("Velco") purchased $133,292.65 in goods; and

    (c)    Hemisphere Distribution Corporation ("Hemisphere") purchased $206,940.40 in goods.

50.    Frank Miller, Deakin and Chaisson knowingly and intentionally made similar misrepresentations in the subsequent borrowing base certificates submitted to LaSalle with respect to Gitto Global's sales, collections and invoices, the magnitude of which only increased in each subsequent certificate from July 26, 2002, through September 15, 2004.  The fictitious sales reported to LaSalle totaled approximately $16,500,000.

51.    LaSalle reasonably relied on the representations in the borrowing base certificates to make loan advances on the LaSalle revolving loan.

### (b)     Fictitious Customers

52.     The accounts receivable listed in the borrowing base certificates included substantial amounts for fictitious sales to Color Compounds & Consultants, Inc. ("CCC"), Hemisphere, Hitachi Cable, Inc. ("Hitachi"), J-Tan Sales & Marketing, Inc. ("J-Tan"), Velco, and Zebulon (collectively referred to as the "Fictitious Customers"). Invoices for these fictitious sales were created at Gitto Global as well as phony checks as payments from the purchasers. J&J Chemical checks payable to Gitto Global deposited to the Fleet Blocked Account were used as payments received for the fictitious sales.

53.     CCC is a corporation doing business in New Hampshire, but was not a customer of Gitto Global. Rather, it was a supplier of raw materials. None of the checks from CCC to Gitto Global was ever cashed by Gitto Global. The checks were fictitious as were the invoices which they purportedly paid.

54.     Hemisphere was a fictitious customer. It was a corporation set up by Louis Pellegrine for Frank Miller. Miller maintained the checkbook. Its sole purpose was to serve as a Fictitious Customer whose invoices inflated Gitto Global's sales. Pellegrine and Miller used Pellegrine's girlfriend, Kathleen Carland ("Carland"), as the front person. Pellegrine took Carland to open Hemisphere's bank account, told the banker she was the president of a company that had something to do with chemicals and had the account statements sent to her home. Pellegrine advanced money to open the checking account, which was later reimbursed by Gitto Global. After the bank account was established, two telephone lines were installed at Pellegrine's office. His office was listed as the corporation's registered office. Carland sent him all of Hemisphere's mail. Pellegrine obtained a signature stamp with Carland's signature, maintained the checkbook, and prepared corporate tax returns. When the bank account was closed, the $1,005,878.23 check was delivered to his office, which later was deposited in Gitto

Global's account.  None of the checks from Hemisphere to Gitto Global was ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

55.    Zebulon was a fictitious customer purportedly located in New Jersey.  It did sell raw materials to Gitto Global at one time.  The fictitious checks of Zebulon showed the same bank account as on the Velco checks.  None of the checks from Zebulon to Gitto Global was ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

56.    Velco was a fictitious customer purportedly located in New York.  It also sold raw materials to Gitto Global at one time.  The fictitious checks of Velco showed the same bank account as on the Zebulon checks. None of the checks from Velco to Gitto Global was ever cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

57.    Hitachi is a company located in New Hampshire.  While Hitachi was a genuine customer of Gitto Global, a majority of the sales purportedly made to Hitachi were not genuine. The majority of sales to Hitachi were supported by invoices and bills of lading which were incomplete and usually unsigned.  The checks for these incomplete and unsigned invoices and bills of lading were not cashed by Gitto Global.  The checks were fictitious as were the invoices which they purportedly paid.

58.    J-Tan was a fictitious customer purportedly located in Massachusetts.  J-Tan is owned by John Tersigni, who received payments from Gitto Global purportedly for "consulting service".  J-Tan never purchased any goods from Gitto Global.  In May, 2002, Frank Miller proposed that J-Tan handle small accounts for Gitto Global and was capitalized by $380,000 sent by Frank Miller and Gary Gitto.  Subsequently, all but $2,000 was returned to Frank Miller and

- 13 -

Gary Gitto because Miller told Tersigni that a pending Gitto Global deal had fallen through. Frank Miller maintained the J-Tan checkbook.

(c)    Manipulation of Process to Borrow Under LaSalle Revolving Loan

59.    In order for Gitto Global to borrow under the LaSalle revolving loan, there needed to be collateral availability.  In order to artificially create availability, Gitto Global would record accounts receivable from the Fictitious Customers, thereby boosting Gitto Global's sales volume, and later have the accounts paid with checks received from J&J Chemical.  There was no money in J&J Chemical and its source of funds, for the most part, was Gitto Global.  The cash receipts from J&J Chemical would reduce the amount owed on the LaSalle revolving loan so that more money could be borrowed, and the receivables created the basis to borrow this additional money.

60.    Each day, Deakin would prepare a daily report based upon checks written the prior day and a separate page for checks that were mailed but not yet deposited for payment. This daily report would be given to Frank Miller so he could determine how much in fictitious sales needed to be put on the borrowing base certificate to create availability.  He also needed to determine how much to pay down on the borrowing base to obtain that availability.  Miller would then tell his wife, Maria Miller, how much in fictitious sales to "generate" on the books and tell Bartlett what volume or amount of checks she should write to J&J Chemical.

61.    At Frank Miller's daily direction, and without an invoice, shipping receipt or purchase order, Bartlett would prepare Gitto Global checks payable to J&J Chemical.  The checks were either signed by Frank Miller or Frank Miller's signature stamp was affixed to the checks by Bartlett.  These checks were invariably to be under $100,000 so that there would be same day availability.  Deposits also were to be less than $4,000,000 per day so there could be same day credit.

390253.1 042314-34311

62.    After Bartlett prepared the checks, she would keep a copy in a file, which she maintained, and would give the originals to Chaisson.  Chaisson, at Frank Miller's direction, would make out reciprocal J&J Chemical checks for the same dollar amount payable to Gitto Global.  Deakin or Chaisson stamped the J&J Chemical checks with the signature of "John Tersigni".  Chaisson recorded those checks as payments from the Fictitious Customers on fictitious invoices that were going to be over 90 days.

63.    Frank Miller or Deakin would deposit the Gitto Global checks made payable to J&J Chemical in the J&J Chemical Account through a teller, or, if the bank was closed, through an ATM.

64.    The checks made payable to Gitto Global from J&J Chemical were added with the other cash receipts for the day.  Chaisson prepared the deposit slip and the checks were deposited in the Fleet Blocked Account by Frank Miller or other Gitto Global employees.

**(d)    Creating Fictitious Sales**

65.    No invoices were created on a daily basis for the fictitious sales by J&J Chemical to Gitto Global.  But, Frank Miller had blank J&J Chemical invoices printed.  When a bank examiner requested information on a specific purchase, with Frank Miller's consent, Deakin, or someone else at Gitto Global, created a corresponding invoice to substantiate the purchase.  On the accounts payable side, if an examiner wanted to see when an item was purchased, with Frank Miller's consent, Deakin, or someone else at Gitto Global, took an invoice and changed the price and the extension to correspond with the inventory report.

66.    To support the fictitious sales by Gitto Global, Frank Miller would direct Maria Miller to create fictitious sales orders to Fictitious Customers for the amount of money that he needed that day.  Maria Miller would then create invoices on the computer for Fictitious Customers.  The invoices would then instruct Dean Childs, the Gitto Global shipping clerk, to

- 15 -

prepare the shipping documents based upon the sales order number on the invoices. Chaisson would then print the invoices from the computer. After printing, Chaisson filed the bills of lading and the invoices in a filing cabinet in chronological order by customer name. Maria Miller kept track of the open fictitious invoices by asking Chaisson about the details on a regular basis. The computer system would automatically generate an aging once the invoice was entered into the system.

67.    The fictitious sales made to the Fictitious Customers were segregate by customer code 99. Maria Miller, Frank Miller and Deakin told Chaisson to use this code. Chaisson kept two sets of books to keep track of the real corporate activity at Gitto Global versus the fictitious activity. A summary of the represented sales and collections and the actual sales and collections is as follows:

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| July – 02 | $    1,278,810 | $      78,810 | $    2,206,314 | $    206,314 |
| August – 02 | $    8,815,527 | $    3,619,632 | $    8,058,446 | $    2,862,550 |
| September – 02 | $    6,552,837 | $    2,678,900 | $    6,906,243 | $    3,032,307 |
| October – 02 | $    12,557,440 | $    1,826,091 | $    11,911,623 | $    1,160,274 |
| November – 02 | $    11,206,090 | $    4,940,552 | $    11,076,928 | $    4,811,390 |
| December – 02 | $    10,621,281 | $    3,217,464 | $    10,825,588 | $    3,421,770 |
| January - 03 | $    11,285,811 | $    2,912,933 | $    11,307,584 | $    2,934,706 |
| February – 03 | $    13,767,617 | $    1,639,129 | $    13,428,035 | $    1,299,546 |
| March – 03 | $    17,111,121 | $    4,333,268 | $    17,989,492 | $    5,211,639 |
| April – 03 | $    16,393,943 | $    2,129,290 | $    16,861,179 | $    2,596,526 |
| May – 03 | $    17,676,634 | $    3,503,422 | $    17,315,021 | $    3,141,809 |
| June – 03 | $    21,337,796 | $    4,204,053 | $    21,454,438 | $    4,320,695 |
| July – 03 | $    25,902,881 | $    (486,000) | $    26,243,609 | $    (145,272) |
| August – 03 | $    31,725,765 | $    1,957,613 | $    31,548,658 | $    1,780,506 |
| September – 03 | $    38,077,352 | $    1,033,873 | $    39,132,440 | $    2,088,961 |
| October – 03 | $    55,968,861 | $    5,918,637 | $    56,432,129 | $    6,381,904 |
| November – 03 | $    50,994,495 | $    5,811,804 | $    50,144,000 | $    4,961,309 |
| December – 03 | $    63,380,646 | $      380,646 | $    63,338,487 | $    338,487 |
| January – 04 | $    62,723,884 | $    3,210,133 | $    62,414,067 | $    2,900,316 |
| February – 04 | $    63,745,043 | $    (302,115) | $    64,349,419 | $    302,261 |

- 16 -

| Month | Represented Sales | Actual Sales | Represented Collections | Actual Collections |
|---|---|---|---|---|
| March – 04 | $ 83,804,496 | $ 2,811,831 | $ 84,177,796 | $ 3,185,132 |
| April – 04 | $ 86,088,250 | $ 3,500,669 | $ 87,493,856 | $ 4,906,274 |
| May – 04 | $ 74,422,760 | $ 2,698,662 | $ 74,263,805 | $ 2,539,708 |
| June – 04 | $ 91,495,847 | $ 3,215,151 | $ 91,703,488 | $ 3,422,792 |
| July – 04 | $ 92,079,534 | $ 3,220,424 | $ 91,966,853 | $ 3,107,743 |
| August – 04 | $ 90,819,019 | $ 4,205,334 | $ 90,761,602 | $ 4,147,917 |
| September 15, 2004 | $ 41,370,938 | $ 1,437,823 | $ 41,190,439 | $ 1,257,324 |
| | | | | |
| **Total** | **$ 1,101,204,678** | **$ 73,698,029** | **$ 1,104,501,539** | **$ 76,174,888** |

68.     Gitto Global's monthly deposits of the purported sales proceeds from J&J Chemical and the funds advanced by LaSalle to Gitto Global based upon those monthly deposits and borrowing base certificates were as follows:

| Month | Deposits | Advances |
|---|---|---|
| July – 02 | $ 2,206,314 | $ 31,676,094 |
| August – 02 | $ 8,058,446 | $ 7,830,571 |
| September – 02 | $ 6,906,243 | $ 6,853,652 |
| October – 02 | $ 11,911,623 | $ 11,676,236 |
| November – 02 | $ 11,076,928 | $ 10,921,079 |
| December – 02 | $ 10,825,588 | $ 10,469,837 |
| January - 03 | $ 11,307,584 | $ 11,076,445 |
| February – 03 | $ 13,428,035 | $ 13,370,847 |
| March – 03 | $ 17,989,492 | $ 17,051,892 |
| April – 03 | $ 16,861,179 | $ 16,682,760 |
| May – 03 | $ 17,315,021 | $ 17,575,707 |
| June – 03 | $ 21,454,438 | $ 21,352,037 |
| July – 03 | $ 26,243,609 | $ 24,893,301 |
| August – 03 | $ 31,548,658 | $ 32,463,644 |
| September – 03 | $ 39,132,440 | $ 38,793,490 |
| October – 03 | $ 56,432,129 | $ 55,831,065 |
| November – 03 | $ 50,144,000 | $ 50,425,294 |
| December – 03 | $ 63,338,487 | $ 62,982,818 |
| January – 04 | $ 62,414,067 | $ 62,408,403 |
| February – 04 | $ 64,349,419 | $ 64,156,518 |
| March – 04 | $ 84,177,796 | $ 83,702,822 |
| April – 04 | $ 87,493,856 | $ 87,445,682 |

| Month | Deposits | Advances |
|---|---|---|
| May – 04 | $ 74,263,805 | $ 74,069,272 |
| June – 04 | $ 91,703,488 | $ 91,553,653 |
| July – 04 | $ 91,966,853 | $ 91,590,499 |
| August – 04 | $ 90,761,602 | $ 90,829,260 |
| September 15, 2004 | $ 41,190,439 | $ 37,152,378 |
| | | |
| **Total** | **$ 1,104,501,539** | **$ 1,124,835,256** |

(e)    **Inventory Misrepresentations**

69.    There were several ways in which the inventory was misrepresented since 1994. First, since 2000, Frank Miller and Maria Miller would instruct David Minardi, purchasing manager at Gitto Global, to change the identification of compounds being produced to more expensive ones.  Although the proper fabrication formula was followed, the lot number and description of the product were changed to indicate a different, more expensive product than the product actually contained in the package.  Minardi maintained a book in which these changes were recorded that he would give to Frank Miller and Maria Miller after the inventory was taken.

70.    Second, the product cost reflected in the valuation inventory would be overstated by Maria Miller instructing Robyn Merchant, Gitto Global's inventory control clerk, to increase the physical count on her monthly inventory reports and to increase the price of the product. Merchant would then generate a new report with the inflated counts and price.  As a result, Gitto Global would overstate the amount of expensive products and this overstatement, in turn, significantly inflated the value of Gitto Global's inventory.

71.    One of the inflated amounts involved the Viton B600 product.  In 2002, Guaranty Business Credit, Gitto Global's lender at that time, performed an inventory audit and discovered this overstatement and that the value of the inventory had been inflated in the borrowing base certificates submitted to it.

72.     The inventory values of Vitrolite products, a volcanic ash rylite material refined and sold to the plastics industry, was also changed every month by increasing the value of the products and pounds in inventory.  As time went on, the number of adjustments made at Maria Miller's direction increased and the higher value inventory was adjusted on a more consistent basis than lower value inventory.

73.     In or around 2002, the inventory adjustment procedure changed in that Maria Miller directed Merchant to talk to Deakin about whether the adjustments made per her direction were sufficient.  Deakin reviewed the adjustments and decided when the adjustments need to "go up" or "go down".  Merchant relayed Deakin's comments to Maria Miller who then made further adjustments based upon Deakin's review until both were satisfied that the inventory value was as it needed to be.

74.     Third, in or around the summer of 2003, Gitto Global purportedly acquired inventory known as Vitrolite from Hi-Tech Environmental Products LLC, n/k/a Vitrotech Corp., when Gitto Global bought that inventory through a series of promissory notes, under which no payments were ever intended.  The promissory notes were not reflected on Gitto Global's financial statements at Frank Miller's direction.  As a result, the purported Vitrolite purchase enabled Gitto Global to increase the inventory value under its borrowing base certificates submitted to LaSalle after June 30, 2003, which created an additional availability of $2-3 million under the Loan Agreement.

75.     On April 1, 2004, the purchase of the Vitrolite product was changed to a sale on consignment, but that change to eliminate the Vitrolite as inventory was not reflected on Gitto Global's books nor on the borrowing base certificates submitted to LaSalle.  Gitto Global continued to borrow against this inventory when it should have been excluded.

76.    Fourth, when LaSalle would perform an inventory audit after July 2002, Frank Miller would direct the movement of inventory from another company to Gitto Global's warehouse in order to misrepresent the amount of inventory on hand.  Or, inventory would be purchased early so that it could be on hand when the inventory count occurred.

**Daily Borrowing Base Certificate Fraud**

77.    The daily borrowing base certificates submitted to LaSalle were submitted by either Frank Miller or Deakin and then later, by Chaisson.  Before Chaisson submitted the certificates, either Frank Miller or Deakin reviewed them.  The borrowing base certificates included fictitious sales, as well as actual sales, and deposits from J&J Chemical, as well as deposits from actual customers.

78.    In order to support an increase in sales, Frank Miller or Deakin would process more fictitious sales by having Maria Miller issue a fictitious invoice and Childs prepare a fictitious bill of lading.  Once Frank Miller or Deakin approved the certificate, Chaisson submitted to LaSalle a summary of the sales for the day, which included fictitious sales from the Fictitious Customers, and the borrowing base certificates.  Frank Miller and Deakin told Chaisson to whom at LaSalle to submit the certificates.  When the borrowing base certificates were submitted via facsimile, Frank Miller's signature was affixed on them.

79.    The borrowing base certificates submitted to LaSalle were also submitted with fictitious inventory values.

80.    LaSalle relied upon the sales figures and inventory valuation in the borrowing base certificates to advance funds under the LaSalle revolving loan.

390253.1 042314-34311

**Check Kite Scheme**

81.    In April, 2001, J&J Chemical opened its checking account with Clinton Savings Bank.  The J&J Chemical Account was used as a mechanism to separate the fictitious receivables and inventory from the legitimate receivables and inventory.

82.    Clinton Savings Bank had a policy of allowing all of its business customers to "draw against uncollected funds" in an unlimited amount.

83.    Beginning with the opening of the J&J Chemical Account, the vast majority of checks deposited into the account came from Gitto Global and the vast majority written on the J&J Chemical Account were to Gitto Global.

84.    In April, 2002, Guaranty Business Credit became suspicious of the overstatement of inventory and started to reject checks drawn on Gitto Global's account at Guaranty Business Credit.  As a result, J&J Chemical checks were returned for insufficient funds and as a further result, Clinton Savings Bank required for six months until November, 2002, that J&J Chemical checks be paid only when there were sufficient funds in the J&J Chemical Account.

85.    To insure that the J&J Chemical Account had cleared funds in order for the check-kite scheme to continue to operate despite Clinton Savings Bank's control, Frank Miller wire transferred to J&J Chemical the sum of $250,000 on May 24, 2002, and $130,000 and $300,000 on November 13, 2002.  Similarly, Charles Gitto wire transferred $150,000 on June 4, 2002 and $150,000 on June 6, 2002 to the J&J Chemical Account.  And, Gary Gitto wire transferred $250,000 on May 24, 2002, $130,000 on June 4, 2002, $160,000 on June 5, 2002 and $100,000 on November 13, 2002 to the J&J Chemical Account.

86.    Once the LaSalle revolving loan was made, beginning in July, 2002 and continuing through September, 2004, Gitto Global, on a daily basis, deposited numerous checks

into the Fleet Blocked Account that they had purportedly received as payment on invoices for goods sold.

87.    Unbeknownst to LaSalle, the vast majority of these checks were drawn on the J&J Chemical Account at Clinton Savings Bank and bore the signature of John Tersigni. Between July, 2002 and September, 2004, over 600 J&J Chemical checks were deposited into the Fleet Blocked Account by Gitto Global.

88.    Fleet Bank, on a daily basis, without waiting until the J&J Chemical checks cleared, transferred the funds from the Fleet Blocked Account to the LaSalle Account, which LaSalle applied to pay down the LaSalle revolving loan.

89.    As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global.

90.    Each day, based on a daily borrowing base certificate, Frank Miller or Janice Chaisson requested an advance on the LaSalle revolving loan for Gitto Global.

91.    LaSalle advanced additional funds on the LaSalle revolving loan, relying on (a) the funds transferred from the Fleet Blocked Account and (b) the representations in the daily borrowing base certificates.

92.    From the LaSalle Account, Rita Bartlett, at the direction of Frank Miller or Deakin, prepared Gitto Global checks, payable to J&J Chemical between July, 2002 and September, 2004, which were deposited at Clinton Savings Bank in the J&J Chemical Account.

93.    In March, 2004, Frank Miller told Clinton Savings Bank that a purchase and sale agreement between Gitto Global and Vitrotech Corp. had been signed and that the transactions between J&J Chemical and Gitto Global involving the J&J Chemical Account were expected to "wind-down and close after the sale."

94. On June 30, 2004, Clinton Savings Bank agreed to pay checks presented against the J&J Chemical Account on uncollected funds until July 15, 2004, in part, based upon Gitto Global's execution of a guaranty and security agreement.

95. On July 23, 2004, Clinton Savings Bank provided J&J Chemical with an $8,400,000 credit line for the sole purpose of providing payment for checks drawn on the account. The line was only to be utilized if checks drawn against uncollected funds were returned.

96. To avoid Clinton Savings Bank suspending its policy of paying on checks deposited to the J&J Chemical Account before they cleared and thereby adversely affecting the operation of the check-kite, Charles Gitto confirmed at the July 23, 2004 closing that the J&J Chemical Account needed to be open in order to allow Gitto Global to be sold and "for everything to come together." Charles Gitto signed a limited, non-recourse guaranty, a security agreement on behalf of Tradex granting a security interest in certain inventory and a mortgage on the property occupied by Gitto Global, all which collateralized the credit agreement.

97. Gary Gitto also attended the July 23, 2004 closing and confirmed the strong desire for the sale to take place and that it "was important for them." Gary Gitto executed and delivered a limited non-recourse guaranty and wire transferred $500,000 that was deposited in an account at Clinton Savings Bank and pledged to the bank.

98. Frank Miller further executed and delivered an unlimited guaranty to Clinton Savings Bank and wire transferred $500,000 as collateral security to the bank in connection with the closing on July 23, 2004.

99. On August 10, 2004, Clinton Savings Bank agreed to extend the credit agreement to August 27, 2004, only if additional collateral was pledged.

100.    On August 18, 2004, Charles Gitto executed an extension letter and a guaranty. Gary Gitto executed an unlimited guaranty, and Frank Miller and Maria Miller executed a third mortgage on their Bolton residence in favor of Clinton Savings Bank in order to induce Clinton Savings Bank to extend the maturity date of the credit agreement preserving the check-kite scheme.

101.    In consideration of the security pledged by Gary Gitto and Charles Gitto, Clinton Savings Bank extended the credit agreement through September 15, 2004.

102.    Between September 13 and September 17, 2004, Janice Chaisson, at the direction of Frank Miller or Deakin, deposited over $12,000,000 in J&J Chemical checks made payable to Gitto Global into the Fleet Blocked Account and Fleet Bank wired those funds to LaSalle in three separate wire transfers.

103.    In reliance upon these deposits, and in response to Gitto Global's request for advances, LaSalle advanced approximately $4,000,000.

104.    When J&J Chemical did not pay the amount it owed under the credit agreement, on September 15, 2004, Clinton Savings Bank dishonored $11,890,588 in checks drawn on the J&J Chemical Account that Gitto Global had deposited in the Fleet Blocked Account and Fleet Bank returned the checks for insufficient funds resulting in an overdraft in the Fleet Blocked Account of $11,890,588, for which LaSalle was obligated.

**False Audit and Examination Information**

105.    In 1999, in order to generate phony checks to substantiate phony sales and fictitious invoices for auditors, Frank Miller bought a software program called "Versa Check Writer" and had it installed on Deakin's computer.  Deakin made out the checks and Frank Miller ensured that a signature was affixed on the checks.

106.    In 2001, Frank Miller had a scanner installed in his office, along with a software package called PaperPort Suite, which allowed the manipulation of scanned documents.  Using the scanner and software, John Moritz ("Moritz"), at one time Gitto Global's vice president of research and development, was able to alter various items on invoices and checks, including the terms, quantity and amount.  When bank examiners from Guaranty Business Credit and later LaSalle came to Gitto Global, Moritz would sit in Frank Miller's office and either Deakin or Frank Miller would bring him a copy of a document that they wanted altered.  Moritz would alter the document as requested, Deakin, Frank Miller and Maria Miller would review the altered document for accuracy and Frank Miller or Deakin, would provide the altered document to the examiner.  Moritz did this for the Fictitious Customers and J&J Chemical.  Afterwards, Moritz would shred the document.

107.    In initially considering whether to provide financing, LaSalle conducted a field audit at Gitto Global from May 15 to May 17, 2002.  At the time, Gitto Global provided financial information to LaSalle, including that accounts receivable was $22,065,600 and inventory was $6,131,202.

108.    Between July 23 and July 26, 2002, Alyssa Whelpley, a field examiner for LaSalle, conducted a take-out audit of Gitto Global's financial condition in order to bring the collateral information current for the closing of the revolving loan.

109.    On July 25, 2002, Frank Miller, in a series of conference calls in which Whelpley participated, purportedly called the top seven customers with account receivable balances to confirm the amount of each of their receivable in which Whelpley participated.  Those top seven included Hitachi, Zebulon, J-Tan, Velco and CCC.  The information provided in the conference calls was false.

110.    In further deciding to provide the financing, Gitto Global provided its audited financial statement as of June 30, 2001 prepared by Pellegrine, which Pellegrine represented was free of material misstatements.  That balance sheet showed accounts receivable of $21,375,595 and inventory of $6,677,095.

111.    As part of the July, 2002 take-out audit, Pellegrine furnished several financial records to LaSalle on which it relied.  He had prepared the 2001 Federal Income Tax Return for Hemisphere which showed no accounts payable as of June 30, 2002.  However, on July 5, 2002, Pellegrine obtained and furnished to LaSalle an account receivable confirmation purportedly from Hemisphere dated July 12, 2002 representing that as of June 30, 2002, Hemisphere owed Gitto Global $3,161,866.40.

112.    On July 25, 2002, from Massachusetts, Pellegrine obtained and faxed to LaSalle in New York, at Frank Miller's direction, account receivable confirmations purportedly from Zebulon showing a balance due of $2,960,058.43 and from Hitachi showing a balance due of $4,440,999.21 as of June 30, 2002.  Those sales were fictitious.

113.    LaSalle relied upon the representations made in the written and telephone confirmations, and the audited financial statement to begin its lending relationship with Gitto Global.

114.    The field examiners of LaSalle were also told by Deakin that J&J Chemical was paying Gitto Global on a COD basis, which was why there were daily checks.  Deakin never said that J&J Chemical was not selling any product.  He did, however, give them invoices showing that J&J Chemical was the supplier of Viton B-600 inventory, when it was not.  These invoices had been printed in blank by Frank Miller and Deakin would merely type in the information

based upon the material selected.  He would enter a quantity based on its unit price so that it equaled the amount of the check.

115.    Louis Pellegrine also prepared the Hemisphere Federal Tax Return for the period covering December 31, 2003, which showed no accounts payable owed Hemisphere.  Yet, in connection with LaSalle's February, 2004 field examination, on February 12, 2004, Pellegrine faxed from Massachusetts to LaSalle in New York a confirmation from Hemisphere representing that it owed Gitto Global $2,415,032.35 as of December 31, 2003.  He also faxed on February 12, 2004, at Frank Miller's direction, from Massachusetts to LaSalle in New York account receivable confirmations from Zebulon showing a balance due of $3,167,545.55, from Hitachi showing a balance due of $5,099,147.94, from J-Tan showing a balance due of $3,115,811.10, and from CCC showing a balance due of $2,537,868.53 as of December 31, 2003.  Pellegrine knew each of these sales confirmations was false.

116.    Louis Pellegrine knew that LaSalle would rely and was relying on the account receivable confirmations to advance funds on the LaSalle revolving loan.

117.    LaSalle relied upon the account receivable confirmations to advance funds on the LaSalle revolving loan.

**The Distribution of Funds**

118.    As set forth in the preceding paragraphs, Gitto Global obtained loan advances from LaSalle under false pretenses and transferred those fraudulently obtained funds to the following persons between July, 2002 through September, 2004:

> (a)    Gary Gitto: $2,874.644.41 in direct payments to him and to his company, Equitech Technologies, LLC for reimbursement of personal expenses charged to six Gitto Global company credit cards for vacations, clothing, a motorcycle, jewelry, furniture, dining and health/beauty spa services, club membership dues, an automobile lease, private school payments, car maintenance, golf fees and expenses charged by his boat captain;

- 27 -

(b)    Frank Miller and Maria Miller: $957,514.33, including payments for personal expenses charged to five Gitto Global credit cards for reimbursement for personal/lifestyle expenditures, insurance, and housing related expenses classified as "building maintenance", which included home heating and interior decorating;

(c)    Charles Gitto:  $1,964,258.91, including payments directly to him and his companies, Tradex and Tradex International.  These payments included personal expenses charged to four Gitto Global company credit cards and for personal/lifestyle expenditures and insurance; and

(d)    Louis Pellegrine:  $345,238.14 for performing little or no work for Gitto Global.

**Roles in the Submittal of False Borrowing Base Certificates**

119.    In the course of and in furtherance of their fraudulent schemes, Frank Miller and Maria Miller used, or caused to be used, in connection with conducting the affairs of Gitto Global, falsified borrowing base certificates between July, 2002 and September 2004.

120.    Frank Miller knowingly participated in the scheme by providing false information to LaSalle, for the purpose of obtaining funds from LaSalle under false pretenses.  Between July 25, 2002 and January 16, 2004, borrowing base certificates with Frank Miller's signature affixed were sent to LaSalle on a daily basis seeking fund advances, while Frank Miller knew that the sales inventory information and the collections information contained therein was false and that LaSalle would rely on that information in advancing funds under the LaSalle revolving loan.

121.    Maria Miller knowingly participated in the scheme by preparing false information to be provided to LaSalle.  Maria Miller knowingly entered data into the computer systems at Gitto Global relating to the Fictitious Customers in order to generate fictitious invoices.  Maria Miller knowingly directed Robyn Merchant to inflate the value of the inventory at Gitto Global by increasing the quantity or the price per pound of certain products.

122.    Each of the aforesaid activities, as well as others, was made or caused to be made by Frank Miller and Maria Miller as part of and in furtherance of the scheme to defraud LaSalle.

- 28 -

123.    Each of the aforesaid violations by Frank Miller and Maria Miller of the bank fraud statute, 18 U.S.C. § 1344, and by Frank Miller of the wire/mail fraud statute, 18 U.S.C. §1341 and 1343, constitutes an instance of racketeering activity as defined in 18 U.S.C. § 1961(1).

**Roles in the Check Kite Scheme**

124.    Between July, 2002 and September, 2004, Gary Gitto knowingly participated in the fraud scheme by his active involvement in the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

    (a)    Gary Gitto borrowed money from Charles Gitto to establish J&J Chemical to operate the check-kite.

    (b)    Gary Gitto provided funds to J&J Chemical in 2002 to allow the check-kite scheme to continue to operate.

    (c)    Gary Gitto attended the closing of the credit agreement between Clinton Savings Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account by providing a limited guaranty and pledging $500,000 as collateral security.

    (d)    Gary Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Savings Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

125.    Between July, 2002 and September, 2004, Frank Miller knowingly participated in the scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

    (a)    Frank Miller directed the check-kiting scheme continuously for over three years for the purpose of obtaining funds from LaSalle under false pretenses.

    (b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there were insufficient funds in the J&J Chemical Account to satisfy the checks.

- 29 -

(c)     Frank Miller on a daily basis directed that J&J Chemical checks be deposited in the Blocked Account.

(d)     Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections.

(e)     Frank Miller regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, (i) to the J&J Chemical Account, thereby completing the check-kite, and (ii) directly to him.

(f)     Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections from customers knowing that the deposits did not, in fact, represent collections.

(g)     Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(h)     Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales, inventory, and collections information contained therein was false and knowing that LaSalle would rely on that information in auditing the financial situation of Gitto Global.

(i)     Frank Miller attended the closing of the credit agreement between Clinton Bank and  J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account by providing a guaranty and a pledge of $500,000 as collateral security.

(j)     Frank Miller pledged a third mortgage on his Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

126.     Between July, 2002 and September, 2004, Maria Miller knowingly participated in the scheme by pledging a third mortgage on her Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

127.    Between July, 2002 and September, 2004, Charles Gitto knowingly participated in the scheme by perpetuating the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

(a)    Charles Gitto provided funds to J&J Chemical in 2002 to allow the check-kite scheme to continue to operate.

(b)    Charles Gitto attended the closing of the credit agreement between Clinton Bank and  J&J Chemical on July 23, 2004, and assisted J&J Chemical in negotiating the terms of the agreement, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(c)    Charles Gitto provided, on behalf of Tradex, a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory to secure J&J Chemical's debt to Clinton Bank in July of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

(d)    Charles Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

128.    Each of the aforesaid activities was made or caused to be made by Gary Gitto, Charles Gitto, Frank Miller, and Maria Miller as part of and in furtherance of the scheme to defraud LaSalle.

**Mail/Wire Fraud Employed During the Examinations and Audit**

129.    In the course of and in furtherance of their scheme to defraud LaSalle, described in the foregoing paragraphs, Frank Miller used, or caused to be used, in connection with conducting the affairs of Gitto Global, mail delivered by the United States Postal Service two or more times, including the five requests for confirmation sent on January 15, 2004 by Frank Miller, the confirmation sent on February 3, 2004 purportedly by Kathleen Carland and the confirmation sent on January 23, 2004 purportedly by John Tersigni.

390253.1 042314-34311

130.    In the course of and in furtherance of their scheme to defraud LaSalle, described in the foregoing paragraphs, Frank Miller also communicated, or caused communications to be made, in connection with conducting the affairs of Gitto Global, by interstate wire two or more times, including, the facsimile sent on July 25, 2002 from Louis Pellegrine, at the direction of Frank Miller, to LaSalle containing the July 11, 2002 confirmations of Zebulon and Hitachi; the facsimile sent on February 12, 2004 from Louis Pellegrine, at the direction of Frank Miller, to LaSalle containing the January and February confirmations of J-Tan, Hemisphere, Zebulon, Hitachi and CCC; and the daily borrowing base certificates sent via e-mail by Janice Chaisson, at the direction of Frank Miller, from January 17, 2004 to September 15, 2004 in furtherance of their efforts to defraud LaSalle.

131.    Louis Pellegrine knowingly participated in the schemes, described in the foregoing paragraphs, by using the mail and interstate wire communications to further the fraud by sending fictitious confirmations to LaSalle by facsimile transmission on July 25, 2002 and in February, 2004 at the request or under the direction of Frank Miller, knowing that the companies had not purchased any goods from Gitto Global, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in advancing funds under the LaSalle revolving loan.

132.    Each of the aforesaid communications, as well as others, was made or caused to be made by Frank Miller and Louis Pellegrine as part of and in furtherance of the scheme to defraud LaSalle.

133.    Each of the aforesaid violations by Frank Miller and Louis Pellegrine of the mail and wire fraud statutes (18 U.S.C. §§ 1341 and 1343) constitute an instance of racketeering activity as defined in 18 U.S.C. § 1961(1).

134.    The acts of racketeering activity performed, engaged in, and committed by Gary Gitto, Frank Miller, Maria Miller, Charles Gitto and Louis Pellegrine have caused substantial injury to LaSalle.  As a result, said activity constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

135.    By reason of the conduct described herein, LaSalle has been damaged in an amount in excess of $30,000,000.00, before trebling, the exact amount of which shall be proved at trial.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants, Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr. and Louis J. Pellegrine, Jr.:

A.    Compensatory damages in an amount exceeding $30,000,000.00, together with interest thereon;

B.    Treble damages for violation of RICO, together with interest thereon;

C.    An award of attorneys' fees;

D.    An award of costs and disbursement herein; and

E.    Such and further relief as may be just and equitable under the circumstances.

## COUNT II
## CIVIL CONSPIRACY TO DEFRAUD THROUGH CHECK-KITING SCHEME
(Against Gary C. Gitto, Frank Miller, Maria Miller,
Charles N. Gitto, Jr., Louis J. Pellegrine, Jr.)

136.    LaSalle restates and incorporates by reference the allegations contained in the foregoing paragraphs 1 through 26 and 38 through 117 as if set forth fully herein.

137.    Beginning in July, 2002, and continuing through September, 2004, Frank Miller, Maria Miller and Louis Pellegrine and others, Deakin, Chaisson, Kozak, Carland and Tersigni,

conspired to defraud LaSalle, misrepresented Gitto Global's business activities and gave false financial information concerning Gitto Global to LaSalle to induce LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan.

138.    Between July, 2002, and September, 2004, Gary Gitto, Frank Miller, Maria Miller and Charles Gitto directed and/or actively participated in a check-kiting scheme between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account in order to obtain funds from LaSalle to which they were not entitled.

139.    To further this check-kiting scheme, Frank Miller was involved in the creation of checks made payable to Gitto Global from the J&J Chemical Account at Clinton Savings Bank knowing there were insufficient funds to satisfy the checks in the J&J Chemical Account.

140.    Frank Miller caused the J&J Chemical checks to be deposited in the Fleet Blocked Account.

141.    Frank Miller represented to LaSalle that these funds from the J&J Chemical checks deposited in the Fleet Blocked Account were from various customers as payment for invoices.  Frank Miller and Maria Miller were involved in the creation of fictitious invoices, bills of lading and checks to support the representations to LaSalle, which were furnished to LaSalle's examiners at field examinations and audits.  In addition, Louis Pellegrine knowingly created letters falsely confirming the fictitious sales, which were furnished to LaSalle in connection with those examinations and audits.

142.    Between July, 2002, and September, 2004, Frank Miller and later at his direction, Janice Chaisson sent borrowing base certificates to LaSalle on a daily basis.  These borrowing

base certificates contained fictitious sales, collections and inventory figures for the purpose of inducing LaSalle to advance funds to Gitto Global under the LaSalle revolving loan.

143.    Between July, 2002, and September, 2004, Gary Gitto knowingly participated in the fraud scheme by participating in the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

(a)    Gary Gitto borrowed money from Charles Gitto to establish J&J Chemical to operate the check-kite.

(b)    Gary Gitto provided funds to J&J Chemical in 2002 to allow the check-kite scheme to continue to operate.

(c)    Gary Gitto attended the closing of the credit agreement between Clinton Bank and  J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account by providing a limited guaranty and pledging $500,000 as collateral security.

(d)    Gary Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

144.    Between July, 2002 and September, 2004, Frank Miller knowingly participated in the scheme by directing the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account.  In doing this:

(a)    Frank Miller directed the check-kiting scheme continuously for over three years for the purpose of obtaining funds from LaSalle under false pretenses.

(b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there were insufficient funds in the J&J Chemical Account to satisfy the checks.

(c)    Frank Miller on a daily basis directed that J&J Chemical checks be deposited in the Fleet Blocked Account.

(d)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections.

(e)    Frank Miller regularly directed the transfer of funds from the LaSalle disbursement account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, (i) to the J&J Chemical Account, thereby completing the check-kite, and (ii) directly to him.

(f)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections from customers knowing that the deposits did not, in fact, represent collections.

(g)    Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(h)    Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales, inventory, and collections information contained therein was false and knowing that LaSalle would rely on that information in auditing the financial situation of Gitto Global.

(i)    Frank Miller attended the closing of the credit agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account by providing a pledge of $500,000 as collateral security.

(j)    Frank Miller pledged a third mortgage on his Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

145.    Between July, 2002 and September, 2004, Maria Miller knowingly participated in the check-kite conspiracy to defraud LaSalle as follows:

(a)    Maria Miller directed Robyn Merchant to adjust the quantities or prices of certain inventory items in order to inflate the value of those items, while knowing those values would be provided to LaSalle and knowing LaSalle would rely on the inventory valuations in determining whether to advance funds to Gitto Global.

(b)    Maria Miller knowingly entered false data into the computer relating to fictitious sales to the Fictitious Customers in order to generate fictitious invoices, while knowing LaSalle would rely on information relating to sales in determining whether to advance funds to Gitto Global.

(c)    Maria Miller pledged a third mortgage on her Bolton residence to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to

extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

146.    Between July, 2002 and September, 2004, Charles Gitto knowingly participated in the check-kite scheme by perpetuating the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account. In doing this:

   (a)    Charles Gitto provided funds to J&J Chemical in 2002 to allow the check-kite scheme to continue to operate.

   (b)    Charles Gitto attended the closing of the credit agreement between Clinton Bank and J&J Chemical on July 23, 2004, and assisted J&J Chemical in negotiating the terms of the agreement, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

   (c)    Charles Gitto provided, on behalf of Tradex, a limited non-recourse guarantee, a mortgage on the property occupied by Gitto Global and a security interest in certain inventory to secure J&J Chemical's debt to Clinton Bank in July of 2004, in order to extend the revolving line of credit for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

   (d)    Charles Gitto provided a personal unlimited guarantee to secure J&J Chemical's debt to Clinton Bank in August of 2004, in order to extend the credit agreement for J&J Chemical and to keep the check-kite operating through the J&J Chemical Account.

147.    Between July, 2002 and September 15, 2004, Louis Pellegrine knowingly participated in the check-kite conspiracy to defraud LaSalle as follows:

   (a)    Louis Pellegrine, in July, 2002 and February, 2004, knowingly sent and delivered fictitious confirmations to LaSalle in which Gitto Global's accounts receivable balances were misrepresented, while knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

   (b)    Louis Pellegrine sent the fictitious confirmations to LaSalle, while knowing that the companies contained therein had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

- 37 -

148.    LaSalle continued to advance funds to Gitto Global under the LaSalle revolving loan on a regular basis in reliance upon the deposits made in the Fleet Blocked Account of J&J Chemical checks that reduced the outstanding loan balance and subsequently, representations made in the confirmations and the borrowing base certificates to make new advances on the LaSalle revolving loan.

149.    Gitto Global has not repaid LaSalle the amount LaSalle loaned to Gitto Global.

150.    As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $32,234,053.00, plus interest and costs.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants, Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., and Louis J. Pellegrine, Jr.:

A.    Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

B.    Punitive damages;

C.    An award of attorneys' fees;

D.    An award of costs and disbursement herein; and

E.    Such and further relief as may be just and equitable under the circumstances.

### COUNT III
### USE OF DECEPTIVE TRADE PRACTICES
### IN VIOLATION OF MASS. GEN. L. c. 93 A, § 2
(Against Frank Miller, Maria Miller and Louis J. Pellegrine, Jr.,)

151.    LaSalle restates and incorporates by reference the allegations contained in the foregoing paragraphs 1 through 26 and 38 through 117 as if set forth fully herein.

152.    Beginning in July, 2002, and continuing through September, 2004, Frank Miller, Maria Miller and Louis Pellegrine used deceptive trade practices, in violation of Mass. Gen. L. c. 93 A, §2, to induce LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan.

153.    LaSalle engages in the conduct of trade and commerce as a lending institution.

154.    Frank Miller, Maria Miller and Louis Pellegrine are persons under the Deceptive Trade Practices Act, Mass. Gen. L. c. 93 A, §2.

155.    Frank Miller, Maria Miller and Louis Pellegrine were engaged in trade or commerce in that they acted in connection with and to further a commercial loan arrangement between LaSalle and Gitto Global.

156.    Frank Miller, Maria Miller and Louis Pellegrine used unfair or deceptive acts or practices declared unlawful under Section 2 of the Deceptive Trade Practices Act.

157.    Between May, 2002 and September, 2004, Frank Miller knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

    (a)    Frank Miller directed the check-kiting activities between the J&J Chemical Account, the Fleet Blocked Account and the LaSalle Account continuously for three years for the purpose of obtaining funds from LaSalle under false pretenses.

    (b)    Frank Miller regularly directed that checks be made payable to Gitto Global, drawn from the J&J Chemical Account, knowing that there were insufficient funds in the J&J Chemical Account to satisfy the checks.

    (c)    Frank Miller on a daily basis directed the J&J Chemical checks to be deposited in the Fleet Blocked Account.

    (d)    Frank Miller directed that the amount of the J&J Chemical deposits be reflected on the borrowing base certificates representing Gitto Global's collections knowing that the deposits did not, in fact, represent collections.

(e)     Frank Miller regularly directed the transfer of funds from the LaSalle Account, advanced by LaSalle in reliance on the borrowing base certificates and the deposits in the Fleet Blocked Account, to the J&J Chemical Account, thereby completing the check kite.

(f)     Frank Miller regularly directed that funds obtained from LaSalle by false pretenses be paid to him directly.

(g)     Frank Miller sent borrowing base certificates to LaSalle on a daily basis from July 25, 2002 to January 16, 2004 seeking fund advances, while knowing that the sales information contained therein was false, knowing the that the inventory information contained therein was false, knowing that the collections information contained therein was false and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

(h)     Frank Miller knowingly sent sham requests for fictitious confirmations of invoices to J-Tan, Hitachi, Velco, Hemisphere and Zebulon knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

(i)     Frank Miller sent these requests for fictitious confirmations knowing that the companies to which they were sent had not purchased any goods from Gitto Global, while knowing the invoices prepared by Gitto Global at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global, knowing that the fictitious confirmations would be sent to LaSalle, and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

(j)     Frank Miller directed Louis Pellegrine to send fictitious confirmations to LaSalle knowing that the companies named therein had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

158.     Between May, 2002 and September, 2004, Maria Miller knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Maria Miller directed Robyn Merchant to adjust the quantities or prices of certain inventory items in order to inflate the value of those items, while knowing those values would be provided to LaSalle and knowing LaSalle

would rely on the inventory valuations in determining whether to advance funds to Gitto Global.

(b)     Maria Miller knowingly entered false data into the computer relating to fictitious sales to the Fictitious Customers in order to generate fictitious invoices while knowing LaSalle would rely on information relating to sales in determining whether to advance funds to Gitto Global.

159.    Between July, 2002 and September 15, 2004, Louis Pellegrine knowingly used deceptive acts and practices for the purpose of inducing LaSalle to enter into a Loan and Security Agreement with Gitto Global and to advance funds under the LaSalle revolving loan as follows:

(a)     Louis Pellegrine, in July, 2002 and February, 2004, knowingly sent and delivered fictitious confirmations to LaSalle in which Gitto Global's account receivable balances were misrepresented knowing that LaSalle would rely on the confirmations in determining whether to advance funds to Gitto Global.

(b)     Louis Pellegrine sent the fictitious confirmations to LaSalle while knowing that the companies purporting to submit them had not purchased any goods from Gitto Global, knowing the invoices prepared by Gitto Global, at the direction of Frank Miller or Gary Gitto were false, knowing that none of the companies owed money to Gitto Global and knowing that LaSalle would rely on the information contained therein in auditing the financial situation of Gitto Global.

160.    In reliance on the false representations made to LaSalle by Frank Miller, Maria Miller and Louis Pellegrine, LaSalle entered into a Loan and Security Agreement with Gitto Global and LaSalle continued to advance funds to Gitto Global on a regular basis.

161.    As a result of the unfair or deceptive act or practices used by Frank Miller, Maria Miller and Louis Pellegrine, LaSalle entered into the Loan Agreement with Gitto Global and advanced funds to Gitto Global under the LaSalle revolving loan.

162.    Gitto Global has not repaid LaSalle the amounts LaSalle loaned to Gitto Global.

163.    As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $32,224,053.00, plus interest and costs.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants Frank Miller, Maria Miller and Louis J. Pellegrine, Jr.:

A. Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

B. Treble damages for knowing violation of Mass. Gen. L. c. 93A §2.

C. An award of attorneys' fees;

D. An award of costs and disbursement herein; and

E. Such and further relief as may be just and equitable under the circumstances.

## COUNT IV
## CIVIL CONSPIRACY TO DEFRAUD
(Against Gary C. Gitto, Frank Miller, Maria Miller,
Charles N. Gitto, Jr., and Louis J. Pellegrine, Jr.,)

164.    LaSalle restates and incorporates by reference the allegations contained in the foregoing paragraphs 1 through 26 and 38 through 117 as if set forth fully herein.

165.    Beginning in July, 2002, and continuing through September, 2004, Gary Gitto, Frank Miller, Maria Miller, Charles Gitto and Louis Pellegrine, participated in a civil conspiracy to obtain money from LaSalle through the LaSalle revolving loan made under false pretenses to Gitto Global.

166.    In furtherance of the civil conspiracy, Frank Miller directed a check-kiting scheme between the Fleet Blocked Account, the LaSalle Account and the J&J Chemical Account.

167.    Between July, 2002 and September, 2004, on a daily basis and in furtherance of the check-kiting scheme, checks were issued from J&J Chemical payable to Gitto Global by or at the direction of Frank Miller and William Deakin; checks were issued from Gitto Global payable

to J&J Chemical by or at the direction of Frank Miller, and William Deakin; fictitious invoices and bills of lading were created to conceal the check-kite by or at the direction of Frank Miller and Maria Miller and others.

168.    Between July, 2002 and September, 2004, on a daily basis and in furtherance of the conspiracy, Frank Miller and Janice Chaisson, at the direction Frank Miller, prepared borrowing base certificates on behalf of Gitto Global, which they knew contained misrepresentations, seeking an advance of funds from LaSalle.  The borrowing base certificates contained misrepresentations regarding Gitto Global's collections, sales and inventory.

169.    Between July, 2002 and September, 2004, and in furtherance of the civil conspiracy, Maria Miller, at the direction of Frank Miller, directed Robyn Merchant to alter the quantities and/or price per pound of certain inventory items to inflate the value of the inventory Gitto Global represented to LaSalle.

170.    In furtherance of the civil conspiracy and at the direction of Frank Miller and Louis Pellegrine created a fictitious customer, Hemisphere; represented that Hemisphere, Zebulon, CCC, J-Tan, Velco and Hitachi were the largest customers of Gitto Global; created invoices and bills of lading purporting to evidence sales to these alleged customers; created false confirmations of accounts receivable balances from the purported customers; and created checks purporting to evidence payments from the alleged customers.

171.    In furtherance of the civil conspiracy and at the direction of Frank Miller and William Deakin, Janice Chaisson kept two sets of books to keep track of the real corporate activity versus the fictitious activity of the civil conspiracy.

172.    Charles Gitto, with knowledge that Gitto Global was misrepresenting its accounts receivable to LaSalle and in furtherance of the civil conspiracy, assisted in the maintenance of

the J&J Chemical Account for the check-kite in 2002 and 2004 by providing funds, a personal guaranty and causing Tradex to provide a guarantee, mortgage and security interest in certain inventory to Clinton Savings Bank.

173.    Gary Gitto, without knowledge the Gitto Global was misrepresenting its accounts receivables and inventory to LaSalle and in furtherance of the civil conspiracy, assisted in the maintenance of the J&J Chemical Account for the check-kite in 2002 and 2004 by providing funds and an unlimited guaranty to Clinton Savings Bank.

174.    Charles Gitto benefited from the conspiracy by receiving proceeds of the conspiracy, directly and through Tradex and Tradex International, of $1,964,258.91, knowing that he was not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

175.    Gary Gitto benefited from the conspiracy by receiving proceeds of the conspiracy, directly and through Equitech Technologies LLC, of $2,874,644.41, knowing that he was not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

176.    Frank Miller and Maria Miller benefited from the conspiracy by receiving proceeds of the conspiracy of $957,514.33, knowing that they were not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

177.    Pellegrine benefited from the conspiracy by receiving proceeds of the conspiracy of $345,238.14, knowing that he was not entitled to those payments and knowing that the funds derived from the proceeds of the civil conspiracy.

178.    As of December 2, 2004, there is due and owing to LaSalle from Gitto Global $32,224,053.00, plus interest and costs.

390253.1 042314-34311

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendants Gary C. Gitto, Frank Miller, Maria Miller, Charles N. Gitto, Jr., and Louis J. Pellegrine, Jr.,:

    A.    Compensatory damages in an amount exceeding $30,000,000, together with interest thereon;

    B.    Punitive damages;

    C.    An award of attorneys' fees;

    D.    An award of costs and disbursement herein; and

    E.    Such and further relief as may be just and equitable under the circumstances.

### COUNT V
### BREACH OF GUARANTY
(Against Gary C. Gitto)

179.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

180.    As alleged above, on or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan to Gitto Global.

181.    As part of the Loan and Security Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, and a Term Note in the original principal sum of $3,000,000.

182.    In consideration of the credit being extended by LaSalle to Gitto Global, Gary Gitto executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities.

183.    On September 26, 2004, Gitto Global declared bankruptcy.

390253.1 042314-34311

184. LaSalle is the owner and holder of the Revolving Note, the Term Note, Loan and Security Agreement, the Gary Gitto Limited Guaranty and all rights thereunder.

185. As of October 13, 2004, there was due and owing (a) under the LaSalle revolving loan, principal of $18,803,353.61, interest of $34,062.77 and interest continues to accrue at the per diem rate of $2,611.58, (b) under the LaSalle term loan, principal of $833,333.42, interest of $1,984.39 and interest continues to accrue at the per diem rate of $156.25 and (c) overdraft of $11,890,588.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendant, Gary C. Gitto:

      A.     Judgment in the amount of $3,000,000 against Gary C. Gitto;

      B.     An award of attorneys' fees;

      C.     An award of costs and disbursement herein; and

      D.     Such and further relief as may be just and equitable under the circumstances.

**COUNT VI**
**BREACH OF GUARANTY**
(Against Frank Miller)

186. LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

187. As alleged above, on or about July 25, 2002, LaSalle and Gitto Global entered into a Loan and Security Agreement, wherein LaSalle made a revolving loan to Gitto Global.

188. As part of the Loan and Security Agreement, Gitto Global executed and delivered to LaSalle a Revolving Note in the original principal sum of $27,000,000, and a Term Note in the original principal sum of $3,000,000.

189.    In consideration of the credit being extended by LaSalle to Gitto Global, Frank Miller executed and delivered to LaSalle a Limited Guaranty in the amount of $3,000,000, plus all court costs and reasonable attorneys' and paralegals' fees paid or incurred by LaSalle in collecting Gitto Global's liabilities.

190.    On September 26, 2004, Gitto Global declared bankruptcy.

191.    LaSalle is the owner and holder of the Revolving Note, the Term Note, Loan and Security Agreement, and the Frank Miller Limited Guaranty and all rights thereunder.

192.    As of October 13, 2004, there is due and owing (a) under the LaSalle revolving loan, principal of $18,803,353.61, interest of $34,062.77 and interest continues to accrue at the per diem rate of $2,611.58, (b) under the LaSalle term loan, principal of $833,333.42, interest of $1,984.39 and interest continues to accrue at the per diem rate of $156.25 and (c) overdraft of $11,890,588.

WHEREFORE, Plaintiff, LaSalle Business Credit, LLC, prays for the following relief against Defendant, Frank Miller:

A.    Judgment in the amount of $3,000,000 against Frank Miller;

B.    An award of attorneys' fees;

C.    An award of costs and disbursement herein; and

D.    Such and further relief as may be just and equitable under the circumstances.

## COUNT VII
## TRUSTEE PROCESS
(Against Legg Mason, Inc. – Charles N. Gitto, Jr.)

193.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

- 47 -

194.    On information and belief, Legg Mason possesses or controls goods, effect or credits of defendant Charles Gitto.

195.    LaSalle requests this Court enter judgment adjudging Legg Mason trustee of the goods, effects and credits of defendant Charles Gitto in an amount to be determined by the Court and charging the trustee in such amount to be applied towards any judgment obtained against Charles Gitto in this action.

### COUNT VIII
### REACH AND APPLY
(Gitto Sales Corporation)

196.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

197.    On information and belief, defendant Gary Gitto has an interest in Gitto Sales Corporation.

198.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Gitto Sales Corporation and Gary Gitto's interest in Gitto Sales Corporation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

199.    LaSalle requests that this Court enter judgment establishing Gary C. Gitto's right and interests in and to Gitto Sales Corporation and order that such rights and interests be reached and applied towards payment of judgment in this action.

### COUNT IX
### REACH AND APPLY
(AWG, LLC)

200.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

390253.1 042314-34311

201.    On information and belief, defendant Gary Gitto has an interest in AWG, LLC.

202.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by AWG, LLC and Gitto's interest in AWG, LLC are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

203.    LaSalle requests that this Court enter judgment establishing Gary C. Gitto's right and interests in and to AWG, LLC and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT X
## REACH AND APPLY
### (Superior Polymers Corporation)

204.    LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

205.    On information and belief, defendant Gary Gitto has an interest in Superior Polymers Corporation.

206.    On information and belief, the money, property or payments that may be paid or distributed to defendant Gary Gitto by Superior Polymers Corporation and Gary Gitto's interest in Superior Polymers Corporation are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

207.    LaSalle requests that this Court enter judgment establishing Gary Gitto's right and interests in and to Superior Polymers Corporation and order that such rights and interests be reached and applied towards payment of judgment in this action.

390253.1 042314-34311

## COUNT XI
## REACH AND APPLY
(Legg Mason, Inc.)

208.   LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

209.   On information and belief, defendant Charles Gitto has an interest in Legg Mason.

210.   On information and belief, the money, property or payments that may be paid or distributed to defendant Charles Gitto by Legg Mason are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reached and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

211.   LaSalle requests that this Court enter judgment establishing Charles Gitto's right and interests in and to Legg Mason, Inc. and order that such rights and interests be reached and applied towards payment of judgment in this action.

## COUNT XII
## REACH AND APPLY
(Tradex)

212.   LaSalle restates and incorporates by reference the allegations contained in the previous paragraphs as if set forth fully herein.

213.   On information and belief, defendant Charles Gitto has an interest in Tradex.

214.   On information and belief, the money, property or payments that may be paid or distributed to defendant Charles Gitto by Tradex are not subject to attachment or by an execution in this action at law, but should be equitably attached and charged for the benefit of LaSalle and be reachyed and applied towards payment of judgment in this action, pursuant to Mass. Gen. L. c. 214, § 3(6) and (7).

215.    LaSalle requests that this Court enter judgment establishing Charles Gitto's right and interests in and to Tradex and order that such rights and interests be reached and applied towards payment of judgment in this action.

Dated:  October 25, 2006                          Respectfully submitted,

                                                  LASALLE BUSINESS CREDIT, LLC


                                                  By:  _____/s/ Richard A. Sugarman_____
                                                          One of its attorneys

Christopher J. Panos (BBO# 555273)
Richard A. Sugarman (BBO# 646791)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2006.

                                                  /s/ Richard A. Sugarman_____

390253.1 042314-34311